# Exhibit A

18438PROV (FAC)

## CROSS-LINKED COHESIVE HYALURONIC ACID WITH LIDOCAINE GEL
By Inventor Pierre Lebreton

5   The present invention generally relates to injectable soft tissue fillers and more specifically relates to hyaluronic acid-based dermal and subdermal fillers including lidocaine gel.

As a person ages, the face begins to show the effects of gravity, sun-exposure, and years of facial muscle movement, such as smiling, frowning, chewing and squinting.  The underlying tissues that keep the skin appearing youthful begin to break down, often resulting in laugh lines,
10   smile lines, "crow's feet" and facial creases.

Soft tissue fillers have been developed to help fill in facial lines and depressions, and for restoring volume of tissues due to fat loss, thereby temporarily restoring a smoother, more youthful appearance.

15

Ideally, a filler will be long-lasting, soft, smooth and natural appearing when implanted in the skin or beneath the skin.  Further, the filler will be easy to implant into a patient using a fine gauge needle and will require low extrusion force for injection.   Ideal fillers would also cause no adverse reaction of effects, and would be injectable with minimal or no discomfort to the patient.

20

For more than 20 years, bovine collagen-based fillers were the only U.S. Food and Drug Administration (FDA)-approved dermal fillers.  Because these dermal fillers are bovine based, one of the main disadvantages has been the potential for allergic reaction in patients.  It is believed that approximately 3-5% of human subjects show serious allergic reactions to bovine
25   collagen, thus requiring careful testing before using these fillers in any particular person. In February 2003, human derived collagens received FDA approval.  These collagens provide the advantaged a significantly reduced risk of allergic reactions.

The search for fillers that do not provoke allergic reactions has brought about the
30   development of hyaluronic acid (HA)-based products.  In December 2003, the first HA-based filler was approved by the FDA.  This was soon followed by other HA-based fillers.

Hyaluronic acid, also known as hyaluronan, is a naturally occurring, water soluble polysaccharide, specifically a glycosaminoglycan, which is a major component of the extra-cellular matrix and is widely distributed in animal tissues. Hyaluronic acid has excellent
5   biocompatibility and does not cause allergic reaction when implanted into a patient. In addition, hyaluronic acid has the ability to bind to large amounts of water, making it an excellent volumizer of soft tissues.

The development of HA-based fillers which exhibit ideal *in vivo* properties as well as
10   ideal surgical usability has proven difficult. For example, HA-based fillers that exhibit desirable stability properties *in vivo*, can be so highly viscous that injection through fine gauge needles is difficult. Conversely, HA-based fillers that are relatively easily injected through fine gauge needles often have relatively inferior stability properties *in vivo*.

15   Crosslinked HA is formed by reacting uncrosslinked HA with a crosslinking agent under suitable reaction conditions. Methods of preparing HA based soft tissue fillers including both crosslinked and uncrosslinked HA are well known.

It has been proposed to incorporate certain therapeutic agents, for example, anesthetic
20   agents such as lidocaine, into injectable HA-based compositions. Unfortunately, HA-based injectable compositions which incorporate lidocaine during the manufacturing process are prone to partial or almost complete degradation prior to injection, particularly during high temperature sterilization steps and/or when placed in storage for any significant length of time.

25   Sadozai et al., U.S. Patent Application Publication No. 2005/0136122, discloses a process for making an HA-based composition including lidocaine which includes hydrating dried HA particles with a phosphate buffer containing lidocaine.

Wohlrab, U.S. Patent Application Publication No. 2006/0122147 discloses a combination
30   preparation comprising hyaluronic acid and a local anesthetic for example lidocaine, and further

additives.   The preparations are used in the medical treatment of diseases of the joints, cartilage and bones.

5       Romeo et al., U.S. Patent No. 6,224,857 discloses pharmaceutical preparations containing salts of hyaluronic acid with a basis anesthetic, particularly, salts with benzydamine or bupuvacaine.

        Additional helpful information may be found in the following: U.S. Patent No. 5,143,724, U.S. Patent No. 5,356,883 and U.S. Patent No. 6,013,679.

10

        The entire disclosure of each of the patents and publications cited in the present patent application is incorporated herein by this specific reference.

DESCRIPTION OF THE INVENTION

15

        The present invention generally relates to soft tissue fillers, for example, dermal and subdermal fillers, based on hyaluronic acids (HA) and pharmaceutically acceptable salts of HA, for example, sodium hyaluronate.   In one aspect of the invention, HA-based compositions including a therapeutically effective amount of an anesthetic agent, for example, lidocaine, are

20      provided.   The present HA-based compositions including lidocaine have an enhanced stability, relative to conventional HA-based compositions including lidocaine, for example when subjected to high temperatures and pressures, for example, those experienced during heat and/or pressure sterilization techniques, for example, autoclaving, and/or for example, when stored at ambient temperature for at least 2 years. Methods or processes of preparing such HA-based

25      compositions are also provided as well as products made by such methods or processes.

        Generally, concentration of sodium hyaluronate in the compositions of the present invention is preferably at least 10mg/ml and up to about 40 mg/ml.   For example, the concentration of NaHA in some of the compositions is in a range between about 20 mg/ml and

30      about 30 mg/ml.   For example, in some embodiments, the compositions have a NaHA concentration of about 22 mg/ml, about 24 mg/ml, about 26mg/ml, or about 28mg/ml.   In

addition, the concentration of lidocaine, for example in the form of lidocaine HCl, is in an amount of between about 0.1% and about 5%, or in any suitable amount effective to mitigate pain experienced upon injection of the composition.

5        In one aspect of the invention, a method is provided for preparing a HA-based composition including and effective amount of lidocaine wherein the method comprises providing a precursor composition comprising a cohesive crosslinked HA-based gel, adding a solution containing lidocaine HCl thereto and homogenizing the mixture to obtain a cohesive, at least partially crosslinked HA-based composition including lidocaine that is stable to

10      autoclaving.  More specifically, the cohesive, crosslinked HA-based gel includes substantially no uncrosslinked HA carrier, and is substantially monophasic in nature.  For example, the gel comprises no greater than about 1% of uncrosslinked HA by volume.

         Without wishing to be bound by any particular theory of operability, it is believed that the

15      high cohesivity of the precursor composition acts to substantially or entirely prevent or impede any breakdown or degradation of the crosslinked HA in the composition with the addition of lidocaine HCl.  This is in contrast to conventional knowledge in the art which has recognized that the addition of lidocaine HCl to crosslinked HA-based gels causes degradation, for example, complete degradation, of the crosslinked HA gel, including loss of viscosity and possibly loss of

20      stability *in vivo*.

         It is believed by the inventor of the present invention that such degradation may primarily occur because many, perhaps most crosslinked HA based gels are conventionally manufactured in a manner that produces gels which are "biphasic" in nature, and are not sufficiently cohesive

25      to prevent such degradation when lidocaine HCl is added.  It has now been discovered that the addition of lidocaine HCl to sufficiently cohesive crosslinked HA-based compositions does not cause any substantial or significant degradation of the compositions, and the compositions maintain their integrity, in terms of rheology, viscosity, appearance and other characteristics even when stored for a lengthy period of time and even when subjected to heat and pressure

30      sterilization, for example, autoclaving.

It is a surprising discovery that highly cohesive, monophasic formulations of crosslinked HA-based compositions including lidocaine can be manufactured in a manner to produce autoclave-stable, injectable HA/lidocaine compositions.

5        In another aspect of the invention, a method of preparing a stable HA-based composition containing an effective amount of lidocaine comprises preparing a cohesive, monophasic, crosslinked HA-based gel, adding lidocaine chlorhydrate to the gel to form a HA/lidocaine gel mixture, homogenizing the mixture, to obtain a crosslinked HA-based composition that is stable to autoclaving.

10

        In a more specific aspect of the invention, a method of preparing a stable HA-based composition containing an effective amount of lidocaine generally comprises the steps of providing purified sodium hyaluronate (NaHA) material, for example, in the form of fibers, hydrating the material, and crosslinking the hydrated material with a suitable crosslinking agent

15    to form an effectively cohesive, crosslinked HA-based gel.  The method further comprises the steps of neutralizing the gel and adding to the gel a solution containing lidocaine, preferably an acidic salt of lidocaine, for example, lidocaine chlorhydrate, to form a HA/lidocaine gel.  The method further comprises homogenizing the HA/lidocaine gel and packaging the homogenized HA/lidocaine gel, for example, in syringes for dispensing.  The syringes are then sterilized, for

20    example by autoclaving at an effective temperature and pressure.   In accordance with the invention, the packaged, sterilized NaHA/lidocaine gel exhibits enhanced stability relative to HA-based compositions including lidocaine which are made using conventional methods and relatively less cohesive, or biphasic HA-based compositions.

25        Without being limited thereto, stabilized HA/lidocaine compositions in accordance with the present invention include cross-linked HA-based compositions and at least partially cross-linked HA-based compositions.

        The term "autoclave stable" or "stable to autoclaving" in the context of the present

30    invention is generally meant herein to mean that the product, or composition, is resistant to degradation such that the product or composition maintains at least one of, and preferably all of,

the following aspects after effective autoclave sterilization: transparent appearance, acceptable pH, acceptable extrusion force and/or rheological characteristics, acceptable NaHA concentration, acceptable sterility, acceptable osmolarity, and acceptable lidocaine concentration. Further, the present products and compositions are considered to be "stable" within the scope of

5   the invention when exposed to temperatures of at least about 120 degrees C to about 130 degrees C and/or pressures of at least about 3 bars during autoclaving for a period of at least about 1 minute to about 15 minutes. Preferably, the present compositions remain stable for a period of at least about 2 months, for example, at least about 6 months, more preferably at least about 12 months, more preferably at least about 36 months, at temperatures of at least  25 degrees C.  In a

10  specific embodiment, the compositions are stable at a temperature up to about 45 degrees C for a period of at least two months.

In a specific embodiment, the manufacturing process of the present invention includes the initial step of providing raw HA material, for example in the form of dry HA fibers or powder.

15  The raw HA material may be hyaluronic acid, its salts and/or mixtures thereof.   In a preferred embodiment, the HA material comprises fibers or powder of sodium hyaluronate (NaHA), and even more preferably, bacterial-sourced sodium hyaluronate.   In other embodiments, the HA material may be animal derived.  In some embodiments, the HA material is a combination of raw materials including HA and at least one other polysaccharide, for example, glycosaminoglycan

20  (GAG).

In accordance with the present disclosure, high molecular weight HA is understood to mean that the HA material has a molecular weight of at least about 1.0 million Daltons (mw $\geq$ $10^6$ Da ) to about 4.0 million Da (mw 4 X $10^6$ Da).  For example, the high molecular weight HA

25  in the present compositions may have a molecular weight of about 2.0 million Da (Mw 2 X $10^6$ Da).  In another example, the high molecular weight HA may have a molecular weight of about 2.8 million Da (Mw 2.8 x $10^6$ Da).

In addition, for purposes of the present disclosure, relatively low molecular weight HA

30  may have a relatively lower molecular weight, for example, a molecular weight of less than 1.0 million Da.  In some embodiments, the relatively low molecular weight HA has a molecular

weight of between about 200,000 Da (mw $0.2 \times 10^6$ Da ) to less than 1.0 million Da, (mw less than $10^6$ Da ), for example, between about 300,000 Da ( $0.3 \times 10^6$ Da ) to about 750,000 Da. (mw $0.75 \times 10^6$ Da ).

5        In some embodiments of the invention, the HA material in the compositions nearly entirely comprises or consists of high molecular weight HA. That is, nearly 100% of the HA material in the present compositions may be high molecular weight HA as defined above.

        In other embodiments of the invention, the HA material in the compositions comprises a
10   combination of relatively high molecular weight HA and relatively low molecular weight HA, as defined above.

        For example, in some embodiments, the HA material of the compositions comprises between about 5% to about 95% high molecular weight HA with the balance of the HA material
15   comprising or consisting of low molecular weight HA. In a typical embodiment of the invention, the ratio of high molecular weight to low molecular weight HA is at least about, and preferably greater than 2 (that means:  Mw HMw / Mw LMw $\geq$ 2) with the high molecular weight HA having a molecular weight of above 1.0 million Da.

20        It will be appreciated by those of skill in the art that the selection of high and low molecular weight HA material and their relative percentages or ratios is made dependent upon the desired characteristics, for example, extrusion force, elastic modulus and/or viscous modulus and/or phase angle expressed as the ration of viscous modulus to elastic modulus, cohesivity, etc. of the final HA-based product. For additional information that may be helpful in understanding
25   this and other aspects of the present invention, see Lebreton, U.S. Patent Application Publication No. 2006/0194758, the entire disclosure of which is incorporated herein by this reference.

        Typically, raw HA material is cleaned and purified. These steps generally involved hydrating the dry HA fibers in the desired high/low molecular weight ratio, for example, using
30   pure water, and filtering the material to remove large foreign matters and other impurities. The filtered, hydrated material is then dried and purified. The high and low molecular weight may be

cleaned and purified separately, and they may also be mixed together, for example, in the desired ratio, just before being crosslinked.

5  In a preferred embodiment of the invention, the pure, dried NaHA fibers are hydrated in an alkaline solution to produce an uncrosslinked NaHA alkaline gel. Any suitable alkaline solution may be used to hydrate the NaHA in this step, for example, but not limited to an aqueous solution containing NaOH. The resulting alkaline gel will have a pH above 7.5, for example, a pH above 9, for example, a pH above 10, for example, a pH above 12, for example, a pH above 13 or greater.

10

The next step in the manufacturing process comprises the step of crosslinking the hydrated, alkaline NaHA gel with a suitable crosslinking agent. The crosslinking agent may be any agent known to be suitable for crosslinking polysaccharides and their derivatives via their hydroxyl groups. Suitable crosslinking agents include but are not limited to, for example, 1,4-
15  butanediol diglycidyl ether (or 1,4-bis(2,3-epoxypropoxy)butane or 1,4-bisglycidyloxybutane=BDDE), 1,2-bis(2,3-epoxypropoxy)ethylene and 1-(2,3-epoxypropyl)-2,3-epoxycyclohexane. The use of more than one crosslinking agent or a different crosslinking agent is not excluded from the scope of the present invention. In is particularly preferred embodiment, the crosslinking agent comprises or consists of 1,4-butanediol diglycidyl ether (BDDE).

20

The step of crosslinking may be carried out using means known to those of skill in the art. Those skilled in the art appreciate how to optimize the conditions of crosslinking according to the nature of the HA, and how to carry out the crosslinking to an optimized degree. The degree of crosslinking is preferably sufficient for the final hydrogel composition obtained from
25  the present methods to remain implanted at the injection site without excessive diffusion away from this injection site. In some embodiments of the present invention, the degree of crosslinking is at least about 2% to about 20%, and more preferably is about 4% to about 12%, wherein the degree of crosslinking is defined as the percent weight ratio of the crosslinking agent to HA-monomeric units in the composition.

30

Importantly, the resulting gel has a characteristic of being highly cohesive. Using a different terminology, the resulting HA-based gel can also be considered substantially "monophasic".

5      Monophasic HA-based gel, at least for purposes of the present disclosure, are to be distinguished from HA-based gels that are not monophasic in character, for example, those gels which are "biphasic" or heterogeneous in character.

Crosslinked HA-based gels which are considered to be "biphasic" or heterogeneous are 10    those HA-based gels which are relatively particulate in nature, and comprise particles of crosslinked HA material dispersed in a carrier of uncrosslinked HA material. When analyzed with the naked eye or microscopically, for example, at a magnification of up to 35X, biphasic or heterogeneous HA-based gels appear particulate in nature. Such dispersed "particles" are often but not always perceptible by touch (tactilely) when felt with the fingers. These gels are usually 15    manufactured by pressing a mass of crosslinked HA-based gel through a sieve or a mesh to create crosslinked HA particles of generally uniform size and/or shape. To form the biphasic gel, these particles are then mixed with a carrier material, usually an amount of uncrosslinked HA, to produce a "biphasic" gel. Examples off such biphasic gels are manufactured by QMed and marketed under the names Perlane and Restylane, for example.

20

The HA-based gel at this step of the present process has a sufficient cohesivity such that the gel will not undergo substantial phase separation after centrifugation of the gel at 2000 rd/min for 5 minutes. Even more preferably, the gel preferably has the characteristic of being capable of absorbing at least one time its weight of water and has a sufficient cohesivity such 25    that when swollen with water at a gel/water weight ratio of about 1:1, the gel maintains its integrity when subjected to centrifugation.

The hydrated crosslinked, HA gel may be swollen to facilitate obtaining the desired cohesivity. This step may be accomplished by neutralizing the crosslinked, hydrated HA gel, for 30    example by adding an aqueous solution containing HCl. The gel is then swelled in a phosphate buffered saline solution for a sufficient time and at a low temperature. The resulting swollen gel

is highly cohesive with no visible distinct particles, for example, no visibly distinct particles when viewed with the naked eye.  In a preferred embodiment, the gel has no visibly distinct particles under a magnification of less than 35X.

5   The cohesive, monophasic gel is now purified by conventional means for example, dialysis or alcohol precipitation, to recover the crosslinked material, to stabilize the pH of the material and remove any unreacted crosslinking agent.   Additional water or slightly alkaline aqueous solution can be added to bring the concentration of the NaHA in the composition to a desired concentration.  In some embodiments, the concentration of NaHA in the composition is

10   in a range between about 10 mg/ml to about 30 mg/ml.

The pH of the purified, substantially pH neutral crosslinked HA gel is preferably adjusted to cause the gel to become slightly alkaline, for example, such that the gel has a pH of greater than about 7.2, for example, about 7.5 to about 8.0.  This step may be accomplished by any

15   suitable means, for example, by adding a suitable amount of dilute sodium hydroxide (NaOH) solution to the gel or any other alkaline molecule and/or buffering composition know by l'homme de l'art.

An effective amount of lidocaine, preferably in the form of lidocaine HCl, is then added

20   to the purified cohesive NaHA gel.  For example, in some embodiments, the lidocaine HCl is provided in a powder form which is solubilized using water for injection (WFI).  The gel is kept neutral with a "strong" buffer or by adjustment with diluted sodium hydroxide in order that the final HA/lidocaine composition will have a desired substantially neutral pH.   Preferably, the final HA-based filler composition including lidocaine will have a lidocaine concentration of

25   between at least about 0.1% and about 5%, for example, about 2% by weight of the composition, or in another example about 0.3%.

After the addition of the lidocaine HCl, or alternatively, during the addition of the lidocaine HCl, the HA/lidocaine gel is homogenized to create a highly homogenous cohesive

30   HA/lidocaine gel having a desired consistency and stability.   Preferably, the homogenization

step comprises mixing, stirring, or beating the gel with a controlled shear force to obtain a substantially homogenous mixture.

After homogenization, the HA/lidocaine composition is introduced into syringes and
5    sterilized.   Sterilization comprises sterilization of the filled syringes by moist heat.   Many different sterilization temperatures and cycle times can be used for this step.   For example, the filled syringes may be sterilized at a temperature of at least about 120 degrees C to about 130 degrees C or greater.   The sterilization cycle may be at least about 1 minute to about 20 minutes or more.

10

Swelling Test/Centrifugation Test/Dye Test

The following Tests may be performed in order to evidence a sufficient cohesivity of a HA-based gel composition for purposes of the present disclosure.

15    Method for testing for sufficient cohesivity of gel:

0.2 g or 0.4g of a gel composition to be tested is placed in a glass syringe.   0.2g (resp.0.4g) or more of phosphate buffer is added to the syringe and the mixture is thoroughly mixed for about 1 hour to obtain a homogenous mixture.   The homogenized mixture is then centrifuged for 5 min at 2000tr/min to remove the air bubbles and to allow the decantation of any
20    particles.   The syringe is then held in a vertical position and one drop of eosin colorant (dye) is deposit at the surface of the gel by means of a syringe and an 18G needle.   A photo (Figure 1A) is taken after 10 min to show diffusion of the dye through the gel.

After dilution of the gel, homogenization and decantation, a biphasic or heterogeneous
25    gel shows a phase separation (an upper diluted less viscous phase without particles and a lower one composed of decanted particles that are visible with the naked eye or under microscope). Under the same conditions, a monophasic cohesive gel shows substantially no phase separation. The dye is prevented from diffusing into the cohesive formulation.   A biphasic, non-cohesive gel shows a clear phase separation.

EXAMPLE 1

Sodium hyaluronate fibers or powder are hydrated in an alkaline solution, for example,
5    an aqueous solution containing NaOH.  The mixture is mixed at ambient temperature to form a
substantially homogenous, alkaline HA gel.

A crosslinking agent, BDDE (1, 4-Butanediol diglycidyl ether), is diluted in an aqueous
solution and added to the HA gel.  The mixture is homogenized for several minutes.
10

Alternatively, BDDE could be added directly to the HA fibers (dry state) at the beginning
of the process, prior to the hydration.  The crosslinking reaction will then start relatively slowly
at ambient temperature, ensuring even better homogeneity and efficacy of the crosslinking.  See,
for example, Piron et al., U.S. Patent No. 6,921,819 which is incorporated herein in its entirety
15    by this reference.

The resulting crosslinked HA gel mixture is then heated at about 50°C for about 2.5
hours.  The material is now a highly crosslinked HA/BDDE gel (aspect = solid gel).  This
crosslinked gel is then neutralized , with a suitable acidic solution.  The neutralized gel is then
20    swollen in a phosphate buffer at a cold temperature, for example a temperature of about 5
degrees C to obtain a highly cohesive gel.

The cohesive swollen gel is then mechanical stirred and filled into dialysis membranes
and dialyzed against a phosphate buffer.  For example, the gel is filled into dialysis membranes
25    and dialyzed against a phosphate buffer for up to several days with regular changes of the bath,
in order to remove the unreacted crosslinker, to stabilize the pH close to neutrality (pH=7.2) and
to ensure proper osmolarity of the gel (osmolarity) (around 300 mOsmol).

After dialysis, the resulting cohesive NaHA gel has a substantially neutral pH (7.2) and
30    no visibly distinct particles in a fluidic media when viewed at a magnification of less than about
35X.

Lidocaine chlorhydrate in powder form is first solubilized in Water for Injection (WFI) and filtered through a 0.2 μm filter.  Dilute sodium hydroxide solution is added to the NaHA gel in order to reach a slightly basic pH (for example, a pH of between about 7.5 and about 8).  The

5 lidocaine chlorhydrate solution is then added to the slightly basic gel to reach a final desired concentration, for example, a concentration of about 0.3% (w/w).  The resulting pH of the HA/lidocaine mixture is then about 7 and the HA concentration is about 24 mg/ml. Mechanical mixing is performed in order to obtain a proper homogeneity in a standard reactor equipped with an appropriate blender mechanism.

10

If desired, a suitable amount of uncrosslinked HA gel may be added to the HA/lidocaine gel mixture with the advantage of increasing the kinetic of lidocaine delivery.  For example, uncrosslinked HA fibers are swollen in a phosphate buffer solution, in order to obtain a homogeneous viscoelastic gel.  This uncrosslinked HA gel is then added to the crosslinked

15 HA/lidocaine gel (for example, at about 5%, w/w).

The resulting gel is then filled into Ready-to-Fill sterile syringes and autoclaved at sufficient temperatures and pressures for sterilization for at least about 1 minutes.

20 After autoclaving, the final HA/lidocaine product is packaged and distributed to physicians.  The product manufactured in accordance with this method exhibits one or more characteristics of stability as defined elsewhere herein.  For example, the autoclaved HA/lidocaine product has a viscosity, cohesivity, and extrusion force that are acceptable.  No degradation of the HA/lidocaine gel product is found during testing of the product after the

25 product has spent several months in storage.

