IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ALLERGAN USA, INC. and<br>ALLERGAN INDUSTRIE SAS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 19-126 (CFC) (SRF) |
| | ) | **REDACTED -** |
| PROLLENIUM US INC. and | ) | **PUBLIC VERSION** |
| PROLLENIUM MEDICAL | ) | |
| TECHNOLOGIES INC., | ) | |
| | ) | |
| Defendants. | ) | |

## ALLERGAN'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR LEAVE TO AMEND ANSWER AND COUNTERCLAIM

<br>

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
Jeffrey J. Lyons (#6437)

OF COUNSEL:

1201 North Market Street
P.O. Box 1347

Gary E. Hood

Wilmington, DE  19899

Mark T. Deming

(302) 658-9200

Luke T. Shannon

jblumenfeld@mnat.com

Randal S. Alexander

jtigan@mnat.com

Enes Ovcina

jlyons@mnat.com

POLSINELLI PC
150 North Riverside Plaza

*Attorneys for Plaintiffs*

Suite 3000
Chicago, IL  60601
(312) 819-1900


Original Filing Date: February 7, 2020
Redacted Filing Date: February 12, 2020

# **TABLE OF CONTENTS**

I.   INTRODUCTION.................................................................................1

II.  NATURE AND STAGE OF PROCEEDINGS ...................................1

III. STATEMENT OF FACTS ................................................................2

    A.   Prosecution of the Patents-in-Suit. ..........................................2

    B.   Prollenium's Inequitable Conduct Counterclaim and
          Affirmative Defense. ..................................................................4

IV.  LEGAL STANDARD OF REVIEW .................................................6

    A.   Standard for Amending Pleadings............................................6

    B.   Inequitable Conduct ..................................................................7

V.   ARGUMENT ...................................................................................9

    A.   Prollenium's Proposed Amendment Would Be Futile.............9

    B.   Prollenium Fails to Allege Any Material Misrepresentation...............9

         1.   Prollenium Improperly Mischaracterizes Dr. Lebreton's
              Declaration Statements ............................................10

         2.   Prollenium Fails To Allege or Demonstrate Any
              Inconsistencies Between Dr. Lebreton's Declaration and
              His Understanding of the Knowledge of a POSA ...................11

    C.   Prollenium Fails to Plead Specific Intent...........................16

    a.   Prollenium's Focus on the Perspective of a POSA Does Not
        Evidence Dr. Lebreton's Specific Intent..............................17

    b.   Prollenium Fails to Allege Dr. Lebreton's Actual Knowledge or
        Specific Intent to Deceive. ..................................................18

VI.  CONCLUSION ............................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Dole v. Arco Chem. Co.*,
  921 F.2d 484 (3d Cir. 1990) ...............................................................7

*Exergen Corp. v. Wal-Mart Stores*,
  575 F.3d 1312 (Fed. Cir. 2009) ...........................................7, 8, 16, 17

*Pac. Biosciences of Cal., Inc. v. Oxford Nanopore Techs., Inc.*,
  C.A. No. 17-275-LPS, C.A. No. 17-1353-LPS, 2019 WL 668843
  (D. Del. Feb. 19, 2019) ..............................................................8, 13, 18

*Senju Pharmaceutical Co., Ltd. v. Apotex, Inc.*,
  921 F. Supp. 2d 297 (D. Del. 2013)..............................................16, 17

*Shane v. Fauver*,
  213 F.3d 113 (3d Cir. 2000) ...........................................................6, 7

*Therasense, Inc. v. Becton, Dickinson & Co.*,
  649 F.3d 1276 (Fed. Cir. 2011) .........................................................7

*Wyeth Holdings Corp. v. Sandoz, Inc.*,
  C.A. No. 09-955-LPS-CJB, 2012 WL 600715 (D. Del. Feb. 3,
  2012) ............................................................................................8

*XpertUniverse, Inc. v. Cisco Sys., Inc.*,
  868 F. Supp. 2d 376 (D. Del. 2012)...............................................16, 17

**Other Authorities**

Fed. R. Civ. P. 9(b) ........................................................................7, 8