EXAMPLE 2

Properties of HA/lidocaine composition manufactured in accordance with a method of the present invention are shown in the Table directly below.

5

| | HA/lidocaine Composition |
|---|---|
| Appearance | Homogeneous transparent gel |
| pH | 7.2 |
| Extrusion force (N) | 10.8N |
| NaHA Content | 23.7 mg/g |
| Sterility | Sterile (SAL$\leq 10^{-6}$) |
| Osmolarity | 321 mosml/kg |
| Lidocaine Content (%) | 0.29% |
| 2,6-dimethylaniline content | Conforms |

In order to ensure that product specifications are maintained throughout the shelf life of the composition, multiple studies are performed.  In addition, 2,6 dimethylaniline content is

10   measured in order to confirm the absence of lidocaine degradation.

14

The Table below provides a summary of stability testing results on the composition manufactured in accordance with the invention.

| Test | HA/lidocaine Composition | | |
|------|------------------|------------------|------------------|
|  | 3 month results | 6 month results | 9 month results |
| Aspect Transparent and homogeneous | Conforms | Conforms | Conforms |
| pH | 7.2 | 7.2 | 7.2 |
| Extrusion Force (N) | 11.9 | 11.1 | 11.9 |
| NaHA Concentration (mg/g) | 23.8 | 23.1 | 24.2 |
| Sterility | Conforms | Conforms | Conforms |
| Osmolarity (mOsm/kg) | 349 | 329 | 342 |
| Lidocaine Content (%) | 0.29 | 0.29 | 0.29 |
| 2,6-dimethylaniline content | Conforms | Conforms | Conforms |

5

It is discovered that at 9 months time (from manufacture date), the composition continues to meet the product specifications.

18438PROV (FAC)

EXAMPLE 3

The following sterile HA formulations (SAMPLES 1-6) are obtained for testing.

5 - A) SAMPLE 1 (Rhexeal) is an uncrosslinked HA mixture 13.5mg/g, with hydroxyl propyl methyl cellulose (HPMC) 5.5 mg/g.

- B) SAMPLE 2 is a biphasic gel having the commercial name Hylaform

- C) SAMPLE 3 is a non-commercial gel made of distinct gel particles mixed with uncrosslinked HA (80/20, w/w). The HA particles (80%) is obtained by disintegration of

10 a "solid" heavily crosslinked HA gel (SKGEL, implant for glaucoma surgery). The particles have different shapes and dimensions (several microns to several mm).

This formulation is believed to be similar to the gel having commercial name RESTYLANE.

- D) SAMPLE 4 is a cohesive formulation ( Juvéderm Refine)

15 - E) SAMPLE 5 (Juvéderm Ultra Plus ) is a cohesive formulation

- F) SAMPLE 6 (Juvéderm Voluma) is a cohesive formulation

SAMPLES 1-6  are each prepared as follows:

20 TEST 1

About 20g of each of SAMPLES 1-6 is individually mixed with a solution of lidocaine chlorhydrate and homogenized.   Each of the SAMPLES is then filled into syringes and autoclaved.

25 TEST 2

About 20g of each of SAMPLES 1-6 is individually mixed with a solution of lidocaine chlorhydrate, and the pH is adjusted to 7.2 using Sodium Hydroxide solution as described in EXAMPLE 1 above.  Each of the SAMPLES is then filled into syringes and autoclaved.

TEST 3

About 20g of each of SAMPLES 1-6 is mixed with an equivalent amount of water for injection (WFI) to take into account dilution effect.   No lidocaine is added. Each of the

5       SAMPLES is then filled into syringes and autoclaved.

RESULTS

For each of the Samples in Tests 1-3, rheological measurements are performed using suitable rheological measurement equipment.

10

It is discovered that neither of Samples 1 and 2 with lidocaine is stable to autoclaving and have degraded and become substantially less viscous in both Test 1 and  Test 2.

Sample 3 is found to be stable to autoclaving in Test 2 but is not stable in Test 1.

15

Samples 4 and 5 are found to be stable to autoclaving only in Test 2.

Sample 6 is found to be stable to autoclaving in both of Test 1 and Test 2.

20      These results are generally shown in accompanying Figs. 2-9.

EXAMPLE 4

Example of kinetic of release:

25

The aim of the release is to show that the Lidocaine contained in cohesive HA formulation

is freely released from the composition.

30      Different small dialysis is operated with different periods of time (about 10g of gel are placed in a small dialysis bag and then put in 30g of water). After each dialysis is stopped at a

given time, the gel is homogenized with a spatula and the amount of Lidocaine is determined by an UV method. The final concentration of the dialysis bath meets the theoretical concentration of lidocaine which indicates the free release of lidocaine from the gel.

Table

5      Lidocaine concentration in % (w/w), correction of the value and determination of the % of released Lidocaine

|  | MMA3056 | MMA4031-EC6 | MMA4031-EC2 | MMA4031-EC3 | MMA4031-EC4 | MMA4031-EC5 | MMA4029-EC7 |
|---|---|---|---|---|---|---|---|
| **Dialysis time (h)** | 0h | 1h30 | 5h00 | 7h00 | 23h00 | 48h00 | 72h00 |
| **[lidocaine] (%)** | 0.29 | 0.20 | 0.16 | 0.15 | 0.08 | 0.07 | 0.07 |

The following Curve 2 depicts the results given in the above Table.

**Curve 2:**



5

The profile of the concentration of lidocaine in the gel Juvéderm Ultra Plus with time shows that it reaches the equilibrium that corresponds to free release of Lidocaine

This in vitro study shows that the lidocaine is not retained in the Juvéderm Gel with

10    Lidocaine and is freely released.

This conclusion applies to

Juvéderm 30 with Lidocaine,

Juvéderm Ultra with Lidocaine,

and Juvéderm Ultra Plus with lidocaine.

18438PROV (FAC)

Although the invention has been described and illustrated with a certain degree of particularity, it is understood that the present disclosure has been made only by way of example, and that numerous changes in the combination and arrangement of parts can be resorted to by those skilled in the art without departing from the scope of the invention, as hereinafter claimed.

**Exhibit B**

U.S. Utility Patent Application
Allergan Docket: 18438-18459 (FAC)

## HYALURONIC ACID-BASED GELS INCLUDING LIDOCAINE

### INVENTOR: PIERRE F. LEBRETON

5

### CROSS REFERENCE TO RELATED APPLICATIONS

This application claims the benefit of U.S. provisional patent application number 61/085,956, filed August 04, 2008, U.S. provisional patent application number 61/087,934 filed on August 11, 2008, and U.S. provisional patent application number 61/096,278 filed September 11, 2008, the entire disclosures all of which are

10 incorporated herein by reference.

### FIELD OF THE INVENTION

The present invention generally relates to injectable soft tissue fillers and more specifically relates to hyaluronic acid-based dermal and subdermal fillers including an anesthetic agent.

15

### BACKGROUND

It is generally accepted that as a person ages, the face begins to show effects of gravity, sun-exposure, and years of facial muscle movement, such as smiling, frowning, chewing and squinting. The underlying tissues that keep the skin appearing youthful begin to break down, often resulting in laugh lines, smile lines, "crow's feet" and

20 facial creases often referred to as the "effects of aging."

In an effort to treat or correct the effects of aging, soft tissue fillers have been developed to help fill in facial lines and depressions and for restoring fat loss-related tissue volume loss. The soft tissue fillers thereby temporarily restore a smoother, more youthful appearance.

25

Ideally, soft tissue fillers are long-lasting, soft, smooth and natural appearing when implanted in the skin or beneath the skin. Further, soft tissue fillers are easy to implant into a patient using a fine gauge needle and require low extrusion force for injection. Ideal fillers would also cause no adverse side effects, and would be injectable with minimal or no discomfort to the patient.

1

U.S. Utility Patent Application
Allergan Docket: 18438-18459 (FAC)

Collagen based soft tissue fillers were developed over 20 years ago, and for some time, bovine collagen-based fillers were the only U.S. Food and Drug Administration (FDA)-approved dermal fillers.  Because these dermal fillers are bovine based, one of the main disadvantages has been the potential for allergic reaction in patients.  It is believed that approximately 3-5% of human subjects show serious allergic reactions to bovine collagen, thus requiring careful testing before using these fillers in any particular person. In addition to allergic reactions, collagen based fillers degrade rapidly upon injection and require frequent treatments to sustain a smoother, more youthful appearance.

In February 2003, human-derived collagen filler compositions received FDA approval.  These collagens provide the advantage of a significantly reduced risk of allergic reactions.  However, despite the reduced incidence of allergic reactions, the human derived collagen fillers still suffered from the rapid degradation of the injected product.

The search for fillers that do not provoke allergic reactions and sustain a smoother, more youthful appearance has brought about the development of hyaluronic acid (HA)-based products.  In December 2003, the first HA-based filler was approved by the FDA.  This was rapidly followed by the development of other HA-based fillers.

HA, also known as hyaluronan, is a naturally occurring, water soluble polysaccharide, specifically a glycosaminoglycan, which is a major component of the extra-cellular matrix and is widely distributed in animal tissues.  HA has excellent biocompatibility and does not cause allergic reactions when implanted into a patient.  In addition, HA has the ability to bind to large amounts of water, making it an excellent volumizer of soft tissues.

The development of HA-based fillers which exhibit ideal *in vivo* properties as well as ideal surgical usability has proven difficult.  For example, HA-based fillers that exhibit desirable stability properties *in vivo*, can be so highly viscous that injection through fine gauge needles is difficult.  Conversely, HA-based fillers that are relatively easily injected through fine gauge needles often have relatively inferior stability properties *in vivo*.

U.S. Utility Patent Application
Allergan Docket: 18438-18459 (FAC)

One method to overcome this problem is to use crosslinked HA-based fillers. Crosslinked HA is formed by reacting free HA with a crosslinking agent under suitable reaction conditions.   Methods of preparing HA based soft tissue fillers including both crosslinked and free HA are well known.

5          It has been proposed to incorporate certain therapeutic agents, for example, anesthetic agents such as lidocaine, into injectable HA-based compositions. Unfortunately, HA-based injectable compositions which incorporate lidocaine during the manufacturing process are prone to partial or almost complete degradation prior to injection, particularly during high temperature sterilization steps and/or when placed in 10    storage for any significant length of time.

It is an objective of the HA-based soft filler compositions and methods of making and using them as described herein to provide soft tissue fillers that do not cause allergic reactions in patients, are biocompatible and are stable and usable *in vivo* and include one or more local anesthetic agents.

15

## SUMMARY

The present description relates to soft tissue fillers, for example, dermal and subdermal fillers, based on hyaluronic acid (HA) and pharmaceutically acceptable salts of HA, for example, sodium hyaluronate (NaHA).   HA-based compositions described 20    herein include a therapeutically effective amount of at least one anesthetic agent.   In one embodiment, for example, the anesthetic agent is lidocaine.  The present HA-based compositions including at least one anesthetic agent have an enhanced stability, relative to conventional HA-based compositions including, for example, lidocaine, when subjected to sterilization techniques such as autoclaving, and/or when stored for long 25    periods at ambient temperature. Methods for preparing such HA-based compositions are also provided as well as products made by such methods.

Described herein are soft tissue filler compositions, the compositions generally comprising: a hyaluronic acid component crosslinked with a crosslinking agent selected from the group consisting of 1,4-butanediol diglycidyl ether (BDDE), 1,4-

U.S. Utility Patent Application
Allergan Docket: 18438-18459 (FAC)

bis(2,3-epoxypropoxy)butane, 1,4-bisglycidyloxybutane, 1,2-bis(2,3-epoxypropoxy)ethylene and 1-(2,3-epoxypropyl)-2,3-epoxycyclohexane, and 1,4-butanediol diglycidyl ether; and at least one anesthetic agent combined with the crosslinked HA component.

5        In yet another embodiment, the at least one anesthetic agent is lidocaine.  In a further embodiment, the amount of the anesthetic agent is present at a concentration between about 0.1% and about 5.0% by weight of the composition.  In still another embodiment, the anesthetic agent is present at a concentration between about 0.2% and about 1.0% by weight of the composition.  In one embodiment, the anesthetic agent

10      is lidocaine and is present at a concentration of about 0.3% by weight of the composition.

        In still another embodiment, the soft tissue filler composition has an extrusion force of between about 10 N and about 13 N, for example, at a rate of about 12.5 mm/minute.  In yet another embodiment, the composition has a viscosity of between

15      about 5 Pa*s and about 450 Pa*s, for example, when measured at about 5 Hz.

        In one embodiment, the HA component is a gel, for example, a cohesive, hydrated gel.  In one embodiment, the HA component is a crosslinked HA gel having no greater than about 1% to about 10% free HA.  For purposes of this disclosure, free HA includes truly free HA as well as lightly crosslinked HA chains and fragments, all in

20      soluble form in water.

        In yet other embodiments, the HA component comprises greater than about 10%, for example, greater than about15%, for example, up to or greater than about 20% free HA.

        In yet another embodiment, the HA component is a gel comprising particles

25      of crosslinked HA in a relatively fluidic medium of free HA.  In some embodiments, the HA component has an average particle size of greater than about 200 μm, for example, greater than about 250 μm.

        Further described herein is a soft tissue filler composition comprising: a HA component crosslinked with 1,4-butanediol diglycidyl ether (BDDE), said HA component

U.S. Utility Patent Application
Allergan Docket: 18438-18459 (FAC)

having a degree of crosslinking of less than about 5%, for example, about 2%, and an anesthetic component having a concentration between about 0.1% and about 5.0% by weight of the soft tissue filler composition, wherein the anesthetic is lidocaine.

Further described herein are methods of preparing soft tissue filler compositions, the methods comprising the steps of: providing a HA component crosslinked with at least one crosslinking agent selected from the group consisting of 1,4-butanediol diglycidyl ether (BDDE), 1,4-bis(2,3-epoxypropoxy)butane, 1,4-bisglycidyloxybutane, 1,2-bis(2,3-epoxypropoxy)ethylene and 1-(2,3-epoxypropyl)-2,3-epoxycyclohexane, and 1,4-butanediol diglycidyl ether or combinations thereof; adjusting the pH of said HA component to an adjusted pH above about 7.2; and adding a solution containing at least one anesthetic agent to the HA component having the adjusted pH to obtain a HA-based filler composition.

In another embodiment, the composition is sterilized, for example, by autoclaving, to form a sterilized composition and wherein the sterilized composition is stable at ambient temperature for at least about months, for example, at least 9 months, at least about 12 months, for example, at least about 36 months, or more.

In still another embodiment, the adjusted pH is above about 7.5.  In another embodiment, the method further comprises the step of homogenizing the HA component during or after the step of adding the solution containing the at least one anesthetic agent.  In a further embodiment, the step of homogenizing comprises subjecting the composition to mixing with a controlled shear.

In another embodiment, the step of providing a HA component comprises providing dry free NaHA material and hydrating the dry free NaHA material in an alkaline solution to obtain an alkaline, free NaHA gel.  In yet another embodiment, the alkaline, free NaHA gel has a pH greater than about 8.0.  In still another embodiment the pH is greater than about 10.

In a further embodiment, the HA component comprises greater than about 20% free HA and the crosslinked portion of the HA component has a degree of crosslinking of less than about 6% or less than about 5%.

U.S. Utility Patent Application
Allergan Docket: 18438-18459 (FAC)

In still a further embodiment, the soft tissue filler composition has a particulate nature in that it comprises particles of crosslinked HA dispersed in a fluid soluble HA medium.  In some embodiments, the average size of such particles is at least about 200 μm, and in other embodiments the average size of such particles is at

5    least about 250 μm.

Further described herein is a soft tissue filler composition comprising: a hyaluronic acid (HA) component crosslinked with 1,4-butanediol diglycidyl ether (BDDE), said HA component having a degree of crosslinking of less than about 5%, and an anesthetic component having a concentration between about 0.1% and about 5.0%

10   by weight of the soft tissue filler composition, wherein the anesthetic is lidocaine.

In a specific embodiment of the invention, a method of preparing a soft tissue filler composition is further described, the method comprising the steps of: providing dry free NaHA material and hydrating the dry free NaHA material in an alkaline solution to obtain an alkaline, free NaHA gel; crosslinking the free NaHA gel with BDDE to form a

15   crosslinked alkaline HA composition with a degree of crosslinking less than about 5% and a pH above about 7.2; adding a solution containing lidocaine HCl to the HA component having the adjusted pH to obtain said HA-based filler composition; homogenizing the HA-based filler composition thereby forming a homogenized HA-based filler composition; and sterilizing the homogenized HA-based filler composition

20   thereby forming a sterilized HA-based filler composition, wherein the soft tissue filler composition has a particle size of greater than about 200 μm, for example, a particle size of greater than about 250 μm.

## BRIEF DESCRIPTION OF THE DRAWINGS

25   Figure 1 graphically illustrates the viscosity of Sample 1 prepared without lidocaine, with lidocaine and pH adjustment during formation and with lidocaine but without pH adjustment during formation versus the shear frequency.

U.S. Utility Patent Application
Allergan Docket: 18438-18459 (FAC)

Figure 2 graphically illustrates the viscosity of Sample 2 prepared without lidocaine, with lidocaine and pH adjustment during formation and with lidocaine but without pH adjustment during formation versus the shear frequency.

5    Figure 3 graphically illustrates the viscosity of Sample 3 prepared without lidocaine, with lidocaine and pH adjustment during formation and with lidocaine but without pH adjustment during formation versus the shear frequency.

Figure 4 graphically illustrates the viscosity of Sample 4 prepared without lidocaine, with lidocaine and pH adjustment during formation and with lidocaine but without pH adjustment during formation versus the shear frequency.

10   Figure 5 graphically illustrates the viscosity of Sample 5 prepared without lidocaine, with lidocaine and pH adjustment during formation and with lidocaine but without pH adjustment during formation versus the shear frequency.

Figure 6 graphically illustrates the relative viscosity/elasticity characteristics of Sample 5 prepared without lidocaine, with lidocaine and pH adjustment during
15   formation and with lidocaine but without pH adjustment during formation versus the shear frequency.

Figure 7 graphically illustrates the viscosity of Sample 6 prepared without lidocaine, with lidocaine and pH adjustment during formation and with lidocaine but without pH adjustment during formation versus the shear frequency.

20   Figure 8 graphically illustrates the relative viscosity/elasticity characteristics of Sample 6 prepared without lidocaine, with lidocaine and pH adjustment during formation and with lidocaine but without pH adjustment during formation versus the shear frequency.

Figure 9 graphically illustrates the lidocaine concentration in the gel from
25   Sample 5 in Example 4 made by the procedure of Test 2 versus time.

### DEFINITIONS

Certain terms as used in the specification are intended to refer to the following definitions, as detailed below.  Where the definition of terms departs from the

U.S. Utility Patent Application
Allergan Docket: 18438-18459 (FAC)

commonly used meaning of the term, applicant intends to utilize the definitions provided below, unless specifically indicated.

Autoclave stable or stable to autoclaving as used herein describes a product or composition that is resistant to degradation such that the product or composition
5   maintains at least one, and preferably all, of the following aspects after effective autoclave sterilization: transparent appearance, pH, extrusion force and/or rheological characteristics, hyaluronic acid (HA) concentration, sterility, osmolarity, and lidocaine concentration.

Centrifugation as used herein refers to the process of using centrifugal forces
10  to evenly distribute substances of greater and lesser density.   Centrifugation is commonly used to separate a liquid phase from a solid or gel phase.  Substantial phase separations resulting from centrifugation would be at least those visible by the naked eye, for example, a liquid phase and a solid phase distinctly separated when viewed with the naked eye.

15          High molecular weight HA as used herein describes a HA material having a molecular weight of at least about 1.0 million Daltons (mw $\geq 10^6$ Da or 1 MDa) to about 4.0 MDa.  For example, the high molecular weight HA in the present compositions may have a molecular weight of about 2.0 MDa.  In another example, the high molecular weight HA may have a molecular weight of about 2.8 MDa.

20          Low molecular weight HA as used herein describes a HA material having a molecular weight of less than about 1.0 MDa.  Low molecular weight HA can have a molecular weight of between about 200,000 Da (0.2 MDa) to less than about 1.0 MDa, for example, between about 300,000 Da (0.3 M Da) to about 750,000 Da. (0.75 MDa).

Degree of Crosslinking as used herein refers to the intermolecular junctions
25  joining the individual HA polymer molecules, or monomer chains, into a permanent structure, or as disclosed herein the soft tissue filler composition.  Moreover, degree of crosslinking for purposes of the present disclosure is further defined as the percent weight ratio of the crosslinking agent to HA-monomeric units within the crosslinked portion of the HA based composition. It is measured by the weight ratio of HA
30  monomers to crosslinker (HA monomers:crosslinker).

U.S. Utility Patent Application
Allergan Docket: 18438-18459 (FAC)

Free HA as used herein refers to individual HA polymer molecules that are not crosslinked to, or very lightly crosslinked to (very low degree of crosslinking) the highly crosslinked (higher degree of crosslinking) macromolecular structure making up the soft tissue filler composition.  Free HA generally remains water soluble. Free HA can
5   alternatively be defined as the "uncrosslinked," or lightly crosslinked component of the macromolecular structure making up the soft tissue filler composition disclosed herein.

Cohesive as used herein is the ability of a HA-based composition to retain its shape and resist deformation.  Cohesiveness is affected by, among other factors, the molecular weight ratio of the initial free HA, the degree of crosslinking, the amount of
10   residual free HA following crosslinking, and  HA-based composition pH.  Moreover, a cohesive HA-based composition resists phase separation when tested according to the method disclosed at Example 1 herein.


## DETAILED DESCRIPTION

15   The present disclosure generally relates to soft tissue fillers, for example, dermal and subdermal fillers, based on hyaluronic acids (HA) and pharmaceutically acceptable salts of HA, for example, sodium hyaluronate (NaHA).  In one aspect, HA-based compositions described herein include a therapeutically effective amount of at least one anesthetic agent, for example, lidocaine.  The present HA-based compositions
20   including at least one anesthetic agent have an enhanced stability, relative to conventional HA-based compositions including, for example, lidocaine, when subjected to high temperatures and pressures, for example, those experienced during heat and/or pressure sterilization techniques, for example, autoclaving, and/or for example, when stored at ambient temperature for an extended period of time.

25   The stable compositions maintain at least one of, or all of, the following aspects after effective autoclave sterilization and/or prolonged storage: transparent appearance, pH for use in a patient, extrusion force and/or rheological characteristics, HA concentration, sterility, osmolarity, and lidocaine concentration.   Methods or processes of preparing such HA-based compositions are also provided as well as
30   products made by such methods or processes.

U.S. Utility Patent Application
Allergan Docket: 18438-18459 (FAC)

As used herein, hyaluronic acid (HA) can refer to any of its hyaluronate salts, and includes, but is not limited to, sodium hyaluronate (NaHA), potassium hyaluronate, magnesium hyaluronate, calcium hyaluronate, and combinations thereof.

Generally, the concentration of HA in the compositions described herein is preferably at least 10 mg/mL and up to about 40 mg/mL. For example, the concentration of HA in some of the compositions is in a range between about 20 mg/mL and about 30 mg/mL. Further, for example, in some embodiments, the compositions have a HA concentration of about 22 mg/mL, about 24 mg/mL, about 26 mg/mL, or about 28 mg/mL.