Fed. R. Civ. P. 15(a)(2).....................................................................6

## I.    INTRODUCTION

Prollenium's Motion for Leave to file a Second Amended Answer and Counterclaims ("SACC") should be denied because amendment would be futile. This is Prollenium's third attempt to try to plead inequitable conduct, and, as before, Prollenium's allegations amount to nothing more than a disguised invalidity argument.  At bottom, Prollenium simply disagrees with Allergan's and the inventor's characterization of the prior art.  That is not inequitable conduct. Moreover, Prollenium has failed to plead facts sufficient to infer specific intent to mislead the PTO.

## II.    NATURE AND STAGE OF PROCEEDINGS

On May 6, 2019, Prollenium filed its Answer, Affirmative Defenses, and Counterclaims. (D.I. 11).  Prollenium's fourth affirmative defense and Count VII of its counterclaims purported to allege that the patents-in-suit are unenforceable due to inequitable conduct before the PTO.  In essence, Prollenium contended that Allergan duped the PTO into issuing the six patents-in-suit by submitting evidence of the surprising stability characteristics of its new formulation.

On June 27, 2019, Allergan filed a Motion to Dismiss Prollenium's fourth affirmative defense and Count VII of its counterclaims. (D.I. 20).  In lieu of responding to Allergan's Motion, on July 15, 2019, Prollenium filed an Amended Answer and Counterclaim. (D.I. 29).  Prollenium's fourth affirmative defense and

Count VII of its amended counterclaim again alleged that the patents-in-suit are unenforceable due to inequitable conduct before the PTO.  On August 12, 2019, Allergan again filed a Motion to Dismiss Prollenium's fourth affirmative defense and Count VII of its counterclaims. (D.I. 34).

On December 30, 2019, Magistrate Judge Fallon issued a Report and Recommendation "that the court grant Allergan's motion to dismiss Count VII of Prollenium's counterclaims for inequitable conduct and grant Allergan's motion to strike Prollenium's fourth affirmative defense of inequitable conduct without prejudice." (D.I. 55).  This Court subsequently adopted Magistrate Judge Fallon's recommendation and granted Allergan's motion to dismiss. (D.I. 61).

## III.   STATEMENT OF FACTS

### A.   Prosecution of the Patents-in-Suit.

Allergan has previously set forth a summary of the relevant points of the prosecution history.  (*See* D.I. 34 at 5-7).  As the Court will recall, the ultimate parent application of the patents-in-suit, U.S. Application 12/393,884 ("the '884 Application"), was filed on February 26, 2009 and issued as U.S. Patent No. 8,357,795 ("the '795 Patent") on January 22, 2013.

In order to show the properties of the invention that were not previously appreciated, on June 14, 2012, the applicant submitted a declaration from the inventor, Dr. Pierre Lebreton, dated May 2, 2012.  (D.I. 11-1 at 2–4).  The

declaration describes numerous observations about the state of the art as Dr. Lebreton understood it, including that: (1) it was believed that adding lidocaine to hyaluronic acid ("HA") gel compositions during manufacturing caused degradation prior to injection; (2) it was believed that lidocaine caused degradation during high temperature sterilization; (3) it was not known whether HA compositions comprising lidocaine were stable after high temperature sterilization when placed in storage for any significant length of time; (4) based on these facts, it was believed that the instability of HA as set forth above would cause a viscosity reduction of the HA; (5) based on these facts, a person of ordinary skill in the art would have expected that a dermal filler comprising HA and lidocaine would not have remained sufficiently stable to be useful as a soft tissue filler; and (6) it was not appreciated that a dermal filler comprising a cohesive gel of HA makes it possible for lidocaine to be combined with HA in a gel that is sufficiently stable to be useful as a soft tissue filler. *Id.* The declaration explains that these advancements were demonstrated by experiments reported in the patent application, and concludes that, to Dr. Lebreton's knowledge, "it was a surprising and unexpected discovery, not appreciated prior to the present invention, that certain cohesive HA gels, as defined in the application, when mixed with lidocaine, could be made to be heat and shelf stable." *Id.* at 4.