In addition, the concentration of one or more anesthetics is in an amount effective to mitigate pain experienced upon injection of the composition. The at least one local anesthetic can be selected from the group of ambucaine, amolanone, amylocaine, benoxinate, benzocaine, betoxycaine, biphenamine, bupivacaine, butacaine, butamben, butanilicaine, butethamine, butoxycaine, carticaine, chloroprocaine, cocaethylene, cocaine, cyclomethycaine, dibucaine, dimethysoquin, dimethocaine, diperodon, dycyclonine, ecgonidine, ecgonine, ethyl chloride, etidocaine, beta-eucaine, euprocin, fenalcomine, formocaine, hexylcaine, hydroxytetracaine, isobutyl p-aminobenzoate, leucinocaine mesylate, levoxadrol, lidocaine, mepivacaine, meprylcaine, metabutoxycaine, methyl chloride, myrtecaine, naepaine, octacaine, orthocaine, oxethazaine, parethoxycaine, phenacaine, phenol, piperocaine, piridocaine, polidocanol, pramoxine, prilocaine, procaine, propanocaine, proparacaine, propipocaine, propoxycaine, psuedococaine, pyrrocaine, ropivacaine, salicyl alcohol, tetracaine, tolycaine, trimecaine, zolamine, and salts thereof. In one embodiment, the at least one anesthetic agent is lidocaine, such as in the form of lidocaine HCl. The compositions described herein may have a lidocaine concentration of between about 0.1% and about 5% by weight of the composition, for example, about 0.2% to about 1.0% by weight of the composition. In one embodiment, the composition has a lidocaine concentration of about 0.3% of the composition. The concentration of lidocaine in the compositions described herein can be therapeutically effective meaning the concentration is adequate to provide a therapeutic benefit without inflicting harm to the patient.

U.S. Utility Patent Application
Allergan Docket: 18438-18459 (FAC)

In one aspect of the invention, a method is provided for preparing a HA-based composition including an effective amount of lidocaine wherein the method comprises providing a precursor composition comprising a cohesive crosslinked HA-based gel, adding a solution containing lidocaine, for example in the form of lidocaine

5   HCl, thereto and homogenizing the mixture to obtain a cohesive, at least partially crosslinked, HA-based composition including lidocaine that is stable to autoclaving. The cohesive, crosslinked HA-based gel includes no greater than about 1% to about 10% of free HA material by volume, for example, no greater than about 5% free HA material.

In some embodiments of the present invention, the HA component of the

10   present compositions, hereinafter sometimes, "precursor composition" is a hydrated, cohesive gel.  A cohesive gel, relative to a non-cohesive gel, is better able retain its shape and resist deformation, for example, after being subjected to shear or other stresses.  It has been discovered by the present inventor that such cohesive gels are less likely to substantially degrade or become unstable over time or when subjected to

15   external stimuli such as sterilization, relative to non-cohesive gels.

Without intending to be bound by any particular theory of operability, it is believed that the cohesivity of the precursor composition in some embodiments of the invention acts to substantially or entirely prevent or impede any breakdown or degradation of the crosslinked HA in the composition with the addition of lidocaine.

20   It is believed that such degradation may primarily occur because many, perhaps most crosslinked HA based gels are conventionally manufactured in a manner that produces gels which are not sufficiently cohesive to prevent such degradation when lidocaine is added.  It has now been discovered that the addition of lidocaine to sufficiently cohesive crosslinked HA-based compositions does not cause substantial or

25   significant degradation of the compositions, and the compositions maintain their integrity in terms of rheology, viscosity, appearance and other characteristics even when stored for a lengthy period of time, for example, for a period of time of at least about 6 months, about 9 months, about 12 months, or about 36 months or greater, for example, at ambient temperatures, and even after being subjected to sterilization procedures, for

30   example, autoclaving.

11

U.S. Utility Patent Application
Allergan Docket: 18438-18459 (FAC)

It is a surprising discovery that formulations of crosslinked HA-based compositions including lidocaine can be manufactured in a manner to produce sterilization-stable, injectable HA/lidocaine compositions.

Further described herein is a method for preparing stable HA-based
5   compositions containing an effective amount of lidocaine by preparing a precursor composition, for example, a cohesive, crosslinked HA-based gel, adding lidocaine chlorhydrate to the gel to form a HA/lidocaine gel mixture, and homogenizing the mixture, to obtain a crosslinked HA-based composition that is stable to autoclaving.

In certain embodiments, the precursor composition is a cohesive, hydrated
10   HA-based gel.  Such a "cohesive" gel will generally include no greater than between about 1% to about 10% soluble-liquid form or free HA by volume.  Such cohesive gels are considered by some in the industry to be monophasic, or substantially single-phase compositions, in that less than about 1% to about 10% of the composition comprises free HA.

15   In yet other embodiments, the precursor composition is a relatively non-cohesive, hydrated HA-based gel.  Such a "non-cohesive" gel generally includes greater than 10%, for example, greater than about 15%, for example, greater than 20% or more of free HA.

In some embodiments, the precursor composition may comprise a first
20   component made up of relatively highly crosslinked HA in a substantially solid phase, and a second component comprising free or relatively less crosslinked HA in a substantially fluidic phase in which the relatively highly crosslinked HA is dispersed.

In some embodiments, the present compositions have a somewhat particulate nature and comprise particles of relatively highly crosslinked HA dispersed in
25   a medium of free HA.  In some embodiments, the average size of such particles of crosslinked HA is at least about 200 μm or at least about 250 μm.  Such particulate compositions are generally less cohesive than otherwise similar compositions which have no discernable particles, or have particles having an average size of less than 200 μm.

U.S. Utility Patent Application
Allergan Docket: 18438-18459 (FAC)

For example, in some embodiments, the precursor composition may be manufactured by pressing a mass of relatively highly crosslinked HA-based gel through a sieve or a mesh to create relatively highly crosslinked HA particles of generally uniform size and shape. These particles are then mixed with a carrier material, for
5    example, an amount of free HA to produce a gel.

In other embodiments, a method of preparing a HA-based composition including an effective amount of lidocaine is provided wherein the method comprises providing a precursor composition including a substantially pH neutral, at least partially crosslinked HA-based gel and adjusting the pH of the gel to a pH of greater than about
10    7.2, for example, about 7.5 to about 8.0. The method further comprises the step of combining a solution containing lidocaine, for example in the form of lidocaine HCl, with the slightly alkaline gel after the pH has been so adjusted and obtaining a HA-based composition including lidocaine that is stable to autoclaving.

Another method of preparing a stable HA-based composition containing an
15    effective amount of lidocaine, as described elsewhere herein, generally comprises the steps of: providing purified NaHA material, for example, in the form of fibers; hydrating the material; and crosslinking the hydrated material with a suitable crosslinking agent to form a crosslinked HA-based gel. The method further comprises the steps of neutralizing and swelling the gel, and adding to the gel a solution containing lidocaine,
20    preferably an acidic salt of lidocaine chlorhydrate, to form a HA/lidocaine gel. Further still, the method further comprises homogenizing the HA/lidocaine gel and packaging the homogenized HA/lidocaine gel, for example, in syringes for dispensing. The syringes are then sterilized by autoclaving at an effective temperature and pressure. In accordance with the present description, the packaged and sterilized cohesive
25    NaHA/lidocaine gels exhibit enhanced stability relative to HA-based compositions including lidocaine which are made using conventional methods.

The present products and compositions are considered to be sterile when exposed to temperatures of at least about 120°C to about 130°C and/or pressures of at least about 12 pounds per square inch (PSI) to about 20 PSI during autoclaving for a
30    period of at least about 1 minute to about 15 minutes.

U.S. Utility Patent Application
Allergan Docket: 18438-18459 (FAC)

The present products and compositions also remain stable when stored for long periods of time at room temperature.  Preferably, the present compositions remain stable for a period of at least about two months, or at least about six months, or at least about 9 months, or at least about 12 months, or at least about 36 months, at temperatures of at least about 25°C.  In a specific embodiment, the compositions are stable at a temperature up to about 45°C for a period of at least two months.

The manufacturing process includes, in one embodiment, the initial step of providing raw HA material in the form of dry HA fibers or powder.  The raw HA material may be HA, its salts and/or mixtures thereof.  In a preferred embodiment, the HA material comprises fibers or powder of NaHA, and even more preferably, bacterial-sourced NaHA.  In some aspects of the present description, the HA material may be animal derived.  The HA material may be a combination of raw materials including HA and at least one other polysaccharide, for example, glycosaminoglycan (GAG).

In some embodiments, the HA material in the compositions nearly entirely comprises or consists of high molecular weight HA.  That is, nearly 100% of the HA material in the present compositions may be high molecular weight HA as defined above.  In other embodiments, the HA material in the compositions comprises a combination of relatively high molecular weight HA and relatively low molecular weight HA, as defined above.

The HA material of the compositions may comprise between about 5% to about 95% high molecular weight HA with the balance of the HA material including low molecular weight HA.  In one embodiment of the invention, the ratio of high molecular weight to low molecular weight HA is at least about, and preferably greater than 2 (w/w ≥ 2) with the high molecular weight HA having a molecular weight of above 1.0 MDa.

It will be appreciated by those of ordinary skill in the art that the selection of high and low molecular weight HA material and their relative percentages or ratios is dependent upon the desired characteristics, for example, extrusion force, elastic modulus, viscous modulus and phase angle expressed as the ratio of viscous modulus to elastic modulus, cohesivity, etc. of the final HA-based product.  For additional information that may be helpful in understanding this and other aspects of the present

U.S. Utility Patent Application
Allergan Docket: 18438-18459 (FAC)

disclosure, see Lebreton, U.S. Patent Application Publication No. 2006/0194758, the entire disclosure of which is incorporated herein by this reference.

The HA-based gels can be prepared according to the present description by first cleaning and purifying dry or raw HA material having a desired high/low molecular weight ratio. These steps generally involve hydrating the dry HA fibers or powder in the desired high/low molecular weight ratio, for example, using pure water, and filtering the material to remove large foreign matters and/or other impurities. The filtered, hydrated material is then dried and purified. The high and low molecular weight HA may be cleaned and purified separately, or may be mixed together, for example, in the desired ratio, just prior to crosslinking.

In one aspect of the present disclosure, pure, dry NaHA fibers are hydrated in an alkaline solution to produce an free NaHA alkaline gel. Any suitable alkaline solution may be used to hydrate the NaHA in this step, for example, but not limited to aqueous solutions containing sodium hydroxide (NaOH), potassium hydroxide (KOH), sodium bicarbonate ($NaHCO_3$), lithium hydroxide (LiOH), and the like. In another embodiment, the suitable alkaline solution is aqueous solutions containing NaOH. The resulting alkaline gel will have a pH above 7.5. The pH of the resulting alkaline gel can have a pH greater than 9, or a pH greater than 10, or a pH greater than 12, or a pH greater than 13.

The next step in the manufacturing process involves the step of crosslinking the hydrated, alkaline NaHA gel with a suitable crosslinking agent. The crosslinking agent may be any agent known to be suitable for crosslinking polysaccharides and their derivatives via their hydroxyl groups. Suitable crosslinking agents include, but are not limited to, 1,4-butanediol diglycidyl ether (or 1,4-bis(2,3-epoxypropoxy)butane or 1,4-bisglycidyloxybutane, all of which are commonly known as BDDE), 1,2-bis(2,3-epoxypropoxy)ethylene and 1-(2,3-epoxypropyl)-2,3-epoxycyclohexane. The use of more than one crosslinking agent or a different crosslinking agent is not excluded from the scope of the present disclosure. In one aspect of the present disclosure, the HA gels described herein are crosslinked using BDDE.

U.S. Utility Patent Application
Allergan Docket: 18438-18459 (FAC)

The step of crosslinking may be carried out using any means known to those of ordinary skill in the art.  Those skilled in the art appreciate how to optimize conditions of crosslinking according to the nature of the HA, and how to carry out crosslinking to an optimized degree.

5          Degree of crosslinking for purposes of the present disclosure is defined as the percent weight ratio of the crosslinking agent to HA-monomeric units within the crosslinked portion of the HA based composition. It is measured by the weight ratio of HA monomers to crosslinker (HA monomers:crosslinker).

The degree of crosslinking in the HA component of the present compositions 10   is at least about 2% and is up to about 20%.

In other embodiments, the degree of crosslinking is greater than 5%, for example, is about 6% to about 8%.

In some embodiments, the degree of crosslinking is between about 4% to about 12%.  In some embodiments, the degree of crosslinking is less than about 6%, for 15   example, is less than about 5%.

In some embodiments, the HA component is capable of absorbing at least about one time its weight in water.  When neutralized and swollen, the crosslinked HA component and water absorbed by the crosslinked HA component is in a weight ratio of about 1:1.  The resulting hydrated HA-based gels have a characteristic of being highly 20   cohesive.

The HA-based gels in accordance with some embodiments of the invention may have sufficient cohesivity such that the gels will not undergo substantial phase separation after centrifugation of the gel at 2000 rd/min for 5 minutes.  In another embodiment, the gels have the characteristic of being capable of absorbing at least one 25   time their weight of water and have sufficient cohesivity such that when swollen with water at a gel/water weight ratio of about 1:1, the gels maintain their integrity, for example, when subjected to centrifugation.

The hydrated crosslinked, HA gels may be swollen to obtain the desired cohesivity.  This step can be accomplished by neutralizing the crosslinked, hydrated HA

gel, for example by adding an aqueous solution containing of an acid, such as HCl.  The gels are then swelled in a phosphate buffered saline (PBS) solution for a sufficient time and at a low temperature.

In one embodiment, the resulting swollen gels are highly cohesive with no visible distinct particles, for example, no visibly distinct particles when viewed with the naked eye.  In one embodiment, the gels have no visibly distinct particles under a magnification of less than 35X.

The cohesive, substantially single-phase gels are now purified by conventional means such as, dialysis or alcohol precipitation, to recover the crosslinked material, to stabilize the pH of the material and to remove any un-reacted crosslinking agent.  Additional water or a slightly alkaline aqueous solution can be added to bring the concentration of the NaHA to a desired concentration.

The pH of the purified, substantially pH neutral, crosslinked HA gels are preferably adjusted to cause the gels to become slightly alkaline such that the gels have a pH of greater than about 7.2, for example, about 7.5 to about 8.0.  This step may be accomplished by any suitable means, for example, by adding a suitable amount of dilute NaOH, KOH, NaHCO$_3$ or LiOH, to the gels or any other alkaline molecule, solution and/or buffering composition know by one skilled in the art.

An effective amount of lidocaine, such as lidocaine HCl, is then added to the purified cohesive NaHA gels.  For example, in some embodiments, the lidocaine HCl is provided in a powder form which is solubilized using water for injection (WFI).  The gels are kept neutral with a buffer or by adjustment with diluted NaOH in order that the final HA/lidocaine composition will have a desired, substantially neutral pH.  The final HA-based filler compositions including lidocaine have a lidocaine concentration of between at least about 0.1% and about 5%, for example, about 2% w/w of the composition, or in another example about 0.3%.

After the addition of the lidocaine HCl, or alternatively, during the addition of the lidocaine HCl, the HA/lidocaine gels, or compositions, are homogenized to create highly homogenous cohesive HA/lidocaine gels having a desired consistency and

U.S. Utility Patent Application
Allergan Docket: 18438-18459 (FAC)

stability.  The homogenization step may comprise mixing, stirring, or beating the gels with a controlled shearing force to obtain a substantially homogenous mixture.

The HA/lidocaine compositions described herein display a viscosity which is dependent on the composition's properties and the presence of at least one anesthetic

5      agent.  The viscosity of the HA/lidocaine compositions can be from about 50 Pa*s to about 450 Pa*s.  In other embodiments, the viscosity can be from about 50 Pa*s to about 300 Pa*s, from about 100 Pa*s to about 400 Pa*s, or about 250 Pa*s to about 400 Pa*s, or about 50 Pa*s to about 250 Pa*s.

After homogenization, the HA/lidocaine compositions are introduced into

10     syringes and sterilized.  Syringes useful according to the present description include any syringe known in the art capable of delivering viscous dermafiller compositions. The syringes generally have an internal volume of about 0.4 mL to about 3 mL, more preferably between about 0.5 mL and about 1.5 mL or between about 0.8 mL and about 2.5 mL.  This internal volume is associated with an internal diameter of the syringe

15     which plays a key role in the extrusion force needed to inject high viscosity dermafiller compositions.  The internal diameters are generally about 4 mm to about 9 mm, more preferably from about 4.5 mm to about 6.5 mm or from about 4.5 mm to about 8.8 mm. Further, the extrusion force needed to deliver the HA/lidocaine compositions from the syringe is dependent on the needle gauge.  The gauges of needles used generally

20     include gauges between about 18G and about 40G, more preferably about 25G to about 33G or from about 16G to about 25G.  A person of ordinary skill in the art can determine the correct syringe dimensions and needle gauge required to arrive at a particular extrusion force requirement.

The extrusion forces displayed by the HA/lidocaine compositions described

25     herein using the needle dimensions described above are at an injection speeds that are comfortable to a patient.  Comfortable to a patient is used to define a rate of injection that does not injure or cause excess pain to a patient upon injection to the soft tissue. One skilled in the art will appreciate that comfortable as used herein includes not only patient comfort, but also comfort and ability of the physician or medical technician

30     injecting the HA/lidocaine compositions.  Although certain extrusion forces may be

U.S. Utility Patent Application
Allergan Docket: 18438-18459 (FAC)

achievable with the HA/lidocaine compositions of the present description, one skilled in the art understands that high extrusion forces can lead to lack of control during injection and that such lack of control may result in additional pain to the patient. Extrusion forces of the present HA/lidocaine compositions can be from about 8 N to about 15 N,

5   or more preferably from about 10 N to about 13 N, or about 11 N to about 12 N, for example, at an extrusion rate of about 12.5 mm/min.

Sterilization, as used herein comprises any method known in the art to effectively kill or eliminate transmissible agents, preferably without substantially altering of degrading the HA/lidocaine compositions.

10   One preferable method of sterilization of the filled syringes is by autoclave. Autoclaving can be accomplished by applying a mixture of heat, pressure and moisture to a sample in need of sterilization. Many different sterilization temperatures, pressures and cycle times can be used for this step. For example, the filled syringes may be sterilized at a temperature of at least about 120°C to about 130°C or greater. Moisture

15   may or may not be utilized. The pressure applied is in some embodiments depending on the temperature used in the sterilization process. The sterilization cycle may be at least about 1 minute to about 20 minutes or more.

Another method of sterilization incorporates the use of a gaseous species which is known to kill or eliminate transmissible agents. Preferably, ethylene oxide is

20   used as the sterilization gas and is known in the art to be useful in sterilizing medical devices and products.

A further method of sterilization incorporates the use of an irradiation source which is known in the art to kill or eliminate transmissible agents. A beam of irradiation is targeted at the syringe containing the HA/lidocaine solution, and the wavelength of

25   energy kills or eliminates the unwanted transmissible agents. Preferable energy useful include, but is not limited to ultraviolet (UV) light, gamma irradiation, visible light, microwaves, or any other wavelength or band of wavelengths which kills or eliminates the unwanted transmissible agents, preferably without substantially altering of degrading the HA/lidocaine composition.

U.S. Utility Patent Application
Allergan Docket: 18438-18459 (FAC)

Further described are In another embodiment, methods of manufacturing cohesive HA-based compositions generally comprising the steps of providing a crosslinked HA-based gel without an anesthetic, (hereinafter, sometimes, a precursor gel) adjusting the pH of the precursor gel to obtain a gel having a pH of between about 7.2 and 8.0, and adding a suitable amount of lidocaine, or other anesthetic agent, to the pH-adjusted gels to obtain cohesive HA-based compositions that include an anesthetic agent.  In one embodiment, the precursor gel is a highly cohesive, substantially single phase gel comprising no greater than about 1% to about 10% free HA by volume, for example, no greater than about 10% free HA by volume.  In another embodiment, the precursor gel is a relatively less cohesive gel comprising at least 10% to about 20% or more free HA by volume.

## Example 1

## Method for testing for cohesivity of gel

For purposes of example only and not to be considered as limiting the present invention in any way, the following tests may be performed in order to evidence or quantify cohesivity of a HA-based gel composition.

First, 0.2 g or 0.4 g of a gel composition to be tested is placed in a glass syringe.  Next, 0.2 g or more of phosphate buffer is added to the syringe and the mixture is thoroughly mixed for about 1 hour to obtain a homogenous mixture.  Then, the homogenized mixture is centrifuged for 5 min at 2000 tr/min to remove the air bubbles and to allow the decantation of any particles.  The syringe is then held in a vertical position and one drop of eosin colorant is deposited at the surface of the gel by means of a syringe and an 18G needle.  After 10 min, the dye has slowly diffused through the gel.

After dilution of the gel, homogenization and decantation, a relatively low cohesivity gel shows a phase separation (an upper diluted less viscous phase without particles and a lower one composed of decanted particles that are visible with the naked eye or under microscope).  Under the same conditions, a highly cohesive gel shows substantially no phase separation, and the dye is prevented from diffusing into the

cohesive formulation. A relatively less cohesive gel, on the other hand, shows a clear phase separation.

## Example 2

### Synthesis of a Soft Tissue Filler with Lidocaine

5        NaHA fibers or powder are hydrated in an alkaline solution, for example, an aqueous solution containing NaOH. The mixture is mixed at ambient temperature, about 23°C, to form a substantially homogenous, alkaline HA gel.

A crosslinking agent, BDDE, is diluted in an aqueous solution and added to
10   the alkaline HA gel. The mixture is homogenized for several minutes.

Alternatively, BDDE can be added directly to the HA fibers (dry state) at the beginning of the process, prior to the hydration. The crosslinking reaction will then start relatively slowly at ambient temperature, ensuring even better homogeneity and efficacy of the crosslinking. Methods of crosslinking polymers in the dry state using a
15   polyfunctional crosslinking agent such as BDDE are described in, for example, Piron et al., U.S. Patent No. 6,921,819 which is incorporated herein by reference in its entirety as if it were part of the present specification.

The resulting crosslinked HA gel mixture is then heated at about 50°C for about 2.5 hours. The material is now a highly crosslinked HA/BDDE gel (aspect = solid
20   gel). This crosslinked gel is then neutralized with a suitable acidic solution. The neutralized HA gel is then swollen in a phosphate buffer at a cold temperature, for example a temperature of about 5°C, to obtain a highly cohesive HA gel. In this specific example, the phosphate buffered saline solution contains water-for-injection (WFI), disodium hydrogen phosphate, and sodium dihydrogen phosphate. When neutralized
25   and swollen, the crosslinked HA component and water absorbed by the crosslinked HA component is in a weight ratio of about 1:1.

The cohesive swollen HA gel is then mechanically stirred and filled into dialysis membranes and dialyzed against a phosphate buffer. The HA gel is then filled into dialysis membranes and dialyzed against a phosphate buffer for up to several days

with regular changes of the bath, in order to remove the un-reacted crosslinker, to stabilize the pH close to neutrality (pH=7.2) and to ensure proper osmolarity of the HA gel.  The osmolarity of the resulting cohesive HA gel is between about 200 mOsmol and about 400 mOsmol, most preferably about 300 mOsmol.

5      After dialysis, the resulting cohesive HA gel has a substantially neutral pH, preferably about 7.2, and no visibly distinct particles in a fluidic media when viewed at a magnification of less than about 35X.