The '795 patent issued on January 22, 2013.

3

**B.**    **Prollenium's Inequitable Conduct Counterclaim and Affirmative Defense.**

In Count VII of its proposed counterclaims and fourth affirmative defense, Prollenium again accuses Allergan of inequitable conduct.  However, Prollenium's latest attempt to make out an inequitable conduct claim with additional alleged "facts" does no more than before.  Its pleading is flawed, yet again, and fails to cure the various deficiencies readily apparent and previously recognized by this Court in its prior multiple attempts to plead inequitable conduct.

At issue, once again, are statements from the Lebreton declaration. Prollenium alleges that the Lebreton declaration contains multiple, material misrepresentations by Dr. Lebreton about the state of the prior art. (D.I. 63 at 11). In its latest iteration, Prollenium continues to cite the same statements in the declaration where the inventor stated his beliefs that:

- "adding lidocaine to [HA] gel compositions during manufacturing caused degradation of the [HA] prior to injection"

- "lidocaine caused degradation of HA gel composition during high temperature sterilization"

- "it was not known whether HA compositions comprising lidocaine were stable or not after high temperature sterilization when placed in storage for any significant length of time"

- "it was also believed that the instability of HA described above would have caused a viscosity reduction of the HA that would make it unsuitable for soft tissue filling applications"

- "a person of ordinary skill in the art would have expected that a dermal filler comprising hyaluronic acid and lidocaine would not have remained sufficiently stable to be useful as a soft tissue filler"

- "it was not appreciated that a dermal filler comprising a cohesive gel of hyaluronic acid makes it possible for lidocaine to be combined with hyaluronic acid in a gel that is sufficiently stable to be useful as a soft tissue filler"

- "it was a surprising and unexpected discovery, not appreciated prior to the present invention, that certain cohesive HA gels, as defined in the application, when mixed with lidocaine, could be made to be heat and shelf stable."

(D.I. 62, Ex. 2, ¶¶ 122-128).

Previously, Prollenium attempted to base its inequitable conduct claim on supposed inconsistencies between these statements and Dr. Lebreton's discussion of the Sadozai reference in the underlying provisional application. The Court found no such inconsistencies and no misrepresentation.

Now, rather than pointing to the provisional application's discussion of Sadozai, Prollenium takes another bite at the same apple and argues that "crosslinked-HA dermal filler products with lidocaine were developed by Allergan's competitors long before August 2008, as shown in prior art documents, internal Allergan documents showing that Lebreton knew about these prior products, and internal Allergan documents dating back to at least 2005 concluding that ███████████████████████ rather than *surprising*." (D.I. 63 at 12.). Prollenium concludes from this that a person of ordinary skill in the art "would

5

have been motivated to incorporate lidocaine into existing HA dermal fillers and would not be surprised by the results." (D.I. 63 at 12).  If this strikes the Court immediately as a prior art based invalidity defense, it is.  It is not inequitable conduct.

Prollenium further argues that "the proposed amendment also pleads facts demonstrating that Lebreton had actual knowledge that the representations in his declaration concerning the state of the art were false and were made with the intent to deceive the PTO." (D.I. 63 at 5).  Prollenium suggests that Dr. Lebreton's purported conclusions based on testing in his declaration were not only unfounded, but they present further evidence of intent to deceive the PTO. (D.I. 63 at 5-6). According to Prollenium, the critical question is "whether the proposed amendment addresse[d] the Court's concerns raised in the R&R, and whether it adequately states a claim for inequitable conduct." (D.I 63 at 11).  As discussed herein, they do not.

## IV.   LEGAL STANDARD OF REVIEW

### A.    Standard for Amending Pleadings

A party may amend its pleading "only with the opposing party's written consent or the court's leave," and "leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a)(2); *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000). Amendment should ordinarily be permitted unless the other party shows

equitable considerations such as undue delay, bad faith, undue prejudice, or futility of the amendment by the moving party. *Dole v. Arco Chem. Co.*, 921 F.2d 484, 487 (3d Cir. 1990); *Shane*, 213 F.3d at 115. "Futility" means that the amended pleading would fail to state a claim upon which relief could be granted. *Shane*, 213 F.3d at 115.