Lidocaine chlorhydrate (lidocaine HCl) in powder form is first solubilized in WFI and filtered through a 0.2 µm filter.  Dilute NaOH solution is added to the cohesive 10  HA gel in order to reach a slightly basic pH (for example, a pH of between about 7.5 and about 8).  The lidocaine HCl solution is then added to the slightly basic gel to reach a final desired concentration, for example, a concentration of about 0.3% (w/w).  The resulting pH of the HA/lidocaine mixture is then about 7 and the HA concentration is about 24 mg/mL. Mechanical mixing is performed in order to obtain a proper 15  homogeneity in a standard reactor equipped with an appropriate blender mechanism. The resulting composition is cohesive.

If desired, a suitable amount of free HA gel may be added to the HA/lidocaine gel mixture with the advantage of increasing the kinetics of lidocaine delivery.  For example, free HA fibers are swollen in a phosphate buffer solution, in 20  order to obtain a homogeneous viscoelastic gel.  This free HA gel is then added to the crosslinked HA/lidocaine gel (for example, at about 5%, w/w).  The resulting gel is then filled into sterile syringes and autoclaved at sufficient temperatures and pressures for sterilization for at least about 1 minute.

After autoclaving, the final HA/lidocaine product is packaged and distributed 25  to physicians.  The product manufactured in accordance with this method exhibits one or more characteristics of stability as defined elsewhere herein.  For example, the autoclaved HA/lidocaine product has a viscosity, cohesivity, and extrusion force that are acceptable.  No degradation of the HA/lidocaine gel product is found during testing of the product after the product has spent several months in storage.

U.S. Utility Patent Application
Allergan Docket: 18438-18459 (FAC)

## Example 3

### Properties of Soft Tissue Fillers

Properties of HA/lidocaine compositions manufactured in accordance with methods described herein are shown in the Table 1 below.  Extrusion force for example

5  was measured using an INSTRON® Advanced Materials Testing System Model 5564 (Instron, Norwood, MA) running BLUEHILL® software version 2.11 (Instron, Norwood, MA).   Other rheological data was collected using a Versa test Column with a MECMESIN® dynamometer AGF 100 N (Mecmesin Limited, West Sussex, United Kingdom) running Emperor software and a TERMO FISHER SCIENTIFIC® Rheometer

10  RS600 (Thermo Fisher Scientific, Inc. Corp., Waltham,  MA).

**Table 1**

|                               | HA/lidocaine Composition          |
|-------------------------------|-----------------------------------|
| **Appearance**                | Homogeneous transparent gel       |
| **pH**                        | 7.2                               |
| **Extrusion force (N)**       | 10.8N                             |
| **NaHA Content**              | 23.7 mg/g                         |
| **Sterility**                 | Sterile (SAL$\leq$10$^{-6}$)      |
| **Osmolarity**                | 321 mOsml/kg                      |
| **Lidocaine Content (%)**     | 0.29%                             |
| **2,6-dimethylaniline content** | Conforms                         |

In order to ensure that product specifications were maintained throughout the shelf life of the composition, multiple studies were performed.   In addition, 2,6

15  dimethylaniline content was measured in order to confirm the absence of lidocaine degradation.

Table 2 provides a summary of stability testing results on the composition manufactured as described herein.

U.S. Utility Patent Application
Allergan Docket: 18438-18459 (FAC)

**Table 2**

| Test | HA/lidocaine Composition | | |
| --- | --- | --- | --- |
| | 3 month results | 6 month results | 9 month results |
| Aspect Transparent and homogeneous | Conforms | Conforms | Conforms |
| pH | 7.2 | 7.2 | 7.2 |
| Extrusion Force (N) | 11.9 | 11.1 | 11.9 |
| NaHA Concentration (mg/g) | 23.8 | 23.1 | 24.2 |
| Sterility | Conforms | Conforms | Conforms |
| Osmolarity (mOsm/kg) | 349 | 329 | 342 |
| Lidocaine Content (%) | 0.29 | 0.29 | 0.29 |
| 2,6-dimethylaniline content | Conforms | Conforms | Conforms |

It was discovered that at 9 months time (from manufacture date), the composition continues to meet the product specifications.

5

## Example 4

### Stability of Soft Tissue Fillers

The following sterilized HA formulations (Samples 1-6) were obtained for testing.

Sample 1 is a free HA mixture 13.5mg/g, with hydroxyl propyl methyl

10    cellulose (HPMC) 5.5 mg/g.

Sample 2 is contains 5.5-6.5 mg/mL of high molecular weight HA (about 4-6 MDa) and a degree of elasticity (G') of about 200.

U.S. Utility Patent Application
Allergan Docket: 18438-18459 (FAC)

Sample 3 is a non-commercial gel made of distinct gel particles mixed with free HA (80/20, w/w). The HA particles (80%) is obtained by disintegration of a "solid" heavily crosslinked HA gel.   The particles have different shapes and dimensions (several microns to several mm).

5    Sample 4 is a cohesive crosslinked HA formulation.  Sample 4 has a HA concentration of about 18 mg/mL, less than 6% crosslinking, a G' of about 60 and a high molecular weight to low molecular weight HA ratio from about 95% to about 5%, to about 100% high molecular weight HA.

Sample 5 is a cohesive crosslinked HA formulation.  Sample 5 has a HA
10    concentration of about 24 mg/mL, about 6% crosslinking, a G' of about 170 and a high molecular weight to low molecular weight HA ratio from about 95% to 5% to about 100% high molecular weight HA.

Sample 6 is a cohesive crosslinked HA formulation. Sample 6 has a HA concentration of about 20 mg/mL, about 5% crosslinking, a G' of about 450 and a high
15    molecular weight to low molecular weight HA ratio from about 10% to 90%.


Each of Samples 1-6 was prepared as follows:

Test 1:   About 20 g of each of Samples 1-6 was individually mixed with a solution of lidocaine chlorhydrate and homogenized.  In this test, during the addition of
20    the lidocaine chlorhydrate, the pH of the sample gel is substantially neutral and is not adjusted, for example, with the addition of sodium hydroxide solution.   Each of the Samples was then filled into syringes and autoclaved.

Test 2:   About 20 g of each of Samples 1-6 was individually mixed with a solution of lidocaine chlorhydrate, and the pH was adjusted to 7.2 using NaOH solution
25    as described in Example 2 above.  Each of the Samples was then filled into syringes and autoclaved.

Test 3:   About 20 g of each of Samples 1-6 was mixed with an equivalent amount of WFI to take into account dilution effect.  No lidocaine was added.  Each of the Samples was then filled into syringes and autoclaved.

U.S. Utility Patent Application
Allergan Docket: 18438-18459 (FAC)

Results:   For each of the Samples in Tests 1-3, rheological measurements were performed using the rheological measurement equipment described in Example 3. The results are generally shown graphically in accompanying Figures 1-8.  Definitions of

5    symbols and units in Table 3 generally apply to Figures 1-8.

**Table 3**

| Symbol | Name | Units | Description |
|--------|------|-------|-------------|
| G' | Elastic Modulus | Pa | Quantifies the solid-like behavior or resistance to permanent deformation. |
| G" | Viscous Modulus | Pa | Quantifies the liquid-like behavior or resistance to flow. |
| (G"/G') | Tan Delta | | (G"/G') the ratio of the viscous modulus to the elastic modulus and useful for quantifying the extent of elasticity.  A value is below 1 means that the fluid is more elastic conversely a value above 1 means the fluid is more viscous. |

As a general guideline, a stable Sample including lidocaine prepared according to Test 1 or 2 would exhibit similar viscosity, when subjected to shear across

10    a range of frequencies, as the Samples prepared according to Test 3 which contain no lidocaine.

It was discovered that neither of Samples 1 and 2 with lidocaine was stable to autoclaving and as a result, degrade and become substantially less viscous in both Test 1 and Test 2.  Figures 1 and 2 in particular illustrate that Samples 1 and 2 have a

15    lowered viscosity, and hence were less stable to sheer when the product was prepared with lidocaine as compared to the product without lidocaine, even when the Sample was prepared according to Test 2 wherein a pH adjustment was performed.

Sample 3 was found to be stable to autoclaving in Test 2 but was not stable in Test 1 and Samples 4 and 5 were found to be stable to autoclaving only in Test 2.

20    Figures 3, 4 and 5 illustrate that Samples 3, 4 and 5 were stable when prepared with lidocaine and no pH adjustment, but were not stable when lidocaine was added and the pH adjusted accordingly.   Figure 6 illustrates that Sample 5 prepared with lidocaine and

U.S. Utility Patent Application
Allergan Docket: 18438-18459 (FAC)

pH control had similar viscous and elastic properties (G"/G') to Sample 5 prepared without lidocaine.  When Sample 5 was prepared with lidocaine and no pH adjustment, the viscous and elastic properties changed.

Sample 6 was found to be stable to autoclaving in both of Test 1 and Test 2. Figure 7 illustrates that Sample 6, no matter how it is produced, had similar viscosity and hence little shear comparison between preparation protocols.  Figure 8 further illustrates that Sample 6 retained similar viscous and elastic properties no matter how it was produced.

## Example 5

## Kinetic Release

The following example illustrates the kinetic of release of lidocaine from cohesive HA gels according to the present description.  The aim of the Example is to show that the lidocaine contained in cohesive HA gels according to the present description is freely released from the gels when placed in the skin.

Dialysis was performed for different periods of time (about 10g of gel were placed in a small dialysis bag and then put in 30g of water). After each dialysis was stopped at a given time, the gel was homogenized with a spatula and the amount of lidocaine was determined by UV method. The final concentration of the dialysis bath met the theoretical concentration of lidocaine which indicates the free release of lidocaine from the gel.

Table 3 illustrates lidocaine concentration in % (w/w), correction of the value and determination of the % of released lidocaine.  Additionally, Figure 9 graphically illustrates the results tabulated in Table 3 below.  Within Figure 9 is indicated the theoretical equilibrium concentration of lidocaine that would exist if the lidocaine were retained in the gel or if it were to be freely released.  As is graphically illustrated therein, the data suggest that the lidocaine is freely released from the gel.

U.S. Utility Patent Application
Allergan Docket: 18438-18459 (FAC)

**Table 3**

|  | MMA3056 | MMA4031-EC6 | MMA4031-EC2 | MMA4031-EC3 | MMA4031-EC4 | MMA4031-EC5 | MMA4029-EC7 |
|---|---|---|---|---|---|---|---|
| **Dialysis time (h)** | 0 hr | 1 hr 30 min | 5 hr | 7 hr | 23 hr | 48 hr | 72 hr |
| **[lidocaine] (%)** | 0.29 | 0.20 | 0.16 | 0.15 | 0.08 | 0.07 | 0.07 |

The concentration profile of lidocaine in Sample 5 from Example 4 (Figure 9) shows that over time it reaches an equilibrium that corresponds to free release of lidocaine. This *in vitro* study shows that lidocaine is freely released from the gel and not retained in the gel once implanted.

Although the invention has been described and illustrated with a certain degree of particularity, it is understood that the present disclosure has been made only by way of example, and that numerous changes in the combination and arrangement of parts can be resorted to by those skilled in the art without departing from the scope of the invention, as hereinafter claimed.

Unless otherwise indicated, all numbers expressing quantities of ingredients, properties such as molecular weight, reaction conditions, and so forth used in the specification and claims are to be understood as being modified in all instances by the term "about." Accordingly, unless indicated to the contrary, the numerical parameters set forth in the specification and attached claims are approximations that may vary depending upon the desired properties sought to be obtained by the present invention. At the very least, and not as an attempt to limit the application of the doctrine of equivalents to the scope of the claims, each numerical parameter should at least be construed in light of the number of reported significant digits and by applying ordinary rounding techniques. Notwithstanding that the numerical ranges and parameters setting forth the broad scope of the invention are approximations, the numerical values set forth in the specific examples are reported as precisely as possible. Any numerical

value, however, inherently contains certain errors necessarily resulting from the standard deviation found in their respective testing measurements.

The terms "a," "an," "the" and similar referents used in the context of describing the invention (especially in the context of the following claims) are to be
5     construed to cover both the singular and the plural, unless otherwise indicated herein or clearly contradicted by context.  Recitation of ranges of values herein is merely intended to serve as a shorthand method of referring individually to each separate value falling within the range.   Unless otherwise indicated herein, each individual value is incorporated into the specification as if it were individually recited herein.  All methods
10     described herein can be performed in any suitable order unless otherwise indicated herein or otherwise clearly contradicted by context.  The use of any and all examples, or exemplary language (e.g., "such as") provided herein is intended merely to better illuminate the invention and does not pose a limitation on the scope of the invention otherwise claimed.  No language in the specification should be construed as indicating
15     any non-claimed element essential to the practice of the invention.

Groupings of alternative elements or embodiments of the invention disclosed herein are not to be construed as limitations.  Each group member may be referred to and claimed individually or in any combination with other members of the group or other elements found herein.  It is anticipated that one or more members of a group may be
20     included in, or deleted from, a group for reasons of convenience and/or patentability. When any such inclusion or deletion occurs, the specification is deemed to contain the group as modified thus fulfilling the written description of all Markush groups used in the appended claims.

Certain embodiments of this invention are described herein, including the
25     best mode known to the inventors for carrying out the invention.  Of course, variations on these described embodiments will become apparent to those of ordinary skill in the art upon reading the foregoing description.  The inventor expects skilled artisans to employ such variations as appropriate, and the inventors intend for the invention to be practiced otherwise than specifically described herein.  Accordingly, this invention
30     includes all modifications and equivalents of the subject matter recited in the claims

U.S. Utility Patent Application
Allergan Docket: 18438-18459 (FAC)

appended hereto as permitted by applicable law.  Moreover, any combination of the above-described elements in all possible variations thereof is encompassed by the invention unless otherwise indicated herein or otherwise clearly contradicted by context.

5        Furthermore, numerous references have been made to patents and printed publications throughout this specification.  Each of the above-cited references and printed publications are individually incorporated herein by reference in their entirety.

        Specific embodiments disclosed herein may be further limited in the claims using consisting of or and consisting essentially of language.  When used in the claims, whether as filed or added per amendment, the transition term "consisting of" excludes

10      any element, step, or ingredient not specified in the claims.  The transition term "consisting essentially of" limits the scope of a claim to the specified materials or steps and those that do not materially affect the basic and novel characteristic(s).  Embodiments of the invention so claimed are inherently or expressly described and enabled herein.

15        In closing, it is to be understood that the embodiments of the invention disclosed herein are illustrative of the principles of the present invention.  Other modifications that may be employed are within the scope of the invention.  Thus, by way of example, but not of limitation, alternative configurations of the present invention may be utilized in accordance with the teachings herein.  Accordingly, the present invention

20      is not limited to that precisely as shown and described.

**Exhibit C**

# ~~CROSS-LINKED COHESIVE~~ HYALURONIC ACID ~~WITH~~ BASED GELS INCLUDING LIDOCAINE ~~GEL~~

### ~~By Inventor Pierre Lebreton~~

### INVENTOR: PIERRE F. LEBRETON

### CROSS REFERENCE TO RELATED APPLICATIONS

This application claims the benefit of U.S. provisional patent application number 61/085,956, filed August 04, 2008, U.S. provisional patent application number 61/087,934 filed on August 11, 2008, and U.S. provisional patent application number 61/096,278 filed September 11, 2008, the entire disclosures all of which are incorporated herein by reference.

### FIELD OF THE INVENTION

The present invention generally relates to injectable soft tissue fillers and more specifically relates to hyaluronic acid-based dermal and subdermal fillers including ~~lidocaine gel~~an anesthetic agent.

### ~~As~~BACKGROUND

It is generally accepted that as a person ages, the face begins to show ~~the~~ effects of gravity, sun-exposure, and years of facial muscle movement, such as smiling, frowning, chewing and squinting. The underlying tissues that keep the skin appearing youthful begin to break down, often resulting in laugh lines, smile lines, "crow's feet" and facial creases~~.~~ often referred to as the "effects of aging."

~~Soft~~In an effort to treat or correct the effects of aging, soft tissue fillers have been developed to help fill in facial lines and depressions~~,~~ and for restoring ~~volume of tissues due to~~fat loss~~.~~-related tissue volume loss. The soft tissue fillers thereby temporarily ~~restoring~~restore a smoother, more youthful appearance.

Ideally, ~~a filler will be~~soft tissue fillers are long-lasting, soft, smooth and natural appearing when implanted in the skin or beneath the skin. Further, ~~the filler will be~~soft tissue fillers are easy to implant into a patient using a fine gauge needle and ~~will~~ require low extrusion force for injection. Ideal fillers would also cause no adverse ~~reaction of~~side effects, and would be injectable with minimal or no discomfort to the patient.

~~For more than 20 years~~Collagen based soft tissue fillers were developed over 20 years ago, and for some time, bovine collagen-based fillers were the only U.S. Food and Drug Administration (FDA)-approved dermal fillers. Because these dermal fillers are bovine based, one of the main disadvantages has been the potential for allergic reaction in patients. It is believed that approximately 3-5% of human subjects show serious allergic reactions to bovine collagen, thus requiring careful testing before using these fillers in any particular person. ~~In February 2003, human derived collagens received FDA approval. These collagens provide the advantaged a significantly reduced risk of allergic reactions~~In addition to allergic reactions, collagen based

fillers degrade rapidly upon injection and require frequent treatments to sustain a smoother, more youthful appearance.

In February 2003, human-derived collagen filler compositions received FDA approval. These collagens provide the advantage of a significantly reduced risk of allergic reactions. However, despite the reduced incidence of allergic reactions, the human derived collagen fillers still suffered from the rapid degradation of the injected product.

The search for fillers that do not provoke allergic reactions and sustain a smoother, more youthful appearance has brought about the development of hyaluronic acid (HA)-based products. In December 2003, the first HA-based filler was approved by the FDA. This was ~~soon~~rapidly followed by the development of other HA-based fillers.

~~Hyaluronic acid~~HA, also known as hyaluronan, is a naturally occurring, water soluble polysaccharide, specifically a glycosaminoglycan, which is a major component of the extra-cellular matrix and is widely distributed in animal tissues. ~~Hyaluronic acid~~HA has excellent biocompatibility and does not cause allergic ~~reaction~~reactions when implanted into a patient. In addition, ~~hyaluronic acid~~HA has the ability to bind to large amounts of water, making it an excellent volumizer of soft tissues.

The development of HA-based fillers which exhibit ideal in vivo properties as well as ideal surgical usability has proven difficult. For example, HA-based fillers that exhibit desirable stability properties in vivo, can be so highly viscous that injection through fine gauge needles is difficult. Conversely, HA-based fillers that are relatively easily injected through fine gauge needles often have relatively inferior stability properties in vivo.

One method to overcome this problem is to use crosslinked HA-based fillers. Crosslinked HA is formed by reacting ~~uncrosslinked~~free HA with a crosslinking agent under suitable reaction conditions. Methods of preparing HA based soft tissue fillers including both crosslinked and ~~uncrosslinked~~free HA are well known.

It has been proposed to incorporate certain therapeutic agents, for example, anesthetic agents such as lidocaine, into injectable HA-based compositions. Unfortunately, HA-based injectable compositions which incorporate lidocaine during the manufacturing process are prone to partial or almost complete degradation prior to injection, particularly during high temperature sterilization steps and/or when placed in storage for any significant length of time.

~~Sadozai et al., U.S. Patent Application Publication No. 2005/0136122, discloses a process for making an HA based composition including lidocaine which includes hydrating dried HA particles with a phosphate buffer containing lidocaine.~~

~~Wohlrab, U.S. Patent Application Publication No. 2006/0122147 discloses a combination preparation comprising hyaluronic acid and a local anesthetic for example lidocaine, and further additives. The preparations are used in the medical treatment of diseases of the joints, cartilage and bones.~~

~~Romeo et al., U.S. Patent No. 6,224,857 discloses pharmaceutical preparations containing salts of hyaluronic acid with a basis anesthetic, particularly, salts with benzydamine or bupuvacaine.~~

~~Additional helpful information may be found in the following: U.S. Patent No. 5,143,724, U.S. Patent No. 5,356,883 and U.S. Patent No. 6,013,679.~~

~~The entire disclosure of each of the patents and publications cited in the present patent application is incorporated herein by this specific reference.~~

It is an objective of the HA-based soft filler compositions and methods of making and using them as described herein to provide soft tissue fillers that do not cause allergic reactions in patients, are biocompatible and are stable and usable in vivo and include one or more local anesthetic agents.

## SUMMARY

The present description relates to soft tissue fillers, for example, dermal and subdermal fillers, based on hyaluronic acid (HA) and pharmaceutically acceptable salts of HA, for example, sodium hyaluronate (NaHA). HA-based compositions described herein include a therapeutically effective amount of at least one anesthetic agent. In one embodiment, for example, the anesthetic agent is lidocaine. The present HA-based compositions including at least one anesthetic agent have an enhanced stability, relative to conventional HA-based compositions including, for example, lidocaine, when subjected to sterilization techniques such as autoclaving, and/or when stored for long periods at ambient temperature. Methods for preparing such HA-based compositions are also provided as well as products made by such methods.

Described herein are soft tissue filler compositions, the compositions generally comprising: a hyaluronic acid component crosslinked with a crosslinking agent selected from the group consisting of 1,4-butanediol diglycidyl ether (BDDE), 1,4- bis(2,3-epoxypropoxy)butane, 1,4-bisglycidyloxybutane, 1,2-bis(2,3- epoxypropoxy)ethylene and 1-(2,3-epoxypropyI)-2,3-epoxycyclohexane, and 1,4- butanediol diglycidyl ether; and at least one anesthetic agent combined with the crosslinked HA component.

In yet another embodiment, the at least one anesthetic agent is lidocaine. In a further embodiment, the amount of the anesthetic agent is present at a concentration between about 0.1% and about 5.0% by weight of the composition. In still another embodiment, the anesthetic agent is present at a concentration between about 0.2% and about 1.0% by weight of the composition. In one embodiment, the anesthetic agent is lidocaine and is present at a concentration of about 0.3% by weight of the composition.

In still another embodiment, the soft tissue filler composition has an extrusion force of between about 10 N and about 13 N, for example, at a rate of about 12.5 mm/minute. In yet another embodiment, the composition has a viscosity of between about 5 Pa*s and about 450 Pa*s, for example, when measured at about 5 Hz.

In one embodiment, the HA component is a gel, for example, a cohesive, hydrated gel. In one embodiment, the HA component is a crosslinked HA gel having no greater than about 1`)/0 to about 10% free HA. For purposes of this disclosure, free HA includes truly free HA as well as lightly crosslinked HA chains and fragments, all in soluble form in water.

In yet other embodiments, the HA component comprises greater than about 10%, for example, greater than about15%, for example, up to or greater than about 20% free HA.

In yet another embodiment, the HA component is a gel comprising particles of crosslinked HA in a relatively fluidic medium of free HA. In some embodiments, the HA component has an average particle size of greater than about 200 pm, for example, greater than about 250 pm.

Further described herein is a soft tissue filler composition comprising: a HA component crosslinked with 1,4-butanediol diglycidyl ether (BDDE), said HA component having a degree of crosslinking of less than about 5%, for example, about 2%, and an anesthetic component having a concentration between about 0.1% and about 5.0% by weight of the soft tissue filler composition, wherein the anesthetic is lidocaine.

Further described herein are methods of preparing soft tissue filler compositions, the methods comprising the steps of: providing a HA component crosslinked with at least one crosslinking agent selected from the group consisting of 1,4-butanediol diglycidyl ether (BDDE), 1,4-bis(2,3-epoxypropoxy)butane, 1,4- bisglycidyloxybutane, 1,2-bis(2,3-epoxypropoxy)ethylene and 1-(2,3-epoxypropyI)-2,3- epoxycyclohexane, and 1,4-butanediol diglycidyl ether or combinations thereof; adjusting the pH of said HA component to an adjusted pH above about 7.2; and adding a solution containing at least one anesthetic agent to the HA component having the adjusted pH to obtain a HA-based filler composition.