### B.   Inequitable Conduct

A claim for inequitable conduct must satisfy the heightened pleading standard of Rule 9(b). *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1326 (Fed. Cir. 2009). It "must include sufficient allegations of underlying facts from which a court may reasonably infer that a specific individual (1) knew of the withheld material information or of the falsity of the material misrepresentation, and (2) withheld or misrepresented this information with a specific intent to deceive the PTO." *Id.* at 1328–29.

The second prong requires that the applicant misrepresented or omitted material information with the specific intent to deceive the PTO. *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290–91 (Fed. Cir. 2011). "Intent and materiality are separate requirements." *Id.* at 1290. Indeed, the Federal Circuit "tighten[ed] the standards for finding *both* intent and materiality in order to redirect a doctrine that has been overused to the detriment of the public." *Id.* at 1290 (emphasis added).

7

Although Rule 9(b) permits general averments of malice, intent, knowledge, and other conditions of the mind, the pleading must allege sufficient underlying facts to support a reasonable inference that the party acted with the requisite state of mind. *Exergen*, 575 F.3d at 1327. "The relevant 'conditions of mind' for inequitable conduct include: (1) knowledge of ... the falsity of the material misrepresentation, and (2) specific intent to deceive the PTO." *Id*. (*citing Hebert v. Lisle Corp.*, 99 F .3d 1109, 1116 (Fed. Cir. 1996); *Molins PLC v. Textron, Inc.*, 48 F .3d 1172, 1181 (Fed. Cir. 1995)).

"[T]o adequately plead the intent prong of an inequitable conduct defense, the claimant need only allege facts from which the Court could *reasonably infer* that the patent applicant made a deliberate decision to deceive the PTO." *Wyeth Holdings Corp. v. Sandoz, Inc.*, C.A. No. 09-955-LPS-CJB, 2012 WL 600715, at *7 (D. Del. Feb. 3, 2012) (emphasis in original). The allegations must nonetheless meet the particularity standard of Rule 9(b), and the facts must support a plausible inference that the claim will ultimately satisfy the clear and convincing burden of proof. *See Pac. Biosciences of Cal., Inc. v. Oxford Nanopore Techs., Inc.*, C.A. No. 17-275-LPS, C.A. No. 17-1353-LPS, 2019 WL 668843, at *2 (D. Del. Feb. 19, 2019).

V.     **ARGUMENT**

A.     **Prollenium's Proposed Amendment Would Be Futile**

A court should deny amendment if it would be futile—i.e., that the amended pleading would fail to state a claim upon which relief could be granted.  In this instance, allowing Prollenium to amend—for the third time—would be futile.  As explained in further detail below, Prollenium's SACC has not sufficiently alleged any material misrepresentation, nor does it support a reasonable inference that Dr. Lebreton acted with the requisite intentional state of mind or made a deliberate decision to deceive the PTO.

B.     **Prollenium Fails to Allege Any Material Misrepresentation**

As before, Prollenium fails to allege that Dr. Lebreton's declaration contained any material misrepresentation, and therefore fails to satisfy the "what" and "where" requirements of inequitable conduct. (*See* D.I. 55, Report and Recommendation, at 12) ("The pleading represents that HA dermal fillers containing lidocaine were known in the art at the time of the invention, and it discloses a list of nine prior art references and practices.  But the pleading fails to associate these prior art references with the alleged misrepresentation in Dr. Lebreton's declaration regarding the viscosity reduction and degradation of HA gel composition in response to high temperature sterilization and storage.").