In another embodiment, the composition is sterilized, for example, by autoclaving, to form a sterilized composition and wherein the sterilized composition is stable at ambient temperature for at least about months, for example, at least 9 months, at least about 12 months, for example, at least about 36 months, or more.

In still another embodiment, the adjusted pH is above about 7.5. In another embodiment, the method further comprises the step of homogenizing the HA component during or after the step of adding the solution containing the at least one anesthetic agent. In a further embodiment, the step of homogenizing comprises subjecting the composition to mixing with a controlled shear.

In another embodiment, the step of providing a HA component comprises providing dry free NaHA material and hydrating the dry free NaHA material in an alkaline solution to obtain an alkaline, free NaHA gel. In yet another embodiment, the alkaline, free NaHA gel has a pH greater than about 8.0. In still another embodiment the pH is greater than about 10.

In a further embodiment, the HA component comprises greater than about 20% free HA and the crosslinked portion of the HA component has a degree of crosslinking of less than about 6% or less than about 5%.

In still a further embodiment, the soft tissue filler composition has a particulate nature in that it comprises particles of crosslinked HA dispersed in a fluid soluble HA medium. In some embodiments, the average size of such particles is at least about 200 pm, and in other embodiments the average size of such particles is at least about 250 pm.

Further described herein is a soft tissue filler composition comprising: a hyaluronic acid (HA) component crosslinked with 1,4-butanediol diglycidyl ether (BDDE), said HA component having

a degree of crosslinking of less than about 5%, and an anesthetic component having a concentration between about 0.1% and about 5.0% by weight of the soft tissue filler composition, wherein the anesthetic is lidocaine.

In a specific embodiment of the invention, a method of preparing a soft tissue filler composition is further described, the method comprising the steps of: providing dry free NaHA material and hydrating the dry free NaHA material in an alkaline solution to obtain an alkaline, free NaHA gel; crosslinking the free NaHA gel with BDDE to form a crosslinked alkaline HA composition with a degree of crosslinking less than about 5% and a pH above about 7.2; adding a solution containing lidocaine HCl to the HA component having the adjusted pH to obtain said HA-based filler composition; homogenizing the HA-based filler composition thereby forming a homogenized HA- based filler composition; and sterilizing the homogenized HA-based filler composition thereby forming a sterilized HA-based filler composition, wherein the soft tissue filler composition has a particle size of greater than about 200 pm, for example, a particle size of greater than about 250 pm.

## BRIEF DESCRIPTION OF THE ~~INVENTION~~ DRAWINGS

Figure 1 graphically illustrates the viscosity of Sample 1 prepared without lidocaine, with lidocaine and pH adjustment during formation and with lidocaine but without pH adjustment during formation versus the shear frequency.

Figure 2 graphically illustrates the viscosity of Sample 2 prepared without lidocaine, with lidocaine and pH adjustment during formation and with lidocaine but without pH adjustment during formation versus the shear frequency.

Figure 3 graphically illustrates the viscosity of Sample 3 prepared without lidocaine, with lidocaine and pH adjustment during formation and with lidocaine but without pH adjustment during formation versus the shear frequency.

Figure 4 graphically illustrates the viscosity of Sample 4 prepared without lidocaine, with lidocaine and pH adjustment during formation and with lidocaine but without pH adjustment during formation versus the shear frequency.

Figure 5 graphically illustrates the viscosity of Sample 5 prepared without lidocaine, with lidocaine and pH adjustment during formation and with lidocaine but without pH adjustment during formation versus the shear frequency.

Figure 6 graphically illustrates the relative viscosity/elasticity characteristics of Sample 5 prepared without lidocaine, with lidocaine and pH adjustment during formation and with lidocaine but without pH adjustment during formation versus the shear frequency.

Figure 7 graphically illustrates the viscosity of Sample 6 prepared without lidocaine, with lidocaine and pH adjustment during formation and with lidocaine but without pH adjustment during formation versus the shear frequency.

Figure 8 graphically illustrates the relative viscosity/elasticity characteristics of Sample 6 prepared without lidocaine, with lidocaine and pH adjustment during formation and with lidocaine but without pH adjustment during formation versus the shear frequency.

Figure 9 graphically illustrates the lidocaine concentration in the gel from Sample 5 in Example 4 made by the procedure of Test 2 versus time.

## DEFINITIONS

Certain terms as used in the specification are intended to refer to the following definitions, as detailed below. Where the definition of terms departs from the commonly used meaning of the term, applicant intends to utilize the definitions provided below, unless specifically indicated.

Autoclave stable or stable to autoclaving as used herein describes a product or composition that is resistant to degradation such that the product or composition maintains at least one, and preferably all, of the following aspects after effective autoclave sterilization: transparent appearance, pH, extrusion force and/or rheological characteristics, hyaluronic acid (HA) concentration, sterility, osmolarity, and lidocaine concentration.

Centrifugation as used herein refers to the process of using centrifugal forces to evenly distribute substances of greater and lesser density. Centrifugation is commonly used to separate a liquid phase from a solid or gel phase. Substantial phase separations resulting from centrifugation would be at least those visible by the naked eye, for example, a liquid phase and a solid phase distinctly separated when viewed with the naked eye.

High molecular weight HA as used herein describes a HA material having a molecular weight of at least about 1.0 million Daltons (mw 106 Da or 1 MDa) to about 4.0 MDa. For example, the high molecular weight HA in the present compositions may have a molecular weight of about 2.0 MDa. In another example, the high molecular weight HA may have a molecular weight of about 2.8 MDa.

Low molecular weight HA as used herein describes a HA material having a molecular weight of less than about 1.0 MDa. Low molecular weight HA can have a molecular weight of between about 200,000 Da (0.2 MDa) to less than about 1.0 MDa, for example, between about 300,000 Da (0.3 M Da) to about 750,000 Da. (0.75 MDa).

Degree of Crosslinking as used herein refers to the intermolecular junctions joining the individual HA polymer molecules, or monomer chains, into a permanent structure, or as disclosed herein the soft tissue filler composition. Moreover, degree of crosslinking for purposes of the present disclosure is further defined as the percent weight ratio of the crosslinking agent to HA-monomeric units within the crosslinked portion of the HA based composition. It is measured by the weight ratio of HA monomers to crosslinker (HA monomers:crosslinker).

Free HA as used herein refers to individual HA polymer molecules that are not crosslinked to, or very lightly crosslinked to (very low degree of crosslinking) the highly crosslinked (higher degree of crosslinking) macromolecular structure making up the soft tissue filler composition. Free HA generally remains water soluble. Free HA can alternatively be defined as the

"uncrosslinked," or lightly crosslinked component of the macromolecular structure making up the soft tissue filler composition disclosed herein.

Cohesive as used herein is the ability of a HA-based composition to retain its shape and resist deformation. Cohesiveness is affected by, among other factors, the molecular weight ratio of the initial free HA, the degree of crosslinking, the amount of residual free HA following crosslinking, and HA-based composition pH. Moreover, a cohesive HA-based composition resists phase separation when tested according to the method disclosed at Example 1 herein.

## DETAILED DESCRIPTION

The present ~~invention~~disclosure generally relates to soft tissue fillers, for example, dermal and subdermal fillers, based on hyaluronic acids (HA) and pharmaceutically acceptable salts of HA, for example, sodium hyaluronate~~.~~ (NaHA). In one aspect ~~of the invention~~, HA-_based compositions ~~including~~described herein include a therapeutically effective amount of ~~an~~at least one anesthetic agent, for example, lidocaine~~, are provided.~~. The present HA-based compositions including ~~lidocaine~~at least one anesthetic agent have an enhanced stability, relative to conventional HA-based compositions including ~~lidocaine~~, for example, lidocaine, when subjected to high temperatures and pressures, for example, those experienced during heat and/or pressure sterilization techniques, for example, autoclaving, and/or for example, when stored at ambient temperature for ~~at least 2 years.~~an extended period of time.

The stable compositions maintain at least one of, or all of, the following aspects after effective autoclave sterilization and/or prolonged storage: transparent appearance, pH for use in a patient, extrusion force and/or rheological characteristics, HA concentration, sterility, osmolarity, and lidocaine concentration. Methods or processes of preparing such HA-based compositions are also provided as well as products made by such methods or processes.

As used herein, hyaluronic acid (HA) can refer to any of its hyaluronate salts, and includes, but is not limited to, sodium hyaluronate (NaHA), potassium hyaluronate, magnesium hyaluronate, calcium hyaluronate, and combinations thereof.

Generally, the concentration of ~~sodium hyaluronate~~HA in the compositions ~~of the present invention~~described herein is preferably at least ~~10mg/ml~~10 mg/mL and up to about 40 mg/~~ml~~mL. For example, the concentration of ~~NaHA~~HA in some of the compositions is in a range between about 20 mg/~~ml~~mL and about 30 mg/~~ml. For~~mL. Further, for example, in some embodiments, the compositions have a ~~NaHA~~HA concentration of about 22 mg/~~ml~~mL, about 24 mg/~~ml~~mL, about ~~26mg/ml~~26 mg/mL, or about ~~28mg/ml.~~28 mg/mL.

In addition, the concentration of ~~lidocaine, for example in the form of lidocaine HCl,~~one or more anesthetics is in an amount ~~of between about 0.1% and about 5%, or in any suitable amount~~ effective to mitigate pain experienced upon injection of the composition. The at least one local anesthetic can be selected from the group of ambucaine, amolanone, amylocaine, benoxinate, benzocaine, betoxycaine, biphenamine, bupivacaine, butacaine, butamben, butanilicaine, butethamine, butoxycaine, carticaine, chloroprocaine, cocaethylene, cocaine, cyclomethycaine, dibucaine, dimethysoquin, dimethocaine, diperodon, dycyclonine, ecgonidine, ecgonine, ethyl chloride, etidocaine, beta-eucaine, euprocin, fenalcomine, formocaine, hexylcaine,

hydroxytetracaine, isobutyl p-aminobenzoate, leucinocaine mesylate, levoxadrol, lidocaine, mepivacaine, meprylcaine, metabutoxycaine, methyl chloride, myrtecaine, naepaine, octacaine, orthocaine, oxethazaine, parethoxycaine, phenacaine, phenol, piperocaine, piridocaine, polidocanol, pramoxine, prilocaine, procaine, propanocaine, proparacaine, propipocaine, propoxycaine, psuedococaine, pyrrocaine, ropivacaine, salicyl alcohol, tetracaine, tolycaine, trimecaine, zolamine, and salts thereof. In one embodiment, the at least one anesthetic agent is lidocaine, such as in the form of lidocaine HCl. The compositions described herein may have a lidocaine concentration of between about 0.1% and about 5% by weight of the composition, for example, about 0.2% to about 1.0% by weight of the composition. In one embodiment, the composition has a lidocaine concentration of about 0.3% of the composition. The concentration of lidocaine in the compositions described herein can be therapeutically effective meaning the concentration is adequate to provide a therapeutic benefit without inflicting harm to the patient.

In one aspect of the invention, a method is provided for preparing a HA- based composition including and an effective amount of lidocaine wherein the method comprises providing a precursor composition comprising a cohesive crosslinked HA- based gel, adding a solution containing lidocaine HCl, for example in the form of lidocaine HCl, thereto and homogenizing the mixture to obtain a cohesive, at least partially crosslinked, HA-based composition including lidocaine that is stable to autoclaving. More specifically, the The cohesive, crosslinked HA-based gel includes substantially no uncrosslinked no greater than about 1% to about 10% of free HA carrier, and is substantially monophasic in nature. For example, the gel comprises material by volume, for example, no greater than about 1% of uncrosslinked 5% free HA by volume material.

In some embodiments of the present invention, the HA component of the present compositions, hereinafter sometimes, "precursor composition" is a hydrated, cohesive gel. A cohesive gel, relative to a non-cohesive gel, is better able retain its shape and resist deformation, for example, after being subjected to shear or other stresses. It has been discovered by the present inventor that such cohesive gels are less likely to substantially degrade or become unstable over time or when subjected to external stimuli such as sterilization, relative to non-cohesive gels.

Without wishing intending to be bound by any particular theory of operability, it is believed that the high cohesivity of the precursor composition in some embodiments of the invention acts to substantially or entirely prevent or impede any breakdown or degradation of the crosslinked HA in the composition with the addition of lidocaine HC1. This is in contrast to conventional knowledge in the art which has recognized that the addition of lidocaine HC1 to crosslinked HA-based gels causes degradation, for example, complete degradation, of the crosslinked HA gel, including loss of viscosity and possibly loss of stability in vivo.

It is believed by the inventor of the present invention that such degradation may primarily occur because many, perhaps most crosslinked HA based gels are conventionally manufactured in a manner that produces gels which are "biphasic" in nature, and are not sufficiently cohesive to prevent such degradation when lidocaine HC1 is added. It has now been discovered that the addition of lidocaine HC1 to sufficiently cohesive crosslinked HA-based compositions does not cause any substantial or significant degradation of the compositions, and the compositions maintain their integrity, in terms of rheology, viscosity, appearance and other characteristics even when stored for a lengthy period of time, for example, for a period of time of at least about 6 months, about 9 months, about 12 months, or about 36 months or greater, for example, at

ambient temperatures, and even ~~when~~after being subjected to ~~heat and pressure~~ sterilization procedures, for example, autoclaving.

It is a surprising discovery that ~~highly cohesive, monophasic~~ formulations of crosslinked HA-based compositions including lidocaine can be manufactured in a manner to produce ~~autoclave~~sterilization-stable, injectable HA/lidocaine compositions.

~~In another aspect of the invention,~~Further described herein is a method ~~of~~for preparing ~~a~~ stable HA-based ~~composition~~compositions containing an effective amount of lidocaine ~~comprises~~by preparing a precursor composition, for example, a cohesive,~~ monophasic,~~ crosslinked HA-based gel, adding lidocaine chlorhydrate to the gel to form a HA/lidocaine gel mixture, and homogenizing the mixture, to obtain a crosslinked HA-based composition that is stable to autoclaving.

In certain embodiments, the precursor composition is a ~~more specific aspect~~cohesive, hydrated HA-based gel. Such a "cohesive" gel will generally include no greater than between about 1% to about 10% soluble-liquid form or free HA by volume. Such cohesive gels are considered by some in the industry to be monophasic, or substantially single-phase compositions, in that less than about 1`)/0 to about 10% of the ~~invention~~composition comprises free HA.

In yet other embodiments, the precursor composition is a relatively non- cohesive, hydrated HA-based gel. Such a "non-cohesive" gel generally includes greater than 10%, for example, greater than about 15%, for example, greater than 20% or more of free HA.

In some embodiments, the precursor composition may comprise a first component made up of relatively highly crosslinked HA in a substantially solid phase, and a second component comprising free or relatively less crosslinked HA in a substantially fluidic phase in which the relatively highly crosslinked HA is dispersed.

In some embodiments, the present compositions have a somewhat particulate nature and comprise particles of relatively highly crosslinked HA dispersed in a medium of free HA. In some embodiments, the average size of such particles of crosslinked HA is at least about 200 pm or at least about 250 pm. Such particulate compositions are generally less cohesive than otherwise similar compositions which have no discernable particles, or have particles having an average size of less than 200 pm.

For example, in some embodiments, the precursor composition may be manufactured by pressing a mass of relatively highly crosslinked HA-based gel through a sieve or a mesh to create relatively highly crosslinked HA particles of generally uniform size and shape. These particles are then mixed with a carrier material, for example, an amount of free HA to produce a gel.

In other embodiments, a method of preparing a ~~stable~~ HA-based composition ~~containing~~including an effective amount of lidocaine is provided wherein the method comprises providing a precursor composition including a substantially pH neutral, at least partially crosslinked HA-based gel and adjusting the pH of the gel to a pH of greater than about 7.2, for example, about 7.5 to about 8.0. The method further comprises the step of combining a solution containing lidocaine, for example in the form of lidocaine HCI, with the slightly alkaline gel

after the pH has been so adjusted and obtaining a HA-based composition including lidocaine that is stable to autoclaving.

Another method of preparing a stable HA-based composition containing an effective amount of lidocaine, as described elsewhere herein, generally comprises the steps of: providing purified ~~sodium hyaluronate (~~NaHA) material, for example, in the form of fibers~~,~~; hydrating the material~~,~~; and crosslinking the hydrated material with a suitable crosslinking agent to form ~~an effectively cohesive,~~a crosslinked HA-based gel. The method further comprises the steps of neutralizing and swelling the gel~~,~~ and adding to the gel a solution containing lidocaine, preferably an acidic salt of lidocaine~~, for example, lidocaine~~ chlorhydrate, to form a HA/lidocaine gel. ~~The~~Further still, the method further comprises homogenizing the HA/lidocaine gel and packaging the homogenized HA/lidocaine gel, for example, in syringes for dispensing. The syringes are then sterilized~~, for example~~ by autoclaving at an effective temperature and pressure. In accordance with the ~~invention~~present description, the packaged~~,~~ and sterilized cohesive NaHA/lidocaine ~~gel exhibits~~gels exhibit enhanced stability relative to HA-based compositions including lidocaine which are made using conventional methods ~~and relatively less cohesive, or biphasic HA-based compositions~~.

~~Without being limited thereto, stabilized HA/lidocaine compositions in accordance with the present invention include cross-linked HA-based compositions and at least partially cross-linked HA-based compositions.~~

~~The term "autoclave stable" or "stable to autoclaving" in the context of the present invention is generally meant herein to mean that the product, or composition, is resistant to degradation such that the product or composition maintains at least one of, and preferably all of, the following aspects after effective autoclave sterilization: transparent appearance, acceptable pH, acceptable extrusion force and/or rheological characteristics, acceptable NaHA concentration, acceptable sterility, acceptable osmolarity, and acceptable lidocaine concentration. Further, the~~The present products and compositions are considered to be ~~"stable" within the scope of the invention~~sterile when exposed to temperatures of at least about 120 ~~degrees~~°C to about 130 ~~degrees~~°C and/or pressures of at least about ~~3 bars~~12 pounds per square inch (PSI) to about 20 PSI during autoclaving for a period of at least about 1 minute to about 15 minutes.

The present products and compositions also remain stable when stored for long periods of time at room temperature. Preferably, the present compositions remain stable for a period of at least about ~~2~~two months, ~~for example,~~or at least about six months, or at least about ~~6~~9 months, ~~more preferably~~or at least about 12 months, ~~more preferably~~or at least about 36 months, at temperatures of at least about 25 ~~degrees~~°C.

In a specific embodiment, the compositions are stable at a temperature up to about 45 ~~degrees~~°C for a period of at least two months. ~~In a specific embodiment, the~~

The manufacturing process ~~of the present invention~~ includes, in one embodiment, the initial step of providing raw HA material~~, for example~~ in the form of dry HA fibers or powder. The raw HA material may be ~~hyaluronic acid~~HA, its salts and/or mixtures thereof. In a preferred embodiment, the HA material comprises fibers or powder of ~~sodium hyaluronate (~~NaHA)~~,~~. and even more preferably, bacterial-sourced ~~sodium hyaluronate. In other embodiments~~NaHA. In some aspects

of the present description, the HA material may be animal derived. In some embodiments, the The HA material is may be a combination of raw materials including HA and at least one other polysaccharide, for example, glycosaminoglycan (GAG).

In accordance with the present disclosure, high molecular weight HA is understood to mean that the HA material has a molecular weight of at least about 1.0 million Daltons (mw > 106 Da) to about 4.0 million Da (mw 4 X 106 Da). For example, the high molecular weight HA in the present compositions may have a molecular weight of about 2.0 million Da (Mw 2 X 106 Da). In another example, the high molecular weight HA may have a molecular weight of about 2.8 million Da (Mw 2.8 x 106 Da).

In addition, for purposes of the present disclosure, relatively low molecular weight HA may have a relatively lower molecular weight, for example, a molecular weight of less than 1.0 million Da. In some embodiments, the relatively low molecular weight HA has a molecular weight of between about 200,000 Da (mw 0.2 X106 Da) to less than 1.0 million Da, (mw less than 106 Da ), for example, between about 300,000 Da ( 0.3 X 106 Da) to about 750,000 Da. (mw 0.75 X 106 Da ).

In some embodiments of the invention In some embodiments, the HA material in the compositions nearly entirely comprises or consists of high molecular weight HA. That is, nearly 100% of the HA material in the present compositions may be high molecular weight HA as defined above.

In other embodiments of the invention, the HA material in the compositions comprises a combination of relatively high molecular weight HA and relatively low molecular weight HA, as defined above.

For example, in some embodiments, the The HA material of the compositions comprises may comprise between about 5% to about 95% high molecular weight HA with the balance of the HA material comprising or consisting of including low molecular weight HA. In a typical one embodiment of the invention, the ratio of high molecular weight to low molecular weight HA is at least about, and preferably greater than 2 (that means: Mw HMw / Mw LMw > w/w 2) with the high molecular weight HA having a molecular weight of above 1.0 million Da MDa.

It will be appreciated by those of ordinary skill in the art that the selection of high and low molecular weight HA material and their relative percentages or ratios is made dependent upon the desired characteristics, for example, extrusion force, elastic modulus and/or, viscous modulus and/or phase angle expressed as the ration ratio of viscous modulus to elastic modulus, cohesivity, etc. of the final HA-based product. For additional information that may be helpful in understanding this and other aspects of the present invention disclosure, see Lebreton, U.S. Patent Application Publication No. 2006/0194758, the entire disclosure of which is incorporated herein by this reference.

Typically, The HA-based gels can be prepared according to the present description by first cleaning and purifying dry or raw HA material is cleaned and purified. having a desired high/low molecular weight ratio. These steps generally involved involve hydrating the dry HA fibers or powder in the desired high/low molecular weight ratio, for example, using pure water, and

filtering the material to remove large foreign matters and~~/~~or other impurities. The filtered, hydrated material is then dried and purified. The high and low molecular weight HA may be cleaned and purified separately, ~~and they~~or may ~~also~~ be mixed together, for example, in the desired ratio, just ~~before being crosslinked~~prior to crosslinking.

In ~~a preferred embodiment~~one aspect of the ~~invention, the~~present disclosure, pure, ~~dried~~dry NaHA fibers are hydrated in an alkaline solution to produce an ~~uncrosslinked~~free NaHA alkaline gel. Any suitable alkaline solution may be used to hydrate the NaHA in this step, for example, but not limited to ~~an~~ aqueous ~~solution~~solutions containing ~~NaOH.~~sodium hydroxide (NaOH), potassium hydroxide (KOH), sodium bicarbonate (NaHCO3), lithium hydroxide (LiOH), and the like. In another embodiment, the suitable alkaline solution is aqueous solutions containing NaOH. The resulting alkaline gel will have a pH above 7.5~~, for example, a.~~ The pH ~~above 9, for example,~~of the resulting alkaline gel can have a pH ~~above~~greater than 9, or a pH greater than 10, ~~for example,~~or a pH ~~above~~greater than 12, ~~for example,~~or a pH ~~above~~greater than 13 ~~or greater~~.