## 1. Prollenium Improperly Mischaracterizes Dr. Lebreton's Declaration Statements

To advance its latest iteration of its inequitable conduct claim, Prollenium relies on a myopic reading of Dr. Lebreton's declaration that cherry-picks excerpts and takes them out of context.  As Allergan has set forth before and above, Dr. Lebreton's declaration explains that "[i]t was believed that adding lidocaine to hyaluronic acid gel compositions during manufacture caused degradation of the hyaluronic acid prior to injection of the HA as a dermal filler" (D.I. 62, Ex. A, ¶ 5). His declaration then proceeds to explain the basis for his statement.  He explains that "[i]t was believed that lidocaine caused degradation of HA gel compositions during high temperature sterilization," and that "[i]t was not known whether HA compositions comprising lidocaine were stable or not after high temperature sterilization when placed in storage for any significant length of time."  (*Id.* ¶¶ 6-7).  These statements provide the foundation for Dr. Lebreton's belief that his lidocaine-containing HA dermal fillers would not have been expected to be stable. (*See id.* ¶¶ 8-10).

Prollenium fails to allege or demonstrate how Dr. Lebreton's statements in any way constitute a misrepresentation.  Dr. Lebreton's declaration explains his understanding that a person of ordinary skill in the art would have expected the addition of lidocaine to HA fillers to cause degradation of HA gel compositions during high-temperature sterilization and a subsequent lack of stability.

Prollenium ignores Dr. Lebreton's statements on high-temperature sterilization, however, and attempts to create a strawman comparison to alleged prior art. Prollenium does this, of course, because there is simply no inconsistency, nor does Prollenium even allege as much, between Dr. Lebreton's statements in his declaration, including with respect to high-temperature sterilized HA gels, and Prollenium's factual allegations regarding what Prollenium claims is his supposed understanding of the state of the prior art.

### 2. Prollenium Fails To Allege or Demonstrate Any Inconsistencies Between Dr. Lebreton's Declaration and His Understanding of the Knowledge of a POSA

Prollenium spends considerable energy citing what it contends are prior art disclosures of HA gels, but Prollenium's allegations do not include any material misrepresentation in Dr. Lebreton's declaration.

### (1) The Existence of Approved HA Gels Is Not Inconsistent with Dr. Lebreton's Declaration.

Prollenium also suggests that, what it claims to be prior approved lidocaine-containing HA products, somehow contradict Dr. Lebreton's declaration.[1] Not so. For example, Prollenium discusses allegedly prior-approved HA gels, but it

---

[1] The relevant inquiry here is whether Dr. Lebreton's declaration contains material misrepresentations, not whether alleged prior art does or does not disclose aspects of the claimed inventions. Allergan's analysis herein focuses on this question, and its discussion herein does not reflect Allergan's positions as to whether the aspects discussed are necessary, in whole or in part, to distinguish the claimed invention from the prior art. Allergan will present its positions in response to Prollenium's invalidity theories at the appropriate time according to the case schedule.

nowhere alleges that any of those gels are high-temperature sterilized. Instead, Prollenium blithely refers to those approved products as being "sterile." (D.I. 62, Ex. A, SACC ¶¶ 58, 59, 63, 76, 85, 89, 97).

Indeed, with respect to the product it calls "Puragen Plus," Prollenium effectively admits that it does not know now—in 2020—whether that product was high-temperature sterilized, stating without citation: "Heat sterilization in an autoclave was, in 2005, and remains today, the standard sterilization method for dermal fillers. So, on information and belief, Puragen Plus was heat sterilized." (*Id*. ¶ 59). If Prollenium today is unable to allege specifically its basis for concluding that supposed prior art products were high-temperature sterilized, its assumption that Dr. Lebreton would have believed a person of ordinary skill in the art would have known (or assumed) that Puragen Plus was high-temperature sterilized falls flat.

Similarly, Prollenium relies heavily on its general discussion of regulatory requirements to suggest that Dr. Lebreton's declaration contains material misrepresentations. Again, Prollenium points to nothing that contradicts Dr. Lebreton's declaration. For example, Prollenium alleges that "[a] person of ordinary skill in the art would understand that in order to obtain FDA approval . . . it would have been necessary for these lidocaine-containing crosslinked-HA

12

dermal fillers to be sterile and stable."[2]   (D.I. 62, Ex. 1, SACC ¶ 29).   Prollenium

does not articulate what it means that such fillers are "sterile and stable."   For

example, Prollenium does not allege whether "stable" enough for regulatory

approval equates to the stability discussed and supported in Dr. Lebreton's

declaration, whether quantitatively or qualitatively.   And again, although

Prollenium refers to products that are "sterile," it leaves unalleged whether those

products are high-temperature sterilized, for example, through autoclaving.   (*See

id.* ¶¶ 31, 58, 59, 63, 76, 85, 89, 97).