The next step in the manufacturing process ~~comprises~~involves the step of crosslinking the hydrated, alkaline NaHA gel with a suitable crosslinking agent. The crosslinking agent may be any agent known to be suitable for crosslinking polysaccharides and their derivatives via their hydroxyl groups. Suitable crosslinking agents include, but are not limited to, ~~for example,~~1,4-butanediol diglycidyl ether (or 1,4-bis(2,3-epoxypropoxy)butane or 1,4- bisglycidyloxybutane~~,~~., all of which are commonly known as BDDE), 1,2-bis(2,3- epoxypropoxy)ethylene and 1-(2,3-~~epoxypropyl~~epoxypropyl)-2,3--epoxycyclohexane. The use of more than one crosslinking agent or a different crosslinking agent is not excluded from the scope of the present ~~invention. In is particularly preferred embodiment, the crosslinking agent comprises or consists of 1,4 butanediol diglycidyl ether (BDDE).~~ disclosure. In one aspect of the present disclosure, the HA gels described herein are crosslinked using BDDE.

The step of crosslinking may be carried out using any means known to those of ordinary skill in the art. Those skilled in the art appreciate how to optimize ~~the~~ conditions of crosslinking according to the nature of the HA, and how to carry out ~~the~~ crosslinking to an optimized degree.

Degree of crosslinking for purposes of the present disclosure is defined as the percent weight ratio of the crosslinking agent to HA-monomeric units within the crosslinked portion of the HA based composition. It is measured by the weight ratio of HA monomers to crosslinker (HA monomers:crosslinker).

The degree of crosslinking ~~is preferably sufficient for the final hydrogel composition obtained from the present methods to remain implanted at the injection site without excessive diffusion away from this injection site. In some embodiments~~in the HA component of the present ~~invention~~compositions is at least about 2% and is up to about 20%.

In other embodiments, the degree of crosslinking is ~~at least about 2% to about 20%, and more preferably is about 4% to about 12%, wherein~~greater than 5%, for example, is about 6% to about 8%.

In some embodiments, the degree of crosslinking is ~~defined as~~between about 4% to about 12%. In some embodiments, the ~~percent weight ratio~~degree of the ~~~~crosslinking ~~agent to HA monomeric units in the composition.~~is less than about 6%, for example, is less than about 5%.

~~Importantly~~In some embodiments, the HA component is capable of absorbing at least about one time its weight in water. When neutralized and swollen, the crosslinked HA component and water absorbed by the crosslinked HA component is in a weight ratio of about 1:1. The resulting ~~gel has~~hydrated HA-based gels have a characteristic of being highly cohesive. ~~Using a different terminology, the resulting HA-based gel can also be considered substantially "monophasic".~~

~~Monophasic HA-based gel, at least for purposes of the present disclosure, are to be distinguished from~~The HA-based gels ~~that are not monophasic in character, for example, those gels which are "biphasic" or heterogeneous in character.~~

~~Crosslinked HA-based gels which are considered to be "biphasic" or heterogeneous are those HA-based gels which are relatively particulate in nature, and comprise particles of crosslinked HA material dispersed in a carrier of uncrosslinked HA material. When analyzed with the naked eye or microscopically, for example, at a magnification of up to 35X, biphasic or heterogeneous HA-based gels appear particulate in nature. Such dispersed "particles" are often but not always perceptible by touch (tactilely) when felt with the fingers. These gels are usually manufactured by pressing a mass of crosslinked HA-based gel through a sieve or a mesh to create crosslinked HA particles of generally uniform size and/or shape. To form the biphasic gel, these particles are then mixed with a carrier material, usually an amount of uncrosslinked HA, to produce a "biphasic" gel. Examples off such biphasic gels are manufactured by QMed and marketed under the names Perlane and Restylane, for example.~~

~~The HA-based gel at this step of the present process has a~~in accordance with some embodiments of the invention may have sufficient cohesivity such that the ~~gel~~gels will not undergo substantial phase separation after centrifugation of the gel at 2000 rd/min for 5 minutes. ~~Even more preferably~~In another embodiment, the ~~gel preferably has~~gels preferably have the characteristic of being capable of absorbing at least one time ~~its~~their weight of water and ~~has a~~have sufficient cohesivity such that when swollen with water at a gel/water weight ratio of about 1:1, the ~~gel maintains its~~gels maintain their integrity, for example, when subjected to centrifugation.

The hydrated crosslinked, HA ~~gel~~gels may be swollen to ~~facilitate obtaining~~obtain the desired cohesivity. This step ~~may~~can be accomplished by neutralizing the crosslinked, hydrated HA gel, for example by adding an aqueous solution containing ~~HCl.~~of an acid, such as HCl. The ~~gel is~~gels are then swelled in a phosphate buffered saline (PBS) solution for a sufficient time and at a low temperature. ~~The~~

In one embodiment, the resulting swollen ~~gel is~~gels are highly cohesive with no visible distinct particles, for example, no visibly distinct particles when viewed with the naked eye. In ~~a preferred~~one embodiment, the ~~gel has~~gels have no visibly distinct particles under a magnification of less than 35X.

The cohesive, ~~monophasic gel is~~substantially single-phase gels are now purified by conventional means ~~for example~~such as, dialysis or alcohol precipitation, to recover the crosslinked material,

to stabilize the pH of the material and to remove any ~~unreacted~~un-reacted crosslinking agent. Additional water or a slightly alkaline aqueous solution can be added to bring the concentration of the NaHA ~~in the composition~~ to a desired concentration.~~In some embodiments, the concentration of NaHA in the composition is in a range between about 10 mg/ml to about 30 mg/ml~~.

The pH of the purified, substantially pH neutral, crosslinked HA ~~gel is~~gels are preferably adjusted to cause the ~~gel~~gels to become slightly alkaline~~, for example,~~ such that the ~~gel has~~gels have a pH of greater than about 7.2, for example, about 7.5 to about 8.0. This step may be accomplished by any suitable means, for example, by adding a suitable amount of dilute ~~sodium hydroxide (~~NaOH~~) solution~~, KOH, NaHCO3 or LiOH, to the ~~gel~~gels or any other alkaline molecule, solution and/or buffering composition know by ~~l'homme de l'~~one skilled in the art.

An effective amount of lidocaine, ~~preferably in the form of~~such as lidocaine ~~HCl~~HCI, is then added to the purified cohesive NaHA ~~gel~~gels. For example, in some embodiments, the lidocaine ~~HCl~~HCI is provided in a powder form which is solubilized using water for injection (WFI). The ~~gel is~~gels are kept neutral with a ~~"strong"~~buffer or by adjustment with diluted ~~sodium hydroxide~~NaOH in order that the final HA/lidocaine composition will have a desired, substantially neutral pH. ~~Preferably, the~~The final HA-_based filler ~~composition~~compositions including lidocaine ~~will~~have a lidocaine concentration of between at least about 0.1% and about 5%, for example, about 2% ~~by weight~~w/w of the composition, or in another example about 0.3%.

After the addition of the lidocaine ~~HCl~~HCI, or alternatively, during the addition of the lidocaine ~~HCl~~HCI, the HA/lidocaine ~~gel is~~gels, or compositions, are homogenized to create ~~a~~highly homogenous cohesive HA/lidocaine ~~gel~~gels having a desired consistency and stability. ~~Preferably, the~~The homogenization step ~~comprises~~may comprise mixing, stirring, or beating the ~~gel~~gels with a controlled ~~shear~~shearing force to obtain a substantially homogenous mixture.

The HA/lidocaine compositions described herein display a viscosity which is dependent on the composition's properties and the presence of at least one anesthetic agent. The viscosity of the HA/lidocaine compositions can be from about 50 Pa*s to about 450 Pa*s. In other embodiments, the viscosity can be from about 50 Pa*s to about 300 Pa*s, from about 100 Pa*s to about 400 Pa*s, or about 250 Pa*s to about 400 Pa*s, or about 50 Pa*s to about 250 Pa*s.

After homogenization, the HA/lidocaine ~~composition is~~compositions are introduced into syringes and sterilized. Syringes useful according to the present description include any syringe known in the art capable of delivering viscous dermafiller compositions. The syringes generally have an internal volume of about 0.4 mL to about 3 mL, more preferably between about 0.5 mL and about 1.5 mL or between about 0.8 mL and about 2.5 mL. This internal volume is associated with an internal diameter of the syringe which plays a key role in the extrusion force needed to inject high viscosity dermafiller compositions. The internal diameters are generally about 4 mm to about 9 mm, more preferably from about 4.5 mm to about 6.5 mm or from about 4.5 mm to about 8.8 mm. Further, the extrusion force needed to deliver the HA/lidocaine compositions from the syringe is dependent on the needle gauge. The gauges of needles used generally include gauges between about 18G and about 40G, more preferably about 25G to about 33G or from about 16G to about 25G. A person of ordinary skill in the art can determine the correct syringe dimensions and needle gauge required to arrive at a particular extrusion force requirement.

The extrusion forces displayed by the HA/lidocaine compositions described herein using the needle dimensions described above are at an injection speeds that are comfortable to a patient. Comfortable to a patient is used to define a rate of injection that does not injure or cause excess pain to a patient upon injection to the soft tissue. One skilled in the art will appreciate that comfortable as used herein includes not only patient comfort, but also comfort and ability of the physician or medical technician injecting the HA/lidocaine compositions. Although certain extrusion forces may be achievable with the HA/lidocaine compositions of the present description, one skilled in the art understands that high extrusion forces can lead to lack of control during injection and that such lack of control may result in additional pain to the patient. Extrusion forces of the present HA/lidocaine compositions can be from about 8 N to about 15 N, or more preferably from about 10 N to about 13 N, or about 11 N to about 12 N, for example, at an extrusion rate of about 12.5 mm/min.

Sterilization comprises, as used herein comprises any method known in the art to effectively kill or eliminate transmissible agents, preferably without substantially altering of degrading the HA/lidocaine compositions.

One preferable method of sterilization of the filled syringes is by moist autoclave. Autoclaving can be accomplished by applying a mixture of heat., pressure and moisture to a sample in need of sterilization. Many different sterilization temperatures, pressures and cycle times can be used for this step. For example, the filled syringes may be sterilized at a temperature of at least about 120 degrees °C to about 130 degrees °C or greater. Moisture may or may not be utilized. The pressure applied is in some embodiments depending on the temperature used in the sterilization process. The sterilization cycle may be at least about 1 minute to about 20 minutes or more.

Swelling Test/Centrifugation Test/Dye Test

The Another method of sterilization incorporates the use of a gaseous species which is known to kill or eliminate transmissible agents. Preferably, ethylene oxide is used as the sterilization gas and is known in the art to be useful in sterilizing medical devices and products.

A further method of sterilization incorporates the use of an irradiation source which is known in the art to kill or eliminate transmissible agents. A beam of irradiation is targeted at the syringe containing the HA/lidocaine solution, and the wavelength of energy kills or eliminates the unwanted transmissible agents. Preferable energy useful include, but is not limited to ultraviolet (UV) light, gamma irradiation, visible light, microwaves, or any other wavelength or band of wavelengths which kills or eliminates the unwanted transmissible agents, preferably without substantially altering of degrading the HA/lidocaine composition.

Further described are In another embodiment, methods of manufacturing cohesive HA-based compositions generally comprising the steps of providing a crosslinked HA-based gel without an anesthetic, (hereinafter, sometimes, a precursor gel) adjusting the pH of the precursor gel to obtain a gel having a pH of between about 7.2 and 8.0, and adding a suitable amount of lidocaine, or other anesthetic agent, to the pH-adjusted gels to obtain cohesive HA-based compositions that include an anesthetic agent. In one embodiment, the precursor gel is a highly cohesive, substantially single phase gel comprising no greater than about 1% to about 10% free HA by volume, for example, no greater than about 10% free HA by volume. In another

embodiment, the precursor gel is a relatively less cohesive gel comprising at least 10% to about 20% or more free HA by volume.

### Example 1

### Method for testing for cohesivity of gel

For purposes of example only and not to be considered as limiting the present invention in any way, the following ~~Tests~~tests may be performed in order to evidence ~~a sufficient cohesivity of a HA-based gel composition for purposes of the present disclosure.~~

~~Method for testing for sufficient~~or quantify cohesivity of ~~gel:~~a HA-based gel composition.

First, 0.2 g or 0.~~4g~~4 g of a gel composition to be tested is placed in a glass syringe. ~~0.2g (resp.~~Next, 0.~~4g)~~2 g or more of phosphate buffer is added to the syringe and the mixture is thoroughly mixed for about 1 hour to obtain a homogenous mixture. ~~The~~Then, the homogenized mixture is ~~then~~centrifuged for 5 min at ~~2000tr~~2000 tr/min to remove the air bubbles and to allow the decantation of any particles. The syringe is then held in a vertical position and one drop of eosin colorant ~~(dye)~~is ~~deposit~~deposited at the surface of the gel by means of a syringe and an 18G needle. ~~A photo (Figure 1A) is taken after~~After 10 min ~~to show diffusion of,~~ the dye ~~has slowly diffused~~ through the gel.

After dilution of the gel, homogenization and decantation, a ~~biphasic or heterogeneous~~relatively low cohesivity gel shows a phase separation (an upper diluted less viscous phase without particles and a lower one composed of decanted particles that are visible with the naked eye or under microscope). Under the same conditions, a ~~monophasic~~highly cohesive gel shows substantially no phase separation~~. The~~, and the dye is prevented from diffusing into the cohesive formulation. A ~~biphasic, non~~relatively less cohesive gel, on the other hand, shows a clear phase separation.

### ~~EXAMPLE 1~~

### ~~Sodium hyaluronate~~Example 2

### Synthesis of a Soft Tissue Filler with Lidocaine

NaHA fibers or powder are hydrated in an alkaline solution, for example, an aqueous solution containing NaOH. The mixture is mixed at ambient temperature, about 23°C, to form a substantially homogenous, alkaline HA gel.

A crosslinking agent, BDDE ~~(1, 4-Butanediol diglycidyl ether),~~ is diluted in an aqueous solution and added to the alkaline HA gel. The mixture is homogenized for several minutes.

Alternatively, BDDE ~~could~~can be added directly to the HA fibers (dry state) at the beginning of the process, prior to the hydration. The crosslinking reaction will then start relatively slowly at ambient temperature, ensuring even better homogeneity and efficacy of the crosslinking ~~See.~~ Methods of crosslinking polymers in the dry state using a polyfunctional crosslinking agent such as BDDE are described in, for example, Piron et al., U.S. Patent No. 6,921,819 which is

incorporated herein by reference in its entirety ~~by this reference~~as if it were part of the present specification.

The resulting crosslinked HA gel mixture is then heated at about 50°C for about 2.5 hours. The material is now a highly crosslinked HA/BDDE gel (aspect = solid gel). This crosslinked gel is then neutralized ~~,~~ with a suitable acidic solution. The neutralized HA gel is then ~~wollen~~swollen in a phosphate buffer at a cold temperature, for example a temperature of about 5 ~~degrees~~°C, to obtain a highly cohesive HA gel. In this specific example, the phosphate buffered saline solution contains water-for-injection (WFI), disodium hydrogen phosphate, and sodium dihydrogen phosphate. When neutralized and swollen, the crosslinked HA component and water absorbed by the crosslinked HA component is in a weight ratio of about 1:1.

The cohesive swollen HA gel is then ~~mechanical~~mechanically stirred and filled into dialysis membranes and dialyzed against a phosphate buffer. ~~For example, the~~The HA gel is then filled into dialysis membranes and dialyzed against a phosphate buffer for up to several days with regular changes of the bath, in order to remove the ~~unreacted~~un-reacted crosslinker, to stabilize the pH close to neutrality (pH=7.2) and to ensure proper osmolarity of the HA gel ~~(. The~~ osmolarity ~~) (around~~ of the resulting cohesive HA gel is between about 200 mOsmol and about 400 mOsmol, most preferably about 300 mOsmol~~).~~.

After dialysis, the resulting cohesive ~~NaHA~~HA gel has a substantially neutral pH ~~(~~, preferably about 7.2)~~,~~ and no visibly distinct particles in a fluidic media when viewed at a magnification of less than about 35X.

Lidocaine chlorhydrate (lidocaine HCl) in powder form is first solubilized in ~~Water for Injection~~ (WFI) and filtered through a 0.2 ~~gm~~µm filter. Dilute ~~sodium hydroxide~~NaOH solution is added to the ~~NaHA~~cohesive HA gel in order to reach a slightly basic pH (for example, a pH of between about 7.5 and about 8). The lidocaine ~~chlorhydrate~~HCl solution is then added to the slightly basic gel to reach a final desired concentration, for example, a concentration of about 0.3% (w/w). The resulting pH of the HA/lidocaine mixture is then about 7 and the HA concentration is about 24 mg/~~ml~~mL. Mechanical mixing is performed in order to obtain a proper homogeneity in a standard reactor equipped with an appropriate blender mechanism. The resulting composition is cohesive.

If desired, a suitable amount of ~~uncrosslinked~~free HA gel may be added to the HA/lidocaine gel mixture with the advantage of increasing the ~~kinetic~~kinetics of lidocaine delivery. For example, ~~uncrosslinked~~free HA fibers are swollen in a phosphate buffer solution, in order to obtain a homogeneous viscoelastic gel. This ~~uncrosslinked~~free HA gel is then added to the crosslinked HA/lidocaine gel (for example, at about 5%, w/w).

The resulting gel is then filled into ~~Ready-to-Fill~~ sterile syringes and autoclaved at sufficient temperatures and pressures for sterilization for at least about 1 ~~minutes~~minute.

After autoclaving, the final HA/lidocaine product is packaged and distributed to physicians. The product manufactured in accordance with this method exhibits one or more characteristics of stability as defined elsewhere herein. For example, the autoclaved HA/lidocaine product has a viscosity, cohesivity, and extrusion force that are acceptable. No degradation of the HA/lidocaine

gel product is found during testing of the product after the product has spent several months in storage.

~~EXAMPLE 2~~

**Example 3**

**Properties of Soft Tissue Fillers**

Properties of HA/lidocaine ~~composition~~compositions manufactured in accordance with ~~a method of the present invention~~methods described herein are shown in the Table ~~directly~~1 below. Extrusion force for example was measured using an INSTRON® Advanced Materials Testing System Model 5564 (Instron, Norwood, MA) running BLUEHILL® software version 2.11 (Instron, Norwood, MA). Other rheological data was collected using a Versa test Column with a MECMESIN® dynamometer AGF 100 N (Mecmesin Limited, West Sussex, United Kingdom) running Emperor software and a TERMO FISHER SCIENTIFIC® Rheometer RS600 (Thermo Fisher Scientific, Inc. Corp., Waltham, MA).

In order to ensure that product specifications were maintained throughout the shelf life of the composition, multiple studies were performed. In addition, 2,6 dimethylaniline content was measured in order to confirm the absence of lidocaine degradation.

**Table 1**

|  | HA/lidocaine Composition |
|---|---|
| **Appearance** | Homogeneous transparent gel |
| **pH** | 7.2 |
| **Extrusion force (N)** | 10.8N |
| **NaHA Content** | 23.7 mg/g |
| **Sterility** | Sterile (SAL<10-6) |
| **Osmolarity** | 321 mosml/kg |
| **Lidocaine Content (%)** | 0.29% |
| **2,6-dimethylaniline content** | Conforms |

In order to ensure that product specifications are maintained throughout the shelf life of the composition, multiple studies are performed. In addition, 2,6-dimethylaniline content is measured in order to confirm the absence of lidocaine degradation.

The Table below2 provides a summary of stability testing results on the composition manufactured in accordance with the invention.as described herein

**Table 2**

| Test | HA/lidocaine Composition | | |
| --- | --- | --- | --- |
| | **3 month results** | **6 month results** | **9 month results** |
| Aspect Transparent and homogeneous | Conforms | Conforms | Conforms |
| pH | 7.2 | 7.2 | 7.2 |
| Extrusion force (N) | 11.9 | 11.1 | 11.9 |
| NaHA Content (mg/g) | 23.8 | 23.1 | 24.2 |
| Sterility | Conforms | Conforms | Conforms |
| Osmolarity (mOsml/kg) | 349 | 329 | 342 |
| Lidocaine Content (%) | 0.29 | 0.29 | 0.29 |
| 2,6-dimethylaniline content | Conforms | Conforms | Conforms |

It iswas discovered that at 9 months time (from manufacture date), the composition continues to meet the product specifications.

EXAMPLE 3

**Example 4**

**Stability of Soft Tissue Fillers**

The following ~~sterile~~sterilized HA formulations (~~SAMPLES~~Samples 1-6) ~~are~~were obtained for testing.

~~A) SAMPLE~~Sample 1 ~~(Rhexeal) is an uncrosslinked~~is a free HA mixture 13.5mg/g, with hydroxyl propyl methyl cellulose (HPMC) 5.5 mg/g.

~~B) SAMPLE 2 is a biphasic gel having the commercial name Hylaform~~

~~C) SAMPLE~~Sample 2 is contains 5.5-6.5 mg/mL of high molecular weight HA (about 4-6 MDa) and a degree of elasticity (G') of about 200.

Sample 3 is a non-commercial gel made of distinct gel particles mixed with ~~uncrosslinked~~free HA (80/20, w/w). The HA particles (80%) is obtained by disintegration of a "solid" heavily crosslinked HA gel ~~(SKGEL, implant for glaucoma surgery).~~. The particles have different shapes and dimensions (several microns to several mm). ~~This formulation is believed to be similar to the gel having commercial name RESTYLANE.~~

~~D) SAMPLE 4 is a cohesive formulation ( Juvederm Refine)~~

~~E) SAMPLE 5 (Juvederm Ultra Plus )~~Sample 4 is a cohesive crosslinked HA formulation. Sample 4 has a HA concentration of about 18 mg/mL, less than 6% crosslinking, a G' of about 60 and a high molecular weight to low molecular weight HA ratio from about 95% to about 5%, to about 100% high molecular weight HA.

Sample 5 is a cohesive crosslinked HA formulation

~~F) SAMPLE 6 (Juvederm Voluma).~~ Sample 5 has a HA concentration of about 24 mg/mL, about 6% crosslinking, a G' of about 170 and a high molecular weight to low molecular weight HA ratio from about 95% to 5% to about 100% high molecular weight HA. Sample 6 is a cohesive crosslinked HA formulation.

~~SAMPLES~~Sample 6 has a HA concentration of about 20 mg/mL, about 5% crosslinking, a G' of about 450 and a high molecular weight to low molecular weight HA ratio from about 10% to 90%.

Each of Samples 1-6 ~~are each~~was prepared as follows:

~~TEST~~Test 1

: About ~~20g~~20 g of each of ~~SAMPLES~~Samples 1-6 ~~is~~was individually mixed with a solution of lidocaine chlorhydrate and homogenized. ~~Each of~~In this test, during the ~~SAMPLES is~~addition of the lidocaine chlorhydrate, the pH of the sample gel is substantially neutral and is not adjusted, for example, with the addition of sodium hydroxide solution. Each of the Samples was then filled into syringes and autoclaved.

~~TEST~~Test 2

: About ~~20g~~20 g of each of ~~SAMPLES~~Samples 1-6 ~~is~~was individually mixed with a solution of lidocaine chlorhydrate, and the pH ~~is~~was adjusted to 7.2 using ~~Sodium Hydroxide~~NaOH solution as described in ~~EXAMPLE 1~~Example 2 above. Each of the ~~SAMPLES is~~Samples was then filled into syringes and autoclaved.

~~TEST~~Test 3

: About ~~20g~~20 g of each of ~~SAMPLES~~Samples 1-6 ~~is~~was mixed with an equivalent amount of ~~water for injection (~~WFI) to take into account dilution effect. No lidocaine ~~is~~was added. Each of the ~~SAMPLES is~~Samples was then filled into syringes and autoclaved.