Fundamentally, Prollenium also ignores the fact that even though a product

may be sufficiently stable for regulatory approval, an inventor is able to improve

upon the state of the art by inventing a product with improved stability.

Prollenium's SACC does not specify the stability of the allegedly prior art HA gels

it identifies.   For example, Prollenium alleges that a Reinmuller reference

"discloses the production of a crosslinked-HA product," and quotes Reinmuller as

stating that "a *heat sterilization* is carried out and the gel is *stored* protected from

light."   (D.I. 62, Ex. 1, SACC ¶ 106-107) (italics in original).   Of course, a

reference to a material being "stored" does not imply that such material is "stable,"

---

[2] Prollenium alleges, without support, that "[i]f a particular dermal filler product had issues regarding stability, degradation, or viscosity reductions following high temperature sterilization, making the composition unsuitable for soft tissue filing applications, this would have prevented approval of the product by FDA."   (D.I. 62, Ex. 1, SACC ¶ 30).   Such bald assertions amount to attorney argument and need not be accepted as true.   *Pac. Biosciences*, 2019 WL 668843, at *2.

let alone upon high-temperature sterilization, in view of Dr. Lebreton's declaration.[3]

        (2)    Allergan's Internal Documents Do Not Establish Any Misrepresentation by Dr. Lebreton.

Prollenium's latest claim attempts to redirect the Court's attention to Dr. Lebreton's statements as to the knowledge of a person of ordinary skill in the art. Prollenium cites internal Allergan reports and other documents regarding Allergan's (and Dr. Lebreton's) own internal testing, and based on that suggests that the knowledge of a person of ordinary skill in the art was not as Dr. Lebreton supposedly represented. Prollenium, in effect, cites against Dr. Lebreton his own work in developing his inventions, and argues that Dr. Lebreton committed inequitable conduct because he did not state that a person of ordinary skill in the art would have developed his inventions. Prollenium's argument would render every patent invalid and unenforceable.

There is nothing inconsistent between the internal Allergan reports and other documents and what Dr. Lebreton said in his declaration regarding the state of the art. More to the point, while Prollenium is entitled to disagree with the state of the art at the time Dr. Lebreton submitted the declaration, and what was set forth in the Allergan documents and Lebreton declaration, that does not amount to a

---

[3] Prollenium also again cites the Sadozai reference as allegedly disclosing "a crosslinked-HA dermal filler that is autoclaved sterilized." (D.I. 62, Ex. 1, SACC ¶¶ 99, 105). As the Court is aware, Sadozai was disclosed to the examiner.

misrepresentation by Dr. Lebreton to the PTO. That is, at base, a validity-related argument, it is not a misrepresentation based in equitable conduct issue. It is routinely what courts hear evidence on in a patent case where experts battle about what a POSA did and did not know at the time of the invention.

          (3)    Prollenium's Discussion of the Testing Referenced in Dr. Lebreton's Declaration Also Fails to Demonstrate Any Misrepresentation.

Prollenium argues that Dr. Lebreton's reference in his declaration to testing reflected in his patent application somehow supports its position that Dr. Lebreton's declaration contains misrepresentations. (D.I. 63 at 22-23). Prollenium's position is untenable. Prollenium's argument asks the Court to ignore the fact that the basis for the supposed misrepresentation is found in the patent application itself. In other words, what the Examiner admittedly had at his fingertips—the very statements that Prollenium now suggests evidence a misrepresentation—somehow misled that Examiner. Although Prollenium appears to disagree with Dr. Lebreton's (and the Examiner's) conclusions regarding their respective evaluations of the testing reflected in the application's specification, the fact remains that the Examiner had before him the specification and had ample opportunity to voice disagreement with Dr. Lebreton's conclusion if he in fact so disagreed.