~~RESULTS~~

Results: For each of the Samples in Tests 1-3, rheological measurements ~~are~~were performed using ~~suitable~~the rheological measurement equipment. described in Example 3. The results are generally shown graphically in accompanying Figures 1-8. Definitions of symbols and units in Table 3 generally apply to Figures 1-8.

**Table 3**

| Symbol | Name | Units | Description |
|---|---|---|---|
| G' | Elastic Modulus | Pa | Quantifies the solid-like behavior or resistance to permanent deformation. |
| G" | Viscous Modulus | Pa | Quantifies the liquid-like behavior or resistance to flow. |
| (G"/G') | Tan Delta | | (G"/G1) the ratio of the viscous modulus to the elastic modulus and useful for quantifying the extent of elasticity. A value is below 1 means that the fluid is more elastic conversely a value above 1 means the fluid is more viscous. |

As a general guideline, a stable Sample including lidocaine prepared according to Test 1 or 2 would exhibit similar viscosity, when subjected to shear across a range of frequencies, as the Samples prepared according to Test 3 which contain no lidocaine.

It ~~is~~was discovered that neither of Samples 1 and 2 with lidocaine ~~is~~was stable to autoclaving and ~~have degraded~~as a result, degrade and become substantially less viscous in both Test 1 and Test 2. Figures 1 and 2 in particular illustrate that Samples 1 and 2 have a lowered viscosity, and hence were less stable to sheer when the product was prepared with lidocaine as compared to the product without lidocaine, even when the Sample was prepared according to Test 2 wherein a pH adjustment was performed.

Sample 3 ~~is~~was found to be stable to autoclaving in Test 2 but ~~is~~was not stable in Test 1.

and Samples 4 and 5 ~~are~~were found to be stable to autoclaving only in Test 2. Figures 3, 4 and 5 illustrate that Samples 3, 4 and 5 were stable when prepared with lidocaine and no pH adjustment, but were not stable when lidocaine was added and the pH adjusted accordingly. Figure 6 illustrates that Sample 5 prepared with lidocaine and pH control had similar viscous and elastic properties (G"/G') to Sample 5 prepared without lidocaine. When Sample 5 was prepared with lidocaine and no pH adjustment, the viscous and elastic properties changed.

Sample 6 ~~is~~was found to be stable to autoclaving in both of Test 1 and Test 2. Figure 7 illustrates that Sample 6, no matter how it is produced, had similar viscosity and hence little shear comparison between preparation protocols. Figure 8 further illustrates that Sample 6 retained similar viscous and elastic properties no matter how it was produced.

~~These results are generally shown in accompanying Figs. 2-9.~~

~~EXAMPLE 4~~

## Example ~~of~~5

### Kinetic Release

The following example illustrates the kinetic of release~~:~~

 of lidocaine from cohesive HA gels according to the present description. The aim of the ~~release~~Example is to show that the ~~Lidocaine~~lidocaine contained in cohesive HA ~~formulation~~

~~is~~ gels according to the present description is freely released from the ~~composition~~gels when placed in the skin.

~~Different small dialysis is operated with~~Dialysis was performed for different periods of time (about 10g of gel ~~are~~were placed in a small dialysis bag and then put in 30g of water). After each dialysis ~~is~~was stopped at a given time, the gel ~~is~~was homogenized with a spatula and the amount of ~~Lidocaine is~~lidocaine was determined by ~~an~~ UV method. The final concentration of the dialysis bath ~~meets~~met the theoretical concentration of lidocaine which indicates the free release of lidocaine from the gel.

Table

~~Lidocaine~~ 3 illustrates lidocaine concentration in % (w/w), correction of the value and determination of the % of released ~~Lidocaine~~lidocaine. Additionally, Figure 9 graphically illustrates the results tabulated in Table 3 below. Within Figure 9 is indicated the theoretical equilibrium concentration of lidocaine that would exist if the lidocaine were retained in the gel or if it were to be freely released. As is graphically illustrated therein, the data suggest that the lidocaine is freely released from the gel.

|  | MMA30 56 | MMA40 31-EC6 | MMA40 31-EC2 | MMA40 31-EC3 | MMA40 31-EC4 | MMA40 31-EC5 | MMA40 29-EC7 |
|---|---|---|---|---|---|---|---|

| Dialysis time (h) | 0h | 1h30 | 5h00 | 7h00 | 23h00 | 48h00 | 72h00 |
|---|---|---|---|---|---|---|---|
| [lidocaine] (%) | 0.29 | 0.20 | 0.16 | 0.15 | 0.08 | 0.07 | 0.07 |

The ~~following Curve 2 depicts the results given in the above Table.~~



~~Curve 2:~~

~~The profile of the~~ concentration profile of lidocaine in ~~the gel Juvederm Ultra Plus with time~~ Sample 5 from Example 4 (Figure 9) shows that over time it reaches ~~the~~an equilibrium that corresponds to free release of ~~Lidocaine~~

lidocaine. This in vitro study shows that ~~the~~ lidocaine is freely released from the gel and not retained in the ~~Juvederm Gel with Lidocaine and is freely released~~gel once implanted.

~~This conclusion applies to~~

~~Juvederm 30 with Lidocaine,~~

~~Juvederm Ultra with Lidocaine,~~

and Juvederm Ultra Plus with lidocaine.

Although the invention has been described and illustrated with a certain degree of particularity, it is understood that the present disclosure has been made only by way of example, and that numerous changes in the combination and arrangement of parts can be resorted to by those skilled in the art without departing from the scope of the invention, as hereinafter claimed.

Unless otherwise indicated, all numbers expressing quantities of ingredients, properties such as molecular weight, reaction conditions, and so forth used in the specification and claims are to be understood as being modified in all instances by the term "about." Accordingly, unless indicated to the contrary, the numerical parameters set forth in the specification and attached claims are approximations that may vary depending upon the desired properties sought to be obtained by the present invention. At the very least, and not as an attempt to limit the application of the doctrine of equivalents to the scope of the claims, each numerical parameter should at least be construed in light of the number of reported significant digits and by applying ordinary rounding techniques. Notwithstanding that the numerical ranges and parameters setting forth the broad scope of the invention are approximations, the numerical values set forth in the specific examples are reported as precisely as possible. Any numerical value, however, inherently contains certain errors necessarily resulting from the standard deviation found in their respective testing measurements.

The terms "a," "an," "the" and similar referents used in the context of describing the invention (especially in the context of the following claims) are to be construed to cover both the singular and the plural, unless otherwise indicated herein or clearly contradicted by context. Recitation of ranges of values herein is merely intended to serve as a shorthand method of referring individually to each separate value falling within the range. Unless otherwise indicated herein, each individual value is incorporated into the specification as if it were individually recited herein. All methods described herein can be performed in any suitable order unless otherwise indicated herein or otherwise clearly contradicted by context. The use of any and all examples, or exemplary language (e.g., "such as") provided herein is intended merely to better illuminate the invention and does not pose a limitation on the scope of the invention otherwise claimed. No language in the specification should be construed as indicating any non-claimed element essential to the practice of the invention.

Groupings of alternative elements or embodiments of the invention disclosed herein are not to be construed as limitations. Each group member may be referred to and claimed individually or in any combination with other members of the group or other elements found herein. It is anticipated that one or more members of a group may be included in, or deleted from, a group for reasons of convenience and/or patentability. When any such inclusion or deletion occurs, the specification is deemed to contain the group as modified thus fulfilling the written description of all Markush groups used in the appended claims.

Certain embodiments of this invention are described herein, including the best mode known to the inventors for carrying out the invention. Of course, variations on these described embodiments will become apparent to those of ordinary skill in the art upon reading the

foregoing description. The inventor expects skilled artisans to employ such variations as appropriate, and the inventors intend for the invention to be practiced otherwise than specifically described herein. Accordingly, this invention includes all modifications and equivalents of the subject matter recited in the claims appended hereto as permitted by applicable law. Moreover, any combination of the above-described elements in all possible variations thereof is encompassed by the invention unless otherwise indicated herein or otherwise clearly contradicted by context.

Furthermore, numerous references have been made to patents and printed publications throughout this specification. Each of the above-cited references and printed publications are individually incorporated herein by reference in their entirety.

Specific embodiments disclosed herein may be further limited in the claims using consisting of or and consisting essentially of language. When used in the claims, whether as filed or added per amendment, the transition term "consisting of" excludes any element, step, or ingredient not specified in the claims. The transition term "consisting essentially of" limits the scope of a claim to the specified materials or steps and those that do not materially affect the basic and novel characteristic(s). Embodiments of the invention so claimed are inherently or expressly described and enabled herein.

In closing, it is to be understood that the embodiments of the invention disclosed herein are illustrative of the principles of the present invention. Other modifications that may be employed are within the scope of the invention. Thus, by way of example, but not of limitation, alternative configurations of the present invention may be utilized in accordance with the teachings herein. Accordingly, the present invention is not limited to that precisely as shown and described.

**Exhibit D**

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/393,884 | 02/26/2009 | Pierre F. Lebreton | 18438-59 (COR) | 1553 |

51957          7590          08/23/2012
ALLERGAN, INC.
2525 DUPONT DRIVE, T2-7H
IRVINE, CA 92612-1599

| EXAMINER |
|---|
| SOROUSH, ALI |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1617 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 08/23/2012 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

patents_ip@allergan.com

PTOL-90A (Rev. 04/07)

UNITED STATES DEPARTMENT OF COMMERCE
**U.S. Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450

| APPLICATION NO./ CONTROL NO. | FILING DATE | FIRST NAMED INVENTOR / PATENT IN REEXAMINATION | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 12/393,884 | 26 February, 2009 | LEBRETON, PIERRE F. | 18438-59 (COR) |

|  | EXAMINER |  |
|---|---|---|
| ALLERGAN, INC. 2525 DUPONT DRIVE, T2-7H IRVINE, CA 92612-1599 | ALI SOROUSH |  |
|  | **ART UNIT** | **PAPER** |
|  | 1617 | 20120817 |

DATE MAILED:

**Please find below and/or attached an Office communication concerning this application or proceeding.**

Commissioner for Patents

---

The IDS submitted on 08/01/2012 has been cosidered.

Any inquiry concerning this communication or earlier communications from the examiner should be directed to ALI SOROUSH whose telephone number is (571)272-9925. The examiner can normally be reached on M-F (9am-6pm).
If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Fereydoun G. Sajjadi can be reached on (571)272-3311. The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.
Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system. Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/ALI SOROUSH/
Examiner, Art Unit 1617

Receipt date: 08/01/2012   12393884 - GAU: 1617

Doc code: IDS   PTO/SB/08a (01-10)
Doc description: Information Disclosure Statement (IDS) Filed   Approved for use through 07/31/2012. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | 12393884 |
| Filing Date | 2009-02-26 |
| First Named Inventor | Pierre F. Lebreton |
| Art Unit | 1617 |
| Examiner Name | Ali Soroush |
| Attorney Docket  Number | 18438-59 (COR) |

| | | **U.S.PATENTS** | | | | Remove |
|---|---|---|---|---|---|---|
| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
| /A.S./ | 1 | 5676964 | | 1997-10-14 | della Valle | |
| | 2 | 6734298 | | 2004-05-11 | Barbucci | |
| | 3 | 6852255 | | 2005-02-08 | Yang | |
| | 4 | 6903199 | | 2005-06-07 | Moon | |
| | 5 | 7196180 | | 2007-03-27 | Aeschlimann | |
| | 6 | 7491709 | | 2009-02-17 | Carey | |
| | 7 | 8124120 | | 2012-02-28 | Sadozai | |

| If you wish to add additional U.S. Patent citation information please click the Add button. | Add |
|---|---|
| **U.S.PATENT APPLICATION PUBLICATIONS** | Remove |

Receipt date: 08/01/2012                                                                                   12593884 - GAU: 1617

| | Application Number | 12593884 |
|---|---|---|
| | Filing Date | 2009-02-26 |
| | First Named Inventor | Pierre F. Lebreton |
| | Art Unit | 1617 |
| | Examiner Name | Ali Soroush |
| | Attorney Docket Number | 18438-59 (COR) |

# INFORMATION DISCLOSURE STATEMENT BY APPLICANT
( **Not for submission under 37 CFR 1.99**)

| Examiner Initial* | Cite No | Publication Number | Kind Code[1] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| /A.S./ | 1 | 20080057091 | | 2008-03-06 | Abdellaoui | |
| | 2 | 20090155362 | | 2009-06-18 | Longin | |
| | 3 | 20100098794 | | 2010-04-22 | Armand | |
| | 4 | 20100316683 | | 2010-12-16 | Piron | |
| | 5 | 20110034684 | | 2011-02-10 | Yokokawa | |
| | 6 | 20060147483 | | 2006-07-01 | Chaouk et al. | |

If you wish to add additional U.S. Published Application citation information please click the Add button.   Add

## FOREIGN PATENT DOCUMENTS                                      Remove

| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2] i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T[5] |
|---|---|---|---|---|---|---|---|---|
| | 1 | | | | | | | ☐ |

If you wish to add additional Foreign Patent Document citation information please click the Add button   Add

## NON-PATENT LITERATURE DOCUMENTS                               Remove

EFS Web 2.1.17

Receipt date: 08/01/2012

| | |
|---|---|
| Application Number | 12593884 |
| Filing Date | 2009-02-26 |
| First Named Inventor | Pierre F. Lebreton |
| Art Unit | 1617 |
| Examiner Name | Ali Soroush |
| Attorney Docket Number | 18438-59 (COR) |

**INFORMATION DISCLOSURE STATEMENT BY APPLICANT**
( Not for submission under 37 CFR 1.99)

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T[5] |
|---|---|---|---|
| /A.S./ | 1 | Millay et al.; "Vasoconstrictors in Facial Plastic Surgery"; Archives of Otolaryngology-Head & Neck Surgery"; Vol. 117; pp. 160-163; February 1991. | ☐ |
| /A.S./ | 2 | WAHL, "European Evaluation of a New Hyaluronic Acid Filler Incorporating Lidocaine", Journal of Cosmetic Dermatology; Vol. 7; pp. 298-303; 2008. | ☐ |

If you wish to add additional non-patent literature document citation information please click the Add button **Add**

**EXAMINER SIGNATURE**

| Examiner Signature | /Ali Soroush/ | Date Considered | 08/17/2012 |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through a citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04. [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3). [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [5] Applicant is to place a check mark here if English language translation is attached.

# Exhibit E

Uɴɪᴛᴇᴅ Sᴛᴀᴛᴇs Pᴀᴛᴇɴᴛ ᴀɴᴅ Tʀᴀᴅᴇᴍᴀʀᴋ Oꜰꜰɪᴄᴇ

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/393,884 | 02/26/2009 | Pierre F. Lebreton | 18438-59 (COR) | 1553 |

51957        7590        01/24/2012
ALLERGAN, INC.
2525 DUPONT DRIVE, T2-7H
IRVINE, CA 92612-1599

| EXAMINER |
|---|
| SOROUSH, ALI |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1617 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 01/24/2012 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated  "Notification Date" to the following e-mail  address(es):

patents_ip@allergan.com

PTOL-90A  (Rev. 04/07)

| *Applicant-Initiated Interview Summary* | Application No. | Applicant(s) |
| | 12/393,884 | LEBRETON, PIERRE  F. |
| | Examiner | Art Unit | |
| | ALI SOROUSH | 1617 | |

All participants (applicant, applicant's representative, PTO personnel):

(1) _ALI SOROUSH_.  (3) _____ .

(2) _Linda Fox_.  (4) _____ .

Date of Interview: _12 January 2012_.

Type:  ☒ Telephonic  ☐ Video Conference
☐ Personal [copy given to: ☐ applicant  ☐ applicant's representative]

Exhibit shown or demonstration conducted:  ☐ Yes  ☒ No.
If Yes, brief description: _____ .

Issues Discussed  ☐101 ☐112 ☐102 ☒103 ☐Others
(For each of the checked box(es) above, please describe below the issue and detailed description of the discussion)

Claim(s) discussed: _23-32,34-36,38 and 40-67_.

Identification of prior art discussed: _Leberton (US Patent Application 2006/0194758 A1, Published 08/31/2006) and Calias et al. (US Patent 6521223 B1, Published 02/18/2003)_.

Substance of Interview
(For each issue discussed, provide a detailed description and indicate if agreement was reached. Some topics may include: identification or clarification of a reference or a portion thereof, claim interpretation, proposed amendments, arguments of any applied references etc...)

_Applicant submitted proposed amendments to the claims to incorporate limitations from the specification to limit the gel composition to have particular properties. Applicant further discussed submitting an affidavit showing that the properties of the gel which were not previously appreciated resulted in the incorporation of lidocaine, where previous attempts failed. The Examiner noted that such an amendment with an affidavit would likely overcome the prior art rejection of record._

**Applicant recordation instructions:** The formal written reply to the last Office action must include the substance of the interview. (See MPEP section 713.04). If a reply to the last Office action has already been filed, applicant is given a non-extendable period of the longer of one month or thirty days from this interview date, or the mailing date of this interview summary form, whichever is later, to file a statement of the substance of the interview

**Examiner recordation instructions**: Examiners must summarize the substance of any interview of record. A complete and proper recordation of the substance of an interview should include the items listed in MPEP 713.04 for complete and proper recordation including the identification of the general thrust of each argument or issue discussed, a general indication of any other pertinent matters discussed regarding patentability and the general results or outcome of the interview, to include an indication as to whether or not agreement was reached on the issues raised.

☒ Attachment

| /ALI  SOROUSH/ | |
| Examiner, Art Unit 1617 | |

## Summary of Record of Interview Requirements

**Manual of Patent Examining Procedure (MPEP), Section 713.04, Substance of Interview Must be Made of Record**

A complete written statement as to the substance of any face-to-face, video conference, or telephone interview with regard to an application must be made of record in the application whether or not an agreement with the examiner was reached at the interview.

**Title 37 Code of Federal Regulations (CFR) § 1.133 Interviews**
Paragraph (b)

In every instance where reconsideration is requested in view of an interview with an examiner, a complete written statement of the reasons presented at the interview as warranting favorable action must be filed by the applicant.  An interview does not remove the necessity for reply to Office action as specified in §§ 1.111, 1.135. (35 U.S.C. 132)

37 CFR §1.2  Business to be transacted in writing.

All business with the Patent or Trademark Office should be transacted in writing.  The personal attendance of applicants or their attorneys or agents at the Patent and Trademark Office is unnecessary.  The action of the Patent and Trademark Office will be based exclusively on the written record in the Office.  No attention will be paid to any alleged oral promise, stipulation, or understanding in relation to which there is disagreement or doubt.

———

The action of the Patent and Trademark Office cannot be based exclusively on the written record in the Office if that record is itself incomplete through the failure to record the substance of interviews.

It is the responsibility of the applicant or the attorney or agent to make the substance of an interview of record in the application file, unless the examiner indicates he or she will do so.  It is the examiner's responsibility to see that such a record is made and to correct material inaccuracies which bear directly on the question of patentability.

Examiners must complete an Interview Summary Form for each interview held where a matter of substance has been discussed during the interview by checking the appropriate boxes and filling in the blanks.  Discussions regarding only procedural matters, directed solely to restriction requirements for which interview recordation is otherwise provided for in Section 812.01 of the Manual of Patent Examining Procedure, or pointing out typographical errors or unreadable script in Office actions or the like, are excluded from the interview recordation procedures below.  Where the substance of an interview is completely recorded in an Examiners Amendment, no separate Interview Summary Record is required.

The Interview Summary Form shall be given an appropriate Paper No., placed in the right hand portion of the file, and listed on the "Contents" section of the file wrapper.  In a personal interview, a duplicate of the Form is given to the applicant (or attorney or agent) at the conclusion of the interview.  In the case of a telephone or video-conference interview, the copy is mailed to the applicant's correspondence address either with or prior to the next official communication.  If additional correspondence from the examiner is not likely before an allowance or if other circumstances dictate, the Form should be mailed promptly after the interview rather than with the next official communication.

The Form provides for recordation of the following information:
– Application Number (Series Code and Serial Number)
– Name of applicant
– Name of examiner
– Date of interview
– Type of interview (telephonic, video-conference, or personal)
– Name of participant(s) (applicant, attorney or agent, examiner, other PTO personnel, etc.)
– An indication whether or not an exhibit was shown or a demonstration conducted
– An identification of the specific prior art discussed
–   An indication whether an agreement was reached and if so, a description of the general nature of the agreement (may be by attachment of a copy of amendments or claims agreed as being allowable).  Note: Agreement as to allowability is tentative and does not restrict further action by the examiner to the contrary.
– The signature of the examiner who conducted the interview (if Form is not an attachment to a signed Office action)

It is desirable that the examiner orally remind the applicant of his or her obligation to record the substance of interview of each case. It should be noted, however, that the Interview Summary Form will not normally be considered a complete and proper recordation of the interview unless it includes, or is supplemented by the applicant or the examiner to include, all of the applicable items required below concerning the substance of the interview.

A complete and proper recordation of the substance of any interview should include at least the following applicable items:
1) A brief description of the nature of any exhibit shown or any demonstration conducted,
2) an identification of the claims discussed,
3) an identification of the specific prior art discussed,
4) an identification of the principal proposed amendments of a substantive nature discussed, unless these are already described on the Interview Summary Form completed by the Examiner,
5) a brief identification of the general thrust of the principal arguments presented to the examiner,
       (The identification of arguments need not be lengthy or elaborate.  A verbatim or highly detailed description of the arguments is not required.  The identification of the arguments is sufficient if the general nature or thrust of the principal arguments made to the examiner can be understood in the context of the application file.  Of course, the applicant may desire to emphasize and fully describe those arguments which he or she feels were or might be persuasive to the examiner.)
6) a general indication of any other pertinent matters discussed, and
7) if appropriate, the general results or outcome of the interview unless already described in the Interview Summary Form completed by the examiner.

Examiners are expected to carefully review the applicant's record of the substance of an interview.  If the record is not complete and accurate, the examiner will give the applicant an extendable one month time period to correct the record.

### Examiner to Check for Accuracy

If the claims are allowable for other reasons of record, the examiner should send a letter setting forth the examiner's version of the statement attributed to him or her.  If the record is complete and accurate, the examiner should place the indication, "Interview Record OK" on the paper recording the substance of the interview along with the date and the examiner's initials.

First Proposed Amendment

23. (Currently Amended) A soft tissue filler composition comprising:

    a hyaluronic acid (HA) component crosslinked with a crosslinking agent selected from the group consisting of 1,4-butanediol diglycidyl ether (BDDE), 1,4-bis(2,3-epoxypropoxy)butane, 1,4-bisglycidyloxybutane, 1,2-bis(2,3-epoxypropoxy)ethylene and 1-(2,3-epoxypropyl)-2,3-epoxycyclohexane, and 1,4-butanediol diglycidyl ether;

    wherein the HA is not crosslinked to a non-HA biopolymer; and

    lidocaine combined with said crosslinked HA component;

    wherein the lidocaine is freely released *in vivo*; [[and]]

    wherein the composition is sterile; and

    wherein the composition does not exhibit significant degradation when stored at ambient temperatures for a period of at least about 6 months.