For these reasons, Prollenium has not sufficiently alleged at least the "what" and the "where" necessary to a legitimate inequitable conduct claim.  Moreover, it has not identified any material misrepresentation to support its inequitable conduct counterclaim and defense.  Prollenium's Motion should be denied as futile for these reasons alone.

### C.    Prollenium Fails to Plead Specific Intent

In addition to failing to allege any material misrepresentation, Prollenium's SACC also makes conclusory allegations that the inventor ***knowingly*** acted with specific intent to deceive the PTO.  Courts routinely dismiss inequitable conduct counterclaims where, as here, the pleadings fail to identify specific facts "from which the court may reasonably infer that a specific individual both knew of invalidating information that was withheld from the PTO and **withheld that information with a specific intent to deceive the PTO**."  *XpertUniverse, Inc. v. Cisco Sys., Inc.*, 868 F. Supp. 2d 376, 379 (D. Del. 2012) (internal citations and quotations omitted) (emphasis added); *see also Exergen*, 575 F.3d at 1328–29; *Senju Pharm. Co. v. Apotex, Inc.*, 921 F. Supp. 2d 297, 306-07 (D. Del. 2013).

Prollenium must do more than simply assert that the inventor knowingly acted with specific intent in order to satisfy the heightened pleading standard.  Yet, none of the allegations in the SACC supports a reasonable inference that Dr.

Lebreton acted with the requisite state of mind, nor do those allegations suggest a supposed deliberate decision by Dr. Lebreton to deceive the PTO.

### a. Prollenium's Focus on the Perspective of a POSA Does Not Evidence Dr. Lebreton's Specific Intent.

Throughout its opening brief, Prollenium pits Dr. Lebreton's declaration against what it represents was the understanding of a person of ordinary skill in the art. This focus is misplaced and utterly fails to address in any legitimate way Dr. Lebreton's intent.

The knowledge of a person of ordinary skill in the art is an objective consideration, whereas inequitable conduct requires Prollenium to allege that Dr. Lebreton subjectively knew of invalidating information and withheld that information with specific intent to deceive the PTO. *See XpertUniverse*, 868 F. Supp. 2d at 379; *Exergen*, 575 F.3d at 1328–29; *Senju*, 921 F. Supp. 2d at 306–07. Prollenium fails to adequately allege Dr. Lebreton's specific intent to deceive the PTO.

Specifically, Prollenium suggests that the development, testing, and in certain instances FDA approval of crosslinked-HA fillers with lidocaine "directly contradicts Lebreton's statements that it was 'not appreciated' that such a combination was feasible based on the expectation (or lack thereof) that adding lidocaine would cause degradation, instability, or viscosity reductions after high temperature sterilization." (D.I. 63 at 14). Prollenium concludes that a person of

ordinary skill in the art would have believed differently based on his or her knowledge of the market for HA fillers with lidocaine.

Prollenium's arguments regarding the knowledge of a person of ordinary skill in the art further illustrates that its inequitable conduct claim is in reality an invalidity argument couched in inequitable conduct terms. Although Prollenium may disagree with Dr. Lebreton's statements regarding the claimed inventions and the prior art, this does not constitute inequitable conduct. *See, e.g.*, *Pac. Biosciences*, 2019 WL 668843, at *3 ("[T]he mere fact that a patent applicant attempts to distinguish its patent from the prior art does not constitute a material omission or misrepresentation where the patent examiner has the prior art before him or her, and therefore, is free to make his or her own conclusions regarding the claimed invention." (citations and quotations omitted)).

### b. Prollenium Fails to Allege Dr. Lebreton's Actual Knowledge or Specific Intent to Deceive.

To the extent Prollenium's allegations suggest Dr. Lebreton was aware of materials and disclosures prior to the submission of his declaration, Prollenium's allegations remain insufficient. Prollenium argues that Dr. Lebreton had actual, personal knowledge that Allergan's competitor's products had successfully incorporated lidocaine into sterile, stable crosslinked-HA fillers before August 2008 and that Allergan documents show Dr. Lebreton was aware of the successful development of these products. (D.I. 63 at 17, 21).