Second Proposed Amendment

23.   (Currently Amended) A soft tissue filler composition comprising:

     a hyaluronic acid (HA) component crosslinked with a crosslinking agent selected from the group consisting of 1,4-butanediol diglycidyl ether (BDDE), 1,4-bis(2,3-epoxypropoxy)butane, 1,4-bisglycidyloxybutane, 1,2-bis(2,3-epoxypropoxy)ethylene and 1-(2,3-epoxypropyl)-2,3-epoxycyclohexane, and 1,4-butanediol diglycidyl ether;

     wherein the HA is not crosslinked to a non-HA biopolymer; and

     lidocaine combined with said crosslinked HA component;

     wherein the lidocaine is freely released *in vivo*; [[and]]

     wherein the composition is sterile; and

     wherein the composition is sufficiently cohesive such that it does not exhibit significant degradation when stored at ambient temperatures for a period of at least about 6 months.

**Exhibit F**

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/393,884 | 02/26/2009 | Pierre F. Lebreton | 18438-59 (COR) | 1553 |

51957        7590        04/09/2012
ALLERGAN, INC.
2525 DUPONT DRIVE, T2-7H
IRVINE, CA 92612-1599

| EXAMINER |
|---|
| SOROUSH, ALI |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1617 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 04/09/2012 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

patents_ip@allergan.com

PTOL-90A (Rev. 04/07)

| *Applicant-Initiated Interview Summary* | Application No. | Applicant(s) |
|---|---|---|
| | 12/393,884 | LEBRETON, PIERRE  F. |
| | Examiner | Art Unit |
| | ALI SOROUSH | 1617 |

All participants (applicant, applicant's representative, PTO personnel):

(1) _ALI SOROUSH_.                                    (3)_____.

(2) _Linda Fox_.                                       (4)_____.

Date of Interview: _03 April 2012_.

Type:     ☐ Telephonic   ☐ Video Conference
          ☒ Personal [copy given to: ☐ applicant   ☒ applicant's representative]

Exhibit shown or demonstration conducted:   ☐ Yes   ☒ No.
   If Yes, brief description: _____.

Issues Discussed  ☐101  ☐112  ☐102  ☒103  ☐Others
(For each of the checked box(es) above, please describe below the issue and detailed description of the discussion)

Claim(s) discussed: _____.

Identification of prior art discussed: _Lebreton (US Patent Application 2006/0194758 A1, Published 08/31/2006)_ .

Substance of Interview
(For each issue discussed, provide a detailed description and indicate if agreement was reached. Some topics may include: identification or clarification of a reference or a portion thereof, claim interpretation, proposed amendments, arguments of any applied references etc...)

_The Applicant discussed submitting a decleration to discuss the unexpected result of incorporating lidocaine into a a hylauronic acid gel that has been cross-linked but is not cross-linked to any other polymer. The Applicant found that incorporation into such a gel was stable and did not degrade over time as was expected by those of oridnary skill in the field. The Examiner indicated that this would be sufficient to overcome the rejection of record._.

**Applicant recordation instructions:** The formal written reply to the last Office action must include the substance of the interview. (See MPEP section 713.04). If a reply to the last Office action has already been filed, applicant is given a non-extendable period of the longer of one month or thirty days from this interview date, or the mailing date of this interview summary form, whichever is later, to file a statement of the substance of the interview

**Examiner recordation instructions:** Examiners must summarize the substance of any interview of record. A complete and proper recordation of the substance of an interview should include the items listed in MPEP 713.04 for complete and proper recordation including the identification of the general thrust of each argument or issue discussed, a general indication of any other pertinent matters discussed regarding patentability and the general results or outcome of the interview, to include an indication as to whether or not agreement was reached on the issues raised.

☐ Attachment

| /ALI  SOROUSH/ | |
| Examiner, Art Unit 1617 | |

## Summary of Record of Interview Requirements

**Manual of Patent Examining Procedure (MPEP), Section 713.04, Substance of Interview Must be Made of Record**
A complete written statement as to the substance of any face-to-face, video conference, or telephone interview with regard to an application must be made of record in the application whether or not an agreement with the examiner was reached at the interview.

### Title 37 Code of Federal Regulations (CFR) § 1.133 Interviews
Paragraph (b)

In every instance where reconsideration is requested in view of an interview with an examiner, a complete written statement of the reasons presented at the interview as warranting favorable action must be filed by the applicant.  An interview does not remove the necessity for reply to Office action as specified in §§ 1.111, 1.135. (35 U.S.C. 132)

### 37 CFR §1.2  Business to be transacted in writing.
All business with the Patent or Trademark Office should be transacted in writing.  The personal attendance of applicants or their attorneys or agents at the Patent and Trademark Office is unnecessary.  The action of the Patent and Trademark Office will be based exclusively on the written record in the Office.  No attention will be paid to any alleged oral promise, stipulation, or understanding in relation to which there is disagreement or doubt.

———

The action of the Patent and Trademark Office cannot be based exclusively on the written record in the Office if that record is itself incomplete through the failure to record the substance of interviews.

It is the responsibility of the applicant or the attorney or agent to make the substance of an interview of record in the application file, unless the examiner indicates he or she will do so.  It is the examiner's responsibility to see that such a record is made and to correct material inaccuracies which bear directly on the question of patentability.

Examiners must complete an Interview Summary Form for each interview held where a matter of substance has been discussed during the interview by checking the appropriate boxes and filling in the blanks.  Discussions regarding only procedural matters, directed solely to restriction requirements for which interview recordation is otherwise provided for in Section 812.01 of the Manual of Patent Examining Procedure, or pointing out typographical errors or unreadable script in Office actions or the like, are excluded from the interview recordation procedures below.  Where the substance of an interview is completely recorded in an Examiners Amendment, no separate Interview Summary Record is required.

The Interview Summary Form shall be given an appropriate Paper No., placed in the right hand portion of the file, and listed on the "Contents" section of the file wrapper.  In a personal interview, a duplicate of the Form is given to the applicant (or attorney or agent) at the conclusion of the interview.  In the case of a telephone or video-conference interview, the copy is mailed to the applicant's correspondence address either with or prior to the next official communication.  If additional correspondence from the examiner is not likely before an allowance or if other circumstances dictate, the Form should be mailed promptly after the interview rather than with the next official communication.

The Form provides for recordation of the following information:
– Application Number (Series Code and Serial Number)
– Name of applicant
– Name of examiner
– Date of interview
– Type of interview (telephonic, video-conference, or personal)
– Name of participant(s) (applicant, attorney or agent, examiner, other PTO personnel, etc.)
– An indication whether or not an exhibit was shown or a demonstration conducted
– An identification of the specific prior art discussed
– An indication whether an agreement was reached and if so, a description of the general nature of the agreement (may be by
   attachment of a copy of amendments or claims agreed as being allowable).  Note: Agreement as to allowability is tentative and does
   not restrict further action by the examiner to the contrary.
– The signature of the examiner who conducted the interview (if Form is not an attachment to a signed Office action)

It is desirable that the examiner orally remind the applicant of his or her obligation to record the substance of interview of each case.  It should be noted, however, that the Interview Summary Form will not normally be considered a complete and proper recordation of the interview unless it includes, or is supplemented by the applicant or the examiner to include, all of the applicable items required below concerning the substance of the interview.

A complete and proper recordation of the substance of any interview should include at least the following applicable items:
1) A brief description of the nature of any exhibit shown or any demonstration conducted,
2) an identification of the claims discussed,
3) an identification of the specific prior art discussed,
4) an identification of the principal proposed amendments of a substantive nature discussed, unless these are already described on the
   Interview Summary Form completed by the Examiner,
5) a brief identification of the general thrust of the principal arguments presented to the examiner,
   (The identification of arguments need not be lengthy or elaborate.  A verbatim or highly detailed description of the arguments is not
   required.  The identification of the arguments is sufficient if the general nature or thrust of the principal arguments made to the
   examiner can be understood in the context of the application file.  Of course, the applicant may desire to emphasize and fully
   describe those arguments which he or she feels were or might be persuasive to the examiner.)
6) a general indication of any other pertinent matters discussed, and
7) if appropriate, the general results or outcome of the interview unless already described in the Interview Summary Form completed by
   the examiner.
Examiners are expected to carefully review the applicant's record of the substance of an interview.  If the record is not complete and accurate, the examiner will give the applicant an extendable one month time period to correct the record.

### Examiner to Check for Accuracy

If the claims are allowable for other reasons of record, the examiner should send a letter setting forth the examiner's version of the statement attributed to him or her.  If the record is complete and accurate, the examiner should place the indication, "Interview Record OK" on the paper recording the substance of the interview along with the date and the examiner's initials.

**Exhibit G**



UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

| 51957 | 7590 | 08/06/2012 |
|---|---|---|

ALLERGAN, INC.
2525 DUPONT DRIVE, T2-7H
IRVINE, CA 92612-1599

| EXAMINER |
|---|
| SOROUSH, ALI |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1617 | |

DATE MAILED: 08/06/2012

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/393,884 | 02/26/2009 | Pierre F. Lebreton | 18438-59 (COR) | 1553 |

TITLE OF INVENTION: HYALURONIC ACID-BASED GELS INCLUDING LIDOCAINE

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | NO | $1740 | $300 | $0 | $2040 | 11/06/2012 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED. THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.**

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN <u>THREE MONTHS</u> FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. <u>THIS STATUTORY PERIOD CANNOT BE EXTENDED.</u> SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.**

**HOW TO REPLY TO THIS NOTICE:**

I. Review the SMALL ENTITY status shown above.

If the SMALL ENTITY is shown as YES, verify your current SMALL ENTITY status:

A. If the status is the same, pay the TOTAL FEE(S) DUE shown above.

B. If the status above is to be removed, check box 5b on Part B - Fee(s) Transmittal and pay the PUBLICATION FEE (if required) and twice the amount of the ISSUE FEE shown above, or

If the SMALL ENTITY is shown as NO:

A. Pay TOTAL FEE(S) DUE shown above, or

B. If applicant claimed SMALL ENTITY status before, or is now claiming SMALL ENTITY status, check box 5a on Part B - Fee(s) Transmittal and pay the PUBLICATION FEE (if required) and 1/2 the ISSUE FEE shown above.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Utility patents issuing on applications filed on or after Dec. 12, 1980 may require payment of maintenance fees. It is patentee's responsibility to ensure timely payment of maintenance fees when due.**

PTOL-85 (Rev. 02/11)

PART B - FEE(S) TRANSMITTAL

**Complete and send this form, together with applicable fee(s), to:** **Mail**     **Mail Stop ISSUE FEE**
**Commissioner for Patents**
**P.O. Box 1450**
**Alexandria, Virginia 22313-1450**
**or Fax   (571)-273-2885**

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

51957      7590      08/06/2012

ALLERGAN, INC.
2525 DUPONT DRIVE, T2-7H
IRVINE, CA 92612-1599

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO (571) 273-2885, on the date indicated below.

_____ (Depositor's name)

_____ (Signature)

_____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/393,884 | 02/26/2009 | Pierre F. Lebreton | 18438-59 (COR) | 1553 |

TITLE OF INVENTION: HYALURONIC ACID-BASED GELS INCLUDING LIDOCAINE

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | NO | $1740 | $300 | $0 | $2040 | 11/06/2012 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| SOROUSH, ALI | 1617 | 536-124000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).
☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.
☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

2. For printing on the patent front page, list
(1) the names of up to 3 registered patent attorneys or agents OR, alternatively,
(2) the name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____

2 _____

3 _____

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed for recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE                    (B) RESIDENCE: (CITY and STATE OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) :    ☐ Individual   ☐ Corporation or other private group entity   ☐ Government

4a. The following fee(s) are submitted:
☐ Issue Fee
☐ Publication Fee (No small entity discount permitted)
☐ Advance Order - # of Copies _____

4b. Payment of Fee(s): (**Please first reapply any previously paid issue fee shown above**)
☐ A check is enclosed.
☐ Payment by credit card. Form PTO-2038 is attached.
☐ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment, to Deposit Account Number _____ (enclose an extra copy of this form).

5. **Change in Entity Status** (from status indicated above)
☐ a. Applicant claims SMALL ENTITY status. See 37 CFR 1.27.    ☐ b. Applicant is no longer claiming SMALL ENTITY status. See 37 CFR 1.27(g)(2).

NOTE: The Issue Fee and Publication Fee (if required) will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the United States Patent and Trademark Office.

Authorized Signature _____      Date _____

Typed or printed name _____      Registration No. _____

This collection of information is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450.

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

PTOL-85 (Rev. 02/11) Approved for use through 08/31/2013.          OMB 0651-0033          U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/393,884 | 02/26/2009 | Pierre F. Lebreton | 18438-59 (COR) | 1553 |

51957      7590      08/06/2012

ALLERGAN, INC.
2525 DUPONT DRIVE, T2-7H
IRVINE, CA 92612-1599

| EXAMINER |
|---|
| SOROUSH, ALI |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1617 | |

DATE MAILED: 08/06/2012

### Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(application filed on or after May 29, 2000)

The Patent Term Adjustment to date is 292 day(s). If the issue fee is paid on the date that is three months after the mailing date of this notice and the patent issues on the Tuesday before the date that is 28 weeks (six and a half months) after the mailing date of this notice, the Patent Term Adjustment will be 292 day(s).

If a Continued Prosecution Application (CPA) was filed in the above-identified application, the filing date that determines Patent Term Adjustment is the filing date of the most recent CPA.

Applicant will be able to obtain more detailed information by accessing the Patent Application Information Retrieval (PAIR) WEB site (http://pair.uspto.gov).

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

PTOL-85 (Rev. 02/11)

## Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

| *Notice of Allowability* | Application No. | Applicant(s) | |
|---|---|---|---|
| | 12/393,884 | LEBRETON, PIERRE  F. | |
| | Examiner | Art Unit | |
| | ALI SOROUSH | 1617 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application.  If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.**  This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant.  See 37 CFR 1.313 and MPEP 1308.

1. ☒ This communication is responsive to 06/14/2012.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____;
   the restriction requirement and election have been incorporated into this action.

3. ☒ The allowed claim(s) is/are 23-32,34-36,38,40-53 and 55-67.

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   a) ☐ All   b) ☐ Some*   c) ☐ None   of the:
      1. ☐ Certified copies of the priority documents have been received.
      2. ☐ Certified copies of the priority documents have been received in Application No. _____ .
      3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the
         International Bureau (PCT Rule 17.2(a)).

   * Certified copies not received: _____.

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below.  Failure to timely comply will result in ABANDONMENT of this application.
**THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ A SUBSTITUTE OATH OR DECLARATION must be submitted. Note the attached EXAMINER'S AMENDMENT or NOTICE OF
   INFORMAL PATENT APPLICATION (PTO-152) which gives reason(s) why the oath or declaration is deficient.

6. ☐ CORRECTED DRAWINGS ( as "replacement sheets") must be submitted.
   (a) ☐ including changes required by the Notice of Draftsperson's Patent Drawing Review ( PTO-948) attached
      1) ☐ hereto or 2) ☐ to Paper No./Mail Date _____.
   (b) ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of
      Paper No./Mail Date _____.

   Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of
   each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).

7. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the
   attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

Attachment(s)
1. ☐ Notice of References Cited (PTO-892)
2. ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3. ☒ Information Disclosure Statements (PTO/SB/08),
   Paper No./Mail Date See Continuation Sheet
4. ☐ Examiner's Comment Regarding Requirement for Deposit
   of Biological Material

5. ☐ Notice of Informal Patent Application
6. ☐ Interview Summary (PTO-413),
   Paper No./Mail Date _____ .
7. ☐ Examiner's Amendment/Comment
8. ☒ Examiner's Statement of Reasons for Allowance
9. ☐ Other _____.

/ALI SOROUSH/
Examiner, Art Unit 1617

**Continuation Sheet (PTOL-37)**                                    **Application No.  12/393,884**

Continuation of Attachment(s) 3. Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date: 03072012, 03302012, 06142012.

Application/Control Number: 12/393,884                                    Page 2
Art Unit: 1617

# DETAILED ACTION

## Acknowledgement of Receipt

Applicant's response filed on 09/29/2011 to the Office Action mailed on

05/31/2011 is acknowledged.

## Claim Status

Claims 23-32, 34-36, 38, 40-53 and 55-67 are pending.

Claims 1-22, 33, 37, and 39 were previously cancelled and claim 54 is cancelled.

Claims 40 and 55 are currently amended.

Claims 23-32, 34-36, 38, 40-53 and 55-67 have been examined.

Claims 23-32, 34-36, 38, 40-53 and 55-67 are allowed.

## Priority

Priority to applications 60/085956 filed on 08/04/2008, 61/087934 filed on

08/11/2008, and 61/096278 filed on 09/11/2008 is acknowledged.

## Information Disclosure Statement

The information disclosure statements (IDSs) submitted on 03/07/2012,

03/30/2012, and 06/14/2012 are in compliance with the provisions of 37 CFR 1.97.

Accordingly, the information disclosure statements have been considered by the

examiner.

### *Withdrawn Claim Rejections - 35 USC § 112*

### *Response to Applicant's Arguments*

The rejection of claim 40 under 35 U.S.C. 112, second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention is withdrawn.

### *Claim Rejections - 35 USC § 103*

### *Response to Applicant's Arguments*

The rejection of claims 23-32, 35, 36, 38, and 40-50 under 35 U.S.C. 103(a) as being unpatentable over Lebreton (US Patent Application 2006/0194758 A1, Published 08/31/2006) in view of Calias et al. (US Patent 6521223 B1, Published 02/18/2003) is withdrawn in view of the unexpected results presented by Applicant.

The rejection of claims 34, 51-53 and 55-67 under 35 U.S.C. 103(a) as being unpatentable over Lebreton (US Patent Application 2006/0194758 A1, Published 08/31/2006) in view of Calias et al. (US Patent 6521223 B1, Published 02/18/2003) as applied to claims 23-32, 35, 36, 38, and 40-50 above, and further in view of Marko et al. (US Patent Application 2004/0101959 A1, Published 05/27/2004) is withdrawn in view of the claim amendments and unexpected results presented by Applicant.

Application/Control Number: 12/393,884                                    Page 4
Art Unit: 1617

## REASONS FOR ALLOWANCE

The following is an examiner's statement of reasons for allowance: Applicant

argues that one of ordinary skill in the art would have expected degradation of the

hyaluronic acid gel with addition of lidocaine during sterilization, as this was what was

known in the prior art. Applicant unexpectedly found that a hyaluronic acid gel cross-

linked, but not with a non-hyaluronic acid biopolymer, mixed with lidocaine and sterilized

does not degrade.

### *Conclusion*

Claims 23-32, 34-36, 38, 40-53 and 55-67 are allowed.

Any comments considered necessary by applicant must be submitted no later

than the payment of the issue fee and, to avoid processing delays, should preferably

accompany the issue fee.  Such submissions should be clearly labeled "Comments on

Statement of Reasons for Allowance."

Any inquiry concerning this communication or earlier communications from the

examiner should be directed to ALI SOROUSH whose telephone number is (571)272-

9925.  The examiner can normally be reached on M-F (9am-6pm).

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Fereydoun G. Sajjadi can be reached on (571)272-3311.  The fax phone

number for the organization where this application or proceeding is assigned is 571-

273-8300.

Application/Control Number: 12/393,884                                    Page 5
Art Unit: 1617

Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/ALI  SOROUSH/
Examiner, Art Unit 1617

July 15, 2012

**Exhibit H**

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| Applicant: Pierre F. Lebreton | Group Art Unit: 1615 |
| | Examiner: Unknown |
| Serial No.: 12/393,884 | |
| | Confirmation No. 1553 |
| Filed: February 26, 2009 | |
| | |
| For:  HYALURONIC ACID-BASED GELS INCLUDING LIDOCAINE | Filed Electronically |

### SUPPLEMENTAL INFORMATION DISCLOSURE STATEMENT

Commissioner For Patents
Alexandria, VA  22313-1450

Dear Sir:

Applicant herewith submits form PTO SB/08 for consideration by the Examiner, consistent with the provisions of 37 CFR § 1.56, 1.97 and 1.98.  It is respectfully requested that the documents be expressly considered during the prosecution of this application and that the documents be made of record therein and appear among the "References Cited" on any patent to issue therefrom.

By submitting this Information Disclosure Statement, Applicant makes no admission that any item listed thereupon is material to the patentability of the invention claimed in the above-entitled patent application.  Further, Applicant makes no assertion hereby that a search was conducted, or if conducted, that any search was thorough.

Applicant respectfully requests that the Examiner indicate consideration of the presently cited references by returning the enclosed Form SB/08 bearing the Examiner's initials and the date considered.

Please charge any fees that may be due in connection with this Information Disclosure Statement and to refund any overpayment to Deposit Account No. 01-0885.

Respectfully submitted,

Dated:  August 4, 2009

/Linda A. Fox/
Linda A. Fox
Registration No. 38,883

Please send all inquiries and correspondence to:
Linda A. Fox
Allergan, Inc. (T2-7H)
2525 Dupont Drive
Irvine, CA  92612
Telephone:  714/246-4758/Facsimile: 714/246-4249

PTO/SB/08 (07-05)
(Substitute for form 1449/PTO)

| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** | |
|---|---|
| Application number: | **12/393,884** |
| Filing Date: | **February 26, 2009** |
| First named Inventor | **Pierre F. Lebreton** |
| Art Unit: | **1615** |
| Examiner Name | **Unknown** |
| Attorney Docket Number: | **18438-59 (COR)** |

Sheet ___1__ of _____1__

## U.S. PATENT DOCUMENTS

| *Examiner Initials* | Cite No.[1] | Document Number — Number Kind Code[2] (if known) | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | AA | US2005/136122 | 06/23/2005 | Sadozai, et al. | |
| | AB | US2005/142152 | 06/30/2005 | Leshchiner, et al. | |
| | AC | US2006/246137 | 11/02/2006 | Hermitte, et al. | |
| | AD | US2007/077292 | 04/05/2007 | Pinsky | |
| | AE | 6685963 | 02/03/2004 | Taupin, et al. | |

## FOREIGN PATENT DOCUMENTS

| *Examiner Initials* | Cite No | Foreign Patent Document — Country Code[3] Number[4] Kind Code[5] (if known) | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear | T[6] |
|---|---|---|---|---|---|---|
| | BA | WO2005/112888 A | 12/01/2005 | Mentor Corp | | X |
| | BB | | | | | |
| | BC | | | | | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609; Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant. [1]Applicant's unique citation designation number (optional). [2]See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04. [3]Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3). [4]For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [5]Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [6]Applicant is to place a check mark here if English language Translation is attached.
This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14.

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 5826156 |
| **Application Number:** | 12393884 |
| **International Application Number:** | |
| **Confirmation Number:** | 1553 |
| **Title of Invention:** | Hyaluronic Acid-Based Gels Including Lidocaine |
| **First Named Inventor/Applicant Name:** | Pierre F. Lebreton |
| **Customer Number:** | 51957 |
| **Filer:** | Linda Allyson Fox/Chris Koken |
| **Filer Authorized By:** | Linda Allyson Fox |
| **Attorney Docket Number:** | 18438-59 (COR) |
| **Receipt Date:** | 04-AUG-2009 |
| **Filing Date:** | 26-FEB-2009 |
| **Time Stamp:** | 15:37:43 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Information Disclosure Statement (IDS) Filed (SB/08) | 18438-59SuppIDS-PTOSB08-080409.pdf | 85410<br>2b0e440e161786fa5f2486a6d1a11214297086f8 | no | 2 |

**Warnings:**

**Information:**

This is not an USPTO supplied IDS fillable form

| 2 | Foreign Reference | WO2005-112888.pdf | 668561 | no | 18 |
| | | | 3dc6a43bbf7080c29e17734f63e867be65e71ac4 | | |

**Warnings:**

**Information:**

| | **Total Files Size (in bytes):** | 753971 |
|---|---|---|

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable.  It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.