18

This is nothing more than an invalidity argument dressed up as inequitable conduct. Prollenium admits in its additional facts that the three different crosslinked-HA dermal fillers with lidocaine had been crosslinked with different agents than those used by Dr. Lebreton in his invention. Prollenium alleges nothing to suggest that Dr. Lebreton understood his declaration's statements to be untrue. Rather, they confirm his belief that he developed a new invention untaught by the prior art. They suggest that Dr. Lebreton appreciated any differences between his invention and the three other formulations.

The reasonable inference here is not what Prollenium says it is. Rather, it is that Dr. Lebreton sought in his declaration to convey those differences. Prollenium may disagree with Dr. Lebreton's conclusions, but that disagreement does not support inequitable conduct, particularly where Prollenium has alleged nothing regarding Dr. Lebreton's state of mind or deliberate attempt to deceive the PTO.

Prollenium further points to laboratory testing conducted in 2005 by Dr. Lebreton which shows that incorporating lidocaine into existing HA dermal fillers was feasible. (D.I. 63 at 19). For example, Prollenium alleges that "Lebreton's team's testing likewise ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆" (D.I 63 at 21). But this, if anything, reflects the inventor's own work in developing the claimed invention. Internal

Allergan documents are not reflective of the understanding of a person of ordinary skill in the art, who would not have access to those materials.

Prollenium's SACC also fails to adequately allege that Dr. Lebreton specifically intended to deceive the PTO. Prollenium's newly pled allegations do not support a reasonable inference of the specific intent required to support an inequitable conduct claim but instead simply allege in conclusory fashion that Dr. Lebreton specifically intended to deceive the examiner. (*E.g.*, D.I. 62, Ex. 1, SACC ¶¶ 135, 181, 185). As Magistrate Judge Fallon noted with respect to Prollenium's Amended Answer and Counterclaims, Prollenium did not allege with particularity that Dr. Lebreton's understanding of the prior art mirrors Prollenium's conclusory assertions regarding the state of the prior art. Prollenium's SACC has done nothing to cure this defect, and Prollenium remains silent as whether or how Dr. Lebreton supposedly specifically intended to deceive the PTO. Without and allegation of specific intent to deceive the PTO, Prollenium's inequitable conduct counterclaim fails as a matter of law.

## VI.  CONCLUSION

Allergan respectfully requests that this Court deny Prollenium's motion for leave to amend its answer and counterclaims.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jeremy A. Tigan*

Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
Jeffrey J. Lyons (#6437)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
jtigan@mnat.com
jlyons@mnat.com

OF COUNSEL:

Gary E. Hood
Mark T. Deming
Luke T. Shannon
Randal S. Alexander
Enes Ovcina
POLSINELLI PC
150 North Riverside Plaza, Suite 3000
Chicago, IL  60601
(312) 819-1900

*Attorneys for Plaintiffs*

February 7, 2020

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief has been prepared in Times New Roman 14-point typeface using Microsoft Word, and contains 4,283 words as determined by the Word Count feature of Microsoft Word.

February 7, 2020

*/s/ Jeremy A. Tigan*
Jeremy A. Tigan (#5239)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 7, 2020, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on February 7, 2020, upon the following in the manner indicated:

John G. Day, Esquire                                             *VIA ELECTRONIC MAIL*
Andrew C. Mayo, Esquire
ASHBY & GEDDES
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
*Attorneys for Defendants*

John W. Harbin, Esquire                                        *VIA ELECTRONIC MAIL*
Gregory J. Carlin, Esquire
Warren Thomas, Esquire
Robert J. Leonard, Esquire
MEUNIER CARLIN & CURFMAN LLP
999 Peachtree Street NE, Suite 1300
Atlanta, GA  30309
*Attorneys for Defendants*

*/s/ Jeremy A. Tigan*
_____
Jeremy A. Tigan (#5239)