# EXHIBIT A

Trials@uspto.gov                                          Paper 19
571-272-7822                                         Date: March 19, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

PROLLENIUM US INC.,
Petitioner,

v.

ALLERGAN INDUSTRIE, SAS,
Patent Owner.

———————————

IPR2019-01508
Patent 9,238,013 B2

———————————

Before JOHN G. NEW, SHERIDAN K. SNEDDEN, and
ROBERT A. POLLOCK, *Administrative Patent Judges.*

SNEDDEN, *Administrative Patent Judge.*

DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314, 37 C.F.R. § 42.4*

IPR2019-01508
Patent 9,238,013 B2

# I.  INTRODUCTION

## A.  Background

Prollenium US Inc. ("Petitioner") filed a Petition for *inter partes* review of claims 1–4 of U.S. Patent No. 9,238,013 ("the '013 patent," Ex. 1001).  Paper 1 ("Pet.").  Allergan Industrie, SAS ("Patent Owner") filed a Preliminary Response.  Paper 8 ("Prelim. Resp.").  On January 10, 2020, we issued an Order granting Petitioner's request for additional briefing regarding whether we should exercise our discretion to deny the Petition under §325(d) and/or §314(a).  Paper 13.  In response to our Order, Petitioner filed a Reply to the Patent Owner Preliminary Response (Paper 14, "Reply"), and Patent Owner filed a corresponding Sur-reply (Paper 18, "Sur-reply).  We review the Petition, Preliminary Response, Reply, Sur-reply, and accompanying evidence under 35 U.S.C. § 314.

## B.  Summary of the Institution Decision

For the reasons provided below, we determine Petitioner has satisfied the threshold requirement set forth in 35 U.S.C. § 314(a).  Because Petitioner has demonstrated a reasonable likelihood that at least one claim of the '013 patent is unpatentable, we institute an *inter partes* review of the challenged claims.

In this Decision, we address all issues raised by the parties in the pre-trial briefing.  Our factual findings and conclusions at this stage of the proceeding are based on the evidentiary record developed thus far.  This is not a final decision as to the patentability of claims for which *inter partes* review is instituted.  Our final decision will be based on the record as fully developed during trial.

IPR2019-01508
Patent 9,238,013 B2

### C.  Real Parties in Interest

Petitioner identifies its real parties-in-interest as Prollenium US Inc. and Prollenium Medical Technologies Inc.  Pet. 61.  Patent Owner identifies its real parties-in-interest as Allergan Industrie, SAS; Allergan USA, Inc.; Allergan Sales, LLC; Allergan Holdings France SAS; Allergan Holdings Limited; Allergan Holdings, Inc.; Allergan Puerto Rico Holdings, Inc.; and Allergan, Inc.  Paper 5, 2.

### D. Related Matters

The '013 patent is at issue in *Allergan USA, Inc. et al v. Prollenium US Inc., et al.*, Case No. 1:19-cv-00126 (D. Del. filed Jan. 22, 2019).  Pet. 61; Paper 5, 2.  The '013 patent issued as a continuation of Application No. 12/393,884, now issued as U.S. Patent No. 8,357,795 B2 ("the '795 patent"). Petitioner has filed two separate Petitions for *inter partes* review of the '795 patent, in IPR2019-01506 and IPR2019-01632.  The '795 patent was the subject of two previous *inter partes* reviews:  IPR2014-01422 filed August 29, 2014, and terminated June 19, 2015, by way of joint motion to terminate, and IPR2017-01906 filed August 2, 2017, and denied on March 9, 2018. Paper 4, 3.

Petitioner has filed Petitions for *inter partes* review of related U.S. patents as follows: U.S. Patent No. 8,450,475 B2 ("the '475 patent") in IPR2019-01505; U.S. Patent No. 8,822,676 B2 ("the '676 patent") in IPR2019-01617; U.S. Patent No. 9,089,519 B2 ("the '519 patent") in IPR2020-00084; and U.S. Patent No. 9,358,322 B2 ("the '322 patent") in IPR2019-01509.  Pet. 61; Paper 5, 3.  The '795, '475, '676, '519, and '332 patents are also at issue in A*llergan USA, Inc. et al v. Prollenium US Inc., et al.*, Case No. 1:19-cv-00126 (D. Del. filed Jan. 22, 2019).  *Id.*

IPR2019-01508
Patent 9,238,013 B2

### E. The '013 Patent

#### 1. Specification

The subject matter claimed in the '013 patent is directed to soft tissue filler compositions.  Ex. 1001, 19:10–20:20.  The compositions include a hyaluronic acid (HA) component and an anesthetic agent, e.g., lidocaine.  *Id.* at 2:39–45.  The hyaluronic acid component is crosslinked with a crosslinking agent, e.g., 1,4-butanediol diglycidyl ether (BDDE).  *Id.* at 2:52–61.

The compositions are sterilized, for example by autoclaving, to form sterile compositions.  *Id.* at 3:46–51.  The compositions may be used as dermal fillers to help fill in facial lines and depressions and for restoring fat loss-related tissue volume.  *Id.* at 1:32–36.  Allergan markets dermal fillers containing crosslinked hyaluronic acid and lidocaine under the tradename Juvéderm®.  Prelim. Resp. 1.

#### 2. Illustrative Claims

Independent claims 1 and 4, reproduced below, are illustrative of the challenged claims.

1. A dermal filler comprising:

(a) a mixture comprising particles of hyaluronic acid crosslinked with 1,4-butanediol diglycidyl ether, and free hyaluronic acid;

(b) about 0.3% by weight lidocaine combined with the mixture;

wherein the dermal filler is heat sterile and has a pH of about 7.

4. A dermal filler comprising:

(a) a hyaluronic acid including particles of crosslinked hyaluronic acid mixed with free hyaluronic acid; and

(b) about 0.3% by weight lidocaine mixed with the hyaluronic acid, wherein:

4

IPR2019-01508
Patent 9,238,013 B2

the crosslinked hyaluronic acid is crosslinked with 1,4-butanediol diglycidyl ether;

the dermal filler being stable at about 25° C. for at least about 6 months after heat sterilization at a temperature of about at least about 120° C. to about 130° C. for a period of at least about 1 minute to about 15 minutes;

the dermal filler having a pH of about 7;

the dermal filler requiring an extrusion force of between about 10N and about 13N when injected at a rate of about 12.5 mm/minute; and

the dermal filler having a viscosity of between about 5 Pa*s and about 450 Pa*s when measured at about 5 Hz.

Ex. 1001, 19:12–18; 20:4–20.

### 3. Relevant Prosecution History

The '013 patent issued from U.S. Application Serial No. 13,746,170 ("the '170 application," Ex. 1040), which is a continuation of U.S. Application Serial No. 12/393,884 ("the '884 application," Ex. 1023), which issued as the '795 patent. During the prosecution of the '884 application, the Examiner rejected the claims as obvious over Lebreton, disclosing BDDE-crosslinked hyaluronic dermal fillers, and secondary references disclosing adding lidocaine to hyaluronic acid dermal fillers. Ex. 1023, 43–46, 78–80. For example, the Examiner rejected the claims as obvious over Lebreton and Wang[1] (teaching crosslinked hyaluronic acid which further comprises preferably an anesthetic such as lidocaine) or Calias[2] (teaching hyaluronic acid crosslinked with DVS and further comprising a drug such as lidocaine).

---

[1] Ex. 1047, W. Wang, U.S. Patent Application Publication No. 2005/0271729 A1, published Dec. 8, 2005 ("Wang").

[2] Ex. 1048, P. Calias et al., U.S. Patent No. 6,521,223 B1, issued Feb. 18, 2003 ("Calias").

IPR2019-01508
Patent 9,238,013 B2

*Id.* at 45, 80.  After a final rejection over Lebreton and Calias, the Applicant argued that "the heat stable property of the claimed dermal filler compositions, as shown in the Declaration and as supported by the data of record, is evidence that the claimed compositions comprising hyaluronic acid and lidocaine, are nonobvious."  *Id.* at 24–25.

To support this argument, the Applicant submitted a Declaration by the inventor, Pierre F. Lebreton, Ph.D. (Ex. 1024).  Ex. 1023, 11–29. Dr. Lebreton attested as follows:

> It was believed that adding lidocaine to hyaluronic acid gel compositions during manufacturing caused degradation of the hyaluronic acid prior to injection of the HA as a dermal filler.

> It was believed that lidocaine caused degradation of HA gel compositions during high temperature sterilization.

> It was not known whether HA compositions comprising lidocaine were stable or not after high temperature sterilization when placed in storage for any significant length of time.

> It was also believed that the instability of HA described above would have caused a viscosity reduction of the HA that would make it unsuitable for soft tissue filling applications.

> Based upon the facts set forth above, a person of ordinary skill in the art would have expected that a dermal filler comprising hyaluronic acid and lidocaine would not have remained sufficiently stable to be useful as soft tissue filler.

> It was not appreciated that a dermal filler comprising a cohesive gel of hyaluronic acid makes it possible for lidocaine to be combined with hyaluronic acid in a gel that is sufficiently stable to be useful as a soft tissue filler.

> The enhanced stability properties of the inventive dermal fillers was evidenced by certain experiments performed under my direction by my research team prior to the application filing date.

>     . . . .

6

IPR2019-01508
Patent 9,238,013 B2

> To my knowledge, it was a surprising and unexpected discovery, not appreciated prior to the present invention, that certain cohesive HA gels, as defined in the application, when mixed with lidocaine, could be made to be heat and shelf stable.

Prelim. Resp. 10–11(paragraph numbers omitted) (quoting Ex. 1024 ¶¶ 5–11, 15); *see* Pet. 11–12. The Applicant further submitted Cui[3] as evidence "that HA gels are known to be sensitive to heat sterilization, and that even more particularly, that HA gels crosslinked with BDDE are known to be especially sensitive to heat sterilization relative to HA gels cross linked with other, i.e. non-BDDE, crosslinkers." Ex. 1023, 28

*F. Evidence*

Petitioner relies upon the following prior art references.

Ex. 1007, R. S. Narins and P. H. Bowman, *Injectable Skin Fillers*, 32 CLIN. PLAST. SURG. 151–162 (2005) ("Narins").

Ex. 1012, B. M. Kinney, *Injecting Puragen Plus into the Nasolabial Folds: Preliminary Observations of FDA Trial*, 26 AESTHETIC SURG. J. 741–748 (2006) ("Kinney").

Ex. 1022, G. D. Monheit, *Hyaluronic Acid Fillers: Hylaform and Captique*, 15 FACIAL PLAST. SURG. CLIN. N. AM. 77–84 (2007) ("Monheit").

Ex. 1029, P. Lebreton, U.S. Patent Application Publication No. 2006/0194758 A1 (published Aug. 31, 2006) ("Lebreton").

Ex. 1030, K. K. Sadozai et al., U.S. Patent Application Publication No. 2005/0136122 A1 (published Jun. 23, 2005) ("Sadozai").

Ex. 1058, X. Zhao, U.S. Patent Application Publication No. 2005/0250939 A1 (published Nov. 10, 2005) ("Zhao").

Ex. 1059, J. Reinmuller, U.S. Patent No. 5,731,298 (issued Mar. 24, 1998) ("Reinmuller").

---

[3] Cui et al., *The comparison of physicochemical properties of four Cross-linked sodium hyaluronate gels with different cross-linking agents*, 396–398 ADV. MATS. RES. 1506–1512 (2012) (Ex. 1025).

IPR2019-01508
Patent 9,238,013 B2

Petitioner also relies upon the Declaration of Dr. Dale P. DeVore
(Ex. 1002) to support its contentions.

### G. Asserted Grounds of Unpatentability

Petitioner asserts that claims 1–4 would have been unpatentable on the
following grounds.

| Ground | Claim(s) | Basis[4] | References |
|:---:|:---:|:---:|:---|
| 1 | 1–4 | § 103(a) | Lebreton, Sadozai, Monheit |
| 2 | 1–4 | § 103(a) | Kinney, Zhao, Narins |
| 3 | 1–4 | § 103(a) | Reinmuller, Lebreton, Monheit |

### H. Abbreviations

| | |
|:---|:---|
| HA | Hyaluronic Acid |
| FDA | Food & Drug Administration |
| BDDE | butanediol diglycidyl ether |
| PBCDI[5] | p-phenylene-bis(ethylcarbodiimide) |
| DVS | 1,4-divinylsulfone |
| DEO | diepoxyoctane |

---

[4] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284
(2011) ("AIA"), amended 35 U.S.C. §§ 102 and 103.  Because the
challenged claims of the '013 patent have an effective filing date before the
effective date of the applicable AIA amendments, we refer to the pre-AIA
versions of 35 U.S.C. § 103 throughout this Decision.
[5] Ex. 1030 ¶ 85.

IPR2019-01508
Patent 9,238,013 B2

## II. ANALYSIS

### A. Level of Ordinary Skill in the Art

The person having ordinary skill in the art is a hypothetical person that is presumed to be aware of all the relevant prior art. *Custom Accessories, Inc. v. Jeffrey-Allan Indust., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986); *Kimberly-Clarke Corp. v. Johnson & Johnson*, 745 F.2d 1437, 1453 (Fed. Cir. 1984). Moreover, the prior art itself is generally sufficient to demonstrate the level of skill in the art at the time of the invention. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (explaining that specific findings regarding ordinary skill level are not required "where the prior art itself reflects an appropriate level and a need for testimony is not shown") (quoting *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed. Cir. 1985)).

Petitioner asserts that a person of ordinary skill in the art would have been "a scientist involved in the development of dermal fillers, who would have an advanced degree, such as a Ph.D., M.S., or M.D., and several years of experience developing dermal fillers for cosmetic use, including [HA]-based dermal fillers." Pet. 13–14 (citing Ex. 1002 ¶¶ 69–72). Petitioner asserts that the person of ordinary skill "would be aware of commercially sold dermal fillers, in the United States and abroad, as well as those products for which approvals were being publicly sought." *Id.* Petitioner asserts that the person of ordinary skill "would also be aware of the process by which FDA reviews dermal filler products, and how FDA communicates the results of such reviews to the public." *Id.* (citing Ex. 1002 ¶¶ 73–75; Ex. 1032, 227).

Patent Owner contends that Board should adopt the same definition for the person of ordinary skill as previously adopted in IPR2017-01906,

IPR2019-01508
Patent 9,238,013 B2

which also involved the '795 patent.[6]  Prelim. Resp. 14–15.  In IPR2017-

01906, the Board determined that a person of ordinary skill in the art:

> would have had a B.S. or M.S. in biochemistry, polymer
> chemistry, medicinal chemistry, pharmaceutical chemistry, or a
> related field with 'several years' of practical experience.
> Alternatively . . . the ordinary artisan would have had less
> practical experience but a Ph.D. in one of those fields, or an M.D.
> in dermatology, plastic surgery, or a specialty related to the
> clinical use of dermal fillers.

*Id.* (citing IPR2017-01906, Paper 15 at 8–9).

On the present record, we find Petitioner's definition reasonable.

Consistent with Petitioner's argument, the proposed definition is not clearly

inconsistent with our prior determination and is supported by Dr. DeVore's

presently uncontested testimony.  *See* Ex. 1002 ¶¶ 69–72.  Further, the art of

record abundantly supports Petitioner's proposition that one of ordinary skill

in the art would have been aware of commercially sold dermal fillers and

publically available information regarding their FDA approval.

Monheit, for example, discusses clinical trials and approval dates of

"five FDA-approved HA skin fillers available in the United States:

Hylaform, Hylaform Plus, Captique (Inamed Corporation), Restylane

(Medicis Aesthetics Inc.), and, most recently, Juvéderm (Allergen

Aesthetics)," noting, for example, that "Hylaform has been available

worldwide since 1998 and in the United States since 2004."  Ex. 1022, 79–

80.  And in summarizing an FDA clinical study comparing Hylaform to

Zyplast, Monheit cites data from a 2003 FDA publication "Available at:

---

[6] *Teoxane S.A. v. Allergan, PLC*, IPR2017-01906, Paper 15 (PTAB Mar. 9, 2018)

IPR2019-01508
Patent 9,238,013 B2

http://www.fda.gov/ohrms/dockets/ac/03/slides/4004s1_01_lerner_files/ frame.htm." *Id.* at 80, Box 1.

Moreover, in reviewing the state of the art of injectable skin fillers for soft tissue augmentation, Narins notes the FDA approval status for commercially available products Zyderm I and II, CosmoDerm, CosmoPlast, Restylane, Hylaform, Radiance FN, Sculptra, and Silikon 1000. Ex. 1007, 152, 153, 156–157, 158, 159. Kinney similarly notes the FDA approval dates of Restylane and Juvaderm (Ex. 1012, 741), and Smith discusses the "FDA status and Approved Uses" of Juvéderm 30, 24HV, and 30HV injectable gels," further noting that the FDA "recently announced a label extension for Juvéderm Ultra and Juvéderm Ultra plus" (Ex. 1009, 67S–68S).

As a whole, the references asserted in the Petition, thus, strongly suggest that skilled artisans were aware of and monitored the commercial and approval status of dermal filler compositions. In light of these teachings and the testimony of Dr. DeVore, we expand upon the Board's earlier definition of one of ordinary skill in the art as indicated by Petitioner's arguments. Thus, for the purpose of institution, a person of ordinary skill in the art as of the filing date of the '013 patent would have a B.S. or M.S. in biochemistry, polymer chemistry, medicinal chemistry, pharmaceutical chemistry, or a related field with several years of practical experience or having less practical experience but a Ph.D. in one of those fields, or an M.D. in dermatology, plastic surgery, or a specialty related to the clinical use of dermal fillers. Such a person would be aware of commercially sold dermal fillers in the United States and abroad, as well as those products for which approvals were being publicly sought.

IPR2019-01508
Patent 9,238,013 B2

The above definition is provisional and the parties are welcome to present further argument on this topic at trial.

### B. Claim Construction

We interpret a claim "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. [§] 282(b)."  37 C.F.R. § 42.100(b).[7]  Under this standard, we construe the claim "in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent."  *Id.*  Furthermore, at this stage in the proceeding, we need only construe the claims to the extent necessary to determine whether to institute *inter partes* review.  *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

Petitioner proposes construction for several claimed terms: "heat sterile," "stable," "free HA," and "particles."  *See* Pet. 14–17.  Patent Owner contends it is not necessary to construe any of the claimed terms.  Prelim.

---

[7] The Office has changed the claim construction standard in AIA proceedings to replace the broadest reasonable interpretation ("BRI") standard with the same claim construction standard used in a civil action in federal district court.  Changes to the Claim Construction Standard for Interpreting Claims in Trial Proceedings Before the Patent Trial and Appeal Board, 83 Fed. Reg. 51,340 (Oct. 11, 2018).  The change applies to petitions filed on or after November 13, 2018. *Id.*  Because the present Petition was filed on July 15, 2019, we construe the claims in accordance with the federal district court standard, now codified at 37 C.F.R. § 42.100(b).

IPR2019-01508
Patent 9,238,013 B2

Resp. 14.  For the purpose of this Decision, we find it helpful to address the term "stable."

Petitioner proposes "stable" to mean that "the composition maintains at least one of the following aspects: transparent appearance, pH, extrusion force and/or rheological characteristics, hyaluronic acid (HA) concentration, sterility, osmolarity, and lidocaine concentration." *Id.* at 15–16 (citing Ex. 1027, 11).

In IPR2017-01906, the panel adopted a more detailed definition of this term as:

> a sterile composition that maintains one or more of the following aspects: transparent appearance, pH, extrusion force and/or rheological characteristics, hyaluronic acid (HA) concentration, sterility, osmolarity, and lidocaine concentration, after being stored at a temperature of at least about 25˚ C for a specified period of time.

*Teoxane,* Paper 15 at 9–10 (quoting Pet. 11).  The Board's prior construction does not appear inconsistent with Petitioner's broader proposed construction. Absent any persuasive argument for an alternative construction, we adopt the reasoning and definition of "stable" as set forth in IPR2017-01906.  *Id.* The parties are, nevertheless, welcome to present further arguments regarding claim construction at trial.

### C. Petitioner's Patentability Challenges

#### 1. Ground 1: Obviousness in view of Lebreton, Sadozai, and Monheit

##### a. Summary of the References Relied Upon

###### i. Lebreton (Ex. 1029)

Lebreton is directed to crosslinking low and high molecular weight polymers to form injectable monophase hydrogels.  Ex. 1029, code (57).

13

IPR2019-01508
Patent 9,238,013 B2

The hydrogels may be used as filling materials in plastic surgery. *Id.* ¶ 5.
Lebreton discloses buffering the crosslinked product to a pH compatible
with the human body, being between 7 and 7.4. *Id.* ¶ 48. Particularly,
Lebreton discloses hydrogels prepared by crosslinking sodium hyaluronate
(sodium salt of hyaluronic acid) with 1,4-butanediol diglycidyl ether
(BDDE). *Id.* ¶¶ 68–76. The degree of crosslinking "is theoretically between
0.5 and 70%, advantageously between 4 and 50%." *Id.* ¶ 46. The
crosslinked products are neutralized to pH 7.2 and sterilized with moist heat
in an autoclave. *Id.* ¶¶ 70, 76, 81.

Lebreton further discloses monophase and biphase hydrogels. *See*
*id.* ¶¶ 64–67, 73, 79, 85, 91. Monophase hydrogels are characterized by "no
apparent liquid phase" and are "soft and free-flowing." *Id.* ¶¶ 64–65.
Biphase hydrogels are characterized as "gel fragments bathed in a low-
viscosity liquid medium" with "no cohesion of the gel and no free-flowing
appearance." *Id.* ¶¶ 66–67. Lebreton discloses monophase hydrogels
characterized by an extrusion force of 14 N and 15 N, when injected through
a 27 G½ needle at a rate of 12.5 mm/min. *Id.* ¶¶ 62, 83, 89.

### ii. *Sadozai (Ex. 1030)*

Sadozai is directed to a crosslinked hyaluronic acid composition
effective for tissue augmentation or drug delivery. Ex. 1030 ¶¶ 7, 8. "[T]he
storage modulus G′ is increased, e.g., composition is stabilized, by the
inclusion of a local anesthetic, e.g., lidocaine, compared to a non-stabilized
composition, e.g., an identical composition except that the local anesthetic is
not included." *Id.* ¶ 68. Particularly, Sadozai discloses compositions
including hyaluronic acid crosslinked with p-phenylene-
bis(ethylcarbodiimide) (PBCDI). *Id.* ¶ 85. The crosslinked hyaluronic acid
compositions are combined with phosphate buffer containing 0.30%

14

IPR2019-01508
Patent 9,238,013 B2

lidocaine (Phosphate Buffer 4) to form a suspension.  *Id.* ¶¶ 84, 90, 100, 102.
The suspensions are loaded into syringes and autoclaved for sterilization.
*Id.* ¶¶ 90 (Example 12), 100 (Example 17).  Sterilization/hydration may be
performed in an autoclave at temperatures between 100° C to 150° C.
*Id.* ¶¶ 54–55.

Sadozai discloses that compositions processed according to Example
12 "with lidocaine have significantly higher modulus G′ over the time of the
test.  Thus, crosslinked [hyaluronic acid] with lidocaine can have good
biostability, and can in some cases have a synergistic effect, increasing G′."
*Id.* ¶ 107.

### iii.  Monheit (Ex. 1022)

Monheit describes the properties of hyaluronic acid fillers used for
wrinkle and volume correction.  Ex. 1022, 77.  Properties of hyaluronic acid
fillers include gel hardness or rheology (flow), particle size, concentration of
hyaluronic acid particles, swelling, ratio of soluble to insoluble hyaluronic
acid, and hydration.  *Id.* at 78.  Monheit discloses free (soluble) "HA is
needed as a lubricant for flow characteristics, thus more free HA is needed
as the G-1 or hardness of the HA is greater.  The disadvantage is that free or
non-crosslinked HA only lasts a few days and the stability of the implant is
related to the crosslinked component."  *Id.*

### b.  Petitioner's Contentions

Petitioner asserts that claims 1–4 are unpatentable under 35 U.S.C.
§ 103(a) as obvious over the combination of Lebreton, Sadozai, and
Monheit.  Pet. 23–33.  Petitioner provides a detailed claim analysis for
claims 1–4 as obvious over Lebreton and Sadozai.  *Id.* at 27–33.  Because
Patent Owner raises no independent arguments with respect to claims 2 and
3, we address claims 1 and 4 as representative

IPR2019-01508
Patent 9,238,013 B2

### i. Elements of Claim 1

#### (a) "A dermal filler comprising:"

Petitioner asserts both Lebreton and Sadozai teach dermal fillers. Pet. 27 (citing Ex. 1029 ¶ 5; Ex. 1030 ¶ 7, 12).

#### (b) "a mixture comprising particles of hyaluronic acid crosslinked with [BDDE],"

Petitioner asserts Lebreton discloses a mixture of BDDE crosslinked hyaluronic acid. *Id.* (citing Ex. 1029 ¶¶ 68–76). Petitioner asserts Lebreton discloses "fine fragments" and "facets" of gel, which would be interpreted by one of ordinary skill as "*particles* . . . of BDDE-crosslinked HA formed by mechanical homogenization of the product of the crosslinking reaction." *Id.* (citing Ex. 1029 ¶¶ 68–76; Ex. 1002 ¶ 139).

#### (c) "and free hyaluronic acid"

Petitioner asserts Monheit discloses that free hyaluronic acid may be added as a lubricant for flow characteristics, which a person of ordinary skill in the art would have included to optimize the injection characteristics of the filler. *Id.* (citing Ex. 1022 ¶ 78; Ex. 1002 ¶ 138).

#### (d) "about 0.3% by weight lidocaine combined with the mixture"

Petitioner asserts Sadozai discloses 0.3% lidocaine in a dermal filler. *Id.* at 28 (Ex. 1030 ¶ 107).

#### (e) "wherein the dermal filler is heat sterile"

Petitioner asserts Lebreton and Sadozai teach heat sterilization of crosslinked hyaluronic acid gels. *Id.* (citing Ex. 1029 ¶¶ 70, 76; Ex. 1030 ¶¶ 90, 107). Petitioner asserts the person of ordinary skill "would be motivated to heat sterilize the lidocaine containing BDDE-crosslinked compositions as well." *Id.*

IPR2019-01508
Patent 9,238,013 B2

*(f)  "has a pH of about 7"*

Petitioner asserts Lebreton teaches a pH range of 7.0–7.4.  Pet. 28 (citing Ex. 1029 ¶ 139).

*ii.  Elements of Claim 4*

Petitioner contends claim 4 includes all of the limitations of claim 1, and further recites the following limitations.  *See* Pet. 31.

*(a)  "the dermal filler being stable at about 25° C. for at least about 6 months after heat sterilization at a temperature of at least about 120° C. to about 130° C for a period of at least about 1 minute to about 15 minutes"*

Petitioner asserts "a POSITA would have appreciated that the recited temperatures and times in claim 4 include a range of standard sterilization conditions known to be effective to sterilize similar compositions."  *Id.* (citing Ex. 1002 ¶ 97).  Petitioner asserts Lebreton and Sadozai teach heat sterilization of their compositions in sealed syringes.  *Id.* at 32 (citing Ex. 1029 ¶¶ 70; Ex. 1030 ¶¶ 90).  Petitioner asserts the person of ordinary skill "would understand that the product (once successfully sterilized) would remain sterile indefinitely so long as the sterilized syringe was not opened."  *Id.* (citing Ex. 1002 ¶¶ 144–146).

*(b)  "the dermal filler requiring an extrusion force of between about 10 N and about 13 N when injected at a rate of about 12.5 mm/minute"*

Petitioner asserts Lebreton discloses "gels having extrusion forces of 14N and 15N, when injected through a 27 G½ needle at a rate of 12.5 mm/min."  *Id.* at 29 (citing Ex. 1029 ¶¶ 62, 83, 89).  Petitioner contends extrusion force is influenced by needle gauge and syringe dimension, neither of which are claimed.  *Id.*  Petitioner asserts the '013 patent's Specification acknowledges a person of ordinary skill in the art can "determine the correct

IPR2019-01508
Patent 9,238,013 B2

syringe dimensions and needle gauge required to arrive at a particular extrusion force requirement." *Id.* (quoting Ex. 1001, 11:49–52).  Therefore, Petitioner asserts "the claimed extrusion force, which represented typical values for dermal fillers in any case, would have been obvious to arrive at by [modifying Lebreton with] the appropriately sized syringe and needle." *Id.* (citing Ex. 1002 ¶¶ 95, 151).

> *(c)   "the dermal filler having a viscosity of between about 5 Pa\*s and about 450 Pa\*s when measured at about 5 Hz."*

Petitioner contends "[a]lthough the viscosity of dermal fillers is rarely reported at 5 Hz, roughly translating the claimed range to 0.1 Hz (a more typical frequency for rheological measurements, EX1039, 267) gives viscosities in the range from 25-2,500 Pa\*s."  Pet. 30 (citing Ex. 1002 ¶ 142).  Petitioner asserts the claimed range overlaps with "essentially every HA dermal filler that has been clinically used as of August 2008 (e.g., ~50–1,200 Pa\*s at 0.1 Hz)."  *Id.*  Petitioner asserts that the person of ordinary skill would have known that a desired viscosity could be obtained by routine optimization of the degree of crosslinking and the amount of free hyaluronic acid.  *Id.* (citing Ex. 1002 ¶¶ 86–94, 142).

> *iii.   Petitioner's articulated rationale to combine the cited references*

Petitioner contends that incorporating lidocaine into crosslinked fillers was a known solution to the problem of injection pain and was previously implemented in fillers containing hyaluronic acid crosslinked with PBCDI, 1,4-divinylsulfone ("DVS"), or diepoxyoctane ("DEO").  *Id.* at 23–24 (citing Ex. 1002 ¶¶ 113, 117, 130–131).  Petitioner contends that "[a] composition containing BDDE-crosslinked HA and lidocaine was a derivative and predictable next step in view of the success of the other three clinically used

IPR2019-01508
Patent 9,238,013 B2

crosslinkers." *Id.* at 24.  Thus, Petitioner contends a person of ordinary skill in the art could have easily incorporated Sadozai's 0.3% lidocaine in a buffer solution into Lebreton's BDDE-crosslinked gel.  *Id.* at 25–26 (citing Ex. 1002 ¶¶ 147–148).  Likewise, Petitioner contends that a person of ordinary skill would have incorporated free hyaluronic acid, as taught by Monheit, to "optimize the flow viscosity of the gel and reduce side effects associated with injection."  *Id.* at 26 (citing Ex. 1002 ¶¶ 91–94).

> *iv.  Objective Evidence of Non-obviousness*

Petitioner contends "the Examiner allowed the claims of the challenged patent (and its related applications) based on Allergan's arguments and proffered evidence pointing to supposed 'unexpected results' of the invention."  Pet. 43.  Petitioner challenges the Inventor's Declaration, the comparative data in the specification, and the extrinsic evidence cited by the Applicant during prosecution.  *Id.* at 45–53.

First, Petitioner asserts that the Inventor's Declaration is unsubstantiated and contradicted by the prior art.  *Id.* at 45–48.  Petitioner asserts that contrary to Lebreton's statements, the totality of the prior art instead gave the POSITA the expectation lidocaine "*could* be successfully combined with various crosslinked HA dermal fillers, including a BDDE-crosslinked HA dermal filler."  *Id.* at 46.  To show that sterile and stable lidocaine-hyaluronic acid combinations were previously known, Petitioner cites dermal fillers commercially available at the time of filing, e.g., Elevess, Prevelle Silk, Puragen Plus, in addition to Sadozai and Kinney.  *Id.* (citing Ex. 1002 ¶¶ 170–172).  Moreover, Dr. DeVore states his opinion that "the POSITA would not have believed that lidocaine caused degradation of HA gels compositions during high temperature sterilization and would have believed that HA compositions comprising lidocaine were stable after high

19

IPR2019-01508
Patent 9,238,013 B2

temperature sterilization." Ex. 1002 ¶ 172.  Dr. DeVore attests that "during the development of Elevess, it was observed that the autoclave-sterilized [PBCDI]-crosslinked HA composition with lidocaine was sufficiently stable to support a product shelf life of 15 months, which is reflected in the Elevess label." *Id.* (citing Ex. 1050, 6).

Second, Petitioner asserts that the comparative data relied on by the Inventor's Declaration does not support nonobviousness.  Pet. 48.  The comparative data appears as Example 4 of the '013 patent's Specification. Ex. 1001, 15:20–16:60.  Dr. DeVore attests that "Example 4 describes experiments in which six samples were evaluated. . . . Allergan argued that the results of Samples 1–3 were consistent with the expectations of the POSITA, and that it was unexpected that Samples 4–6 did not exhibit the same viscosity reduction."  Ex. 1002 ¶ 178.  Dr. DeVore states "[i]n my opinion, Sample 1 is completely irrelevant—it is a mixture of *uncrosslinked* HA and a completely different polymer (hydroxypropyl methylcellulose).  I am not aware of a mixture of uncrosslinked HA and HPMC being used as a dermal filler, either in 2008 or now."  *Id.* ¶ 179.  Dr. DeVore states that the viscosity differences are not indicative of instability as "[t]he final viscosity for Samples 2 and 3 in each test (~75–375 Pa*s) is substantially the same as the final viscosities of Samples 4–6 (~50–90 Pa*s), all of which are within the range of marketed dermal fillers (50–1,200 Pa*s)."  *Id.* ¶ 181 (citing Ex. 1039, 267).  DeVore states that there is no meaningful difference in viscosity reduction between Sample 3 (35% reduction when combined with lidocaine without pH adjustment) and Sample 4 (30% reduction in viscosity in the same test) and that the difference was not "much lower" as alleged by Allergan.  *Id.* ¶¶ 185–186.

20

IPR2019-01508
Patent 9,238,013 B2

Third, Petitioner asserts that the extrinsic evidence cited by the Application during prosecution, i.e., Cui, "is irrelevant to the question of whether Allergan's BDDE-crosslinked HA composition showed unexpected results compared to the other crosslinkers known to POSITAs at the time." Pet. 53 (citing Ex. 1002 ¶ 176). Petitioner argues that "Cui was published in 2012, well after the claimed priority date of the patent. The reasonable expectation of success (and expected results) is evaluated at the time the invention was made—a later published reference that might have taught away from the claimed invention is irrelevant." *Id.* at 52–53 (citing *Bristol-Myers Squibb Co. v. Teva Pharms. USA, Inc.* 752 F.3d 967, 976 (Fed. Cir. 2014)). Dr. DeVore states that Cui compares the stability of BDDE-crosslinked hyaluronic acid with three crosslinkers that had not "been seriously investigated for use in dermal fillers as of August 2008," as opposed to the known non-BDDE crosslinkers for dermal fillers. Ex. 1002 ¶ 175. Dr. DeVore states his opinion that "the Cui reference in no way supports Allergan's assertion that BDDE crosslinked HA was 'especially sensitive' to heat sterilization relative to 'non-BDDE' crosslinkers. At the very least, Cui is irrelevant . . . because Cui's comparisons do not relate to any of the crosslinkers relied upon here." *Id.* ¶ 176.

### c. *Patent Owner's Contentions*

In its Preliminary Response, Patent Owner directs substantially all of its argument to whether the Board should exercise discretion to deny the Petition under 35 U.S.C § 325(d). *See* Prelim. Resp. 1–2, 16–36. We address Patent Owner's arguments under 35 U.S.C § 325(d) below.

Although Patent Owner does not directly address the substance of Petitioner's grounds, Patent Owner does address the relevance of Cui in the

IPR2019-01508
Patent 9,238,013 B2

context of its § 325(d) arguments.  *See* Prelim. Resp. 29–30; Sur-Reply 3–4.

In sum, Patent Owner argues that Cui is relevant because it "discusses

divinyl sulfone (DVS) crosslinked HA gels, which Petitioner admits were

known and approved before August 2008."  Prelim. Resp. 29.  We accord

this argument little weight because Cui provides no comparative information

about the stability of HA gels crosslinked with either DVS or BDDE.

Rather, and as Patent Owner admits, "Cui focused on gels crosslinked with

four new agents of 'lower toxicity'" as compared to DVS."  *Id.* at 30 (citing

Ex. 1025, 1506); *see* Reply 3 (noting that "Cui does not *test or compare*

BDDE to *any* of the three crosslinkers discussed in the Petition[] or the

Examiner's art").

      Patent Owner responds that we should discount Dr. Devore's

testimony because it is "conclusory and fails to provide a well-reasoned

rationale or objective support for the proposed grounds."  Prelim. Resp. 33.

As an initial matter, at this stage of the proceeding, we give at least some

weight to an expert's unopposed testimony.  Moreover, we accord little

weight to Patent Owner's argument as it appears to rely on summary

statements from Dr. Devore's declaration that are further explained

elsewhere in the Declaration.  Patent Owner argues, for example, that a

sentence fragment from paragraph 138 of Dr. Devore's declaration ("the

POSITA would have been motivated to incorporate free HA into the

lidocaine-containing BDDE-crosslinked HA composition") is "without

evidentiary support."  Prelim. Resp. 33.  The passage, read in full, however,

expressly cites to Exhibits 1009 and 1022 as support for the proposition that

"[t]he POSITA would have been aware that prior devices included free HA

and that free HA could enhance the passage of the composition through a

needle and reduce injection-related inflammation."  Ex. 1002 ¶ 138.

IPR2019-01508
Patent 9,238,013 B2

Accordingly, we do not find persuasive Patent Owner's argument that we should discount Dr. Devore's testimony as unduly conclusory. Patent Owner will have the opportunity to rebut and challenge Dr. Devore's testimony at trial.

### d. Conclusion

Having considered the parties positions and evidence of record, summarized above, we determine that Petitioner has established a reasonable likelihood of prevailing in demonstrating the unpatentability of claims 1–4 with respect to Ground 1.

### 2. Ground 2: Obviousness in view of Kinney, Zhao, and Narins

### a. Summary of the References Relied Upon

### i. Kinney

Kinney describes a clinical study comparing two dermal fillers, Restylane and Puragen Plus. Ex. 1012, 742. Restylane is a non-animal source hyaluronic acid (NASHA) single crosslinked with BDDE. *Id.* at 741. Kinney describes "the pain associated with injection" as a "major disadvantage" of existing hyaluronic preparations, such as Restylane." *Id.* Puragen Plus is a NASHA double-crosslinked with DEO, thereby forming ester and ether bonds. *Id.* at 742. Kinney discloses that double-crosslinking protects the ether bonds during sterilization. *Id.* Moreover, "[t]he increased chemical stability allows for the addition of lidocaine 0.3% for a relatively pain-free injection." *Id.* Kinney discloses "[n]ot surprisingly, there was minimal to no pain in essentially every patient injected with Puragen Plus, and less pain in every patient injected with Puragen Plus compared with patients injected with Restylane." *Id.* at 746.

IPR2019-01508
Patent 9,238,013 B2

### ii. Zhao

Zhao is directed to double-crosslinked hyaluronic acid derivatives having improved biostability.  Ex. 1058 ¶ 14.  Zhao discloses crosslinking agents may be used for the double-crosslinking process may include butanediol diglycidylether (BDDE) and 1,2,7,8-diepoxyoctane (DEO). *Id.* ¶¶ 19–21).  Zhao discloses an example of a double-crosslinking process for hyaluronic acid, including a first crosslinking reaction with DEO under alkaline conditions, and a second crosslinking reaction with DEO under acidic conditions.  *Id.* ¶ 32.  Zhao discloses the degree of crosslinking may range from 10–50%.  *Id.* ¶ 56.

### iii. Narins

Narins discloses that Restylane is a stabilized partially crosslinked hyaluronic acid gel.  Ex. 1007, 156.  Narins discloses "[t]he material is heat-sterilized in its final container and has a shelf life of 1.5 years from the date of manufacture."  *Id.*

### b. Petitioner's Contentions

Petitioner asserts that claims 1–4 are unpatentable under 35 U.S.C. § 103(a) as obvious over the combination of Kinney, Zhao, and Narins.  Pet. 34–37.  Petitioner provides a detailed claim analysis for each of claims 1–4. Pet. 35–37.  We address Petitioner's arguments as to claims 1 and 4 as representative.

### i. Claim 1

#### (a) "A dermal filler comprising:"

Petitioner asserts both Kinney and Zhao teach dermal fillers.  Pet. 35 (citing Ex. 1012, 741–742; Ex. 1058 ¶ 60, 67).

24

IPR2019-01508
Patent 9,238,013 B2

> (b) *"a mixture comprising particles of hyaluronic acid crosslinked with [BDDE],"*

Petitioner asserts "Kinney discloses particles of BDDE crosslinked HA filler (Restylane) and particles of DEO crosslinked HA filler (Puragen Plus)." *Id.* (citing Ex. 1012, 741–742).

> (c) *"and free hyaluronic acid"*

Petitioner asserts that Kinney discloses Restylane contains "minimally modified HA," which a person of ordinary skill in the art would have understood as very minimally crosslinked or "free hyaluronic acid." *Id* (citing Ex. 1012, 742; Ex. 1002 ¶¶ 91–94).

> (d) *"about 0.3% by weight lidocaine combined with the mixture"*

Petitioner asserts Kinney discloses Puragen Plus containing 0.3% lidocaine. *Id.* (citing Ex. 1012, 742).

> (e) *"wherein the dermal filler is heat sterile"*

Petitioner asserts Narins teaches Restylane is heat sterilized. *Id.* at 36 (citing Ex. 1007, 156). Petitioner asserts Kinney discloses "the double crosslinking of DEO in Puragen Plus improves stability during sterilization." *Id.* (citing Ex. 1012, 742).

> (f) *"has a pH of about 7"*

Petitioner asserts one of ordinary skill in the art "knew that dermal fillers were formulated at a pH compatible with the human body, including pH 7." *Id.* (citing Ex. 1002 ¶ 151).

> *ii.   Claim 4*

Petitioner contends claim 4 includes all of the limitations of claim 1 and further recites the following limitations. *See id.* at 37.

> (a) *"the dermal filler being stable at about 25° C. for at least about 6 months after heat sterilization at a*

IPR2019-01508
Patent 9,238,013 B2

> *temperature of at least about 120° C. to about 130° C*
> *for a period of at least about 1 minute to about 15*
> *minutes"*

Petitioner asserts a POSITA would have appreciated that the recited temperatures and times in claim 4 include a range of standard sterilization conditions known to be effective to sterilize similar compositions." *Id.* (citing Ex. 1002 ¶ 97). Petitioner asserts Narins discloses Restylane is sterilized in its final container. *Id.* (citing Ex. 1007, 156). Petitioner asserts the person of ordinary skill "would understand that the product (once successfully sterilized) would remain sterile indefinitely so long as the sterilized syringe was not opened." *Id.* (citing Ex. 1002 ¶¶ 153).

> *(b) "the dermal filler requiring an extrusion force of*
> *between about 10 N and about 13 N when injected at a*
> *rate of about 12.5 mm/minute"*

Petitioner contends "the recited extrusion force and injection rate would have been obvious to arrive at by merely selecting an appropriate syringe and needle gauge." Pet. 36 (citing Ex. 1002 ¶ 153).

> *(c) "the dermal filler having a viscosity of between*
> *about 5 Pa*s and about 450 Pa*s when measured at*
> *about 5 Hz."*

Petitioner contends "[t]he POSITA could have easily selected a viscosity to match a desired clinical goal, and could have achieved this viscosity through routine optimization of the filler (including the degree of crosslinking and the amount of free HA added to the filler)." *Id.* at 37 (citing Ex. 1002 ¶¶ 91–95).

### iii.   Motivation to Combine

Petitioner asserts that Kinney teaches Puragen Plus (double-DEO crosslinked hyaluronic acid with lidocaine) was preferred to Restylane (single-BDDE crosslinked hyaluronic acid and free hyaluronic acid) due to

26

IPR2019-01508
Patent 9,238,013 B2

the addition of lidocaine.  Pet. 33–34.  Petitioner asserts the person of ordinary skill "would have been motivated to exchange the DEO crosslinker in Puragen Plus with a BDDE crosslinker, as BDDE-crosslinked fillers were already established in the marketplace and approved by FDA."  *Id.* at 34 (citing Ex. 1002 ¶ 148).  Petitioner asserts that double-BDDE crosslinked hyaluronic acid could have been made using Zhao's process given the similarity between DEO and BDDE as bis-epoxide crosslinkers.  *Id.* (citing Ex. 1002 ¶¶ 149).

> *c.  Conclusion*

Having considered the parties positions and evidence of record, summarized above, we determine that Petitioner has established a reasonable likelihood of prevailing in demonstrating the unpatentability of claims 1–4 respect to Ground 2.

> *3.  Obviousness in view of Reinmuller and Lebreton*
>
> *a.  Summary of the References Relied Upon*
>
> *i.  Reinmuller*

Reinmuller discloses an injectable gel containing cross-linked hyaluronic acid and 2% by weight lidocaine.  Ex. 1059, 7:1–11.  The lidocaine acts as a local anesthetic to avoid pain when the injection cannula is inserted.  *Id.* at 4:62–64.

Reinmuller discloses the cross-linked hyaluronic acid is commercially available as Hylon and Hylagel available from the Biomatrix Company and cites U.S. Pat. Nos. 4,713,488 and 4,605,691.  *Id.* at 3:49–54.  Petitioner asserts that based on this disclosure, a person skilled in the art would have known "that Hylagel was a DVS-crosslinked HA."  Pet. 22 (citing Ex. 1002 ¶ 122).

IPR2019-01508
Patent 9,238,013 B2

Reinmuller discloses the gel is dispensed into pressure-resistant ampoules and sealed. Ex. 1059, 7:15–18. The packaged gel is heat sterilized and protected from light. *Id.*

### b. *Petitioner's Contentions*

Petitioner asserts that claims 1–4 are unpatentable under 35 U.S.C. § 103(a) as obvious over the combination of Reinmuller, Lebreton, and Monheit. Pet. 38–43. Petitioner provides a detailed claim analysis for each of the challenged claims. *Id.* at 40–43. We address Petitioner's arguments as to claims 1 and 4 as representative.

### i. *Claim 1*

#### (a) *"A dermal filler comprising:"*

Petitioner asserts Lebreton discloses dermal fillers. *Id.* at 40 (citing Ex. 1029 ¶ 5). Petitioner asserts a person of ordinary skill "would have recognized that Reinmuller's tissue augmentation composition could be adapted for use as a dermal filler." *Id.* (citing Ex. 1059, 2:44–45, 67).

#### (b) *"a mixture comprising particles of hyaluronic acid crosslinked with [BDDE],"*

Petitioner asserts both Reinmuller and Lebreton discloses particles of crosslinked hyaluronic acid. *Id.* (citing Ex. 1002 ¶ 122). Petitioner asserts that Lebreton discloses particles of hyaluronic acid crosslinked with BDDE. *Id.* (citing Ex. 1029 ¶¶ 34, 45).

#### (c) *"and free hyaluronic acid"*

Petitioner asserts Monheit discloses that free hyaluronic acid may be added as a lubricant for flow characteristics, which a person of ordinary skill in the art would have included to optimize the injection characteristics of the filler. *Id.* at 41 (citing Ex. 1022 ¶ 78; Ex. 1002 ¶ 91–94).

IPR2019-01508
Patent 9,238,013 B2

> (d) *"about 0.3% by weight lidocaine combined with the mixture"*

Petitioner asserts Reinmuller's composition includes 2 wt.% lidocaine. *Id.* (citing Ex. 1059, 7:9). Petitioner contends "[i]t would have been obvious to lower the amount of lidocaine to 0.3% because this concentration was commonly known to be effective to mitigate injection pain and routinely incorporated in other dermal fillers." *Id.* at 41–42 (citing Ex. 1002 ¶ 158).

> (e) *"wherein the dermal filler is heat sterile"*

Petitioner asserts both Reinmuller and Lebreton disclose heat sterilizing their compositions. Pet. 42 (citing Ex. 1059, 7:16–18; Ex. 1029 ¶ 70).

> (f) *"has a pH of about 7"*

Petitioner asserts Reinmuller teaches a pH of 7. *Id.* (citing Ex. 1059, 7:15).

> ii. *Claim 4*

Petitioner contends claim 4 includes all of the limitations of claim 1 and further recites the following limitations. *See id.* at 43.

> (a) *"the dermal filler being stable at about 25° C. for at least about 6 months after heat sterilization at a temperature of at least about 120° C. to about 130° C for a period of at least about 1 minute to about 15 minutes"*

Petitioner asserts a POSITA would have appreciated that the "temperatures and times recited in claim 4 include a range of standard sterilization conditions known to be effective to sterilize similar compositions." *Id.* (citing Ex. 1002 ¶ 160). Petitioner asserts both Reinmuller and Lebreton disclose sterilizing their composition in sealed

IPR2019-01508
Patent 9,238,013 B2

containers.  *Id.* (citing Ex. 1059, 7:16–18; Ex. 1029 ¶ 70).  Petitioner asserts the person of ordinary skill "would have sterilized the BDDE-crosslinked gel and lidocaine in a sealed container, including at the recited temperature and time conditions, and by doing so would necessarily obtain a product that maintained its sterility (i.e., stability) for a period greater than 6 months." *Id.* (citing Ex. 1002 ¶ 160).

> (b) *"the dermal filler requiring an extrusion force of between about 10 N and about 13 N when injected at a rate of about 12.5 mm/minute"*

Petitioner contends "the recited extrusion force and injection rate would have been obvious to arrive at by merely selecting an appropriate syringe and needle gauge."  Pet. 42 (citing Ex. 1002 ¶¶ 141, 153, 160).

> (c) *"the dermal filler having a viscosity of between about 5 Pa\*s and about 450 Pa\*s when measured at about 5 Hz."*

Petitioner refers to the earlier discussion as to viscosity and contends "the POSITA could have selected and prepared a filler having the claimed viscosity using routine optimization."  *Id.*

### iii.  Motivation to Combine

Petitioner asserts a person of ordinary skill would have been motivated to exchange Reinmuller's DVS-crosslinked hyaluronic acid with Lebreton's BDDE hyaluronic acid because BDDE-crosslinked compositions exhibit increased *in vivo* residences times as compared to DVS-crosslinked compositions, the crosslinkers were viewed as interchangeable, and BDDE-crosslinked fillers were already approved by FDA.  *Id.* at 38–39 (citing Ex. 1002 ¶ 154–155).  Petitioner asserts one of ordinary skill "would have had a reasonable expectation that this modification would result in a [0.3%] lidocaine-containing dermal filler which mitigates injection pain, just as it

IPR2019-01508
Patent 9,238,013 B2

did for other crosslinked HA dermal fillers such as Elevess (EX1019, 4), Prevelle Silk (EX1020, 8; EX1052), and Puragen Plus (EX1012, 742)." *Id.* at 39.

### c. Conclusion

Having considered the parties positions and evidence of record, summarized above, we determine that Petitioner has established a reasonable likelihood of prevailing in demonstrating the unpatentability of claims 1–4 with respect to Ground 3.

### D. Discretion under 35 U.S.C. § 325(d)

Patent Owner contends Petitioner presents substantially the same art or arguments previously presented to the Office.  Prelim. Resp. 18.  Patent Owner argues the Board should exercise its discretion and deny the Petition under 35 U.S.C. §§ 325(d) and 314(a).  *Id.*  We address Patent Owner's argument below.

### 1. Legal Standard

Institution of an *inter partes* review is discretionary.  *See Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1367 (Fed. Cir. 2016) (explaining that under 35 U.S.C. § 314(a), "the PTO is permitted, but never compelled, to institute an IPR proceeding").  Our discretionary determination of whether to institute review is guided, in part, by 35 U.S.C. § 325(d), which states, in relevant part:

> In determining whether to institute or order a proceeding under this chapter, chapter 30, or chapter 31, the Director may take into account whether, and reject the petition or request because, the same or substantially the same prior art or arguments previously were presented to the Office.

*See also* 157 CONG. REC. S1360, S1376 (daily ed. Mar. 8, 2011) (statement of Sen. Kyl) ("[T]he second sentence of section 325(d) . . . authorizes the

IPR2019-01508
Patent 9,238,013 B2

Director to reject any . . . petition . . . on the basis that the same or substantially the same prior art or arguments previously were presented to the Office.  This will prevent parties from mounting attacks on patents that raise issues that are substantially the same as issues that were already before the Office with respect to the patent.  The Patent Office has indicated that it currently is forced to accept many requests . . . that are cumulative to or substantially overlap with issues previously considered by the Office with respect to the patent.").

In evaluating whether the same or substantially the same prior art or arguments were previously presented to the Office under § 325(d), the Board has considered a number of non-exclusive factors, including, for example:

> (a) the similarities and material differences between the asserted art and the prior art involved during examination;
>
> (b) the cumulative nature of the asserted art and the prior art evaluated during examination;
>
> (c) the extent to which the asserted art was evaluated during examination, including whether the prior art was the basis for rejection;
>
> (d) the extent of the overlap between the arguments made during examination and the manner in which Petitioner relies on the prior art or Patent Owner distinguished the prior art;
>
> (e) whether Petitioner has pointed out sufficiently how the Examiner erred in its evaluation of the asserted prior art; and
>
> (f) the extent to which additional evidence and facts presented in the Petition warrant reconsideration of the asserted prior art or arguments.

IPR2019-01508
Patent 9,238,013 B2

*Becton, Dickinson and Co. v. B. Braun Melsungen AG*, IPR2017-01586, Paper 8 at 17–18 (PTAB Dec. 15, 2017) (informative) ("the *Becton Dickinson* factors").

### 2. *Becton Dickinson Factors a through d*

With respect to factors a through d, Patent Owner argues that "the references on which Petitioner relies, and arguments based on those references, are the same or substantially the same as those considered during prosecution of the '013 patent and its parent, the '795 patent." Prelim. Resp. 18.

With respect to the primary reference of Ground 1, Patent Owner argues that the Examiner's rejection in view of Lebreton was successfully overcome during the prosecution of the '013 patent. *Id.* at 18–19. Patent Owner further argues that Kinney, the primary reference for Ground 2, "is cumulative of the Lebreton (Ex. 1029), Wang (Ex. 1047), and Calias (Ex. 1048) references that the Examiner cited during prosecution of the '795 patent." *Id.* at 20. Regarding Reinmuller, the primary reference of Ground 3, Patent Owner contends that, "like Petitioner's other primary references, [Reinmuller] appears on the face of the '013 patent and was considered by the Examiner during prosecution of the '013 patent" and additionally that the reference is "substantially similar, if not identical, to the relevant disclosures in Lebreton, Wang, and Calias, which formed the bases of obviousness rejections during prosecution of the '013 patent family." *Id.* at 21–22. With regard to the secondary references relied on by Petitioner in Grounds 1–3, namely, Sadozai, Zhao, Narins, and Monheit, Patent Owner contends that each of these references is "also cumulative of art that was considered, and overcome, during prosecution of the '013 patent family." *Id.* at 24.

IPR2019-01508
Patent 9,238,013 B2

Petitioner, however, argues that "Allergan's argument that Lebreton was 'distinguished' in prosecution is inaccurate; Allergan never overcame the *prima facie* cases made by the Examiner.  Instead, every patent was allowed based on Allergan's proffered unexpected results, primarily the unsubstantiated inventor declaration."  Paper 14, 1–2.  Petitioner's assertion is supported by the relevant prosecution history, as further discussed below. *See e.g.,* section I(E)(3), above.

Petitioner also argues that the asserted grounds combine Lebreton (and Kinney) with "substantially different secondary references (Sadozai, etc.) than used by the Examiner and provide arguments and evidence (including the unrebutted DeVore testimony) not considered by the Examiner."  Reply 2–6.  We find particularly persuasive for the purpose of our § 325(d) analysis, Petitioner's contention that, whereas Calais and Wang, cited by the Examiner, "merely *suggest* lidocaine . . . *could* be added to a crosslinked HA gel . . . [,] Sadozai[8] directly refutes the inventor's declaration that lidocaine would degrade a HA gel during high temperature sterilization."  Reply 2–3 (citations omitted); *see also*, Ex. 1002 ¶¶ 31–35, 39, 43, 49, 128–129, 137.  With respect to Grounds 2 and 3, we also find persuasive Petitioner's related argument that, unlike the references cited by the Examiner, Kinney and Reinmuller provide working examples of stable, cross-linked HA fillers with lidocaine.  Pet. 58–59; Reply 4–5.  Thus,

---

[8] Although Sadozai was of record during examination of the '475 patent, because it directly refutes a statement in the Lebreton Declaration, we find, as discussed in Section III.A.3 below, Petitioner has shown sufficiently that the Examiner erred in not appreciating the relevance of the teaching of Sadozai during evaluation of the Lebreton Declaration.

IPR2019-01508
Patent 9,238,013 B2

Kinney and Reinmuller are not the same or substantially the same art previously presented to the Office during examination.

On balance, factors a through d do not weigh in favor of exercising our discretion to deny institution under §325(d).

### 3. Becton Dickinson Factor e

As to factor e, Patent Owner asserts that "Petitioner fails to meets its burden to demonstrate how the Examiner allegedly erred in his review of the prior art during prosecution." Prelim. Resp. 27. As discussed in section I(E)(3), above, the parties agree that the Examiner relied on the Lebreton Declaration in allowing the claims of the '013 patent to issue. According to Petitioner, the Examiner's error in allowing these claims "was induced by the declaration." Reply 6. Although Petitioner's analysis is not contrary to the present record, whether the Examiner "erred" by relying on the Lebreton Declaration is subsumed into our analysis of factor f, below.

### 4. Becton Dickinson Factor f

Even if we were to accept at face value Patent Owner's arguments regarding factors a through d, they would be outweighed by our analysis of factor f: "the extent to which additional evidence and facts presented in the Petition warrant reconsideration of the asserted prior art or arguments," which in this case, relates to Petitioner's arguments and evidence regarding the Lebreton Declaration. *See generally*, Pet. 48–51; Reply 6–7.

#### a. Paragraphs 4–10 of the Lebreton Declaration

The Lebreton Declaration presents two general arguments. First, that one of ordinary skill in the art would have known that the addition of lidocaine to crosslinked HA dermal filler compositions was incompatible

IPR2019-01508
Patent 9,238,013 B2

with high temperature sterilization. *See* Ex. 1024 ¶¶ 4–10.[9] Petitioner, supported by the testimony of its expert Dr. DeVore, however, provides substantial evidence to the contrary. In particular, Petitioner provides that one of ordinary skill in the art would have understood that lidocaine-containing crosslinked HA dermal fillers could be sterilized with high temperatures and that such products were approved by the FDA for commercial sale. *See e.g.*, Pet. 46–47 (citing Ex. 1002 ¶¶ 170–172).

Patent Owner appears to take the position that the Lebreton Declaration would have provided the Examiner with a complete picture of the prior art because he "was aware of the very references and teachings Petitioner alleges were absent" in the Declaration." Prelim. Resp. 28 (arguing that the Examiner specifically considered Lebreton, Kinney, Reinmuller, and Sadozai, as well as Monheit, Zhao, and Narins, which Patent Owner contends are cumulative to references considered during prosecution of the '013 patent family). The current record, however, further includes the presently unrebutted testimony of Dr. DeVore, and the question of whether the secondary references before the Examiner were truly cumulative is a matter of factual dispute that can be addressed at trial. *See* Reply 2–5. These factors weigh against exercising our discretion under § 325(d), as do the parties' arguments with respect to Cui, discussed in section II(C)(1)(b)(iv), and II(C)(1)(c), above.

---

[9] As noted in the Petition, these "statements were *not* limited to BDDE-crosslinked HA [as presently claimed], and Allergan's accompanying Response at the time included pending claims covering use of *any* crosslinker." Pet. 45 (citing Ex. 1023, 18–20 (claims 51–67)).

IPR2019-01508
Patent 9,238,013 B2

> *b.  Paragraphs 11–15 of the Lebreton Declaration*

With reference to Example 4 of the incorporated provisional applications, the Lebreton Declaration further asserts that "other HA gels" mixed with lidocaine (represented by samples 4 and 5) "surprisingly and unexpectedly" maintained their viscosity and elasticity after high temperature sterilization as compared to gel samples 1, 2, and 3.  Ex. 1024 ¶¶ 11–15.  There appears to be no dispute that the lidocaine-gel compositions of samples 4 and 5 comprise BDDE-crosslinked soft tissue filler compositions within the scope of the challenged claims.  Petitioner, nonetheless, contends this portion of the Lebreton Declaration does not provide support for unexpected results because, first, samples 1–3 do not represent the closest prior art and, second, even though samples 1 and 2 show less drop in viscosity after sterilization as compared to samples 4–6, this difference is merely a matter of degree rather than kind.  Pet. 48–51 (citations omitted); *see* Ex. 1002 ¶¶ 179–186.

We find particularly interesting Dr. DeVore's presently uncontested testimony that:

> Allergan's experiment and its interpretation of the results fundamentally misunderstands the point of stability testing. The consideration whether a crosslinked HA composition would be suitable as a dermal filler depends on its *final* viscosity, not how much the viscosity drops during sterilization.  It is irrelevant if the viscosity drops by 5%, 50%, or even 90%, so long as the sterilized final product has the desired viscosity and is shelf stable.

Ex. 1002 ¶ 180.  Dr. DeVore further testified that Sample 1 is irrelevant as a mixture of uncrosslinked HA and a polymer other than HA, whereas "[t]he final viscosity of samples 2 and 3 in each test (~75–375 PA*s) is substantially the same as the final viscosities of Samples 4–6 (~50–09

37

IPR2019-01508
Patent 9,238,013 B2

PA*s), all of which are within the range of marketed dermal fillers (50–1,200 PA*s)." *Id.* at ¶ 181.  In support, Dr. DeVore points to the priority documents as identifying samples 2 and 3 as corresponding to FDA-approved dermal fillers Hylaform and Restylane, respectively.  *See id.* at ¶¶ 183–184 (citing Ex. 1013, 26:7; Ex. 1028, 19:7).

Dr. DeVore further testifies that:

> During the prosecution of '795 patent, Allergan stated that Sample 3, when combined with lidocaine without pH adjustment, exhibited a 35% reduction in viscosity, while Sample 4 exhibited a 30% reduction in viscosity in the same test.  EX1023, 26–27.  During the prosecution of this application, Allergan argued that the claimed compositions exhibited a "much lower" reduction in viscosity.

*Id.* at ¶ 185.

> In my opinion, even if viscosity reduction by itself was a meaningful measure of suitability (it is not), there is no meaningful difference between a 30% and 35% reduction in viscosity. . . . Determining whether 30% is significantly different from 35% would require statistical analysis, such as required in FDA submissions. Such analysis is not present in the challenged patents. Thus, it is impossible to tell if the difference between Sample 3 and Sample 4, when pH is not controlled, is real or not.

*Id.* at ¶ 186.

We do not, on the present record, find Dr. DeVore's testimony "conclusory" and without a "well-reasoned rationale or objective support" as Patent Owner contends.  Prelim. Resp. 33.  To the contrary, Dr. DeVore's testimony weighs against exercising our discretion under § 325(d).  We, nonetheless, look forward to Patent Owner's testing of Dr. DeVore's opinions at trial.

IPR2019-01508
Patent 9,238,013 B2

### 5. Conclusion

In sum, upon weighing the relevant Becton Dickinson factors, we find that Grounds 2 and 3 do not rely upon the same or substantially the same prior art or arguments previously presented to the Office during examination, and although Ground 1 relies upon the same or substantially the same art previously presented to the Office during examination, Petitioner has demonstrated sufficiently how the Office erred in a manner material to the patentability of the challenged claims in reliance on the Lebreton Declaration to overcome the prior art. Thus, we decline to exercise our discretion under 35 U.S.C. § 325(d) to deny institution of the Petition.

## III. CONCLUSION

On the present record, we find Petitioner has made a sufficiently persuasive showing that the cited references would have taught or suggested each element of claims 1–4, and set forth a sufficient rationale for why a person of ordinary skill would have been motivated to combine these teachings and suggestions to arrive at the invention recited in those claims. Petitioner has established a reasonable likelihood of prevailing in demonstrating that claims 1–4 would have been obvious over the combinations of prior art set forth in the asserted grounds

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that, pursuant to 35 U.S.C. § 314(a), that an *inter partes* review of claims 1–4 of the '013 patent is instituted with respect to all grounds set forth in the Petition; and

FURTHER ORDERED, pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4(b), that the *inter partes* review of the '013 patent shall commence on

IPR2019-01508
Patent 9,238,013 B2

the entry date of this Order, and notice is hereby given of the institution of a

trial.

IPR2019-01508
Patent 9,238,013 B2

FOR PETITIONER:

Christopher L. Curfman
William W. Cutchins
MEUNIER CARLIN & CURFMAN LLC
ccurfman@mcciplaw.com
wcutchins@mcciplaw.com


FOR PATENT OWNER:

Dorothy P. Whelan
Michael Kane
FISH & RICHARDSON P.C.
whelan@fr.com
kane@fr.com

Trials@uspto.gov
571-272-7822

Paper 17
Date: March 19, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

PROLLENIUM US INC.,
Petitioner,

v.

ALLERGAN INDUSTRIE, SAS,
Patent Owner.

———————————

IPR2019-01509
Patent 9,358,322 B2

———————————

Before JOHN G. NEW, SHERIDAN K. SNEDDEN, and
ROBERT A. POLLOCK, *Administrative Patent Judges.*

POLLOCK, *Administrative Patent Judge.*

DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314, 37 C.F.R. § 42.4*

## I.   INTRODUCTION

### A.   Background

Prollenium US Inc. ("Petitioner") filed a Petition for an *inter partes* review of claims 1–4 of U.S. Patent No. 9,358,322 B2 ("the '322 patent," Ex. 1001).  Paper 2 ("Pet.").  Allergan Industrie, SAS ("Patent Owner") timely filed a Preliminary Response.  Paper 6 ("Prelim. Resp.").  On January

IPR2019-01509
Patent 9,358,322 B2

10, 2020, we issued an Order granting Petitioner's request for additional briefing regarding whether we should exercise our discretion to deny the Petition under §325(d) and/or §314(a). Paper 11. In response to our Order, Petitioner filed a Reply to the Patent Owner Preliminary Response (Paper 12, "Reply"), and Patent Owner filed a corresponding Sur-reply (Paper 16, "Sur-reply). We review the Petition, Preliminary Response and accompanying evidence under 35 U.S.C. § 314.

   B.   *Summary of the Institution Decision*

       For the reasons provided below, we determine Petitioner has satisfied the threshold requirement set forth in 35 U.S.C. § 314(a). Because Petitioner has/has not demonstrated a reasonable likelihood that at least one claim of the '322 patent is unpatentable, we institute an *inter partes* review of the challenged claims.

   C.   *Real Parties in Interest*

       Petitioner identifies its real parties-in-interest as Prollenium US Inc. and Prollenium Medical Technologies Inc. Pet. 67. Patent Owner identifies its real parties-in-interest as Allergan Industrie, SAS; Allergan USA, Inc.; Allergan Sales, LLC; Allergan Holdings France SAS; Allergan Holdings Limited; Allergan Holdings, Inc.; Allergan Puerto Rico Holdings, Inc.; and Allergan, Inc. Paper 3, 2.

   D.   *Related Matters*

       The '322 patent is at issue in *Allergan USA, Inc. et al. v. Prollenium US Inc., et al.*, Case No. 1:19-cv-00126 (D. Del. filed Jan. 22, 2019). Pet. 67–68; Paper 3, 2–3. The '322 patent is a continuation of U.S. Patent No. 8,450,475 ("the '475 patent"), which was the subject of two previous *inter partes* reviews: In IPR2014-01417, the Board denied institution for failure to timely identify all real parties in interest, and subsequently terminated

2

IPR2019-01509
Patent 9,358,322 B2

proceedings on June 19, 2015, in response to the parties' joint motion to terminate. The Board denied the petition in IPR2017-02002 on its merits on March 9, 2018 (Ex. 3001, "the 02002 IPR").

In addition to the '322 patent challenged here, Petitioner has filed Petitions for *inter partes* review of related U.S. patents as follows: U.S. Patent No. 8,357,795 B2 ("the '795 patent") in IPR2019-01506 and IPR2019-01632; U.S. Patent No. 8,450,475 B2 in IPR2019-01505; U.S. Patent No. 8,822,676 B2 ("the '676 patent") in IPR2019-01617; U.S. Patent No. 9,089,519 B2 ("the '519 patent") in IPR2020-00084; and U.S. Patent No. 9,238,013 B2 ("the '013 patent") in IPR2019-01508. Pet. 68; Paper 3, 2–3. The '795, '475, '676, '519, and '013 patents are also at issue in *Allergan USA, Inc. et al. v. Prollenium US Inc., et al.*, Case No. 1:19-cv-00126 (D. Del. filed Jan. 22, 2019). Pet. 68; Paper 3, 2–3.

### E. Asserted Grounds of Unpatentability

Petitioner asserts six grounds of unpatentability. Pet. 3.

| Ground | Claims | 35 U.S.C. § | Asserted References |
|--------|--------|-------------|---------------------|
| 1 | 1–4 | 103(a)[1] | Lebreton,[2] Sadozai,[3] Monheit[4] |
| 2 | 2 | 103(a) | Lebreton, Sadozai, Smith[5] |

---

[1] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) ("AIA"), amended 35 U.S.C. §§ 102 and 103. Because the challenged claims of the '322 patent have an effective filing date before the effective date of the applicable AIA amendments, we refer to the pre-AIA versions of 35 U.S.C. § 103 throughout this Decision.

[2] Lebreton, US 2006/0194758, published Aug. 31, 2006. Ex. 1029.

[3] Sadozai, US 2005/0136122 A1, published Jun. 23, 2005. Ex. 1030.

[4] Gary D. Monheit, *Hyaluronic Acid Fillers: Hylaform and Captique*, 15 FACIAL PLAST. SURG. CLIN. N. AM. 77–84 (2007). Ex. 1022.

[5] Kevin C. Smith, *Practical Use of Juvéderm: Early Experience*, 120 PLASTIC AND RECONSTRUCTIVE SURG. 67S–73S (2007). Ex. 1009.

IPR2019-01509
Patent 9,358,322 B2

| Ground | Claims | 35 U.S.C. § | Asserted References |
|--------|--------|-------------|---------------------|
| 3 | 1–4 | 103(a) | Kinney,[6] Zhao,[7] Narins,[8] Monheit |
| 4 | 2 | 103(a) | Kinney, Zhao, Narins, Smith |
| 5 | 1–4 | 103(a) | Reinmuller,[9] Lebreton, Monheit |
| 6 | 2 | 103(a) | Reinmuller, Lebreton, Smith |

In support of its patentability challenges, Petitioner relies on, *inter alia*, the Declaration of Dale P. DeVore, Ph.D.  Ex. 1002.

### F.   The '322 Patent and Relevant Background

#### 1.   Specification

According to the '322 patent's Specification, soft tissue fillers have been developed to treat or correct the effects of aging by filling in facial lines and depressions and restoring fat loss-related tissue volume.  Ex. 1001, 1:32–36.  Hyaluronic acid (HA)-based fillers have been used since 2003 as hyaluronic acid "has excellent biocompatibility and does not cause allergic reactions when implanted into a patient."  *Id.* at 1:62–2:8.  Chemically crosslinked hyaluronic acid was developed to improve *in vivo* stability of hyaluronic acid fillers.  *Id.* at 2:9–22.  These compositions may contain a mixture of crosslinked and free hyaluronic acid to provide stability and

---

[6] Brian M. Kinney, *Injecting Puragen Plus into the Nasolabial Folds: Preliminary Observations of FDA Trial*, 26 AESTHETIC SURG. J. 741–748 (2006).  Ex. 1012.
[7] Zhao, US 2005/0250939 A1, published Nov. 10, 2005.  Ex. 1058.
[8] Rhoda S. Narins and Paul H. Bowman, *Injectable Skin Fillers*, 32 CLIN. PLAST. SURG. 151–162 (2005).  Ex. 1007.
[9] U.S. Patent No. 5,731,298, issued Mar. 24, 1998.  Ex. 1059.

IPR2019-01509
Patent 9,358,322 B2

surgical usability. *See id.* According to the '322 patent's Specification, hyaluronic acid compositions containing therapeutic agents, e.g., lidocaine, are missing in the art because "HA-based injectable compositions which incorporate lidocaine during the manufacturing process are prone to partial or almost complete degradation prior to injection, particularly during high temperature sterilization steps and/or when placed in storage for any significant length of time." *Id.* at 2:23–30.

The '322 patent's Specification discloses "stable" hyaluronic acid soft tissue fillers that include a therapeutically effective amount of lidocaine. *Id.* at 5:28–49. The Specification states that the hyaluronic acid compositions containing lidocaine have an enhanced stability "when subjected to high temperatures and pressures, for example, those experienced during heat and/or pressure sterilization techniques, for example, autoclaving." *Id.* at 5:34–41. The Specification states that "[i]t is a surprising discovery that formulations of crosslinked HA-based compositions including lidocaine can be manufactured in a manner in accordance with the invention to produce sterilization-stable, injectable HA/lidocaine compositions." *Id.* at 6:57–60. According to the Specification, "[t]he crosslinking agent may be any agent known to be suitable for crosslinking polysaccharides and their derivatives via their hydroxyl groups. Suitable crosslinking agents include but are not limited to, 1,4-butanediol diglycidyl ether (or 1,4-bis(2,3-epoxypropoxy)butane or 1,4-bisglycidyloxybutane, all of which are commonly known as BDDE), 1,2-bis(2,3-epoxypropoxy)ethylene and 1-(2,3-epoxypropyl)-2,3-epoxycyclohexane." *Id.* at 9:11–19.

The '322 patent's Specification discloses an example of a soft tissue filler with lidocaine as Example 2. *Id.* at 12:24–13:30. The filler includes hyaluronic acid crosslinked with 1,4-butanediol diglycidyl ether ("BDDE"),

5

IPR2019-01509
Patent 9,358,322 B2

combined with lidocaine HCl, and free (uncrosslinked) hyaluronic acid. *Id.*
After mixing, the resulting gel is "filled into Ready-to-Fill sterile syringes
and autoclaved at sufficient temperatures and pressures for sterilization for
at least about 1 minutes." *Id.* at 13:19–22. The Specification states that "the
autoclaved HA/lidocaine product has [] viscosity, cohesivity, and extrusion
force that are acceptable" and may be "packaged and distributed to
physicians." *Id.* at 13:23–28. "No degradation of the HA/lidocaine gel
product is found during testing of the product after the product has spent
several months in storage." *Id.* at 13:28–30.

### 2. Challenged Claims

Petitioner challenges claims 1–4 of the '322 patent, which are all of
the claims. We list independent claim 1 below:

> 1. A soft tissue filler composition comprising:
>
> a sterile, stable injectable gel comprising a mixture of soluble
> form hyaluronic acid (HA),
>
> particles of HA crosslinked with 1,4-butanediol diglycidyl
> ether (BDDE), and
>
> lidocaine in an amount effective to mitigate pain upon
> injection of the gel.

Ex. 1001, 16:44–49.

### 3. Relevant Prosecution History

The parties both state that the prosecution histories of the '475 patent,
U.S. Application Serial No. 12/393,768 ("the '768 application," Ex. 1033)
and the '795 patent, U.S. Application Serial No. 12/393,884 ("the '884
application," Ex. 1024) are relevant to the issued claims of the '322 patent.
Pet. 11; Prelim. Resp. 4. The '475 patent matured from U.S. Application
Serial No. 12/393,768 ("the '768 application") and shares essentially the
same specification with the '322 patent at challenged here. The '795 patent

IPR2019-01509
Patent 9,358,322 B2

matured from U.S. Application Serial No. 12/393,884 ("the '884 application"). Ex. 1001, code (60); Ex. 3002, code (60). Both patents claim priority to the same three provisional application: Nos. 61/085,956 (Ex. 1013, "the '956 application"); 61/087,934 (Ex. 1028, "the '934 application"); and 61/906,278 (Ex. 1044, "the '278 application"). Ex. 1001, code (60); Ex. 3002, code (60). As indicated on the front pages of the '322, '475 and '795 patents, the same Examiner allowed each patent. *See, e.g.*, Pet. 10–11; Prelim. Resp. 9; Ex. 1001. Patent Owner reviews the relevant prosecution history on pages 4–12 of the Preliminary response, which we briefly summarize below.

During the prosecution leading to the issuance of the '475 patent, the Examiner rejected the claims as obvious over Lebreton and Reinmuller.[10] Ex. 1033, 68–71. The Examiner found that Lebreton disclosed a sterile soft tissue filler containing hyaluronic acid crosslinked with BDDE. *Id.* at 70 (citing Ex. 1029 ¶¶ 74, 76). The Examiner found Reinmuller disclosed mixtures of crosslinked hyaluronic acid with up to 20% uncrosslinked hyaluronic acid. *Id.* at 70–71 (citing Ex. 2004, 2:41–46; 5:1–26), as well as the addition of a local anesthetic, e.g., lidocaine to the hyaluronic acid mixture to minimize pain from the injection (*id.* at 71 (citing Ex. 2004, 2:54–63; 3:28–30). The Examiner determined one of ordinary skill in the art would have been motivated to add uncrosslinked hyaluronic acid and lidocaine to Lebreton's hyaluronic acid-BDDE "to treat inflammation associated with administration of the soft tissue filler and also to treat any pain associated with the injection of the gel into the soft tissue." *Id.* After a

---

[10] WO 2005/067944 A1, published Jul. 28, 2005, cited as U.S. Patent No. 7,902,171 B2, issued Mar. 8, 2011. Ex. 2004.

IPR2019-01509
Patent 9,358,322 B2

response by the Applicant, the Examiner made the same rejection Final.  *Id.* at 16–23.

In an Examiner's Interview after the Final Rejection, the Applicant proposed amendments "to limit the claims to the crosslinking agent being BDDE, the anesthetic being lidocaine, and the composition being sterilized." *Id.* at 12.  Applicant also indicated that they unexpectedly found that the addition of lidocaine the filler composition did not cause the composition to become unstable as was expected." *Id.* at 12.  The Applicant submitted an after-final amendment, amending the independent claims to recite, *inter alia*, a "stable, sterile soft tissue filler" comprising hyaluronic acid crosslinked with BDDE, uncrosslinked hyaluronic acid, and lidocaine.  Ex. 2005, 3–9.

During the prosecution of the '884 application, the Examiner rejected all pending claims in view of Lebreton in view of Calais (US Pat. No. 6,521,223 B1) and Marko (US Pat. Appln. 2004/01011959).  *See* Ex. 1023, 42–47.  During the prosecution of the '884 application, the Applicant submitted a Declaration by the inventor, Pierre F. Lebreton, Ph.D.  *Id.* at 22; Ex. 1024.  Dr. Lebreton attested as follows:

> 5.     It was believed that adding lidocaine to hyaluronic acid gel compositions during manufacturing caused degradation of the hyaluronic acid prior to injection of the HA as a dermal filler.

> 6.     It was believed that lidocaine caused degradation of HA gel compositions during high temperature sterilization.

> 7.     It was not known whether HA compositions comprising lidocaine were stable or not after high temperature sterilization when placed in storage for any significant length of time.

> 8.     It was also believed that the instability of HA described above would have caused a viscosity reduction of the HA that would make it unsuitable for soft tissue filling applications.

8

IPR2019-01509
Patent 9,358,322 B2

9.      Based upon the facts set forth above, a person of ordinary skill in the art would have expected that a dermal filler comprising hyaluronic acid and lidocaine would not have remained sufficiently stable to be useful as soft tissue filler.

10.      It was not appreciated that a dermal filler comprising a cohesive gel of hyaluronic acid makes it possible for lidocaine to be combined with hyaluronic acid in a gel that is sufficiently stable to be useful as a soft tissue filler.

Ex. 1024 ¶¶ 5–10. With reference to Example 4 of the '884 application,[11]

Dr. Lebreton further testified that:

11.      The enhanced stability properties of the inventive dermal fillers was evidenced by certain experiments performed under my direction by my research team prior to the application filing date.

12.      The experiments are generally set forth in the patent application in the Examples and Drawings.

13.      The experiments showed that certain HA gels, when mixed with lidocaine, degraded and became substantially less viscous after high temperature sterilization, specifically autoclave sterilization, as would have been expected by one of ordinary skill in the art.  This is shown in Figures 1–3 of the application.  Samples 1, 2 and 3 exhibited a decrease in viscosity of approximately 60%, 73% and 35%, respectively.

14.      I discovered that other HA gels, when mixed with lidocaine, maintained their viscosity and elasticity even after such high temperature sterilization.  This is shown in Figures 4, 5, and 7 of the application.  Samples 4, 5 and 6 exhibited a decrease in viscosity of approximately 30%, 0% and 13%, respectively and a non-significant viscosity change (measured

---

[11] Although Example 4 does not appear in the '322 patent challenged here, Petitioner reasonably argues that the substance of Example 4 is set forth in the common provisional applications, which are incorporated by reference into the '322 patent.  *See* Pet. 54; Ex. 1001, 1:7–14.

IPR2019-01509
Patent 9,358,322 B2

at ~4%, ~9%, ~2%, respectively, below 10%) with additional
pH adjustment.

15.   To my knowledge, it was a surprising and unexpected
discovery, not appreciated prior to the present invention, that
certain cohesive HA gels, as defined in the application, when
mixed with lidocaine, could be made to be heat and shelf stable.

Ex. 1024, ¶¶ 11–15; s*ee* Ex. 1023, 25–26 (discussing amendment to the
specification of the '884 application "to clarify the results of the
experiments" in Example 4 and associated figures); Pet. 13–14; Prelim.
Resp. 9–10.

In addition to the discussion of Example 4 and the Lebreton
declaration, the Applicant further submitted Cui[12] as evidence "that HA gels
are known to be sensitive to heat sterilization, and that even more
particularly, that HA gels crosslinked with BDDE are known to be
especially sensitive to heat sterilization relative to HA gels cross linked with
other, i.e. non-BDDE, crosslinkers." Ex. 1023, 28. The Examiner withdrew
the rejection and the '844 Application issued as the U.S. Patent No.
8,357,795. *Id.* at 5, 9. The Examiner's Reasons for Allowance states:

Applicant argues that one of ordinary skill in the art would have
expected degradation of the hyaluronic acid gel with addition of
lidocaine during sterilization, as this was what was known in
the prior art. Applicant unexpectedly found that a hyaluronic
acid gel crosslinked, but not with a non-hyaluronic acid
biopolymer, mixed with lidocaine and sterilized does not
degrade.

Ex. 1023, 9.

---

[12] Cui et al., *The comparison of physicochemical properties of four Cross-
linked sodium hyaluronate gels with different cross-linking agents*, 396–398
ADV. MATS. RES. 1506–1512 (2012) (Ex. 1025).

IPR2019-01509
Patent 9,358,322 B2

The parties agree that the above evidence of unexpected results was considered by the same Examiner in the prosecution of the co-pending '768 application, which issued as the '322 patent challenged here.  Pet. 11; Prelim. Resp. 11–12.[13]  The examiner allowed claims 1–4 of the '322 patent without rejection or amendment.  Pet. 15 (citing Prosecution History of U.S. Application Serial No. 13/891,052 ("the '052 application," Ex. 1064).  In the Reasons for Allowance, the Examiner stated "Applicant has shown that the combination of crosslinked hyaluronic acid and lidocaine are stable when exposed to high temperatures necessary in sterilizing the composition (See unexpected results arguments in copending application 12/393768)."  Ex. 1064, 8.

## II.  ANALYSIS

### A.  Legal Standards

"In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable."  *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")).  This burden of persuasion never shifts to Patent Owner.  *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (discussing the burden of proof in *inter partes* review).

A claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the subject matter sought to be patented and the prior art are such

---

[13] Although discussed extensively by the parties, the Lebreton declaration and Cui reference are not included in the '475 or '322 patent file histories. *See, e.g.*, Pet. 2, fn.1, 14, 51.

IPR2019-01509
Patent 9,358,322 B2

that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which that subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) objective evidence of nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

In analyzing the obviousness of a combination of prior art elements, it can be important to identify a reason that would have prompted one of skill in the art "to combine . . . known elements in the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418. A precise teaching directed to the specific subject matter of a challenged claim is not necessary to establish obviousness. *Id.* Rather, "any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *Id.* at 420. Accordingly, a party that petitions the Board for a determination of unpatentability based on obviousness must show that "a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1381 (Fed. Cir. 2016) (internal quotations and citations omitted).

### B.  *Level of Ordinary Skill in the Art*

In determining the level of skill in the art, we consider the type of problems encountered in the art, the prior art solutions to those problems, the rapidity with which innovations are made, the sophistication of the

IPR2019-01509
Patent 9,358,322 B2

technology, and the educational level of active workers in the field. *Custom Accessories, Inc. v. Jeffrey-Allan Indus. Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986); *Orthopedic Equip. Co. v. United States*, 702 F.2d 1005, 1011 (Fed. Cir. 1983).

In IPR2017-02002, the Board determined that a person of ordinary skill in the art as of the filing date of the '475 patent:

> would have had a B.S. or M.S. in biochemistry, polymer chemistry, medicinal chemistry, pharmaceutical chemistry, or a related field with 'several years' of practical experience. Alternatively … the ordinary artisan would have had less practical experience but a Ph.D. in one of those fields, or an M.D. in dermatology, plastic surgery, or a specialty related to the clinical use of dermal fillers.

Ex. 3001, 8. Patent Owner contends that Board should adopt the same definition here because the 02002 IPR involved the same patent and a subset of the same asserted references (Lebreton, Reinmuller, and Kinney) at issue here. Prelim. Resp. 14–16; *see* Sur-reply 4–5.

Petitioner, however, advances a definition of one of ordinary skill in the art that purportedly "explains . . . further" the definition set forth in IPR2017-02002. Reply 9. In particular, Petitioner argues that a person of ordinary skill in the art as of the relevant date "would have an advanced degree, such as a Ph.D., M.S., or M.D., and several years of experience developing dermal fillers for cosmetic use, including HA-based dermal fillers" and, moreover, "would be aware of commercially sold dermal fillers, in the United States and abroad, as well as those products for which approvals were being publicly sought." Pet. 15–16 (citing Ex. 1002 ¶¶ 69–72).

On the present record, we find Petitioner's definition reasonable. Consistent with Petitioner's argument, the proposed definition is not clearly

IPR2019-01509
Patent 9,358,322 B2

inconsistent with our prior determination and is supported by Dr. DeVore presently uncontested testimony. *See* Ex. 1002 ¶¶ 69–72. Further, the art of record supports Petitioner's proposition that one of ordinary skill in the art would have been aware of commercially sold dermal fillers and publically available information regarding their FDA approval.

Monheit, for example, discusses clinical trials and approval dates of "five FDA-approved HA skin fillers available in the United States: Hylaform, Hylaform Plus, Captique (Inamed Corporation), Restylane (Medicis Aesthetics Inc.), and, most recently, Juvederm (Allergen Aesthetics)" noting, for example, that "Hylaform has been available worldwide since 1998 and in the United States since 2004." Ex. 1022, 79–80. And in summarizing an FDA clinical study comparing Hylaform to Zyplast, Monheit cites data from a 2003 FDA publication "Available at: http://www.fda.gov/ohrms/dockets/ac/03/slides/4004s1_01_lerner_files/ frame.htm." *Id.* at 80, Box 1.

Reinmuller discloses an injectable gel containing crosslinked hyaluronic acid and 2% by weight lidocaine. Ex. 1059, 7:1–11. Reinmuller discloses the crosslinked hyaluronic acid is commercially available as Hylon and Hylagel available from the Biomatrix Company. *Id.* at 3:49–54.

In reviewing the state of the art of injectable skin fillers for soft tissue augmentation, Narins notes the FDA approval status for commercially available products Zyderm I and II, CosmoDerm, CosmoPlast, Restylane, Hylaform, Radiance FN, Sculptra, and Silikon 1000. Ex. 1007, 152, 153, 156–157, 158, 159, 161. Kinney similarly notes the FDA approval dates of Restylane and Juvéderm (Ex. 1012, 741), and Smith discusses the "FDA status and Approved Uses" of Juvéderm 30, 24HV, and 30HV injectable

14

IPR2019-01509
Patent 9,358,322 B2

gels," further noting that the FDA "recently announced a label extension for Juvéderm Ultra and Juvéderm Ultra plus" (Ex. 1009, 67S–68S).

We further note that Clark,[14] asserted by Prollenium in copending IPR2019-01505, reviews the clinical and commercial history of dermal fillers, stating. for example, that "Hylaform and Hylaform Plus have received FDA approval and are indicated for injection into the middermis to deep dermis for correction of moderate to severe facial wrinkles and folds" (Ex. 1008, 27S); that "Hylaform . . . has been used for skin augmentation in Europe since 1996 and received U.S. Food and Drug Administration approval in April of 2004," whereas "Hylaform Plus . . . was approved by the Food and Drug  administration in October of 2004" (*id.* at 28S); and that results of a clinical trial "yet to be published but . . . submitted to the U.S. Food and Drug Administration . . . [are] available in the Hylaform package insert" (*id.* at 30S).

As a whole, the prior art of record strongly suggests that skilled artisans were aware of, and monitored, the commercial and approval status of dermal filler compositions.  In light of these teachings and the testimony of Dr. DeVore we expand upon the Board's earlier definition of one of ordinary skill in the art as indicated by Petitioner's arguments.

Thus, for the purpose of institution, a person of ordinary skill in the art as of the filing date of the '475 patent would have a B.S. or M.S. in biochemistry, polymer chemistry, medicinal chemistry, pharmaceutical chemistry, or a related field with several years of practical experience or having less practical experience but a Ph.D. in one of those fields, or an

---

[14] Clark, *Animal-Based Hyaluronic Acid Fillers: Scientific and Technical Considerations*, 120 Plastic and Reconstructive Surg. 27S–32S (2007). Ex. 1008.

IPR2019-01509
Patent 9,358,322 B2

M.D. in dermatology, plastic surgery, or a specialty related to the clinical use of dermal fillers.  Such a person would be aware of commercially sold dermal fillers, in the United States and abroad, as well as those products for which approvals were being publicly sought.

The above definition is provisional and the parties are welcome to present further argument on this topic at trial.

C.  *Claim Construction*

We interpret a claim "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b)." 37 C.F.R. § 42.100(b) (2019). Under this standard, we construe the claim "in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." *Id.*  Furthermore, at this stage in the proceeding, we need only construe the claims to the extent necessary to determine whether to institute *inter partes* review.  *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

Petitioner proposes the same claim constructions of "sterile," "stable," "soluble form HA," and "particles" adopted in an earlier district court proceeding regarding the '475 patent.  Pet. 16–19 (citing *Allergan USA, Inc. et al. v. Medicis Aesthetics, Inc. et al.*, No. 13-1436 (C.D. Cal. Aug. 12, 2014) (claim construction order) (Ex. 1027)).  Patent Owner contends it is not necessary to construe any of the terms.  Prelim. Resp. 14.  For the purpose of institution, we find it helpful to address the terms "stable" and "soluble form HA."

16

IPR2019-01509
Patent 9,358,322 B2

*1. "stable"*

Petitioner proposes "stable" to "mean that the composition maintains at least one of the following aspects: transparent appearance, pH, extrusion force and/or rheological characteristics, [hyaluronic acid] concentration, sterility, osmolarity, and lidocaine concentration." Pet, 17 (citing Ex. 1027, 11). Petitioner cites to the '322 patent's definition of "autoclave stable" and "stable to autoclaving" to support the construction. *Id.* (citing Ex. 1001, 4:44–51).

In IPR 2017-2002, the panel adopted a more detailed definition of this term as:

> soft tissue filler that is free of viable microorganisms as determined by a sterility test recognized by a regulatory authority, the filler can be sterilized by any method known in the art, and is resistant to degradation such that the composition maintains one or more of the following aspects: transparent appearance, pH, extrusion force and/or rheological characteristics, hyaluronic acid (HA) concentration, sterility, osmolarity, and lidocaine concentration, after being effectively sterilized by autoclaving and subsequently stored at a temperature of at least about 25° C for at least about two months.

Ex. 3001, 14–15. The Board's prior construction does not appear inconsistent with Petitioner's broader proposed construction. Absent any persuasive argument for an alternative construction, we adopt the reasoning and definition of "stable" as set forth in the 02002 IPR. *See id.* at 9–15. The parties are, nevertheless, welcome to present further arguments regarding claim construction at trial.

*2. Soluble form HA*

Petitioner proposes "soluble form HA" has the same definition as "free HA." Pet. 18. Petitioner asserts the '322 patent's Specification

17

IPR2019-01509
Patent 9,358,322 B2

discloses that "Free HA generally remains water soluble.  Free HA can alternatively be defined as the 'uncrosslinked,' or lightly crosslinked component of the macromolecular structure making up the soft tissue filler composition disclosed herein." *Id.* (citing Ex. 1001, 5:8–16).

Petitioner's proposed construction appears reasonable and supported by the Specification.  Although we adopt it here for clarity, the parties are welcome to present further argument at trial regarding the construction of this term.

### D. *Obviousness in view of Lebreton, Sadozai, and Monheit or Smith (Grounds 1 and 2)*

As Ground 1, Petitioner challenges claims 1–4 as obvious in view of Lebreton, Sadozai, and Monheit.  Pet. 26–34.  As Ground 2, Petitioner challenges claim 2 as obvious in view of Lebreton, Sadozai, and Smith.  *Id.* at 35.  Petitioner's challenges include detailed mapping of the teachings of these references to each limitation of the claims.  *See id.* at 26–35.

Rather than address any of Petitioner's asserted grounds directly, Patent Owner directs substantially all of its argument to whether the Board should exercise discretion to deny the Petition under 35 U.S.C §§ 314(a) and 325(d).  *See* Prelim. Resp. 1–2, 16–42.  To the extent Patent Owner raises issues relevant to the merits of Petitioner's grounds in discussing *Becton Dickenson* factor f, we address them in section II(D)(5)(g), below.  We consider Patent Owner's arguments under 35 U.S.C §§ 314(a) and 325(d) as a whole, in section III.

We begin our analysis of Petitioner's obviousness contentions with an overview of the references asserted under Grounds 1 and 2, and Petitioner's assertions of why one of ordinary skill in the art would have sought to

IPR2019-01509
Patent 9,358,322 B2

combine the teachings of these references as set forth in the challenged claims.

### 1. *Lebreton (Ex. 1029)*

Lebreton is directed to crosslinking mixtures of low and high molecular weight polymers to form injectable monophase hydrogels that may be used as filling materials in plastic surgery. Ex. 1029, abstract, ¶ 5. Lebreton characterizes monophase hydrogels as "soft and free-flowing," with "no apparent liquid phase" (*id.* ¶¶ 64–65), whereas biphase hydrogels comprise "gel fragments bathed in a low-viscosity liquid medium" with "no cohesion of the gel and no free-flowing appearance" (*id.* ¶¶ 66–67). Lebreton discloses buffering crosslinked hydrogels to a pH compatible with the human body, being between 7 and 7.4. *Id.* ¶¶ 48–49.

As Examples 1–4, Lebreton discloses hydrogels prepared by crosslinking sodium hyaluronate (sodium salt of hyaluronic acid) with 1,4-butanediol diglycidyl ether (BDDE). *Id.* ¶¶ 68–92. The crosslinked HA compositions are then neutralized to pH 7.2, packed into syringes, and subject to high termperature sterilization in an autoclave. *See id.* at ¶¶ 70, 76, 81.

The '322 patent cites Lebreton in explaining how selection of various HA components in dermal fillers was known to affect characteristics such as extrusion force, elastic modulus, and viscous modulus, among others. Ex. 1001, 8:38–52.

### 2. *Sadozai (Ex. 1030)*

Sadozai is directed to a crosslinked hyaluronic acid composition effective for tissue augmentation or drug delivery. Ex. 1030 ¶¶ 7, 8. According to Sadozai, "the storage modulus G′ is increased, e.g.,

IPR2019-01509
Patent 9,358,322 B2

composition is stabilized, by the inclusion of a local anesthetic, e.g., lidocaine, compared to a non-stabilized composition, e.g., an identical composition except that the local anesthetic is not included." *Id.* ¶ 68.

Sadozai discloses nine Examples of compositions including hyaluronic acid crosslinked with p-phenylene-bis(ethylcarbodiimide) ("PBCDI"). *Id.* ¶ 85. The crosslinked hyaluronic acid compositions of Example 5, was combined with phosphate buffer containing 0.30% lidocaine (Phosphate Buffer 4) to form a suspension. *Id.* ¶¶ 84, 90, 100, 102. The suspensions were loaded into syringes and sterilized in an autoclave at temperatures between 100° C to 150° C. *Id.* ¶¶ 54–55, 90 (Example 12), 100 (Example 17).

In Example 21, Sadozai discloses that compositions "with lidocaine have significantly higher modulus G′ over the time of the test. Thus, crosslinked hyaluronic acid with lidocaine can have good biostability, and can in some cases have a synergistic effect, increasing G′." *Id.* ¶ 107.

### 3. Monheit (Ex. 1022)

Monheit describes the properties of hyaluronic acid fillers used for wrinkle and volume correction. Ex. 1022, 77. Properties of hyaluronic acid fillers include gel hardness or rheology (flow), particle size, concentration of hyaluronic acid particles, swelling, ratio of soluble to insoluble hyaluronic acid, and hydration. *Id.* at 78. Monheit discloses free (soluble) "HA is needed as a lubricant for flow characteristics, thus more free HA is needed as the G-1 or hardness of the HA is greater. The disadvantage is that free or non-crosslinked HA only lasts a few days and the stability of the implant is related to the crosslinked component." *Id.*

IPR2019-01509
Patent 9,358,322 B2

### 4. *Smith (Ex. 1009)*

Smith discloses "practical information on the use of Juvéderm Ultra and Juvéderm Ultra Plus injectable gel fillers." Ex. 1009, 67S. Smith discloses Juvéderm Ultra and Juvéderm Ultra Plus have been on the market in Europe since 2003 and were introduced to the U.S. in 2007. *Id.* Smith describes Juvéderm as hyaluronic acid crosslinked with BDDE and including "[a]bout 10% non-crosslinked" HA "to optimize the follow properties of the material." *Id.* Smith discloses that

> [b]y comparison, particle-based products tend to contain a considerably larger amount of free hyaluronic acid (typically around 20 percent of the total hyaluronic acid in the syringe), and all of this free hyaluronic acid is found in the vehicle system (where it is used as a gelling agent to keep the particles in suspension).

*Id.* at 72S.

### 5. *Analysis of Claim 1*

Petitioner provides a detailed claim analysis for claim 1 as obvious over Lebreton, Sadozai, and Monheit, which we summarize below. Pet. 31–32. Because Patent Owner raises no independent arguments with respect to claims 2–4, we address claim 1, Ground 1, as representative.

#### a) *"A soft tissue filler composition comprising"*

Petitioner asserts Lebreton and Sadozai both disclose soft tissue fillers. *Id.* at 31 (citing Ex. 1029 ¶ 5; Ex. 1030 ¶¶ 7, 12).

#### b) *"a sterile, stable injectable gel"*

Petitioner asserts Lebreton and Sadozai each disclose autoclave sterilization. *Id.* (citing Ex. 1029 ¶ 70; Ex. 1030 ¶¶ 90, 96, 103). Petitioner asserts Lebreton discloses a BDDE-crosslinked gel that is sterilized in its final container, which would have been considered stable by a person of

21

IPR2019-01509
Patent 9,358,322 B2

ordinary skill in the art, by remaining sterile so long as the final container was not opened. *Id.* (citing Ex. 1002 ¶¶ 137, 233).

> c) *"comprising a mixture of soluble form hyaluronic acid (HA)"*

Petitioner asserts Monheit discloses adding soluble form hyaluronic acid as a lubricant for flow characteristics. *Id.* (citing Ex. 1022, 78). Petitioner asserts a person of ordinary skill would have been motivated to include soluble form hyaluronic acid to optimize the injection characteristics of the filler. *Id.* at 31–32 (citing Ex. 1002 ¶¶ 139, 233–234).

> d) *"particles of HA crosslinked with 1,4-butanediol diglycidyl ether (BDDE)"*

Petitioner asserts Lebreton discloses particles of hyaluronic acid crosslinked with BDDE. *Id.* at 32 (citing Ex. 1029 ¶¶ 68–76).

> e) *"and lidocaine in an amount effective to mitigate pain upon injection of the gel."*

Petitioner asserts Sadozai discloses 0.3% lidocaine, which is the conventional concentration of lidocaine known to be effective to mitigate injection pain of crosslinked hyaluronic acid fillers. *Id.* (citing Ex. 1030 ¶ 107; Ex. 1002 ¶¶ 161, 232–233).

> f) *Motivation to Combine*

Petitioner asserts that a person of ordinary skill in the art would have known that injection pain was a common side effect of injectable dermal fillers, including Lebreton's BDDE-hyaluronic acid crosslinked filler. Pet. 27 (citing Ex. 1002 ¶ 115). Petitioner contends that incorporating lidocaine into crosslinked fillers was a known solution to the problem of injection pain, and was previously implemented in fillers containing hyaluronic acid crosslinked with BCDI, DVS (1,4-divinylsulfone), or DEO (diepoxyoctane). *Id.* at 27–28 (citing Ex. 1002 ¶¶ 119, 132–133). Petitioner contends that "[a]

22

IPR2019-01509
Patent 9,358,322 B2

composition containing BDDE-crosslinked HA and lidocaine was a derivative and predictable next step in view of the success of the other three clinically used crosslinkers." *Id.* at 28. Petitioner contends a person of ordinary skill in the art could have incorporated Sadozai's 0.3% lidocaine in a buffer solution into Lebreton's BDDE-crosslinked gel. *Id.* at 30 (citing Ex. 1002 ¶¶ 232–233).

Petitioner further asserts that a person of ordinary skill in the art would have been motivated to incorporate free hyaluronic acid into Lebreton's crosslinked hyaluronic acid filler to optimize the injectability of a gel. *Id.* at 29–30 (citing Ex. 1002 ¶¶ 91–94). Petitioner contends that a person of ordinary skill in the art would have understood that increasing free hyaluronic acid concentration in a mixture decreases the extrusion force and thus is a result-effective variable subject to routine optimization. *Id.* Petitioner contends a person of ordinary skill in the art would have added the desired amount of free hyaluronic acid to the combined composition of Lebreton and Sadozai, loaded the composition into a syringe, and sterilized the composition using an autoclave. *Id.* at 30–31 (citing Ex. 1002 ¶¶ 135, 233).

### g) *Objective Evidence of Non-obviousness*

Petitioner contends "the Examiner allowed the claims of the challenged patent (and its related applications) based on Allergan's arguments and proffered evidence pointing to supposed 'unexpected results' of the invention." Pet. 50. Petitioner challenges the Declaration of the sole named inventor, Pierre F. Lebreton ("the Lebreton Declaration"), the comparative data incorporated into the specification, and the extrinsic evidence cited by the Applicant during prosecution. *Id.* at 50–51.

IPR2019-01509
Patent 9,358,322 B2

Petitioner first challenges the Lebreton Declaration as unsubstantiated and contradicted by the prior art. *Id.* at 51–54. Petitioner asserts that "contrary to Lebreton's statements, the totality of the prior art instead gave the POSITA the expectation lidocaine could be successfully combined with various crosslinked HA dermal fillers, including a BDDE-crosslinked HA dermal filler." *Id.* at 52 (emphasis omitted). To show that sterile and stable lidocaine-hyaluronic acid combinations were previously known, Petitioner cites commercially available dermal fillers, e.g., Elevess, Prevelle Silk, Puragen Plus, as well as Sadozai and Kinney. *Id.* at 52–53 (citing Ex. 1002 ¶¶ 260–262). Petitioner relies on Dr. DeVore's testimony one of ordinary skill in the art "would not have believed that lidocaine caused degradation of HA gels compositions during high temperature sterilization and would have believed that HA compositions comprising lidocaine." Ex. 1002 ¶ 261. Dr. DeVore attests that "during the development of Elevess, it was observed that the autoclave-sterilized [BCDI]-crosslinked HA composition with lidocaine was sufficiently stable to support a product shelf life of 15 months, which is reflected in the Elevess label." *Id.* (citing Ex. 1050, 6 (CTA summary)). Dr. DeVore states that "[f]or example, during the development of Elevess, it was observed that the autoclave-sterilized [BCDI]-crosslinked HA composition with lidocaine was sufficiently stable to support a product shelf life of 15 months, which is reflected in the Elevess label." *Id.* (citing Ex. 1050, 6).

Second, Petitioner asserts that the comparative data relied on by the Lebreton Declaration does not support nonobviousness. Pet. 54–55. This comparative data is disclosed in Example 4 of '795 patent (Ex. 3002, 15:20–17:2, Figs. 1–8), and as Example 3 in provisional application Nos. 61/085,956 (Ex. 1013, 16–17, Figs. 2–9); 61/087,934 (Ex. 1028, 16–17,

24

IPR2019-01509
Patent 9,358,322 B2

Figs. 2–9; and 61/906,278 (Ex. 1044, 15–16, Figs. 1–8), which are incorporated by reference by the '475 patent (Pet. 54; Ex. 1001, 1:7–14).

Dr. DeVore attests that "Example 4 describes experiments in which six samples were evaluated. . . . Allergan argued that the results of Samples 1–3 were consistent with the expectations of the POSITA, and that it was unexpected that Samples 4–6 did not exhibit the same viscosity reduction." Ex. 1002 ¶ 267. Dr. DeVore states "[i]n my opinion, Sample 1 is completely irrelevant—it is a mixture of uncrosslinked HA and a completely different polymer (hydroxypropyl methylcellulose). I am not aware of a mixture of uncrosslinked HA and HPMC being used as a dermal filler, either in 2008 or now." Id. ¶ 268. Dr. DeVore states that the reported viscosity differences are not indicative of instability as "[t]he final viscosity for Samples 2 and 3 in each test (~75–375 Pa*s) is substantially the same as the final viscosities of Samples 4–6 (~50–90 Pa*s), all of which are within the range of marketed dermal fillers (50–1,200 Pa*s)." Id. ¶ 270. According to Dr. DeVore, there is no meaningful difference in viscosity reduction between Sample 3 (35% reduction when combined with lidocaine without pH adjustment) and Sample 4 (30% reduction in viscosity in the same test) and that the difference was not "much lower" as alleged by Allergan. Id. ¶¶ 274–275.

During prosecution of the '884 application, the Applicant asserted that Cui, "shows that HA gels are known to be sensitive to heat sterilization, and that even more particularly, that HA gels crosslinked with BDDE are known to be especially sensitive to heat sterilization relative to HA gels cross linked with other, i.e. non-BDDE, crosslinkers." Ex. 1023, 28. Petitioner, however, asserts that Cui, "is irrelevant to the question of whether Allergan's BDDE-crosslinked HA composition showed unexpected results

IPR2019-01509
Patent 9,358,322 B2

compared to the other crosslinkers known to POSITAs at the time." Pet. 60 (citing Ex. 1002 ¶ 266).

Petitioner argues that "Cui was published in 2012, well after the claimed priority date of the patent. The reasonable expectation of success (and expected results) is evaluated at the time the invention was made—a later published reference that might have taught away from the claimed invention is irrelevant." *Id.* at 59 (citing *Bristol-Myers Squibb Co. v. Teva Pharms. USA, Inc*. 752 F.3d 967, 976 (Fed. Cir. 2014)). Petitioner further relies on Dr. DeVore's testimony that Cui compares the stability of BDDE-crosslinked hyaluronic acid with three crosslinkers that had not "been seriously investigated for use in dermal fillers as of August 2008," as opposed to the known non-BDDE crosslinkers for dermal fillers. Ex. 1002 ¶ 264. Dr. DeVore concludes that "the Cui reference in no way supports Allergan's assertion that BDDE crosslinked HA was 'especially sensitive' to heat sterilization relative to 'non-BDDE' crosslinkers. At the very least, Cui is irrelevant . . . because Cui's comparisons do not relate to any of the crosslinkers relied upon here." *Id.* ¶ 265.

Patent Owner responds that we should discount Dr. DeVore's testimony because it is "conclusory and fails to provide a well-reasoned rationale or objective support for the proposed grounds." Prelim. Resp. 32. As an initial matter, at this stage of the proceeding, we give at least some weight to an expert's unopposed testimony. Moreover, we accord little weight to Patent Owner's argument as it appears to rely on summary statements from Dr. DeVore's declaration that are further explained elsewhere in the Declaration. Patent Owner argues, for example, that a sentence fragment from paragraph 145 of Dr. DeVore's declaration ("a POSITA would have been motivated to incorporate uncrosslinked (free) HA

26

IPR2019-01509
Patent 9,358,322 B2

into the lidocaine-containing BDDE-crosslinked H composition in varying amounts") is "without evidentiary support." *Id.* at 32.  The passage, read in full, however, expressly cites to paragraphs 91 and 145–147 of Dr. DeVore's declaration.  Ex. 1002 ¶ 145.  Referenced paragraph 91, in turn, cites to Exhibits 1045 and 1022 as support for the proposition that "[o]ne well-known technique to optimize the required extrusion force was to add free HA to the composition."  Follow-on paragraphs 92 and 93 further rely on Exhibits 1009 and 1037 in discussing additional evidence that one of ordinary skill would be motivated to incorporate free HA into an injectable filler composition.   Paragraphs 145–147 of Dr. DeVore's declaration further support the proposition summarized in paragraph 145 with reference to arguments and evidence in, e.g., paragraphs 91–94, 147–149, and 187 of the declaration and Exhibits 1002, 1008, and 1009.

Accordingly, we do not find persuasive Patent Owner's argument that we should discount Dr. DeVore's testimony as unduly conclusory.  Patent Owner will have the opportunity to rebut and challenge Dr. DeVore's testimony at trial.

### h)  Conclusion

For the reasons set forth above, Petitioner has established a reasonable likelihood of prevailing in demonstrating the unpatentability of at claims 1–4 with respect to Grounds 1 and 2 as presently asserted.

### E.  Obviousness in view of Kinney, Zhao, Narins, and Monheit, or Smith (Grounds 3 and 4)

As Ground 3, Petitioner challenges claims 1–4 as obvious in view of Kinney, Zhao, Narins, and Monheit.  Pet. 31–34.  As Ground 4, Petitioner challenges claim 2 as obvious in view of Kinney, Zhao, Narins, and Smith.

IPR2019-01509
Patent 9,358,322 B2

*Id.* at 35. Petitioner's challenges include detailed mapping of teachings of these references to each limitation of the claims. *See id.* at 31–35.

The parties' arguments with respect to evidence of unexpected results are addressed in section II(D)(5)(g), above. We begin our analysis of Petitioner's obviousness contentions with an overview of the additional references asserted under Grounds 3 and 4, and Petitioner's assertions of why one of ordinary skill in the art would have sought to combine the teachings of these references as set forth in the challenged claims.

### 1. *Kinney (Ex. 1012)*

Kinney teaches a clinical study comparing two dermal fillers: (1) Restylane, which had been on the market for several years, and (2) Puragen Plus, a non-animal source hyaluronic acid gel containing lidocaine that was undergoing FDA clinical trials. Ex. 1012, 741–742. Kinney describes "the pain associated with injection" as a "major disadvantage" of existing hyaluronic preparations, such as Restylane. *Id.* According to Kinney, Puragen Plus is double-crosslinked with DEO, thereby forming ester and ether bonds. *Id.* at 742. Kinney discloses that double-crosslinking protects the ether bonds during sterilization, where "[t]he increased chemical stability allows for the addition of lidocaine 0.3% for a relatively pain-free injection." *Id.* Kinney discloses "[n]ot surprisingly, there was minimal to no pain in essentially every patient injected with Puragen Plus, and less pain in every patient injected with Puragen Plus compared with patients injected with Restylane." *Id.* at 746.

### 2. *Zhao (Ex. 1058)*

Zhao is directed to double-crosslinked hyaluronic acid derivatives having improved biostability. Ex. 1058 ¶ 14. Zhao discloses crosslinking agents may be used for the double-crosslinking process may include BDDE

IPR2019-01509
Patent 9,358,322 B2

(butanediol diglycidylether) and DEO (1,2,7,8-diepoxyoctane). *Id.* ¶¶ 19–21. Zhao discloses an example of a double-crosslinking process for hyaluronic acid, including a first crosslinking reaction with DEO under alkaline conditions, and a second crosslinking reaction with DEO under acidic conditions. *Id.* ¶ 32. Zhao discloses the degree of crosslinking may range from 10–50%. *Id.* ¶ 56.

### 3. Narins (Ex. 1007)

Narins discloses that Restylane is a stabilized partially crosslinked hyaluronic acid gel. Ex. 1007, 156. Narins discloses "[t]he material is heat-sterilized in its final container and has a shelf life of 1.5 years from the date of manufacture." *Id.*

### 4. Analysis of Claim 1

Petitioner provides a detailed claim analysis for claim 1 as obvious over Kinney, Zhao, Narins, and Monheit, which we summarize below. Pet. 38–39.

#### a) "A soft tissue filler composition comprising"

Petitioner asserts both Kinney and Zhao disclose soft tissue fillers. *Id.* at 38 (citing Ex. 1012, 741–742; Ex. 1058 ¶¶ 60, 67).

#### b) "a sterile, stable injectable gel"

Petitioner asserts Narins discloses Restylane (single-BDDE crosslinked hyaluronic acid) is heat sterilized, and that a person of ordinary skill in the art would sterilize a double-BDDE crosslinked gel using the same conditions. *Id.* (citing Ex. 1007, 156; Ex. 1002 ¶¶ 111, 239). Petitioner asserts that the composition would remain stable as long as the final container was not opened, and thus meet the stable requirement. *Id.* (citing Ex. 1002 ¶¶ 137, 239).

IPR2019-01509
Patent 9,358,322 B2

> c) *"comprising a mixture of soluble form hyaluronic acid (HA)"*

Petitioner asserts Monheit discloses adding soluble form hyaluronic acid as a lubricant for flow characteristics. *Id.* (citing Ex. 1022, 78). Petitioner asserts a person of ordinary skill would have been motivated to include soluble form hyaluronic acid to optimize the injection characteristics of the filler. *Id.* at 31–32 (citing Ex. 1002 ¶¶ 139, 233–234).

> d) *"particles of HA crosslinked with 1,4-butanediol diglycidyl ether (BDDE)"*

Petitioner asserts Kinney discloses single-BDDE crosslinked hyaluronic acid (Restylane) and double-DEO crosslinked hyaluronic acid (Puragen Plus). *Id.* at 39 (citing Ex. 1012, 741–742). Petitioner contends a person of ordinary skill would have been motivated to prepare particles of double-BDDE cross-linked hyaluronic acid. *Id.* (citing Ex. 1002 ¶¶ 238–240).

> e) *"and lidocaine in an amount effective to mitigate pain upon injection of the gel."*

Petitioner asserts Kinney discloses 0.3% lidocaine, which is the conventional concentration of lidocaine known to be effective to mitigate injection pain of crosslinked hyaluronic acid fillers. *Id.* (citing Ex. 1012, 742; Ex. 1002 ¶¶ 238, 243).

> f) *Motivation to Combine*

Petitioner asserts that Kinney and Narins disclose Restylane, a known single-BDDE crosslinked hyaluronic acid filler having the side effect of injection pain. *Id.* at 36 (citing Ex. 1012, 741; Ex. 1007, 156). Petitioner asserts that Kinney discloses patients preferred Puragen Plus, which contained lidocaine combined with particles of double-DEO crosslinked hyaluronic acid filler, over Restylane. *Id.* (citing Ex. 1012, 746). Petitioner

IPR2019-01509
Patent 9,358,322 B2

contends a person of ordinary skill could have modified Restylane to include lidocaine and double-BDDE crosslinked hyaluronic acid following Zhao's process. *Id.* at 37 (citing Ex. 1058 ¶¶ 19, 83–93). Petitioner contends that a person of ordinary skill would expect lidocaine to function analogously in both crosslinked gels due to the chemical similarity between BDDE and DEO crosslinkers. *Id.* (citing Ex. 1002 ¶¶ 83–84, 238).

Petitioner further asserts a person of ordinary skill would have been motivated to include soluble form hyaluronic acid to optimize the injectability ("lubricant . . . flow characteristics") of the gel as taught by Monheit. *Id.* (citing Ex. 1022, 78–79; Ex. 1002 ¶¶ 91–94, 112). Petitioner contends soluble hyaluronic acid concentration is a result-effective variable subject to routine optimization. *Id.*

g) *Conclusion*

For the reasons set forth above, Petitioner has established a reasonable likelihood of prevailing in demonstrating the unpatentability of at claims 1–4 with respect to Grounds 3 and 4 as presently asserted.

F. *Obviousness in view of Reinmuller, Lebreton, and Monheit or Smith (Grounds 5 and 6).*

As Ground 5, Petitioner challenges claims 1–4 as obvious in view of Reinmuller, Lebreton and Monheit. Pet. 42–49. As Ground 6, Petitioner challenges claim 2 as obvious in view of Reinmuller, Lebreton and Smith. *Id.* at 49–51. Petitioner's challenges include detailed mapping of teachings of these references to each limitation of the claims. *Id.* at 42–51.

The parties' arguments with respect to evidence of unexpected results are addressed in section II(D)(5)(g), above. We begin our analysis of Petitioner's obviousness contentions with an overview of the additional references asserted under Grounds 5 and 6, and Petitioner's assertions of

IPR2019-01509
Patent 9,358,322 B2

why one of ordinary skill in the art would have sought to combine the teachings of these references as set forth in the challenged claims.

### 1. *Reinmuller (Ex. 1059)*

Reinmuller discloses an injectable gel containing crosslinked hyaluronic acid and 2% by weight lidocaine hydrochloride. Ex. 1059, 7:1–11. The lidocaine acts as a local anesthetic to avoid pain when the injection cannula is inserted. *Id.* at 4:49–50, 62–64.

Reinmuller discloses the crosslinked hyaluronic acid is commercially available as Hylon and Hylagel available from the Biomatrix Company and cites U.S. Pat. Nos. 4,713,488 and 4,605,691. *Id.* at 3:49–54. Relying on the testimony of Dr. DeVore, Petitioner asserts that based on this disclose, a person skilled in the art would have known "that Hylagel was a DVS-crosslinked HA." Pet. 25 (citing Ex. 1002 ¶ 124). Reinmuller discloses the gel is dispensed into pressure-resistant ampoules and sealed. Ex. 1059, 7:16–18. The packaged gel is heat sterilized and protected from light. *Id.*

### 2. *Analysis of Claim 1*

Petitioner provides a detailed claim analysis for claim 1 as obvious over Reinmuller, Lebreton, and Monheit, which we summarize below. Pet. 44–46.

#### a) *"A soft tissue filler composition comprising"*

Petitioner asserts Reinmuller and Lebreton both disclose soft tissue fillers. *Id.* at 44 (citing Ex. 1029 ¶ 5; Ex. 1059, 2:44–45, 67).

#### b) *"a sterile, stable injectable gel"*

Petitioner asserts Reinmuller and Lebreton each disclose sterilized compositions. *Id.* (citing Ex. 1059, 7:16–18; Ex. 1029 ¶ 70). Petitioner asserts that Reinmuller's and Lebreton's sterilized compositions in sealed containers would have been considered stable by a person of ordinary skill

32

IPR2019-01509
Patent 9,358,322 B2

in the art, by remaining sterile so long as the final container was not opened. *Id.* at 44–45 (citing Ex. 1002 ¶¶ 246–247).

### c) *"comprising a mixture of soluble form hyaluronic acid (HA)"*

Petitioner asserts Monheit discloses adding soluble form hyaluronic acid as a lubricant for flow characteristics. *Id.* at 45 (citing Ex. 1022, 78). Petitioner asserts a person of ordinary skill would have been motivated to include soluble form hyaluronic acid to optimize the injection characteristics of the filler. *Id.* (citing Ex. 1002 ¶¶ 91–94).

### d) *"particles of HA crosslinked with 1,4-butanediol diglycidyl ether (BDDE)"*

Petitioner asserts Lebreton discloses particles of hyaluronic acid crosslinked with BDDE. *Id.* at 45–46 (citing Ex. 1029 ¶¶ 34, 45). Petitioner contends a skilled artisan would have been motivated to replace Reinmuller's DVS crosslinker with Lebreton's BDDE crosslinker due to Lebreton's express preference for BDDE, market acceptance of BDDE crosslinked hyaluronic acid, and superior *in vivo* properties of BDDE crosslinked fillers. *Id.* at 46 (citing Ex. 1029 ¶ 5; Ex. 1002 ¶ 101; Ex. 1005, 124–125).

### e) *"and lidocaine in an amount effective to mitigate pain upon injection of the gel."*

Petitioner asserts Reinmuller discloses 2% by weight lidocaine, which is incorporated to avoid pain during injection. *Id.* (citing Ex. 1059, 4:63–65, 7:9).

### f) *Motivation to Combine*

Petitioner asserts that a person skilled in the art would have been motivated to modify Reinmuller's DVS crosslinked hyaluronic acid and lidocaine composition with BDDE crosslinked hyaluronic acid as taught by

33

IPR2019-01509
Patent 9,358,322 B2

Lebreton.  Pet. 42–43 (citing Ex. 1002 ¶¶ 124, 244).  Petitioner contends

DVS and BDDE were conventional crosslinkers that would have been

viewed as interchangeable by those skilled in the art.  *Id.* (Ex. 1002 ¶ 244).

Petitioner contends those skilled in the art would have known that BDDE

crosslinked hyaluronic acid fillers exhibit beneficially increased *in vivo*

residence times as compared to DVS crosslinked fillers.  *Id.* (*see* Ex. 1002

¶ 245).

Petitioner further asserts a person of ordinary skill would have been

motivated to include soluble form hyaluronic acid to optimize the

injectability of the gel as taught by Monheit.  *Id.* at 43 (citing Ex. 1022, 78–

79; Ex. 1002 ¶¶ 91–94, 112, 247–248).  Petitioner contends soluble

hyaluronic acid concentration is a result-effective variable subject to routine

optimization.  *Id.*

     *g)  Conclusion*

For the reasons set forth above, Petitioner has established a reasonable

likelihood of prevailing in demonstrating the unpatentability of at claims 1–4

with respect to Grounds 5 and 6 as presently asserted.

## III.   DISCRETION TO DENY INSTITUTION

Patent Owner contends Petitioner presents substantially the same art

or arguments previously presented to the Office.  Prelim. Resp. 16–17.

Patent Owner further contends Petitioner repackages the arguments

previously presented to and rejected by the Board in IPR2017-02002.  *Id.*

Patent Owner argues the Board should exercise its discretion and deny the

Petition under 35 U.S.C. §§ 325(d) and 314(a).  We address each of these

arguments below.

IPR2019-01509
Patent 9,358,322 B2

A.    Discretion under 35 U.S.C. § 325(d)

Under § 325(d), we have discretion to deny a petition that presents the same or substantially the same prior art or arguments as previously presented to the Office.  35 U.S.C. § 325(d) (2018).  In evaluating whether the factual predicate under § 325(d) is met, the Board has considered a number of non-exclusive factors, including, for example:

a) the similarities and material differences between the asserted art and the prior art involved during examination;

b) the similarities and material differences between the cumulative nature of the asserted art and the prior art evaluated during examination;

c) the extent to which the asserted art was evaluated during examination, including whether the prior art was the basis for rejection;

d) the extent of the overlap between the arguments made during examination and the manner in which Petitioner relies on the prior art or Patent Owner distinguished the prior art;

e) whether Petitioner has pointed out sufficiently how the Examiner erred in its consideration of the asserted prior art; and

f) the extent to which additional evidence and facts presented in the Petition warrant reconsideration of the asserted prior art or arguments.

*Becton, Dickinson and Co. v. B. Braun Melsungen AG*, IPR2017-01586, Paper 8, 17–18 (PTAB Dec. 15, 2017) (precedential) ("the *Becton Dickinson* factors").

1.    *Becton Dickinson* Factors a through d

With respect to factors a through d, Patent Owner argues that "the references on which Petitioner relies, and arguments based on those

35

IPR2019-01509
Patent 9,358,322 B2

references, are the same or substantially the same as those considered during prosecution of the '322 Patent." Prelim. Resp. 18. With respect to the primary reference of Grounds 1 and 2, Patent Owner argues that the Examiner's rejection in view of Lebreton was "explicity considered and distinguished" during the prosecution of the '322 patent. *Id.* at 18–19. Patent Owner further argues that Kinney, the primary reference for Grounds 3 and 4, "is cumulative of the Wang, Lupo, and Reinmuller references that the Examiner cited during prosecution." *Id.* at 19–20 (citing Ex. 2006, 145). Patent Owner further asserts that Kinney and Reinmuller (the primary references of Grounds 5 and 6) were cited in an IDS filed April 10, 2014. (*id.* at 19, 21 (citing Ex. 2006, 144, 145)), and that all of the "secondary references on which Petitioner relies (Sadozai, Zhao, Narins, Monheit, and Smith) are cumulative of art that was considered, and overcome, during prosecution of the '322 patent family" (*id.* at 23).

Petitioner, however, argues that "Allergan's argument that Lebreton was 'distinguished' in prosecution is inaccurate; Allergan never overcame the *prima facie* cases made by the Examiner. Instead, every patent was allowed based on Allergan's proffered unexpected results, primarily the unsubstantiated inventor declaration." Reply 1–2. Petitioner's assertion is supported by the relevant prosecution history, as further discussed below. *See, e.g.*, section I(F)(3), above; *see also* Prelim. Resp. 4 ("Ultimately, the [']475 and '322 patents were allowed based on the unexpected results from the claimed inventions.").

Petitioner also argues that the asserted grounds combine Lebreton (and Kinney) with "substantially different secondary references (Sadozai, etc.) than used by the Examiner and provide arguments and evidence (including the unrebutted DeVore testimony) not considered by the

36

IPR2019-01509
Patent 9,358,322 B2

Examiner." Reply 2–6. We find particularly persuasive for the purpose of our § 325(d) analysis, Petitioner's contention that, whereas Calais and Wang, cited by the Examiner, "merely *suggest* lidocaine . . . *could* be added to a crosslinked HA gel[,] . . . . Sadozai[15] directly refutes the inventor's declaration that lidocaine would degrade a HA gel during high temperature sterilization." *Id.* at 2–3 (citations omitted); *see also*, Ex. 1002 ¶¶ 31–35, 39, 43, 49, 130–131, 144.

With respect to Grounds 4–6, we acknowledge that Kinney and Reinmuller were cited in an IDS, and thus, are the same art previously presented to the Office. We find persuasive, however, Petitioner's argument that the Examiner overlooked the relevance of these references because, unlike the references cited by the Examiner, Kinney and Reinmuller provide working examples of stable, crosslinked HA fillers with lidocaine. Pet. 67–68; Reply 4–5.

On balance, factors a through d do not weigh in favor of exercising our discretion to deny institution under § 325(d).

    2.    *Becton Dickinson* Factor e

As to factor e, Patent Owner asserts that "Petitioner fails to meet[] its burden to demonstrate how the Examiner allegedly erred in his review of the prior art during prosecution." Prelim. Resp. 27. As discussed in section I(F)(3), above, the parties agree that the Examiner relied on the Lebreton Declaration in allowing the claims of the '322 patent to issue. According to

_____

[15] Although Sadozai was of record during examination of the '322 patent, because it directly refutes a statement in the Lebreton Declaration, we find, as discussed in Section III.A.3 below, Petitioner has shown sufficiently that the Examiner erred in not appreciating the relevance of the teaching of Sadozai during evaluation of the Lebreton Declaration.

37

IPR2019-01509
Patent 9,358,322 B2

Petitioner, the Examiner's error in allowing these claims "was induced by the declaration." Reply 6. Although Petitioner's analysis is not contrary to the present record, whether the Examiner "erred" by relying on Lebreton declaration is subsumed into our analysis of factor f, below.

### 3. *Becton Dickinson* Factor f

Even if we were to accept Patent Owner's arguments regarding factors a through d at face value, they would be outweighed by our analysis of factor f: "the extent to which additional evidence and facts presented in the Petition warrant reconsideration of the asserted prior art or arguments," which in this case, relates to Petitioner's arguments and evidence regarding the Lebreton Declaration. *See generally*, Pet. 52–59; Reply 6–7.

### a) *Paragraphs 4–10 of the Lebreton Declaration*

The Lebreton Declaration presents two general arguments. First, that one of ordinary skill in the art would have known that the addition of lidocaine to crosslinked HA dermal filler compositions was incompatible with high temperature sterilization. *See* Ex. 1024 ¶¶ 4–10.[16] Petitioner, supported by the testimony of its expert Dr. DeVore, however, provides substantial evidence to the contrary. In particular, that one of ordinary skill in the art would have understood that lidocaine-containing crosslinked HA dermal fillers could be sterilized with high temperatures, and that such products were approved by the FDA for commercial sale. *See e.g.*, Pet. 52–54 (citing Ex. 1002 ¶¶ 254, 259–262; Ex. 1030 ¶ 107; Ex. 1012, 746;

---

[16] As noted in the Petition, these "statements were *not* limited to BDDE-crosslinked HA [as presently claimed], and Allergan's accompanying Response at the time included pending claims covering use of *any* crosslinker." Pet. 52 (citing Ex. 1023, 18–20 (claims 51–67)).

38

IPR2019-01509
Patent 9,358,322 B2

Ex. 1021, P1039 (dermatology journal abstract on HA/lidocaine combination preclinical evaluation)).

Petitioner appears to take the position that the Lebreton Declaration would have provided the Examiner with an incomplete picture of the prior art. Pet. 65. Patent Owner disagrees, arguing that the Examiner "was aware of the very references and teachings Petitioner alleges were absent" in the Declaration. Prelim. Resp. 28 (arguing that the Examiner considered Lebreton, Reinmuller, Kinney, and Sadozai as well as references cumulative to Monheit, Smith, Zhao, and Narins). The current record, however, further includes the presently unrebutted testimony of Dr. DeVore, and the question of whether the secondary references before the Examiner were truly cumulative is a matter of factual dispute that can be addressed at trial. *See* Reply 2–5. Moreover, as noted in section III(A)(1), above, the record indicates that the Examiner overlooked the relevance of the working examples disclosed in Kinney and Reinmuller during examination. These factors weigh against exercising our discretion under § 325(d), as do the parties' arguments with respect to Cui, discussed in section II(D)(7)(g), above.

### b) Paragraphs 11–15 of the Lebreton Declaration

With reference to Example 4 of the incorporated provisional applications, the Lebreton Declaration further asserts that "other HA gels" mixed with lidocaine (represented by samples 4 and 5) "surprising[ly] and unexpected[ly]" maintained their viscosity and elasticity after high temperature sterilization as compared to gel samples 1, 2, and 3. Ex. 1024 ¶¶ 11–15. There appears to be no dispute that the lidocaine-gel compositions of samples 4 and 5 comprise BDDE-crosslinked soft tissue filler compositions within the scope of the challenged claims. Petitioner,

39

IPR2019-01509
Patent 9,358,322 B2

nonetheless, contends this portion of the Lebreton Declaration does not provide support for unexpected results because first, samples 1–3 do not represent the closest prior art and, second, even though samples 1 and 2 show less drop in viscosity after sterilization as compared to samples 4–6, this difference is merely a matter of degree rather than kind.  Pet. 54–58 ; *see* Ex. 1002 ¶¶ 266–276.

We find particularly interesting Dr. DeVore's presently uncontested testimony that

> Allergan's experiment and its interpretation of the results fundamentally misunderstands the point of stability testing. The consideration whether a crosslinked HA composition would be suitable as a dermal filler depends on its *final* viscosity, not how much the viscosity drops during sterilization.  It is irrelevant if the viscosity drops by 5%, 50%, or even 90%, so long as the sterilized final product has the desired viscosity and is shelf stable.

Ex. 1002 ¶ 269.  Dr. DeVore further testified that Sample 1 is irrelevant as a mixture of uncrosslinked HA and a polymer other than HA, whereas "[t]he final viscosities of samples 2 and 3 in each test (~75–375 PA*s) is substantially the same as the final viscosities of Samples 4–6 (~50–09 PA*s), all of which are within the range of marketed dermal fillers (50–1,200 PA*s)."  *Id.* ¶¶ 268, 272.  In support, Dr. DeVore points to the priority documents as identifying samples 2 and 3 as corresponding to FDA-approved dermal fillers Hylaform and Restylane, respectively.  *See id.* ¶¶ 272, 273 (citing Ex. 1013, 26:7, 12–13; Ex. 1028, 19:7, 12–13).

Dr. DeVore further testifies that:

> During the prosecution of '795 patent, Allergan stated that Sample 3, when combined with lidocaine without pH adjustment, exhibited a 35% reduction in viscosity, while Sample 4 exhibited a 30% reduction in viscosity in the same

40

IPR2019-01509
Patent 9,358,322 B2

> test. EX1023, 26-27.  During the prosecution of this
> application, Allergan argued that the claimed compositions
> exhibited a "much lower" reduction in viscosity.

*Id.* ¶ 274.

> In my opinion, even if viscosity reduction by itself was a
> meaningful measure of suitability (it is not), there is no
> meaningful difference between a 30% and 35% reduction in
> viscosity. . . . Determining whether 30% is significantly
> different from 35% would require statistical analysis, such as
> required in FDA submissions. Such analysis is not present in
> the Challenged Patents. Thus, it is impossible to tell if the
> difference between Sample 3 and Sample 4, when pH is not
> controlled, is real or not.

*Id.* ¶ 275.

On the present record, Dr. DeVore's testimony weighs against
exercising our discretion under § 325(d).  We, nonetheless, look forward to
Patent Owner's testing of Dr. DeVore's opinions at trial.

### 4.    Conclusion

In sum, upon weighing the relevant Becton Dickinson factors, we that
although the grounds may rely on the same or substantially the same art or
arguments previously presented to the Office, Petitioner has demonstrated
sufficiently how the Office erred in a manner material to the patentability of
the challenged claims in reliance on the Lebreton Declaration to overcome
the prior art.  Thus, we decline to exercise our discretion under 35 U.S.C.
§ 325(d) to deny institution of the Petition.

### B.    Discretion under 35 U.S.C. § 314(a)

The Patent Owner argues that the Board should exercise its discretion
under 35 U.S.C. § 314(a) and deny Petitioner's request for institution of
*inter partes* review.  Prelim. Resp. 36–42.  The Patent Owner points to the
Board's prior decision in IPR2017-02002 ("the 02002 IPR") involving a

IPR2019-01509
Patent 9,358,322 B2

challenge to a different patent by a different, and unrelated, petitioner,
Teoxane S.A. *Id.*; *see* Pet. 62 (characterizing Teoxane as an "unrelated[]
competitor[] of both Allergan and Prollenium").

In urging the Board to deny institution under § 314(a), the Patent
Owner points to criteria set forth by the Board in *General Plastic Industrial
Co., Ltd. v. Canon Kabushiki Kaisha*, No. IPR2016-01357 (PTAB Sept. 6,
2017).  Prelim. Resp. 37.  These factors include:

> (1)  Whether the same petitioner previously filed a petition directed to the same claims of the same patent;
>
> (2) Whether at the time of filing of the first petition the petitioner knew of the prior art asserted in the second petition or should have known of it;
>
> (3)  Whether at the time of filing of the second petition the petitioner already received the patent owner's preliminary response to the first petition or received the Board's decision on whether to institute review in the first petition;
>
> (4)  The length of time that elapsed between the time the petitioner learned of the prior art asserted in the second petition and the filing of the second petition;
>
> (5) Whether the petitioner provides adequate explanation for the time elapsed between the filings of multiple petitions directed to the same claims of the same patent;
>
> (6) The finite resources of the Board; and
>
> (7) The requirement under 35 U.S.C. § 316(a)(11) to issue a final determination not later than 1 year after the date on which the Director notices institution of review.

*Id.* (citing *General Plastic*, Paper 11 at 2, 9–10).

Petitioner admits that it read the papers from IPR2017-02002 prior to
filing this IPR.  Reply 1, 8.  In view of that admission, Patent Owner urges

IPR2019-01509
Patent 9,358,322 B2

that we deny this Petition because it "relies on the same or substantially the same references, and makes practically indistinguishable arguments from those advanced in IPR2017-02002." Prelim. Resp. 40.[17]  According to Patent Owner "Petitioner's use of the Board's institution decision in IPR2017-02002 as a roadmap for the Petition in this case implicates the fairness concerns discussed in *General Plastic* and favors denying institution." *Id.* at 41.  We do not agree.

Addressing the first *General Plastic* factor, Patent Owner argues that "Petitioner has repackaged into this petition practically identical prior art grounds to challenge related patent claims." *Id.* at 38.  We find this argument unavailing because Patent Owner presents no evidence that the '322 patent has been challenged by any party in an IPR.  To the contrary, "this is the first Petition challenging any claims of this patent.  So the *General Plastic* factors and analysis do not apply here." Pet. 61.

To the extent it were appropriate to apply *General Plastic*, we take into account Prollenium's contention that "[Patent Owner] makes no effort to show why *Prollenium*, which has *no relationship* to Teoxane and was sued years later, should be barred."  Reply 8.  On the present record, we agree that Prollenium has no significant relationship to the petitioner of the 02002 IPR.  *See Valve Corp. v. Electronic Scripting Prods., Inc.* IPR2019-00062, Paper 11, 9 (Apr. 2, 2019) (precedential) ("[W]e consider any

---

[17] As noted by the parties, the Board declined to institute trial on an earlier Petition by a third unrelated Petitioner for failure to timely identify all real parties in interest.  Pet. 62, Prelim. Resp. 36, fn.107 (citing *Galderma S.A. v. Allergan Industrie, SAS*, No. IPR2014-01417, Paper 15 (PTAB Mar. 5, 2015) (case terminated after additional proceedings).

IPR2019-01509
Patent 9,358,322 B2

relationship between those petitioners when weighing the General Plastic factors.").

Accordingly, *General Plastic* factor 1 strongly weighs against exercising our discretion under § 314(a).

With respect to *General Plastic* factors 2 and 4, we agree with Petitioner that these factors relate to prior art *withheld* from the first Petition and, because there is no evidence that Prollenium was involved with any earlier petition challenging the '475 patent, and because there is no evidence that Prollenium was aware of any infringement assertions against it at the time of the earlier petition filings, these factors are inapplicable here. Likewise, factor 5, ("[w]hether the petitioner provides adequate explanation for the time elapsed between the filings of multiple petitions directed to the same claims of the same patent"), also fails to weigh in favor of denying institution because, as there is no evidence that Prollenium was involved in any such earlier petition or that Prollenium was even aware of the infringement assertions against it at the time of the earlier petition filings, there is no elapsed time to explain.

Specific to *General Plastic* factor 4, we also acknowledge Petitioner's argument that "Allergan served its complaint for infringement on Prollenium almost a year after the Board denied the Teoxane petitions in March 2018. So Prollenium had no need to challenge this patent (or the several other asserted patents) until Allergan initiated the underlying litigation." Pet. 63. Prollenium's assertion weighs against exercising our discretion under § 314(a).

Patent Owner argues that *General Plastic* factor 3 weighs in favor of denying institution because "[g]uided by the Board's analysis of the previous petitions, Petitioner crafted this petition against the '322 patent to

IPR2019-01509
Patent 9,358,322 B2

try to 'overcome[] the deficiencies' identified by the Board's analysis" in the
02002 IPR.  Prelim. Resp. 40–41 (citing Pet. 62–63) (alteration in original).

Setting aside the fact that the '322 patent was not challenged in the 02002

IPR, we note Petitioner's characterization that:

> The Board denied Teoxane's petitions for various reasons,
> including failure to show certain anticipation references
> inherently disclosed certain claim elements, and a general lack
> of supporting evidence for the petitioner's positions. *See*
> [Ex. 3001, 15, 17, 19, 24–25] (rejecting anticipation and
> obviousness ground for failure to show inherent features and
> the stable limitation, rejecting ground for asserting "bare
> attorney argument," rejecting ground for failure to show a
> German reference was "of record" or how its alleged English
> counterpart met the limitations of the claims, and other failures
> to direct the Board to the specific and competent evidence to
> support the contentions).

Pet. 62–63.  Even were we to give weight to Patent Owner's assertion that

the instant Petition asserts "practically identical prior art grounds to

challenge related patent claims" as those set forth in the 02002 IPR, those

grounds were not fully adjudicated on the merits.  *See* Prelim. Resp. 38.  We

note in particular that the weight the Board should accord the Lebreton

Declaration–a cornerstone of Petitioner's argument–is not mentioned, let

alone addressed on the merits, in the 02002 IPR decision.  *See* Ex. 3001.  As

such, in this instance, we do not find it persuasive that Prollenium was in

possession of the Board's decision denying the 02002 IPR prior to filing this

Petition.  Accordingly, General Plastic factor 3 does not weigh in favor of

denying institution under § 314(a).

Finally, because Patent Owner has not shown, nor do we discern, that

this Petition raises unusual issues challenging the finite resources of the

Board or our capacity to issue a final determination within the statutory

IPR2019-01509
Patent 9,358,322 B2

limits of 35 U.S.C. § 316(a)(11), *General Plastic* factors 6 and 7 do not weigh in favor of denying institution under § 314(a). *See* Prelim. Resp. 42.

Consequently, and for the reasons explained above, we decline to exercise our discretion under 35 U.S.C. § 314(a) to deny institution of the Petition.

## IV. CONCLUSION

On the present record, we find Petitioner has made a sufficiently persuasive showing that the cited references would have taught or suggested each element of claims 1–4, and set forth a sufficient rationale for why a person of ordinary skill would have been motivated to combine these teachings and suggestions to arrive at the invention recited in those claims. Petitioner has established a reasonable likelihood of prevailing in demonstrating that claims 1–4 would have been obvious over the combinations of prior art set forth in the asserted grounds.

Our factual findings and conclusions at this stage of the proceeding are based on the evidentiary record developed thus far. This is not a final decision as to the patentability of claims for which *inter partes* review is instituted. Our final decision will be based on the record as fully developed during trial.

## V. ORDER

In consideration of the foregoing, it is hereby:

ORDERED, pursuant to 35 U.S.C. § 314(a), that an *inter partes* review of claims 1–4 of the '322 patent is instituted with respect to all grounds set forth in the Petition; and

FURTHER ORDERED, pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4(b), that the *inter partes* review of the '322 patent shall commence on

IPR2019-01509
Patent 9,358,322 B2

the entry date of this Order, and notice is hereby given of the institution of a

trial.

IPR2019-01509
Patent 9,358,322 B2

FOR PETITIONER:

Christopher L. Curfman
William W. Cutchins
MEUNIER CARLIN & CURFMAN LLC
ccurfman@mcciplaw.com
wcutchins@mcciplaw.com

FOR PATENT OWNER:

Dorothy P. Whelan
Michael Kane
FISH & RICHARDSON P.C.
whelan@fr.com
kane@fr.com

Trials@uspto.gov                                                    Paper 17
Patent 8,822,676 B2                                   Date: March 20, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

PROLLENIUM US INC.,

Petitioner,

v.

ALLERGAN INDUSTRIE, SAS,

Patent Owner.

_____

IPR2019-01617
Patent 8,822,676 B2

_____

*Before* JOHN G. NEW, SHERIDAN K. SNEDDEN, and
ROBERT A. POLLOCK, *Administrative Patent Judges*.

NEW, *Administrative Patent Judge*.

DECISION
Granting Institution of *Inter Partes* Review
35 U.S.C. § 314(a)

Case IPR2019-01617
Patent No. 8,822,676 B2

# I. INTRODUCTION

Petitioner Prollenium US Inc. filed a Petition (Paper 1, "Petition") requesting *inter partes* review of claims 1–31 of US Patent 8,822,676 B2 (Ex. 1001, "the '676 patent").  Patent Owner Allergan Industrie SAS (the "Patent Owner") timely filed a Preliminary Response.  Paper 6 ("Prelim. Resp.").

On January 10, 2020, we issued an Order granting Petitioner's request for additional briefing upon the subject of whether we should exercise our discretion to deny the Petition under § 325(d) and/or § 314(a).  Paper 11.  In response to our Order, Petitioner filed a Reply to the Patent Owner Preliminary Response (Paper 12, "Reply"), and Patent Owner filed a corresponding Sur-reply (Paper 16, "Sur-reply").

Under 35 U.S.C. § 314, the Board "may not authorize an *inter partes* review to be instituted unless … the information presented in the petition . . . and any response … shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition."  Upon consideration of the Petition, Preliminary Response, Reply, and Sur-Reply, we determine that the evidence presented demonstrates a reasonable likelihood that Petitioner would prevail in establishing the unpatentability of at least one claim of the '676 patent.

# II. BACKGROUND

## A.    *Related Matters*

The parties identify the following consolidated civil action:

Case IPR2019-01617
Patent No. 8,822,676 B2

*Allergan USA, Inc. and Allergan Industrie SAS v. Prollenium US Inc. and Prollenium Medical Technologies Inc.*, Civil Action No. 19-126-CFC (D. Del.)

Paper 4, 2.

Petitioner has filed Petitions for *inter partes* review of related U.S. patents as follows: US Patent No. 8,450,475 B2 (the "'475 patent") in IPR2019-01505; US Patent No. 9,238,013 (the "'013 patent) in IPR2019-01508; US Patent No. 9,089,519 B2 (the "'519 patent") in IPR2020-00084; and US Patent No. 9,358,322 B2 (the "'322 patent") in IPR2019-01509. Pet. 67–68; Paper 4, 3.

### B.    The Asserted Grounds of Unpatentability

Petitioner contends that claims 1–31 of the '676 patent are unpatentable based on the following grounds:

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1, 3–31 | 103(a) | Lebreton[1], Sadozai[2], CTA Summary[3] |

---

[1] Lebreton (US 2006/0194758 A1, August 31, 2006) ("Lebreton") (Ex. 1029).

[2] Sadozai et al. (US 2005/0136122 Al, June 23, 2005) ("Sadozai") (Ex. 1030).

[3] CTA Commercial U.S. Package Insert, October 12, 2006 (the "CTA Summary") (Ex. 1031).

Case IPR2019-01617
Patent No. 8,822,676 B2

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 2 | 103(a) | Lebreton, Sadozai, CTA Summary, Monheit[4] |
| 1–31 | 103(a) | Kinney[5], Zhao-1[6], Narins[7] |

Petitioner also relies upon the Declaration of Dr. Dale P. DeVore (Ex. 1003).

C.    *The '676 Patent*

The '676 patent is generally directed to cohesive soft tissue fillers, for example, dermal and subdermal fillers, based on hyaluronic acids ("HA") and pharmaceutically acceptable salts thereof.  Ex. 1001 Abstr.  More specifically, the '676 patent teaches crosslinked HA (including butanediol diglycidyl ether ("BDDE")-crosslinked fillers containing lidocaine).  Pet. 12 (citing Ex. 1001 col. 1, ll. 18–21).  The '676 patent also teaches that "HA-based injectable compositions which incorporate lidocaine during the manufacturing process are prone to partial or almost complete degradation

---

[4] G.D. Monheit, *Hyaluronic Acid Fillers: Hylaform and Captique*, 15(1) Neuromodulators and Soft Tissue Fillers 77–84 (2007) ("Monheit") (Ex. 1022).

[5] B.M. Kinney, *Injecting Puragen Plus into the Nasolabial Folds: Preliminary Observations of FDA Trial*, 26(6) Aesthetic Surg. J. 741–48 (2006) ("Kinney") (Ex. 1012).

[6] Zhao (US 2005/0250939 A1, November 10, 2005) ("Zhao-1") (Ex. 1058).

[7] R.S. Narins et al., *Injectable Skin Fillers*, 32 Clin. Plastic Surg. 151–62 (2005) ("Narins") (Ex. 1007).

4

Case IPR2019-01617
Patent No. 8,822,676 B2

prior to injection, particularly during high temperature sterilization steps and/or when placed in storage for any significant length of time." Pet. 13 (quoting Ex. 1001 col. 2, ll. 25–30).

### D.   Illustrative Claim

Claim 1 (the only independent claim) is illustrative and recites:

> 1.   A dermal filler composition comprising hyaluronic acid (HA) crosslinked with 1,4-butanediol diglycidyl ether (BDDE), and about 0.3% lidocaine by weight,
>
> wherein the lidocaine is freely released in vivo; and
>
> wherein the composition is sterile.

Ex. 1001 col. 19, ll. 20–24.

### E.   Prosecution History of the '676 Patent

On February 26, 2009, the present Patent Owner filed two similar applications: (1) US Appl. Ser. No. 12/393,884 (the "'884 application"), which issued as US 8,357,795 (the "'795 patent"), and US Appl. Ser. No. 12,393,768 (the "'768 application"), which issued as US 8,450,475 (the "'475 patent"). Pet. 14. The '676 patent-in-suit is a continuation of the '884 application/'795 patent. *Id.* The '884 application included claims directed to, *inter alia*, BDDE-crosslinked HA compositions containing lidocaine. *Id.* The arguments and evidence submitted by the Patent Owner in the parent '884 application were relied upon by the Examiner when allowing the '676 patent and form the basis of Petitioner's argument. *Id.*

The Examiner rejected the claims as being obvious over prior art that taught BDDE-crosslinked HA dermal fillers in combination with other

Case IPR2019-01617
Patent No. 8,822,676 B2

references disclosing the addition of lidocaine to other dermal fillers. Pet.

14. The Patent Owner subsequently argued the rejection by citing a

declaration submitted by the inventor, Dr. Pierre F. Lebreton (the "Lebreton

Declaration," Ex. 1024), who opined that a person of ordinary skill in the art

would not have expected that a lidocaine-containing HA composition could

be successfully sterilized by autoclave without degradation. *Id.* at 14–15

(citing Ex. 1023, 25–28; *see also* Ex. 1024 ¶¶ 13–16). Specifically, the

Patent Owner argued then that "it was a surprising and unexpected discovery

… that certain [HA] gels … when mixed with lidocaine, could be made to be

heat stable and thus useful as dermal fillers." *Id.* (quoting Ex. 1023 23). At

the time of this response, some pending claims were directed to BDDE-

crosslinked HA, and other claims were directed to HA crosslinked with any

crosslinker. *Id.* at 15 (citing Ex. 1012 18–20 (claims 51-67)). The Patent

Owner also argued that a skilled artisan would have expected that autoclave

sterilization would unacceptably reduce the composition's viscosity, thereby

making it unsuitable for use as a filler. *Id.* (citing Ex. 1023 25).

Also before the Examiner at this time was Y-j Cui et al., *The*

*Comparison of Physicochemical Properties of Four Crosslinked Sodium*

*Hyaluronate Gels with Different Crosslinking Agents*, 369–98 ADV.

MATERIALS RES. 1506–512 (2012) ("Cui") which allegedly teaches that HA

crosslinked with BDDE was less heat stable than HA crosslinked with other

crosslinkers. Pet. at 15–16 (citing Ex. 1025). The Patent Owner argued to

the Examiner that this was further evidence that the autoclave stability of the

claimed compositions was unexpected. *Id.* at 16 (citing Ex. 1023 28).

The Patent Owner (the "then-Applicant") also pointed to Example 4

of the '884 application's specification, arguing that Samples 1, 2, 3, which

Case IPR2019-01617
Patent No. 8,822,676 B2

were described as "non-cohesive HA gels," "showed a substantial reduction in viscosity" after lidocaine was added and the samples were autoclaved. Pet. 16. According to the Patent Owner, these results of Samples 1, 2, and 3 would have been expected by a skilled artisan. *Id.* The Patent Owner further argued that Samples 4, 5, and 6, which were described as "cohesive gels," "exhibited a much lower, or even insignificant change in viscosity" when lidocaine was added and the compositions were heat sterilized. *Id.* (citing Ex. 1023 26–27).

The Examiner subsequently allowed the claims of the '884 application, accepting the Patent Owner's characterization of the state of the art and finding that Example 4 demonstrated unexpected results. Pet. 16 (citing Ex. 1023 9).

The parent application of the '676 patent, US Appl. Ser. No. 13/419,079 (the "'079 application"), was filed on March 13, 2012 as a continuation of the '884 application. Pet. 17. The same Examiner who examined the parent '884 application, issued an obviousness rejection of the '079 application similar to that in the parent application. *Id.* The Patent Owner again overcame this rejection by arguing it was "believed that crosslinked HA composition when combined with lidocaine were not capable of withstanding high temperature sterilization without a significant reduction in viscosity […] which would make these compositions unsuitable for soft tissue filling applications." *Id.* (quoting Ex. 1026 18). The Patent Owner resubmitted the Cui reference, but did not formally enter the Lebreton Declaration into the record. *Id.* (*see* Ex. 1026 19). The Examiner subsequently allowed the claims, noting that the Patent Owner "unexpectedly found that a hyaluronic acid gel crosslinked, but not with a

Case IPR2019-01617
Patent No. 8,822,676 B2

non[-]hyaluronic acid biopolymer, mixed with lidocaine and sterilized does
not degrade." *Id.* (quoting Ex. 1026 9).  The '676 patent issued on
September 2, 2014 (Ex. 1001).

## III. ANALYSIS

### A.    *Claim Construction*

In an *inter partes* review for a petition filed on or after November 13,
2018, the "[claims] of a patent … shall be construed using the same claim
construction standard that would be used to construe the [claims] in a civil
action under 35 U.S.C. § 282(b), including construing the [claims] in
accordance with the ordinary and customary meaning of such claims as
understood by one of ordinary skill in the art and the prosecution history
pertaining to the patent." *See* 37 C.F.R. § 42.100(b) (2019)); *see also
Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–14 (Fed. Cir. 2005) (*en banc*).
Only those terms that are in controversy need be construed, and only to the
extent necessary to resolve the controversy.  *See Nidec Motor Corp. v.
Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017)
(citing *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed.
Cir. 1999)).

In a related district court litigation, *Allergan USA, Inc. v. Medicis
Aesthetics, Inc.*, Case No. SACV 13-1436 AG (JPR) (C.D. Calif.),[8] the
district court judge entered a claim construction order following a *Markman*
hearing.  Ex. 1027.  Petitioner proposes constructions for certain claim terms

---

[8] This case relates to the '795 patent, which issued from the '884 application,
the parent of application of the '676 patent.  *See* Pet. 19; Ex. 1027.

Case IPR2019-01617
Patent No. 8,822,676 B2

that are consistent with those of the district court.  Petition 19–21.  The
Patent Owner does not concede that Petitioner's proposed constructions are
the correct interpretation of these claims under the *Phillips* standard, but
does not expressly contest any of Petitioner's proposed constructions.
Prelim. Resp. 17.

Resolving the parties' dispute regarding whether we should institute
*inter partes* review does not require any express claim construction at this
time.

B.      *A Person of Ordinary Skill in the Art*

Petitioner proposes that a person of ordinary skill, at and before the
priority date of the patent, would have been: (1) a scientist involved in the
development of dermal fillers; (2) would have an advanced degree, such as
an M.S., M.D., or Ph.D.; and (3) possessed several years of experience
developing dermal fillers for cosmetic use, including HA-based dermal
fillers.  Pet. 18.  Petitioner contends that such a skilled artisan would have
been aware of commercially sold dermal fillers, in the United States and
abroad, as well as those products for which approvals were being publicly
sought.  *Id.* (citing Ex. 1002 ¶¶ 69–72).

Petitioner also states that a person of ordinary skill in the art would
also have been aware of the process by which the FDA reviews dermal filler
products, and how the FDA communicates the results of such reviews to the
public.  Pet. 18.  Specifically, Petitioner posits that a skilled artisan would
have known that once the FDA approved a dermal filler, the Agency would
have hosted information about that filler on its webpage.  *Id.* (citing Ex.
1002 ¶¶ 73–75; Ex. 1032 227).

9

Case IPR2019-01617
Patent No. 8,822,676 B2

The Patent Owner points to the Board's related findings in a prior *inter partes* proceeding, IPR2017-01906, which involved the '795 patent. Prelim. Resp. 17.  In that proceeding, the Board adopted a definition of the level of skill of a person of ordinary skill in the art consistent with Petitioner's characterizations (1)–(3), *supra*.  *Id.* at 17–18.  The Patent Owner rejects Petitioner's additional qualifications respecting "products for which approvals were being publicly sought" and awareness "of the process by which FDA reviews dermal filler products and how FDA communicates the results of such review to the public."  *Id.* at 18–19.  The Patent Owner notes that Petitioner fails to offer any reason why the Board's previous definition of a POSITA is incorrect, or any reason why the Board should accept Petitioner's new definition of a POSITA.

We address the Patent Owner's argument in this respect in our analysis under 35 U.S.C. § 314(a) in section III *G*, *infra*.

C.   *Petitioner's Argument, Grounds 1 and 2: Alleged Obviousness over Lebreton, Sadozai, the CTA Summary, and Monheit*

1.   Overview of Lebreton

Lebreton teaches dermal filler compositions, including BDDE-crosslinked HA dermal filler obtained by crosslinking a mixture of low and high molecular weight HA starting materials.  Ex. 1029 ¶¶ 43–45.  Lebreton teaches that such fillers have improved properties relative to fillers using only high or only low molecular weight HA.  *Id.* at ¶¶ 21–24.  Lebreton teaches that the fillers can be formulated at pH between 6.5 and 7.5, preferably between 7 and 7.4, and even more preferably between 7.1 and 7.3, and that the pH can be controlled using the appropriate buffer solution.

10

Case IPR2019-01617
Patent No. 8,822,676 B2

*Id.* at ¶ 49.  The '676 patent cites Lebreton in explaining how selection of various HA components in dermal fillers was known to affect characteristics such as extrusion force, elastic modulus, and viscous modulus, among others.  Ex. 1001 col. 9, ll. 30–40.

Lebreton teaches two examples in which a mixture of high molecular weight and low molecular weight HA is crosslinked with BDDE in the presence of sodium hydroxide.  Ex. 1029 ¶¶ 76, 80–92.  The resulting mixture is neutralized to pH 7.2 using a phosphate buffer and dialyzed, then mechanically homogenized, loaded into a syringe, and sterilized in an autoclave.  *Id.*

### 2.    Overview of Sadozai

Sadozai teaches p-phenylene-bis(ethylcarbodiimide) ("BDCI")–crosslinked HA dermal fillers that include lidocaine.  Ex. 1030 ¶¶ 7, 84–85.  Sadozai teaches that its dermal fillers may include an anesthetic that can increase the stability of the dermal filler relative to the same filler without the anesthetic.  *Id.* at ¶ 68.

Sadozai teaches examples of nine crosslinked HA gels prepared by crosslinking HA with BDCI.  Ex. 1030 ¶ 85.  Sadozai further teaches several examples in which one of the crosslinked HA samples (Example 5) is reconstituted in a phosphate buffer containing 0.3% lidocaine hydrochloride (Buffer 4).  *Id.* at ¶¶ 90, 100, 102. The resulting gel is loaded into a syringe and autoclaved, after which the storage modulus (which is related to viscosity) of the lidocaine-containing crosslinked HA is higher than an otherwise identical crosslinked HA without lidocaine.  *Id.* at ¶¶ 90, 107 (relating storage modulus to viscosity).

11

Case IPR2019-01617
Patent No. 8,822,676 B2

3.     Overview of the CTA Summary

The CTA Summary teaches an FDA-approved sterile Cosmetic Tissue
Augmentation ("CTA") product containing 28 mg/mL crosslinked HA
suspended in a buffer and 0.3% lidocaine hydrochloride.  Ex. 1050 1.  The
CTA Summary teaches that the referenced product has a pH of between 6.2
and 7.6, and that more than 90% of the lidocaine elutes from the product *in
vitro* within two minutes.  *Id.* at 6.  The CTA Summary teaches that the
composition has a shelf-life of 15 months, as measured by sterility, visual
appearance, endotoxin, viscoelastic properties, UV absorbance, pH,
osmolality, HA concentration, extrusion force, HA fragment concentration,
or lidocaine concentration.  *Id.*

4.     Overview of Monheit

Monheit is cited by Petitioner only with respect to Ground 2, which is
limited to claim 2.  Monheit teaches characteristics that can be routinely
varied to provide fillers with the desired physical properties for a particular
application, including gel hardness (rheological properties), particle size, HA
concentration, swelling, ratio of soluble to insoluble HA, and hydration.  Ex.
1022 77–79.  Monheit specifically teaches that varying amounts of free HA

12

Case IPR2019-01617
Patent No. 8,822,676 B2

can be incorporated into crosslinked HA compositions "as a lubricant for flow characteristics." *Id.* at 78.

### 5.  Ground 1: Obviousness over Lebreton, Sadozai, and the CTA Summary

Petitioner argues that Lebreton describes a BDDE-crosslinked HA dermal filler.  Pet. 27.  According to Petitioner, by August 2008, lidocaine (at 0.3 wt%) had been incorporated in a range of dermal fillers to mitigate injection pain.  *Id.* (citing Ex. 1002 ¶¶ 115–118, 124–131).  Furthermore, Petitioner asserts, free (i.e., soluble or uncrosslinked) HA, in amounts of at least 4%, 10%, and 25%, was conventionally included in HA fillers to optimize injection characteristics of the compositions.  *Id.* (citing Ex. 1002 ¶¶ 91–94; Ex. 1022 79; Ex. 1008 29S; Ex. 1009 67S).  Petitioner contends that adding lidocaine and free HA in conventional amounts to a filler taught by the prior art—i.e., the composition taught by the '676 patent—is not inventive.  *Id.* (*see* Ex. 1013 16–19 (describing mixing Juvéderm Ultra Plus with lidocaine, adjusting pH to 7.2, and observing the mixture can be autoclave sterilized and that the lidocaine is freely released from the gel)).

Petitioner argues that Lebreton teaches BDDE-crosslinked dermal fillers are said to have improved properties over earlier BDDE-crosslinked fillers.  Pet. 28 (citing Ex. 1002 ¶ 113).  According to Petitioner, a skilled artisan would have been aware that post-injection pain was a drawback for such products, but that the bioengineering community had already developed a solution in other such crosslinked dermal fillers—incorporating anesthetic

13

Case IPR2019-01617
Patent No. 8,822,676 B2

agents including lidocaine.  *Id.*  Petitioner points to Sadozai as exemplifying such a solution.  *Id.*

Petitioner contends that lidocaine had been successfully incorporated into compositions containing HA crosslinked with the three other conventional crosslinking agents: 1,4-divinylsulfone ("DVS"), diepoxyoctane ("DEO"), and BDCI.  Pet. 28 (citing Ex. 1002 ¶ 118; Ex. 1020 8 (DVS); Ex. 1012 742, Ex. 1002 ¶¶ 117, 130–131 (DEO); Ex. 1050 1; Ex. 1002 ¶¶ 115–116 (BDCI)).  Two of these compositions had already received FDA approval by the earliest claimed filing date of the '676 patent.  *Id.* (*see* Ex. 1020 8, Ex. 1052 (DVS-based Prevelle Silk); Ex. 1019 5, Ex. 1002 ¶ 116 (BDCI-based Anika Therapeutics' Elevess, an implementation of Sadozai). And the third (DEO-based Puragen Plus) had been approved in Europe and was undergoing clinical trials in the U.S.  *Id.* (citing Ex. 1012 742; Ex. 1002 ¶¶ 117, 130–131).  Petitioner asserts that a composition containing BDDE-crosslinked HA and lidocaine was a derivative and predictable next step in view of the success of the other three clinically used crosslinkers, or that, at least, adding lidocaine to Lebreton would have been obvious to try.  *Id.*

Petitioner additionally argues that the prior art would have suggested to a person of ordinary skill that there existed a reasonable expectation of success in adding lidocaine to the BDDE-based crosslinked composition of Lebreton to produce a lidocaine-containing dermal filler.  Pet. 28.  Petitioner points out that the repeated successful use of lidocaine across the remaining spectrum of crosslinked HA dermal fillers would have prompted a skilled artisan to attempt the combination.  *Id.* at 29.  Petitioner argues that DVS, BDCI, and DEO crosslinked HA gels share many more similarities with

14

Case IPR2019-01617
Patent No. 8,822,676 B2

BDDE-crosslinked gel than differences.  *Id.* (citing Ex.1002 ¶¶ 153, 192).
Petitioner notes that, once crosslinked, all four crosslinkers are devoid of
reactive or unstable functional groups which a skilled artisan might suspect
would unfavorably react in the presence of lidocaine.  *Id.* (citing Ex. 1002
¶¶ 153).

Furthermore, Petitioner argues, because lidocaine had been
successfully incorporated into dermal fillers containing more significant
chemical differences than the various crosslinked-HA compositions, such as
synthetic polymers, bovine collagen, and human collagen, a person of
ordinary skill in the art would have reasonably expected that lidocaine could
also be successfully incorporated into a BDDE-crosslinked gel.  Id. at 29
(citing Ex. 1002 ¶ 113).

The Patent Owner does not expressly contest Petitioner's arguments
with respect to the obviousness of the claims, but argues, rather, that the
Board should exercise its discretion to deny institution under 35 U.S.C.
§§ 314(a) and 325(d).  Prelim. Resp. 21–48.  We address these arguments
*infra*.  However, based upon Petitioner's arguments, we find that, with
respect to Ground 1, the prior art teaches the limitations of claims 1 and 3–
31, and that a person of ordinary skill in the art would have been motivated
to combine the references with a reasonable expectation of success.  We
therefore conclude that there is a reasonable likelihood that the Petitioner
will prevail at trial upon this ground.

Case IPR2019-01617
Patent No. 8,822,676 B2

6.    Ground 2: Obviousness over Lebreton, Sadozai, the CTA Summary, and Monheit

Claim 2 of the '676 patent depends from claim 1 and adds "wherein the composition further comprises free HA."  Petitioner contends that Monheit teaches that some amount of free HA can be included to act as a lubricant and to aid flow characteristics of the filler.  Pet. 41 (citing Ex. 1022 78).  Petitioner contends that a person of ordinary skill in the art would, at the time of filing, have been motivated to include free HA to optimize the injection characteristics of the filler, and could have done so with a reasonable expectation of success through routine modification of the Lebreton process.  *Id.* (Ex. 1002 ¶¶ 138, 156).

The Patent Owner does not expressly contest Petitioner's arguments with respect to the obviousness of the claims, but argues, rather, that the Board should exercise its discretion to deny institution under 35 U.S.C. §§ 314(a) and 325(d).  Resp. 21–48.  We address these arguments *infra*. However, based upon Petitioner's arguments, we find, with respect to Ground 2, that the prior art teaches the limitations of claim 2, and that a person of ordinary skill in the art would have been motivated to combine the references with a reasonable expectation of success.  We therefore conclude there is a reasonable likelihood that the Petitioner will prevail at trial upon this ground.

16

Case IPR2019-01617
Patent No. 8,822,676 B2

D.     *Petitioner's Argument, Ground 3: Alleged Obviousness over Kinney, Zhao-1, and Narins*

1.     Overview of Kinney

Kinney teaches a clinical study comparing two dermal fillers: (1) Restylane, which had been on the market for several years, and (2) Puragen Plus, which was undergoing FDA clinical trials.  Ex. 1012 741–742.  Kinney teaches that Restylane is an injectable dermal filler containing 20 mg/mL of BDDE-crosslinked HA particles with a high concentration of "minimally modified HA molecules."  *Id.*  Kinney further teaches that a "major disadvantage" of existing HA based fillers was the pain that accompanied injection.  *Id.* at 741.  Kinney also teaches Puragen Plus, a dermal filler containing 20 mg/mL of DEO-double crosslinked HA particles and lidocaine hydrochloride (0.3%), which was then undergoing clinical trials.  *Id.* at 742.  Kinney teaches that injection with Puragen Plus caused minimal or no pain for patients, especially when compared to Restylane.  *Id.* at 746.

2.     Overview of Zhao-1

Zhao-1 teaches double-crosslinked HA dermal fillers with improved biostability relative to single-crosslinked HA.  Ex. 1058 ¶¶ 14, 67.  Zhao-1 teaches an example in which double-crosslinked HA was prepared by first crosslinking HA with DEO under alkaline conditions, followed by crosslinking the resultant product with DEO under acidic conditions.  *Id.* at ¶ 32.  Zhao-1 also teaches that a number of crosslinking agents, including both BDDE and DEO, can be used to prepare double-crosslinked HA using

17

Case IPR2019-01617
Patent No. 8,822,676 B2

the described methods. *Id.* at ¶¶ 19–21. Zhao-1 teaches that the

compositions may have a degree of crosslinking from 10–50%. *Id.* at ¶ 56.

### 3.    Overview of Narins

Narins teaches characteristics of several FDA-approved dermal fillers,

including Restylane. Ex. 1007 151, 153. Narins teaches additional details,

including that Restylane is heat sterilized in its final container and has a

shelf life of 1.5 years from date of manufacture. *Id.* at 156.

### 4.    Ground 3: Obviousness over Kinney, Zhao-1, and the Narins

Petitioner argues that Kinney teaches a DEO double-crosslinked HA

filler that includes 0.3 wt% lidocaine to afford "relatively pain-free

injection." Pet. 41 (citing Ex. 1012 742). Petitioner notes that Kinney states

that the double-crosslinking provides certain advantages, including

"enhanced stability in vivo and slower degradation *in vivo*." *Id.* (citing Ex.

1012 742).

Petitioner argues that Zhao-1 teaches DEO double-crosslinked HA,

and that BDDE crosslinks are interchangeable with DEO crosslinks. Pet. 41

(citing Ex. 1058 ¶ 19). Petitioner asserts that, given the market preference

for BDDE-crosslinked HA fillers, it would have been obvious to substitute

the DEO crosslinker of Kinney with BDDE, as taught by Zhao-1, and to

sterilize the resulting composition using the conventional methods taught by

Narins. *Id.*

Petitioner argues further that a person of ordinary skill in the art

would have been motivated to exchange the DEO crosslinker in Puragen

Plus with a BDDE crosslinker, because BDDE-crosslinked fillers were

Case IPR2019-01617
Patent No. 8,822,676 B2

already established in the marketplace and approved by the FDA. Pet. 42 (citing Ex. 1002 ¶ 175). Furthermore, argues Petitioner, because BDDE and DEO are each bis-epoxide crosslinkers, a skilled artisan would have reasonably expected that Zhao's process could be altered to use BDDE instead of DEO. *Id.* (citing Ex. 1002 ¶ 176. Petitioner also argues that, given that BDDE and DEO are chemically similar, a POSITA would reasonably expect that lidocaine would function analogously in both of the crosslinked gels. *Id.* (citing Ex. 1002 ¶ 180).

The Patent Owner does not expressly contest Petitioner's arguments with respect to the obviousness of the claims, but argues, rather, that the Board should exercise its discretion to deny institution under 35 U.S.C. §§ 314(a) and 325(d). Prelim. Resp. 21–48. We address these arguments *infra*. However, based upon Petitioner's arguments, we find that the prior art teaches the limitations of claims 1–31, and that a person of ordinary skill in the art would have been motivated to combine the references with a reasonable expectation of success. We therefore conclude that, with respect to Ground 3, there is a reasonable likelihood that the Petitioner will prevail at trial upon this ground.

E.    *Petitioner's Argument: Unexpected Results*

As we have explained *supra*, the Examiner allowed the claims of the applications that eventually resulted in the issuance of the '676 patent, based on the then-Applicant's arguments and proffered evidence pointing to the "unexpected results" of the invention. *See, e.g.*, Pet. 50. Petitioner argues that the Lebreton Declaration is unsubstantiated and is contradicted by the cited prior art. *Id.* at 50–53. Furthermore, argues Petitioner, contrary to the

19

Case IPR2019-01617
Patent No. 8,822,676 B2

Examiner's findings, Cui does not support the then-Applicant's argument that the claimed BDDE-crosslinked composition was "especially sensitive" to heat sterilization "relative to … non-BDDE crosslinkers." *Id.* (quoting Ex. 1023 28). Petitioner also argues that even if, *arguendo*, evidence of unexpected results were present during examination, such evidence (or other secondary considerations) must be balanced against the other evidence of obviousness. *Id.* at 50–51 (citing, e.g., *Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286, 1293 (Fed. Cir. 2013)).

First, Petitioner argues that the Lebreton Declaration does not accurately characterize the state of the art. Pet. 51. Petitioner asserts that the Lebreton Declaration made several statements concerning the state of the art from the view of person of ordinary skill "shortly prior to August 4, 2008." *Id.* These statements include:

> It was believed that adding lidocaine to [HA] gel compositions during manufacturing caused degradation of the [HA] prior to injection of the HA as a dermal filler.

> It was believed that lidocaine caused degradation of HA gel compositions during high temperature sterilization.

> It was not known whether HA compositions comprising lidocaine were stable or not after high temperature sterilization when placed in storage for any significant length of time.

> It was also believed that the instability of HA described above would have caused a viscosity reduction of the HA that would make it unsuitable for soft-tissue filling applications

Pet. 52 (quoting Ex. 1024 ¶¶ 4–8). Petitioner notes that these statements from the Lebreton Declaration were not limited to BDDE-crosslinked HA, and that the application at the time included pending claims covering use of

20

Case IPR2019-01617
Patent No. 8,822,676 B2

any crosslinker, and not just BDDE. *Id.* (citing Ex. 1023 18–20 (*see* claims 51–67)). Petitioner argues that the neither the Lebreton Declaration nor the inventor cited any prior art references to support the opinions expressed in the Declaration. *Id.* (citing Ex. 1024 ¶¶ 4–8; Ex. 1023 24–28).

Petitioner contends that, as argued *supra*, the totality of the prior art would have instead given a person of skill in the art the expectation that lidocaine could be successfully combined with various crosslinked HA dermal fillers, including a BDDE-crosslinked HA dermal filler. *Id.* Petitioner asserts that a skilled artisan would have been aware of commercial, lidocaine-containing, crosslinked HA dermal fillers such as Elevess, Prevelle Silk and Puragen Plus, as well as the teachings of the prior art documents cited in the Petition, including Sadozai and Kinney. *Id.* at 52–53. Each of these products and references expressly teach or suggest that crosslinked HA lidocaine-containing fillers were sterilizable, and were sufficiently stable to be approved by FDA as a dermal filler. *Id.* at 53 (citing Ex. 1002 ¶¶ 194, 198–199).

Petitioner argues that there is there is no evidence of record to suggest that a person of ordinary skill in the art would have expected that the addition of lidocaine would degrade crosslinked-HA compositions. Pet. 53 (citing Ex. 1002 ¶ 196). According to Petitioner, the skilled artisan would have had the exact opposite expectation: although Puragen Plus and Prevelle Silk are not explicitly described as sterile and stable, a person of ordinary skill would have known that these characteristics were necessary for FDA approval. *Id.* (citing Ex. 1002 ¶ 198).

Furthermore, Petitioner argues, Sadozai and Kinney both teach that the lidocaine-containing crosslinked HA fillers had viscosities similar to, or

21

Case IPR2019-01617
Patent No. 8,822,676 B2

even greater than, other crosslinked HA fillers that did not include lidocaine.
*Id.* (citing Ex. 1030 ¶ 107; Ex. 1012 746; *see also* EX1021, AB94).
Petitioner contends that each of these references supports the conclusion that
a person of ordinary skill would have reasonably expected that lidocaine
could be incorporated into a BDDE-crosslinked HA filler and heat sterilized
without compromising the viscosity of the final product.  Pet. 53–54 (citing
E. 1002 ¶ 199).  Petitioner argues further that, rather than expecting
lidocaine to degrade HA during autoclave sterilization, the prior art
suggested that it could increase the stability of the composition.  *Id.* at 54
(citing Ex. 1002 ¶ 191).

Petitioner asserts that there is no evidence to support the inventor's
characterization of the prior art but, rather, that the evidence demonstrates
that a skilled artisan would have reasonably expected that the addition of
lidocaine to a crosslinked HA dermal filler, including the fillers taught by
Lebreton, would result in a stable dermal filler.  *Id.*

Petitioner further disputes the Lebreton Declaration's statement that
the comparative data in the specification of the '884 application supports the
conclusion that addition of lidocaine unexpectedly prevented a decrease in
viscosity of the claimed composition.  Pet. 54.  Petitioner points out that the
Lebreton Declaration states that experiments described in Example 4 of the
specification showed that Samples 1–3 showed a greater decrease in
viscosity after autoclave sterilization than did Samples 4–5 (the
compositions claimed in the '884 application).  *Id.* (citing Ex. 1024 ¶¶ 13–
14).  Petitioner notes that the Lebreton Declaration opined that it was a
"surprising and unexpected discovery" that the HA gels of his application
"could be made to be heat and shelf-stable."  *Id.* (quoting Ex. 1024 ¶ 15).

22

Case IPR2019-01617
Patent No. 8,822,676 B2

Petitioner asserts, however, that the evidence does not establish or suggest that there are any meaningful differences between the claimed compositions and the compositions to which they are compared. *Id.* at 54–55.

Moreover, argues Petitioner, even if Samples 1–3 of Example 4 exhibited a more "substantial" decrease in post-sterilization viscosity compared to Samples 4–6, as was argued during prosecution, that fact alone would be insufficient to establish that the resulting compositions would be unsuitable as dermal fillers. Pet. 55 (citing Ex. 1023 26). Petitioner points to the Declaration of its expert, Dr. Dale P. DeVore (the "DeVore Declaration"), which states that the reported viscosities of Samples 1–3 are all within a range that a skilled artisan would have found to be acceptable in a dermal filler. *Id.* at 55–56 (citing Ex. 1002 ¶ 208; Ex. 1039 267). Furthermore, argues Petitioner, a person of ordinary skill in the art would have expected that the sterilized composition would not undergo any further viscosity reduction or other degradation. *Id.* at 56 (citing Ex. 1002 ¶ 209).

By way of example, Petitioner points to Sample 2 of Example 4, which is described in the '884 applications as the commercial product "Hylaform," an FDA-approved, DVS-crosslinked HA filler. Pet. 56 (citing Ex. 1002 ¶ 210; Ex. 1013 26). Petitioner argues that Sample 2 demonstrates that when pH control is employed with the lidocaine addition (which a skilled artisan would allegedly have known to do), the viscosity after autoclave remains within the acceptable range for use as a dermal filler. *Id.* (citing Ex. 1002 ¶ 210). Petitioner therefore reasons that there is nothing in Sample 2 suggesting that Hylaform could not have been combined with lidocaine. Petitioner also notes that the DeVore Declaration states that the specification's experiments with respect to Sample 1 are irrelevant, because

23

Case IPR2019-01617
Patent No. 8,822,676 B2

that composition was not being used as a dermal filler, either in 2008 or now. *Id.* (citing Ex. 1002 ¶ 206). And with respect to Sample 3, the Patent Owner argued during prosecution that it lost viscosity to autoclave sterilization. *Id.* (citing Ex. 1023 24–28). However, Petitioner argues, the data actually show that when lidocaine is added to Sample 3, with pH control, the resulting composition's viscosity increases relative to the non-lidocaine sample after autoclave stabilization by about 10%, as the Patent Owner acknowledges. *Id.* at 56–57 (citing Ex. 1002 ¶ 211; Ex. 1001 Fig. 3). Petitioner contends that a person of ordinary skill in the art would have understood that a filler should be accordingly formulated at a physiologically acceptable pH (e.g., about 7). *Id.* (citing Ex. 1002 ¶ 211).

Petitioner argues that the remaining evidence relied upon by the current Patent Owner during examination is Cui, which, the Patent Owner argued, demonstrates that BDDE-crosslinked HA fillers were "known to be especially sensitive to heat sterilization relative to HA crosslinked with other, i.e. non-BDDE crosslinkers," so that the discovery of the claimed sterile compositions was, allegedly, unexpected and surprising, given the supposedly unstable nature of HA-based gels crosslinked with BDDE even without the addition of lidocaine. *Id.* at 58 (citing Ex. 1023 28).

Petitioner contends that Cui compares the stability of BDDE-crosslinked HA with HA crosslinked with three other crosslinking agents, but Cui does not test or compare BDDE to any of the three crosslinking agents that were known in the art and approved by FDA in the United States in August 2008, or since. Pet. 58–59 (citing and comparing Ex. 1025 1506 with Ex. 1002 ¶ 202).

24

Case IPR2019-01617
Patent No. 8,822,676 B2

Petitioner also points out that Cui was published in 2012, after the claimed priority date of the patent.  Pet. 59.  Petitioner therefore reasons that Cui could not have informed a person of ordinary skill in the art's understanding of BDDE-crosslinked HA stability at the time the application was filed, and that Cui is therefore irrelevant.  *Id.*

We find this issue of whether the evidence presented in the DeVore Declaration, if presented to the Examiner, would have been sufficient to outweigh the opinions expressed in the Lebreton Declaration, to be at the core of our decision whether to institute.  As we explained *supra*, the Patent Owner did not succeed in persuading the Examiner that the claims were not *prima facie* obvious over the prior art, but rather demonstrated that secondary considerations, *viz.*, the allegedly unexpected and surprising properties of the composition – its resistance to degradation under high heat sterilization – were sufficient to outweigh the Examiner's *prima facie* conclusion.  The Patent Owner argues that, Petitioner's arguments notwithstanding, the Examiner's determination should stand and that Petitioner's arguments were adequately considered during examination by the Examiner, who found them persuasive.  The Patent Owner therefore urges us to exercise our discretion under 35 U.S.C. §§ 314(a) and 325(d) and deny institution on the grounds that Petitioner's arguments were considered and rejected by the Examiner.  We consequently now turn to the Patent Owner's arguments.

F.    *The Patent Owner's Response I: 35 U.S.C. § 314(a)*

Responding to Petitioner's arguments, the Patent Owner argues that the Board should exercise its discretion under 35 U.S.C. § 314(a) and deny

25

Case IPR2019-01617
Patent No. 8,822,676 B2

Petitioner's request for institution of the *inter partes* review. Prelim Resp.
21. The Patent Owner points to the Board's prior decision in IPR2017-
01906, contending that, even though that proceeding involved the '795
patent (the parent of the '676 patent), a discretionary decision not to institute
under § 314(a) is nevertheless appropriate in this instance. *Id.* (citing *NHK
Spring Co., Ltd. v. Intri-Plex Techs., Inc.*, No. IPR2018-00752, Paper 8, at
20 (PTAB Sept. 12, 2018)).

In urging the Board to deny institution under § 314(a), the Patent
Owner points to the criteria set forth by the Board in its decision in *General
Plastic Industrial Co., Ltd. v. Canon Kabushiki Kaisha*, No. IPR2016-01357
(PTAB Sept. 6, 2017). Prelim. Resp. 22. These factors include:

(1) Whether the same petitioner previously filed a petition
directed to the same claims of the same patent;

(2) Whether at the time of filing of the first petition the petitioner
knew of the prior art asserted in the second petition or should
have known of it;

(3) Whether at the time of filing of the second petition the
petitioner already received the patent owner's preliminary
response to the first petition or received the Board's decision
on whether to institute review in the first petition;

(4) The length of time that elapsed between the time the
petitioner learned of the prior art asserted in the second
petition and the filing of the second petition;

(5) Whether the petitioner provides adequate explanation for the
time elapsed between the filings of multiple petitions directed
to the same claims of the same patent;

(6) The finite resources of the Board; and

Case IPR2019-01617
Patent No. 8,822,676 B2

> (7) The requirement under 35 U.S.C. § 316(a)(11) to issue a final
> determination not later than 1 year after the date on which the
> Director notices institution of review.

*Id.* at 22–23 (citing *General Plastic*, Paper 19 at 2, 9–10).

The Patent Owner first argues that Petitioner relied on the prior institution decision in IPR2017-01906 to prove that the CTA Summary is a printed publication. Prelim. Resp. 23. The Patent Owner asserts that the CTA Summary is an FDA Premarket Approval ("PMA") document summarizing the features of an injectable dermal filler containing HA and lidocaine hydrochloride. *Id.* (citing Ex. 1050). The Patent Owner notes that, based on Ex. 1054, Petitioner alleges that the CTA Summary was included in a listing of approved PMAs on the FDA's website by December 31, 2006. *Id.* (citing Pet. 4). According to the Patent Owner, however, the issue is not whether the PMA was listed on the FDA's website by December 31, 2006, and thus more than one year before the priority date of the '676 patent (i.e., more than one year before August 4, 2008). *Id.* Rather, the Patent Owner asserts, the correct issue is whether the CTA Summary itself would have been available to a skilled artisan exercising reasonable diligence before the critical date. *Id.* at 23–24 (citing *SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*, 511 F.3d 1186, 1194 (Fed. Cir. 2008); *In re Cronyn*, 890 F.2d 1158, 1159-60 (Fed. Cir. 1989)).

The Patent Owner contends that, in IPR2017-01906, Teoxane S.A. ("Teoxane"), the Petitioner in that proceeding, challenged the claims of the '795 parent patent on the basis of the CTA Summary (referred to therein as the "Elevess Summary"). Prelim. Resp. 24 (citing IPR2017-01906, Paper 15 at 7–8). The Patent Owner points out that the Board held that Teoxane

Case IPR2019-01617
Patent No. 8,822,676 B2

failed to meet its burden to demonstrate that a diligent person of ordinary skill in the art would have located the CTA Summary before the critical date. *Id.* (citing IPR2017-01906, Paper 15 at 10–16). The Patent Owner emphasizes that the Board criticized Teoxane for failing to present:

> [A]ny persuasive evidence (such as testimony from Dr. Prestwich or any other person competent to opine from the perspective of an ordinary artisan) tending to establish that interested persons, exercising reasonable diligence, would have routinely examined FDA quarterly listings of PMA approvals, such as the FDA quarterly listing purportedly represented in Exhibit 1069.

*Id.* at 24–25 (quoting IPR2017-01906, Paper 15 at 13). Consequently, the Patent Owner reports, the Board held that Teoxane had failed to prove that the CTA Summary was a printed publication. *Id.*

The Patent Owner now argues that Petitioner had access to the Board's institution decision in IPR2017-01906 before filing this Petition. Prelim. Resp. 25. The Patent Owner contends that Petitioner acknowledges its awareness of the Teoxane petition and institution decision, stating that Petitioner "has provided additional documentary and testimonial evidence to support that reference's public availability." *Id.* (quoting Pet. 62–63). The Patent Owner contends that Petitioner has used the institution decision from IPR2017-01906 as a guide to addressing the deficiencies related to the CTA Summary's status as a printed publication. *Id.* at 26. The Patent Owner alleges that Petitioner is now offering testimony from the DeVore Declaration concerning what a person of ordinary skill in the art would have been aware of and would have known with respect to the CTA Summary. *Id.* (Ex. 1002 ¶ 19).

28

Case IPR2019-01617
Patent No. 8,822,676 B2

The Patent Owner contends that Petitioner, relying on the DeVore Declaration, attempts to create an "artificial" definition of a person of ordinary skill in the art.  Prelim. Resp. 26.  The Patent Owner argues that Petitioner proposes that a person of ordinary skill would have been "aware of the process by which FDA reviews dermal filler products and how FDA communicates the results of the reviews to the public."  *Id.* (quoting Pet. 18).  The Patent Owner asserts that there is no support for Petitioner's new definition of a person of ordinary skill in the art, which adds additional elements to the definition that the Board adopted earlier in IPR2017-01906.  *Id.*

The Patent Owner argues that, according to his curriculum vitae, Dr. DeVore is not a person of ordinary skill in the art.  Prelim. Resp. 26 (citing Ex. 1003).  According to the Patent Owner, Dr. DeVore's opinions reflect his personal knowledge, and not knowledge available to the public and, as such, are not characteristic of a skilled artisan as defined by the Board in IPR2017-01906.  *Id.* at 26–27.  According to the Patent Owner, Petitioner offers no evidence that, under the Board's prior definition, a person of ordinary skill would have routinely reviewed PMA approvals and would have located the CTA Summary by exercising reasonable diligence.  *Id.* at 27.

The Patent Owner points to Exhibit 1039 as resolving this issue.  Prelim. Resp. 27.  The Patent Owner observes that Petitioner describes Exhibit 1039 as a January 2008 publication, accepted for publication in July 2007, which refers to the FDA Summary of Safety and Effectiveness of Allergan's JUVÉDERM product, as well as PMA documents for "two other products."  *Id.* (citing Pet. 5).  However, argues the Patent Owner Exhibit

Case IPR2019-01617
Patent No. 8,822,676 B2

1039 does not refer to the CTA Summary. *Id.* The Patent Owner asserts that, if a skilled artisan would have recognized Anika Therapeutics as a well-known developer of dermal fillers and had routinely searched the FDA's database for PMAs, Exhibit 1039 would have discussed the CTA summary, which it does not. *Id.* at 27–28.

The Patent Owner further argues that Petitioner's reliance on various issues of the "Skin Therapy Letter" journal is similarly not persuasive. Prelim. Resp. 28. The Patent Owner notes that Petitioner contends that these issues include a recurring section titled "Update on Drugs" that gives notice of FDA approvals, and asserts that this simple listing would have prompted a skilled artisan to seek out PMAs published by the FDA. *Id.* (citing Pet. 5–6). The Patent Owner contends that this assertion is no more than unsupported speculation on Petitioner's part. *Id.* According to the Patent Owner, being aware of FDA approvals by reviewing updates in "Skin Therapy Letter" does not prove that a skilled artisan would have routinely searched the FDA's database for PMA approvals and would have located the CTA Summary before the critical date.[9] *Id.*

Similarly, argues the Patent Owner, knowledge of Anika Therapeutics' activity in the area of dermal fillers does not prove that a skilled artisan would have located the CTA Summary before the critical date, and, therefore, Petitioner has failed to show that the CTA Summary qualifies as a printed publication. Prelim. Resp. 28.

---

[9] The Patent Owner further notes that the references in question are directed at physicians and that Dr. DeVore is not a physician, nor does the Declarant provide evidence that physicians would search FDA databases for PMA approvals. Resp. 28.

Case IPR2019-01617
Patent No. 8,822,676 B2

Turning next to the *General Plastic* factors, the Patent Owner argues that Petitioner's alleged use of the Board's institution decision in IPR2017-01906 as a roadmap for the Petition in this case implicates the fairness concerns discussed in *General Plastic*.  Prelim. Resp. 29.  The Patent Owner contends that, although Prollenium was not the Petitioner in the previous IPR challenge against the '795 patent, that fact does not mitigate Petitioner's alleged capitalizing on the prior petition.  *Id.* (citing *Valve Corp. v. Electronic Scripting Prods.*, IPR2019-00062, Paper 11 at 15 (PTAB Apr. 2, 2019) (holding that the application of the *General Plastic* factors are not limited to instances where multiple petitions are filed by the same petitioner).

The Patent Owner argues further that *General Plastic* factors four and five also weigh in favor of denial, because Petitioner had more than 17 months to review and analyze the positions taken in the previous attacks on the related '795 patent and the Board's analysis of those arguments in formulating the Petition.  Prelim. Resp. 29.  Furthermore, the Patent Owner argues, Petitioner waited almost 9 months to file the Petition after commencement of the corresponding district court litigation.  *Id.* (citing Complaint, *Allergan USA, Inc. v. Prollenium US Inc.*, No. 01:19-cv-00126, Dkt. No. 1 (D. Del. Jan. 22, 2019); *see also* IPR2019-00062, Paper 11 at 14).

With respect to the sixth and seventh *General Plastic* factors, the Patent Owner argues that not instituting *inter partes* review would conserve Board resources and promote expeditious resolution of such reviews.  Prelim. Resp. 30.  The Patent Owner suggests that the Board's resources are more profitably expended addressing matters other than an allegedly second attempt to raise a plurality of duplicative grounds against the same patent

31

Case IPR2019-01617
Patent No. 8,822,676 B2

claims. *Id.* (citing *Conopco v. Procter & Gamble Co.*, No. IPR2014-00628, Paper 21 at 12 (PTAB. Oct. 20, 2014) (citing *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)).

Petitioner replies that the Petition does not present the type of "abuse of the review process" that concerned the Board in *General Plastic*. Reply 8. Petitioner argues that extending the *General Plastic* analysis to cover continuations asserted against unrelated defendants would be fundamentally unfair, and that Petitioner should not be prejudiced by a prior petitioner's poorly argued positions. *Id.* Moreover, Petitioner argues, the Grounds presented in the Petition are not the same as those presented with respect to the previously challenged patents. *Id.* (comparing Ex. 1069 9 with IPR2019-01506, Paper 2 at 1 (charts summarizing Grounds). Petitioner argues that, to the extent there is overlap among cited art and grounds, Petitioner's Petition is different because it presents its own arguments and evidence. *Id.*

Petitioner acknowledges that it has reviewed the Teoxane papers. However Petitioner disputes the Patent Owner's assertion that there is "no excuse" for us "capitalizing on the prior petition." Reply 8 (quoting, e.g., IPR2019-01632 Resp. 24 (citing *Valve Corp.*). According to Petitioner, the Patent Owner has not shown why Petitioner, which is unrelated to the Petitioner in the prior patent *inter partes* review proceedings, should be barred in these proceedings. *Id.*

Turning to the CTA Summary, Petitioner disputes the Patent Owner's contention that Petitioner's proposed definition of a person of ordinary skill in the art is "artificial" and inappropriate because it "differs from the definition adopted by the Board in IPR2017-01906" and that Petitioner has offered no reason to depart from it. Reply 9 (quoting, e.g., IPR2019-01632,

Case IPR2019-01617
Patent No. 8,822,676 B2

Resp. 14–15).  Petitioner contends that its definition does not change the
prior definition, it merely explains it further, and points out that the Board
only accepted the petitioner's then-undisputed definition for the purpose of
that order.  *Id.* (citing IPR2017-01906, Paper 15 at 9).

 Petitioner asserts that the Patent Owner does not dispute that the CTA
Summary was available on the FDA's website.  Reply 9.  Petitioner argues
that the Patent Owner characterizes the issue as whether a skilled artisan
would have "routinely searched" the PMA database and "would have
located" the CTA Summary," and it cites an article that Allergan speculates
"surely" would have discussed CTA Summary had it been available.  *Id.*
(citing IPR 2019-01632 Resp. 19 22–24).  However, Petitioner argues the
correct issue is "whether interested members of the relevant public could
obtain the information if they wanted to."  *Id.* at 9–10 (citing *GoPro, Inc. v.
Contour IP Holding LLC*, 908 F.3d 690, 693 (Fed. Cir. 2018).  Petitioner
asserts that the CTA Summary need only have been accessible, not actually
accessed.  *Id.* at 10.

 Petitioner asserts that the *GoPro* test is satisfied.  Reply 10.  Petitioner
asserts that, in addition to Dr. DeVore's testimony in his Declaration
concerning the level of skill in the art, the cited documentary evidence
demonstrates the interest and familiarity with competitors' products and
their FDA approvals of a person of ordinary skill in the art.  *Id.* (comparing
IPR2019-01632 Resp. 22, with 01632 Ex. 1001 ¶¶ 70–75, 118–19).
Similarly, argues Petitioner, the evidence demonstrates a skilled artisan's
likely knowledge of Anika and its CTA product documents, and directions
for searching the PMA database.  *Id.* (citing IPR2019-01632 Pet. 4–5).

Case IPR2019-01617
Patent No. 8,822,676 B2

Petitioner also urges the Board to consider the FDA's position that its PMAs are sufficiently publicly accessible to satisfy FDA's obligations under federal law. Reply 10 (citing IPR2019-01632 Pet. 3–4). Petitioner contends that a skilled artisan, exercising reasonable diligence, would have been both interested in, and able to locate, the CTA Summary. *Id.* (citing IPR2019-01632 Pet. 6). Petitioner therefore contends that the evidence is sufficient to establish at least a reasonable likelihood that the CTA Summary was publicly accessible. *Id.* (citing *Hulu LLC v. Sound View Innovations, LLC*, IPR2018-01039, Paper 29 at 13 (Dec. 20, 2019) (precedential)).

In the Sur-Reply, the Patent Owner repeats the argument that Petitioner has used the Board's previous decision in IPR2017-01906 as a roadmap in addressing the deficiencies related to the CTA Summary's status as a printed publication, and that this use supports dismissal under Section 314(a). Sur-Reply 4.

The Patent Owner also asserts that Petitioner assumes that the inclusion of the CTA Summary on the FDA's website means it is a printed prior art publication. Sur-Reply 4 (citing Reply 9–10). To the contrary, the Patent Owner argues, skilled artisans did not routinely search FDA's website for new PMAs. *Id.* (citing *Hulu*, IPR2018-01039, Paper 29 at 10) (holding that "Public accessibility requires more than technical accessibility"). The Patent Owner argues that Dr. DeVore is not a person of ordinary skill in the art, and that the fact that he may have searched the FDA's database reflects the particular nature of some of his duties, which included regulatory activity. *Id.*

34

Case IPR2019-01617
Patent No. 8,822,676 B2

G.  *The Board's Decision with respect to the Patent Owner's argument re 35 U.S.C. § 314(a)*

We decline to exercise our broad discretion to deny institution under 35 U.S.C. § 314(a).  Applying the factors set forth in *General Plastic*, we find that, with respect to factor (1), Petitioner is not the same party that filed a petition directed to the same claims of the same patent.  As the present Petitioner points out, it is a different entity from the party (Teoxane) that filed the petitions in the prior proceedings (IPR2019-01505 and -01506), and only two of the patents (the '475 and '795 patents) were challenged in those prior proceedings.  *See* 2019-01617 Reply 8.

With respect to *General Plastic* factors (2) and (4), we agree with Petitioner that these factors relate to prior art withheld from the first Petition and, because there is no evidence that Petitioner was involved with any earlier petition challenging the '676 patent, and because there is no evidence that Petitioner was aware of any infringement assertions against it at the time of the earlier petition filings, these factors are inapplicable here.  Likewise, factor (5), ("[w]hether the petitioner provides adequate explanation for the time elapsed between the filings of multiple petitions directed to the same claims of the same patent"), also fails to weigh in favor of denying institution because, as there is no evidence that Petitioner was involved in any such earlier petition or that Petitioner was even aware of the infringement assertions against it at the time of the earlier petition filings, there is no elapsed time to explain.

With respect to factors (6) and (7), we find that we must turn to the central issue of the Patent Owner's argument, *viz.*, whether the CTA Summary qualifies as a printed publication for prior art purposes.  *See* 2019-

35

Case IPR2019-01617
Patent No. 8,822,676 B2

01617 Resp. 23.  The Patent Owner specifically points to the Board's prior

Decision in IPR2017-01906, in which we held that:

> [W]e determine that Petitioner fails to establish sufficiently that
> the Elevess Summary [i.e., the CTA Summary] would have been
> publicly available prior to the critical date....
>
> That new evidence is accompanied by no witness testimony, or
> any other competent information, tending to establish the
> relevance of the new documents asserted for the first time in the
> Reply.  Here again, Petitioner relies on conclusory statements of
> counsel.  Critically lacking in the Reply is any persuasive
> evidence (such as testimony from Dr. Prestwich or any other
> person competent to opine from the perspective of an ordinary
> artisan) tending to establish that interested persons, exercising
> reasonable diligence, would have routinely examined FDA
> quarterly listings of PMA approvals, such as the FDA quarterly
> listing purportedly represented in Exhibit 1069.

IPR2017-01906 Paper 15 at 13 (references omitted).

In other words, the Board found, in IPR2017-01906, that the

petitioner in that proceeding had not adduced sufficient evidence to establish

that the CTA Summary would have been publicly available and that

"interested persons, exercising reasonable diligence, would have routinely

examined FDA quarterly listings of PMA approvals, such as the FDA

quarterly."  *See* IPR2017-01906 Paper 15 at 13.  Tellingly, the Board in the

prior proceedings did not reach the merits of whether the CTA Summary

actually qualifies as a printed publication for prior art purposes, but found

only that the petitioner had failed to provide sufficient evidence to support

an argument that the reference was a printed publication.  *Id.*

Petitioner in the proceedings now before us offers the DeVore

Declaration in evidentiary support of its contention that the CTA Summary

Case IPR2019-01617
Patent No. 8,822,676 B2

is a printed publication for prior art purposes. Because the Board did not
have the opportunity to evaluate such evidence in the prior proceedings, but
merely found that the petitioner's arguments were insufficient, as relying
merely upon attorney argument, we find that the evaluation of the evidence
offered by Petitioner in these proceedings is worthy of scrutiny to decide the
merits of the issue, and that a trial proceeding is the best way to provide such
scrutiny. We do not ultimately decide the merits of the evidence presented
in the DeVore Declaration at this time, but only that such evidence is
credible and probative.

The Patent Owner presents two arguments in opposition to the
testimony offered in the DeVore Declaration. The first is that Dr. DeVore is
not a "person of ordinary skill in the art" as defined in the prior proceedings
and in the parallel district court litigation. *See* 2019-01617 Resp. 26 (citing
Ex. 1003). The Patent Owner contends that, due to Dr. DeVore's
experience, his personal knowledge would not have been knowledge
available to the public and, as such, not characteristic of that of a skilled
artisan as defined by the Board in the prior proceedings. *Id.* at 36–37.

We do not consider this argument to be relevant to our decision to
institute trial. If, as the Patent Owner argues, Dr. DeVore's qualifications
exceed those of a person of ordinary skill in the art, whether by dint of his
academic qualifications and work history, or his personal knowledge and
experience, we fail to see how this precludes Dr. DeVore from opining as to
what would be the knowledge of a person of ordinary skill in the art. *See
e.g.*, Ex. 1002 ¶¶ 69–72. Such testimony is capable of being challenged by
the Patent Owner at trial, and evaluated by the Board in light of both parties'
arguments.

Case IPR2019-01617
Patent No. 8,822,676 B2

The Patent Owner argues further that Petitioner is constructing, *via* the DeVore Declaration, "an artificial definition of a person of ordinary skill in the art." *See* 2019-01617 Resp. 26. The Patent Owner argues that there is no support for Petitioner's new definition of a person of ordinary skill in the art, which adds additional elements to the definition that the Board adopted earlier in IPR2017-01906. *Id.*

We do not find this argument persuasive. In the present proceedings, the Patent Owner specifically objects to the additional qualification proposed by the Petitioner as being characteristic of a person of ordinary skill in the art, *viz.*:

> A POSITA would also be aware of the process by which FDA reviews dermal filler products and how FDA communicates the results of such reviews to the public. In particular, the POSITA would have known that once FDA has approved a dermal filler, the FDA would have hosted information about that filler on its webpage.

*See* 2019-01617 Pet. 18. We find that whether a person of ordinary skill in the art, as defined by the petitioner in the prior proceedings, i.e.,

> [A] person of ordinary skill … hav[ing] had a B.S. or M.S. in biochemistry, polymer chemistry, medicinal chemistry, pharmaceutical chemistry, or a related field with "several years" of practical experience. Alternatively according to Petitioner the ordinary artisan would have had less practical experience but a Ph.D. in one of those fields, or an M.D. in dermatology, plastic surgery, or a specialty related to the clinical use of dermal fillers

(*Id.*) would have also had this specific knowledge, as part of the performance of her qualifications and duties, is a finding of fact, best determined at trial *via* the evidence and testimony of both parties and evaluated by the Board.

Case IPR2019-01617
Patent No. 8,822,676 B2

We find this to be particularly so because the qualifications recited as defining a person of ordinary skill in the art typically define the broad contours of an artisan's education and capabilities and do not speak to every particular aspect of their knowledge and duties. Given that, we find that whether a person of ordinary skill in this particular art would be "aware of the process by which FDA reviews dermal filler products and how FDA communicates the results of such reviews to the public" is a finding of fact based on evidence presented at trial.

Consequently, and with respect to factors (6) and (7) set forth *supra* in *General Plastic*, we conclude that determination of these facts at trial is not wasteful of the Board's finite resources and are indeed integral to our resolution of these proceedings.

Turning to the DeVore Declaration itself, Dr. DeVore opines that a person of ordinary skill in the art would hold an advanced degree (e.g., Ph.D., M.D., or M.S.) in biochemistry, polymer chemistry, medicinal chemistry, pharmaceutical chemistry, or a related field, and would possess several years of experience developing HA-based medical devices (including crosslinked hyaluronic acid). Ex. 1002 ¶¶ 69–72. According to Dr. DeVore, such a skilled artisan would be aware of both currently marketed dermal fillers, as well as those being publicly tested by medical device companies. *Id.* at ¶ 70. Dr. DeVore testifies that, in his opinion, a person of ordinary skill in the art would have been aware of the process by which FDA reviews applications for new dermal filler products, as well as how the results of those reviews are communicated to the public. *Id.*

Dr. DeVore further testifies that a person of ordinary skill in the art would be aware of products in development by competitor companies, as

39

Case IPR2019-01617
Patent No. 8,822,676 B2

well as the launch of such competitor products.  Ex. 1002 ¶ 71.  Dr. DeVore
notes that, in each of the companies for which he has worked, there has been
a person (or team of people), usually in the marketing department, whose
responsibilities include monitoring press releases, SEC filings and annual
reports, and approvals related to competitor products.  *Id.*  In event such a
relevant product was announced or approved, Dr. DeVore opines, it would
have quickly been brought to the attention of the research personnel, if they
were not already aware of it.  *Id.*

With respect to the CTA Summary, Dr. DeVore acknowledges that he
was directly involved in the development of the product described in the
CTA Summary and, consequently, had personal knowledge of the Elevess
product.  Ex. 1002 ¶ 115.  Dr. DeVore testifies that a skilled artisan *circa*
2006–2008 would have understood the title of the CTA Summary refers to a
potential dermal filler, along the lines of the class of HA dermal fillers such
as Restylane, Perlane, and Hylaform.  *Id.* ¶ 116 (citing e.g., Ex. 1030 ¶¶
0001, 0007, 0022, 0071; Ex. 1006 364; Ex. 1007 161–162).  Dr. DeVore
also states that the package insert for Elevess also identified U.S. Patent
6,537,979 and U.S. Appl. Ser. No. 10/743,557 (which published as U.S.
2005/0136122).  *Id.* (citing Ex. 1031 12).  Dr. DeVore opines that a skilled
artisan would understand that these listed patent documents were relevant to
the CTA product.  *Id.*.

We conclude that Dr. DeVore's testimony, the substance of which the
Patent Owner does not substantively contest in this respect, reasonably and
credibly establishes that a person of ordinary skill in the art would:

> be aware of the process by which FDA reviews dermal filler
> products and how FDA communicates the results of such reviews

Case IPR2019-01617
Patent No. 8,822,676 B2

> to the public. In particular, the POSITA would have known that
> once FDA has approved a dermal filler, the FDA would have
> hosted information about that filler on its webpage

as argued by Petitioner.  *See* 2019-01671 Pet. 18.

Consequently, and for the reasons explained, we decline to exercise our discretion under 35 U.S.C. § 314(a) to deny institution of the Petitioner's Petition to Institute in the present proceedings upon that basis.

*H.*     *The Patent Owner's Response II: 35 U.S.C. § 325(d)*

The Patent Owner next urges the Board to exercise its discretion not to institute trial under 35 U.S.C. § 325(d).  Prelim. Resp. 30.  The Patent Owner argues that the factors set forth in our informative decision in *Becton, Dickinson & Co. v. B. Braun Melsungen AG*, No. IPR2017-01586, Paper 8 at 17–18 (PTAB Dec. 15, 2017) (informative) militate in favor of denying institution of *inter partes* review.  *Id.* at 30–31.  Specifically, the Patent Owner contends that the same, or cumulative, art and arguments advanced by Petitioner were considered and, ultimately, rejected throughout the extensive prosecution history of the '676 patent.  *Id.* at 31.

Specifically, the Patent Owner asserts that Petitioner's expert, Dr. DeVore, disagrees with the inventor and the Examiner with respect to the unexpected results evidence that formed the basis for allowing the '676 patent claims.  Prelim. Resp. 31.  However, argues the Patent Owner, a mere difference of opinion is not sufficient to warrant institution based on references and arguments the Examiner already considered.  *Id.* (citing *Apple Inc. v. Qualcomm Inc.*, No. IPR2018-01453, Paper 7 at 10–15 (PTAB Feb. 27, 2019) (denying institution under § 325(d) where Petitioner relied on

41

Case IPR2019-01617
Patent No. 8,822,676 B2

the same art that the Examiner considered, and the challenge was merely Petitioner's expert disagreeing with the Examiner's interpretation of the art)); *Apotex, Inc. v. Celgene Corp.*, No. IPR2018-00685, Paper 8 at 25–26 PTAB Sept. 27, 2018) (denying institution where "[e]ssentially, Petitioner and [Petitioner's expert] disagree with the Examiner's conclusion that, on balance, the subject matter of the claims would not have been obvious….").

The factors set forth in *Becton, Dickinson* are:

(a) the similarities and material differences between the asserted art and the prior art involved during examination;

(b) the cumulative nature of the asserted art and the prior art evaluated during examination;

(c) the extent to which the asserted art was evaluated during examination, including whether the prior art was the basis for rejection;

(d) the extent of the overlap between the arguments made during examination and the manner in which Petitioner relies on the prior art or Patent Owner distinguishes the prior art;

(e) whether Petitioner has pointed out sufficiently how the Examiner erred in its evaluation of the asserted prior art; and

(f) the extent to which additional evidence and facts presented in the Petition warrant reconsideration of prior art or arguments.

*Becton, Dickinson*, IPR2017-01586, Paper 8 at 17–18.  We consider these factors in turn.

1.    *Becton, Dickinson* factors (a)–(d)

42

Case IPR2019-01617
Patent No. 8,822,676 B2

With respect to these factors, the Patent Owner argues that the two primary references upon which Petitioner relies, and arguments based on those references, are the same or substantially the same as those considered during prosecution of the '676 patent.  Prelim. Resp. 32.

      i.      Lebreton

With respect to Lebreton, the Patent Owner argues that the reference not only appears on the face of the '676 patent, but is expressly cited and incorporated by reference in the specification of the '676 patent.  Prelim. Resp. 32 (citing Ex. 1001 col. 9, ll. 38–40).

The Patent Owner points out that Lebreton was also the primary reference relied upon by the Examiner during prosecution of the '676 patent.  Resp. 32.  The Patent Owner contends that Petitioner advances the same obviousness arguments, based upon Lebreton that were presented and successfully overcome during prosecution.  *Id.* at 32–33.  The Patent Owner notes that Petitioner argues that "Lebreton describes a BDDE-crosslinked HA filler" and "[m]erely adding lidocaine and free HA in conventional amounts to an existing commercial product—which the provisional applications demonstrate is all that Allergan did—is not inventive."  *Id.* at 33 (quoting Pet. 27).  The Patent Owner asserts that this is the same argument, based on Lebreton, raised by the Examiner in Office Actions of May 31, 2011, and December 27, 2011, during prosecution of the '795 patent, and of August 30, 2013, during prosecution of the '676 patent, and that the then-Applicant successfully overcame during prosecution.  *Id.* (citing Ex. 1023 43, 78; Ex. 2005 95).

Case IPR2019-01617
Patent No. 8,822,676 B2

Petitioner replies that, contrary to the Patent Owner's contention that
Lebreton was "distinguished" in prosecution, the Patent Owner never
overcame the *prima facie* conclusions of obviousness made by the
Examiner.  Reply 1–2.  Rather, Petitioner argues, the patents were allowed
based on Allergan's proffered unexpected results, primarily the
unsubstantiated Lebreton Declaration.  *Id.* at 2 (citing Resp. 8–11).
Furthermore, Petitioner argues, the Grounds relying upon Lebreton use
substantially different secondary references (Sadozai, etc.) than those used
by the Examiner and provide arguments and evidence (including the DeVore
Declaration) not considered by the Examiner.  *Id.* (citing e.g., IPR2019-
01506 Pet. 51–62 (arguing the unsupported inventor declaration of
unexpected results is contradicted by the evidence).  Petitioner urges the
Board to institute so it can resolve the disputed fact issue of unexpected
results during trial.  *Id.* (citing *Mylan Pharmaceuticals Inc. v. Biogen MA
Inc.*, IPR2018-01403, Paper 12, 37–38 (Feb. 6, 2019).

ii.    Kinney

Turning to the Kinney reference, the Patent Owner argues that Kinney
was considered by the Examiner during prosecution of the '676 patent.
Prelim. Resp. 33.  Specifically, the Patent Owner (then the Applicant)
brought the Kinney reference to the Examiner's attention via an IDS filed on
April 10, 2014, and that the Examiner acknowledged review of Kinney in
the Notice of Allowance filed on July 18, 2014.  *Id.* (citing Ex. 2005 32).
The Patent Owner therefore argues that Kinney (which appears on the face
of the '676 patent) was expressly considered during prosecution of the '676
patent.  *Id.* at 33–34.

44

Case IPR2019-01617
Patent No. 8,822,676 B2

The Patent Owner asserts that Kinney is cumulative of Lebreton (Ex. 1029), Wang (Ex. 1047), Calias (Ex. 1048), and Marko (Ex. 2004), all of which were cited by the Examiner during prosecution of the '676 and '795 patents. Prelim. Resp. 34. According to the Patent Owner, Petitioner relies on Kinney (Ex. 1012) for its disclosure that (1) "Restylane is an injectable dermal filler containing 20 mg/mL of BDDE-crosslinked HA particles with a high concentration of 'minimally modified HA molecules'" and (2) a skilled artisan would have been motivated to include lidocaine in an HA filler. *Id.* (citing Pet. 26, 41–42). The Patent Owner contends that Petitioner merely repeats the same arguments set forth by the Examiner with respect to the references that the Patent Owner overcame during prosecution of the '676 and '795 patents. *Id.* at 34–35.

Petitioner disputes Patent Owner's assertions that Kinney is cumulative of Lebreton, Wang, etc. Reply 4. Petitioner points out that Kinney teaches a BDDE-crosslinked gel and teaches inclusion of an anesthetic. *Id.* Petitioner asserts that Kinney expressly teaches the clinical use of a sterile, stable, DEO-crosslinked-HA filler with lidocaine (Puragen Plus). *Id.* Furthermore, Petitioner argues, in each Ground, Kinney is used as a starting point—the crosslinker is replaced with BDDE. Reply 5. Petitioner argues that the Examiner's rejections were based on adding lidocaine to Lebreton's BDDE-crosslinked gel; the Examiner never considered Petitioner's argument that it would have been obvious to modify the crosslinker in a prior art lidocaine-containing gel. *Id.* Petitioner asserts that, rather than "rehashing" any of the Examiner's arguments, the Kinney Grounds present a new approach. *Id.*

45

Case IPR2019-01617
Patent No. 8,822,676 B2

iii.    Secondary References

The Patent Owner argues further that the secondary references relied upon by Petitioner (*viz.*, Sadozai, CTA Summary, Monheit, Zhao-1, and Narins) are either the same as, or cumulative of, the prior art that was considered, and distinguished, during prosecution of the '676 patent family. Prelim. Resp. 35.  The Patent Owner contends that Sadozai (Ex. 1030) is cumulative of Wang (Ex. 1047), Calias (Ex. 1048), and Marko (Ex. 2004), and was considered by the Examiner during prosecution.  *Id.* (citing Ex. 1001 2).

The Patent Owner notes that Petitioner's argument that, because Sadozai discloses a lidocaine-containing HA composition that was autoclavable, Sadozai is more relevant that Wang, Calias, and Marko. Prelim. Resp. 35.  However, argues the Patent Owner, Sadozai does not describe autoclavable, lidocaine-containing HA compositions crosslinked with BDDE, but rather teaches HA crosslinked with a different crosslinking agent (PBDCI), and is consequently of little probative worth.  *Id.* at 35–36.

The Patent Owner repeats the argument, presented *supra*, that the CTA Summary is not a printed publication.  Prelim. Resp. 36.  However, the Patent Owner argues, even if, *arguendo*, the CTA Summary is a printed publication, it is irrelevant because it fails to establish that a person of ordinary skill in the art would have reasonably expected the lidocaine in Lebreton's BDDE-crosslinked gels to behave similarly to that in the PBDCI-crosslinked HA gels of Sadozai and the CTA Summary.  *Id.*  The Patent Owner again argues that this issue was raised by the Examiner during prosecution of the '676 patent family, which was ultimately allowed based

46

Case IPR2019-01617
Patent No. 8,822,676 B2

upon then-Applicant's unexpected results related to stability.  *Id.* (citing Ex. Ex. 2005 11).

With respect to Monheit (which relates only to claim 2, the Patent Owner contends that the reference is cumulative of Reinmuller (Ex. 2010), which was before the Examiner during prosecution of the '676 patent. Prelim. Resp. 37 (citing Ex. 1001 2; Ex. 2005 93).  The Patent Owner also observes that, during prosecution of the related '475 patent, the Examiner pointed to Reinmuller for its disclosure of uncrosslinked HA.  *Id.*

With respect to Zhao-1 (Ex. 1058), the Patent Owner argues that it is substantially similar to the relevant disclosure in another Zhao reference, Zhao et al., (US 2004/0127699 A1, July 1, 2004) (Ex. 2006; "Zhao-2"), which was cited during prosecution of the '676 patent family.  Prelim. Resp. 37.

The Patent Owner notes that Petitioner acknowledges that Narins discloses a "description of the same Restylane product disclosed by Kinney."  Prelim. Resp. 38 (quoting Pet. 27).  The Patent Owner argues that Petitioner relies upon Narins as teaching that the Restylane product disclosed by Kinney is heat sterilized and has a shelf life of 1.5 years.  *Id.* The Patent Owner contends, however, that Lebreton, cited on the face of the '676 patent and used as the basis of § 103 obviousness rejections during prosecution of the '676 patent family, states the hydrogels disclosed therein were "packed into syringes and sterilized in an autoclave by means of moist heat."  *Id.* (quoting Ex. 1029 ¶ 70).  Therefore, the Patent Owner argues, Narins is cumulative of at least Lebreton.  *Id.*

47

Case IPR2019-01617
Patent No. 8,822,676 B2

Summarizing, the Patent Owner argues that Petitioner relies upon the same or cumulative art used by the Examiner during prosecution, and makes the same arguments that were successfully overcome.  Prelim. Resp. 38.

Petitioner replies that Sadozai directly refutes the Lebreton Declaration's statement that lidocaine would degrade a HA gel during high temperature sterilization.  Reply 3.  Petitioner points out that neither the Lebreton Declaration nor the pending claims were limited to BDDE-crosslinked gels when the declaration was submitted.  *Id.* (citing Ex. 1023 18–20).

Petitioner argues that Calais and Wang suggest lidocaine (among other anesthetic agents) could be added to a crosslinked HA gel, but neither provides a working example of such gel, much less a heat sterilized gel.  Reply 2–3 (citing Ex 1047 ¶ 54; Ex. 1048, 4).  Petitioner contends that Marko is irrelevant because it discloses a non-HA, *collagen* filler with lidocaine.  *Id.* at 3 (citing Ex. 2004 ¶ 89).

With respect to Cui, Petitioner argues that the reference does not corroborate the Lebreton Declaration.  Reply 3.  Petitioner contends that Cui does not test or compare BDDE to any of the three crosslinkers discussed in the Petitions or the Examiner's art.  *Id.* (citing Ex. 1025).  Furthermore, Petitioner argues, Cui does not even mention lidocaine, much less show that not all lidocaine-containing compositions had the same stability, as the Patent Owner asserts.  *Id.* at 3–4.  Moreover, Petitioner contends that Cui's teaching that DVS crosslinkers are more toxic is irrelevant, given Dr. DeVore's testimony that FDA approved their use.  *Id.* at 4 (citing Ex. 1002 ¶ 242).

48

Case IPR2019-01617
Patent No. 8,822,676 B2

Finally, with respect to the Patent Owner's argument that Zhao-1's disclosure is substantially similar to the relative disclosure of Zhao-2, Petitioner argues that, to the contrary, Zhao-2 is directed to crosslinking of HA and at least one other polymer (i.e., it is not self-crosslinked), whereas Zhao-1 is directed to self-crosslinking HA with, *inter alia*, DEO and BDDE. Reply 6 (citing Ex. 1058 ¶¶ 15–17] E. 2005 ¶¶ 16–18). Petitioner therefore argues that Zhao is directly applicable to the double DEO-crosslinked Puragen Plus taught by Kinney. *Id.*

### 2.    *Becton, Dickinson* factor (e)

The Patent Owner argues that Petitioner has failed to meet the burden of demonstrating how the Examiner allegedly erred in his review of the prior art during prosecution. Prelim. Resp. 40. The Patent Owner contends that Petitioner argues that the Examiner erred in his analysis because he "had an incomplete picture of the prior art." *Id.* (quoting Pet. 64–65). The Patent Owner repeats that the Examiner either considered the references Petitioner alleges were absent (i.e., Lebreton, the CTA Summary, Kinney, and Sadozai) or that references (Monheit, Zhao-1, and Narins) are cumulative of those considered during prosecution of the '676 patent family (i.e., Lebreton, Wang, Calias, Marko, and Zhao-2). *Id.* at 40–41.

The Patent Owner argues further that Petitioner's argument that inventor Lebreton's declaration was "unsubstantiated and erroneous" is unsubstantiated, and that Dr. DeVore's criticism of the data is misplaced. Prelim. Resp. 41 (quoting Pet. 65). The Patent Owner contends that Petitioner's arguments, based on the DeVore Declaration, do not rebut the

49

Case IPR2019-01617
Patent No. 8,822,676 B2

experiments cited in the Specification and in the Lebreton Declaration, or
the Examiner's conclusion of unexpected results. *Id.*

With respect to the Cui reference, the Patent Owner observes that
Petitioner and Dr. DeVore criticize Cui, because Cui did not compare
BDDE-crosslinked HA gels with FDA-approved crosslinking agents, and
because Cui was not prior art. Prelim. Resp. 42 (citing pet. 58–59). The
Patent Owner argues, to the contrary, that Cui teaches such crosslinking
agents. *Id.* (citing Ex. 1025 1506). The Patent Owner notes that Petitioner,
and Petitioner's expert, Dr. DeVore, fail to point to any evidence refuting
Cui's disclosures that BDDE-crosslinked hyaluronic acid gels were known
to be sensitive to heat sterilization relative to other crosslinked HA gels. *Id.*
The Patent Owner argues further that whether Cui qualifies as prior art is
irrelevant. *Id.* at 43. The Patent Owner asserts that post-filing information
and data can be used to demonstrate unexpected results. *Id.* (citing *Knoll
Pharm. Co. v. Teva Pharm. USA, Inc.*, 367 F.3d 1381, 1385 (Fed. Cir.
2004)).

With respect to Petitioner's argument that Sadozai and Kinney both
disclose lidocaine-containing crosslinked HA fillers that had viscosities
similar to crosslinked HA fillers without lidocaine, the Patent Owner
contends that this argument fails to address unexpected results in the context
of the limitations set forth in the claims, e.g., the requirement that lidocaine
be freely released *in vivo*, the pH requirements of claims 10 and 11, and the
storage stability recited in claims 13–21 and 23–31. *Id*. at 44.

Petitioner replies that, as explained *supra*, the art cited in the Petition
differs in key respects from the references reviewed by the Examiner during
prosecution and contradicts the assertions of the Lebreton Declaration during

50

Case IPR2019-01617
Patent No. 8,822,676 B2

examination.  Reply 6.  Petitioner argues that, to the extent there are factual disputes about the interpretation of the Patent Owner's evidence of unexpected results, such disputes are best resolved at trial.  *Id.* at 6–7.

### 3.    *Becton, Dickinson* factor (f)

Finally, the Patent Owner contends that Petitioner fails to present any new evidence weighing in favor of institution.  Prelim. Resp. 45.  The Patent Owner repeats that the references relied upon by the Examiner were of record and/or cumulative of references relied upon by the Examiner, and that the DeVore Declaration is conclusory and fails to provide a well-reasoned rationale or objective support for the proposed grounds.  *Id.* (citing Ex. 1002 ¶¶ 19, 140, 180).

Furthermore, the Patent Owner argues that Dr. DeVore's opinion that the claimed invention is obvious represents an over-simplified view of the invention, aided by the benefit of hindsight.  Prelim. Resp. 46.  According to the Patent Owner, Dr. DeVore discusses how it would have been obvious to modify individual features of the invention claimed in the '676 patent—for example, choice of crosslinker, HA concentration, gel hardness, particle size and distribution, free HA, pH, sterility, and viscosity.  *Id.* at 47 (citing Ex. 102 ¶¶ 82–100).  Dr. DeVore states these "different factors […] could be routinely modified in order to obtain a crosslinked-HA filler having a desired spectrum of clinical characteristics."  *Id.* (quoting Ex. 1002 ¶ 100).  The Patent Owner contends that Dr. DeVore analyzes these factors in isolation, failing to address the interplay between these factors, and that persons of ordinary skill in the contemporaneous art would have recognized that modifying one variable affects the impact of other aspects of the

51

Case IPR2019-01617
Patent No. 8,822,676 B2

composition. *Id.* (citing Ex. 1014 1091–092; Ex. 1022 78; Ex. 1005 124). The Patent Owner contends that Dr. DeVore offers no new evidence to rebut the Examiner's conclusion that the claimed inventions exhibited unexpected results. *Id.* at 48.

Petitioner replies that, contrary to the Patent Owner's contention that that Lebreton was "distinguished" in prosecution, the Patent Owner never overcame the *prima facie* conclusions of obviousness made by the Examiner. Reply 1–2. Rather, Petitioner argues, the patents were allowed based on the Patent Owner's proffered unexpected results, primarily the unsubstantiated Lebreton Declaration. *Id.* at 2 (citing Resp. 8–11). Furthermore, Petitioner argues, the Grounds relying upon Lebreton use substantially different secondary references (Sadozai, etc.) than those used by the Examiner and provide arguments and evidence (including the DeVore Declaration) not considered by the Examiner. *Id.* (citing e.g., IPR2019-01506 Pet. 51–62 (arguing the unsupported inventor declaration of unexpected results is contradicted by the evidence)). Petitioner urges the Board to institute so it can resolve the disputed fact issue of unexpected results during trial. *Id.* (citing *Mylan Pharmaceuticals Inc. v. Biogen MA Inc.*, IPR2018-01403, Paper 12, 37–38 (Feb. 6, 2019)).

Petitioner replies that the Petition presents substantial new evidence and disputes the Patent Owner's contention that Dr. DeVore's testimony is "conclusory" and "without evidentiary support," contending that the Patent Owner's citations to the DeVore Declaration come from an introductory paragraph, and omit Dr. DeVore's reasoning. Reply 7.

52

Case IPR2019-01617
Patent No. 8,822,676 B2

G.    *The Board's Decision with respect to the Patent Owner's argument re 35 U.S.C. § 325(d)*

We decline to accept the Patent Owner's invitation to exercise our discretion under Section 325(d) and not institute *inter partes* review.

1.    *Becton, Dickinson* factors (a)–(d)

Despite the Patent Owner's assertions to the contrary, we find that the Patent Owner (the then-Applicant) did not overcome the combined teachings of Lebreton, Sadozai, the CTA Summary, and Monheit during prosecution. To the contrary, the then-Applicant persuaded the Examiner that, despite the Examiner's *prima facie* conclusion that the claims were obvious over the prior art, secondary considerations, *viz.*, the allegedly unexpected results disclosed in the Lebreton Declaration, sufficed to persuade the Examiner that the proposed claims were patentable.  *See* Ex. 1023 8.  Specifically, the Examiner, in the Notice of Allowance, remarked that: "Applicant argues that they have unexpectedly found that the addition of lidocaine to the instant hyaluronic acid soft tissue filler did not result in instability of the composition as was expected by those of ordinary skill in the art at the time of the instant invention."  *Id.* at 9.

Petitioner's expert, Dr. DeVore, attacks the credibility of the Lebreton Declaration as failing, *inter alia*, to provide any evidentiary support for its characterization of what a person of ordinary skill in the art would have believed "shortly prior to August 4, 2008."  Ex. 1002 ¶ 198.  We find this assertion persuasive.  The Lebreton Declaration cites no evidence of record in support of what a person of ordinary skill would have understood to be the state of the art at the time of invention, other than the unsupported

53

Case IPR2019-01617
Patent No. 8,822,676 B2

opinion of the inventor of the '884 application, Dr. Lebreton.  Dr. DeVore

disagrees with Dr. Lebreton, and provides evidentiary support for his

contention that lidocaine could be added to a crosslinked HA composition

and sterilized without degrading the composition.  *See* Ex. 1002 ¶¶ 197–198.

Specifically, Dr. DeVore declares that:

> As explained throughout much of this declaration, the prior art explicitly taught that lidocaine had been successfully combined with several other crosslinked-HA dermal fillers, leading to (at least) the products Prevelle Silk, Elevess, and Puragen Plus. The POSITA would have been aware of these products and would have also been aware of the references cited in "Grounds" of the Petition and this declaration, as well as other publications such as Toth and Hanke. Each of these references except for Hanke explicitly describe a crosslinked-HA dermal filler combined with lidocaine, and the POSITA would have understood Hanke's HA composition was crosslinked as well. Further a POSITA would have understood that each of the commercial products, as described in the various references cited, would have been sterilized and "sufficiently stable" (to use Lebreton's words from his declaration) in order to obtain FDA approval and be competitive in the marketplace.

*Id.* at ¶ 198.

Balancing the statements and evidence presented in the two

Declarations, we find Dr. DeVore's to be better supported by evidence than

the Lebreton Declaration and, consequently, more credible, and not a mere

"difference of opinion," as argued by the Patent Owner.  *See* Prelim. Resp.

31.  We consequently conclude that, had the evidence in the DeVore

Declaration been presented to the Examiner during prosecution of the '884

patent, there is a reasonable likelihood that the Examiner would have

Case IPR2019-01617
Patent No. 8,822,676 B2

maintained the rejection of the claims of the '884 application, and that the

'676 patent would not have issued.

We find, similarly, with respect to Ground 3, that the DeVore

Declaration's assessment of the state of the art, and the knowledge of a

person of ordinary skill in that art, are supported by evidence and,

consequently, more persuasive than the unsupported opining of the Lebreton

Declaration.  We find particularly persuasive Dr. DeVore's conclusion, with

respect to the combination of Kinney and Zhao, that:

> Because BDDE and DEO are each bis-epoxide crosslinkers, the
> POSITA would have reasonably expected that Zhao process
> could be adapted to use BDDE instead of DEO. Both crosslinkers
> rely on the same chemistry—nucleophilic epoxide opening by
> the N-acetyl glucosamine primary alcohol, followed by
> nucleophilic epoxide opening by the glucoronic acid
> carboxylate. In both cases, epoxide opening results in the
> presence of a secondary alcohol in the crosslinking chain. Given
> the high degree of similarity between the two crosslinkers, the
> POSITA would reasonably expect that lidocaine would function
> analogously in both crosslinked gels.

Ex. 1002 ¶ 176.

For the same reason, we are not persuaded that the results of Example

4 are necessarily probative of unexpected results.  "[W]hen unexpected

results are used as evidence of nonobviousness, the results must be shown to

be unexpected compared with the closest prior art."  *In re Baxter Travenol

Labs.*, 952 F.2d 388, 392 (Fed. Cir. 1991).  Zhao-1 teaches that the stable

DEO double-crosslinked HA of Kinney are interchangeable with BDDE

crosslinks.  Ex. 1058 ¶ 19.  Consequently, Kinney and Zhao represent the

closest prior art.  However, the Lebreton Declaration is silent regarding these

references.  Accordingly, we do not find the Lebreton's conclusion that the

55

Case IPR2019-01617
Patent No. 8,822,676 B2

claimed compositions possessed unexpected or surprising properties in view of the closest prior art to be persuasive.

Because we conclude that the statements of the DeVore Declaration, supported by evidence, concerning the state of the art at the time of invention, and the knowledge of a person of ordinary skill in the art, are more credible than the unsupported opinions of the Lebreton Declaration, we find that, had that evidence been before the Examiner, there is a reasonable likelihood that the Examiner would have sustained the *prima facie* conclusion of obviousness under Section 103, discounting what was then interpreted as evidence of unexpected results.

Moreover, as the DeVore Declaration points out, Sadozai directly refutes the Lebreton Declaration's averral that lidocaine would degrade a HA gel during high temperature sterilization.  See Reply 2–3; *see also* Ex. 1002 ¶¶ 31–35, 39, 43, 49, 130–131, 144.  We accordingly determine that, because Sadozai was of record during examination of the '676 patent, the Examiner erred by failing to appreciate the relevance of the teachings of Sadozai during evaluation of the Lebreton Declaration.  We consequently find that *Becton, Dickinson* factors (a)-(d) weigh in favor of institution.

### 2.     *Becton, Dickinson* factor (e)

Similarly, we find that Petitioner has pointed out sufficiently how the Examiner erred in evaluating the asserted prior art.  Again, we emphasize that the Patent Owner did not overcome the Examiner's conclusion that the claims were obvious over the prior art, but relied, rather, on the Lebreton Declaration as establishing that the claimed composition possessed properties that were unexpected or surprising over the closest prior art.

Case IPR2019-01617
Patent No. 8,822,676 B2

These findings were dependent upon the Lebreton Declaration's
unsupported statements concerning the state of the art and the level of
knowledge of a person of ordinary skill in the art.

Nor, and for the reasons we have explained *supra*, do we find
persuasive the Lebreton Declaration's opinion that the properties exhibited
by the claimed composition were unexpected in view of the closest prior art.
We find persuasive Petitioner's argument, supported by evidence adduced in
the DeVore Declaration, that:

> [A skilled artisan] would have been aware of commercial
> lidocaine-containing crosslinked HA dermal fillers such as
> Elevess, Prevelle Silk and Puragen Plus, as well as the disclosure
> of the prior art documents cited [in the Petition], including
> Sadozai and Kinney. Each of these products and references
> expressly teach, or suggest, that crosslinked HA lidocaine-
> containing fillers were sterilizable, and were sufficiently stable
> to be approved by FDA as a dermal filler.

Pet. at 52–53 (citing Ex. 1002 ¶¶ 194, 198–199).

### 3.    *Becton, Dickinson* factor (f)

Factor (f) of *Becton, Dickinson* requires us to inquire whether as to the
extent to which additional evidence and facts presented in the Petition
warrant reconsideration of prior art or arguments. *Becton, Dickinson*,
IPR2017-01586, Paper 8 at 18. Once again, we turn to whether the evidence
presented in the DeVore Declaration is sufficient to persuasively challenge
that presented in the Lebreton Declaration during examination. The Patent
Owner argues that the DeVore Declaration is "conclusory" and fails to
provide a well-reasoned rationale or objective support for the proposed
grounds. Prelim. Resp. 45. We do not agree.

57

Case IPR2019-01617
Patent No. 8,822,676 B2

> The Lebreton Declaration asserts that:
>
> It was believed that adding lidocaine to hyaluronic acid gel compositions during manufacturing caused degradation to the hyaluronic acid prior to injection of the HA as a dermal filler.
>
> It was believed that lidocaine caused degradation of the HA gel compositions during high temperature sterilization
>
> It was not known whether HA compositions comprising lidocaine were stable or not after high temperature sterilization when placed in storage for any significant length of time.
>
> It was also believed that the instability of HA described above would have caused a viscosity reduction of the HA that would make it unsuitable for soft tissue filling applications.
>
> Based upon the facts set forth above, a person of ordinary skill in the art would have expected that a dermal filler comprising hyaluronic acid and lidocaine would not have remained sufficiently stable to be useful as a soft tissue filler.
>
> It was not appreciated that a dermal filler comprising a cohesive gel of hyaluronic acid makes it possible for lidocaine to be combined with hyaluronic acid in a gel that is sufficiently stable to be useful as a soft tissue filler.

Lebreton Decl. ¶¶ 5–10. Each of these statements represents the opinion of Dr. Lebreton, but we note that they are not supported by any evidence of record in the Declaration.

Also before the Examiner at that time was Cui, which the Patent Owner argues demonstrates that HA crosslinked with BDDE was "known to be especially sensitive to heat sterilization relative to HA crosslinked with other, i.e. non-BDDE crosslinkers," so that the discovery of the claimed sterile compositions was, allegedly, unexpected and surprising, given the

58

Case IPR2019-01617
Patent No. 8,822,676 B2

supposedly unstable nature of HA-based gels crosslinked with BDDE even without the addition of lidocaine.  *See* Ex. 1023 28.

In his Declaration, Dr. DeVore notes that: "The statements in the declaration were not limited to fillers containing both BDDE-crosslinked HA and free HA.  Moreover, I understand that when the declaration was submitted, the pending claims were not limited to BDDE-crosslinked HA." DeVore Decl. ¶ 196 (citing Ex. 1023 18–20, claims 51–67).  Dr. DeVore asserts that:

> [A] skilled artisan would have been aware of commercial, lidocaine-containing, crosslinked HA dermal fillers such as Elevess, Prevelle Silk and Puragen Plus, as well as the teachings of the prior art documents cited in the Petition, including Sadozai and Kinney.  *Id.* at 52–53.  *Each of these products and references expressly teach, or suggest, that crosslinked HA lidocaine-containing fillers were sterilizable, and were sufficiently stable to be approved by FDA as a dermal filler.*

DeVore Decl. ¶ 198.  Similarly, the Dr. Lebreton points to the experiments presented in the Specification of the '884 application, stating that:

> The experiments showed that certain HA gels, when mixed with lidocaine, degraded and became substantially less viscous after high temperature sterilization, specifically autoclave sterilization, as would have been expected by one of ordinary skill in the art. [referring to samples 1, 2, 3, Figs. 1–3].

> I discovered that other HA gels, when mixed with lidocaine, maintained their viscosity and elasticity, even after such high temperature sterilization. [referring to samples 4, 5, 6, Figs. 4, 5, 7].

Lebreton Decl. ¶¶ 13–14.

Responding to these statements, Dr. DeVore states:

Case IPR2019-01617
Patent No. 8,822,676 B2

> In my opinion, Sample 1 is completely irrelevant—it is a mixture of uncrosslinked HA and a completely different polymer (hydroxypropyl methylcellulose). I am not aware of a mixture of uncrosslinked HA and HMPC being used as a dermal filler, either in 2008 or now.
>
> Moreover, Allergan's experiment and its interpretation of the results fundamentally misunderstands the point of stability testing. The consideration whether a crosslinked HA composition would be suitable as a dermal filler depends on its *final* viscosity, not how much the viscosity drops during sterilization.
> ….
> Allergan argued the viscosity differences, measured at 0.1 Hz, indicated that Samples 1-3 were not stable to autoclave sterilization. EX1023, 26- 27. In my opinion, the data does not support that conclusion. The final viscosity for Samples 2 and 3 in each test (~75-375 Pa*s) is substantially the same as the final viscosities of Samples 4-6 (~50-90 Pa*s), all of which are within the range of marketed dermal fillers (50-1,200 Pa*s). EX1039, 267.

DeVore Decl. ¶¶ 206–208.

In short, Dr. DeVore points to prior art that is evidence of record to rebut the unsupported statements of the Lebreton Declaration concerning the state of the prior art, as well as a skilled artisan's knowledge of that art. Dr. DeVore also provides evidence-based arguments that undermine the probative value of the tests in Example 4 as indicative of unexpected or surprising results.

Contrary to the Patent Owner's arguments, we do not find these statements to be "conclusory" or lacking in objective support. The Patent Owner may attempt to rebut the statements of the DeVore Declaration at trial, but, in our view, the DeVore Declaration asserts evidence of record and

60

Case IPR2019-01617
Patent No. 8,822,676 B2

arguments that presumptively rebut the Lebreton Declaration, and consequently warrant denial of the Patent Owner's request that we deny institution.

## V. CONCLUSION

For the reasons we have explained, we conclude that Petitioner has made a sufficiently persuasive showing that the cited references would have taught or suggested the elements of claims 1–31, and set forth a sufficient rationale for why a person of ordinary skill would have been motivated to combine these teachings and suggestions to arrive at the invention recited in those claims. Petitioner has established a reasonable likelihood of prevailing in demonstrating that claims 1–31 would have been obvious over the combinations of prior art set forth in the asserted grounds.

## ORDER

In consideration of the foregoing, it is hereby:

ORDERED, pursuant to 35 U.S.C. § 314(a), that an *inter partes* review of claims 1–31 of the '676 patent is instituted with respect to all grounds set forth in the Petition; and

FURTHER ORDERED, pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4(b), that the *inter partes* review of the '676 patent shall commence on the entry date of this Order, and notice is hereby given of the institution of a trial.

Case IPR2019-01617
Patent No. 8,822,676 B2


FOR PETITIONER:

Christopher L. Curfman
William W. Cutchins
MEUNIER CARLIN & CURFMAN LLC
ccurfman@mcciplaw.com
wcutchins@mcciplaw.com


FOR PATENT OWNER:

Dorothy P. Whelan
Michael Kane
FISH & RICHARDSON P.C.
whelan@fr.com
kane@fr.com

Trials@uspto.gov
571-272-7822

Paper 18
Date: March 19, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

PROLLENIUM US INC.,
Petitioner,

v.

ALLERGAN INDUSTRIE, SAS,
Patent Owner.

———————

IPR2019-01505
Patent 8,450,475 B2

———————

Before JOHN G. NEW, SHERIDAN K. SNEDDEN, and
ROBERT A. POLLOCK, *Administrative Patent Judges.*

POLLOCK, *Administrative Patent Judge*.

DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314, 37 C.F.R. § 42.4*

IPR2019-01505
Patent 8,450,475 B2

# I.   INTRODUCTION

## A.   Background

Prollenium US Inc. ("Petitioner") filed a Petition for *inter partes* review of claims 1–9, 18, and 27–37 of U.S. Patent No. 8,450,475 B2 ("the '475 patent," Ex. 1001).  Paper 2 ("Pet.").  Allergan Industrie, SAS ("Patent Owner") timely filed a Preliminary Response.  Paper 6 ("Prelim. Resp."). On January 10, 2020, we issued an Order granting Petitioner's request for additional briefing regarding whether we should exercise our discretion to deny the Petition under §325(d) and/or §314(a).  Paper 12.  In response to our Order, Petitioner filed a Reply to the Patent Owner Preliminary Response (Paper 13, "Reply"), and Patent Owner filed a corresponding Sur-reply (Paper 17, "Sur-reply").  We review the Petition, Preliminary Response, Reply, Sur-reply, and accompanying evidence under 35 U.S.C. § 314.

## B.   Summary of the Institution Decision

For the reasons provided below, we determine Petitioner has satisfied the threshold requirement set forth in 35 U.S.C. § 314(a).  Because Petitioner has demonstrated a reasonable likelihood that at least one claim of the '475 patent is unpatentable, we institute an *inter partes* review of the challenged claims.

## C.   Real Parties-in-Interest

Petitioner identifies its real parties-in-interest as Prollenium US Inc. and Prollenium Medical Technologies Inc.  Pet. 69.  Patent Owner identifies its real parties-in-interest as Allergan Industrie, SAS; Allergan USA, Inc.; Allergan Sales, LLC; Allergan Holdings France SAS; Allergan Holdings Limited; Allergan Holdings, Inc.; Allergan Puerto Rico Holdings, Inc.; and Allergan, Inc.  Paper 3, 2.

2

IPR2019-01505
Patent 8,450,475 B2

    D.    *Related Matters*

    The '475 patent is at issue in *Allergan USA, Inc. et al. v. Prollenium US Inc., et al.*, Case No. 1:19-cv-00126 (D. Del. filed Jan. 22, 2019). Pet. 70, Paper 3, 2. The '475 patent was the subject of two previous *inter partes* reviews: In IPR2014-01417, the Board denied institution for failure to timely identify all real parties in interest, and subsequently terminated proceedings on June 19, 2015, in response to the parties' joint motion to terminate. The Board denied the petition in IPR2017-02002 (Ex. 1067) on its merits on March 9, 2018 (Ex. 3001, "the 02002 IPR").

    In addition to the '475 patent challenged here, Petitioner has filed Petitions for *inter partes* review of related U.S. patents as follows: U.S. Patent No. 8,357,795 B2 ("the '795 patent") in IPR2019-01506 and IPR2019-01632; U.S. Patent No. 8,822,676 B2 ("the '676 patent") in IPR2019-01617; U.S. Patent No. 9,089,519 B2 ("the '519 patent") in IPR2020-00084; U.S. Patent No. 9,238,013 B2 ("the '013 patent") in IPR2019-01508; and U.S. Patent No. 9,358,322 B2 ("the '322 patent") in IPR2019-01509. Pet. 70; Paper 3, 2–3. The '795, '676, '519, '013, and '332 patents are also at issue in *Allergan USA, Inc. et al v. Prollenium US Inc., et al.*, Case No. 1:19-cv-00126 (D. Del. filed Jan. 22, 2019). *Id.*

IPR2019-01505
Patent 8,450,475 B2

> E.      Asserted Grounds of Unpatentability

Petitioner asserts six grounds of unpatentability.  Pet. 1–2.

| Ground | Claims | 35 U.S.C. § | Asserted References |
|---|---|---|---|
| 1 | 1–9, 18, 27–37 | 103(a)[1] | Lebreton,[2] Sadozai,[3] Monheit[4] |
| 2 | 1–9, 18 | 103(a) | Lebreton, Sadozai, Clark[5] |
| 3 | 27–37 | 103(a) | Lebreton, Sadozai, Smith[6] |
| 4 | 1–9, 18, 27–37 | 103(a) | Kinney,[7] Zhao,[8] Narins,[9] Monheit |
| 5 | 1–9, 18 | 103(a) | Kinney, Zhao, Narins, Clark |
| 6 | 27–37 | § 103(a) | Kinney, Zhao, Narins, Smith |

---

[1] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) ("AIA"), amended 35 U.S.C. §§ 102 and 103.  Because the challenged claims of the '475 patent have an effective filing date before the effective date of the applicable AIA amendments, we refer to the pre-AIA versions of 35 U.S.C. § 103 throughout this Decision.

[2] Lebreton, US 2006/0194758, published Aug. 31, 2006.  Ex. 1029.

[3] Sadozai, US 2005/0136122 A1, published Jun. 23, 2005.  Ex. 1030.

[4] Monheit, *Hyaluronic Acid Fillers: Hylaform and Captique*, 15 FACIAL PLAST. SURG. CLIN. N. AM. 77–84 (2007).  Ex. 1022.

[5] Clark, *Animal-Based Hyaluronic Acid Fillers: Scientific and Technical Considerations*, 120 PLASTIC AND RECONSTRUCTIVE SURG. 27S–32S (2007). Ex. 1008.

[6] Smith, *Practical Use of Juvéderm: Early Experience*, 120 PLASTIC AND RECONSTRUCTIVE SURG. 67S–73S (2007).  Ex. 1009.

[7] Kinney, *Injecting Puragen Plus into the Nasolabial Folds: Preliminary Observations of FDA Trial*, 26 AESTHETIC SURG. J. 741–748 (2006). Ex. 1012.

[8] Zhao, US 2005/0250939 A1, published Nov. 10, 2005.  Ex. 1058.

[9] Narins and Bowman, *Injectable Skin Fillers*, 32 CLIN. PLAST. SURG. 151–162 (2005).  Ex. 1007.

4

IPR2019-01505
Patent 8,450,475 B2

In support of its patentability challenges, Petitioner relies on, *inter alia*, the Declaration of Dale P. DeVore, Ph.D.  Ex. 1002.

  F. *The '475 Patent and Relevant Background*

    1. *Specification*

According to the '475 patent's Specification, soft tissue fillers have been developed to treat or correct the effects of aging by filling in facial lines and depressions and restoring fat loss-related tissue volume.  Ex. 1001, 1:30–34.  Hyaluronic acid ("HA")-based fillers have been used since 2003 as hyaluronic acid "has excellent biocompatibility and does not cause allergic reactions when implanted into a patient."  *Id.* at 1:60–2:6.  Chemically crosslinked HA was developed to improve *in vivo* stability of hyaluronic acid fillers.  *Id.* at 2:7–19.  These compositions may contain a mixture of crosslinked and free hyaluronic acid to provide stability and surgical usability.  *See id.*  According to the '475 patent's Specification, hyaluronic acid compositions containing therapeutic agents, e.g., lidocaine, are absent in the art because "HA-based injectable compositions which incorporate lidocaine during the manufacturing process are prone to partial or almost complete degradation prior to injection, particularly during high temperature sterilization steps and/or when placed in storage for any significant length of time."  *Id.* at 2:20–27.

The '475 patent's Specification discloses "stable" hyaluronic acid soft tissue fillers that include a therapeutically effective amount of lidocaine.  *Id.* at 5:25–44.  The Specification states that the hyaluronic acid compositions containing lidocaine have "an enhanced stability[] relative to conventional HA-based compositions . . . when subjected to high temperatures and pressures, for example, those experienced during heat and/or pressure sterilization techniques, for example, autoclaving."  *Id.* at 5:31–38; *see* 5:39–

IPR2019-01505
Patent 8,450,475 B2

44 (defining stability in terms of specific properties or characteristics of the composition).  The Specification states that "[i]t is a surprising discovery that formulations of crosslinked HA-based compositions including lidocaine can be manufactured in a manner in accordance with the invention to produce sterilization-stable, injectable HA/lidocaine compositions." *Id.* at 6:55–58.  According to the Specification, "[t]he crosslinking agent may be any agent known to be suitable for crosslinking polysaccharides and their derivatives via their hydroxyl groups. Suitable crosslinking agents include but are not limited to, 1,4-butanediol diglycidyl ether (or 1,4-bis(2,3-epoxypropoxy)butane or 1,4-bisglycidyloxybutane, all of which are commonly known as BDDE), 1,2-bis(2,3-epoxypropoxy)ethylene and 1-(2,3-epoxypropyl)-2,3-epoxycyclohexane." *Id.* at 9:8–15.

The '475 patent's Specification discloses an example of a soft tissue filler with lidocaine as Example 2.  *Id.* at 12:20–13:26.  The filler includes hyaluronic acid crosslinked with 1,4-butanediol diglycidyl ether ("BDDE"), combined with lidocaine HCl, and free (uncrosslinked) hyaluronic acid.  *Id.* After mixing, the resulting gel is "filled into Ready-to-Fill sterile syringes and autoclaved at sufficient temperatures and pressures for sterilization for at least about 1 minutes." *Id.* at 13:15–18.  The Specification states that "the autoclaved HA/lidocaine product has [] viscosity, cohesivity, and extrusion force that are acceptable" and may be "packaged and distributed to physicians." *Id.* at 13:19–24.  "No degradation of the HA/lidocaine gel product is found during testing of the product after the product has spent several months in storage." *Id.* at 13:24–26.

6

IPR2019-01505
Patent 8,450,475 B2

### 2. *Challenged Claims*

The '475 patent includes 37 claims. Of these, Petitioner challenges claims 1–9, 18, and 27–34. Pet 1. The challenged independent claims, claims 1, 18, 27, 31, and 34 recite:

> 1. A stable, sterile soft tissue filler comprising:
>
> a hyaluronic acid (HA) component comprising HA crosslinked with 1,4-butanediol diglycidyl ether (BDDE), and uncrosslinked HA, wherein the HA component comprises greater than about 10% uncrosslinked HA by volume; and
>
> lidocaine combined with said crosslinked HA component.

Ex. 1001, 16:40–46.

> 18. A stable, sterile soft tissue filler comprising:
>
> a hyaluronic acid (HA) component crosslinked with 1,4-butanediol diglycidyl ether (BDDE), said HA component having a degree of crosslinking of less than about 5% and uncrosslinked HA in an amount of at least about 10% by volume of the HA component; and
>
> lidocaine having a concentration of about 0.3% by weight of said soft tissue filler;
>
> wherein the soft tissue filler has been heat sterilized.

*Id.* at 17:32–40.

> 27. A stable, sterile soft tissue filler composition comprising:
>
> a 1,4-butanediol diglycidyl ether (BDDE)-crosslinked hyaluronic acid (HA) having a degree of crosslinking of about 2% to about 20%;
>
> at least 10% free HA by volume; and
>
> about 0.1% to about 5% lidocaine by weight of the composition.

*Id.* at 18:14–21.

> 31. A heat-sterilized, stable dermal filler comprising:

IPR2019-01505
Patent 8,450,475 B2

> a hyaluronic acid (HA) comprising both crosslinked HA and uncrosslinked HA, the crosslinked HA being crosslinked with 1,4-butanediol diglycidyl ether (BDDE) and having a degree of crosslinking of less than about 5%; and
>
> lidocaine at a concentration of about 0.3% by weight of said dermal filler;
>
> the dermal filler having a pH of about 7.

*Id.* at 18:28–36.

> 34. A stable, sterile soft tissue filler comprising:
>
> a hyaluronic acid (HA) component comprising HA crosslinked with 1,4-butanediol diglycidyl ether (BDDE), and uncrosslinked HA; and
>
> lidocaine at a concentration of about 0.3% by weight of the soft tissue filler combined with said crosslinked HA component; wherein the soft tissue filler is stable after heat sterilization at between about 120 degrees C. and about 130 degrees C.; and
>
> wherein the soft tissue filler has a pH of about 7.

*Id.* at 18:42–52.

> 3.   *Relevant Prosecution History*

The parties agree that the prosecution histories of the '475 patent and the '795 patent, are relevant to the issued claims of the '475 patent.  Pet. 10; Prelim. Resp. 4.  The '475 patent matured from U.S. Application Serial No. 12/393,768 ("the '768 application," Ex. 1033), whereas the '795 patent matured from U.S. Application Serial No. 12/393,884 ("the '884 application," Ex. 1023).  Ex. 1001 code (60); Ex. 3002, code (60).  Both patents claim priority to the same three provisional application: Nos. 61/085,956 (Ex. 1013, "the '956 application"); 61/087,934 (Ex. 1028, "the '934 application"); and 61/906,278 (Ex. 1044, "the '278 application").  *Id.* As indicated on the front pages of the '475 and '795 patents, the same

IPR2019-01505
Patent 8,450,475 B2

Examiner allowed both patents.  Patent Owner reviews the relevant prosecution history on pages 4–12 of the Preliminary response, which we briefly summarize below.

During the prosecution leading to the issuance of the '475 patent, the Examiner rejected the claims as obvious over Lebreton and Reinmuller.[10] Ex. 1033, 68–71.  The Examiner found that Lebreton disclosed a sterile soft tissue filler containing hyaluronic acid crosslinked with BDDE.  *Id.* at 70 (citing Ex. 1029 ¶¶ 74, 76).  The Examiner found Reinmuller disclosed mixtures of crosslinked hyaluronic acid with up to 20% uncrosslinked hyaluronic acid (*id.* at 70–71 (citing Ex. 2004, 2:41–46; 5:1–26)), as well as the addition of a local anesthetic, e.g., lidocaine, to the hyaluronic acid mixture to minimize pain from the injection (*id.* at 71 (citing Ex. 2004, 2:54–63; 3:28–30)).[11]  The Examiner determined one of ordinary skill in the art would have been motivated to add Reinmuller's uncrosslinked hyaluronic acid and lidocaine to Lebreton's BDDE-crosslinked hyaluronic acid preparation "to treat inflammation associated with administration of the soft tissue filler and also to treat any pain associated with the injection of the gel into the soft tissue."  *Id.*  Following a response by the Applicant, the Examiner applied the same analysis in a Final Rejection.  *Id.* at 16–23.

In an Examiner's Interview after the Final Rejection, the Applicant proposed amendments "to limit claims to the crosslinking agent being

---

[10] WO 2005/067944 A1, published Jul. 28, 2005, cited as U.S. Patent No. 7,902,171 B2, issued Mar. 8, 2011.  Ex. 2004.

[11] As discussed in detail on pages 4–8 of the Preliminary Response, Applicant overcame rejections based on Lebreton in combination with Wang (Ex. 1047) and Lupo (Ex. 1005) by amending the claims to recite that the crosslinked HA component is "greater than about 10% uncrosslinked HA by volume."

9

IPR2019-01505
Patent 8,450,475 B2

BDDE, the anesthetic being lidocaine, and the composition being sterilized."
*Id.* at 12.  Applicant also indicated that they unexpectedly found that the
addition of lidocaine to the filler composition did not cause the composition
to become un-stable as was expected."  *Id.* at 12.  The Applicant submitted
an after-final amendment, amending the independent claims to recite, *inter
alia*, a "stable, sterile soft tissue filler" comprising hyaluronic acid
crosslinked with BDDE, uncrosslinked hyaluronic acid, and lidocaine.
Ex. 2005, 3–9.

During the prosecution of the '884 application, the Examiner rejected
all pending claims in view of Lebreton in view of Calais (US Pat. No.
6,521,223 B1) and Marko (US Pat. Appln. 2004/01011959).  *See* Ex. 1023,
42–47.  In response, Applicant submitted a Declaration by the inventor,
Pierre F. Lebreton, Ph.D. (Ex. 1024).  *Id.* at 22; Ex. 1024.  In addressing the
prior art as of the date of the invention, Dr. Lebreton testified that:

5.      It was believed that adding lidocaine to hyaluronic acid gel
compositions during manufacturing caused degradation of the
hyaluronic acid prior to injection of the HA as a dermal filler.

6.      It was believed that lidocaine caused degradation of HA
gel compositions during high temperature sterilization.

7.      It was not known whether HA compositions comprising
lidocaine were stable or not after high temperature sterilization
when placed in storage for any significant length of time.

8.      It was also believed that the instability of HA described
above would have caused a viscosity reduction of the HA that
would make it unsuitable for soft tissue filling applications.

9.      Based upon the facts set forth above, a person of ordinary
skill in the art would have expected that a dermal filler
comprising hyaluronic acid and lidocaine would not have
remained sufficiently stable to be useful as soft tissue filler.

10

IPR2019-01505
Patent 8,450,475 B2

> 10.   It was not appreciated that a dermal filler comprising a cohesive gel of hyaluronic acid makes it possible for lidocaine to be combined with hyaluronic acid in a gel that is sufficiently stable to be useful as a soft tissue filler.

Ex. 1024 ¶¶ 5–10.  With reference to Example 4 of the '884 application,[12]

Dr. Lebreton further testified that:

> 11.   The enhanced stability properties of the inventive dermal fillers was evidenced by certain experiments performed under my direction by my research team prior to the application filing date.

> 12.   The experiments are generally set forth in the patent application in the Examples and Drawings.

> 13.   The experiments showed that certain HA gels, when mixed with lidocaine, degraded and became substantially less viscous after high temperature sterilization, specifically autoclave sterilization, as would have been expected by one of ordinary skill in the art.  This is shown in Figures 1–3 of the application.  Samples 1, 2 and 3 exhibited a decrease in viscosity of approximately 60%, 73% and 35%, respectively.

> 14.   I discovered that other HA gels, when mixed with lidocaine, maintained their viscosity and elasticity even after such high temperature sterilization.  This is shown in Figures 4, 5, and 7 of the application.  Samples 4, 5 and 6 exhibited a decrease in viscosity of approximately 30%, 0% and 13%, respectively and a non-significant viscosity change (measured at ~4%, ~9%, ~2%, respectively, below 10%) with additional pH adjustment.

> 15.   To my knowledge, it was a surprising and unexpected discovery, not appreciated prior to the present invention, that certain cohesive HA gels, as defined in the application, when mixed with lidocaine, could be made to be heat and shelf stable.

---

[12] Although Example 4 does not appear in the '475 patent challenged here, Petitioner reasonably argues that the substance of Example 4 is set forth in the common provisional applications, which are incorporated by reference into the '475 patent.  *See* Pet. 55; Ex. 1001, 1:6–12.

IPR2019-01505
Patent 8,450,475 B2

*Id.* ¶¶ 11–15; s*ee* Ex. 1023, 25–27 (discussing amendment to the specification of the '884 application "to clarify the results of the experiments" in Example 4 and associated figures); Pet. 11–12; Prelim. Resp. 10–11.

In addition to the discussion of Example 4 and the Lebreton declaration, the Applicant submitted Cui[13] as evidence "that HA gels are known to be sensitive to heat sterilization, and that even more particularly, that HA gels cross-linked with BDDE are known to be especially sensitive to heat sterilization relative to HA gels cross linked with other, i.e. non-BDDE, crosslinkers." Ex. 1023, 28 (emphasis omitted).[14]

The Examiner withdrew the rejection and the '844 Application issued as the U.S. Patent No. 8,357,795. *Id.* at 23. The Examiner's Reasons for Allowance states:

> Applicant argues that one of ordinary skill in the art would have expected degradation of the hyaluronic acid gel with addition of lidocaine during sterilization, as this was what was known in the prior art. Applicant unexpectedly found that a hyaluronic acid gel crosslinked, but not with a non-hyaluronic acid biopolymer, mixed with lidocaine and sterilized does not degrade.

Ex. 1023, 9.

The parties assert that the above evidence of unexpected results was submitted to the same Examiner in the prosecution of the co-pending '884 application, which issued as the '475 patent challenged here. Pet. 10–11;

---

[13] Cui et al., *The comparison of physicochemical properties of four cross-linked sodium hyaluronate gels with different cross-linking agents*, 396–398 ADV. MATS. RES. 1506–1512 (2012). Ex. 1025.
[14] Although discussed extensively by the parties, we note that neither Cui, nor the Lebreton declaration, are included in the '475 patent file history.

IPR2019-01505
Patent 8,450,475 B2

Prelim. Resp. 9.  According to Patent Owner, "the '475 patent was allowed based on the unexpected results from the claimed inventions."  Prelim. Resp. 4; *see also* Pet. 10–14 (section titled: "The ['475] patent was granted based on proffered 'unexpected results.'").

## II.  ANALYSIS

### A.  *Legal Standards*

"In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable."  *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")).  This burden of persuasion never shifts to Patent Owner.  *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (discussing the burden of proof in *inter partes* review).

A claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which that subject matter pertains.  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).  The question of obviousness is resolved on the basis of underlying factual determinations including:  (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) objective evidence of nonobviousness.  *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

In analyzing the obviousness of a combination of prior art elements, it can be important to identify a reason that would have prompted one of skill

IPR2019-01505
Patent 8,450,475 B2

in the art "to combine . . . known elements in the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418. A precise teaching directed to the specific subject matter of a challenged claim is not necessary to establish obviousness. *Id.* Rather, "any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *Id.* at 420. Accordingly, a party that petitions the Board for a determination of unpatentability based on obviousness must show that "a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1381 (Fed. Cir. 2016) (internal quotations and citations omitted).

    B.    *Level of Ordinary Skill in the Art*

In determining the level of skill in the art, we consider the type of problems encountered in the art, the prior art solutions to those problems, the rapidity with which innovations are made, the sophistication of the technology, and the educational level of active workers in the field. *Custom Accessories, Inc. v. Jeffrey-Allan Indus. Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986); *Orthopedic Equip. Co. v. United States*, 702 F.2d 1005, 1011 (Fed. Cir. 1983).

In IPR2017-02002, the Board determined that a person of ordinary skill in the art as of the filing date of the '475 patent:

> would have had a B.S. or M.S. in biochemistry, polymer chemistry, medicinal chemistry, pharmaceutical chemistry, or a related field with 'several years' of practical experience. Alternatively … the ordinary artisan would have had less practical experience but a Ph.D. in one of those fields, or an M.D.

14

IPR2019-01505
Patent 8,450,475 B2

> in dermatology, plastic surgery, or a specialty related to the
> clinical use of dermal fillers.

Ex. 3001, 8.  Patent Owner contends that Board should adopt the same

definition here because the 02002 IPR involved the same patent and a subset

of the same asserted references (Lebreton and Kinney) at issue here.  Prelim.

Resp. 13–14; *see* Sur-reply 4–5.

Petitioner, however, advances a definition of one of ordinary skill in

the art that purportedly "explains . . . further" the definition set forth in

IPR2017-02002.  *See* Reply 9.  In particular, Petitioner argues that a person

of ordinary skill in the art as of the relevant date "would have an advanced

degree, such as a Ph.D., M.S., or M.D., and several years of experience

developing dermal fillers for cosmetic use, including HA-based dermal

fillers" and, moreover, "would be aware of commercially sold dermal fillers,

in the United States and abroad, as well as those products for which

approvals were being publicly sought."  Pet. 14 (citing Ex. 1002 ¶¶ 69–72).

On the present record, we find Petitioner's definition reasonable.

Consistent with Petitioner's argument, the proposed definition is not clearly

inconsistent with our prior determination and is supported by Dr. DeVore

presently uncontested testimony.  *See* Ex. 1002 ¶¶ 69–72.  Further, the art of

record abundantly supports Petitioner's proposition that one of ordinary skill

in the art would have been aware of commercially sold dermal fillers and

publically available information regarding their FDA approval.

Monheit, for example, discusses clinical trials and approval dates of

"five FDA-approved HA skin fillers available in the United States:

Hylaform, Hylaform Plus, Captique (Inamed Corporation), Restylane

(Medicis Aesthetics Inc.), and, most recently, Juvéderm (Allergen

Aesthetics)" noting, for example, that "Hylaform has been available

15

IPR2019-01505
Patent 8,450,475 B2

worldwide since 1998 and in the United States since 2004." Ex. 1022, 79–80. And in summarizing an FDA clinical study comparing Hylaform to Zyplast, Monheit cites data from a 2003 FDA publication "Available at: http://www.fda.gov/ohrms/dockets/ac/03/slides/4004s1_01_lerner_files/frame.htm." *Id.* at 80, Box 1.

Clark similarly reviews the clinical and commercial history of dermal fillers. Clark notes, for example, that "Hylaform and Hylaform Plus have received FDA approval and are indicated for injection into the middermis to deep dermis for correction of moderate to severe facial wrinkles and folds" (Ex. 1008, 27S); that "Hylaform . . . has been used for skin augmentation in Europe since 1996 and received U.S. Food and Drug Administration approval in April of 2004," whereas "Hylaform Plus . . . was approved by the Food and Drug administration in October of 2004" (*id.* at 28S); and that results of a clinical trial "yet to be published but . . . submitted to the U.S. Food and Drug Administration . . . [are] available in the Hylaform package insert" (*id.* at 30S).

In reviewing the state of the art of injectable skin fillers for soft tissue augmentation, Narins notes the FDA approval status for commercially available products Zyderm I and II, CosmoDerm, CosmoPlast, Restylane, Hylaform, Radiance FN, Sculptra, and Silikon 1000. Ex. 1007, 152, 153, 156–157, 158, 159, 161. Kinney similarly notes the FDA approval dates of Restylane and Juvéderm (Ex. 1012, 741), and Smith discusses the "FDA status and Approved Uses" of Juvéderm 30, 24HV, and 30HV injectable gels," further noting that the FDA "recently announced a label extension for Juvéderm Ultra and Juvéderm Ultra plus" (Ex. 1009, 67S–68S).

As a whole, the references asserted in the Petition, thus, strongly suggest that skilled artisans were aware of and monitored the commercial

16

IPR2019-01505
Patent 8,450,475 B2

and approval status of dermal filler compositions.  In light of these teachings and the testimony of Dr. DeVore we expand upon the Board's earlier definition of one of ordinary skill in the art as indicated by Petitioner's arguments.

Thus, for the purpose of institution, a person of ordinary skill in the art as of the filing date of the '475 patent would have a B.S. or M.S. in biochemistry, polymer chemistry, medicinal chemistry, pharmaceutical chemistry, or a related field with several years of practical experience or having less practical experience but a Ph.D. in one of those fields, or an M.D. in dermatology, plastic surgery, or a specialty related to the clinical use of dermal fillers.  Such a person would be aware of commercially sold dermal fillers, in the United States and abroad, as well as those products for which approvals were being publicly sought.

The above definition is provisional and the parties are welcome to present further argument on this topic at trial.

C.    *Claim Construction*

We interpret a claim "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b)." 37 C.F.R. § 42.100(b) (2019). Under this standard, we construe the claim "in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." *Id.*  Furthermore, at this stage in the proceeding, we need only construe the claims to the extent necessary to determine whether to institute *inter partes* review.  *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the

17

IPR2019-01505
Patent 8,450,475 B2

extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

Petitioner proposes the claim constructions of "sterile," "stable," "uncrosslinked HA," "free HA," and "particles" adopted in an earlier district court proceeding. *See* Pet. 15–17 (citing *Allergan USA, Inc. et al. v. Medicis Aesthetics, Inc. et al.*, No. 13-1436 (C.D. Cal. Aug. 12, 2014) (claim construction order) (Ex. 1027)). Patent Owner contends it is not necessary to construe any claim term. Prelim. Resp. 13. For the purpose of this Decision, we find it helpful to address the term "stable."

The challenged independent claims recite "a stable, sterile soft tissue filler" in the preamble of the claims. *See* Ex. 1001, 16:40–49; 17:32–40; 18:14–52. Both parties and the district court appear to consider this language limiting, despite appearing only in the preambles. *See* Pet. 14–16; Prelim. Resp. 13; Ex. 1027, 7–11. Consistent with these positions, the panel in IPR2017-02002 set forth a well-reasoned explanation of why the preamble is limiting, which we adopt here. *See* Ex. 3001, 9–12.

Petitioner proposes "stable" to "mean that the composition maintains at least one of the following aspects: transparent appearance, pH, extrusion force and/or rheological characteristics, [hyaluronic acid] concentration, sterility, osmolarity, and lidocaine concentration." Pet. 15(citing Ex. 1027, 11). Petitioner cites to the '475 patent Specification's definition of "autoclave stable" and "stable to autoclaving" to support the construction. *Id.* (citing Ex. 1001, 4:41–48). The 02002 IPR panel adopted a more detailed definition of this term as:

> soft tissue filler that is free of viable microorganisms as
> determined by a sterility test recognized by a regulatory
> authority, the filler can be sterilized by any method known in
> the art, and is resistant to degradation such that the composition

18

IPR2019-01505
Patent 8,450,475 B2

> maintains one or more of the following aspects: transparent
> appearance, pH, extrusion force and/or rheological
> characteristics, hyaluronic acid (HA) concentration, sterility,
> osmolarity, and lidocaine concentration, after being effectively
> sterilized by autoclaving and subsequently stored at a
> temperature of at least about 25° C for at least about two
> months.

Ex. 3001, 14–15.  The Board's prior construction does not appear

inconsistent with Petitioner's broader proposed construction.  Absent any

persuasive argument for an alternative construction, we adopt the reasoning

and definition of "stable" as set forth in the 02002 IPR.  *See* Ex. 3001, 9–15.

The parties are, nevertheless, welcome to present further arguments

regarding claim construction at trial.

> D.    *Obviousness in view of Lebreton, Sadozai, and Monheit, Clark,*
> *or Smith (Grounds 1–3)*

As Ground 1, Petitioner challenges claims 1–9, 18, and 27–37 as

obvious in view of Lebreton, Sadozai, and Monheit.  Pet. 23–41.  As Ground

2, Petitioner challenges claims 1–9 and 18 as obvious in view of Lebreton,

Sadozai, and Clark.  *Id.*  As Ground 3, Petitioner challenges claims 27–37 as

obvious in view of Lebreton, Sadozai, and Smith.  *Id.*  Petitioner's

challenges include detailed mapping of the teachings of these references to

each limitation of the claims.  *See id.*

In its Preliminary Response, Patent Owner asserts the decision

denying institution in IPR2017-02002 spells "out in detail the reasons why

the petition failed to meet the reasonable likelihood standard."  Prelim. Resp.

1.  As noted at page 35 of our Consolidated Trial Practice Guide, however,

"§ 42.6(a)(3) prohibits incorporating arguments by reference from one

document into another."  Patent Owner directs substantially all of its

argument to whether the Board should exercise discretion to deny the

IPR2019-01505
Patent 8,450,475 B2

Petition under 35 U.S.C §§ 314(a) and 325(d). *See* Prelim. Resp. 1–2, 15–38. To the extent Patent Owner raises issues relevant to the merits of Petitioner's grounds in discussing *Becton Dickenson* factor f, we address them in section II(D)(6)(h), below. We subsequently consider Patent Owner's arguments under 35 U.S.C §§ 314(a) and 325(d) as a whole, in section III.

We begin our analysis of Petitioner's obviousness contentions with an overview of the references asserted under Grounds 1–3, and Petitioner's assertions of why one of ordinary skill in the art would have sought to combine the teachings of these references as set forth in the challenged claims.

### 1. Lebreton (Ex. 1029)

Lebreton is directed to crosslinking mixtures of low and high molecular weight polymers to form injectable monophase hydrogels that may be used as filling materials in plastic surgery. Ex. 1029, abstract, ¶ 5. Lebreton characterizes monophase hydrogels as "soft and free-flowing," with "no apparent liquid phase" (*id.* ¶¶ 64–65), whereas biphase hydrogels comprise "gel fragments bathed in a low-viscosity liquid medium" with "no cohesion of the gel and no free-flowing appearance" (*id.* ¶¶ 66–67). Lebreton discloses buffering crosslinked hydrogels to a pH compatible with the human body, being between 7 and 7.4. *Id.* ¶¶ 48–49.

As Examples 1–4, Lebreton discloses hydrogels prepared by crosslinking sodium hyaluronate (sodium salt of hyaluronic acid) with 1,4-butanediol diglycidyl ether (BDDE). *Id.* ¶¶ 68–92. The crosslinked HA compositions are then neutralized to pH 7.2, packed into syringes, and subject to high termperature sterilization in an autoclave. *See id.* ¶¶ 70, 76, 81.

20

IPR2019-01505
Patent 8,450,475 B2

The '475 patent cites Lebreton in explaining how selection of various HA components in dermal fillers was known to affect characteristics such as extrusion force, elastic modulus, and viscous modulus, among others. Ex. 1001, 8:39–49.

### 2.   *Sadozai (Ex. 1030)*

Sadozai is directed to a crosslinked hyaluronic acid composition effective for tissue augmentation or drug delivery.  Ex. 1030 ¶¶ 7, 8. According to Sadozai, "the storage modulus G′ is increased, e.g., composition is stabilized, by the inclusion of a local anesthetic, e.g., lidocaine, compared to a non-stabilized composition, e.g., an identical composition except that the local anesthetic is not included." *Id.* ¶ 68.

Sadozai discloses nine Examples of compositions including hyaluronic acid crosslinked with p-phenylene-bis(ethylcarbodiimide) ("PBCDI").  *Id.* ¶ 85.  The crosslinked hyaluronic acid compositions of Example 5, was combined with phosphate buffer containing 0.30% lidocaine (Phosphate Buffer 4) to form a suspension.  *Id.* ¶¶ 84, 90, 100, 102.  The suspensions were loaded into syringes and sterilized in an autoclave at temperatures between 100° C to 150° C.  *Id.* ¶¶ 54–55, 90 (Example 12), 100 (Example 17).

In Example 21, Sadozai discloses that compositions "with lidocaine have significantly higher modulus G′ over the time of the test.  Thus, crosslinked hyaluronic acid with lidocaine can have good biostability, and can in some cases have a synergistic effect, increasing G′." *Id.* ¶ 107.

### 3.   *Monheit (Ex. 1022)*

Monheit describes the properties of hyaluronic acid fillers used for wrinkle and volume correction.  Ex. 1022, 77.  Properties of hyaluronic acid fillers include gel hardness or rheology (flow), particle size, concentration of

21

IPR2019-01505
Patent 8,450,475 B2

hyaluronic acid particles, swelling, ratio of soluble to insoluble hyaluronic acid, and hydration. *Id.* at 78. Monheit discloses free (soluble) "HA is needed as a lubricant for flow characteristics, thus more free HA is needed as the G-1 or hardness of the HA is greater. The disadvantage is that free or non-crosslinked HA only lasts a few days and the stability of the implant is related to the crosslinked component." *Id.*

### 4. *Clark (Ex. 1008)*

Clark discloses that hyaluronic acid's "viscoelastic properties are determined by the length of the molecular chains, its concentration, the crosslinking and the particles size." Ex. 1008, 28S. Clark discloses that other physical characteristics, including gel hardness (G′) and swelling or hydration, can be used to make clinical decisions in choosing a product. *Id.* Clark discloses the properties of five different hyaluronic acid products, including Hylaform and Restylane. *Id.* at 29S, Table 1. Hylaform is characterized by about 4% fluid by weight soluble hyaluronic acid and Restylane is characterized by about 25% fluid by weight soluble hyaluronic acid. *Id.*

### 5. *Smith (Ex. 1009)*

Smith discloses "practical information on the use of Juvéderm Ultra and Juvéderm Ultra Plus injectable gel fillers." Ex. 1009, 67S. Smith discloses Juvéderm Ultra and Juvéderm Ultra Plus have been on the market in Europe since 2003 and were introduced to the U.S. in 2007. *Id.* Smith describes Juvéderm as hyaluronic acid crosslinked with BDDE and including "[a]bout 10% non-crosslinked hyaluronic acid . . . to optimize the follow properties of the material." *Id.* Smith discloses that

> [b]y comparison, particle-based products tend to contain a considerably larger amount of free hyaluronic acid (typically

IPR2019-01505
Patent 8,450,475 B2

> around 20 percent of the total hyaluronic acid in the syringe),
> and all of this free hyaluronic acid is found in the vehicle
> system (where it is used as a gelling agent to keep the particles
> in suspension).

*Id.* at 72S.

### 6.   *Analysis of Claim 34*

Petitioner provides a detailed claim analysis for claim 34 as obvious over Lebreton, Sadozai, and Monheit or Smith, and refers to this analysis as to the remaining independent claims.  Pet. 29–34.  Because Patent Owner raises no independent arguments with respect to claims 1–9, 18, and 27–33, or 35–37, we address claim 34 as representative.

### a)   *"A stable, sterile soft tissue filler comprising"*

Petitioner asserts Lebreton discloses soft tissue fillers that are autoclave sterilized.  *Id.* at 29 (citing Ex. 1029 ¶ 70).

### b)   *"a hyaluronic acid (HA) component comprising HA crosslinked with [BDDE]"*

Petitioner asserts Lebreton discloses a mixture of BDDE-crosslinked hyaluronic acid.  *Id.* (citing Ex. 1029 ¶¶ 68–76).

### c)   *"uncrosslinked HA"*

As Ground 1, Petitioner asserts Monheit discloses adding free hyaluronic acid as a lubricant.  *Id.* (citing Ex. 1022, 78).  Petitioner asserts that a person of ordinary skill would have been motivated to add uncrosslinked (i.e., free or soluble) hyaluronic acid to optimize the flow characteristics of the filler.  *Id.* (citing Ex. 1002 ¶ 147).

As Ground 3, Petitioner asserts Smith discloses known crosslinked hyaluronic acid fillers, e.g., Juvéderm, incorporated free hyaluronic acid in varying amounts.  *Id.* at 30 (citing Ex. 1009, 67S, 72S).  Petitioner asserts that a person of ordinary skill would have been motivated to include free

IPR2019-01505
Patent 8,450,475 B2

hyaluronic acid in filler to improve injectability with a reasonable expectation of success in doing so. *Id.* (citing Ex. 1002 ¶¶ 147–150).

>  d)  *"lidocaine at a concentration of about 0.3% by weight of the soft tissue filler combined with said crosslinked HA component"*

Petitioner asserts Sadozai discloses a crosslinked hyaluronic acid filler containing 0.3% lidocaine. *Id.* (citing Ex. 1030 ¶ 70; Ex. 1002 ¶ 140).

>  e)  *"wherein the soft tissue filler is stable after heat sterilization at between 120 degrees C. and about 130 degrees C."*

Petitioner asserts Lebreton discloses sterilizing crosslinked hyaluronic acid gels in an autoclave with moist heat. *Id.* (citing Ex. 1029 ¶ 70). Petitioner further cites Sadozai which discloses hydrating BCDI-crosslinked hyaluronic acid particles at a temperature of 120–140° C. *See id.* (citing Ex. 1030 ¶ 54). Petitioner contends "[m]erely reciting a range of conditions known to be effective to sterilize an otherwise obvious composition, and observing the inherent effect of such sterilization, cannot confer patentability." *Id.* at 31 (citing *In re Kao*, 639 F.3d 1057, 1069 (Fed. Cir. 2011). Petitioner further contends that the term *stable* includes compositions that maintain *sterility* over a length of time, thus "when subjected to the claimed sterilization conditions, the resulting composition would remain 'stable' for as long as the container was not opened." *Id.*

>  f)  *"wherein the soft tissue filler has a pH of about 7"*

Petitioner asserts Lebreton discloses a pH of 7.0–7.4. *Id.* at 31 (citing Ex. 1029 ¶ 48). Petitioner contends a person of ordinary skill in the art could have selected any pH within this range. *Id.* (citing Ex. 1002, ¶¶ 174, 181).

IPR2019-01505
Patent 8,450,475 B2

### g) Motivation to Combine

Petitioner asserts that a person of ordinary skill in the art would have known that injection pain was a common side effect of injectable dermal fillers, including Lebreton's BDDE-hyaluronic acid crosslinked filler. Pet. 24 (citing Ex. 1002 ¶ 115). Petitioner contends that incorporating lidocaine into crosslinked fillers was a known solution to the problem of injection pain, and was previously implemented in fillers containing hyaluronic acid crosslinked with BCDI, DVS (1,4-divinylsulfone), or DEO (diepoxyoctane). *Id.* at 24–25 (citing Ex. 1002 ¶¶ 118, 119, 132–133). Petitioner contends that "[a] composition containing BDDE-crosslinked HA and lidocaine was a derivative and predictable next step in view of the success of the other three clinically used crosslinkers." *Id.* at 25. Petitioner further asserts that a person of ordinary skill in the art could have easily incorporated Sadozai's 0.3% lidocaine in a buffer solution into Lebreton's BDDE-crosslinked gel. *Id.* at 28 (citing Ex. 1002 ¶¶ 145–146).

According to Petitioner, a person of ordinary skill in the art would have been motivated to incorporate free hyaluronic acid into Lebreton's crosslinked hyaluronic acid filler to optimize the injectable of a gel. *Id.* at 27 (citing Ex. 1002 ¶¶ 91–94). Petitioner contends that a person of ordinary skill in the art would have understood that increasing free hyaluronic acid concentration in a mixture decreases the extrusion force, and thus is a result-effective variable subject to routine optimization. *Id.* (citing Ex. 1002 ¶ 147). Petitioner contends a person of ordinary skill in the art would have added the desired amount of free hyaluronic acid to the combined composition of Lebreton and Sadozai, loaded the composition into a syringe, and sterilized the composition using an autoclave. *Id.* at 28 (citing Ex. 1002 ¶¶ 140–143, 145–146).

IPR2019-01505
Patent 8,450,475 B2

*h) Objective Evidence of Non-obviousness*

Petitioner contends "the Examiner allowed the claims of the challenged patent (and its related applications) based on Allergan's arguments and proffered evidence pointing to supposed 'unexpected results' of the invention." Pet. 51.  Petitioner challenges the Declaration of the sole named inventor, Pierre F. Lebreton ("the Lebreton Declaration"), the comparative data incorporated into the specification, and the extrinsic evidence cited by the Applicant during prosecution. *Id.*

First, Petitioner challenges the Lebreton Declaration as unsubstantiated and contradicted by the prior art. *Id.* at 52–55.  Petitioner asserts that "contrary to Lebreton's statements, the totality of the prior art instead gave the POSITA the expectation lidocaine could be successfully combined with various crosslinked HA dermal fillers, including a BDDE-crosslinked HA dermal filler." *Id.* at 53.  To show that sterile and stable lidocaine-hyaluronic acid combinations were previously known, Petitioner cites commercially available dermal fillers, e.g., Elevess, Prevelle Silk, Puragen Plus, as well as the teachings of Sadozai and Kinney. *Id.* at 53–54 (citing Ex. 1002 ¶¶ 260–262).  In addition, Petitioner's expert, Dr. DeVore, testifies that "the POSITA would not have believed that lidocaine caused degradation of HA gels compositions during high temperature sterilization and would have believed that HA compositions comprising lidocaine were stable after high temperature sterilization when placed in storage for any significant length of time." Ex. 1002 ¶ 261.  Dr. DeVore states that "[f]or example, during the development of Elevess, it was observed that the autoclave-sterilized [BCDI]-crosslinked HA composition with lidocaine was sufficiently stable to support a product shelf life of 15 months, which is reflected in the Elevess label." *Id.* (citing Ex. 1050, 6) (CTA Summary).

IPR2019-01505
Patent 8,450,475 B2

Second, Petitioner asserts that the comparative data relied on in the Lebreton Declaration does not support nonobviousness.  Pet. 55.  This comparative data is disclosed in Example 4 of '795 patent (Ex. 3002, 15:20–17:2, Figs 1–8), and as Example 3 in provisional application Nos. 61/085,956 (Ex. 1013, 16–17, Figs 2–9); 61/087,934 (Ex. 1028, 16–17, Figs 2–9; and 61/906,278 (Ex. 1044, 15–16, Figs 1–8), which are incorporated by reference by the '475 patent (Pet. 55; Ex. 1001, 1:7–12).

Dr. DeVore attests that "Example 4 describes experiments in which six samples were evaluated. . . . Allergan argued that the results of Samples 1–3 were consistent with the expectations of the POSITA, and that it was unexpected that Samples 4–6 did not exhibit the same viscosity reduction." Ex. 1002 ¶ 267.  "In my opinion, Sample 1 is completely irrelevant—it is a mixture of uncrosslinked HA and a completely different polymer (hydroxypropyl methylcellulose).  I am not aware of a mixture of uncrosslinked HA and HPMC being used as a dermal filler, either in 2008 or now."  Id. ¶ 268.  Dr. DeVore further states that the reported viscosity differences are not indicative of instability as "[t]he final viscosity for Samples 2 and 3 in each test (~75–375 Pa*s) is substantially the same as the final viscosities of Samples 4–6 (~50–90 Pa*s), all of which are within the range of marketed dermal fillers (50–1,200 Pa*s)."  Id. ¶ 270.  According to Dr. DeVore, there is no meaningful difference in viscosity reduction between Sample 3 (35% reduction when combined with lidocaine without pH adjustment) and Sample 4 (30% reduction in viscosity in the same test) and that the difference was not "much lower" as alleged by Allergan. Id. ¶¶ 274–275.

During prosecution of the '884 application, the Applicant asserted that Cui, "shows that HA gels are known to be sensitive to heat sterilization, and

IPR2019-01505
Patent 8,450,475 B2

that even more particularly, that HA gels crosslinked with BDDE are known to be especially sensitive to heat sterilization relative to HA gels cross linked with other, i.e. non-BDDE, crosslinkers." Ex. 1023, 28 (emphasis omitted). Petitioner, however, asserts that Cui, "is irrelevant to the question of whether Allergan's BDDE-crosslinked HA composition showed unexpected results compared to the other crosslinkers known to POSITAs at the time." Pet. 61 (citing Ex. 1002 ¶ 266).

Petitioner argues that "Cui was published in 2012, well after the claimed priority date of the patent. The reasonable expectation of success (and expected results) is evaluated at the time the invention was made—a later published reference that might have taught away from the claimed invention is irrelevant." *Id.* at 60 (citing *Bristol-Myers Squibb Co. v. Teva Pharms. USA, Inc*., 752 F.3d 967, 976 (Fed. Cir. 2014)). Petitioner further relies on Dr. DeVore's testimony that Cui compares the stability of BDDE-crosslinked hyaluronic acid with three crosslinkers that had not "been seriously investigated for use in dermal fillers as of August 2008," as opposed to the known non-BDDE crosslinkers for dermal fillers. Ex. 1002 ¶ 264. Dr. DeVore concludes that "the Cui reference in no way supports Allergan's assertion that BDDE crosslinked HA was 'especially sensitive' to heat sterilization relative to 'non-BDDE' crosslinkers. At the very least, Cui is irrelevant . . . because Cui's comparisons do not relate to any of the crosslinkers relied upon here." *Id.* ¶ 265.

Although Patent Owner does not directly address the substance of Petitioner's grounds, Patent Owner does address the relevance of Cui in the context of its § 325(d) arguments. *See* Prelim. Resp 27–32; Sur-reply 4. In sum, Patent Owner argues that Cui is relevant because it "discusses divinyl sulfone (DVS) crosslinked HA gels, which Petitioner admits were known

28

IPR2019-01505
Patent 8,450,475 B2

and approved before August 2008." Prelim. Resp. 28. We accord this argument little weight because Cui provides no comparative information about the stability of HA gels crosslinked with either DVS or BDDE. Rather, and as Patent Owner admits, "Cui focused on gels linked with four new agents of 'lower-toxicity'" as compared to DVS." *Id.* (citing Ex. 1025, 1506); *see* Sur-reply 3 (noting that "Cui does not *test or compare* BDDE to *any* of the three crosslinkers discussed in the Petition[] or the Examiner's art").

Patent Owner responds that we should discount Dr. Devore's testimony because it is "conclusory and fails to provide a well-reasoned rationale or objective support for the proposed grounds." Prelim. Resp. 28. As an initial matter, at this stage of the proceeding, we give at least some weight to an expert's unopposed testimony. Moreover, we accord little weight to Patent Owner's argument as it appears to rely on summary statements from Dr. Devore's declaration that are further explained elsewhere in the Declaration. Patent Owner argues, for example, that a sentence fragment from paragraph 145 of Dr. Devore's declaration ("a POSITA would have been motivated to incorporate uncrosslinked (free) HA into the lidocaine-containing BDDE-crosslinked H composition in varying amounts") is "without evidentiary support." *Id.* at 29. The passage, read in full, however, expressly cites to paragraphs 91 and 145–147 of Dr. Devore's declaration. Ex. 1002 ¶ 145. Referenced paragraph 91, in turn, cites to Exhibits 1045 and 1022 as support for the proposition that "[o]ne well-known technique to optimize the required extrusion force was to add free HA to the composition." Follow-on paragraphs 92 and 93 further rely on Exhibits 1009 and 1037 in discussing additional evidence that one of ordinary skill would be motivated to incorporate free HA into an injectable

IPR2019-01505
Patent 8,450,475 B2

filler composition.   Paragraphs 145–147 of Dr. Devore's declaration further support the proposition summarized in paragraph 145 with reference to arguments and evidence in, e.g., paragraphs 91–94, 147–149, and 187 of the declaration and Exhibits 1002, 1008, and 1009.

Accordingly, we do not find persuasive Patent Owner's argument that we should discount Dr. Devore's testimony as unduly conclusory.  Patent Owner will have the opportunity to rebut and challenge Dr. Devore's testimony at trial.

*i)  Conclusion*

For the reasons set forth above, Petitioner has established a reasonable likelihood of prevailing in demonstrating the unpatentability of claim 34 with respect to Grounds 1–3.

E.    *Obviousness in view of Kinney, Zhao, Narins, and Monheit, Clark, or Smith (Grounds 4–6)*

As Ground 4, Petitioner challenges claims 1–9, 18, and 27–37 as obvious in view of Kinney, Zhao, Narins, and Monheit.  Pet. 42–62.  As Ground 5, Petitioner challenges claims 1–9 and 18 as obvious in view of Kinney, Zhao, Narins, and Clark.  *Id.*  As Ground 6, Petitioner challenges claims 27–37 as obvious in view of Kinney, Zhao, Narins, and Smith.  *Id.* Petitioner's challenges include detailed mapping of teachings of these references to each limitation of the claims.  *See id.*

The parties' arguments with respect to evidence of unexpected results are addressed in section II(D)(6)(h), above.  We begin our analysis of Petitioner's obviousness contentions with an overview of the references asserted under Grounds 4–6, and Petitioner's assertions of why one of ordinary skill in the art would have sought to combine the teachings of these references as set forth in the challenged claims.

IPR2019-01505
Patent 8,450,475 B2

### 1.   Kinney (Ex. 1012)

Kinney teaches a clinical study comparing two dermal fillers: (1) Restylane, which had been on the market for several years, and (2) Puragen Plus, a non-animal source hyaluronic acid gel containing lidocaine that was undergoing FDA clinical trials. Ex. 1012, 741–742. Kinney describes "the pain associated with injection" as a "major disadvantage" of existing hyaluronic preparations, such as Restylane. *Id.* According to Kinney, Puragen Plus is double-crosslinked with DEO, thereby forming ester and ether bonds. *Id.* at 742. Kinney discloses that double-crosslinking protects the ether bonds during sterilization, where "[t]he increased chemical stability allows for the addition of lidocaine 0.3% for a relatively pain-free injection." *Id.* Kinney discloses "[n]ot surprisingly, there was minimal to no pain in essentially every patient injected with Puragen Plus, and less pain in every patient injected with Puragen Plus compared with patients injected with Restylane." *Id.* at 746.

### 2.   Zhao (Ex. 1058)

Zhao is directed to double-crosslinked hyaluronic acid derivatives having improved biostability. Ex. 1058 ¶ 14. Zhao discloses crosslinking agents may be used for the double-crosslinking process may include BDDE (butanediol diglycidylether) and DEO (1,2,7,8-diepoxyoctane). *Id.* ¶¶ 19–21. Zhao discloses an example of a double-crosslinking process for hyaluronic acid, including a first crosslinking reaction with DEO under alkaline conditions, and a second crosslinking reaction with DEO under acidic conditions. *Id.* ¶ 32. Zhao discloses the degree of crosslinking may range from 10–50%. *Id.* ¶ 56.

IPR2019-01505
Patent 8,450,475 B2

> 3.     *Narins (Ex. 1007)*

Narins discloses that Restylane is a stabilized partially crosslinked hyaluronic acid gel.  Ex. 1007, 156.  Narins discloses "[t]he material is heat-sterilized in its final container and has a shelf life of 1.5 years from the date of manufacture."  *Id.*

> 4.     *Analysis of Claim 34*

Petitioner provides a detailed claim analysis for claim 34 as obvious over Kinney, Zhao, Narins, and Monheit, Clark, or Smith.  Pet. 43–45.  Petitioner refers to this analysis as to the remaining independent claims.  Because Patent Owner raises no independent arguments with respect to claims 1–9, 18, and 27–33, and 35–37, we address claim 34 as representative.

> a)  *"A stable, sterile soft tissue filler comprising"*

Petitioner asserts that Kinney discloses sterile soft tissue fillers.  Pet. 43 (citing Ex. 1012, 741–742).  Petitioner asserts that Narins discloses that Restylane is heat-sterilized in its final container, and a person of ordinary skill in the art would have heat-sterilized the combination of Kinney and Zhao.  *See id.* (citing Ex. 1007, 156; Ex. 1002 ¶ 190).

> b)  *"a hyaluronic acid (HA) component comprising HA crosslinked with [BDDE]"*

Petitioner asserts that Kinney discloses a hyaluronic acid crosslinked with BDDE (Restylane) and a hyaluronic acid crosslinked with DEO (Puragen Plus).  *Id.* at 44 (citing Ex. 1012, 741–742).  Petitioner contends a person of ordinary skill would have been motivated to exchange the DEO crosslinker in Puragen Plus with a BDDE crosslinker.  *Id.* (citing Ex. 1002 ¶ 188).

32

IPR2019-01505
Patent 8,450,475 B2

### c)  "uncrosslinked HA"

As Ground 4, Petitioner asserts Monheit discloses adding free hyaluronic acid as a lubricant.  *Id*. (citing Ex. 1022, 78).  Petitioner asserts that a person of ordinary skill would have been motivated to add uncrosslinked (i.e., free or soluble) hyaluronic acid to optimize the flow characteristics of the filler.  *Id*. (citing Ex. 1002 ¶¶ 191, 222).

As Ground 6, Petitioner asserts Smith discloses known crosslinked hyaluronic acid fillers, e.g., Juvéderm, incorporated free hyaluronic acid in varying amounts.  *Id.* (citing Ex. 1009, 67S, 72S).  Petitioner asserts that a person of ordinary skill would have been motivated to include free hyaluronic acid in filler to improve injectability with a reasonable expectation of success in doing so.  *Id.* (citing Ex. 1002 ¶¶ 191).

### d)  "lidocaine at a concentration of about 0.3% by weight"

Petitioner asserts that Kinney discloses Puragen Plus contains 0.3% lidocaine HCl.  *Id.* (citing Ex. 1012, 742).

### e)  "wherein the soft tissue filler is stable after heat sterilization at between about 120 degrees C. and about 130 degrees C.

Petitioner refers to Ground 1 to argue that a person of ordinary skill would have appreciated the recited sterilization conditions would have been effective to sterilize dermal fillers.  *Id.*

Petitioner further asserts that a person of ordinary skill would have been motivated to use Narin's heat sterilization of Restylane for a double-BDDE-crosslinked composition.  *Id.* at 45 (citing Ex. 1007, 156; Ex. 1002 ¶ 190).  Petitioner contends that the person of ordinary skill "would have necessarily obtained a product that maintained its sterility (i.e., stability) until opened."  *Id.* (citing Ex. 1002 ¶ 190).

IPR2019-01505
Patent 8,450,475 B2

*f) "wherein the soft tissue filler has a pH of about 7"*

Petitioner asserts that a person of ordinary skill "knew that dermal fillers were formulated at a pH compatible with the human body, including pH 7." *Id.* (citing Ex. 1002 ¶ 217).

*g) Motivation to Combine*

Petitioner asserts that a person of ordinary skill in the art "would have been motivated to exchange the DEO crosslinker in Puragen Plus with a BDDE crosslinker, as BDDE-crosslinked fillers were already established in the marketplace and approved by FDA." Pet. 42 (citing Ex. 1002 ¶ 188). Petitioner asserts that a person of ordinary skill in the art could have made particles of double-BDDE-crosslinked hyaluronic acid following the Zhao's process. *Id.* at 42–43 (citing Ex. 1002 ¶ 189). Petitioner contends that a person of ordinary skill in the art would have reasonably expected that lidocaine would function analogously in both BDDE and DEO gels, because both compounds are formed with bis-epoxide crosslinkers. *Id.* at 43 (citing Ex. 1002 ¶ 189). As further explained by Dr. DeVore:

> Both crosslinkers rely on the same chemistry—nucleophilic epoxide opening by the N-acetyl glucosamine primary alcohol, followed by nucleophilic epoxide opening by the glucoronic acid carboxylate. In both cases, epoxide opening results in the presence of a secondary alcohol in the crosslinking chain. Given the high degree of similarity between the two crosslinkers, the POSITA would reasonably expect that lidocaine would function analogously in both crosslinked gels.

Ex. 1002 ¶ 189.

Petitioner further asserts that a person of ordinary skill in the art would have added an optimized amount of free hyaluronic acid to the crosslinked hyaluronic acid filler to improve injectability as taught by Smith and Clark. *Id.* at 42.

34

IPR2019-01505
Patent 8,450,475 B2

### *h) Conclusion*

For the reasons set forth above, Petitioner has established a reasonable likelihood of prevailing in demonstrating the unpatentability of claim 34 with respect to Grounds 4–6.

### III.    DISCRETION TO DENY INSTITUTION

Patent Owner contends Petitioner presents substantially the same art or arguments previously presented to the Office.  Prelim. Resp. 15.  Patent Owner further contends Petitioner repackages the arguments previously presented to and rejected by the Board in IPR2017-02002.  *Id.*  Patent Owner argues the Board should exercise its discretion and deny the Petition under 35 U.S.C. §§ 325(d) and 314(a).  *Id.*  We address each of these arguments below.

### *A.    Discretion under 35 U.S.C. § 325(d)*

Under § 325(d), we have discretion to deny a petition that presents the same or substantially the same prior art or arguments as previously presented to the Office.  35 U.S.C. § 325(d) (2018).  In evaluating whether the factual predicate under § 325(d) is met, the Board has considered a number of non-exclusive factors, including, for example:

a) the similarities and material differences between the asserted art and the prior art involved during examination;

b) the similarities and material differences between the cumulative nature of the asserted art and the prior art evaluated during examination;

c) the extent to which the asserted art was evaluated during examination, including whether the prior art was the basis for rejection;

d) the extent of the overlap between the arguments made during examination and the manner in which Petitioner relies on the prior art or Patent Owner distinguished the prior art;

IPR2019-01505
Patent 8,450,475 B2

    e) whether Petitioner has pointed out sufficiently how the Examiner erred in its consideration of the asserted prior art; and

    f) the extent to which additional evidence and facts presented in the Petition warrant reconsideration of the asserted prior art or arguments.

*Becton, Dickinson and Co. v. B. Braun Melsungen AG*, IPR2017-01586, Paper 8, 17–18 (PTAB Dec. 15, 2017) (precedential) ("the *Becton Dickinson* factors").

        *1.   Becton Dickinson* Factors a through d

    With respect to factors a through d, Patent Owner argues that "the references on which Petitioner relies, and arguments based on those references, are the same or substantially the same as those considered during prosecution of the '475 Patent." Prelim. Resp. 17. With respect to the primary reference of Grounds 1–3, Patent Owner argues that the Examiner's rejection in view of Lebreton was successfully overcome during the prosecution of the '475 patent. *Id.* at 17–18. Patent Owner further argues that Kinney, the primary reference for the remaining grounds, "is cumulative of the Wang, Lupo, and Reinmuller references that the Examiner cited during prosecution," and that all of the "secondary references on which Petitioner relies (Sadozai, Zhao, Monheit, Clark, Narins, and Smith) are also cumulative of art that was considered, and overcome, during prosecution of the '475 Patent." *Id.* at 18–22.

    Petitioner, however, argues that "Allergan's argument that Lebreton was 'distinguished' in prosecution is inaccurate; Allergan never overcame the *prima facie* cases made by the Examiner. Instead, every patent was allowed based on Allergan's proffered unexpected results, primarily the unsubstantiated inventor declaration." Reply, 1–2. Petitioner's assertion is

36

IPR2019-01505
Patent 8,450,475 B2

supported by the relevant prosecution history, as further discussed below. *See e.g.,* section I(F)(3), above; *see also* Prelim. Resp. 4 ("Ultimately, the '475 patent was allowed based on the unexpected results from the claimed invention.").

Petitioner also argues that the asserted grounds combine Lebreton (and Kinney) with "substantially different secondary references (Sadozai, etc.) than used by the Examiner and provide arguments and evidence (including the unrebutted DeVore testimony) not considered by the Examiner."  Reply, 2–6.  We find particularly persuasive for the purpose of our § 325(d) analysis, Petitioner's contention that, whereas Calais and Wang, cited by the Examiner, "merely *suggest* lidocaine . . . *could* be added to a crosslinked HA gel[,] . . . . Sadozai[15] directly refutes the inventor's declaration that lidocaine would degrade a HA gel during high temperature sterilization."  Reply 2–3 (citations omitted); *see also*, Ex. 1002 ¶¶ 31–35, 39, 43, 49, 130–131, 144.

With respect to Grounds 4–6, we find persuasive Petitioner's related argument that, unlike the references cited by the Examiner, Kinney provides working examples of stable, cross linked HA fillers with lidocaine.  Pet. 67–68; Reply 4–5.  Thus, Kinney is not the same or substantially the same art previously presented to the Office during examination.

On balance, factors a through d do not weigh in favor of exercising our discretion to deny institution under § 325(d).

---

[15] Although Sadozai was of record during examination of the '475 patent, because it directly refutes a statement in the Lebreton Declaration, we find, as discussed in Section III(A)(3) below, Petitioner has shown sufficiently that the Examiner erred in not appreciating the relevance of the teaching of Sadozai during evaluation of the Lebreton Declaration.

IPR2019-01505
Patent 8,450,475 B2

### 2. *Becton Dickinson* Factor e

As to factor e, Patent Owner asserts that Petitioner has not "pointed out sufficiently how the Examiner erred in its evaluation of the asserted prior art." Prelim. Resp. 16. As discussed in section I(F)(3), above, the parties agree that the Examiner relied on the Lebreton Declaration in allowing the claims of the '475 patent to issue. According to Petitioner, the Examiner's error in allowing these claims "was induced by the declaration." Reply 6. Although Petitioner's analysis is not contrary to the present record, whether the Examiner "erred" by relying on Lebreton declaration is subsumed into our analysis of factor f, below.

### 3. *Becton Dickinson* Factor f

Even if we were to accept at face value Patent Owner's arguments regarding factors a through d, they would be outweighed by our analysis of factor f: "the extent to which additional evidence and facts presented in the Petition warrant reconsideration of the asserted prior art or arguments," which in this case, relates to Petitioner's arguments and evidence regarding the Lebreton Declaration. *See generally* Pet. 52–59; Reply 6–7.

#### a) *Paragraphs 4–10 of the Lebreton Declaration*

The Lebreton Declaration presents two general arguments. First, that one of ordinary skill in the art would have known that the addition of lidocaine to crosslinked HA dermal filler compositions was incompatible with high temperature sterilization. *See* Ex. 1024 ¶¶ 4–10.[16] Petitioner, supported by the testimony of its expert Dr. DeVore, however, provides

---

[16] As noted in the Petition, these "statements were *not* limited to BDDE-crosslinked HA [as presently claimed], and Allergan's accompanying Response at the time included pending claims covering use of *any* crosslinker." Pet. 53 (citing Ex. 1023, 18–20 (claims 51–67)).

IPR2019-01505
Patent 8,450,475 B2

substantial evidence to the contrary.  In particular, that one of ordinary skill in the art would have understood that lidocaine-containing crosslinked HA dermal fillers could be sterilized with high temperatures, and that such products were approved by the FDA for commercial sale.  *See e.g.*, Pet. 53–55 (citing Ex. 1002 ¶¶ 254, 259–262; Ex. 1030 ¶ 107; Ex. 1012, 746; Ex. 1021, P1039) (dermatology journal abstract on HA/lidocaine combination preclinical evaluation).

Petitioner appears to take the position that the Lebreton Declaration would have provided the Examiner with an incomplete picture of the prior art.  Pet. 66.  Patent Owner disagrees, arguing that the Examiner "was aware of the very references and teachings Petitioner alleges were absent" in the Declaration.  Prelim. Resp. 24 (arguing that the Examiner specifically considered Lebreton and Sadozai as well as references cumulative to Kinney, Monheit, Clark, Smith, Zhao, and Narins).  The current record, however, further includes the presently unrebutted testimony of Dr. DeVore, and the question of whether the secondary references before the Examiner were truly cumulative is a matter of factual dispute that can be addressed at trial.  *See* Reply 2–5.  These factors weigh against exercising our discretion under § 325(d), as do the parties' arguments with respect to Cui, discussed in section II(D)(6)(h), above.

> b)   *Paragraphs 11–15 of the Lebreton Declaration*

With reference to Example 4 of the incorporated provisional applications, the Lebreton Declaration further asserts that "other HA gels" mixed with lidocaine (represented by samples 4 and 5) "surprising[ly] and unexpected[ly]" maintained their viscosity and elasticity after high temperature sterilization as compared to gel samples 1, 2, and 3.  Ex. 1024 ¶¶ 11–15.  There appears to be no dispute that the lidocaine-gel

IPR2019-01505
Patent 8,450,475 B2

compositions of samples 4 and 5 comprise BDDE-crosslinked soft tissue filler compositions within the scope of the challenged claims.  Petitioner, nonetheless, contends this portion of the Lebreton Declaration does not provide support for unexpected results because first, samples 1–3 do not represent the closest prior art and, second, even though samples 1 and 2 show less drop in viscosity after sterilization as compared to samples 4–6, this difference is merely a matter of degree rather than kind.  Pet. 55–59; *see* Ex. 1002 ¶¶ 266–276.

We find particularly interesting Dr. DeVore's presently uncontested testimony that

> Allergan's experiment and its interpretation of the results fundamentally misunderstands the point of stability testing. The consideration whether a crosslinked HA composition would be suitable as a dermal filler depends on its *final* viscosity, not how much the viscosity drops during sterilization.  It is irrelevant if the viscosity drops by 5%, 50%, or even 90%, so long as the sterilized final product has the desired viscosity and is shelf stable.

Ex. 1002 ¶ 269.  Dr. DeVore further testified that Sample 1 is irrelevant as a mixture of uncrosslinked HA and a polymer other than HA, whereas "[t]he final viscosities of samples 2 and 3 in each test (~75–375 PA*s) is substantially the same as the final viscosities of Samples 4–6 (~50–09 PA*s), all of which are within the range of marketed dermal fillers (50–1,200 PA*s)."  *Id.* ¶¶ 268, 272.  In support, Dr. DeVore points to the priority documents as identifying samples 2 and 3 as corresponding to FDA-approved dermal fillers Hylaform and Restylane, respectively.  *See id.* ¶¶ 272, 273 (citing Ex. 1013, 26:7, 12–13; Ex. 1028, 19:7, 12–13).

Dr. DeVore further testifies that:

40

IPR2019-01505
Patent 8,450,475 B2

> During the prosecution of '795 patent, Allergan stated that Sample 3, when combined with lidocaine without pH adjustment, exhibited a 35% reduction in viscosity, while Sample 4 exhibited a 30% reduction in viscosity in the same test. EX1023, 26-27.  During the prosecution of this application, Allergan argued that the claimed compositions exhibited a "much lower" reduction in viscosity.

*Id.* ¶ 274.

> In my opinion, even if viscosity reduction by itself was a meaningful measure of suitability (it is not), there is no meaningful difference between a 30% and 35% reduction in viscosity. . . . Determining whether 30% is significantly different from 35% would require statistical analysis, such as required in FDA submissions. Such analysis is not present in the Challenged Patents. Thus, it is impossible to tell if the difference between Sample 3 and Sample 4, when pH is not controlled, is real or not.

*Id.* ¶ 275.

We do not, on the present record, find Dr. DeVore's testimony "conclusory" or "without objective support" as Patent Owner contends.  *See* Prelim. Resp. 31.  To the contrary, Dr. DeVore's testimony weighs against exercising our discretion under § 325(d).  We, nonetheless, look forward to Patent Owner's testing of Dr. DeVore's opinions at trial.

>    *4.    Conclusion*

In sum, upon weighing the relevant *Becton Dickinson* factors, we find that grounds 4–6 do not rely upon the same or substantially the same prior art or arguments previously presented to the Office during examination, and although grounds 1–3 rely upon the same or substantially the same art previously presented to the Office during examination, Petitioner has demonstrated sufficiently how the Office erred in a manner material to the patentability of the challenged claims in reliance on the Lebreton

IPR2019-01505
Patent 8,450,475 B2

Declaration to overcome the prior art.  Thus, we decline to exercise our discretion under 35 U.S.C. § 325(d) to deny institution of the Petition.

      B.     *Discretion under 35 U.S.C. § 314(a)*

      The Patent Owner argues that the Board should exercise its discretion under 35 U.S.C. § 314(a) and deny Petitioner's request for institution of *inter partes* review.  Prelim. Resp. 32–38.  The Patent Owner points to the Board's prior decision in IPR2017-02002 ("the 02002 IPR") involving a different, and unrelated, petitioner, Teoxane S.A.  *Id.*; *see* Pet. 63–64 (stating that Prollenium has no connection to this "potential competitor").

      In urging the Board to deny institution under § 314(a), the Patent Owner points to criteria set forth by the Board in *General Plastic Industrial Co., Ltd. v. Canon Kabushiki Kaisha*, No. IPR2016-01357 (PTAB Sept. 6, 2017).  Prelim. Resp. 33–34.  These factors include:

> (1)  Whether the same petitioner previously filed a petition directed to the same claims of the same patent;

> (2)  Whether at the time of filing of the first petition the petitioner knew of the prior art asserted in the second petition or should have known of it;

> (3)  Whether at the time of filing of the second petition the petitioner already received the patent owner's preliminary response to the first petition or received the Board's decision on whether to institute review in the first petition;

> (4)  The length of time that elapsed between the time the petitioner learned of the prior art asserted in the second petition and the filing of the second petition;

> (5)  Whether the petitioner provides adequate explanation for the time elapsed between the filings of multiple petitions directed to the same claims of the same patent;

IPR2019-01505
Patent 8,450,475 B2

> (6) The finite resources of the Board; and
>
> (7) The requirement under 35 U.S.C. § 316(a)(11) to issue a final determination not later than 1 year after the date on which the Director notices institution of review.

*Id.* (citing *General Plastic*, Paper 11 at 2, 9–10).

Petitioner admits that it read the papers from IPR2017-02002 prior to filing this IPR.  Reply, 8.  In view of that admission, Patent Owner urges that we deny this Petition because it "relies on the same or substantially the same references and practically indistinguishable arguments that were advanced in the prior IPR petitions."  Prelim. Resp. 36.[17]  According to Patent Owner "Petitioner's use of the Board's institution decision in IPR2017-02002 as a roadmap for the Petition in this case implicates the fairness concerns discussed in *General Plastic* and favors denying institution."  *Id.* at 37.  We do not agree.

With respect to the first *General Plastic* factor, Patent Owner argues that "Petitioner has repackaged into this third petition challenging the '475 patent practically identical prior art grounds to challenge the same patent claims."  *Id.* at 34.  In support, Patent Owner appears to argue that Grounds 5 and 6 of the 02002 IPR involving Debacker, Sadozai, and Reinmuller are "nearly identical" to Grounds 1–3 of the instant Petition because "Debacker . . . like Lebreton, discloses BDDE-crosslinked dermal fillers containing uncrosslinked HA."  *Id.* at 35; *see* Sur-reply, 1–4.  Patent Owner appears to make a similar argument with respect to Ground 7 of the 02002 IPR

---

[17] As noted by the parties, the Board declined to institute trial on an earlier Petition by a third unrelated Petitioner for failure to timely identify all real parties in interest.  Pet. 62, Prelim. Resp. 32, fn.92 (citing *Galderma S.A. v. Allergan Industrie, SAS*, IPR2014-01417, Paper 15 (PTAB Mar. 5, 2015) (case terminated after additional proceedings).

43

IPR2019-01505
Patent 8,450,475 B2

(involving Expert Anti-Aging, Sadozai, and Lebreton) because "Expert Anti-Aging "discloses sterilized compositions of BDDE crosslinked HA dermal fillers."  Prelim. Resp., 35.  Patent Owner further argues that Grounds 4–6 of the instant Petition (involving Kinney, Zhao, and Narins, in combination with Monheit, Clark, or Smith, respectively), are repetitive of Grounds 2 and 4 of the 02002 IPR (involving Lupo, Toth, Kinney, and additionally Reinmuller I) because both sets of grounds "rely on the same reference–Kinney–and advance similar arguments–namely, that compositions comprising BDDE-crosslinked HA fillers containing lidocaine that were stabile after sterilization was obvious."  *Id.* at 35–36; Ex. 3001, 7.  Petitioner's high levels of generalization are insufficient to support its assertion that Petitioner has "repackaged into [this Petition] practically identical prior art grounds to challenge the same patent claims."  *See* Prelim. Resp. 34.

Further, and perhaps more pertinent to *General Plastic* factor 1, Petitioner avers that "this is Prollenium's first Petition, and Prollenium has no connection to the prior petitioner. . . . [Moreover,] only Prollenium has been sued under this patent."  Pet. 64; *see* Reply 8 ("Allergan makes no effort to show why *Prollenium*, which has *no relationship* to Teoxane and was sued years later, should be barred.").  On the present record, we agree that Prollenium has no significant relationship to the petitioner of the 02002 IPR.  *See Valve Corp. v. Electronic Scripting Prods., Inc.* IPR2019-00062, Paper 11, 9 (Apr. 2, 2019) (precedential) ("[W]e consider any relationship between those petitioners when weighing the General Plastic factors.").  Accordingly, *General Plastic* factor 1 weighs against exercising our discretion under § 314(a).

IPR2019-01505
Patent 8,450,475 B2

With respect to *General Plastic* factors 2 and 4, we agree with Petitioner that these factors relate to prior art *withheld* from the first Petition and, because there is no evidence that Prollenium was involved with any earlier petition challenging the '475 patent, and because there is no evidence that Prollenium was aware of any infringement assertions against it at the time of the earlier petition filings, these factors are inapplicable here.  Likewise, factor 5, ("[w]hether the petitioner provides adequate explanation for the time elapsed between the filings of multiple petitions directed to the same claims of the same patent"), also fails to weigh in favor of denying institution because, as there is no evidence that Prollenium was involved in any such earlier petition or that Prollenium was even aware of the infringement assertions against it at the time of the earlier petition filings, there is no elapsed time to explain.

Patent Owner argues that *General Plastic* factor 3 weighs in favor of denying institution because "[g]uided by the Board's analysis of the previous petitions, Petitioner crafted this third petition against the '475 patent to try to 'overcome the deficiencies' identified by the Board's analysis."  Prelim. Resp. 36–37.  But as noted by Petitioner, the Board denied the 02002 Petition

> for various reasons, including failure to show certain anticipation references inherently disclosed certain claim elements, and a general lack of supporting evidence for the petitioner's positions. *See* [Ex. 3001, 15, 17, 19, 24–25] (rejecting anticipation and obviousness ground for failure to show inherent features and the stable limitation, rejecting ground for asserting "bare attorney argument," rejecting ground for failure to show a German reference was "of record" or how its alleged English counterpart met the limitations of the claims, and other failures to direct the Board to the specific and competent evidence to support the contentions).

IPR2019-01505
Patent 8,450,475 B2

Pet. 63.  Even were we to accept Patent Owner's position that the instant

Petition asserted "practically identical prior art grounds" as set forth in the

02002 IPR, those grounds were not fully adjudicated on the merits.  *See*

Prelim. Resp. 34.  We note in particular that the weight the Board should

accord the Lebreton Declaration–a cornerstone of Petitioner's argument–is

not mentioned, let alone addressed on the merits, in the 02002 IPR decision.

*See* Ex. 3001.  As such, in this instance, we do not find it persuasive that

Prollenium was in possession of the Board's decision denying the 02002

IPR prior to filing this Petition.  Accordingly, General Plastic factor 3 does

not weigh in favor of denying institution under § 314(a).

Finally, because Patent Owner has not shown, nor do we discern, that

this Petition raises unusual issues challenging the finite resources of the

Board or our capacity to issue a final determination within the statutory

limits of 35 U.S.C. § 316(a)(11), *General Plastic* factors 6 and 7 do not

weigh in favor of denying institution under § 314(a).

Consequently, and for the reasons explained above, we decline to

exercise our discretion under 35 U.S.C. § 314(a) to deny institution of the

Petition.

## IV.   CONCLUSION

On the present record, we find Petitioner has made a sufficiently

persuasive showing that the cited references would have taught or suggested

each element of claims 1–9, 18, and 27–37, and set forth a sufficient

rationale for why a person of ordinary skill would have been motivated to

combine these teachings and suggestions to arrive at the invention recited in

those claims.  Petitioner has established a reasonable likelihood of prevailing

in demonstrating that claims 1–9, 18, and 27–37 would have been obvious

over the combinations of prior art set forth in the asserted grounds.

46

IPR2019-01505
Patent 8,450,475 B2

Our factual findings and conclusions at this stage of the proceeding are based on the evidentiary record developed thus far.  This is not a final decision as to the patentability of claims for which *inter partes* review is instituted.  Our final decision will be based on the record as fully developed during trial.

## V.    ORDER

In consideration of the foregoing, it is hereby:

ORDERED, pursuant to 35 U.S.C. § 314(a), that an *inter partes* review of claims 1–9, 18, and 27–37 of the '475 patent is instituted with respect to all grounds set forth in the Petition; and

FURTHER ORDERED, pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4(b), that the *inter partes* review of the '475 patent shall commence on the entry date of this Order, and notice is hereby given of the institution of a trial.

IPR2019-01505
Patent 8,450,475 B2

FOR PETITIONER:

Christopher L. Curfman
William W. Cutchins
MEUNIER CARLIN & CURFMAN LLC
ccurfman@mcciplaw.com
wcutchins@mcciplaw.com


FOR PATENT OWNER:

Dorothy P. Whelan
Michael Kane
FISH & RICHARDSON P.C.
whelan@fr.com
kane@fr.com

Trials@uspto.gov
571-272-7822

Paper 18
Date: March 31, 2020



UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

PROLLENIUM US INC.,
Petitioner,

v.

ALLERGAN INDUSTRIE, SAS,
Patent Owner.

———————————

IPR2019-01506
Patent 8,357,795 B2

———————————

Before GRACE KARAFFA OBERMANN, SHERIDAN K. SNEDDEN,
and ROBERT A. POLLOCK, *Administrative Patent Judges.*

SNEDDEN, *Administrative Patent Judge.*

DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314*

IPR2019-01506
Patent 8,357,795 B2

## I.   INTRODUCTION

Prollenium US Inc. ("Petitioner") filed a Petition for *inter partes* review of claims 1–11, 22, 40, and 41 of U.S. Patent No. 8,357,795 ("the '795 patent," Ex. 1001). Paper 1 ("Pet."). Allergan Industrie, SAS ("Patent Owner") filed a Preliminary Response. Paper 7 ("Prelim. Resp."). On January 10, 2020, we issued an Order granting Petitioner's request for additional briefing regarding whether we should exercise our discretion to deny the Petition under §325(d) and/or §314(a). Paper 12. In response to our Order, Petitioner filed a Reply to the Patent Owner Preliminary Response (Paper 13, "Reply"), and Patent Owner filed a corresponding Sur-reply (Paper 17, "Sur-reply).

To institute an *inter partes* review, we must determine that the information presented in the Petition shows "a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition." 35 U.S.C. § 314(a) (2012). The Supreme Court has held that a decision to institute under 35 U.S.C. § 314 may not institute on fewer than all claims challenged in the petition. *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1359–60 (2018) ("SAS"). After considering the evidence and arguments presented in the Petition, we determine that Petitioner has demonstrated a reasonable likelihood of success in proving that at least claim 1 of the '795 patent is unpatentable. Accordingly, an *inter partes* review of all of the claims and all of the grounds presented in the Petition is hereby instituted.

In this Decision, we address all issues raised by the parties in the pre-trial briefing. Our factual findings and conclusions at this stage of the proceeding are based on the evidentiary record developed thus far. This is not a final decision as to the patentability of claims for which *inter partes*

IPR2019-01506
Patent 8,357,795 B2

review is instituted.  Our final decision will be based on the record as fully developed during trial.

A. *Real Parties in Interest*

Petitioner identifies its real parties-in-interest as Prollenium US Inc. and Prollenium Medical Technologies Inc.  Pet. 69.  Patent Owner identifies its real parties-in-interest as Allergan Industrie, SAS; Allergan USA, Inc.; Allergan Sales, LLC; Allergan Holdings France SAS; Allergan Holdings Limited; Allergan Holdings, Inc.; Allergan Puerto Rico Holdings, Inc.; and Allergan, Inc.  Paper 4, 2.

B. *Related Matters*

Petitioner has filed a separate Petition for *inter partes* review of claims 26–39 of the '795 patent as IPR2019-01632.  The '795 patent is at issue in *Allergan USA, Inc. et al v. Prollenium US Inc., et al.*, Case No. 1:19-cv-00126 (D. Del. filed Jan. 22, 2019).  Pet. 69; Paper 4, 3.  The '795 patent was the subject of two previous *inter partes* reviews: IPR2014-01422 filed August 29, 2014, and terminated June 19, 2015, by way of joint motion to terminate, and IPR2017-01906 filed August 2, 2017, and denied on March 9, 2018.  Paper 4, 3.

Petitioner has filed Petitions for *inter partes* review of related U.S. patents as follows: U.S. Patent No. 8,450,475 B2 ("the '475 patent") in IPR2019-01505; U.S. Patent No. 8,822,676 B2 ("the '676 patent") in IPR2019-01617; U.S. Patent No. 9,089,519 B2 ("the '519 patent") in IPR2020-00084; U.S. Patent No. 9,238,013 B2 ("the '013 patent") in IPR2019-01508; and U.S. Patent No. 9,358,322 B2 ("the '322 patent") in IPR2019-01509.  Pet. 69–70; Paper 4, 3.  The '475, '676, '519, '013, and '332 patents are also at issue in *Allergan USA, Inc. et al. v. Prollenium US Inc., et al.*, Case No. 1:19-cv-00126 (D. Del. filed Jan. 22, 2019).  *Id.*

3

IPR2019-01506
Patent 8,357,795 B2

C.  *The '795 Patent*

1.  *Specification*

The subject matter claimed in the '795 patent is directed to soft tissue filler compositions.  Ex. 1001, 19:20–22:27.  The compositions include a hyaluronic acid (HA) component and an anesthetic agent, e.g., lidocaine.  *Id.* at 2:36–49.  The hyaluronic acid component is crosslinked with a crosslinking agent, e.g., 1,4-butanediol diglycidyl ether (BDDE).  *Id.* at 2:50–58.  The '795 patent specification refers to cohesive compositions that are defined by "the ability of a HA-based composition to retain its shape and resist deformation."  *Id.* at 5:62–63.

The compositions are sterilized, for example by autoclaving, to form sterile compositions.  *Id.* at 3:42–47.  The compositions may be used as dermal fillers to help fill in facial lines and depressions and for restoring fat loss-related tissue volume.  *Id.* at 1:30–34.  Allergan markets dermal fillers containing crosslinked hyaluronic acid and lidocaine under the tradename Juvéderm®.  Prelim. Resp. 1–2.

2.  *Illustrative Claims*

Independent claims 1 and 22, reproduced below, are illustrative of the challenged claims.

1. A soft tissue filler composition comprising:

a  hyaluronic acid (HA) component crosslinked with a crosslinking agent selected from the group consisting of 1,4-butanediol diglycidyl ether (BDDE), 1,4-bis(2,3-epoxypropoxy)butane, 1,4-bisglycidyloxybutane, 1,2-bis(2,3-epoxypropoxy)ethylene and 1-(2,3-epoxypropyl)-2,3-epoxycyclohexane, and 1,4-butanediol diglycidyl ether;

wherein the HA is not crosslinked to a non-HA biopolymer; and

lidocaine combined with said crosslinked HA component;

4

IPR2019-01506
Patent 8,357,795 B2

wherein the lidocaine is freely released in vivo; and

wherein the composition is sterile.

22. A cohesive soft tissue filler composition, the composition comprising:

a hyaluronic acid (HA) component crosslinked with 1,4-butanediol diglycidyl ether (BDDE); and

unbound lidocaine HCl combined with the crosslinked HA component,

wherein said cohesive soft tissue filler composition has an extrusion force of between about 10 N and about 13 N and has a viscosity of between about 5 Pa*s and about 450 Pa*s after sterilization.

Ex. 1001, 19:20–32; 20:35–44.

### 3.  Relevant Prosecution History

The '795 patent issued from U.S. Application Serial No. 12/393,884 ("the '884 application," Ex. 1023).  During the prosecution of the '884 application, the Examiner rejected the claims as obvious over Lebreton, disclosing BDDE-crosslinked hyaluronic dermal fillers, and secondary references disclosing adding lidocaine to hyaluronic acid dermal fillers.  Ex. 1023, 43–46, 78–80.  For example, the Examiner rejected the claims as obvious over Lebreton and Wang[1] (teaching "crosslinked hyaluronic acid" that further comprises preferably an anesthetic such as lidocaine) or Calias[2] (teaching hyaluronic acid crosslinked with DVS and further comprising a drug such as lidocaine).  Id. at 45, 80.  After a final rejection over Lebreton and Calias, the Applicant argued that "the heat stable property of the claimed

---

[1] Ex. 1047, W. Wang, U.S. Patent Application Publication No. 2005/0271729 A1, published Dec. 8, 2005 ("Wang").
[2] Ex. 1048, P. Calias et al., U.S. Patent No. 6,521,223 B1, issued Feb. 18, 2003 ("Calias").

IPR2019-01506
Patent 8,357,795 B2

dermal filler compositions, as shown in the Declaration and as supported by the data of record, is evidence that the claimed compositions comprising hyaluronic acid and lidocaine, are nonobvious." *Id.* at 24–25.

To support this argument, the Applicant submitted a Declaration by the inventor, Pierre F. Lebreton, Ph.D. (Ex. 1024).  Ex. 1023, 11–29. Dr. Lebreton attested as follows:

> It was believed that adding lidocaine to hyaluronic acid gel compositions during manufacturing caused degradation of the hyaluronic acid prior to injection of the HA as a dermal filler.

> It was believed that lidocaine caused degradation of HA gel compositions during high temperature sterilization.

> It was not known whether HA compositions comprising lidocaine were stable or not after high temperature sterilization when placed in storage for any significant length of time.

> It was also believed that the instability of HA described above would have caused a viscosity reduction of the HA that would make it unsuitable for soft tissue filling applications.

> Based upon the facts set forth above, a person of ordinary skill in the art would have expected that a dermal filler comprising hyaluronic acid and lidocaine would not have remained sufficiently stable to be useful as soft tissue filler.

> It was not appreciated that a dermal filler comprising a cohesive gel of hyaluronic acid makes it possible for lidocaine to be combined with hyaluronic acid in a gel that is sufficiently stable to be useful as a soft tissue filler.

> The enhanced stability properties of the inventive dermal fillers was evidenced by certain experiments performed under my direction by my research team prior to the application filing date.

> To my knowledge, it was a surprising and unexpected discovery, not appreciated prior to the present invention, that certain cohesive HA gels, as defined in the application, when mixed with lidocaine, could be made to be heat and shelf stable.

IPR2019-01506
Patent 8,357,795 B2

Ex. 1024, ¶¶ 6–11, 15; *See* Pet. 11–12; Prelim. Resp. 10–11.  The Applicant further submitted Cui[3] as evidence "that HA gels are known to be sensitive to heat sterilization, and that even more particularly, that HA gels crosslinked with BDDE are known to be especially sensitive to heat sterilization relative to HA gels cross-linked with other, i.e. non-BDDE, crosslinkers."  Ex. 1023, 28.

### D. Evidence

Petitioner relies upon the following prior art references.

Ex. 1007, R. S. Narins and P. H. Bowman, *Injectable Skin Fillers*, 32 CLIN. PLAST. SURG. 151–162 (2005) ("Narins").

Ex. 1012, B. M. Kinney, *Injecting Puragen Plus into the Nasolabial Folds: Preliminary Observations of FDA Trial*, 26 AESTHETIC SURG. J. 741–748 (2006) ("Kinney").

Ex. 1029, P. Lebreton, U.S. Patent Application Publication No. 2006/0194758 A1 (published Aug. 31, 2006) ("Lebreton").

Ex. 1030, K. K. Sadozai et al., U.S. Patent Application Publication No. 2005/0136122 A1 (published Jun. 23, 2005) ("Sadozai").

Ex. 1058, X. Zhao, U.S. Patent Application Publication No. 2005/0250939 A1 (published Nov. 10, 2005) ("Zhao").

Ex. 1059, J. Reinmuller, U.S. Patent No. 5,731,298 (issued Mar. 24, 1998) ("Reinmuller").

Petitioner also relies upon the Declaration of Dr. Dale P. DeVore (Ex. 1002) to support its contentions.

### E. Asserted Grounds of Unpatentability

Petitioner asserts that claims 1–11, 22, 40, and 41 would have been unpatentable on the following grounds.

---

[3] Cui et al., *The comparison of physicochemical properties of four Cross-linked sodium hyaluronate gels with different cross-linking agents*, 396–398 ADV. MATS. RES. 1506–1512 (2012) (Ex. 1025).

IPR2019-01506
Patent 8,357,795 B2

| Ground | Claim(s) | U.S.C. § [4] | References/Basis |
|--------|----------|--------------|------------------|
| 1 | 1–11, 22, 40, 41 | 103(a) | Lebreton, Sadozai |
| 2 | 1, 3–11, 40, 41 | 103(a) | Kinney, Zhao, Narins |
| 3 | 1, 3–11, 40, 41 | 103(a) | Reinmuller, Lebreton |

### F.   Abbreviations

| HA | Hyaluronic Acid |
|----|-----------------|
| CTA | Cosmetic Tissue Augmentation |
| FDA | Food & Drug Administration |
| PMA | Premarketing Approval |
| BDDE | butanediol diglycidyl ether |
| BCDI | p-phenylene-bis(ethylcarbodiimide) |
| DVS | 1,4-divinylsulfone |
| DEO | diepoxyoctane |

## II.   ANALYSIS

### A.   Level of Ordinary Skill in the Art

The person having ordinary skill in the art is a hypothetical person who is presumed to be aware of all the relevant prior art. *Custom Accessories, Inc. v. Jeffrey-Allan Indust., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986); *Kimberly-Clarke Corp. v. Johnson & Johnson*, 745 F.2d 1437, 1453

---

[4] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) ("AIA"), amended 35 U.S.C. §§ 102 and 103.  Because the challenged claims of the '795 patent have an effective filing date before the effective date of the applicable AIA amendments, we refer to the pre-AIA versions of 35 U.S.C. § 103 throughout this Decision.

IPR2019-01506
Patent 8,357,795 B2

(Fed. Cir. 1984). Moreover, the prior art itself is generally sufficient to demonstrate the level of skill in the art at the time of the invention. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (explaining that specific findings regarding ordinary skill level are not required "where the prior art itself reflects an appropriate level and a need for testimony is not shown") (quoting *Litton Indus. Prods., Inc. v. Solid State Sys. Corp*., 755 F.2d 158, 163 (Fed. Cir. 1985)).

Petitioner asserts that a person of ordinary skill in the art would have been "a scientist involved in the development of dermal fillers, who would have an advanced degree, such as a Ph.D., M.S., or M.D., and several years of experience developing dermal fillers for cosmetic use, including HA-based dermal fillers." Pet. 13 (citing Ex. 1002 ¶¶ 69–72). Petitioner asserts that the person of ordinary skill "would be aware of commercially sold dermal fillers, in the United States and abroad, as well as those products for which approvals were being publicly sought." *Id.* Petitioner asserts that the person of ordinary skill "would also be aware of the process by which FDA reviews dermal filler products, and how FDA communicates the results of such reviews to the public." *Id.* (citing Ex. 1002 ¶¶ 73–75; Ex. 1032, 227).

Patent Owner contends that the Board should adopt the same definition for the person of ordinary skill as previously adopted in IPR2017-01906, which also involved the '795 patent.[5] Prelim. Resp. 12. In IPR2017-01906, the Board determined that a person of ordinary skill in the art:

> would have had a B.S. or M.S. in biochemistry, polymer chemistry, medicinal chemistry, pharmaceutical chemistry, or a related field with 'several years' of practical experience. Alternatively . . . the ordinary artisan would have had less

[5] *Teoxane S.A. v. Allergan, PLC*, IPR2017-01906, Paper 15 (PTAB Mar. 9, 2018)

IPR2019-01506
Patent 8,357,795 B2

> practical experience but a Ph.D. in one of those fields, or an M.D.
> in dermatology, plastic surgery, or a specialty related to the
> clinical use of dermal fillers.

*Id.* (citing IPR2017-01906, Paper 15 at 8–9).

On the present record, we find Petitioner's definition reasonable. Consistent with Petitioner's argument, the proposed definition is not clearly inconsistent with our prior determination and is supported by Dr. DeVore's presently uncontested testimony. *See* Ex. 1002 ¶¶ 69–72. Further, the art of record abundantly supports Petitioner's proposition that one of ordinary skill in the art would have been aware of commercially sold dermal fillers and publically available information regarding their FDA approval.

Monheit[6], for example, discusses clinical trials and approval dates of "five FDA-approved HA skin fillers available in the United States: Hylaform, Hylaform Plus, Captique (Inamed Corporation), Restylane (Medicis Aesthetics Inc.), and, most recently, Juvéderm (Allergen Aesthetics)," noting, for example, that "Hylaform has been available worldwide since 1998 and in the United States since 2004." Ex. 1022, 79–80. And in summarizing an FDA clinical study comparing Hylaform to Zyplast, Monheit cites data from a 2003 FDA publication "Available at: http://www.fda.gov/ohrms/dockets/ac/03/slides/4004s1_01_lerner_files/frame.htm." *Id.* at 80, Box 1.

Moreover, in reviewing the state of the art of injectable skin fillers for soft tissue augmentation, Narins notes the FDA approval status for commercially available products Zyderm I and II, CosmoDerm, CosmoPlast,

---

[6] Ex. 1014, Gary D. Monheit & Chad L. Prather, *Juvéderm: A Hyaluronic Acid Dermal Filler*, Journal of Drugs in Dermatology, Vol. 6, Issue 11, 1091–1092 (Nov. 2007) ("Monheit"). *See also*, Ex. 1002 ¶¶ 39, 105 (Dr. DeVore's reliance on Monheit); Prelim. Resp. 31 (same).

IPR2019-01506
Patent 8,357,795 B2

Restylane, Hylaform, Radiance FN, Sculptra, and Silikon 1000.  Ex. 1007, 152, 153, 156–157, 158, 159.  Kinney similarly notes the FDA approval dates of Restylane and Juvaderm (Ex. 1012, 741), and Smith[7] discusses the "FDA status and Approved Uses" of "Juvéderm 30, 24HV, and 30HV injectable gels," further noting that the FDA "recently announced a label extension for Juvéderm Ultra and Juvéderm Ultra plus" (Ex. 1009, 67S–68S).

Thus, as a whole, the evidence of record strongly suggests that skilled artisans were aware of and monitored the commercial and regulatory approval status of dermal filler compositions.  In light of these teachings and the testimony of Dr. DeVore, we expand upon the Board's earlier definition of one of ordinary skill in the art as indicated by Petitioner's arguments.  Thus, for the purpose of institution, a person of ordinary skill in the art as of the filing date of the '795 patent would have a B.S. or M.S. in biochemistry, polymer chemistry, medicinal chemistry, pharmaceutical chemistry, or a related field with several years of practical experience or have had  less practical experience but a Ph.D. in one of those fields, or an M.D. in dermatology, plastic surgery, or a specialty related to the clinical use of dermal fillers.  Such a person would have been aware of commercially sold dermal fillers in the United States and abroad, as well as those products for which approvals were being publicly sought.

The above definition is provisional and the parties are welcome to present further argument on this topic at trial.

---

[7] Ex. 1009, Smith, *Practical Use of Juvéderm: Early Experience*, 120 PLASTIC AND RECONSTRUCTIVE SURG. 67S–73S (2007) ("Smith").

IPR2019-01506
Patent 8,357,795 B2

### B. Claim Construction

We interpret a claim "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b)." 37 C.F.R. § 42.100(b)(2019). Under this standard, we construe the claim "in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." *Id.* Furthermore, at this stage in the proceeding, we need only construe the claims to the extent necessary to determine whether to institute *inter partes* review. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

Petitioner proposes construction for the following claimed terms: "sterile" (claims 1, 40), "freely release in vivo" (claim 1), "unbound" (claim 22), cohesive (claims 2, 22). Pet. 13–20. Patent Owner contends it is not necessary to construe any of the claimed terms. Prelim. Resp. 11.

Having considered the parties' positions and evidence of record, we determine that no express construction of any other claim term is necessary to determine whether Petitioner has shown by a preponderance of the evidence that the claims are unpatentable in this case.

IPR2019-01506
Patent 8,357,795 B2

### C. Petitioner's Patentability Challenges

#### 1. Ground 1: Obviousness in view of Lebreton and Sadozai

##### a) Summary of the References Relied Upon

###### (1) Lebreton

Lebreton is directed to crosslinking low and high molecular weight polymers to form injectable monophase hydrogels. Ex. 1029, code [57]. The hydrogels may be used as filling materials in plastic surgery. *Id.* ¶ 5. Lebreton discloses buffering the crosslinked product to a pH compatible with the human body, being between 7 and 7.4. *Id.* ¶ 48. Particularly, Lebreton discloses hydrogels prepared by crosslinking sodium hyaluronate (sodium salt of hyaluronic acid) with 1,4-butanediol diglycidyl ether (BDDE). *Id.* ¶¶ 68–76. The degree of crosslinking "is theoretically between 0.5 and 70%, advantageously between 4 and 50%." *Id.* ¶ 46. The crosslinked products are neutralized to pH 7.2 and sterilized with moist heat in an autoclave. *Id.* ¶¶ 70, 76, 81.

Lebreton further discloses monophase and biphase hydrogels. *See id.* ¶¶ 64–67, 73, 79, 85, 91. Monophase hydrogels are characterized by "no apparent liquid phase" and are "soft and free-flowing." *Id.* ¶¶ 64–65. Biphase hydrogels are characterized as "gel fragments bathed in a low-viscosity liquid medium" with "no cohesion of the gel and no free-flowing appearance." *Id.* ¶¶ 66–67. Lebreton discloses monophase hydrogels characterized by an extrusion force of 14 N and 15 N, when injected through a 27 G½ needle at a rate of 12.5 mm/min. *Id.* ¶¶ 62, 83, 89.

###### (2) Sadozai

Sadozai is directed to a crosslinked hyaluronic acid composition effective for tissue augmentation or drug delivery. Ex. 1030 ¶¶ 7, 8. "[T]he storage modulus G′ is increased, e.g., composition is stabilized, by the

13

IPR2019-01506
Patent 8,357,795 B2

inclusion of a local anesthetic, e.g., lidocaine, compared to a non-stabilized composition, e.g., an identical composition except that the local anesthetic is not included." *Id.* ¶ 68.  Particularly, Sadozai discloses compositions including hyaluronic acid crosslinked with p-phenylene-bis(ethylcarbodiimide) (BCDI).  *Id.* ¶ 85.  The crosslinked hyaluronic acid compositions are combined with phosphate buffer containing 0.30% lidocaine (Phosphate Buffer 4) to form a suspension.  *Id.* ¶¶ 84, 90, 100, 102.  The suspensions are loaded into syringes and autoclaved for sterilization.  *Id.* ¶¶ 90 (Example 12), 100 (Example 17).  Sterilization/hydration may be performed in an autoclave at temperatures between 100° C to 150° C.  *Id.* ¶¶ 54–55.

Sadozai discloses that compositions processed according to Example 12 "with lidocaine have significantly higher modulus G′ over the time of the test.  Thus, crosslinked hyaluronic acid with lidocaine can have good biostability, and can in some cases have a synergistic effect, increasing G′."  *Id.* ¶ 107.

### b) Petitioner's Contentions

Petitioner asserts that claims 1–11, 22, 40, and 41 are unpatentable under 35 U.S.C. § 103(a) as obvious over the combination of Lebreton and Sadozai.  Pet. 24–38.  Petitioner provides a detailed claim analysis for claims 1 and 22 as obvious over Lebreton and Sadozai.  Pet. 29–34.  Petitioner refers to this analysis as to the remaining claims.  Therefore, we address Petitioner's arguments as to claims 1 and 22.

### (1) Claim 1

### (a) "A soft tissue filler composition comprising: a hyaluronic acid (HA) component crosslinked with a

14

IPR2019-01506
Patent 8,357,795 B2

> *crosslinking agent selected from the group consisting of [BDDE]"*

Petitioner asserts Lebreton discloses a BDDE-crosslinked hyaluronic acid soft tissue filler.  Pet. 28 (citing Ex. 1029 ¶¶ 5, 68–76).

> (b)  *"wherein the HA is not crosslinked to a non-HA biopolymer"*

Petitioner asserts Lebreton discloses a BDDE-crosslinked hyaluronic acid that is not crosslinked to any other polymer.  *Id.* (citing Ex. 1029 ¶¶ 68–76).

> (c)  *"and lidocaine combined with said crosslinked HA component"*

Petitioner asserts Sadozai discloses 0.3% lidocaine.  *Id.* (Ex. 1030 ¶ 107).

> (d)  *"wherein the lidocaine is freely release in vivo"*

Petitioner asserts a person of ordinary skill "would have modified Lebreton's process by including lidocaine in the buffer solution, per Sadozai."  *Id.* (citing Ex. 1002 ¶¶147–148).  Petitioner asserts that the person of ordinary skill "would reasonably expect lidocaine loaded into a gel by this process to diffuse from the gel in an uninhibited fashion upon implantation," particularly so that it would both mitigate pain and reach equilibrium in an *in vitro* assay.  *Id.* at 28–29 (citing Ex. 1002 ¶¶ 149–152, 156, 158).

> (e)  *"and wherein the composition is sterile."*

Petitioner asserts Lebreton and Sadozai teach heat sterilization of crosslinked hyaluronic acid gels.  *Id.* at 29 (citing Ex. 1029 ¶¶ 70, 76; Ex. 1030 ¶¶ 90, 107).  Petitioner asserts the person of ordinary skill "would be motivated to sterilize the lidocaine containing BDDE-crosslinked compositions as well."  *Id.*

15

IPR2019-01506
Patent 8,357,795 B2

### (2) Claim 22

#### (a) *"A cohesive soft tissue filler composition, the composition comprising"*

Petitioner asserts Lebreton and Sadozai both teach soft tissue fillers. Pet. 37 (citing Ex. 1029 ¶ 5; Ex. 1030 ¶¶7, 12).  Petitioner contends a person of ordinary skill "would have understood Lebreton's 'monophase' compositions to be cohesive, and would expect the incorporation of lidocaine would not affect the cohesivity of the gel." *Id.*

#### (b) *"a hyaluronic acid (HA) component crosslinked with [BDDE]; and"*

Petitioner asserts Lebreton discloses a BDDE-crosslinked hyaluronic acid. *Id.* (citing Ex. 1029 ¶¶ 68–76).

#### (c) *"unbound lidocaine combined with the crosslinked HA component"*

Petitioner asserts that no covalent bonds would be formed by modifying Lebreton's process with Sadozai's lidocaine containing buffer solution.  *Id.* at 38 (citing Ex. 1002 ¶¶ 192–194).  Petitioner asserts that a person of ordinary skill "would have reasonably expected that the lidocaine in the modified composition would have been 'substantially unbound' to the HA." *Id.*

#### (d) *"wherein said cohesive soft tissue filler composition has an extrusion force of between about 10 N and about 13 N"*

Petitioner asserts Lebreton discloses "gels having extrusion forces of 14N and 15N, when injected through a 27 G½ needle at a rate of 12.5 mm/min." *Id.* 32–33 (citing Ex. 1029 ¶¶ 62, 83, 89).  Petitioner contends extrusion force is influenced by needle gauge and syringe dimension, neither of which are claimed.  *Id.*  Petitioner asserts the '795 patent's Specification

16

IPR2019-01506
Patent 8,357,795 B2

acknowledges "a person of ordinary skill in the art can determine the correct syringe dimensions and needle gauge required to arrive at a particular extrusion force requirement." *Id.* (quoting Ex. 1001, 11:49–52). Therefore, Petitioner asserts the claimed extrusion force would have been obvious to arrive at by modifying Lebreton with the appropriately sized syringe and needle. *Id.* at 33 (citing Ex. 1002 ¶¶ 95, 173).

> *(e) "and has a viscosity of between about 5 Pa\*s and about 450 Pa\*s after sterilization."*

Petitioner asserts the claimed range overlaps with "essentially every HA dermal filler that has been clinically used as of August 288 (e.g., ~50–1,200 Pa\*s at 0.1 Hz). *Id.* Petitioner asserts that the person of ordinary skill would have known that a desired viscosity could be obtained by routine optimization of the degree of crosslinking and the amount of free hyaluronic acid. *Id.* at 33–34 (citing Ex. ¶¶ 86–94, 174).

> *(3) Motivation to Combine*

Petitioner contends that incorporating lidocaine into crosslinked fillers was a known solution to the problem of injection pain, and was previously implemented in fillers containing hyaluronic acid crosslinked with BCDI, 1,4-divinylsulfone ("DVS"), or diepoxyoctane ("DEO"). *Id.* at 25 (citing Ex. 1002 ¶¶ 116, 117, 130–131). Petitioner contends that "[a] composition containing BDDE-crosslinked HA and lidocaine was a derivative and predictable next step in view of the success of the other three clinically used crosslinkers." *Id.* Thus, Petitioner contends a person of ordinary skill in the art could have easily incorporated Sadozai's 0.3% lidocaine in a buffer solution into Lebreton's BDDE-crosslinked gel. *Id.* at 27 (citing Ex. 1002 ¶¶ 147–148).

17

IPR2019-01506
Patent 8,357,795 B2

### (4)  Objective Evidence of Non-obviousness

Petitioner contends "the Examiner allowed the claims of the challenged patent (and its related applications) based on Allergan's arguments and proffered evidence pointing to supposed 'unexpected results' of the invention."  Pet. 51.  Petitioner challenges the Inventor's Declaration, the comparative data in the specification, and the extrinsic evidence cited by the Applicant during prosecution.  *Id.* at 51–52.

First, Petitioner asserts that the Inventor's Declaration is unsubstantiated and contradicted by the prior art.  *Id.* at 53–56.  Petitioner asserts that, contrary to Lebreton's statements, the totality of the prior art instead gave the POSITA the expectation lidocaine could be successfully combined with various crosslinked HA dermal fillers, including a BDDE-crosslinked HA dermal filler.  *Id.* at 54.  To show that sterile and stable lidocaine-hyaluronic acid combinations were previously known, Petitioner cites dermal fillers that were commercially available at the time of filing, e.g., Elevess, Prevelle Silk, Puragen Plus, in addition to Sadozai and Kinney.  *Id.* (citing Ex. 1002 ¶¶ 237–239).  Moreover, Dr. DeVore states his opinion that "the POSITA would not have believed that lidocaine caused degradation of HA gels compositions during high temperature sterilization and would have believed that HA compositions comprising lidocaine."  Ex. 1002 ¶ 239.  Dr. DeVore attests that "during the development of Elevess, it was observed that the autoclave-sterilized [BCDI]-crosslinked HA composition with lidocaine was sufficiently stable to support a product shelf life of 15 months, which is reflected in the Elevess label."  *Id.* (citing Ex. 1050, 6).

Second, Petitioner asserts that the comparative data relied on by the Inventor's Declaration does not support nonobviousness.  Pet. 56.  The comparative data appears as Example 4 of the '795 patent's Specification.

IPR2019-01506
Patent 8,357,795 B2

Ex. 1001, 15:20–17:2.  Dr. DeVore attests that "Example 4 describes experiments in which six samples were evaluated. . . . Allergan argued that the results of Samples 1–3 were consistent with the expectations of the POSITA, and that it was unexpected that Samples 4–6 did not exhibit the same viscosity reduction."  Ex. 1002 ¶ 245.  Dr. DeVore states "[i]n my opinion, Sample 1 is completely irrelevant—it is a mixture of uncrosslinked HA and a completely different polymer (hydroxypropyl methylcellulose).  I am not aware of a mixture of uncrosslinked HA and HMPC being used as a dermal filler, either in 2008 or now."  *Id.* ¶ 246.  Dr. DeVore states that the viscosity differences are not indicative of instability as "[t]he final viscosity for Samples 2 and 3 in each test (~75–375 Pa*s) is substantially the same as the final viscosities of Samples 4–6 (~50–90 Pa*s), all of which are within the range of marketed dermal fillers (50–1,200 Pa*s)."  *Id.* ¶ 248 (citing Ex. 1039, 267).  Dr. DeVore states that there is no meaningful difference in viscosity reduction between Sample 3 (35% reduction when combined with lidocaine without pH adjustment) and Sample 4 (30% reduction in viscosity in the same test) and that the difference was not "much lower" as alleged by Allergan.  *Id.* ¶¶ 252–253.

Third, Petitioner asserts that the extrinsic evidence cited in the Application during prosecution, i.e., Cui, "is irrelevant to the question of whether Allergan's BDDE-crosslinked HA composition showed unexpected results compared to the other crosslinkers known to POSITAs at the time."  Pet. 61 (citing Ex. 1002 ¶ 243).  Petitioner argues that "Cui was published in 2012, well after the claimed priority date of the patent.  The reasonable expectation of success (and expected results) is evaluated at the time the invention was made—a later published reference that might have taught away from the claimed invention is irrelevant."  *Id.* at 60 (citing *Bristol-*

19

IPR2019-01506
Patent 8,357,795 B2

*Myers Squibb Co. v. Teva Pharms. USA, Inc*. 752 F.3d 967, 976 (Fed. Cir. 2014)).  Dr. DeVore states that Cui compares the stability of BDDE-crosslinked hyaluronic acid with three crosslinkers that had not "been seriously investigated for use in dermal fillers as of August 2008," as opposed to the known non-BDDE crosslinkers for dermal fillers. Ex. 1002 ¶ 242.  Dr. DeVore states his opinion that "the Cui reference in no way supports Allergan's assertion that BDDE crosslinked HA was 'especially sensitive' to heat sterilization relative to 'non-BDDE' crosslinkers.  At the very least, Cui is irrelevant . . . because Cui's comparisons do not relate to any of the crosslinkers relied upon here." *Id.* ¶ 243.

### c)   Patent Owner's Contentions

In its Preliminary Response, Patent Owner directs substantially all of its argument to whether the Board should exercise discretion to deny the Petition under 35 U.S.C §§ 314(a) and 325(d).  *See* Prelim. Resp. 1–2, 13–32.  We address Patent Owner's arguments under 35 U.S.C § 325(d) below.

Although Patent Owner does not directly address the merits of Petitioner's grounds, Patent Owner does address the relevance of Cui in the context of its § 325(d) arguments.  *See* Prelim. Resp. 26–27; Sur-Reply 3–4. In sum, Patent Owner argues that Cui is relevant because it "discusses divinyl sulfone (DVS) crosslinked HA gels, which Petitioner admits were known and approved before August 2008."  Prelim. Resp. 26.  We accord this argument little weight at this juncture because Cui provides no comparative information about the stability of HA gels crosslinked with either DVS or BDDE.  Rather, and as Patent Owner admits, "Cui focused on gels crosslinked with four new agents of 'lower toxicity'" as compared to DVS."  *Id.* (citing Ex. 1025, 1506); *see* Reply 3 (noting that "Cui does not

20

IPR2019-01506
Patent 8,357,795 B2

*test or compare* BDDE to *any* of the three crosslinkers discussed in the
Petition[] or the Examiner's art").

Patent Owner responds that we should discount Dr. DeVore's
testimony because it is "conclusory and fails to provide a well-reasoned
rationale or objective support for the proposed grounds." Prelim. Resp. 29.
As an initial matter, at this stage of the proceeding, we give at least some
weight to an expert's unopposed testimony. Moreover, we accord little
weight to Patent Owner's argument about the lack of support in Dr.
DeVore's testimony as Patent Owner appears to rely on summary statements
from Dr. DeVore's declaration that are further explained, with specific
support, elsewhere in the Declaration. Patent Owner argues, for example,
that a sentence fragment from paragraph 148 of Dr. DeVore's declaration
("the POSITA could have easily modified the Lebreton process to
incorporate lidocaine") is "without evidentiary support." Prelim. Resp. 29–
30. The passage, read in full, however, expressly cites to Exhibits 1029 and
1030 as support for the proposition that "[t]he POSITA would have
recognized that merely including lidocaine hydrochloride in the buffer
solution . . . would be sufficient to obtain the lidocaine-containing gel." Ex.
1002 ¶ 148. Accordingly, we do not find persuasive Patent Owner's
argument that we should discount Dr. DeVore's testimony as unduly
conclusory. Patent Owner will have the opportunity to rebut and challenge
Dr. DeVore's testimony at trial.

*d) Conclusion*

Having considered the parties' positions and evidence of record,
summarized above, we determine that Petitioner has established a reasonable
likelihood of prevailing in demonstrating the unpatentability of claims 1–11,
22, 40, and 41 with respect to Ground 1.

21

IPR2019-01506
Patent 8,357,795 B2

### 2. Ground 2: Obviousness in view of Kinney, Zhao, and Narins

#### a) Summary of the References Relied Upon

##### (1) Kinney

Kinney describes a clinical study comparing two dermal fillers, Restylane and Puragen Plus. Ex. 1012, 742. Restylane is a non-animal source hyaluronic acid (NASHA) single crosslinked with BDDE. *Id.* at 741. Kinney describes "the pain associated with injection" as a "major disadvantage" of existing hyaluronic preparations, such as Restylane." *Id.* Puragen Plus is a NASHA double-crosslinked with DEO, thereby forming ester and ether bonds. *Id.* at 742. Kinney discloses that double-crosslinking protects the ether bonds during sterilization. *Id.* Moreover, "[t]he increased chemical stability allows for the addition of lidocaine 0.3% for a relatively pain-free injection." *Id.* Kinney discloses "[n]ot surprisingly, there was minimal to no pain in essentially every patient injected with Puragen Plus, and less pain in every patient injected with Puragen Plus compared with patients injected with Restylane." *Id.* at 746.

##### (2) Zhao

Zhao is directed to double-crosslinked hyaluronic acid derivatives having improved biostability. Ex. 1058 ¶ 14. Zhao discloses crosslinking agents may be used for the double-crosslinking process and may include butanediol diglycidylether (BDDE) and 1,2,7,8-diepoxyoctane (DEO). *Id.* ¶¶ 19–21). Zhao discloses an example of a double-crosslinking process for hyaluronic acid, including a first crosslinking reaction with DEO under alkaline conditions, and a second crosslinking reaction with DEO under acidic conditions. *Id.* ¶ 32. Zhao discloses the degree of crosslinking may range from 10–50%. *Id.* ¶ 56.

IPR2019-01506
Patent 8,357,795 B2

### (3) *Narins*

Narins discloses that Restylane is a stabilized partially crosslinked hyaluronic acid gel. Ex. 1007, 156. Narins discloses "[t]he material is heat-sterilized in its final container and has a shelf life of 1.5 years from the date of manufacture." *Id.*

### b) *Petitioner's Contentions*

Petitioner asserts that claims 1, 3–11, 40, and 41 are unpatentable under 35 U.S.C. § 103(a) as obvious over the combination of Kinney, Zhao, and Narins. Pet. 38–44. Petitioner provides a detailed claim analysis for claim 1. Pet. 46–48. Petitioner refers to this analysis in addressing the remaining claims. Therefore, we address Petitioner's arguments as to claim 1.

### (1) *"A soft tissue filler composition comprising"*

Petitioner asserts both Kinney and Zhao disclose soft tissue fillers. Pet. 40 (citing Ex. 1012, 741–742; Ex. 1058 ¶¶ 60, 67).

### (2) *"a hyaluronic acid (HA) component crosslinked with a crosslinking agent selected from the group consisting of [BDDE]"*

Petitioner asserts Kinney discloses a Restylane, BDDE-crosslinked hyaluronic acid filler, and Puragen Plus, a DEO-crosslinked hyaluronic acid filler. *Id.* (citing Ex. 1012, 741–742).

### (3) *"wherein the HA is not crosslinked to a non-HA biopolymer"*

Petitioner contends the hyaluronic acid in "Restylane and Puragen Plus is not crosslinked to a non-HA biopolymer." *Id.* at 41 (citing Ex. 1002 ¶ 201).

23

IPR2019-01506
Patent 8,357,795 B2

(a) *"and lidocaine combined with said crosslinked HA component"*

Petitioner asserts Kinney discloses 0.3% lidocaine in Puragen Plus. *Id.* (Ex. 1012, 742).

(b) *"wherein the lidocaine is freely release in vivo"*

Petitioner asserts "Lidocaine is freely release[d] from Puragen Plus" because the reference teaches there was minimal to no pain, indicating free release upon injection. *Id.* (citing Ex. 1012, 746). Petitioner asserts that the person of ordinary skill "would have reasonably expected that lidocaine would be released from a double-BDDE crosslinked HA gel in the same fashion as the double-DEO crosslinked gel." *Id.* (citing Ex. 1002 ¶¶203–206).

(c) *"and wherein the composition is sterile."*

Petitioner asserts Kinney teaches sterile Puragen and Naris teaches sterile Restylane. *Id.* (citing Ex. 1012, 742; Ex. 1007, 156). Petitioner asserts the person of ordinary skill "would be motivated to sterilize the double BDDE-crosslinked dermal-filler as well." *Id.* (citing Ex. 1002 ¶ 177).

(4) *Motivation to Combine*

Petitioner asserts that Kinney teaches Puragen Plus (double-DEO crosslinked hyaluronic acid with lidocaine) was preferred to Restylane (single-BDDE crosslinked hyaluronic acid and free hyaluronic acid) due to the addition of lidocaine. *See id.* at 39 (citing Ex. 1012, 741). Petitioner asserts the person of ordinary skill "would have been motivated to exchange the DEO crosslinker in Puragen Plus with a BDDE crosslinker, as BDDE-crosslinked fillers were already established in the marketplace and approved by FDA." *Id.* (citing Ex. 1002 ¶ 199). Petitioner asserts that double-BDDE

24

IPR2019-01506
Patent 8,357,795 B2

crosslinked hyaluronic acid could have been made using Zhao's process given the similarity between DEO and BDDE as bis-epoxide crosslinkers." *Id.* at 39–40 (citing Ex. 1002 ¶¶ 180, 200).

    *c)   Conclusion*

Having considered the parties' positions and evidence of record, summarized above, we determine that Petitioner has established a reasonable likelihood of prevailing in demonstrating the unpatentability of claims 1, 3–11, 40, and 41 with respect to Ground 2.

    *3.   Obviousness in view of Reinmuller and Lebreton*

        *a)   Summary of the References Relied Upon*

            *(1)   Reinmuller*

Reinmuller discloses an injectable gel containing cross-linked hyaluronic acid and 2% by weight lidocaine. Ex. 1059, 7:1–11. The lidocaine acts as a local anesthetic to avoid pain when the injection cannula is inserted. *Id.* at 4:62–64.

Reinmuller discloses the cross-linked hyaluronic acid is commercially available as Hylon and Hylagel available from the Biomatrix Company and cites U.S. Pat. Nos. 4,713,448 and 4,605,691. *Id.* at 3:49–54. Petitioner asserts that, based on this disclosure, a person skilled in the art would have known "that Hylagel was a DVS-crosslinked HA." Pet. 24 (citing Ex. 1002 ¶ 122).

Reinmuller discloses the gel is dispensed into pressure-resistant ampoules and sealed. Ex. 1059, 7:15–18. The packaged gel is heat-sterilized and protected from light. *Id.*

        *b)   Petitioner's Contentions*

Petitioner asserts that claims 1, 3–11, 40, and 41 are unpatentable under 35 U.S.C. § 103(a) as obvious over the combination of Reinmuller and

IPR2019-01506
Patent 8,357,795 B2

Sadozai.  Pet. 46–51.  Petitioner provides a detailed claim analysis for claim 1.  Pet. 46–48.  Petitioner refers to this analysis in addressing the remaining claims.  Therefore, we address Petitioner's arguments as to claim 1.

> (1)   *"A soft tissue filler composition comprising"*

Petitioner asserts both Reinmuller and Lebreton disclose soft tissue fillers.  Pet. 46 (citing Ex. 1059, 2:44–45, 67; Ex. 1029 ¶ 5).

> (2)   *"a hyaluronic acid (HA) component crosslinked with a crosslinking agent selected from the group consisting of [BDDE]"*

Petitioner asserts Lebreton discloses BDDE-crosslinked hyaluronic acid gels.  *Id.* (citing Ex. 1029 ¶¶ 34, 45).

> (3)   *"wherein the HA is not crosslinked to a non-HA biopolymer"*

Petitioner contends the hyaluronic acids in Reinmuller and Lebreton are not crosslinked to any other polymer.  *Id.* at 47 (citing Ex. 1059, 7:6–8; Ex. 1029 ¶¶ 68, 76).

> (a)   *"and lidocaine combined with said crosslinked HA component"*

Petitioner asserts "Reinmuller's composition includes 2% by weight lidocaine."  *Id.* (Ex. 1059, 7:9).

> (b)   *"wherein the lidocaine is freely release in vivo"*

Petitioner asserts "Lidocaine is freely release[d] from Reinmuller's compositions" because the reference teaches incorporating lidocaine to avoid injection pain, thereby indicating free release upon injection.  *Id.* (citing Ex. 1059, 4:63–65).  Petitioner asserts that the person of ordinary skill "would have reasonably believed that lidocaine would still be freely released once Reinmuller's DVS crosslinker was replaces with Lebreton's BDDE."  *Id.* (citing Ex. 1002 ¶¶ 218–220).

26

IPR2019-01506
Patent 8,357,795 B2

(c) *"and wherein the composition is sterile."*

Petitioner asserts both Reinmuller and Lebreton teach sterile compositions. *Id.* at 48 (citing Ex. 1059, 7:16–18; Ex. 1029 ¶ 70).

(4) *Motivation to Combine*

Petitioner asserts a person of ordinary skill would have been motivated to exchange Reinmuller's DVS-crosslinked hyaluronic acid with Lebreton's BDDE hyaluronic acid because BDDE-crosslinked compositions exhibit increased *in vivo* residence times as compared to DVS-crosslinked compositions, the crosslinkers were viewed as interchangeable, and BDDE-crosslinked fillers were already approved by the FDA. *Id.* at 45 (citing Ex. 1002 ¶ 215). Petitioner asserts one of ordinary skill "would have had a reasonable expectation that this modification would result in a [0.3%] lidocaine-containing dermal filler which mitigates injection pain, just as it did for other crosslinked HA dermal fillers such as Eleveess (EX1019, 4), Prevelle Silk (EX1020, 8; EX1052), and Puragen Plus (EX1012, 742)." *Id.*

c) *Conclusion*

Having considered the parties' positions and evidence of record, summarized above, we determine that Petitioner has established a reasonable likelihood of prevailing in demonstrating the unpatentability of claims 1, 3–11, 40, and 41 with respect to Ground 3.

D. *Discretion to Deny Institution*

Patent Owner contends Petitioner presents substantially the same art or arguments previously presented to the Office. Prelim. Resp. 16. Patent Owner argues the Board should exercise its discretion and deny the Petition under 35 U.S.C. §§ 325(d). *Id.* We address Patent Owner's argument below.

IPR2019-01506
Patent 8,357,795 B2

### 1. Legal Standard

Institution of an *inter partes* review is discretionary. *See Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1367 (Fed. Cir. 2016) (explaining that under 35 U.S.C. § 314(a), "the PTO is permitted, but never compelled, to institute an IPR proceeding"). Our discretionary determination of whether to institute review is guided, in part, by 35 U.S.C. § 325(d), which states, in relevant part:

> In determining whether to institute or order a proceeding under this chapter, chapter 30, or chapter 31, the Director may take into account whether, and reject the petition or request because, the same or substantially the same prior art or arguments previously were presented to the Office.

*See also* 157 CONG. REC. S1360, S1376 (daily ed. Mar. 8, 2011) (statement of Sen. Kyl) ("[T]he second sentence of section 325(d) . . . authorizes the Director to reject any . . . petition . . . on the basis that the same or substantially the same prior art or arguments previously were presented to the Office. This will prevent parties from mounting attacks on patents that raise issues that are substantially the same as issues that were already before the Office with respect to the patent. The Patent Office has indicated that it currently is forced to accept many requests . . . that are cumulative to or substantially overlap with issues previously considered by the Office with respect to the patent.").

In evaluating whether the same or substantially the same prior art or arguments were previously presented to the Office under § 325(d), the Board has considered a number of non-exclusive factors, including, for example:

> (a) the similarities and material differences between the asserted art and the prior art involved during examination;

> (b) the cumulative nature of the asserted art and the prior art

IPR2019-01506
Patent 8,357,795 B2

evaluated during examination;

(c) the extent to which the asserted art was evaluated during examination, including whether the prior art was the basis for rejection;

(d) the extent of the overlap between the arguments made during examination and the manner in which Petitioner relies on the prior art or Patent Owner distinguished the prior art;

(e) whether Petitioner has pointed out sufficiently how the Examiner erred in its evaluation of the asserted prior art; and

(f) the extent to which additional evidence and facts presented in the Petition warrant reconsideration of the asserted prior art or arguments.

*Becton, Dickinson and Co. v. B. Braun Melsungen AG*, IPR2017-01586, Paper 8 at 17–18 (PTAB Dec. 15, 2017) (informative) ("the *Becton Dickinson* factors").

2.   *Becton Dickinson* Factors (a) through (d)

With respect to factors (a) through (d), Patent Owner argues that "the three primary references on which Petitioner relies, and arguments based on those references, are the same or substantially the same as those considered during prosecution of the '795 Patent."  Prelim. Resp. 16.

With respect to the primary reference of Ground 1, Patent Owner argues that the Examiner's rejection in view of Lebreton was successfully overcome during the prosecution of the '795 patent.  *Id.* at 16–17.  Patent Owner further argues that Kinney, the primary reference for Ground 2, "is cumulative of the Lebreton (Ex. 1029), Wang (Ex. 1047), Calias (Ex. 1048) and Marko (Ex. 2004) references that the Examiner cited during prosecution of the '795 patent."  *Id.* at 17.  Regarding Reinmuller, the primary reference of Ground 3, Patent Owner contends that the reference is "substantially

29

IPR2019-01506
Patent 8,357,795 B2

similar, if not identical, to the relevant disclosures in Lebreton, Wang, and Calias, which formed the bases of obviousness rejections during prosecution of the '795 patent." *Id.* at 18.  With regard to the secondary references relied on by Petitioner in Grounds 1–3, namely, Sadozai, Zhao, and Narins, Patent Owner contends that each of these references is "either the same as or cumulative of art that was considered, and distinguished, during prosecution of the '795 patent." *Id.* at 20.

Petitioner, however, argues that "Allergan's argument that Lebreton was 'distinguished' in prosecution is inaccurate; Allergan never overcame the *prima facie* cases made by the Examiner.  Instead, every patent was allowed based on Allergan's proffered unexpected results, primarily the unsubstantiated inventor declaration."  Reply, 1–2.  Petitioner's assertion is supported by the relevant prosecution history, as further discussed below. *See e.g.,* section I(C)(3), above.

Petitioner also argues that the asserted grounds combine Lebreton (and Kinney) with "substantially different secondary references (Sadozai, etc.) than used by the Examiner and provide arguments and evidence (including the unrebutted DeVore testimony) not considered by the Examiner."  Reply 2–6.  We find particularly persuasive for the purpose of our § 325(d) analysis Petitioner's contention that, whereas Calias and Wang, cited by the Examiner, "merely *suggest* lidocaine . . . *could* be added to a crosslinked HA gel . . . [,] Sadozai directly refutes the inventor's declaration that lidocaine would degrade a HA gel during high temperature sterilization."  Reply 2–3 (citations omitted); *see also*, Ex. 1002 ¶¶ 31–35, 39, 43, 49, 128–129, 137.

With respect to Grounds 2 and 3, we acknowledge that Kinney and Reinmuller were cited in an IDS, and thus, are the same art previously

30

IPR2019-01506
Patent 8,357,795 B2

presented to the Office.  We find persuasive, however, Petitioner's argument that the Examiner overlooked the relevance of these references because, unlike the references cited by the Examiner, Kinney and Reinmuller provide working examples of stable, crosslinked HA fillers with lidocaine.  Pet. 67–68; Reply 4–5.  *Advanced Bionics, LLC v. MED-EL Elektromedizinische Geräte GmbH*, IPR2019-01469 (PTAB Feb. 13, 2020) (Paper 6) (precedential).

On balance, factors (a) through (d) do not weigh in favor of exercising our discretion to deny institution under §325(d).

### 3. *Becton Dickinson* Factor (e)

As to factor (e), Patent Owner asserts that "Petitioner fails to meets its burden to demonstrate how the Examiner allegedly erred in his review of the prior art during prosecution."  Prelim. Resp. 24.  According to Petitioner, the Examiner's error in allowing these claims "was induced by the declaration."  Reply 6.  Although Petitioner's analysis is not contrary to the present record, whether the Examiner "erred" by relying on the Lebreton Declaration is subsumed into our analysis of factor (f), below.

### 4. *Becton Dickinson* Factor (f)

Even if we were to accept at face value Patent Owner's arguments regarding factors (a) through (d), they would be outweighed by our analysis of factor (f): "the extent to which additional evidence and facts presented in the Petition warrant reconsideration of the asserted prior art or arguments," which in this case, relates to Petitioner's arguments and evidence regarding the Lebreton Declaration.  *See generally*, Pet. 58–60; Reply 6–7.

#### a) *Paragraphs 4–10 of the Lebreton Declaration*

The Lebreton Declaration presents two general arguments.  First, that one of ordinary skill in the art would have known that the addition of

31

IPR2019-01506
Patent 8,357,795 B2

lidocaine to crosslinked HA dermal filler compositions was incompatible with high temperature sterilization. *See* Ex. 1024 ¶¶ 4–10.[8]  Petitioner, in arguments supported by the testimony of its expert Dr. DeVore, however, directs us to substantial evidence to the contrary.  In particular, Petitioner identifies evidence that one of ordinary skill in the art would have understood that lidocaine-containing crosslinked HA dermal fillers could be sterilized with high temperatures and that such products were approved by the FDA for commercial sale. *See e.g.*, Pet. 54 (citing Ex. 1002 ¶¶ 237–239).

Patent Owner appears to take the position that the Lebreton Declaration would have provided the Examiner with a complete picture of the prior art because he "was aware of the very references and teachings Petitioner alleges were absent" in the Declaration."  Prelim. Resp. 25 (arguing that the Examiner specifically considered Lebreton, Kinney, Reinmuller, and Sadozai, as well as Monheit, Zhao, and Narins, which Patent Owner contends are cumulative to references considered during prosecution of the '795 patent family).  The current record, however, further includes the presently unrebutted testimony of Dr. DeVore, and the question of whether the secondary references before the Examiner were truly cumulative is a matter of factual dispute that can be addressed at trial. *See* Reply 2–5.  Moreover, as noted in section II(D)(2), above, the record indicates that the Examiner overlooked the relevance of the working examples disclosed in Kinney and Reinmuller during examination.  These

---

[8] As noted in the Petition, these "statements were *not* limited to BDDE-crosslinked HA [as presently claimed], and Allergan's accompanying Response at the time included pending claims covering use of *any* crosslinker."  Pet. 53 (citing Ex. 1023, 18–20 (claims 51–67)).

IPR2019-01506
Patent 8,357,795 B2

factors weigh against exercising our discretion under § 325(d), as do the parties' arguments with respect to Cui, discussed in section II(C)(1)(b)(4), above.

> b)  *Paragraphs 11–15 of the Lebreton Declaration*

With reference to Example 4 of the incorporated provisional applications, the Lebreton Declaration further asserts that "other HA gels" mixed with lidocaine (represented by samples 4 and 5) "surprisingly and unexpectedly" maintained their viscosity and elasticity after high temperature sterilization as compared to gel samples 1, 2, and 3.  Ex. 1024 ¶¶ 11–15.  There appears to be no dispute at this juncture that the lidocaine-gel compositions of samples 4 and 5 comprise BDDE-crosslinked soft tissue filler compositions within the scope of the challenged claims.  Petitioner, nonetheless, contends this portion of the Lebreton Declaration does not provide support for unexpected results because, first, samples 1–3 do not represent the closest prior art and, second, even though samples 1 and 2 show less drop in viscosity after sterilization as compared to samples 4–6, this difference is merely a matter of degree rather than kind.  Pet. 56–59 (citations omitted); *see* Ex. 1002 ¶¶ 246–253.

We find particularly interesting Dr. DeVore's presently uncontested testimony that:

> Allergan's experiment and its interpretation of the results fundamentally misunderstands the point of stability testing. The consideration whether a crosslinked HA composition would be suitable as a dermal filler depends on its *final* viscosity, not how much the viscosity drops during sterilization.  It is irrelevant if the viscosity drops by 5%, 50%, or even 90%, so long as the sterilized final product has the desired viscosity and is shelf stable.

IPR2019-01506
Patent 8,357,795 B2

Ex. 1002 ¶ 247.  This testimony was not available to the Examiner during patent prosecution.  Nor was Dr. DeVore's testimony that Sample 1 is irrelevant as a mixture of uncrosslinked HA and a polymer other than HA, whereas "[t]he final viscosity of samples 2 and 3 in each test (~75–375 PA*s) is substantially the same as the final viscosities of Samples 4–6 (~50– 09 PA*s), all of which are within the range of marketed dermal fillers (50– 1,200 PA*s)."  *Id.* at ¶ 248.  In support of that contention, Dr. DeVore points to the priority documents as identifying samples 2 and 3 as corresponding to FDA-approved dermal fillers Hylaform and Restylane, respectively.  *See id.* at ¶¶ 250–251 (citing Ex. 1013, 26:7; Ex. 1028, 19:7).

> Dr. DeVore further testifies that:

> During the prosecution of '795 patent, Allergan stated that Sample 3, when combined with lidocaine without pH adjustment, exhibited a 35% reduction in viscosity, while Sample 4 exhibited a 30% reduction in viscosity in the same test.  EX1023, 26–27.  During the prosecution of this application, Allergan argued that the claimed compositions exhibited a "much lower" reduction in viscosity.

*Id.* at ¶ 252.

> In my opinion, even if viscosity reduction by itself was a meaningful measure of suitability (it is not), there is no meaningful difference between a 30% and 35% reduction in viscosity. . . . Determining whether 30% is significantly different from 35% would require statistical analysis, such as required in FDA submissions. Such analysis is not present in the challenged patents. Thus, it is impossible to tell if the difference between Sample 3 and Sample 4, when pH is not controlled, is real or not.

*Id.* at ¶ 253.

We do not, on the present record, find Dr. DeVore's testimony "conclusory" and without a "well-reasoned rationale or objective support" as Patent Owner contends.  Prelim. Resp. 29.  To the contrary, Dr. DeVore's

IPR2019-01506
Patent 8,357,795 B2

testimony weighs against exercising our discretion under § 325(d).  We, nonetheless, look forward to Patent Owner's testing of Dr. DeVore's opinions at trial.

    *5.  Conclusion*

    In sum, upon weighing the relevant *Becton Dickinson* factors, we determine that, although the grounds may rely on the same or substantially the same art or arguments previously presented to the Office, Petitioner has demonstrated sufficiently how the Office erred in a manner material to the patentability of the challenged claims in reliance on the Lebreton Declaration to overcome the prior art.  Thus, we decline to exercise our discretion under 35 U.S.C. § 325(d) to deny institution of the Petition.

## III. CONCLUSION

    On the present record, we find Petitioner shows sufficiently that the cited references would have taught or suggested each element of claims 1–11, 22, 40, and 41, and set forth a sufficient rationale for why a person of ordinary skill would have been motivated to combine these teachings and suggestions to arrive at the invention recited in those claims.  Petitioner has established a reasonable likelihood of prevailing in demonstrating that claims 1–11, 22, 40, and 41 would have been obvious over the combinations of prior art set forth in the asserted grounds.

## IV. ORDER

    In consideration of the foregoing, it is hereby:

    ORDERED that, pursuant to 35 U.S.C. § 314(a), that an *inter partes* review of claims 1–11, 22, 40, and 41 of the '795 patent is instituted with respect to all grounds set forth in the Petition; and

    FURTHER ORDERED, pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4(b), that the *inter partes* review of the '795 patent shall commence on

IPR2019-01506
Patent 8,357,795 B2

the entry date of this Order, and notice is hereby given of the institution of a

trial.

IPR2019-01506
Patent 8,357,795 B2

FOR PETITIONER:

Christopher L. Curfman
William W. Cutchins
Warren J. Thomas
John W. Harbin
MEUNIER CARLIN & CURFMAN LLC
ccurfman@mcciplaw.com
wcutchins@mcciplaw.com
wthomas@mcciplaw.com
mcc.prollenium.ipr@mcciplaw.com

FOR PATENT OWNER:

Dorothy P. Whelan
Michael Kane
FISH & RICHARDSON P.C.
whelan@fr.com
kane@fr.com

Trials@uspto.gov
571-272-7822

Paper 18
Date: March 31, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

PROLLENIUM US INC.,
Petitioner,

v.

ALLERGAN INDUSTRIE, SAS,
Patent Owner.

_____

IPR2019-01632
Patent 8,357,795 B2

_____

Before GRACE KARAFFA OBERMANN, SHERIDAN K. SNEDDEN,
and ROBERT A. POLLOCK, *Administrative Patent Judges.*

SNEDDEN, *Administrative Patent Judge.*

DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314*

IPR2019-01632
Patent 8,357,795 B2

## I.    INTRODUCTION

Prollenium US Inc. ("Petitioner") filed a Petition for *inter partes* review of claims 26–39 of U.S. Patent No. 8,357,795 ("the '795 patent," Ex. 1001).  Paper 1 ("Pet.").  Allergan Industrie, SAS ("Patent Owner") filed a Preliminary Response.  Paper 7 ("Prelim. Resp.").  On January 10, 2020, we issued an Order granting Petitioner's request for additional briefing regarding whether we should exercise our discretion to deny the Petition under §325(d) and/or §314(a).  Paper 12.  In response to our Order, Petitioner filed a Reply to the Patent Owner Preliminary Response (Paper 13, "Reply"), and Patent Owner filed a corresponding Sur-reply (Paper 17, "Sur-reply).

To institute an *inter partes* review, we must determine that the information presented in the Petition shows "a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition." 35 U.S.C. § 314(a) (2012).  The Supreme Court has held that a decision to institute under 35 U.S.C. § 314 may not institute on fewer than all claims challenged in the petition.  *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1359–60 (2018) ("SAS").  After considering the evidence and arguments presented in the Petition, we determine that Petitioner has demonstrated a reasonable likelihood of success in proving that at least claim 26 of the '795 patent is unpatentable.  Accordingly, an *inter partes* review of all of the claims and all of the grounds presented in the Petition is hereby instituted.

In this Decision, we address all issues raised by the parties in the pre-trial briefing.  Our factual findings and conclusions at this stage of the proceeding are based on the evidentiary record developed thus far.  This is not a final decision as to the patentability of claims for which *inter partes*

IPR2019-01632
Patent 8,357,795 B2

review is instituted.  Our final decision will be based on the record as fully developed during trial.

### A. Real Parties in Interest

Petitioner identifies its real parties-in-interest as Prollenium US Inc. and Prollenium Medical Technologies Inc.  Pet. 61.  Patent Owner identifies its real parties-in-interest as Allergan Industrie, SAS; Allergan USA, Inc.; Allergan Sales, LLC; Allergan Holdings France SAS; Allergan Holdings Limited; Allergan Holdings, Inc.; Allergan Puerto Rico Holdings, Inc.; and Allergan, Inc.  Paper 4, 2.

### B. Related Matters

Petitioner has filed a separate Petition for *inter partes* review of claims 1–11, 22, 40, and 41 of the '795 patent as IPR2019-01506.  The '795 patent is at issue in *Allergan USA, Inc. et al v. Prollenium US Inc., et al.*, Case No. 1:19-cv-00126 (D. Del. filed Jan. 22, 2019).  Pet. 61; Paper 4, 2.  The '795 patent was the subject of two previous *inter partes* reviews: IPR2014-01422 filed August 29, 2014 and terminated June 19, 2015 by way of joint motion to terminate, and IPR2017-01906 filed August 2, 2017 and denied on March 9, 2018.  Paper 4, 2–3.

Petitioner has filed Petitions for *inter partes* review of related U.S. patents as follows: U.S. Patent No. 8,450,475 B2 ("the '475 patent") in IPR2019-01505; U.S. Patent No. 8,822,676 B2 ("the '676 patent") in IPR2019-01617; U.S. Patent No. 9,089,519 B2 ("the '519 patent") in IPR2020-00084; U.S. Patent No. 9,238,013 B2 ("the '013 patent") in IPR2019-01509; and U.S. Patent No. 9,358,322 B2 ("the '322 patent") in IPR2019-01509.  Pet. 61–62; Paper 4, 3.  The '475, '676, '519, '013, and '332 patents are also at issue in A*llergan USA, Inc. et al v. Prollenium US Inc., et al.*, Case No. 1:19-cv-00126 (D. Del. filed Jan. 22, 2019).  *Id.*

3

IPR2019-01632
Patent 8,357,795 B2

### C. The '795 Patent

#### 1. Specification

The subject matter claimed in the '795 patent is directed to soft tissue filler compositions. Ex. 1001, 19:20–22:27. The compositions include a hyaluronic acid (HA) component and an anesthetic agent, e.g., lidocaine. *Id.* at 2:36–49. The hyaluronic acid component is crosslinked with a crosslinking agent, e.g., 1,4-butanediol diglycidyl ether (BDDE). *Id.* at 2:50–59. "The pH of the purified, substantially pH neutral, crosslinked HA gels are preferably adjusted to cause the gels to become slightly alkaline such that the gels have a pH of greater than about 7.2, for example, about 7.5 to about 8.0." *Id.* at 10:64–67.

The compositions are sterilized, for example by autoclaving, to form sterile compositions. *Id.* at 3:42–47. The compositions may be used as dermal fillers to help fill in facial lines and depressions and for restoring fat loss-related tissue volume. *Id.* at 1:30–34. Allergan markets dermal fillers containing crosslinked hyaluronic acid and lidocaine under the tradename Juvéderm®. Prelim. Resp. 1–2.

#### 2. Illustrative Claims

Independent claims 26 and 29, reproduced below, are illustrative of the challenged claims.

26. A composition comprising a crosslinked hyaluronic acid (HA) at a concentration of about 20 mg/mL to about 30 mg/mL and lidocaine at a concentration of about 0.1% to about 5% by weight, wherein the composition has a pH above about 7.5.

29. A sterile composition comprising a crosslinked hyaluronic acid (HA) at a concentration of about 22 mg/mL and lidocaine at a concentration of about 0.2% to about 1% by weight, wherein the composition is stable during storage under ambient conditions for at least 3 months.

IPR2019-01632
Patent 8,357,795 B2

Ex. 1001, 21:10–14, 19–23.

### 3.   *Relevant Prosecution History*

The '795 patent issued from U.S. Application Serial No. 12/393,884 ("the '884 application," Ex. 1023).  During the prosecution of the '884 application, the Examiner rejected the claims as obvious over Lebreton, disclosing BDDE-crosslinked hyaluronic dermal fillers, and secondary references disclosing adding lidocaine to hyaluronic acid dermal fillers.  Ex. 1023, 43–46, 78–80.  For example, the Examiner rejected the claims as obvious over Lebreton and Wang[1] (teaching crosslinked hyaluronic acid that further comprises preferably an anesthetic such as lidocaine) or Calias[2] (teaching hyaluronic acid crosslinked with DVS and further comprising a drug such as lidocaine).  *Id.* at 45, 80.  After a final rejection over Lebreton and Calias, the Applicant argued that "the heat stable property of the claimed dermal filler compositions, as shown in the Declaration and as supported by the data of record, is evidence that the claimed compositions comprising hyaluronic acid and lidocaine, are nonobvious."  *Id.* at 24–25.

To support this argument, the Applicant submitted a Declaration by the inventor, Pierre F. Lebreton, Ph.D. (Ex. 1024).  Ex. 1023, 11–29.  Dr. Lebreton attested as follows:

> It was believed that adding lidocaine to hyaluronic acid gel compositions during manufacturing caused degradation of the hyaluronic acid prior to injection of the HA as a dermal filler.

> It was believed that lidocaine caused degradation of HA gel compositions during high temperature sterilization.

---

[1] Ex. 1047, W. Wang, U.S. Patent Application Publication No. 2005/0271729 A1, published Dec. 8, 2005 ("Wang").

[2] Ex. 1048, P. Calias et al., U.S. Patent No. 6,521,223 B1, issued Feb. 18, 2003 ("Calias").

IPR2019-01632
Patent 8,357,795 B2

> It was not known whether HA compositions comprising lidocaine were stable or not after high temperature sterilization when placed in storage for any significant length of time.

> It was also believed that the instability of HA described above would have caused a viscosity reduction of the HA that would make it unsuitable for soft tissue filling applications.

> Based upon the facts set forth above, a person of ordinary skill in the art would have expected that a dermal filler comprising hyaluronic acid and lidocaine would not have remained sufficiently stable to be useful as soft tissue filler.

> It was not appreciated that a dermal filler comprising a cohesive gel of hyaluronic acid makes it possible for lidocaine to be combined with hyaluronic acid in a gel that is sufficiently stable to be useful as a soft tissue filler.

> The enhanced stability properties of the inventive dermal fillers was evidenced by certain experiments performed under my direction by my research team prior to the application filing date.

> To my knowledge, it was a surprising and unexpected discovery, not appreciated prior to the present invention, that certain cohesive HA gels, as defined in the application, when mixed with lidocaine, could be made to be heat and shelf stable.

*See* Pet. 14; Prelim. Resp. 10–12. The Applicant further submitted Cui[3] as evidence "that HA gels are known to be sensitive to heat sterilization, and that even more particularly, that HA gels crosslinked with BDDE are known to be especially sensitive to heat sterilization relative to HA gels cross linked with other, i.e. non-BDDE, crosslinkers." Ex. 1023, 28.

### D. Evidence

Petitioner relies upon the following prior art references.

---

[3] Cui et al., *The comparison of physicochemical properties of four Cross-linked sodium hyaluronate gels with different cross-linking agents*, 396–398 ADV. MATS. RES. 1506–1512 (2012) (Ex. 1025).

IPR2019-01632
Patent 8,357,795 B2

Ex. 1050, *Cosmetic Tissue Augmentation Product, Summary of Safety and Effectiveness*, Premarket Approval (PMA) Application No. P050033 (FDA Dec. 20, 2006) ("CTA Summary").[4]

Ex. 1051, Letter from Mark N. Melkerson, Director, Division of General, Restorative and Neurological Devices, FDA, to Constance Garrison, Vice President, Regulatory, Clinical and Quality Systems, Anika Therapeutics, Inc. (Dec. 20, 2006) ("PMA Letter").

Ex. 1054, FDA Medical Devices; Availability of Safety and Effectiveness Summaries for Premarket Approval Applications, 72 Fed. Reg. 15885, 15886 (Apr. 3, 2007).

Ex. 1029, P. Lebreton, U.S. Patent Application Publication No. 2006/0194758 A1 (published Aug. 31, 2006) ("Lebreton").

Ex. 1030, K. K. Sadozai et al., U.S. Patent Application Publication No. 2005/0136122 A1 (published Jun. 23, 2005) ("Sadozai").

Petitioner also relies upon the Declaration of Dr. Dale P. DeVore (Ex. 1002) to support its contentions.

### E. *Asserted Grounds of Unpatentability*

Petitioner asserts that claims 26–39 would have been unpatentable on the following grounds.

| Ground | Claim(s) | 35 U.S.C. §[5] | References/Basis |
|--------|----------|------------|------------------|
| 1 | 26–39 | 103(a) | CTA Summary |
| 2 | 26–39 | 103(a) | Lebreton, Sadozai |

---

[4] We address the status of the CTA Summary as prior art below.

[5] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) ("AIA"), amended 35 U.S.C. §§ 102 and 103.  Because the challenged claims of the '795 patent have an effective filing date before the effective date of the applicable AIA amendments, we refer to the pre-AIA versions of 35 U.S.C. § 103 throughout this Decision.

IPR2019-01632
Patent 8,357,795 B2

*F.  Abbreviations*

| HA | Hyaluronic Acid |
|---|---|
| CTA | Cosmetic Tissue Augmentation |
| FDA | Food & Drug Administration |
| PMA | Premarketing Approval |
| BDDE | butanediol diglycidyl ether |
| BCDI[6] | p-phenylene-bis(ethylcarbodiimide) |
| DVS | 1,4-divinylsulfone |
| DEO | Diepoxyoctane |

## II.    ANALYSIS

*A.  Level of Ordinary Skill in the Art*

The person having ordinary skill in the art is a hypothetical person who is presumed to be aware of all the relevant prior art.  *Custom Accessories, Inc. v. Jeffrey-Allan Indust., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986); *Kimberly-Clarke Corp. v. Johnson & Johnson*, 745 F.2d 1437, 1453 (Fed. Cir. 1984).  Moreover, the prior art itself is generally sufficient to demonstrate the level of skill in the art at the time of the invention.  *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (explaining that specific findings regarding ordinary skill level are not required "where the prior art itself reflects an appropriate level and a need for testimony is not shown") (quoting *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed. Cir. 1985)).

Petitioner asserts that a person of ordinary skill in the art would have been "a scientist involved in the development of dermal fillers, who would

---

[6] Ex. 1030 ¶ 85.

IPR2019-01632
Patent 8,357,795 B2

have an advanced degree, such as a Ph.D., M.S., or M.D., and several years of experience developing dermal fillers for cosmetic use, including HA-based dermal fillers." Pet. 16 (citing Ex. 1002 ¶¶ 69–72). Petitioner asserts that the person of ordinary skill "would be aware of commercially sold dermal fillers, in the United States and abroad, as well as those products for which approvals were being publicly sought." *Id.* Petitioner asserts that the person of ordinary skill "would also be aware of the process by which FDA reviews dermal filler products, and how FDA communicates the results of such reviews to the public." *Id.* (citing Ex. 1002 ¶¶ 73–75; Ex. 1032, 227).

Patent Owner contends that the Board should adopt the same definition for the person of ordinary skill as previously adopted in IPR2017-01906, which also involved the '795 patent.[7] Prelim. Resp. 13–15. In IPR2017-01906, the Board determined that a person of ordinary skill in the art would have had "a B.S. or M.S. in biochemistry, polymer chemistry, medicinal chemistry, pharmaceutical chemistry, or a related field with 'several years' of practical experience. Alternatively . . . the ordinary artisan would have had less practical experience but a Ph.D. in one of those fields, or an M.D. in dermatology, plastic surgery, or a specialty related to the clinical use of dermal fillers." *Id.* at 13 (citing IPR2017-01906, Paper 15 at 8–9).

On the present record, we find Petitioner's definition reasonable. Consistent with Petitioner's argument, the proposed definition is not clearly inconsistent with our prior determination and is supported by Dr. DeVore's presently uncontested testimony. *See* Ex. 1002 ¶¶ 69–72. Further, the art of

---

[7] *Teoxane S.A. v. Allergan, PLC*, IPR2017-01906, Paper 15 (PTAB Mar. 9, 2018)

9

IPR2019-01632
Patent 8,357,795 B2

record abundantly supports Petitioner's proposition that one of ordinary skill in the art would have been aware of commercially sold dermal fillers and publically available information regarding their FDA approval.

Monheit[8], for example, discusses clinical trials and approval dates of "five FDA-approved HA skin fillers available in the United States: Hylaform, Hylaform Plus, Captique (Inamed Corporation), Restylane (Medicis Aesthetics Inc.), and, most recently, Juvéderm (Allergen Aesthetics)," noting, for example, that "Hylaform has been available worldwide since 1998 and in the United States since 2004." Ex. 1022, 79–80. And in summarizing an FDA clinical study comparing Hylaform to Zyplast, Monheit cites data from a 2003 FDA publication "Available at: http://www.fda.gov/ohrms/dockets/ac/03/slides/4004s1_01_lerner_files/frame.htm." *Id.* at 80, Box 1.

Moreover, in reviewing the state of the art of injectable skin fillers for soft tissue augmentation, Narins[9] notes the FDA approval status for commercially available products Zyderm I and II, CosmoDerm, CosmoPlast, Restylane, Hylaform, Radiance FN, Sculptra, and Silikon 1000. Ex. 1007, 152, 153, 156–157, 158, 159. Kinney[10] similarly notes the FDA approval

---

[8] Ex. 1014, Gary D. Monheit & Chad L. Prather, *Juvéderm: A Hyaluronic Acid Dermal Filler*, Journal of Drugs in Dermatology, Vol. 6, Issue 11, 1091-1095 (Nov. 2007) ("Monheit"). *See also*, Ex. 1002 ¶¶ 39, 105 (Dr. DeVore's reliance on Monheit); Prelim. Resp. 31 (same).
[9] Ex. 1007, R. S. Narins and P. H. Bowman, *Injectable Skin Fillers*, 32 CLIN. PLAST. SURG. 151–162 (2005) ("Narins").

[10] Ex. 1012, B. M. Kinney, *Injecting Puragen Plus into the Nasolabial Folds: Preliminary Observations of FDA Trial*, 26 AESTHETIC SURG. J. 741–748 (2006) ("Kinney").

10

IPR2019-01632
Patent 8,357,795 B2

dates of Restylane and Juvaderm (Ex. 1012, 741), and Smith[11] discusses the "FDA status and Approved Uses" of Juvéderm 30, 24HV, and 30HV injectable gels," further noting that the FDA "recently announced a label extension for Juvéderm Ultra and Juvéderm Ultra plus" (Ex. 1009, 67S–68S).

Thus, as a whole, the evidence of record strongly suggests that skilled artisans were aware of and monitored the commercial and approval status of dermal filler compositions. In light of these teachings and the testimony of Dr. DeVore, we expand upon the Board's earlier definition of one of ordinary skill in the art as indicated by Petitioner's arguments. Thus, for the purpose of institution, a person of ordinary skill in the art as of the filing date of the '795 patent would have a B.S. or M.S. in biochemistry, polymer chemistry, medicinal chemistry, pharmaceutical chemistry, or a related field with several years of practical experience or have had less practical experience but a Ph.D. in one of those fields, or an M.D. in dermatology, plastic surgery, or a specialty related to the clinical use of dermal fillers. Such a person would have been aware of commercially sold dermal fillers in the United States and abroad, as well as those products for which approvals were being publicly sought.

The above definition is provisional and the parties are welcome to present further argument on this topic at trial.

B. Claim Construction

We interpret a claim "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C.

---

[11] Ex. 1009, Smith, *Practical Use of Juvéderm: Early Experience*, 120 PLASTIC AND RECONSTRUCTIVE SURG. 67S–73S (2007) ("Smith").

IPR2019-01632
Patent 8,357,795 B2

282(b)." 37 C.F.R. § 42.100(b) (2019).  Under this standard, we construe the claim "in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." *Id.*  Furthermore, at this stage in the proceeding, we need only construe the claims to the extent necessary to determine whether to institute *inter partes* review.  *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

Petitioner proposes construction for several claimed terms, which we address below.  *See* Pet. 16–20.  Patent Owner contends it is not necessary to construe any of the claimed terms.  Prelim. Resp. 13.

Petitioner proposes construction for the following claimed terms: "sterile" (claim 29), "stable" (claim 29–31), "stable to autoclaving" (claim 28), "freely released in vivo" (claim 37), and "unbound to the HA" (claim 38–39).  Pet. 16–20.  Patent Owner contends it is not necessary to construe any of the claimed terms.  Prelim. Resp. 11.  For the purpose of this Decision, we find it helpful to address the term "sterile."

1.  *Sterile*

Petitioner proposes "sterile" to mean a composition that is "substantially free of detectable viable organisms."  Pet. 17 (citing *Allergan USA, Inc. et al. v. Medicis Aesthetics, Inc. et al.*, No. 13-1436 (C.D. Cal. Aug. 12, 2014) (claim construction order)) (Ex. 1027, 7).  Petitioner further cites to the '795 patent's Specification which states "[s]terilization, as used herein comprises any method known in the art to effectively kill or eliminate transmissible agents."  *Id.* (citing Ex. 1001, 12:4–7).

12

IPR2019-01632
Patent 8,357,795 B2

In IPR2017-01906, the panel adopted a more detailed definition of this term as:

> a sterile composition that maintains one or more of the following aspects: transparent appearance, pH, extrusion force and/or rheological characteristics, hyaluronic acid (HA) concentration, sterility, osmolarity, and lidocaine concentration, after being stored at a temperature of at least about 25° C for a specified period of time.

*Teoxane,* Paper 15 at 9–10 (quoting Pet. 11). The Board's prior construction does not appear inconsistent with Petitioner's broader proposed construction. Absent any persuasive argument for an alternative construction, we adopt the reasoning and definition of "sterile" as set forth in IPR2017-01906. *Id.* The parties are, nevertheless, welcome to present further arguments regarding claim construction at trial.

### C. Petitioner's Patentability Challenges

#### 1.   Ground 1: Obviousness in view of CTA Summary

##### a)   Summary of the Reference Relied Upon

###### (1)   CTA Summary (Ex. 1050)

Petitioner asserts CTA Summary qualifies as prior art under 35 U.S.C. § 102(b) because a person of ordinary skill in the art "exercising reasonable diligence would have been able to locate the CTA Summary before August 4, 2007." Pet. 6. Petitioner asserts Anika Therapeutics Inc. (Anika) received premarket approval from FDA on December 20, 2006 for the dermal product initially designated CTA.[12] *Id.* at 3. Petitioner asserts the CTA Summary was made available on the FDA's website by December 31, 2006, as shown by the FDA Notice in the Federal Register. *Id.* (citing Ex. 1054, 15886). Petitioner asserts that the FDA would have expected the

---

[12] The product was later renamed "Elevess." Pet. 3. (citing Ex. 1002 ¶ 115).

IPR2019-01632
Patent 8,357,795 B2

interested public, including those of ordinary skill in the art, "to be aware of and locate such PMA approval orders." *Id.* (citing Ex. 1054, 15,886; Ex. 1002 ¶¶ 70–71). Petitioner asserts that those of ordinary skill in the art at the time would have reviewed such PMA notices and would have been aware of and recognized Anika's CTA product as a relevant HA-based dermal filler. *See id.* 4–5 (citing Ex. 1002 ¶¶ 70–75, 115–116, 118).

CTA Summary discloses an injectable dermal filler including crosslinked hyaluronic acid and 0.3% lidocaine HCl in a buffer solution. Ex. 1050, 1. The CTA Summary discloses the product was provided in a pre-filled syringe at a volume of 1 mL. *Id.* All lots of the CTA product were sterile and met the pH specification of 6.2–7.6. *Id.* at 6.

CTA Summary discloses that "[*i*]*n vitro* testing demonstrated that over 90% of the lidocaine elutes from CTA within 2 minutes." *Id.* Stability studies for shelf-life characteristics including: sterility, visual appearance, viscoelastic properties, HA concentration, extrusion force, HA fragments and lidocaine concentration, "support an expiration date of 15 months." *Id.*

### b) *Petitioner's Contentions*

Petitioner asserts that claims 26–39 are unpatentable under 35 U.S.C. § 103(a) as obvious over CTA Summary. Pet. 23–30. Petitioner provides a detailed claim analysis for claims 26 and 29. *Id.* at 24–30. We address Petitioner's arguments as to claims 26 and 29.

#### (1)   Claim 26

##### (a) *"A composition comprising a crosslinked [HA] at a concentration of about 20 mg/mL to about 30 mg/mL"*

Petitioner asserts CTA is a sterile gel containing crosslinked hyaluronic acid at a concentration of 28 mg/mL. Pet. 24 (citing Ex. 1050, 1).

14

IPR2019-01632
Patent 8,357,795 B2

> (b) *"and lidocaine at a concentration of about 0.1% to about 5% by weight,"*

Petitioner asserts CTA contains 0.3% lidocaine. *Id.*

> (c) *"wherein the composition has a pH above about 7.5."*

Petitioner asserts CTA Summary discloses a pH specification of 6.2–7.6, which overlaps the claimed range. *Id.* (citing Ex. 1050, 60). Petitioner asserts a person of ordinary skill would have selected any pH within the range, including 7.5 and 7.6. *Id.* (citing Ex. 1002 ¶ 144).

> (2)    *Claim 29*

> (a) *"A sterile composition comprising a crosslinked [HA]"*

Petitioner asserts CTA is a sterile gel containing crosslinked hyaluronic acid." Pet. 27 (citing Ex. 1050, 1).

> (b) *"at a concentration of about 22 mg/mL and"*

Petitioner asserts CTA has a concentration of 28 mg/mL. *Id.* Petitioner contends the "concentration of crosslinked HA is a result-effective variable," subject to routine optimization. *Id.* at 26. Petitioner contends that other "commercially successful HA fillers (e.g., Perlane and Restylane) were known to possess HA concentrations of 20 mg/mL," establishing a reasonable expectation of success. *Id.* (citing Ex. 1008, 29S; Ex. 1039, 266; Ex. 1002 ¶ 153).

> (c) *"lidocaine at a concentration of about 0.2% to about 1% by weight,"*

Petitioner asserts CTA contains 0.3% lidocaine. *Id.* at 27 (citing Ex. 1050, 1).

> (d) *"wherein the composition is stable during storage under ambient conditions for at least 3 months."*

Petitioner asserts CTA summary discloses stability studies supported an expiration date of 15 months. *Id.* (citing Ex. 1050, 6).

IPR2019-01632
Patent 8,357,795 B2

(3)   *Objective Evidence of Non-obviousness*

Petitioner contends "the Examiner allowed the claims of the challenged patent (and its related applications) based on Allergan's arguments and proffered evidence pointing to supposed 'unexpected results' of the invention."  Pet. 43.  Petitioner challenges the Inventor's Declaration, the comparative data in the specification, and the extrinsic evidence cited by the Applicant during prosecution.  *Id.* at 43–44.

First, Petitioner asserts that the Inventor's Declaration is unsubstantiated and contradicted by the prior art.  *Id.* at 44–47.  Petitioner asserts that "contrary to Lebreton's statements, the totality of the prior art instead gave the POSITA the expectation lidocaine could be successfully combined with various crosslinked HA dermal fillers, including a BDDE-crosslinked HA dermal filler."  *Id.* at 45.  To show that sterile and stable lidocaine-hyaluronic acid combinations were previously known, Petitioner cites dermal fillers commercially available as of the filing date, e.g., Elevess, Prevelle Silk, Puragen Plus, in addition to Sadozai and Kinney.  *Id.* at 45–46 (citing Ex. 1002 ¶¶ 209–210).  Moreover, Dr. DeVore states his opinion that "the POSITA would not have believed that lidocaine caused degradation of HA gels compositions during high temperature sterilization and would have believed that HA compositions comprising lidocaine were stable after high temperature sterilization when placed in storage for any significant length of time."  Ex. 1002 ¶ 210.  Dr. DeVore attests that "during the development of Elevess, it was observed that the autoclave-sterilized [BCDI]-crosslinked HA composition with lidocaine was sufficiently stable to support a product shelf life of 15 months, which is reflected in the Elevess label."  *Id.* (citing Ex. 1050, 6).

IPR2019-01632
Patent 8,357,795 B2

Second, Petitioner asserts that the comparative data relied on by the Inventor's Declaration does not support nonobviousness. Pet. 56. The comparative data appears as Example 4 of the '795 patent's Specification. Ex. 1001, 15:20–17:2. Dr. DeVore attests that "Example 4 describes experiments in which six samples were evaluated. . . . Allergan argued that the results of Samples 1–3 were consistent with the expectations of the POSITA, and that it was unexpected that Samples 4–6 did not exhibit the same viscosity reduction." Ex. 1002 ¶ 216. Dr. DeVore states "[i]n my opinion, Sample 1 is completely irrelevant—it is a mixture of uncrosslinked HA and a completely different polymer (hydroxypropyl methylcellulose). I am not aware of a mixture of uncrosslinked HA and HPMC being used as a dermal filler, either in 2008 or now." *Id.* ¶ 217. Dr. DeVore states that the viscosity differences are not indicative of instability as "[t]he final viscosity for Samples 2 and 3 in each test (~75–375 Pa*s) is substantially the same as the final viscosities of Samples 4–6 (~50–90 Pa*s), all of which are within the range of marketed dermal fillers (50–1,200 Pa*s)." *Id.* ¶ 219(citing Ex. 1039, 267). Dr. DeVore states that there is no meaningful difference in viscosity reduction between Sample 3 (35% reduction when combined with lidocaine without pH adjustment) and Sample 4 (30% reduction in viscosity in the same test) and that the difference was not "much lower" as alleged by Allergan. *Id.* ¶¶ 223–224.

Third, Petitioner asserts that the extrinsic evidence cited in the Application during prosecution, i.e., Cui, "is irrelevant to the question of whether Allergan's BDDE-crosslinked HA composition showed unexpected results compared to the other crosslinkers known to POSITAs at the time." Pet. 61 (citing Ex. 1002 ¶ 243). Petitioner argues that "Cui was published in 2012, well after the claimed priority date of the patent. The reasonable

17

IPR2019-01632
Patent 8,357,795 B2

expectation of success (and expected results) is evaluated at the time the invention was made—a later published reference that might have taught away from the claimed invention is irrelevant." *Id.* at 60 (citing *Bristol-Myers Squibb Co. v. Teva Pharms. USA, Inc.* 752 F.3d 967, 976 (Fed. Cir. 2014)). Dr. DeVore states that Cui compares the stability of BDDE-crosslinked hyaluronic acid with three crosslinkers that had not "been seriously investigated for use in dermal fillers as of August 2008," as opposed to the known non-BDDE crosslinkers for dermal fillers. Ex. 1002 ¶ 213. Dr. DeVore states his opinion that "the Cui reference in no way supports Allergan's assertion that BDDE crosslinked HA was 'especially sensitive' to heat sterilization relative to 'non-BDDE' crosslinkers. At the very least, Cui is irrelevant . . . because Cui's comparisons do not relate to any of the crosslinkers relied upon here." *Id.* ¶ 214.

### c) *Patent Owner's Contentions*

In its Preliminary Response, Patent Owner directs substantially all of its argument to whether the Board should exercise discretion to deny the Petition under 35 U.S.C § 325(d). *See* Prelim. Resp. 1–2, 26–39. We address Patent Owner's arguments under 35 U.S.C § 325(d) below.

### d) *Conclusion*

Having considered the parties positions and evidence of record, summarized above, we determine that Petitioner has established a reasonable likelihood of prevailing in demonstrating the unpatentability of claims 26–39 with respect to Ground 1.

IPR2019-01632
Patent 8,357,795 B2

### 2. *Ground 2: Obviousness in view of Lebreton and Sadozai*

#### a) *Summary of the References Relied Upon*

##### (1) *Lebreton*

Lebreton is directed to crosslinking low and high molecular weight polymers to form injectable monophase hydrogels. Ex. 1029, code (57). The hydrogels may be used as filling materials in plastic surgery. *Id.* ¶ 5. Lebreton discloses buffering the crosslinked product to a pH compatible with the human body, being between 6.5 and 7.5, preferably between 7 and 7.4, and even more preferably between 7.1 and 7.3. *Id.* ¶¶ 48–49. Particularly, Lebreton discloses hydrogels prepared by crosslinking sodium hyaluronate (sodium salt of hyaluronic acid) with 1,4-butanediol diglycidyl ether (BDDE). *Id.* ¶¶ 68–76.

Lebreton discloses two examples of mixtures of low and high molecular weight hyaluronic acid crosslinked with BDDE in the presence of sodium hydroxide. *Id.* ¶¶ 74, 80–92 (Examples 3 and 4). "The crosslinked product is neutralized to a pH of 7.2 in a phosphate solution and then dialyzed." *Id.* ¶¶ 76. The resulting monophase hydrogel "is mechanically homogenized before being packed into syringes and sterilized in an autoclave." *Id.* ¶¶ 76, 85, 91.

##### (2) *Sadozai*

Sadozai is directed to a crosslinked hyaluronic acid composition effective for tissue augmentation or drug delivery. Ex. 1030 ¶¶ 7, 8. "[T]he storage modulus $G'$ is increased, e.g., composition is stabilized, by the inclusion of a local anesthetic, e.g., lidocaine, compared to a non-stabilized composition, e.g., an identical composition except that the local anesthetic is not included." *Id.* ¶ 68. Particularly, Sadozai discloses compositions including hyaluronic acid crosslinked with p-phenylene-

IPR2019-01632
Patent 8,357,795 B2

bis(ethylcarbodiimide) (BCDI).  *Id.* ¶ 85.  The crosslinked hyaluronic acid

compositions are combined with phosphate buffer containing 0.30%

lidocaine (Phosphate Buffer 4) to form a suspension.  *Id.* ¶¶ 84, 90, 100, 102.

The suspensions are loaded into syringes and autoclaved for sterilization.

*Id.* ¶¶ 90 (Example 12), 100 (Example 17).  Sterilization/hydration may be

performed in an autoclave at temperatures between 100° C to 150° C.

*Id.* ¶¶ 54–55.

Sadozai discloses that compositions processed according to Example

12 "with lidocaine have significantly higher modulus G′ over the time of the

test.  Thus, crosslinked hyaluronic acid with lidocaine can have good

biostability, and can in some cases have a synergistic effect, increasing G′."

*Id.* ¶ 107.

> b)  *Petitioner's Contentions*

Petitioner asserts that claims 26–39 are unpatentable under 35 U.S.C.

§ 103(a) as obvious over Lebreton and Sadozai.  Pet. 30–43.  Petitioner

provides a detailed claim analysis for claims 26 and 29.  *Id.* at 33–43.  We

address Petitioner's arguments as to claims 26 and 29.

> (1)    *Claim 26*

>> (a) *"A composition comprising a crosslinked [HA] at a concentration of about 20 mg/mL to about 30 mg/mL"*

Petitioner asserts Lebreton discloses a composition comprising

crosslinked hyaluronic acid at a concentration of from 10–40 mg/mL,

preferably 20–30 mg/mL.  Pet. 33 (citing Ex. 1029 ¶ 49).

>> (b) *"and lidocaine at a concentration of about 0.1% to about 5% by weight,"*

Petitioner asserts Sadozai discloses 0.3% lidocaine in a dermal filler.

*Id.* at 34 (citing Ex. 1030 ¶ 107).

20

IPR2019-01632
Patent 8,357,795 B2

> (c) *"wherein the composition has a pH above about 7.5."*

Petitioner contends the claim term "pH above *about* 7.5 encompasses "a range above and below 7.5." *Id.* Petitioner asserts Lebreton discloses a pH of between 6.5–7.5. *Id.* (citing Ex. 1029 ¶ 49). Petitioner asserts Lebreton's pH range overlaps the pH range of claims 26 (above about 7.5) and 27 (about 7.5 to about 8). *Id.*

> (2)    *Claim 29*

> > (a) *"A sterile composition comprising a crosslinked [HA] at a concentration of about 22 mg/mL and"*

Petitioner asserts Lebreton discloses a composition comprising crosslinked hyaluronic acid at a concentration of from 10–40 mg/mL, preferably 20–30 mg/mL. *Id.* at 38 (citing Ex. 1029 ¶ 49).

> > (b)  *"lidocaine at a concentration of about 0.2% to about 1% by weight,"*

Petitioner asserts Sadozai discloses 0.3% lidocaine in a dermal filler. *Id.* (citing Ex. 1030 ¶ 107).

> > (c) *"wherein the composition is stable during storage under ambient conditions for at least 3 months."*

Petitioner asserts "the term stable includes compositions that maintain sterility over a length of time," and both Lebreton and Sadozai disclose gels packed into syringes and sterilized in an autoclave. *Id.* at 39 (citing Ex. 1029 ¶ 70; Ex. 1030 ¶ 54).

> c)  *Patent Owner's Contentions*

In its Preliminary Response, Patent Owner directs substantially all of its argument to whether the Board should exercise discretion to deny the Petition under 35 U.S.C § 325(d). *See* Prelim. Resp. 1–2, 26–39. We address Patent Owner's arguments under 35 U.S.C § 325(d) below.

21

IPR2019-01632
Patent 8,357,795 B2

Although Patent Owner does not directly address the merits of Petitioner's grounds, Patent Owner does address the relevance of Cui in the context of its § 325(d) arguments.  *See* Prelim. Resp. 33–34; Sur-Reply 3–4. In sum, Patent Owner argues that Cui is relevant because it "discusses divinyl sulfone (DVS) crosslinked HA gels, which Petitioner admits were known and approved before August 2008."  Prelim. Resp. 33.  We accord this argument little weight at this juncture because Cui provides no comparative information about the stability of HA gels crosslinked with either DVS or BDDE.  Rather, and as Patent Owner admits, "Cui focused on gels crosslinked with four new agents of 'lower toxicity'" as compared to DVS."  *Id.* (citing Ex. 1025, 1506); *see* Reply 3 (noting that "Cui does not *test or compare* BDDE to *any* of the three crosslinkers discussed in the Petition[] or the Examiner's art").

Patent Owner responds that we should discount Dr. DeVore's testimony because it is "conclusory and fails to provide a well-reasoned rationale or objective support for the proposed grounds."  Prelim. Resp. 36. As an initial matter, at this stage of the proceeding, we give at least some weight to an expert's unopposed testimony.  Moreover, we accord little weight to Patent Owner's argument about the lack of support in Dr. DeVore's testimony as Patent Owner appears to rely on summary statements from Dr. DeVore's declaration that are further explained, with specific support, elsewhere in the Declaration.  Patent Owner argues, for example, that a sentence fragment from paragraph 193 of Dr. DeVore's declaration ("the POSITA could have easily modified the Lebreton process to incorporate lidocaine") is "without evidentiary support."  Prelim. Resp. 37. The passage, read in full, however, expressly cites to Exhibits 1029 and 1030 as support for the proposition that "[t]he POSITA would have

IPR2019-01632
Patent 8,357,795 B2

recognized that merely including lidocaine hydrochloride in the buffer solution . . . would be sufficient to obtain the lidocaine-containing gel." Ex. 1002 ¶ 170.  Accordingly, we do not find persuasive Patent Owner's argument that we should discount Dr. DeVore's testimony as unduly conclusory.  Patent Owner will have the opportunity to rebut and challenge Dr. DeVore's testimony at trial.

### d)  Conclusion

Having considered the parties' positions and evidence of record, summarized above, we determine that Petitioner has established a reasonable likelihood of prevailing in demonstrating the unpatentability of claims 26–39 with respect to Ground 2.

### III.  DISCRETION TO DENY INSTITUTION

Patent Owner argues the Board should exercise its discretion and deny the Petition under 35 U.S.C. §§ 325(d) and 314(a).  Prelim. Resp. 17–40.  With regard to Ground 1, Patent Owner contends that Petitioner "used the institution decision in IPR2017-01906 as a roadmap for its attempt to prove that the CTA Summary is a printed publication."  *Id.* at 17.  With regard to Ground 2, Patent Owner contends Petitioner presents substantially the same art or arguments previously presented to the Office.  *Id.* at 26.  We address each of these arguments below.

### A.  Discretion under 35 U.S.C. § 314(a)

Patent Owner argues that the Board should exercise its discretion under 35 U.S.C. § 314(a) and deny Petitioner's request for institution of *inter partes* review.  Prelim. Resp. 17–26.  In urging the Board to deny institution under § 314(a), Patent Owner points to criteria set forth by the Board in *General Plastic Industrial Co., Ltd. v. Canon Kabushiki Kaisha,*

IPR2019-01632
Patent 8,357,795 B2

No. IPR2016-01357 (PTAB Sept. 6, 2017).  Prelim. Resp. 33–34.  These factors include:

(1)  Whether the same petitioner previously filed a petition directed to the same claims of the same patent;

(2)  Whether at the time of filing of the first petition the petitioner knew of the prior art asserted in the second petition or should have known of it;

(3)  Whether at the time of filing of the second petition the petitioner already received the patent owner's preliminary response to the first petition or received the Board's decision on whether to institute review in the first petition;

(4)  The length of time that elapsed between the time the petitioner learned of the prior art asserted in the second petition and the filing of the second petition;

(5)  Whether the petitioner provides adequate explanation for the time elapsed between the filings of multiple petitions directed to the same claims of the same patent;

(6)  The finite resources of the Board; and

(7)  The requirement under 35 U.S.C. § 316(a)(11) to issue a final determination not later than 1 year after the date on which the Director notices institution of review.

*Id.* (citing *General Plastic*, Paper 11 at 2, 9–10).

Patent Owner contends that "[t]he Board denied the petition [in IPR2017-01906] because the petitioner failed to prove the CTA Summary qualified as a printed publication."  Prelim. Resp. 16.[13]  Patent Owner urges that we deny this Petition because

---

[13] As noted by the parties, the Board declined to institute trial on an earlier Petition by a third unrelated Petitioner for failure to timely identify all real parties in interest.  Pet. 54 (citing *Galderma S.A. v. Allergan Industrie, SAS,*

IPR2019-01632
Patent 8,357,795 B2

> Petitioner now uses the institution decision in IPR2017-01906 as a roadmap to remedy that defect, albeit unsuccessfully, by crafting an artificial definition of a POSITA that requires the POSITA to be "aware of the process by which FDA reviews dermal filler products, and how FDA communicates the results of the reviews to the public."

*Id.* (footnotes omitted).  According to Patent Owner, "Petitioner relied on the prior institution decision to prove the CTA Summary is a printed publication" (*id.* at 18), which raises fairness concerns (*Id.* at 24).  We do not agree.

### 1.    *General Plastic Factors 1 and 3*

> Relevant to *General Plastic* factors 1 and 3, Patent Owner argues that

> Petitioner had access to the Board's institution decision in IPR2017-01906 before filing this Petition. [Pet. 54–55] Petitioner acknowledges its awareness of the Teoxane petition and institution decision, and states it "overcomes the deficiencies of the Teoxane petition." [*Id.* at 61.]

Prelim. Resp. 21.  Patent Owner further contends that the issue of whether the CTA Summary was available to a person of ordinary skill in the art was addressed by the Board in IPR2017-01906 where "[t]he Board held that Teoxane failed to meet its burden to demonstrate that a POSITA exercising reasonable diligence would have located the CTA Summary before the critical date."  *Id.* at 19.  Patent Owner contends that "Petitioner used the institution decision from IPR2017-01906 as a guide to address[] the deficiencies related to the CTA Summary's status as a printed publication" and "now offers testimony from Dr. DeVore regarding what a

---

No. IPR2014-01422, Paper 14 (PTAB Mar. 5, 2015) (case terminated after additional proceedings); Paper 3, 2.

IPR2019-01632
Patent 8,357,795 B2

POSITA allegedly would have been aware of and would have done with respect to the CTA Summary." *Id.* at 21 (citing Pet. 3–6; Ex. 1002 ¶¶ 70–75, 115–118). Patent Owner contends that Petitioner offers a "new definition of a POSITA, which adds additional requirements to the definition the Board adopted earlier in IPR2017-01906 as consistent with the prior art." *Id.*; Pet. 16.

Relevant to *General Plastic* factor 1, Petitioner avers that, "[b]ecause this is Prollenium's first challenge to the '795 patent, and Prollenium has no connection to the prior petitioner, General Plastic Factor 1 weighs heavily in favor of institution. And only Prollenium has been sued in the pending lawsuit." Pet. 55–56; *see also* Reply 8 ("Allergan makes no effort to show why *Prollenium*, which has *no relationship* to Teoxane and was sued years later, should be barred."). Relevant to *General Plastic* factor 3, Petitioner concedes reviewing the preliminary response and the Board's decision denying institution in IPR2017-01906, but contends that, "to the extent there is overlap between the two petitions, Prollenium has addressed Teoxane's evidentiary failings." Pet. 56. Petitioner further contends that its obviousness grounds raise different evidentiary issues and challenges the claims in different ways. *Id.*

On the present record, we agree that Prollenium has no significant relationship to the Petitioner of IPR2017-01906. *See Valve Corp. v. Electronic Scripting Prods., Inc.* IPR2019-00062, Paper 11, 9 (Apr. 2, 2019) (precedential) ("[W]e consider any relationship between those petitioners when weighing the General Plastic factors."). Accordingly, *General Plastic* factor 1 weighs against exercising our discretion under § 314(a).

As to *General Plastic* factor 3, even if we were to accept Patent Owner's position that the issue before the Board in IPR2017-01906 was

26

IPR2019-01632
Patent 8,357,795 B2

"whether the CTA Summary itself was available to a person of ordinary skill in the art exercising reasonable diligence before the critical date" (Prelim. Resp. 34), that issue was not fully adjudicated on the merits.  IPR2017-01906, Paper 15.  Rather, we agree with Petitioner that the panel in IPR2017-01906 merely determined that the record lacked the evidentiary support necessary to establish that CTA Summary was public accessible before the critical date.  *See* IPR2017-01906, Paper 15, 11–12 ("the Petition advances bare attorney argument that the '[CTA] Summary was published online at least by January 10, 2007.'").  Furthermore, we note in particular that the weight the Board should accord the Lebreton Declaration—a cornerstone of Petitioner's argument in this case—is not mentioned, let alone addressed on the merits, in the IPR2017-01906 decision.  *See e.g.*, Ex. 1002 ¶¶ 70–75, 115–116, 118.  As such, in this instance, we do not find determinative that Petitioner was in possession of the Board's decision denying IPR2017-01906 prior to filing this Petition.  Under the particular circumstances presented, General Plastic factor 3 carries less weight, for example, than factor 1 (namely, that the earlier proceeding was filed by a different petitioner).

> 2.    *General Plastic factors 2, 4, and 5*

With respect to *General Plastic* factors 2 and 4, we agree with Petitioner that these factors relate to prior art *withheld* from the first Petition and, because there is no evidence that Petitioner was involved with any earlier petition challenging the '795 patent, and because there is no evidence that Petitioner was aware of any infringement assertions against it at the time of the earlier petition filings, these factors are inapplicable here.

Likewise, factor 5, ("[w]hether the petitioner provides adequate explanation for the time elapsed between the filings of multiple petitions

IPR2019-01632
Patent 8,357,795 B2

directed to the same claims of the same patent"), also fails to weigh in favor of denying institution because, as there is no evidence that Petitioner was involved in any such earlier petition or that Petitioner was even aware of the infringement assertions against it at the time of the earlier petition filings, there is no elapsed time to explain.

### 3.    *General Plastic factors 6 and 7*

Finally, because Patent Owner has not shown, nor do we discern, that this Petition raises unusual issues challenging the finite resources of the Board or our capacity to issue a final determination within the statutory limits of 35 U.S.C. § 316(a)(11), *General Plastic* factors 6 and 7 do not weigh in favor of denying institution under § 314(a).

### 4.    *Conclusion*

Having weighed each of the *General Plastic* factors, and for the reasons explained above, we decline to exercise our discretion under 35 U.S.C. § 314(a) to deny institution of the Petition.

### B.  *Discretion under 35 U.S.C. §§ 325(d)*

Institution of an *inter partes* review is discretionary.  *See Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1367 (Fed. Cir. 2016) (explaining that under 35 U.S.C. § 314(a), "the PTO is permitted, but never compelled, to institute an IPR proceeding").  Our discretionary determination of whether to institute review is guided, in part, by 35 U.S.C. § 325(d), which states, in relevant part:

> In determining whether to institute or order a proceeding under this chapter, chapter 30, or chapter 31, the Director may take into account whether, and reject the petition or request because, the same or substantially the same prior art or arguments previously were presented to the Office.

IPR2019-01632
Patent 8,357,795 B2

*See also* 157 Cong. Rec. S1360, S1376 (daily ed. Mar. 8, 2011) (statement of Sen. Kyl) ("[T]he second sentence of section 325(d) . . . authorizes the Director to reject any . . . petition . . . on the basis that the same or substantially the same prior art or arguments previously were presented to the Office.  This will prevent parties from mounting attacks on patents that raise issues that are substantially the same as issues that were already before the Office with respect to the patent.  The Patent Office has indicated that it currently is forced to accept many requests . . . that are cumulative to or substantially overlap with issues previously considered by the Office with respect to the patent.").

In evaluating whether the same or substantially the same prior art or arguments were previously presented to the Office under § 325(d), the Board has considered a number of non-exclusive factors, including, for example:

(a) the similarities and material differences between the asserted art and the prior art involved during examination;

(b) the cumulative nature of the asserted art and the prior art evaluated during examination;

(c) the extent to which the asserted art was evaluated during examination, including whether the prior art was the basis for rejection;

(d) the extent of the overlap between the arguments made during examination and the manner in which Petitioner relies on the prior art or Patent Owner distinguished the prior art;

(e) whether Petitioner has pointed out sufficiently how the Examiner erred in its evaluation of the asserted prior art; and

(f) the extent to which additional evidence and facts presented in the Petition warrant reconsideration of the asserted prior art or arguments.

IPR2019-01632
Patent 8,357,795 B2

*Becton, Dickinson and Co. v. B. Braun Melsungen AG*, IPR2017-01586, Paper 8 at 17–18 (PTAB Dec. 15, 2017) (informative) ("the *Becton Dickinson* factors").

    1.    *Becton Dickinson Factors (a) through (d)*

With respect to factors (a) through (d), Patent Owner argues that "the same art and arguments the Petition advances were considered, and ultimately rejected, throughout the extensive prosecution history of the '795 Patent." Prelim. Resp. 26.

With respect to the primary reference of Ground 2, Patent Owner argues that the Examiner's rejection in view of Lebreton was successfully overcome during the prosecution of the '795 patent. *Id.* at 27–28. With regard to the secondary reference Sadozai, Patent Owner contends this reference "is cumulative of art considered and distinguished during prosecution of the '795 patent." *Id.* at 29.

Petitioner, however, argues that "Allergan's argument that Lebreton was 'distinguished' in prosecution is inaccurate; Allergan never overcame the *prima facie* cases made by the Examiner. Instead, every patent was allowed based on Allergan's proffered unexpected results, primarily the unsubstantiated inventor declaration." Reply, 1–2. Petitioner's assertion is supported by the relevant prosecution history, as further discussed below. *See e.g.,* section I(C)(3), above.

Petitioner also argues that the asserted grounds combine Lebreton with "substantially different secondary references (Sadozai, etc.) than used by the Examiner and provide arguments and evidence (including the unrebutted DeVore testimony) not considered by the Examiner." Reply 2–6. We find particularly persuasive for the purpose of our § 325(d) analysis, Petitioner's contention that, whereas Calais and Wang, cited by the

IPR2019-01632
Patent 8,357,795 B2

Examiner, "merely *suggest* lidocaine . . . *could* be added to a crosslinked HA gel . . . [,] Sadozai directly refutes the inventor's declaration that lidocaine would degrade a HA gel during high temperature sterilization." Reply 2–3 (citations omitted). *Oticon Medical AB v. Cochlear Limited*, IPR2019-00975 (PTAB Oct. 16, 2019) (Paper 15) (precedential as to sections II.B and II.C).

On balance, factors (a) through (d) do not weigh in favor of exercising our discretion to deny institution under §325(d).

### 2.   *Becton Dickinson* Factor (e)

As to factor (e), Patent Owner asserts that "Petitioner fails to meets its burden to demonstrate how the Examiner allegedly erred in his review of the prior art during prosecution." Prelim. Resp. 31. According to Petitioner, the Examiner's error in allowing these claims "was induced by the declaration." Reply 6. Although Petitioner's analysis is not contrary to the present record, whether the Examiner "erred" by relying on the Lebreton Declaration is subsumed into our analysis of factor (f), below.

### 3.   *Becton Dickinson* Factor (f)

Even if we were to accept at face value Patent Owner's arguments regarding factors (a) through (d), they would be outweighed by our analysis of factor (f): "the extent to which additional evidence and facts presented in the Petition warrant reconsideration of the asserted prior art or arguments," which in this case, relates to Petitioner's arguments and evidence regarding the Lebreton Declaration. *See generally*, Pet. 47–51; Reply 6–7.

#### a)   *Paragraphs 4–10 of the Lebreton Declaration*

The Lebreton Declaration presents two general arguments. First, that one of ordinary skill in the art would have known that the addition of lidocaine to crosslinked HA dermal filler compositions was incompatible

31

with high temperature sterilization. *See* Ex. 1024 ¶¶ 4–10.[14]  Petitioner, in arguments supported by the testimony of its expert Dr. DeVore, however, directs us to substantial evidence to the contrary.  In particular, Petitioner identifies evidence that one of ordinary skill in the art would have understood that lidocaine-containing crosslinked HA dermal fillers could be sterilized with high temperatures and that such products were approved by the FDA for commercial sale.  *See e.g.*, Pet. 45–46 (citing Ex. 1002 ¶¶ 209–210).

Patent Owner appears to take the position that the Lebreton Declaration would have provided the Examiner with a complete picture of the prior art because he "was aware of the very references and teachings Petitioner alleges were absent" in the Declaration.  Prelim. Resp. 32 (arguing that the Examiner specifically considered Lebreton and Sadozai, which Patent Owner contends are cumulative to references considered during prosecution of the '795 patent).  The current record, however, further includes the presently unrebutted testimony of Dr. DeVore, and the question of whether the secondary references before the Examiner were truly cumulative is a matter of factual dispute that can be addressed at trial.  *See* Reply 2–5.  Moreover, the record indicates that the Examiner overlooked the relevance of the working examples disclosed in Kinney and Reinmuller during examination.  These factors weigh against exercising our discretion under § 325(d), as do the parties' arguments with respect to Cui, discussed above.

---

[14] As noted in the Petition, these "statements were *not* limited to BDDE-crosslinked HA [as presently claimed and] Allergan and the inventor cited no prior art references to support the inventor's opinions."  Pet. 45 (citing Ex. 1024 ¶¶ 4–8 and Ex. 1023, 24–28).

IPR2019-01632
Patent 8,357,795 B2

### b) *Paragraphs 11–15 of the Lebreton Declaration*

With reference to Example 4 of the incorporated provisional applications, the Lebreton Declaration further asserts that "other HA gels" mixed with lidocaine (represented by samples 4 and 5) "surprisingly and unexpectedly" maintained their viscosity and elasticity after high temperature sterilization as compared to gel samples 1, 2, and 3. Ex. 1024 ¶¶ 11–15. There appears to be no dispute at this juncture that the lidocaine-gel compositions of samples 4 and 5 comprise BDDE-crosslinked soft tissue filler compositions within the scope of the challenged claims. Petitioner, nonetheless, contends this portion of the Lebreton Declaration does not provide support for unexpected results because, first, samples 1–3 do not represent the closest prior art and, second, even though samples 1 and 2 show less drop in viscosity after sterilization as compared to samples 4–6, this difference is merely a matter of degree rather than kind. Pet. 48–50 (citations omitted).

We find particularly interesting Dr. DeVore's presently uncontested testimony that:

> Allergan's experiment and its interpretation of the results fundamentally misunderstands the point of stability testing. The consideration whether a crosslinked HA composition would be suitable as a dermal filler depends on its *final* viscosity, not how much the viscosity drops during sterilization. It is irrelevant if the viscosity drops by 5%, 50%, or even 90%, so long as the sterilized final product has the desired viscosity and is shelf stable.

Ex. 1002 ¶ 218. This testimony was not available to the Examiner during patent prosecution. Nor was Dr. DeVore's testimony that Sample 1 is irrelevant as a mixture of uncrosslinked HA and a polymer other than HA, whereas "[t]he final viscosity of samples 2 and 3 in each test (~75–375

33

IPR2019-01632
Patent 8,357,795 B2

PA*s) is substantially the same as the final viscosities of Samples 4–6 (~50–09 PA*s), all of which are within the range of marketed dermal fillers (50–1,200 PA*s)." *Id.* at ¶ 219.  In support of that contention, Dr. DeVore points to the priority documents as identifying samples 2 and 3 as corresponding to FDA-approved dermal fillers Hylaform and Restylane, respectively. *See id.* at ¶¶ 221–222 (citing Ex. 1013, 26:7; Ex. 1028, 19:7).

> Dr. DeVore further testifies that:
>
> During the prosecution of '795 patent, Allergan stated that Sample 3, when combined with lidocaine without pH adjustment, exhibited a 35% reduction in viscosity, while Sample 4 exhibited a 30% reduction in viscosity in the same test.  EX1023, 26–27.  During the prosecution of this application, Allergan argued that the claimed compositions exhibited a "much lower" reduction in viscosity.

*Id.* at ¶ 223.

> In my opinion, even if viscosity reduction by itself was a meaningful measure of suitability (it is not), there is no meaningful difference between a 30% and 35% reduction in viscosity. . . . Determining whether 30% is significantly different from 35% would require statistical analysis, such as required in FDA submissions. Such analysis is not present in the challenged patents. Thus, it is impossible to tell if the difference between Sample 3 and Sample 4, when pH is not controlled, is real or not.

*Id.* at ¶ 224.

We do not, on the present record, find Dr. DeVore's testimony "conclusory" and without a "well-reasoned rationale or objective support" as Patent Owner contends.  Prelim. Resp. 36.  To the contrary, Dr. DeVore's testimony weighs against exercising our discretion under § 325(d).  We, nonetheless, look forward to Patent Owner's testing of Dr. DeVore's opinions at trial.

IPR2019-01632
Patent 8,357,795 B2

*4.    Conclusion*

In sum, upon weighing the relevant Becton Dickinson factors, we determine that, although the grounds may rely on the same or substantially the same art or arguments previously presented to the Office, Petitioner has demonstrated sufficiently how the Office erred in a manner material to the patentability of the challenged claims in reliance on the Lebreton Declaration to overcome the prior art.  Thus, we decline to exercise our discretion under 35 U.S.C. § 325(d) to deny institution of the Petition.

## IV.    CONCLUSION

On the present record, we find Petitioner shows sufficiently that the cited references would have taught or suggested each element of claims 26–39, and set forth a sufficient rationale for why a person of ordinary skill would have been motivated to combine these teachings and suggestions to arrive at the invention recited in those claims.  Petitioner has established a reasonable likelihood of prevailing in demonstrating that claims 26–39 would have been obvious over the combinations of prior art set forth in the asserted grounds.

## V.    ORDER

In consideration of the foregoing, it is hereby:

ORDERED that, pursuant to 35 U.S.C. § 314(a), that an *inter partes* review of claims 26–39 of the '795 patent is instituted with respect to all grounds set forth in the Petition; and

FURTHER ORDERED, pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4(b), that the *inter partes* review of the '795 patent shall commence on the entry date of this Order, and notice is hereby given of the institution of a trial.

IPR2019-01632
Patent 8,357,795 B2

FOR PETITIONER:

Christopher L. Curfman
William W. Cutchins
Warren J. Thomas
John W. Harbin
MEUNIER CARLIN & CURFMAN LLC
ccurfman@mcciplaw.com
wcutchins@mcciplaw.com
wthomas@mcciplaw.com
mcc.prollenium.ipr@mcciplaw.com


FOR PATENT OWNER:

Dorothy P. Whelan
Michael Kane
FISH & RICHARDSON P.C.
whelan@fr.com
kane@fr.com

Trials@uspto.gov
571-272-7822

Paper 12
Entered: April 10, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

PROLLENIUM US INC.,

Petitioner,

v.

ALLERGAN INDUSTRIE, SAS,

Patent Owner.

_____

IPR2020-00084
Patent 9,089,519 B2

_____

*Before* JOHN G. NEW, SHERIDAN K. SNEDDEN, and
ROBERT A. POLLOCK, *Administrative Patent Judges*.

NEW, *Administrative Patent Judge*.

DECISION
Instituting *Inter Partes* Review
35 U.S.C. § 314(a)

IPR2020-00084
Patent 9,089,519 B2

# I. INTRODUCTION

Petitioner Prollenium US Inc. filed a Petition (Paper 1, "Petition")
requesting *inter partes* review of claims 1–8 of US Patent 9,089,519 B2 (Ex. 1001,
"the '519 patent"). Patent Owner Allergan Industrie SAS (the "Patent Owner")
timely filed a Preliminary Response. Paper 11 ("Prelim. Resp.").

Under 35 U.S.C. § 314, the Board "may not authorize an *inter partes* review
to be instituted unless … the information presented in the petition … and any
response … shows that there is a reasonable likelihood that the petitioner would
prevail with respect to at least one of the claims challenged in the petition." Upon
consideration of the Petition and the Preliminary Response we determine that the
evidence presented demonstrates a reasonable likelihood that Petitioner would
prevail, on Petitioner's Grounds 4 and 5, in establishing the unpatentability of at
least one claim of the '519 patent. We determine that Petitioner has not
demonstrated a reasonable likelihood it would prevail as to Grounds 1–3.
Although the panel finds that Petitioner is not likely to prevail on some Grounds,
the Board here institutes on all grounds in the petition. *PGS Geophysical AS v.
Iancu*, 891 F.3d 1354, 1360 (Fed. Cir. 2018) (interpreting the statute to require "a
simple yes-or-no institution choice respecting a petition, embracing all challenges
included in the petition").

# II. BACKGROUND

*A.    Related Matters*

The parties identify the following consolidated civil action:

*Allergan USA, Inc. and Allergan Industrie SAS v. Prollenium US Inc.
and Prollenium Medical Technologies Inc.*, Civil Action No. 19-126-
CFC (D. Del. filed Jan. 22, 2019).)

Paper 4, 1–2.

IPR2020-00084
Patent 9,089,519 B2

Petitioner has filed Petitions for *inter partes* review of related U.S. patents as follows: US Patent No. 8,450,475 B2 (the "'475 patent") in IPR2019-01505; US Patent No. 9,238,013 (the "'013 patent") in IPR2019-01508; US Patent No. 8,822,676 B2 (the "'676 patent") in IPR2019-01617; and US Patent No. 9,358,322 B2 (the "'322 patent") in IPR2019-01509.  Pet. 68–69.

B.    *The Asserted Grounds of Unpatentability*

Petitioner contends that claims 1–8 of the '519 patent are unpatentable based on the following grounds:

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1–4 | 102(a)(1) | PMA P050047/S005[1] |
| 1–4 | 102(a)(1) | Weinkle[2] |
| 1–4 | 102(a)(1) | U.S. 2010/0028438 A1[3] |
| 1–8 | 103 | Lebreton[4], Sadozai[5], |

---

[1] Summary Review Memo Template, P050047/S005, Juvederm Ultra Xc And Juvederm Ultra Plus XC (January 6, 2010") ("P050047/S005") (Ex. 1060).

[2] S.H. Weinkle et al., *A Multi-Center, Double-Blind, Randomized Controlled Study of the Safety and Effectiveness of Juvederm® Injectable Gel with and without Lidocaine*, 8 J. COSMETIC DERMATOL. 205–10 (2009) ("Weinkle") (Ex. 1070).

[3] Lebreton (U.S. 2010/0028438 A1, February 4, 2010) (the "'438 application) (Ex. 1072).

[4] Lebreton (US 2006/0194758 A1, August 31, 2006) ("Lebreton") (Ex. 1029).

[5] Sadozai et al. (US 2005/0136122 Al, June 23, 2005) ("Sadozai") (Ex. 1030).

3

IPR2020-00084
Patent 9,089,519 B2

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1–8 | 103 | P050047[6], Kinney[7] |

Petitioner also relies upon the Declaration of its declarant, Dr. Dale P. DeVore (the "DeVore Declaration") (Ex. 1002).

*C.    The '519 Patent*

The '519 patent is generally directed to cohesive soft tissue fillers, for example, dermal and subdermal fillers, based on hyaluronic acids ("HA") and pharmaceutically acceptable salts thereof.  Ex. 1001 Abstr.  More specifically, the '519 patent teaches soft tissue filler compositions generally comprising: a hyaluronic acid component crosslinked with a crosslinking agent selected from the group consisting of 1,4-butanediol diglycidyl ether (BDDE), 1,4-bis(2,3-epoxypropoxy) butane, 1,4-bisglycidyloxybutane, 1,2-bis(2,3-epoxypropoxy) ethylene and 1-(2,3-epoxypropyl)-2,3-epoxycyclohexane, and 1,4-butanediol diglycidyl ether; and at least one anesthetic agent, generally lidocaine, combined with the crosslinked HA component.  Ex. 1001 col. 2, ll. 54–62.

*D.    Illustrative Claim*

Claim 1 is illustrative and recites:

---

[6] Inamed Corporation, *Summary Of Safety And Effectiveness Data: JUVEDERM™: Premarket Application (PMA) Number P050047* (June 2, 2006) ("P050047") (Ex. 1074).

[7] B.M. Kinney, *Injecting Puragen Plus into the Nasolabial Folds: Preliminary Observations of FDA Trial*, 26(6) AESTHETIC SURG. J. 741–48 (2006) ("Kinney") (Ex. 1012).

IPR2020-00084
Patent 9,089,519 B2

> 1.     A first sterile dermal filler composition comprising hyaluronic acid crosslinked with 1,4-butanediol diglycidyl ether (BDDE), and about 0.3% lidocaine by weight, wherein the first composition fills in facial lines and depressions substantially the same as a second sterile dermal filler comprising hyaluronic acid crosslinked with BDDE wherein the second composition does not include lidocaine but otherwise has the same composition as the first composition.

Ex. 1001 col. 19, ll. 16–23.

Independent claims 3 and 5 are similar, but recite, respectively, that the first sterile dermal filler composition "restores fat loss-related tissue volume loss substantially the same," or "is substantially as stable during storage under ambient conditions for at least 3 months," as the second dermal filler. *Id.* at col. 20, ll. 2–3, 12–13.

E.     *Prosecution History of the '519 Patent*

In August and September 2008, Allergan filed a trio of provisional applications (US Appl. Ser. No. 61/085,956, August 04, 2008 (the "'956 application"); US Appl. Ser. No. 61/087,934, August 11, 2008 (the "'934 application"); and US Appl. Ser. No. 61/096,278, September 11, 2008 (the "'278 application") to which the '519 patent claims the priority benefit.  Pet. 11.

The parent application of the '519 patent, US Appl. Ser. No. 14/242,747 (the "'747 application") was filed on April 1, 2014, as a continuation of US Appl. Ser. No. 13/419,079 ("the '079 application"), which is, in turn, a continuation of US Appl. Ser. No. 12/393,884 (the "'884 application").  Pet. 13. The Examiner issued a first action Notice of Allowance on October 10, 2014, citing arguments and evidence relied upon by the Patent Owner in the examination of the '884 application.  *Id.* (citing Ex. 1049 6–7).  Specifically, the then-applicant argued, citing a declaration submitted by the inventor, that a person of ordinary

IPR2020-00084
Patent 9,089,519 B2

skill in the art would not have expected a lidocaine-containing HA composition could be sterilized by autoclave. *Id.* (citing Ex. 1023 25–28). Specifically, the then-applicant argued that "it was a surprising and unexpected discovery … that certain [HA] gels … when mixed with lidocaine, could be made to be heat stable and thus useful as dermal fillers." *Id.* at 13–14 (quoting Ex. 1023 23). At the time of this response, some pending claims were directed to BDDE-crosslinked HA, and other claims were directed to HA crosslinked with any crosslinker. *Id.* at 54 (citing Ex. 1023, 18–20 (claims 51–67)).

The Patent Owner also argued that a skilled artisan would have expected that autoclave sterilization would unacceptably reduce the composition's viscosity, thereby making it unsuitable for use as a filler. Pet. 14 (citing Ex. 1023 25). The Examiner accepted these arguments in the '884 application and they were expressly cited again by the Examiner in the reasons for allowance of the '519 patent. *Id.* (citing Ex. 1049 7).

The '519 patent issued on July 28, 2015 (Ex. 1001).

## III. ANALYSIS

### A.   *Claim Construction*

In an *inter partes* review for a petition filed on or after November 13, 2018, the "[claims] of a patent … shall be construed using the same claim construction standard that would be used to construe the [claims] in a civil action under 35 U.S.C. § 282(b), including construing the [claims] in accordance with the ordinary and customary meaning of such claims as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." *See* 37 C.F.R. § 42.100(b) (2019); *see also Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–14 (Fed. Cir. 2005) (*en banc*). Only those terms that are in controversy need be construed,

IPR2020-00084
Patent 9,089,519 B2

and only to the extent necessary to resolve the controversy. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co. Matal*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (citing *Vivid Techs., Inc. v. America Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)).

In a related district court litigation, *Allergan USA, Inc. v. Medicis Aesthetics, Inc.*, Case No. SACV 13-1436 AG (JPRx) (C.D. Calif.), 2014 WL 5488895 (C.D. Calif. Aug. 12, 2014),[8] the district court judge entered a claim construction order following a *Markman* hearing.  Ex. 1027.  Petitioner proposes constructions for certain claim terms, *viz.*, "sterile," "stable," and "freely released *in vivo*" that are consistent with those of the district court.  Pet. 15–18.  The Patent Owner does not concede that Petitioner's proposed constructions are the correct interpretation of these claims under the *Phillips* standard, but does not expressly contest any of Petitioner's proposed constructions. Prelim. Resp. 18–19.

We find that resolving the parties' dispute regarding whether we should institute *inter partes* review does not require any express claim construction at this stage of the proceedings.

B.    *A Person of Ordinary Skill in the Art*

Petitioner proposes that a person of ordinary skill, at and before the priority date of the patent, would have been: (1) a scientist involved in the development of dermal fillers; (2) would have an advanced degree, such as an M.S., M.D., or Ph.D.; and (3) possessed several years of experience developing dermal fillers for cosmetic use, including HA-based dermal fillers.  Pet. 14.  Petitioner contends that

---

[8] This case relates to the '795 patent, which issued from the '884 application, of which the application that issued as the '519 patent is a continuation.  *See* Pet. 19; Ex. 1027.

IPR2020-00084
Patent 9,089,519 B2

such a skilled artisan would have been aware of commercially sold dermal fillers, in the United States and abroad, as well as those products for which approvals were being publicly sought. *Id.* (citing Ex. 1002 ¶¶ 69–72).

Petitioner also states that a person of ordinary skill in the art would also have been aware of the process by which FDA reviews dermal filler products, and how FDA communicates the results of such reviews to the public. Pet. 14. Specifically, Petitioner posits that a skilled artisan would have known that once the FDA approved a dermal filler, the Agency would have posted information about that filler on its webpage. *Id.* (citing Ex. 1002 ¶¶ 73–75; Ex. 1032 227).

The Patent Owner points to the Board's related findings in a prior *inter partes* proceeding, IPR2017-01906, which involved the '795 patent. Prelim. Resp. 20. In that proceeding, the Board adopted a definition of the level of skill of a person of ordinary skill in the art consistent with Petitioner's characterizations (1)– (3), *supra*. *Id.* The Patent Owner rejects Petitioner's additional qualifications respecting "products for which approvals were being publicly sought" and awareness "of the process by which FDA reviews dermal filler products and how FDA communicates the results of such review to the public." *Id.* The Patent Owner notes that Petitioner fails to offer any reason why the Board's previous definition of a person of ordinary skill in the art is incorrect, or any reason why the Board should accept Petitioner's new definition. *Id.*

We do not find the Patent Owner's argument persuasive. The Patent Owner specifically objects to the additional qualification proposed by the Petitioner as being characteristic of a person of ordinary skill in the art, *viz.*:

> A POSITA would also be aware of the process by which FDA reviews dermal filler products, and how FDA communicates the results of such reviews to the public. In particular, the POSITA would have known that once FDA had approved a dermal filler, the FDA would have hosted information about that filler on its webpage.

8

IPR2020-00084
Patent 9,089,519 B2

*See* Pet. 14.  We find that whether a person of ordinary skill in the art, as defined by the petitioner in the prior proceedings would have also had this specific knowledge, as part of the performance of her qualifications and duties, is a finding of fact.  Petitioner has presented testimony, *via* the DeVore Declaration, that:

> The POSITA would be aware of both currently marketed dermal fillers, as well as those being publicly tested by medical device companies. The POSITA would have been aware of the process by which FDA reviews applications for new dermal filler products, as well as how the results of those reviews are communicated to the public.

Ex. 1002 ¶ 70.

The Patent Owner presents no evidence or testimony to rebut Dr. DeVore's opinion, and we consequently agree with the Petitioner's definition of a person of ordinary skill in the art would have the additional knowledge and abilities testified to by Dr. DeVore.  We find this to be particularly so because the qualifications recited as defining a person of ordinary skill in the art typically define the broad contours of an artisan's education and capabilities and do not speak to every particular aspect of their knowledge and duties.  Given that, we adopt for our present purposes that a person of ordinary skill in this particular art would be "aware of the process by which FDA reviews dermal filler products, and how FDA communicates the results of such reviews to the public."  Pet. 14.  The Patent Owner may adduce evidence at trial to rebut this definition.

C.    *Grounds 1, 2, and 3: Anticipation of Claims 1–4 by PMA P050047/S005, Weinkle, or the '438 application, respectively*

1.    Priority claims of the '519 patent

For the cited prior art references to anticipate claims 1–4 of the '519 patent, the '519 patent must not be able to claim the priority benefit of the '956, '934, or

IPR2020-00084
Patent 9,089,519 B2

'278 applications (the "priority applications"), thereby rendering the cited

references eligible as prior art.  Petitioner argues that the effective filing date of

claims 1–4 is the actual filing date of the application that issued as the '519 patent,

April 1, 2014, rather than the claimed priority date, because the parent applications

do not provide sufficient support for the claims as filed.  Pet. 18–19.

a.      Alleged lack of literal support for claims 1–4

Petitioner first argues that effective filing date of claims 1–4 of the '519

patent is April 1, 2014 filing date of the '747 application, the application that

issued as the '519 patent, rather than the earlier priority date(s) claimed by the

Patent Owner, because the parent applications do not provide literal support for the

claims as filed.  Pet. 20.  Petitioner points out that independent claims 1 and 3 are

directed to sterile dermal fillers comprising BDDE-crosslinked HA and 0.3%

lidocaine, and notes that there are no other structural limitations.  *Id.*  To the

contrary, Petitioner contends, each claim is directed to a functional result—the

filler's cosmetic performance.  *Id.*  Petitioner asserts that claim 1 recites a filler

with lidocaine that "fills in facial lines and depressions substantially the same" as

an otherwise same filler that does not contain lidocaine.  *Id.*  Similarly, argues

Petitioner, claim 3 recites a filler with lidocaine that "restores fat loss-related tissue

volume loss substantially the same" as an otherwise same filler that does not

contain lidocaine.  *Id.*

According to Petitioner, no disclosure in the priority documents suggests

that the disclosed fillers have the claimed functional characteristics.  Pet. 21 (citing

Ex. 1002 ¶ 146).  Petitioner asserts that the there are no comparative tests in the

'956, '934, or '278 applications from which equivalent performance could be

deduced or inferred, and that no example shows that the claimed fillers fill in facial

IPR2020-00084
Patent 9,089,519 B2

lines and depression, or restore fat loss-related tissue volume loss at all, much less that they do so substantially the same relative to a comparative filler that does not contain lidocaine. *Id.* (citing Ex. 1002 ¶¶ 146–147).

Petitioner contends that, although filling facial lines and depressions or restoring fat loss-related tissue volume loss may be intended objectives of the claimed dermal fillers, as they are with all dermal fillers, compositions having those characteristics are not demonstrated or described anywhere in the priority documents, much less in enough detail to identify how the "fill[ing]" or "restor[ing]" is performed in either lidocaine or non-lidocaine fillers. Pet. 21 (citing, e.g., Ex. 1082 col. 1, ll. 30–34; also citing *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1349–50 (Fed. Cir. 2010) (*en banc*)). Petitioner contends that the disclosure is silent as to how any composition—whether prior art or supposedly inventive filler—performs at filling or whether and how the disclosed embodiments perform "substantially the same" at filling facial lines or restoring tissue volume loss. *Id.* Therefore, argues Petitioner, there is nothing in the specification of the claimed priority documents that would clearly allow a person of ordinary skill in the art to recognize fillers having the claimed performance. *Id.* (citing Ex. 1002 ¶¶ 144–147, 152).

The Patent Owner responds that each of the '956, '934, and '278 applications discuss the ability of these compositions to retain their viscosity so that they can function to fill in facial lines and restore fat loss-related tissue volume. Prelim. Resp. 23. By way of example, the Patent Owner notes that these priority applications state: "Soft tissue fillers have been developed to help fill in facial lines and depressions, and for restoring volume of tissues due to fat loss." *Id.* (quoting Ex. 1013 11; Ex. 1028 4; Ex. 1044 16). The Patent Owner further argues that these priority applications further describe problems that soft tissue

IPR2020-00084
Patent 9,089,519 B2

fillers exhibited in performing these functions, disclosing that: "The development of HA-based fillers which exhibit ideal in vivo properties as well as ideal surgical usability has proven difficult." *Id.* (quoting Ex. 1013 12; Ex. 1028 5; Ex. 1044 17). Furthermore, argues the Patent Owner, in the case of HA-injectable compositions, the priority applications attribute these problems to lidocaine-induced degradation, disclosing that: "HA-based injectable compositions which incorporate lidocaine during the manufacturing process are prone to partial or almost complete degradation prior to injection, particularly during high temperature sterilization steps and/or when placed in storage for any significant length of time." *Id.* at 23–24 (quoting Ex. 1013 12; Ex. 1028 5; Ex. 1044 17). The Patent Owner contends that the '956, '934, and '278 applications subsequently characterize the invention as solving the degradation problem, leading to improved stability and comparable performance to HA-based compositions lacking lidocaine. *Id.* at 24 (citing Ex. 1013 13–14; Ex. 1028 6–7; Ex. 1044 18).

The Patent Owner contends that support for claims 1–4 can also be found in the '956, '934, and '278 applications *via* their disclosures with respect to the stability experiments involving the claimed compositions. Prelim. Resp. 25. The Patent Owner responds that, because the claimed compositions are stable, they are able to perform the filling features recited in claims 1–4. *Id.* The Patent Owner points to the tables provided in the priority applications summarizing the "stability testing results on the composition manufactured in accordance with the invention." *Id.* (quoting Ex. 1013 25; Ex. 1028 18; Ex. 1044 29). According to the Patent Owner, the data in the Table show that the extrusion force of the compositions containing lidocaine remained constant over a period of 3–9 months, and thus maintain their integrity to function as claimed over a period of 3–9 months. *Id.*

12

IPR2020-00084
Patent 9,089,519 B2

The Patent Owner argues further that the '956, '934, and '278 applications also include figures and discussion that demonstrate changes in viscosity between the autoclaved samples with and without lidocaine.  Prelim. Resp. 25.  The Patent Owner points to these figures as demonstrating that the viscosity at 0.1 Hz of BDDE-crosslinked cohesive Samples 4, 5, and 6, which embody the invention, did not decrease to any appreciable extent (not greater than about 30%) when lidocaine was added and the combination was autoclaved.  *Id.* (citing Ex. 1013 40–44; Ex. 1028 39–43; Ex. 1044 43–45).

Summarizing, the Patent Owner contends that the '956, '934, and '278 applications convey to a person of skill in the art that, because the lidocaine-containing samples embodying the claimed invention retain their viscosity and extrusion force, and consequently solve the lidocaine degradation problem, they are able to perform the filling functions as well as identical compositions lacking lidocaine.  Prelim. Resp. 26.

We agree with the Patent Owner.  The priority applications, as exemplified by the '956 application, expressly state that: "Soft tissue fillers have been developed to help fill in facial lines and depressions, and for restoring volume of tissues due to fat loss, thereby temporarily restoring a smoother, more youthful appearance."  Ex. 1013 11.  The '956 applications continues:

> The search for fillers that do not provoke allergic reactions has brought about the development of hyaluronic acid (HA)-based products. In December 2003, the first HA-based filler was approved by the FDA. This was soon followed by other HA-based fillers.
>
> Hyaluronic acid, also known as hyaluronan, is a naturally occurring, water soluble polysaccharide, specifically a glycosaminoglycan, which is a major component of the extracellular matrix and is widely distributed in animal tissues. Hyaluronic acid has excellent biocompatibility and does not cause allergic reaction when implanted

13

IPR2020-00084
Patent 9,089,519 B2

> into a patient. In addition, hyaluronic acid has the ability to bind to large amounts of water, making it an excellent volumizer of soft tissues.
>
> ….
>
> Crosslinked HA is formed by reacting uncrosslinked HA with a crosslinking agent under suitable reaction conditions. Methods of preparing HA based soft tissue fillers including both crosslinked and uncrosslinked HA are well known.

*Id.* at 11–12.

> The '956 application further discloses that:

> The next step in the manufacturing process comprises the step of crosslinking the hydrated, alkaline NaHA gel with a suitable crosslinking agent. The crosslinking agent may be any agent known to be suitable for crosslinking polysaccharides and their derivatives via their hydroxyl groups. Suitable crosslinking agents include but are not limited to, for example, 1,4-butanediol diglycidyl ether (or 1,4-bis(2,3-epoxypropoxy)butane or 1,4-bisglycidyloxybutane=BDDE), 1,2-bis(2,3-epoxypropoxy)ethylene and 1-(2,3-epoxypropyl)-2,3-epoxycyclohexane.

*Id.* at 18. The priority applications thus disclose that HA dermal fillers crosslinked with BDDE, as claimed in the '519 patent, were well-known in the art at the time of filing. Indeed, Petitioner's declarant, Dr. DeVore, testifies that it was known in the art, as of August 2008, that:

> Facial dermal fillers are a class of implantable medical devices that are used to fill wrinkles or add volume to portions of the face where facial tissue has been lost. Dermal fillers are viscous liquid compositions which are injected using a syringe into a patient's face in order to restore lost volume and remove facial wrinkle lines and folds.

Ex. 1002 ¶ 78. Dr. DeVore further attests that:

> Although many different compounds can be used to crosslink HA, as of August 2008 the vast majority of dermal fillers were prepared from a small number of crosslinker compounds: 1,4-butanediol diglycidyl ether ("BDDE"), divinylsulfone ("DVS"), p-phenylene-bis(ethylcarbodiimide) ("BDCI"), and diepoxyoctane ("DEO")….

14

IPR2020-00084
Patent 9,089,519 B2

Ex. 1002 ¶ 85.  It is therefore evident to us that, as of the time of filing of the priority applications, it was well known in the art, as attested to by Dr. DeVore, that dermal fillers were used for "fill[ing] wrinkles or add[ing] volume to portions of the face where facial tissue has been lost," and that, among such dermal fillers, HA crosslinked with BDDE was not only a commonly used and well understood formulation, but was known by the trade name of Juvéderm Ultra Plus.  *See id.* ¶ 192.

Furthermore, the Examples in the priority applications demonstrate that adding lidocaine to BDDE-crosslinked HA-based dermal fillers results in compositions that demonstrate essentially similar thermal stability and viscosity properties possessed by BDDE-crosslinked HA based dermal fillers[9] without lidocaine, i.e., both compositions behave in the same way as dermal fillers "fill[ing] wrinkles or add[ing] volume to portions of the face where facial tissue has been lost."  Figure 6 of the '956 application is reproduced below:

---

[9] In viewing these data, we have concerns about the lack of repetitive sampling and concurrent statistical analysis in the Examples of the priority applications as well as in the Specification of the '519 patent.  Nevertheless, the data presented support a *prima facie* argument that the thermal stability properties of the samples are similar, the which point is not disputed by the parties at this time.

IPR2020-00084
Patent 9,089,519 B2



Figure 6 of the '956 application demonstrates the post-sterilization thermal stability of a commercially available BDDE-crosslinked HA dermal filler (Juvéderm Ultra Plus): (1) without lidocaine; (2) with 0.3% lidocaine; and (3) with 0.3% lidocaine and with pH adjusted to 7.2

Figure 6 of the '965 application (and the other priority applications) thus demonstrates that a BDDE-crosslinked HA-based dermal filler exhibits similar viscosities post-autoclaving whether paired with 0.3% lidocaine or sterile water (control). We agree that a person of ordinary skill in the art would have comprehended, from these disclosures of the priority documents, that a BDDE-crosslinked HA-based dermal filler containing 0.3% lidocaine would act in the same manner as the commercially-available, BDDE-crosslinked HA dermal filler (Juvéderm Ultra Plus) in its intended purpose of "fill[ing] wrinkles or add[ing] volume to portions of the face where facial tissue has been lost." Or, as Petitioner's declarant declarant opines:

> Because the POSITA would expect the lidocaine to be voided from the gel quickly after implantation, the POSITA would have expected the lidocaine-containing gel *to have substantially the same clinical performance, including the claimed filling in facial lines and wrinkles (claim 1) and restoring fat loss related tissue volume loss*, as an otherwise same gel that did not contain lidocaine.

16

IPR2020-00084
Patent 9,089,519 B2

Ex. 1002 ¶ 196 (emphasis added).  We therefore do not find convincing Petitioner's argument that claims 1–4 of the '519 patent lack literal support in the disclosures of the '956, '934, and '278 applications.

      b.     Whether the disclosed species support claims 1–4

Petitioner next argues that the species disclosed in the '956, '934, and '278 applications do not describe the full scope of the fillers recited in the claims.  Pet. 22 (citing Ex. 1002 ¶ 152).  Petitioner notes that, in an unpredictable art, the disclosure of many species will not describe a genus if the genus is much broader than the species.  *Id.* (citing *Abbvie Deutschland GmbH & Co. v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1301 (Fed. Cir. 2014)).  According to Petitioner, the Patent Owner has repeatedly argued that the claims were patentable because it was not expected that lidocaine could be combined with hyaluronic acid and that it was an unexpected discovery that cohesive gels could be successfully combined with lidocaine.  *Id.* at 23 (citing Ex. 104 ¶¶ 5–10; Ex. 1023, 23–25).

Petitioner asserts that the claims of the '519 patent are broad, requiring only the presence of BDDE-crosslinked HA and 0.3% lidocaine.  Pet. 23.  The claims cover fillers with essentially any degree of crosslinking, any particle size, any amount of free HA and almost any ratio of high and low molecular weight HA.  *Id.* (Ex. 1002 ¶¶ 149–150).  However, Petitioner argues the '956, '934, and '278 applications disclose only three species, each of which is a cohesive gel having 6% crosslinking or less.  *Id.* (citing Ex. 1001 col. 15, ll. 38–52).

Petitioner contends that, in view of the breadth of the claims, the Patent Owner's repeated assertions that the art was unpredictable compels a finding that the claims are not entitled to the claimed priority date, even if one or more of the species disclosed therein might have the claimed performance.  Pet. 24.  Petitioner

IPR2020-00084
Patent 9,089,519 B2

argues that the '519 patent and the priority documents all contend that it was unpredictable whether lidocaine could be added to a dermal filler. *Id.* (citing Ex. 1001 col. 2, ll. 26–31). Petitioner also observes that the '956 application (which is incorporated by reference into each of the priority applications) explicitly states that it was "recognized" by the "conventional knowledge in the art" that adding lidocaine to HA compositions resulted in degradation. *Id.* (citing Ex. 1013 col. 4, ll. 14–20) (emphasis added).

Petitioner also points to the Declaration of inventor Dr. Pierre Lebreton (the "Lebreton Declaration" (Ex. 1024)), submitted during examination, which states that "shortly prior to August 4, 2008," "it was believed that adding lidocaine to hyaluronic acid gel compositions during manufacturing caused degradation of the hyaluronic acid prior to injection of the HA as a dermal filler." Pet. 25 (quoting Ex. 1024 ¶¶ 4–5). Petitioner asserts that the Lebreton Declaration states that it was discovered that a subset of dermal fillers, e.g., cohesive gels, could be successfully combined with lidocaine: "To my knowledge, it was a surprising and unexpected discovery, not appreciated prior to the present invention, that certain cohesive HA gels, as defined in the application, when mixed with lidocaine, could be made to be heat and shelf stable." *Id.* (quoting Ex. 1024 ¶ 15).

Summarizing, Petitioner contends that the alleged breadth of the claims, the alleged lack of a sufficient number of examples, and the Patent Owner's asserted unpredictability of the art compel a finding that the claims are not described by any of the claimed priority documents. Pet. 26.

The Patent Owner responds that claims 1–4 are drawn to sterile dermal filler compositions containing BDDE-crosslinked HA and 0.3% lidocaine that perform the claimed filler functions that are substantially the same as identical dermal fillers lacking lidocaine. Prelim. Resp. 27–28 (citing Ex. 1001 col. 19, ll. 16–20).

IPR2020-00084
Patent 9,089,519 B2

According to the Patent Owner, the claims therefore require a specific polymer (crosslinked HA), a specific crosslinker (BDDE), a specific anesthetic (lidocaine), and a specific amount of the anesthetic (0.3%). *Id.* at 28.

The Patent Owner notes that Petitioner acknowledges that the priority applications describe three species embodying the claimed invention. Prelim. Resp. 28 (citing Pet. 23). The Patent Owner asserts that the '956, '934, and '278 applications each describe Samples 4–6, which correspond to Juvéderm Refine, Juvéderm Ultra Plus, and Juvéderm Voluma. *Id.* (citing Ex. 1013 26; Ex. 1028 19; Ex. 1044 30). The Patent Owner argues that these samples all contain BDDE-crosslinked HA and (in Test 2) 0.3% lidocaine as recited in claims 1–4. *Id.* The Patent Owner contends that the text of the priority applications shows that when Samples 4–6 are mixed with lidocaine, the resulting compositions are stable with autoclaving. *Id.* Furthermore, argues the Patent Owner, the priority applications demonstrate the free release of lidocaine from the Juvéderm Ultra Plus gel (Sample 5). *Id.* (citing Ex. 1013 29; Ex. 1028 22; Ex. 1044 34). The Patent Owner therefore argues that the three species disclosed in the priority applications adequately support claims 1–4.

We do not find Petitioner's arguments persuasive. We agree with Petitioner that the Examples of the '956, '934, and '278 applications disclose three species, each of which is a cohesive gel having 6% crosslinking or less (i.e., Samples 4–6). *See* Pet. 23. However, the priority applications also disclose that "[c]rosslinked HA is formed by reacting uncrosslinked HA with a crosslinking agent under suitable reaction conditions. Methods of preparing HA based soft tissue fillers including both crosslinked and uncrosslinked HA are well known." *See, e.g.*, Ex. 1013 2. The priority applications further disclose that:

> The next step in the manufacturing process comprises the step of crosslinking the hydrated, alkaline NaHA gel with a suitable

IPR2020-00084
Patent 9,089,519 B2

> crosslinking agent. The crosslinking agent may be any agent known to
> be suitable for crosslinking polysaccharides and their derivatives via
> their hydroxyl groups.… The use of more than one crosslinking agent
> or a different crosslinking agent is not excluded from the scope of the
> present invention. In is [sic] particularly preferred embodiment, the
> crosslinking agent comprises or consists of 1,4-butanediol diglycidyl
> ether (BDDE).

*Id.* at 18. The priority applications additionally disclose that:

> The step of crosslinking may be carried out using means known to those
> of skill in the art. Those skilled in the art appreciate how to optimize
> the conditions of crosslinking according to the nature of the HA, and
> how to carry out the crosslinking to an optimized degree. The degree of
> crosslinking is preferably sufficient for the final hydrogel composition
> obtained from the present methods to remain implanted at the injection
> site without excessive diffusion away from this injection site. In some
> embodiments of the present invention, the degree of crosslinking is at
> least about 2% to about 20%, and more preferably is about 4% to about
> 12%, wherein the degree of crosslinking is defined as the percent
> weight ratio of the crosslinking agent to HA-monomeric units in the
> composition.

*Id.* at 18. The priority applications thus disclose that: (1) optimizing the

crosslinking of HA with BDDE was well known within the art of dermal fillers; (2)

for the purposes of the claimed invention, the degree of crosslinking is at least

about 2% to about 20%, and more preferably is about 4% to about 12%, and that

(3) as explained *supra*, the Examples demonstrate that a commercially-available

dermal filler, in which the HA was 6% crosslinked with BDDE (i.e., Juvéderm

Ultra Plus) exhibited thermal stability when combined with 0.3% lidocaine that

was comparable to that demonstrated by the same dermal filler without lidocaine.

Petitioner argues that claims 1–4 of the '519 patent are not sufficiently

supported by the disclosures of the '956, '934, and '278 applications because (as

the Patent Owner argued during examination) the art of dermal fillers is so

IPR2020-00084
Patent 9,089,519 B2

unpredictable that a person of ordinary skill would not have received sufficient guidance from the priority applications to practice the claimed invention. Petitioner points to the statements of the Lebreton Declaration in support of this contention.

> The Lebreton Declaration states that:
>
> It was believed that adding lidocaine to hyaluronic acid gel compositions during manufacturing caused degradation to the hyaluronic acid prior to injection of the HA as a dermal filler.
>
> It was believed that lidocaine caused degradation of the HA gel compositions during high temperature sterilization
>
> It was not known whether HA compositions comprising lidocaine were stable or not after high temperature sterilization when placed in storage for any significant length of time.
>
> It was also believed that the instability of HA described above would have caused a viscosity reduction of the HA that would make it unsuitable for soft tissue filling applications.
>
> Based upon the facts set forth above, a person of ordinary skill in the art would have expected that a dermal filler comprising hyaluronic acid and lidocaine would not have remained sufficiently stable to be useful as a soft tissue filler.
>
> It was not appreciated that a dermal filler comprising a cohesive gel of hyaluronic acid makes it possible for lidocaine to be combined with hyaluronic acid in a gel that is sufficiently stable to be useful as a soft tissue filler.

Ex. 1024 ¶¶ 5–10.  We find that the Lebreton Declaration asserts, at most, that it would have been uncertain to a person of ordinary skill in the art that combining lidocaine with a BDDE-crosslinked HA-based dermal filler would have the same thermal stability properties as the same BDDE-crosslinked HA-based dermal filler without lidocaine – a supposition contradicted by Trials 1–3 disclosed by the

IPR2020-00084
Patent 9,089,519 B2

priority Declarations.  Furthermore, and as we explain *infra*, the statements of the Lebreton Declaration are unsupported by any factual evidence of record.

Petitioner, however, argues that the art is not uncertain, and that the lack of degradation caused by the addition of 0.3% lidocaine would have been entirely expected by a person of ordinary skill in the art.  The DeVore Declaration, upon which Petitioner expressly relies, attests that:

> Moreover, in my opinion a POSITA, at least "shortly prior to" August 4, 2008, would have believed that lidocaine *could* be added to a HA gel. As explained throughout much of this declaration, the prior art explicitly taught that lidocaine *had* been successfully combined with several other crosslinked-HA dermal fillers, leading to (at least) the products Prevelle Silk, Elevess, and Puragen Plus. The POSITA would have been aware of these products and would have also been aware of the references cited in "Grounds" of the Petition and this declaration, as well as other publications such as Toth and Hanke. Each of these references except for Hanke explicitly describe a crosslinked-HA dermal filler combined with lidocaine, and the POSITA would have understood Hanke's HA composition was crosslinked as well. Further a POSITA would have understood that each of the commercial products, as described in the various references cited, would have been sterilized and "sufficiently stable" (to use Lebreton's words from his declaration) in order to obtain FDA approval and be competitive in the marketplace. Thus, the prior art and documents cited here contradict Lebreton's opinions in his declaration about the knowledge of the POSITA.

Ex. 1002 ¶ 208 (internal reference omitted).  Petitioner cannot credibly argue simultaneously that the art was so uncertain that a person of ordinary skill would not have understood that the addition of 0.3% lidocaine would not degrade a crosslinked HA-based dermal filler and also argue that the art was certain enough that a skilled artisan would have understood "that lidocaine had been successfully combined with several other crosslinked-HA dermal fillers." *Id.*  Furthermore, the statement of the DeVore Declaration is supported by evidence of record (*See* Ex.

22

IPR2020-00084
Patent 9,089,519 B2

1021 (Toth[10] and Hanke[11], quoted *supra*)), whereas the assertions of the Lebreton are not.  We therefore determine that the opinions expressed in this passage of the DeVore Declaration are, at least with respect to the degree of certainty in the art, more credible than those of the DeVore Declaration.

Finally, even were we, *arguendo*, to agree that the '956, '934, and '278 applications did not provide sufficient support for claims 1–4, the '519 patent also claims the priority benefit of the '884 application (*see* II E, *supra*).  The Specification of US 8,357,795 B2 (the "'795 patent," which issued from the '884 application) discloses the same stability tests as the priority applications.  *See* Ex. 1082 cols. 15–17, ll. 21–2).  Furthermore, the Specification of the '795 patent discloses:

> The step of crosslinking may be carried out using any means known to those of ordinary skill in the art. Those skilled in the art appreciate how to optimize conditions of crosslinking according to the nature of the HA, and how to carry out crosslinking to an optimized degree.

> Degree of crosslinking for purposes of the present disclosure is defined as the percent weight ratio of the crosslinking agent to HA-monomeric units within the crosslinked portion of the HA based composition. It is measured by the weight ratio of HA monomers to crosslinker (HA monomers:crosslinker).

> The degree of crosslinking in the HA component of the present compositions is at least about 2% and is up to about 20%.

---

[10] C.A. Toth et al., *Preclinical Evaluation of a Novel Hyaluronic Acid 28 mg/mI, Lidocaine 0.3% Stable Combination Product*, 56(2) J. AMER. ACAD. DERMATOL. SUPPL. AB94 (2007) ("Toth").

[11] C.W. Hanke et al., *Effectiveness and Durability of a Hyaluronic Acid 28 mg/ml, Lidocaine 0.3% Stable Combination Product as Demonstrated in a Multicenter, Randomized Trial*, 56(2) J. AMER. ACAD. DERMATOL. SUPPL. AB94 (2007) ("Hanke").

IPR2020-00084
Patent 9,089,519 B2

> In other embodiments, the degree of crosslinking is greater than 5%, for example, is about 6% to about 8%.
>
> In some embodiments, the HA component is capable of absorbing at least about one time its weight in water. When neutralized and swollen, the crosslinked HA component and water absorbed by the crosslinked HA component is in a weight ratio of about 1:1. The resulting hydrated HA-based gels have a characteristic of being highly cohesive.
>
> The HA-based gels in accordance with some embodiments of the invention may have sufficient cohesivity such that the gels will not undergo substantial phase separation after centrifugation of the gel at 2000 rd/min for 5 minutes. In another embodiment, the gels have the characteristic of being capable of absorbing at least one time their weight of water and have sufficient cohesivity such that when swollen with water at a gel/water weight ratio of about 1:1, the gels maintain their integrity, for example, when subjected to centrifugation.

*Id.* at col. 10, ll. 11–45. The Specification of the '795 patent provides even more specific disclosures concerning claims 1–4 of the '519 patent. The '884 application was filed on February 26, 2009, which antedates the allegedly anticipatory references relied upon by the Examiner: (1) P050047/S005 (dated January 6, 2010) (Ex. 1060); (2) Weinkle (published September 2009) (Ex. 1070); and (3) the '438 application (filed February 4, 2010) (Ex. 1072). We conclude that these additional disclosures of the '884 application provide further, and sufficient, support for claims 1–4 of the '519 patent. Because the filing date of the '884 application antedates the dates of the art references cited by Petitioner, we determine that P050047/S005, Weinkle, and the '438 application do not qualify as prior art to the '519 patent, we find that the evidence presented does not demonstrate a reasonable likelihood that Petitioner would prevail on Grounds 1–3.

IPR2020-00084
Patent 9,089,519 B2

D.   *Ground 4: Obviousness of Claims 1–8 over Lebreton and Sadozai*

1.   Overview of Lebreton

Lebreton teaches dermal filler compositions, including BDDE-crosslinked HA dermal filler obtained by crosslinking a mixture of low and high molecular weight HA starting materials.  Ex. 1029 ¶¶ 43–45.  Lebreton teaches that such fillers have improved properties relative to fillers using only high or only low molecular weight HA.  *Id.* at ¶¶ 21–24.  Lebreton teaches that the fillers can be formulated at pH between 6.5 and 7.5, preferably between 7 and 7.4, and even more preferably between 7.1 and 7.3, and that the pH can be controlled using the appropriate buffer solution.  *Id.* at ¶ 48.  The '519 patent cites Lebreton in explaining how selection of various HA components in dermal fillers was known to affect characteristics such as extrusion force, elastic modulus, and viscous modulus, among others.  Ex. 1001 col. 9, ll. 30–40.

Lebreton teaches two examples in which a mixture of high molecular weight and low molecular weight HA is crosslinked with BDDE in the presence of sodium hydroxide.  Ex. 1029 ¶¶ 80–92.  The resulting mixture is neutralized to pH 7.2 using a phosphate buffer and dialyzed, then mechanically homogenized, loaded into a syringe, and sterilized in an autoclave.  *Id.*


2.   Overview of Sadozai

Sadozai teaches p-phenylene-bis(ethylcarbodiimide) ("BDCI")–crosslinked HA dermal fillers that include lidocaine.  Ex. 1030 ¶¶ 7, 85.  Sadozai teaches that its dermal fillers may include an anesthetic that can increase the stability of the dermal filler relative to the same filler without the anesthetic.  *Id.* at ¶ 68.

Sadozai teaches examples of nine crosslinked HA gels prepared by crosslinking HA with BDCI.  Ex. 1030 ¶ 85.  Sadozai further teaches several

IPR2020-00084
Patent 9,089,519 B2

examples in which one of the crosslinked HA samples (Example 5) is reconstituted
in a phosphate buffer containing 0.3% lidocaine hydrochloride (Buffer 4). *Id.* at ¶¶
90, 100, 102. The resulting gel is loaded into a syringe and autoclaved, after which
the storage modulus (which is related to viscosity) of the lidocaine-containing
crosslinked HA is higher than an otherwise identical crosslinked HA without
lidocaine. *Id.* at ¶¶ 90, 107 (relating storage modulus to viscosity).

3.      Obviousness over Lebreton and Sadozai

Petitioner argues that Lebreton teaches two examples in which a mixture of
high molecular weight and low molecular weight HA is crosslinked with BDDE in
the presence of sodium hydroxide. Pet. 35. According to Petitioner, the resulting
mixture is adjusted to a physiological pH, mechanically homogenized, loaded into
a syringe, and sterilized with an autoclave. *Id.* (citing Ex. 1029 ¶¶ 80–92).
Petitioner acknowledges that Lebreton's compositions do not contain lidocaine.

Petitioner argues that Sadozai discloses BDCI-crosslinked HA dermal fillers
that include lidocaine. Pet. 35 (citing Ex. 1030 ¶¶ 7, 85; Ex. 1002 ¶ 128).
Petitioner contends that Sadozai teaches that the dermal fillers may include an
anesthetic that can increase the stability of the dermal filler relative to an
equivalent filler without the anesthetic. *Id.* (citing Ex. 1030 ¶ 68). Petitioner
asserts that Sadozai discloses nine crosslinked HA gels prepared by crosslinking
HA with another known crosslinker, p-phenylene-bis(ethylcarbodiimide)
("BDCI"), and further discloses at least one crosslinked HA sample which is
reconstituted in a phosphate buffer containing 0.3% lidocaine hydrochloride
(Buffer 4), and is then loaded into a syringe and autoclaved (Example 5). *Id.* at
35–36 (citing Ex. 1030 ¶¶ 90, 100, 102). Petitioner argues that Sadozai teaches
that the storage modulus (which is related to viscosity) of the lidocaine-containing

IPR2020-00084
Patent 9,089,519 B2

crosslinked HA was higher than an otherwise same crosslinked HA without lidocaine. *Id.* at 36 (citing Ex. 1030 ¶ 107); Ex. 1002 ¶ 129 (relating storage modulus to viscosity)).

Petitioner argues that, at the time of filing of the '519 patent, lidocaine had been successfully incorporated into compositions containing HA crosslinked with the three other conventional crosslinking agents: (1) 1,4-divinylsulfone ("DVS"); (2) diepoxyoctane ("DEO"); and (3) BDCI. Pet. 9–10, 16 (citing Ex. 1059 col. 7, ll. 1–17; Ex. 1002 ¶¶ 121–123; Ex. 1012 742; Ex. 1002 ¶¶ 117, 130–131; Ex. 1050 1; Ex. 1002 ¶¶ 114–116). Petitioner asserts that two products had, at the time of filing, already received FDA approval by the earliest filing date of challenged patent, and that the third (Puragen Plus) was approved in Europe and undergoing clinical trials in the U.S. *Id.* at 36 (citing Ex. 1020 8; Ex. 1012 742; Ex. 1002 ¶¶ 117, 130–131; Ex. 1052 (Prevelle Silk); Ex. 1019 4 (Anika's Elevess, (an implementation of Sadozai); Ex. 1002 ¶ 115). Petitioner contends that a composition containing BDDE-crosslinked HA and lidocaine was a derivative and predictable next step in view of the success of the other three clinically-used crosslinkers. *Id.* Petitioner asserts that, at minimum, adding lidocaine to Lebreton would have been obvious to try. *Id.*

Petitioner argues further that the prior art would have suggested, to a skilled artisan, a reasonable expectation of success in adding lidocaine to the BDDE-crosslinked HA of Lebreton to produce a lidocaine-containing dermal filler. Pet. 37. Petitioner contends that the repeated successful use of lidocaine across the remaining spectrum of crosslinked HA dermal fillers would have prompted a person of ordinary skill in the art to, at minimum, attempt the combination. *Id.* Petitioner points to its declarant, Dr. DeVore's opinion that HA gels crosslinked with DVS, BDCI, or DEO share many more similarities with BDDE-crosslinked

IPR2020-00084
Patent 9,089,519 B2

gel than there are differences. *Id.* (citing Ex. 1002 ¶¶ 187, 199–200). Once crosslinked, Dr. DeVore opines, all four crosslinkers are devoid of reactive or unstable functional groups which a skilled artisan might suspect would unfavorably react in the presence of lidocaine. *Id.* (*see* Ex. 1002 ¶¶ 199–200).

Furthermore, argues Petitioner, lidocaine had been successfully incorporated into dermal fillers containing more significant chemical differences than the various crosslinked HA compositions. Pet. 37. Petitioner notes that, in the cosmetic field alone, lidocaine had been successfully incorporated into fillers based on synthetic polymers, bovine collagen, and human collagen. *Id.* (citing Ex. 1002 ¶ 113). Petitioner asserts that there is therefore no credible reason why the POSITA would have not expected that lidocaine could be successfully incorporated into a BDDE-crosslinked HA gel as well. *Id.*

The Patent Owner does not expressly contest Petitioner's arguments with respect to the obviousness of the claims, but argues, rather, that the Board should exercise its discretion to deny institution on Ground 4, and on Ground 5, under 35 U.S.C. § 325(d). Prelim. Resp. 33–50. We address these arguments *infra*. However, based upon Petitioner's arguments, we find that, with respect to Ground 4, the prior art cited by Petitioner teaches the limitations of claims 1–8, and that a person of ordinary skill in the art would have been motivated to combine the references with a reasonable expectation of success. We therefore conclude that there is a reasonable likelihood that the Petitioner will prevail at trial upon this ground.

E.     *Ground 5: Obviousness of Claims 1–8 over P050047 and Kinney*

1.     Overview of P050047

P050047 is a printed publication with a publication date of no later than June

IPR2020-00084
Patent 9,089,519 B2

30, 2006.  Ex. 1074.  The Juvéderm family of dermal fillers received premarket approval ("PMA") from the FDA on June 2, 2006, based on P050047, filed by Inamed Corporation[12] ("Inamed").  *Id.*  According to the Food & Drug Administration (FDA) Notice in the Federal Register, the "Safety and Effectiveness Data" for Juvéderm was available on FDA's website by June 30, 2006.  Ex. 1075 56,158 (listing the Juvéderm gel implants among the "List of Safety and Effectiveness Summaries for Approved PMAs Made Available" in the second quarter of 2006).

2.     Overview of Kinney

Kinney teaches a clinical study comparing two dermal fillers: (1) Restylane, which had been on the market for several years, and (2) Puragen Plus, which was undergoing FDA clinical trials.  Ex. 1012 741–742.  Kinney teaches that Restylane is an injectable dermal filler containing 20 mg/mL of BDDE-crosslinked HA particles with a high concentration of "minimally modified HA molecules."  *Id.*  Kinney further teaches that a "major disadvantage" of existing HA based fillers was the pain that accompanied injection.  *Id.* at 741.  Kinney also teaches Puragen Plus, a dermal filler containing 20 mg/mL of DEO-double crosslinked HA particles and lidocaine hydrochloride (0.3%), which was then undergoing clinical trials.  *Id.* at 742.  Kinney teaches that injection with Puragen Plus caused minimal or no pain for patients, especially when compared to Restylane.  *Id.* at 746.

3.     Obviousness over P050047 and Kinney

Petitioner argues that P050047 discloses sterile BDDE-crosslinked HA gels formulated at a concentration of 22-26 mg/mL suspended in a physiological buffer.

---

[12] The Patent Owner subsequently acquired Inamed.  *See* Pet. 4.

IPR2020-00084
Patent 9,089,519 B2

Pet. 46 (citing Ex. 1074 1).  Petitioner notes that these gels are given the trade name Juvéderm and are indicated for the correction of moderate to severe facial wrinkles and folds.  *Id.*  According to Petitioner, P050047 discloses Juvéderm 30HV, which is intended for use in certain types of wrinkles.  *Id.* (citing Ex. 1074, 2).

Petitioner argues that Kinney teaches results of a clinical trial of "Puragen Plus," a DEO-crosslinked HA dermal filler that includes 0.3 wt% lidocaine, and which provides a "relatively pain-free injection."  Pet. 46 (citing Ex. 1012 742). Petitioner contends that Kinney teaches that injection of the lidocaine-containing filler resulted in less pain than injection with a filler that did not contain lidocaine, such as known products Restylane and Puragen (the predecessor of Puragen Plus), and that all patients preferred the lidocaine-containing filler.  *Id.* (citing Ex. 1012 746).

It is Petitioner's position that a person of ordinary skill in the art would have been motivated to add lidocaine to the Juvéderm 30HV product described by P050047, because Kinney teaches patients preferred Puragen Plus over Restylane (a BDDE-crosslinked HA filler), due to it containing lidocaine for pain reduction. Pet. 46 (citing Ex. 1012 746; Ex. 1002 ¶ 189).  Petitioner contends that a skilled artisan would have been motivated to add lidocaine to Juvéderm, with the expectation that it would reduce pain and increase patient demand in the marketplace.  *Id.* at 46–47 (citing Ex. 1002 ¶ 189).  Furthermore, Petitioner argues, because BDDE and DEO are each bis-epoxide crosslinkers resulting in the same type of crosslink bonds, a person of ordinary skill would have reasonably expected that lidocaine would function analogously in both of the crosslinked gels.  *Id.* at 47 (citing Ex. 1002 ¶ 195).

30

IPR2020-00084
Patent 9,089,519 B2

The Patent Owner responds that the Board should decline to initiate *inter partes* review on Ground 5 because Petitioner fails to prove that P050047 qualifies as a printed publication under pre-AIA 35 U.S.C. § 102(b). Prelim. Resp. 29. The Patent Owner argues that P050047 is an FDA Premarket Approval ("PMA") document entitled "Summary of Safety and Effectiveness Data," and summarizes the features of Juvéderm 30, Juvéderm 24 HV, and Juvéderm 30HV, which are HA-BDDE crosslinked fillers that lack lidocaine. *Id.* at 30 (citing 1074 1–2). The Patent Owner notes that Petitioner points Exhibit 1075, arguing that P050047 was included in a listing of approved PMAs published on the FDA's website no later than June 30, 2006. *Id.* (citing Pet. 4).

The issue, according to the Patent Owner, is not whether P050047 was listed on the FDA's website by June 30, 2006, more than one year before the filing date of the '519 patent (i.e., more than one year before August 4, 2008). Prelim. Resp. 30. Rather, the Patent Owner argues, the issue is whether P050047 was available to a person of ordinary skill in the art exercising reasonable diligence before the critical date. *Id.* (citing, e.g., *SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*, 511 F.3d 1186, 1194 (Fed. Cir. 2008)).

The Patent Owner notes that Petitioner's declarant, Dr. DeVore, testifies as to what a person of ordinary skill in the art would have been aware of, and would have done, with respect to P050047. Prelim. Resp. 30–31 (citing Ex. 1002 ¶¶ 70–75, 155–159). However, the Patent Owner observes, Dr. DeVore's curriculum vitae indicates that he is not a person of ordinary skill in the art, as determined in the prior, related IPR2017-01906, and which the Patent Owner urges to adopt in these proceedings. *Id.* at 31.

According to the Patent Owner, Petitioner offers no evidence that, under the Board's previous definition, a skilled artisan would have routinely reviewed PMA

31

IPR2020-00084
Patent 9,089,519 B2

approvals and would have located P050047 before the critical date by exercising

reasonable diligence.  Prelim. Resp. 31–32.  The Patent Owner notes that Petitioner

contends that a person of ordinary skill would have known how to search the

FDA's online database to locate PMA notices and would have "recognized

Inamed's Juvéderm gel implant product as a relevant dermal filler because Inamed

was a known developer of HA-based dermal fillers."  *Id.* at 32 (citing Pet. 5).

However, argues the Patent Owner, the real question is whether a skilled artisan

would have routinely searched that database and, seeing notice of Inamed's PMA,

would have searched for P050047.  *Id.*

The Patent Owner contends that the evidence cited by Petitioner fails to

support its position.  Prelim. Resp. 32.  By way of example, the Patent Owner

points to Petitioner's Exhibit 1039, a January 2008 publication, which cites

P050047, as well as PMA documents for "two other products."  *Id.* (citing Pet. 5).

The Patent Owner notes that Petitioner also relies on various issues of the

"Skin Therapy Letter" journal (Ex. 1076).  *Id.*  The Patent Owner contends that

Petitioner argues that these issues include a recurring section titled "Update on

Drugs" that gives notice of FDA approvals, and asserts that this simple listing

would have prompted a POSITA to seek out FDA PMAs.  *Id.* (citing Pet. 5–6).

However, the Patent Owner contends that Petitioner's statements about these

references are no more than unsupported speculation.  Prelim. Resp. 32.

According to the Patent Owner, references to P050047 and awareness of FDA

approvals by reviewing updates in "Skin Therapy Letter" do not prove that a

person of ordinary skill in the art would have routinely searched the FDA's

database for PMA approvals and would have located P050047 before the critical

date.  *Id.* at 32–33.  The Patent Owner observes that all of the references that

Petitioner cites are directed at M.D.s, and that Dr. DeVore does not hold that

32

IPR2020-00084
Patent 9,089,519 B2

degree and does not provide evidence that a skilled artisan possessing an M.D. would search FDA databases for PMA approvals. *Id.* at 33. Similarly, argues the Patent Owner, knowledge of Inamed's activity in the area of dermal fillers does not prove that a person of ordinary skill would have located P050047 before the critical date. *Id.* Consequently, the Patent Owner argues, Petitioner fails to show that P050047 qualifies as a printed publication and qualified prior art to the '519 patent. *Id.*

We do not find the Patent Owner's argument persuasive. As we have explained in III.B *supra*, Dr. DeVore has testified that:

> The POSITA would be aware of both currently marketed dermal fillers, as well as those being publicly tested by medical device companies. The POSITA would have been aware of the process by which FDA reviews applications for new dermal filler products, as well as how the results of those reviews are communicated to the public.

Ex. 1002 ¶ 72. Although the Patent Owner attacks Dr. DeVore's testimony as "unsupported speculation," the Patent Owner presents no evidence or testimony of record to rebut Dr. DeVore's opinion. *Id.* at 32; *see In re De Blauwe*, 736 F.2d 699, 705 (Fed. Cir. 1984) (holding that arguments and conclusions unsupported by factual evidence carry no evidentiary weight). We consequently agree with the Petitioner's definition of a person of ordinary skill in the art would have the additional knowledge and abilities testified to by Dr. DeVore, and would therefore have been aware of the P050047 reference, for the reasons attested by Dr. DeVore. We find this to be particularly so because the qualifications recited as defining a person of ordinary skill in the art typically define the broad contours of an artisan's education and capabilities and do not speak to every particular aspect of their knowledge and duties.

IPR2020-00084
Patent 9,089,519 B2

The Patent Owner additionally attacks Dr. DeVore's testimony, based upon his experience, as not being reflective of that of a person of ordinary skill in the art. The Patent Owner also criticizes Dr. DeVore's testimony, because Dr. DeVore does not hold an M.D. degree.  The Patent Owner observes that all of the references that Petitioner cites are directed at M.D.s, and that Dr. DeVore does not hold that degree and does not provide evidence that a skilled artisan possessing an M.D. would search FDA databases for PMA approvals.  *See* Prelim. Resp. 30–31, 33.  We fail to see the relevance of these arguments.  If, as the Patent Owner seems to argue, Dr. DeVore's qualifications exceed those of a person of ordinary skill in the art, whether by dint of his academic qualifications and work history, or his personal knowledge and experience, we fail to see how this precludes Dr. DeVore from opining as to what would be the knowledge of a person of ordinary skill in the art.  *See*, *e.g.*, Ex. 1002 ¶¶ 69–72.  Such testimony is capable of being challenged by the Patent Owner at trial, and evaluated by the Board in light of both parties' arguments.

Furthermore, although Dr. DeVore does not hold an M.D. degree, he does, indisputably, hold a Ph.D. in the related area, and has extensive experience in the field of dermal fillers.  *See* Ex. 1002 4–9.  The definition of a person of ordinary skill in the art, as agreed to by both parties in the related district court proceedings, would be: (1) a scientist involved in the development of dermal fillers; (2) would have an advanced degree, such as an M.S., M.D., or Ph.D.; and (3) possessed several years of experience developing dermal fillers for cosmetic use, including HA-based dermal fillers.  *See*, *e.g.*, Pet. 14; Prelim. Resp. 20.  By these criteria, Dr. DeVore is at least a person of ordinary skill in the art and can testify to the understanding and ability of an ordinarily skilled artisan at the time of filing.  We consequently agree with Petitioner that the P050047 reference, for the purpose of

34

IPR2020-00084
Patent 9,089,519 B2

this Decision to Institute qualifies, as a printed publication under pre-AIA 35 U.S.C. § 102(b), and as prior art for Ground 5.

As with respect to Ground 4, the Patent Owner does not expressly contest Petitioner's arguments with respect to the obviousness of the claims, but argues, rather, that the Board should exercise its discretion to deny institution on Ground 4, and on Ground 5, under 35 U.S.C. § 325(d).  Prelim. Resp. 33–50.  We address these arguments *infra*.  However, based upon Petitioner's arguments, we find that, with respect to Ground 5, the prior art cited by Petitioner teaches the limitations of claims 1–8, and that a person of ordinary skill in the art would have been motivated to combine the references with a reasonable expectation of success.  We therefore conclude that there is a reasonable likelihood that the Petitioner will prevail at trial upon this ground.

F.  *Exercise of Discretion on Grounds 4 and 5 under 35 U.S.C. § 325(d)*

The Patent Owner urges us to exercise our discretion under 35 U.S.C. § 325(d) and deny institution of Grounds 4 and 5.  Prelim. Resp. 33.  The Patent Owner argues that the factors set forth in our decision in *Becton, Dickinson & Co. v. B. Braun Melsungen AG*, No. IPR2017-01586, Paper 8 at 17–18 (PTAB Dec. 15, 2017) (precedential as to § III.C.5, first paragraph) militate in favor of denying institution of *inter partes* review.  *Id.* at 33–34.  The Patent Owner contends that the same, or cumulative, art and arguments advanced by Petitioner were considered and, ultimately, rejected throughout the extensive prosecution history of the '519 patent.  *Id.* at 34.

Specifically, the Patent Owner asserts that Petitioner's declarant, Dr. DeVore, disagrees with the inventor and the Examiner with respect to the unexpected results evidence that formed the basis for allowing the '519 patent

35

IPR2020-00084
Patent 9,089,519 B2

claims.  Prelim. Resp. 34.  However, argues the Patent Owner, a mere difference of opinion is not sufficient to warrant institution based on references and arguments the Examiner already considered.  *Id.* (citing *Apple Inc. v. Qualcomm Inc.*, IPR2018-01453, Paper 7 at 10–15 (PTAB Feb. 27, 2019) (denying institution under § 325(d) where Petitioner relied on the same art that the Examiner considered, and the challenge was merely Petitioner's declarant disagreeing with the Examiner's interpretation of the art)); *Apotex, Inc. v. Celgene Corp.*, No. IPR2018-00685, Paper 8 at 25–26 PTAB Sept. 27, 2018) (denying institution where "[e]ssentially, Petitioner and

[Petitioner's declarant] disagree with the Examiner's conclusion that, on balance, the subject matter of the claims would not have been obvious….").

> The factors set forth in *Becton, Dickinson* are:
>
> (a) the similarities and material differences between the asserted art and the prior art involved during examination;
>
> (b) the cumulative nature of the asserted art and the prior art evaluated during examination;
>
> (c) the extent to which the asserted art was evaluated during examination, including whether the prior art was the basis for rejection;
>
> (d) the extent of the overlap between the arguments made during examination and the manner in which Petitioner relies on the prior art or Patent Owner distinguishes the prior art;
>
> (e) whether Petitioner has pointed out sufficiently how the Examiner erred in its evaluation of the asserted prior art; and
>
> (f) the extent to which additional evidence and facts presented in the Petition warrant reconsideration of prior art or arguments.

*Becton, Dickinson*, IPR2017-01586, Paper 8 at 17–18.

36

IPR2020-00084
Patent 9,089,519 B2

More recently, the Board explained a two-part framework that the Board uses under § 325(d):

> (1) whether the same or substantially the same art previously was presented to the Office or whether the same or substantially the same arguments previously were presented to the Office; and

> (2) if either condition of first part of the framework is satisfied, whether the petitioner has demonstrated that the Office erred in a manner material to the patentability of challenged claims.

*Advanced Bionics, LLC v. MED-EL Elektromedizinische Geräte GmbH*, IPR2019-01469, Paper 6 at 8 (PTAB Feb. 13, 2020) (precedential).  The Board explained that the *Becton, Dickinson* factors "provide useful insight into how to apply the framework under 35 U.S.C. § 325(d)."  *Id.* at 9.   We consider these factors in turn.


    1.    *Becton, Dickinson* factors (a)–(d)

i.    Lebreton

With respect to Lebreton, the Patent Owner argues that the reference not only appears on the face of the '519 patent, but is expressly cited and incorporated by reference in the specification of the '519 patent.  Prelim. Resp. 35 (citing Ex. 1001 col. 9, ll. 36–40).

The Patent Owner points out that Lebreton was also the primary reference relied upon by the Examiner during prosecution of the '795 and '676 patents, of which the '519 patent is a continuation.  Prelim. Resp. 35.  The Patent Owner contends that Petitioner advances the same obviousness arguments, based upon Lebreton that were presented and successfully overcome during prosecution.  *Id.* at 35–36.  The Patent Owner notes that Petitioner argues that Lebreton discloses BDDE-crosslinked HA dermal fillers without lidocaine and that a skilled artisan could have successfully incorporated lidocaine into Lebreton's BDDE-crosslinked gels.  *Id.* at 36 (citing Pet. 35–38).  The Patent Owner contends that this is the same

37

IPR2020-00084
Patent 9,089,519 B2

argument based on the same primary reference that the Examiner raised in rejections dated May 31, 2011 and December 27, 2011 during prosecution of the '795 patent and on August 30, 2013 during prosecution of the '676 patent (parent applications to the '519 patent), that Allergan successfully overcame. *Id.* (citing Ex. 1023 45–46, 79–80; Ex. 2005 70).


      ii.    Sadozai

The Patent Owner argues that Sadozai appears on the face of the '519 patent and was considered by the Examiner during prosecution. Prelim. Resp. 36 (citing Ex. 1001, 2). The Patent Owner argues further that Sadozai, is either the same as, or cumulative of, the prior art that was considered, and distinguished, during prosecution of the '519 patent. Prelim. Resp. 36 (citing Pet. 35–36). The Patent Owner contends that Sadozai (Ex. 1030) is cumulative of Wang[13] (Ex. 1047), Calias[14] (Ex. 1048), and Marko[15] (Ex. 2004), and was considered by the Examiner during prosecution. *Id.* (citing Ex. 1001 2).

The Patent Owner notes that Petitioner argues that because Sadozai teaches a lidocaine-containing HA composition that was sterilized and FDA-approved, a person of ordinary skill in the art would have expected that adding lidocaine to Lebreton's BDDE-crosslinked HA fillers would have created stable fillers. Prelim. Resp. 37 (citing Pet. 54–56). However, the Patent Owner argues, Sadozai does not describe sterile lidocaine-containing BDDE-crosslinked HA. *Id.* The Patent Owner asserts that Wang, Calias, and Marko likewise described HA crosslinked

---

[13] Wang (US 2005/0271729 A1, December 8, 2005) ("Wang").

[14] Calias et al. (US 6,521,223 B1, February 18, 2003) ("Calias").

[15] Marko et al. (US 2004/0101959 A1, May 27, 2004) ("Marko").

with agents other than BDDE. *Id.* Therefore, the Patent Owner argues, Sadozai, adds nothing to Wang, Calias, and Marko, nor does it describe the free release of lidocaine *in vivo*, as required by claims 2, 4, and 8. *Id.* Rather, the Patent Owner asserts that Sadozai states that "[t]he crosslinked HA can function as a vehicle which provides the controlled or sustained release of the bioactive agent." *Id.* (quoting Ex. 1030 ¶ 59). The Patent Owner contends that "[c]ontrolled or sustained release" is the opposite of free release. *Id.*

### iii.  P050047

The Patent Owner repeats the argument presented *supra*, that P050047 is not a printed publication. Prelim. Resp. 37–38. However, the Patent Owner argues, even if, *arguendo*, the P050047 is a printed publication, it is merely cumulative of Lebreton (Ex. 1029). *Id.* at 38. The Patent Owner contends that P050047, like Lebreton, discloses BDDE-crosslinked HA gels that lack lidocaine. *Id.* (citing Ex. 1074 1–2). The Patent Owner again argues that this issue was raised by the Examiner during prosecution of the '519 patent, which was ultimately allowed. *Id.*

### iv.  Kinney

Turning to the Kinney reference, the Patent Owner argues that Kinney was considered by the Examiner during prosecution of the '519 patent. Prelim. Resp. 38. The Patent Owner asserts that Kinney is cumulative of Lebreton (Ex. 1029), Wang (Ex. 1047), Calias (Ex. 1048), and Marko (Ex. 2004), all of which were cited by the Examiner during prosecution of the '795 patent. *Id.*

According to the Patent Owner, Petitioner relies on Kinney (Ex. 1012) for its disclosure that (1) "injection with the lidocaine-containing filler [Puragen Plus] resulted in less pain than injection with a filler that did not contain lidocaine, such

IPR2020-00084
Patent 9,089,519 B2

as known products Restylane and Puragen (the predecessor of Puragen Plus) and that all patients preferred the lidocaine-containing filler" and (2) a person of ordinary skill in the art would have been motivated to include lidocaine in an HA filler and would have expected BDDE and DEO crosslinking agents to behave similarly.  Prelim. Resp. 38–39 (citing Pet. 46–47).

The Patent Owner contends that Petitioner merely repeats the same arguments set forth by the Examiner with respect to the references that the Patent Owner overcame during prosecution of the '519 patent family.  Prelim Resp. 39. Specifically, the Patent Owner argues, these are similar to the arguments that the Examiner advanced during prosecution of the '519 patent family in the context of Wang, Calias, and Marko.  *Id.*  The Patent Owner argues that, like Kinney, Wang and Calias both describe the inclusion of an anesthetic (e.g., lidocaine) into crosslinked HA compositions, and Marko discloses crosslinked hydrogels compositions containing 0.3% by weight lidocaine.  *Id.* (citing Ex. 1023 47).

Summarizing, the Patent Owner argues that Petitioner relies upon the same or cumulative art used by the Examiner during prosecution, and makes the same arguments that were successfully overcome and that, consequently, factors *Becton-Dickinson* factors (a)–(d) support denial of *inter partes* review institution.  Prelim. Resp. 39.


2.    *Becton, Dickinson* factor (e)

The Patent Owner argues that Petitioner has failed to meet the burden of demonstrating how the Examiner allegedly erred in his review of the prior art during prosecution.  Prelim. Resp. 41.  The Patent Owner contends that Petitioner argues that the Examiner erred in his analysis because he "had an incomplete picture of the prior art."  *Id.* (quoting Pet. 66).  The Patent Owner repeats that the

IPR2020-00084
Patent 9,089,519 B2

Examiner either considered the references (i.e., Lebreton, Kinney, and Sadozai) or that P050047 is cumulative of Lebreton. *Id.* at 41–42.

The Patent Owner argues further that Petitioner's argument that inventor Lebreton's declaration was "unsubstantiated and erroneous" is unsupported by evidence, and that Dr. DeVore's criticism of the data is misplaced. Prelim. Resp. 42 (quoting Pet. 65). The Patent Owner contends that Petitioner's arguments, based on the DeVore Declaration, do not rebut the experiments cited in the Specification and in the Lebreton Declaration, or the Examiner's conclusion of unexpected results. *Id.*

With respect to the Cui reference[16] (Ex. 1025), the Patent Owner observes that Petitioner and Dr. DeVore criticize Cui, because Cui did not compare BDDE-crosslinked HA gels with FDA-approved crosslinking agents, and because Cui was not prior art. Prelim. Resp. 43 (citing Pet. 60–61). The Patent Owner argues, to the contrary, that Cui teaches such crosslinking agents. *Id.* (citing Ex. 1025 1506). The Patent Owner notes that Petitioner, and Petitioner's declarant, Dr. DeVore, fail to point to any evidence refuting Cui's disclosures that BDDE-crosslinked hyaluronic acid gels were known to be sensitive to heat sterilization relative to other crosslinked HA gels. *Id.* The Patent Owner argues further that whether Cui qualifies as prior art is irrelevant. *Id.* at 44. The Patent Owner asserts that post-filing information and data can be used to demonstrate unexpected results. *Id.* (citing *Knoll Pharm. Co. v. Teva Pharm. USA, Inc.*, 367 F.3d 1381, 1385 (Fed. Cir. 2004)).

---

[16] Y-j Cui et al., *The Comparison of Physicochemical Properties of Four Cross-linked Sodium Hyaluronate Gels with Different Cross-linking Agents*, 369–98 ADV. MATERIALS RES. 1506–512 (2012).

IPR2020-00084
Patent 9,089,519 B2

With respect to Petitioner's argument that Sadozai and Kinney both disclose lidocaine-containing crosslinked HA fillers that had viscosities similar to crosslinked HA fillers without lidocaine, the Patent Owner contends that this argument fails to address unexpected results in the context of the limitations set forth in the claims, e.g., the requirement of claims 2, 4, and 8 that lidocaine be freely released *in vivo*, and the storage stability recited in claims 6 and 7. *Id*. at 44.

3.    *Becton, Dickinson* factor (f)

Finally, the Patent Owner contends that Petitioner fails to present any new evidence weighing in favor of institution. Prelim. Resp. 46. The Patent Owner repeats that the references relied upon by the Examiner were of record and/or cumulative of references relied upon by the Examiner, and that the DeVore Declaration is conclusory and fails to provide a well-reasoned rationale or objective support for the proposed grounds. *Id.* (citing Ex. 1002 ¶¶ 19, 140, 180).

Furthermore, the Patent Owner argues that Dr. DeVore's opinion that the claimed invention is obvious represents an over-simplified view of the invention, aided by the benefit of hindsight. Prelim. Resp. 47. According to the Patent Owner, Dr. DeVore discusses how it would have been obvious to modify individual features of the invention claimed in the '519 patent—for example, choice of crosslinker, HA concentration, gel hardness, particle size and distribution, free HA, pH, sterility, and viscosity. *Id.* at 47–48 (citing Ex. 1002 ¶¶ 82–100). Dr. DeVore states these "different factors […] could be routinely modified in order to obtain a crosslinked-HA filler having a desired spectrum of clinical characteristics." *Id.* at 48 (quoting Ex. 1002 ¶ 102). The Patent Owner contends that Dr. DeVore analyzes these factors in isolation, failing to address the interplay between these factors, and that persons of ordinary skill in the

42

IPR2020-00084
Patent 9,089,519 B2

contemporaneous art would have recognized that modifying one variable affects the impact of other aspects of the composition. *Id.* (citing Ex. 1014 1091–1092; Ex. 1022 78; Ex. 1005 124).  The Patent Owner contends that Dr. DeVore offers no new evidence to rebut the Examiner's conclusion that the claimed inventions exhibited unexpected results. *Id.* at 49.

G.  *The Board's Decision with respect to the Patent Owner's argument with respect to 35 U.S.C. § 325(d)*

We decline to accept the Patent Owner's invitation to exercise our discretion under Section 325(d) and not institute *inter partes* review.

1.  *Becton, Dickinson* factors (c)

Despite the Patent Owner's assertions to the contrary, we find that the Patent Owner (the then-Applicant) did not overcome the combined teachings of Lebreton, Sadozai, P050047, and Kinney during prosecution.  To the contrary, the then-Applicant persuaded the Examiner that, despite the Examiner's *prima facie* conclusion that the claims were obvious over the prior art, secondary considerations, *viz.*, the allegedly unexpected results disclosed in the Lebreton Declaration, sufficed to persuade the Examiner that the proposed claims were patentable.  *See* Ex. 1023 8.

Petitioner's declarant, Dr. DeVore, attacks the credibility of the Lebreton Declaration as failing, *inter alia*, to provide any evidentiary support for its characterization of what a person of ordinary skill in the art would have believed "shortly prior to August 4, 2008." Ex. 1002 ¶ 208.  We find this assertion persuasive.  The Lebreton Declaration cites no evidence of record in support of what a person of ordinary skill would have understood to be the state of the art at

43

IPR2020-00084
Patent 9,089,519 B2

the time of invention, other than the unsupported opinion of the inventor of the

'884 application, Dr. Lebreton.  Dr. DeVore disagrees with Dr. Lebreton, and

provides evidentiary support for his contention that lidocaine could be added to a

crosslinked HA composition and sterilized without degrading the composition.  *See*

Ex. 1002 ¶¶ 197–198.  Specifically, Dr. DeVore declares that:

> As explained throughout much of this declaration, the prior art
> explicitly taught that lidocaine *had* been successfully combined with
> several other crosslinked-HA dermal fillers, leading to (at least) the
> products Prevelle Silk, Elevess, and Puragen Plus. The POSITA would
> have been aware of these products and would have also been aware of
> the references cited in "Grounds" of the Petition and this declaration,
> as well as other publications such as Toth and Hanke. Each of these
> references except for Hanke explicitly describe a crosslinked-HA
> dermal filler combined with lidocaine, and the POSITA would have
> understood Hanke's HA composition was crosslinked as well. Further
> a POSITA would have understood that each of the commercial
> products, as described in the various references cited, would have been
> sterilized and "sufficiently stable" (to use Lebreton's words from his
> declaration) in order to obtain FDA approval and be competitive in the
> marketplace.

*Id.* at ¶ 208.

Balancing the statements and evidence presented in the two Declarations, we

find Dr. DeVore's to be better supported by evidence than the Lebreton

Declaration and, consequently, more credible, and not a mere "difference of

opinion," as argued by the Patent Owner.  *See* Prelim. Resp. 34.  We consequently

conclude that, had the evidence in the DeVore Declaration been presented to the

Examiner during prosecution of the '884 patent, there is a reasonable likelihood

that the Examiner would have maintained the rejection of the claims of the '884

application, and that the '519 patent would not have issued.

We find, similarly, with respect to Grounds 4 and 5, that the DeVore

Declaration's assessment of the state of the art, and the knowledge of a person of

IPR2020-00084
Patent 9,089,519 B2

ordinary skill in that art, are supported by evidence and, consequently, more persuasive than the unsupported opining of the Lebreton Declaration. We find particularly persuasive Dr. DeVore's conclusion that:

> Because BDDE and DEO are each bis-epoxide crosslinkers, the POSITA would have reasonably expected that Zhao process could be adapted to use BDDE instead of DEO. Both crosslinkers rely on the same chemistry—nucleophilic epoxide opening by the N-acetyl glucosamine primary alcohol, followed by nucleophilic epoxide opening by the glucoronic acid carboxylate. In both cases, epoxide opening results in the presence of a secondary alcohol in the crosslinking chain. Given the high degree of similarity between the two crosslinkers, the POSITA would reasonably expect that lidocaine would function analogously in both crosslinked gels.

Ex. 1002 ¶ 176.

For the same reason, we are not persuaded that the results of Example 4 are necessarily probative of unexpected results. "[W]hen unexpected results are used as evidence of nonobviousness, the results must be shown to be unexpected compared with the closest prior art." *In re Baxter Travenol Labs.*, 952 F.2d 388, 392 (Fed. Cir. 1991).

Because we conclude that the statements of the DeVore Declaration, supported by evidence, concerning the state of the art at the time of invention, and the knowledge of a person of ordinary skill in the art, are more credible than the unsupported opinions of the Lebreton Declaration, we find that, had that evidence been before the Examiner, there is a reasonable likelihood that the Examiner would have sustained the *prima facie* conclusion of obviousness under Section 103, discounting what was then interpreted as evidence of unexpected results.

Moreover, as the DeVore Declaration points out, Sadozai directly refutes the Lebreton Declaration's averral that lidocaine would degrade a HA gel during high temperature sterilization. *See* Ex. 1002 ¶¶ 31–35, 39, 43, 49, 130–131, 144. We

IPR2020-00084
Patent 9,089,519 B2

accordingly determine that, because Sadozai was of record during examination of the '519 patent, the Examiner erred by failing to appreciate the relevance of the teachings of Sadozai during evaluation of the Lebreton Declaration.

We acknowledge that Lebreton, Sadozai, and Kinney were cited in an IDS, and thus, are the same art previously presented to the Office.  Because the "same or substantially the same prior art or arguments previously were presented to the Office" in this case, we next turn to the question of whether Petitioner has sufficiently demonstrated that the Office materially erred in evaluating the art or the arguments, as informed by considering *Becton, Dickinson* factors (e) and (f).  *See Advanced Bionics*, IPR2019-01469, Paper 6 at 8, 10; *Becton, Dickinson*, Paper 8 at 24 (considering whether the petitioner has pointed out sufficiently how the examiner erred in its evaluation of the asserted prior art).

### 2.   *Becton, Dickinson* factor (e)

Similarly, we find that Petitioner has pointed out sufficiently how the Examiner erred in evaluating the asserted prior art.  *See Advanced Bionics*, IPR2019-01469, Paper 6 at 10–11.  Again, we emphasize that the Patent Owner did not overcome the Examiner's conclusion that the claims were obvious over the prior art, but relied, rather, on the Lebreton Declaration as establishing that the claimed composition possessed properties that were unexpected or surprising over the closest prior art.  These findings were dependent upon the Lebreton Declaration's unsupported statements concerning the state of the art and the level of knowledge of a person of ordinary skill in the art.

Nor, and for the reasons we have explained *supra*, do we find persuasive the Lebreton Declaration's opinion that the properties exhibited by the claimed composition were unexpected in view of the closest prior art.  We find persuasive

46

IPR2020-00084
Patent 9,089,519 B2

Petitioner's argument, supported by evidence adduced in the DeVore Declaration, that:

> [A skilled artisan] would have been aware of commercial lidocaine-containing crosslinked HA dermal fillers such as Elevess, Prevelle Silk and Puragen Plus, as well as the disclosure of the prior art documents cited [in the Petition], including Sadozai and Kinney. Each of these products and references explicitly state, or at minimum suggest, that crosslinked HA lidocaine-containing fillers were sterilizable, and were sufficiently stable to be approved by FDA as a dermal filler.

Pet. 54–55 (citing Ex. 1002 ¶¶ 208–209).

### 3.    *Becton, Dickinson* factor (f)

Factor (f) of *Becton, Dickinson* requires us to inquire whether as to the extent to which additional evidence and facts presented in the Petition warrant reconsideration of prior art or arguments. *Becton, Dickinson*, IPR2017-01586, Paper 8 at 18. Once again, we turn to whether the evidence presented in the DeVore Declaration is sufficient to persuasively challenge that presented in the Lebreton Declaration during examination. The Patent Owner argues that the DeVore Declaration is "conclusory" and fails to provide a well-reasoned rationale or objective support for the proposed grounds. Prelim. Resp. 46. We do not agree.

The Lebreton Declaration asserts that:

> It was believed that adding lidocaine to hyaluronic acid gel compositions during manufacturing caused degradation to the hyaluronic acid prior to injection of the HA as a dermal filler.

> It was believed that lidocaine caused degradation of the HA gel compositions during high temperature sterilization.

47

IPR2020-00084
Patent 9,089,519 B2

> It was not known whether HA compositions comprising lidocaine were stable or not after high temperature sterilization when placed in storage for any significant length of time.
>
> It was also believed that the instability of HA described above would have caused a viscosity reduction of the HA that would make it unsuitable for soft tissue filling applications.
>
> Based upon the facts set forth above, a person of ordinary skill in the art would have expected that a dermal filler comprising hyaluronic acid and lidocaine would not have remained sufficiently stable to be useful as a soft tissue filler.
>
> It was not appreciated that a dermal filler comprising a cohesive gel of hyaluronic acid makes it possible for lidocaine to be combined with hyaluronic acid in a gel that is sufficiently stable to be useful as a soft tissue filler.

Ex. 1024 ¶¶ 5–10.  Each of these statements represents the opinion of Dr. Lebreton, but we note that they are not supported by any evidence of record in the Declaration.

Also before the Examiner at that time was Cui, which the Patent Owner argues demonstrates that HA crosslinked with BDDE was "known to be especially sensitive to heat sterilization relative to HA gels crosslinked with other, i.e. non-BDDE crosslinkers," so that the discovery of the claimed sterile compositions was, allegedly, unexpected and surprising, given the supposedly unstable nature of HA-based gels crosslinked with BDDE even without the addition of lidocaine.  *See* Ex. 1023 28.

In his Declaration, Dr. DeVore notes that: "The statements in the declaration were not limited to fillers containing both BDDE-crosslinked HA and free HA. Moreover, I understand that when the declaration was submitted, the pending claims were not limited to BDDE-crosslinked HA."  Ex. 1002 ¶ 206 (citing Ex. 1023 18–20, claims 51–67).  Petitioner asserts Dr. DeVore attests that:

48

IPR2020-00084
Patent 9,089,519 B2

> [A] skilled artisan would have been aware of commercial, lidocaine-containing, crosslinked HA dermal fillers such as Elevess, Prevelle Silk and Puragen Plus, as well as the teachings of the prior art documents cited in the Petition, including Sadozai and Kinney. *Id.* at 52–53. *Each of these products and references expressly teach, or suggest, that crosslinked HA lidocaine-containing fillers were sterilizable, and were sufficiently stable to be approved by FDA as a dermal filler*.

Pet. 54–55 (citing Ex. 1002 ¶¶ 208–209). Similarly, the Dr. Lebreton points to the experiments presented in the Specification of the '884 application, stating that:

> The experiments showed that certain HA gels, when mixed with lidocaine, degraded and became substantially less viscous after high temperature sterilization, specifically autoclave sterilization, as would have been expected by one of ordinary skill in the art. [referring to samples 1, 2, 3, Figs. 1–3].
>
> I discovered that other HA gels, when mixed with lidocaine, maintained their viscosity and elasticity, even after such high temperature sterilization [referring to samples 4, 5, 6, Figs. 4, 5, 7].

Ex.1024 ¶¶ 13–14.

> Responding to these statements, Dr. DeVore states:
>
> In my opinion, Sample 1 is completely irrelevant—it is a mixture of *uncrosslinked* HA and a completely different polymer (hydroxypropyl methylcellulose). I am not aware of a mixture of uncrosslinked HA and HMPC being used as a dermal filler, either in 2008 or now.
>
> Moreover, Allergan's experiment and its interpretation of the results fundamentally misunderstands the point of stability testing. The consideration whether a crosslinked HA composition would be suitable as a dermal filler depends on its *final* viscosity, not how much the viscosity drops during sterilization.
>
> ….
>
> Allergan argued the viscosity differences, measured at 0.1 Hz, indicated that Samples 1-3 were not stable to autoclave sterilization. EX1023, 26-27. In my opinion, the data does not support that conclusion. The final viscosity for Samples 2 and 3 in each test (~75-375 Pa*s) is

49

IPR2020-00084
Patent 9,089,519 B2

> substantially the same as the final viscosities of Samples 4-6 (~50-90
> Pa*s), all of which are within the range of marketed dermal fillers (50–
> 1,200 Pa*s). EX1039, 267.

Ex. 1002 ¶¶ 216–218.

In short, Dr. DeVore points to prior art that is evidence of record to rebut the unsupported statements of the Lebreton Declaration concerning the state of the prior art, as well as a skilled artisan's knowledge of that art.  Dr. DeVore also provides evidence-based arguments that undermine the probative value of the tests in Example 4 as indicative of unexpected or surprising results.

Contrary to the Patent Owner's arguments, we do not find these statements to be "conclusory" or lacking in objective support.  The Patent Owner may attempt to rebut the statements of the DeVore Declaration at trial, but, in our view, the DeVore Declaration adduces evidence of record and presents arguments that presumptively rebut the Lebreton Declaration and, consequently, warrant denial of the Patent Owner's request that we deny institution.

In sum, having weighed the relevant *Becton Dickinson* factors, we find that although the grounds may rely on the same or substantially the same art or arguments previously presented to the Office, Petitioner has demonstrated sufficiently how the Office erred in a manner material to the patentability of the challenged claims in reliance on the Lebreton Declaration to overcome the prior art.  *Advanced Bionics*, IPR2019-01469, Paper 6 at 8–9.  Consequently, we decline to exercise our discretion under 35 U.S.C. § 325(d) to deny institution of the Petition.

## V. CONCLUSION

For the reasons we have explained, we conclude that Petitioner has made a sufficiently persuasive showing that the cited references would have taught or suggested the elements of claims 1–8, and set forth a sufficient rationale for why a

50

IPR2020-00084
Patent 9,089,519 B2

person of ordinary skill would have been motivated to combine these teachings and suggestions to arrive at the invention recited in those claims.  Petitioner has therefore established a reasonable likelihood of prevailing in demonstrating that claims 1–8 would have been obvious over the combinations of prior art set forth in the asserted grounds.

## VI. ORDER

In consideration of the foregoing, it is hereby:

ORDERED, pursuant to 35 U.S.C. § 314(a), that an *inter partes* review of claims 1–8 of the '519 patent is INSTITUTED with respect to all Grounds in the Petition; and

FURTHER ORDERED, pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4(b), that the *inter partes* review of the '519 patent shall commence on the entry date of this Order, and notice is hereby given of the institution of a trial.


FOR PETITIONER:

Christopher L. Curfman
William W. Cutchins
MEUNIER CARLIN & CURFMAN LLC
ccurfman@mcciplaw.com
wcutchins@mcciplaw.com

FOR PATENT OWNER:

Dorothy P. Whelan
Michael Kane
FISH & RICHARDSON P.C.
whelan@fr.com
kane@fr.com

"

"

"

**GZJ KDKV'D"**



**Allergan Reports Fourth Quarter and Full-Year 2019 Financial Results**

February 10, 2020

- Full-Year 2019 GAAP Net Revenues of $16.1 Billion; Q4 2019 GAAP Net Revenues of $4.4 Billion -
- Full-Year 2019 GAAP Loss Per Share of $16.02; Non-GAAP Performance Net Income Per Share of $17.64 -
- Q4 2019 GAAP Loss Per Share of $0.97; Non-GAAP Performance Net Income Per Share of $5.22 -
- Q4 2019 GAAP Operating Loss of $276.6 Million; Non-GAAP Operating Income of $2.08 Billion -
- Full-Year and Q4 2019 GAAP Net Revenue Driven by Growth in Top Promoted Products Including VRAYLAR®, BOTOX®, JUVÉDERM® Collection, OZURDEX® and Lo LOESTRIN®; Global Facial Aesthetics Rose 9.5% in FY 2019 and 8.2% in Q4 2019 (Excluding Exchange) -
- Continues to Advance R&D Pipeline on Key Programs Including FDA Approval of UBRELVY™ (Ubrogepant) for Migraine; Bimatoprost SR for Glaucoma NDA and Abicipar for Wet Age-Related Macular Degeneration BLA Under FDA Review -

DUBLIN, Feb. 10, 2020 /PRNewswire/ -- Allergan plc (NYSE: AGN) today reported its full-year and fourth quarter 2019 financial results including full-year 2019 GAAP net revenues of $16.1 billion, a 1.9 percent increase from 2018. Fourth quarter 2019 GAAP net revenues were $4.35 billion, a 6.6 percent increase from the prior year quarter.



**FOURTH QUARTER AND FULL-YEAR 2019 FINANCIAL RESULTS**

| (unaudited; $ in millions, except per share amounts) | Q4 '19 | Q4 '18 | Q4 '19 v Q4 '18 | Year Ended December 31, 2019 | Year Ended December 31, 2018 | 2019 v 2018 |
|---|---|---|---|---|---|---|
| Total Net Revenues | $ 4,351.0 | $ 4,079.7 | 6.6 % | $ 16,088.9 | $ 15,787.4 | 1.9 % |
| | | | | | | |
| Operating (Loss) | $ (276.6) | $ (5,384.1) | 94.9 % | $ (4,445.3) | $ (6,247.6) | 28.8 % |
| Diluted EPS | $ (0.97) | $ (12.63) | 92.4 % | $ (16.02) | $ (15.26) | (5.0) % |
| SG&A Expense | $ 1,639.6 | $ 1,193.6 | 37.4 % | $ 5,943.5 | $ 4,521.8 | 31.4 % |
| R&D Expense | $ 452.5 | $ 678.1 | (33.3) % | $ 1,812.0 | $ 2,266.2 | (20.0) % |
| Tax Rate | 24.8 % | 23.2 % | 1.6 % | (2.9) % | 25.8 % | (28.7) % |
| | | | | | | |
| Non-GAAP Net Revenues | $ 4,351.0 | $ 4,079.7 | 6.6 % | $ 16,063.9 | $ 15,762.4 | 1.9 % |
| Non-GAAP Operating Income | $ 2,079.3 | $ 1,917.8 | 8.4 % | $ 7,314.5 | $ 7,555.8 | (3.2) % |
| Non-GAAP Performance Net Income Per Share | $ 5.22 | $ 4.29 | 21.7 % | $ 17.64 | $ 16.69 | 5.7 % |
| Non-GAAP Adjusted EBITDA | $ 2,205.8 | $ 1,990.5 | 10.8 % | $ 7,760.1 | $ 7,954.1 | (2.4) % |
| Non-GAAP SG&A Expense | $ 1,162.2 | $ 1,140.4 | 1.9 % | $ 4,600.6 | $ 4,354.9 | 5.6 % |
| Non-GAAP R&D Expense | $ 414.8 | $ 436.1 | (4.9) % | $ 1,708.6 | $ 1,574.5 | 8.5 % |
| Non-GAAP Tax Rate | 10.3 % | 14.3 % | (4.0) % | 11.7 % | 14.2 % | (2.5) % |

**Executive Commentary**

"I am proud of Allergan's colleagues who achieved many important milestones in 2019 that will make a difference to patients for years to come. They achieved FDA approval of UBRELVY™, a first-in-class oral treatment for migraine; two new approvals for BOTOX® for pediatric spasticity; approval for VRAYLAR® for bipolar depression; and filings for two new eye care drugs - Bimatoprost SR for glaucoma and Abicipar for Age-related Macular Degeneration," said Brent Saunders, Chairman and CEO of Allergan. "Our colleagues also grew our core business[1] by 7.1 percent in 2019 and by 11.0 percent in the fourth quarter (excluding exchange), creating strong momentum for 2020 and our proposed combination with AbbVie."

**Full-Year 2019 Financial Results**

GAAP operating loss in 2019 was $4.45 billion compared with $6.25 billion in 2018. Non-GAAP operating income, which excludes the impact of impairments, amortization and other items, was $7.31 billion in 2019 compared to $7.56 billion in 2018. GAAP cash flow from operations for the full year of 2019 totaled $7.24 billion. Cash flow from operations for the full year of 2019 includes a one-time $1.6 billion refund of taxes previously paid on capital gains. The tax refund was accrued in a prior period and the cash was received in the third quarter of 2019.

**Fourth Quarter 2019 Financial Results**

GAAP operating loss in the fourth quarter of 2019 was $276.6 million. Non-GAAP operating income in the fourth quarter of 2019 was $2.08 billion, an increase of 8.4 percent versus the prior year. GAAP cash flow from operations for the fourth quarter of 2019 totaled $1.67 billion.

**Operating Expenses**

Total GAAP Selling, General and Administrative (SG&A) Expense was $1.64 billion for the fourth quarter of 2019, compared to $1.19 billion in the prior year quarter. Total non-GAAP SG&A expense was $1.16 billion for the fourth quarter of 2019, an increase of 1.9 percent from the prior year quarter, primarily related to an increase in spending to support key products and new product launches. GAAP R&D investment for the fourth quarter of 2019 was $452.5 million, compared to $678.1 million in the fourth quarter of 2018. Non-GAAP R&D investment for the fourth quarter of 2019 was $414.8 million, a decrease of 4.9 percent compared to the prior year quarter.

**Amortization, Tax and Capitalization**

Amortization expense for the fourth quarter of 2019 was $1.52 billion, compared to $1.57 billion in the fourth quarter of 2018. The Company's GAAP tax rate was 24.8 percent in the fourth quarter of 2019. The Company's non-GAAP adjusted tax rate was 10.3 percent in the fourth quarter of 2019. As of December 31, 2019, Allergan had cash and marketable securities of $5.91 billion and outstanding indebtedness of $22.6 billion.

**Operating Charges and Impairments**

Allergan recorded a pre-tax charge of $302.5 million in the three months ended December 31, 2019 related to settlements reached in principle by subsidiaries Warner Chilcott and Watson with direct and indirect purchasers of LOESTRIN® 24 Fe and MINASTRIN® 24 Fe, resolving class action litigations pending in the U.S. District Court for the District of Rhode Island. Additionally, Allergan recorded a pre-tax charge of $78.8 million in the three months ended December 31, 2019 related to settlements reached in principle by its Allergan, Inc. subsidiary with a putative plaintiff class of direct purchasers of RESTASIS®, as well as a group of pharmaceutical retailers, in the previously disclosed direct purchaser class action antitrust litigation pending in the U.S. District Court for the Eastern District of New York. Also in the fourth quarter of 2019, Allergan recorded a $314.0 million GAAP intangible asset impairment related to CARAFATE® due to the entry of a generic competitor. The Company excludes operating charges, asset sales and impairments, net and in-process research and development impairments from its Non-GAAP performance net income attributable to shareholders as well as Adjusted EBITDA and Non-GAAP Operating Income.

[1] Core business = Promoted Brands & Brands with Ongoing Exclusivity + Other Product Revenues & Other Revenues (See Table 12)

**FOURTH QUARTER 2019 BUSINESS SEGMENT RESULTS**

**U.S. Specialized Therapeutics**

U.S. Specialized Therapeutics net revenues were $1.82 billion in the fourth quarter of 2019, an increase of 0.7 percent versus the prior year quarter. Demand growth in BOTOX® Therapeutic, BOTOX® Cosmetic, ALLODERM® and JUVÉDERM® Collection was offset by a decline in sales of CoolSculpting® and lower RESTASIS® revenues compared to the prior year quarter. Segment gross margin for the fourth quarter of 2019 was 91.4 percent. Segment contribution for the fourth quarter of 2019 was $1.24 billion.

*Medical Aesthetics*

- Facial Aesthetics
  - BOTOX® Cosmetic net revenues in the fourth quarter of 2019 were $271.8 million, an increase of 5.3 percent from the prior year quarter. For full-year 2019, BOTOX® Cosmetic net revenues were $991.3 million, an increase of 9.3 percent from 2018.
  - JUVÉDERM® Collection (defined as JUVÉDERM®, VOLUMA® and other fillers) net revenues in the fourth quarter of 2019 were $166.4 million, an increase of 5.1 percent versus the prior year quarter. For full-year 2019, JUVÉDERM® Collection net revenues were $587.5 million, an increase of 7.2 percent from 2018.
- Regenerative Medicine
  - ALLODERM® net revenues in the fourth quarter of 2019 were $104.7 million, an increase of 10.3 percent versus the prior year quarter.
- Body Contouring
  - CoolSculpting® net revenues (including both CoolSculpting® Systems/Applicators and Consumables) in the fourth quarter of 2019 were $53.3 million, a decrease of 34.4 percent versus the prior year quarter.
  - CoolTone™ received regulatory clearance in the U.S. in 2019 and full launch began in January 2020.

*Neurosciences & Urology*

- BOTOX® Therapeutic net revenues in the fourth quarter of 2019 were $463.0 million, an increase of 6.9 percent versus the prior year quarter.

*Eye Care*

- RESTASIS® net revenues in the fourth quarter of 2019 were $309.0 million, a decrease of 4.9 percent versus the prior year quarter.
- ALPHAGAN®/COMBIGAN® net revenues in the fourth quarter of 2019 were $94.5 million, a decrease of 3.3 percent versus the prior year quarter.
- OZURDEX® net revenues in the fourth quarter of 2019 were $31.6 million, an increase of 7.8 percent versus the prior year quarter.

**U.S. General Medicine**

U.S. General Medicine net revenues in the fourth quarter of 2019 were $1.61 billion, an increase of 15.2 percent versus the prior year quarter. Demand growth in VRAYLAR®, LINZESS®, VIIBRYD® and Lo LOESTRIN® was partially offset by lower revenues from products that lost exclusivity. Segment gross margin for the fourth quarter of 2019 was 82.1 percent. Segment contribution for the fourth quarter of 2019 was $1.03 billion.

*Central Nervous System*

- VRAYLAR® net revenues were $283.1 million in the fourth quarter of 2019, an increase of 88.1 percent from the prior year quarter. For full-year 2019, VRAYLAR® net revenues were $857.5 million, an increase of 76.0 percent from 2018.
- VIIBRYD®/FETZIMA® net revenues in the fourth quarter of 2019 were $114.2 million, an increase of 19.6 percent from the prior year quarter.

*Gastrointestinal, Women's Health & Diversified Brands*

- LINZESS® net revenues in the fourth quarter of 2019 were $231.2 million, an increase of 12.7 percent versus the prior year quarter.
- Lo LOESTRIN® net revenues in the fourth quarter of 2019 were $156.2 million, an increase of 8.6 percent versus the prior year quarter.
- BYSTOLIC®/BYVALSON® net revenues in the fourth quarter of 2019 were $169.6 million, an increase of 11.8 percent from the prior year quarter.

**International**

International net revenues in the fourth quarter of 2019 were $917.7 million, an increase of 8.1 percent versus the prior year quarter excluding foreign exchange impact, partly due to growth in Facial Aesthetics, BOTOX® Therapeutic and OZURDEX®. Segment gross margin for the fourth quarter of 2019 was 83.8 percent. Segment contribution was $515.8 million.

*Facial Aesthetics*

- BOTOX® Cosmetic net revenues in the fourth quarter of 2019 were $182.9 million, an increase of 19.8 percent versus the prior year quarter excluding foreign exchange impact. For full-year 2019, BOTOX® Cosmetic net revenues were $671.7 million, an increase of 11.2 percent from 2018 excluding foreign exchange impact.
- JUVÉDERM® Collection net revenues in the fourth quarter of 2019 were $190.0 million, an increase of 5.7 percent versus the prior year quarter excluding foreign exchange impact. For full-year 2019, JUVÉDERM® Collection net revenues were $656.1 million, an increase of 12.1 percent from 2018 excluding foreign exchange impact.

*Eye Care*

- LUMIGAN®/GANFORT® net revenues in the fourth quarter of 2019 were $95.6 million, an increase of 1.4 percent versus the prior year quarter excluding foreign exchange impact.
- OZURDEX® net revenues in the fourth quarter of 2019 were $66.7 million, an increase of 132.8 percent versus the prior year quarter excluding foreign exchange impact. OZURDEX® growth was primarily related to a return to full stock in 2019 following a 2018 recall of OZURDEX® in certain international markets.

*Botox® Therapeutic*

- BOTOX® Therapeutic net revenues in the fourth quarter of 2019 were $102.5 million, an increase of 8.9 percent versus the prior year quarter excluding foreign exchange impact.

**PIPELINE UPDATE**

Allergan R&D continues to advance its pipeline. During the fourth quarter of 2019, the Company's key clinical developments included:

- Allergan received approval from the U.S. Food and Drug Administration (FDA) for the Company's New Drug Application (NDA) for UBRELVY™ (ubrogepant) for the acute treatment of migraine with or without aura in adults. UBRELVY™ is a first-in-class oral CGRP receptor antagonist (gepant) for the treatment of migraine attacks once they start. Launch began in January 2020.
- Allergan announced the FDA has granted Qualified Infectious Disease Product (QIDP) Designation and Fast Track Designation for ATM-AVI (aztreonam and avibactam) for the treatment of antibiotic-resistant gram-negative infections including complicated intra-abdominal infections (cIAI), complicated urinary tract infections (cUTI) and hospital-acquired bacterial pneumonia (HABP)/ventilator-associated bacterial pneumonia (VABP). ATM-AVI is an investigational, fixed-dose, intravenous combination antibiotic being developed jointly with Pfizer.
- The FDA approved Allergan's supplemental Biologics License Application (sBLA) to expand the BOTOX® (onabotulinumtoxinA) label for the treatment of pediatric patients ages two years and older with lower limb spasticity, excluding spasticity caused by cerebral palsy. This marks the 14th approved indication for BOTOX® and BOTOX® Cosmetic combined in the U.S., and the 11th BOTOX® therapeutic indication. The FDA approved BOTOX® (onabotulinumtoxinA) for pediatric upper limb spasticity in the second quarter of 2019.

In addition to fourth quarter 2019 pipeline developments listed above, Allergan expects two additional significant launches in the next twelve months:

- FDA action is expected in the first half of 2020 on Allergan's NDA for Bimatoprost Sustained-Release, a biodegradable implant for the reduction of intraocular pressure in patients with open-angle glaucoma or ocular hypertension. Launch is expected to follow in the first half of 2020.
- The FDA is currently reviewing a Biologics License Application (BLA) for Abicipar pegol, a novel, investigational DARPin® therapy, in patients with neovascular (wet) age-related macular degeneration (nAMD). The FDA is expected to take action on the BLA in mid-2020, with launch expected to follow. The Medicines Agency (EMA) is also reviewing a Marketing Authorisation Application (MAA) for Abicipar in patients with nAMD. A decision from the European Commission is expected in the second half of 2020.

**UPDATE ON PROPOSED ABBVIE TRANSACTION**

On January 10, 2020, AbbVie and Allergan received conditional approval from the European Commission for AbbVie's proposed acquisition of Allergan, subject to the approved divestiture of brazikumab (IL-23 inhibitor) and other conditions.

On January 27, 2020, Allergan announced that it entered into definitive agreements to divest brazikumab and ZENPEP® (pancrelipase) in conjunction with the ongoing regulatory approval process for the proposed transaction.

AstraZeneca will acquire brazikumab, currently in Phase 2b/3 development for Crohn's Disease and in Phase 2 development for ulcerative colitis, including global development and commercial rights.

Nestle will acquire and take full operational ownership of ZENPEP® upon closing the transaction with customary transition support from Allergan. ZENPEP® is a treatment, which is available in the United States, for exocrine pancreatic insufficiency due to cystic fibrosis and other conditions. Nestle also will be acquiring Viokace, another pancreatic enzyme preparation, as part of the same transaction.

The closings of the divestitures of brazikumab and ZENPEP® are contingent upon receipt of U.S. Federal Trade Commission and European Commission approval, closing of AbbVie's pending acquisition of Allergan and the satisfaction of other customary closing conditions.

Allergan expects the close of the pending AbbVie transaction around the end of the first quarter 2020, subject to receipt of required regulatory approvals and other closing conditions.

Due to the pending transaction, Allergan is not hosting a conference call to discuss its fourth quarter and full-year 2019 results.

**Allergan Contacts:**
**Investors:**
Manisha Narasimhan, PhD   (862) 261-7162

**Media:**
Lisa Brown                (862) 261-7320

**About Allergan plc**

Allergan plc (NYSE: AGN), headquartered in Dublin, Ireland, is a global pharmaceutical leader focused on developing, manufacturing and commercializing branded pharmaceutical, device, biologic, surgical and regenerative medicine products for patients around the world. Allergan markets a portfolio of leading brands and best-in-class products primarily focused on four key therapeutic areas including medical aesthetics, eye care, central nervous system and gastroenterology. As part of its approach to delivering innovation for better patient care, Allergan has built one of the broadest pharmaceutical and device research and development pipelines in the industry.

For more information, visit Allergan's website at www.Allergan.com.

**Forward-Looking Statement**

Statements contained in this press release that refer to future events or other non-historical facts are forward-looking statements that reflect Allergan's current perspective on existing trends and information as of the date of this release. Actual results may differ materially from Allergan's current expectations depending upon a number of factors affecting Allergan's business. These factors include, among others, the difficulty of predicting the timing or outcome of FDA approvals or actions, if any; the impact of competitive products and pricing; market acceptance of and continued demand for Allergan's products; the impact of uncertainty around timing of generic entry related to key products, including RESTASIS®, on our financial results; risks associated with divestitures, acquisitions, mergers and joint ventures; risks related to impairments; uncertainty associated with financial projections, projected debt reduction, projected cost reductions, projected synergies, restructurings, increased costs, and adverse tax consequences; difficulties or delays in manufacturing; risks related to the proposed transaction between AbbVie and Allergan, such as, but not limited to, failure to complete the possible transaction, failure to realize the expected benefits of the possible transaction, and general economic and business conditions affecting the combined company following the consummation of the possible transaction and other risks and uncertainties detailed in Allergan's periodic public filings with the Securities and Exchange Commission, including but not limited to Allergan's Annual Report on Form 10-K for the year ended December 31, 2018 and Allergan's Quarterly Report on Form 10-Q for the period ended September 30, 2019. Except as expressly required by law, Allergan disclaims any intent or obligation to update these forward-looking statements.

**Statements Required by the Irish Takeover Rules**

No statement in this press release is intended to constitute a profit forecast for any period, nor should any statements be interpreted to mean that earnings or earnings per share will necessarily be greater or lesser than those for the relevant preceding financial periods for Allergan. No statement in this press release constitutes an asset valuation.

The directors of Allergan accept responsibility for the information contained in this press release. To the best of the knowledge and belief of the directors of Allergan (who have taken all reasonable care to ensure that such is the case), the information contained in this press release is in accordance with the facts and does not omit anything likely to affect the import of such information.

Any holder of 1% or more of any class of relevant securities of Allergan may have disclosure obligations under Rule 8.3 of the Irish Takeover Panel Act, 1997, Takeover Rules 2013.

The following presents Allergan plc's statement of operations for the three and twelve months ended December 31, 2019 and 2018:

Table 1

**ALLERGAN PLC**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
(Unaudited; in millions, except per share amounts)

| | Three Months Ended December 31, | | Year Ended December 31, | |
|---|---|---|---|---|
| | 2019 | 2018 | 2019 | 2018 |
| Net revenues | $ 4,351.0 | $ 4,079.7 | $ 16,088.9 | $ 15,787.4 |
| **Operating expenses:** | | | | |
| Cost of sales (excludes amortization and impairment of acquired intangibles including product rights) | 704.0 | 590.0 | 2,493.1 | 2,191.4 |
| Research and development | 452.5 | 678.1 | 1,812.0 | 2,266.2 |
| Selling, general and administrative | 1,639.6 | 1,193.6 | 5,943.5 | 4,521.8 |
| Amortization | 1,517.5 | 1,569.1 | 5,856.6 | 6,552.3 |
| In-process research and development impairments | - | 6.6 | 436.0 | 804.6 |
| Goodwill and other asset impairments / sales, net | 314.0 | 5,426.4 | 3,993.0 | 5,698.7 |
| Total operating expenses | 4,627.6 | 9,463.8 | 20,534.2 | 22,035.0 |
| Operating (loss) | (276.6) | (5,384.1) | (4,445.3) | (6,247.6) |
| **Non-operating income (expense):** | | | | |
| Interest income | 25.3 | 11.6 | 76.8 | 45.2 |

| | | | | |
|---|---|---|---|---|
| Interest (expense), net | (191.9) | (210.2) | (783.0) | (911.2) |
| Other income (expense), net | 21.2 | (9.9) | 32.8 | 256.7 |
| Total other income (expense), net | (145.4) | (208.5) | (673.4) | (609.3) |
| (Loss) before income taxes and noncontrolling interest | (422.0) | (5,592.6) | (5,118.7) | (6,856.9) |
| (Benefit) / provision for income taxes | (104.7) | (1,296.7) | 146.4 | (1,770.7) |
| Net (loss) | (317.3) | (4,295.9) | (5,265.1) | (5,086.2) |
| Loss / (income) attributable to noncontrolling interest | 0.1 | (4.0) | (5.9) | (10.2) |
| Net (loss) attributable to shareholders | (317.2) | (4,299.9) | (5,271.0) | (5,096.4) |
| Dividends on preferred shares | - | - | - | 46.4 |
| Net (loss) attributable to ordinary shareholders | $ (317.2) | $ (4,299.9) | $ (5,271.0) | $ (5,142.8) |
| | | | | |
| (Loss) per share attributable to ordinary shareholders: | | | | |
| Net (loss) per share - basic | $ (0.97) | $ (12.83) | $ (16.02) | $ (15.26) |
| Net (loss) per share - diluted | (0.97) | (12.83) | (16.02) | (15.26) |
| | | | | |
| Weighted average shares outstanding: | | | | |
| Basic | 328.4 | 335.1 | 329.0 | 337.0 |
| Diluted | 328.4 | 335.1 | 329.0 | 337.0 |

The following table details Allergan plc's product revenue for significant promoted products globally, within the U.S., and international for the three and twelve months ended December 31, 2019 and 2018.

Table 2

**ALLERGAN PLC**
**NET REVENUES TOP GLOBAL PRODUCTS**
**(Unaudited; in millions)**

| | Three Months Ended December 31, 2019 | | | | | Three Months Ended December 31, 2018 | | | | | Movement | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | US Specialized Therapeutics | US General Medicine | International | Corporate | Total | US Specialized Therapeutics | US General Medicine | International | Corporate | Total | Total Change | Total Change Percentage |
| Botox® | $ 734.8 | $ - | $ 285.4 | $ - | $ 1,020.2 | $ 691.4 | $ - | $ 254.5 | $ - | $ 945.9 | $ 74.3 | 7.9 % |
| Restasis® | 309.0 | - | 18.7 | - | 327.7 | 325.0 | - | 16.6 | - | 341.6 | (13.9) | (4.1) % |
| Juvederm® Collection | 166.4 | - | 180.9 | - | 347.3 | 158.4 | - | 174.0 | - | 332.4 | 14.9 | 4.5 % |
| Lumigan®/Ganfort® | 81.9 | - | 95.6 | - | 177.5 | 74.0 | - | 96.9 | - | 170.9 | 6.6 | 3.9 % |
| Linzess®/Constella® | - | 231.2 | 6.8 | - | 238.0 | - | 205.2 | 6.4 | - | 211.6 | 26.4 | 12.5 % |
| Bystolic®/Byvalson® | - | 169.6 | 0.6 | - | 170.2 | - | 151.7 | 0.4 | - | 152.1 | 18.1 | 11.9 % |
| Alphagan®/Combigan® | 94.5 | - | 43.1 | - | 137.6 | 97.7 | - | 46.7 | - | 144.4 | (6.8) | (4.7) % |
| Lo Loestrin® | - | 156.2 | - | - | 156.2 | - | 143.8 | - | - | 143.8 | 12.4 | 8.6 % |
| Breast Implants | 67.1 | - | 15.1 | - | 82.2 | 68.2 | - | 10.5 | - | 78.7 | 3.5 | 4.4 % |
| Vibryd®/Fetzima® | - | 114.2 | 3.6 | - | 117.8 | - | 95.5 | 2.3 | - | 97.8 | 20.0 | 20.4 % |
| Eye Drops | 61.2 | - | 59.3 | - | 120.5 | 47.9 | - | 71.7 | - | 119.6 | 0.9 | 0.8 % |
| Asacol®/Delzicol® | - | 8.5 | 8.9 | - | 17.4 | - | 27.9 | 10.7 | - | 38.6 | (21.2) | (54.9) % |
| Coolsculpting® Consumables | 36.4 | - | 16.6 | - | 53.0 | 54.5 | - | 23.4 | - | 77.9 | (24.9) | (32.0) % |
| Coolsculpting® Systems & Add On | | | | | | | | | | | | |
| Aczone® | 16.9 | - | 8.8 | - | 25.7 | 26.8 | - | 21.5 | - | 48.3 | (22.6) | (46.8) % |
| Ozurdex® | 31.6 | - | 66.7 | - | 98.3 | 29.3 | - | 29.6 | - | 58.9 | 39.4 | 66.9 % |
| Carafate®/Sulcrate® | - | 46.9 | 0.9 | - | 47.8 | - | 54.1 | 0.7 | - | 54.8 | (7.0) | (12.8) % |
| Aczone® | 2.5 | - | - | - | 2.5 | 0.6 | - | 0.1 | - | 0.7 | 1.8 | n.m. |
| Zenpep® | - | 80.8 | 0.5 | - | 81.3 | - | 66.8 | 0.4 | - | 67.2 | 14.1 | 21.0 % |
| Canasa®/Salofalk® | - | 7.5 | 4.7 | - | 12.2 | - | 38.8 | 4.5 | - | 43.3 | (31.1) | (71.8) % |
| Viraylar® | - | 283.1 | - | - | 283.1 | - | 150.5 | - | - | 150.5 | 132.6 | 88.1 % |
| Saphris® | - | 36.3 | - | - | 36.3 | - | 36.8 | - | - | 36.8 | (0.5) | (1.4) % |
| Viberzi® | - | 49.8 | 0.4 | - | 50.2 | - | 48.9 | 0.6 | - | 49.5 | 0.7 | 1.4 % |
| Teflaro® | - | 38.1 | 3.7 | - | 30.0 | - | 30.0 | - | - | 30.0 | 11.8 | 39.3 % |
| Namzaric® | - | 20.2 | - | - | 20.2 | - | 22.6 | - | - | 22.6 | (2.4) | (10.6) % |
| Rapaflo® | 2.0 | - | 2.5 | - | 4.5 | 18.9 | - | 1.8 | - | 20.7 | (16.2) | (78.3) % |
| Skin Care | 44.6 | - | 4.2 | - | 48.8 | 40.4 | - | 3.6 | - | 44.0 | 4.8 | 10.9 % |
| Kybella®/Belkyra® | 6.3 | - | 0.8 | - | 7.1 | 7.2 | - | 1.0 | - | 8.2 | (1.1) | (13.4) % |
| Alloderm® | 104.7 | - | 2.0 | - | 106.7 | 94.9 | - | 2.5 | - | 97.4 | 9.3 | 9.5 % |
| Dalvance® | - | 26.4 | 2.4 | - | 28.8 | - | 17.3 | 1.0 | - | 18.3 | 10.5 | 57.4 % |
| Avyaz® | - | 30.7 | - | - | 30.7 | - | 24.6 | - | - | 24.6 | 6.1 | 24.8 % |
| Liletta® | - | 22.5 | - | - | 22.5 | - | 14.6 | - | - | 14.6 | 7.9 | 54.1 % |
| Namenda® | - | 3.2 | - | - | 3.2 | - | 10.7 | - | - | 10.7 | (7.5) | (70.1) % |
| Armour Thyroid | - | 57.4 | - | - | 57.4 | - | 53.4 | - | - | 53.4 | 4.0 | 7.5 % |
| Savella® | - | 21.5 | - | - | 21.5 | - | 23.6 | - | - | 23.6 | (2.1) | (8.9) % |
| **Total Net Revenues** | $ 1,821.2 | $ 1,610.7 | $ 917.7 | $ 1.4 | 4,351.0 | $ 1,808.8 | $ 1,397.9 | $ 870.2 | $ 2.8 | 4,079.7 | $ 271.3 | 6.6 % |
| | | | | | | | | | | | | |
| [1]Botox® is comprised of the following: | | | | | | | | | | | | |
| Botox® Therapeutics | 463.0 | - | 102.5 | - | 565.5 | 433.3 | - | 96.7 | - | 530.0 | 35.5 | 6.7 % |
| Botox® Cosmetics | 271.8 | - | 182.9 | - | 454.7 | 258.1 | - | 157.8 | - | 415.9 | 38.8 | 9.3 % |

| | Twelve Months Ended December 31, 2019 | | | | | Twelve Months Ended December 31, 2018 | | | | | Movement | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | US Specialized Therapeutics | US General Medicine | International | Corporate | Total | US Specialized Therapeutics | US General Medicine | International | Corporate | Total | Total Change | Total Change Percentage |
| Botox® | $ 2,730.5 | $ - | $ 1,060.8 | $ - | $ 3,791.3 | $ 2,545.8 | $ - | $ 1,031.6 | $ - | $ 3,577.4 | $ 213.9 | 6.0 % |
| Restasis® | 1,138.4 | - | 50.2 | - | 1,188.6 | 1,197.0 | - | 64.5 | - | 1,261.5 | (72.9) | (5.8) % |
| Juvederm® Collection | 587.5 | - | 656.1 | - | 1,243.6 | 548.2 | - | 614.8 | - | 1,163.0 | 80.6 | 6.9 % |
| Lumigan®/Ganfort® | 269.2 | - | 360.8 | - | 630.0 | 291.8 | - | 392.6 | - | 684.4 | (54.4) | (7.9) % |
| Linzess®/Constella® | - | 803.2 | 23.8 | - | 827.0 | - | 761.1 | 24.1 | - | 785.2 | 41.8 | 5.3 % |
| Bystolic®/Byvalson® | - | 600.6 | 2.1 | - | 602.7 | - | 583.8 | 2.0 | - | 585.8 | 16.9 | 2.9 % |
| Alphagan®/Combigan® | 360.0 | - | 162.0 | - | 522.0 | 375.4 | - | 176.0 | - | 551.4 | (29.4) | (5.3) % |
| Lo Loestrin® | - | 588.9 | - | - | 588.9 | - | 527.7 | - | - | 527.7 | 61.2 | 11.6 % |
| Breast Implants | 254.4 | - | 0.6 | - | 255.0 | 263.0 | - | 130.1 | - | 393.1 | (138.1) | (35.1) % |
| Vibryd®/Fetzima® | - | 412.1 | 11.4 | - | 423.5 | - | 342.4 | 7.2 | - | 349.6 | 73.9 | 21.1 % |
| Eye Drops | 230.4 | - | 235.8 | - | 466.2 | 202.7 | - | 279.7 | - | 482.4 | (16.2) | (3.4) % |
| Asacol®/Delzicol® | - | 76.7 | 36.1 | - | 112.8 | - | 130.8 | 45.7 | - | 176.5 | (63.7) | (36.1) % |
| Coolsculpting® Consumables | 185.3 | - | 76.3 | - | 261.6 | 235.3 | - | 64.2 | - | 299.5 | (37.9) | (12.7) % |
| Coolsculpting® Systems & Add On | | | | | | | | | | | | |
| Applicators | 62.8 | - | 42.4 | - | 105.2 | 126.3 | - | 43.3 | - | 169.6 | (64.4) | (38.0) % |
| Alloderm® | 395.9 | - | 7.9 | - | 403.8 | 407.3 | - | 8.0 | - | 415.3 | (11.5) | (2.8) % |
| Ozurdex® | 125.5 | - | 274.6 | - | 400.1 | 111.0 | - | 187.7 | - | 298.7 | 101.4 | 33.9 % |
| Carafate®/Sulcrate® | - | 212.5 | 3.0 | - | 215.5 | - | 217.8 | 2.8 | - | 220.6 | (5.1) | (2.3) % |
| Aczone® | 9.3 | - | - | - | 9.3 | 55.1 | - | 0.4 | - | 55.5 | (46.2) | (83.2) % |
| Zenpep® | - | 288.0 | 1.2 | - | 289.2 | - | 237.3 | 0.4 | - | 237.7 | 51.5 | 21.7 % |
| Canasa®/Salofalk® | - | 31.5 | 16.8 | - | 48.3 | - | 169.2 | 17.6 | - | 186.8 | (138.5) | (74.1) % |
| Viraylar® | - | 857.5 | - | - | 857.5 | - | 487.1 | - | - | 487.1 | 370.4 | 76.0 % |
| Saphris® | - | 135.3 | - | - | 135.3 | - | 139.7 | - | - | 139.7 | (4.4) | (3.1) % |
| Viberzi® | - | 187.9 | 1.6 | - | 189.5 | - | 176.5 | 1.3 | - | 177.8 | 11.7 | 6.6 % |
| Teflaro® | - | 147.0 | 6.0 | - | 153.0 | - | 128.0 | 0.3 | - | 128.3 | 24.7 | 19.3 % |
| Namzaric® | - | 88.6 | - | - | 88.6 | - | 115.8 | - | - | 115.8 | (27.2) | (23.5) % |
| Rapaflo® | 23.5 | - | 6.0 | - | 29.5 | 81.9 | - | 6.4 | - | 88.3 | (58.8) | (66.6) % |
| Skin Care | 158.0 | - | 14.6 | - | 172.6 | 138.8 | - | 15.2 | - | 154.0 | 18.6 | 12.1 % |
| Kybella®/Belkyra® | 27.4 | - | 3.3 | - | 30.7 | 31.8 | - | 6.3 | - | 38.1 | (7.4) | (19.4) % |
| Dalvance® | - | 81.9 | 6.0 | - | 87.9 | - | 56.1 | 2.3 | - | 58.4 | 29.5 | 50.5 % |
| Avyaz® | - | 116.7 | - | - | 116.7 | - | 94.6 | - | - | 94.6 | 22.1 | 23.4 % |
| Liletta® | - | 79.1 | - | - | 79.1 | - | 50.9 | - | - | 50.9 | 28.2 | 55.4 % |
| Namenda® | - | 22.8 | - | - | 22.8 | - | 94.0 | - | - | 71.0 | (48.2) | (67.9) % |
| Armour Thyroid | - | 218.5 | - | - | 218.5 | - | 198.8 | - | - | 198.8 | 19.7 | 9.9 % |
| Savella® | - | 88.5 | - | - | 88.5 | - | 85.0 | - | - | 85.0 | 3.5 | 4.1 % |
| Other Products Revenues | 261.9 | 797.6 | 342.6 | 32.0 | 1,434.1 | 308.9 | 749.3 | 380.2 | 39.5 | 1,477.9 | (43.8) | (3.0) % |

| Total Net Revenues | | $ 6,820.0 | | $ 5,834.9 | | $ 3,402.0 | | $ 32.0 | | 16,088.9 | | $ 6,920.3 | | $ 5,322.9 | | $ 3,504.7 | | $ 39.5 | | 15,787.4 | | $ 301.5 | | 1.9 | % |

[1] Botox® is comprised of the following:

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Botox® Therapeutics | 1,739.2 | - | 389.1 | - | 2,128.3 | 1,638.5 | - | 390.4 | - | 2,028.9 | 99.4 | 4.9 | % |
| Botox® Cosmetics | 991.3 | - | 671.7 | - | 1,663.0 | 907.3 | - | 641.2 | - | 1,548.5 | 114.5 | 7.4 | % |

The following table presents Allergan plc's Condensed Consolidated Balance Sheets as of December 31, 2019 and December 31, 2018.

Table 3

**ALLERGAN PLC**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(Unaudited; in millions)**

| | December 31, 2019 | December 31, 2018 |
|---|---|---|
| **Assets** | | |
| Cash and cash equivalents | $ 2,503.3 | $ 880.4 |
| Marketable securities | 3,411.6 | 1,026.9 |
| Accounts receivable, net | 3,192.3 | 2,868.1 |
| Inventories | 1,133.1 | 846.9 |
| Prepaid expenses and other current assets | 886.4 | 819.1 |
| Assets held for sale | 31.7 | 916.2 |
| Property, plant and equipment, net | 1,926.5 | 1,787.0 |
| Investments and other assets | 984.9 | 3,034.3 |
| Right of use asset - operating leases | 490.4 | - |
| Product rights and other intangibles | 37,890.6 | 43,695.4 |
| Goodwill | 42,248.3 | 45,913.3 |
| Total assets | $ 94,699.1 | $ 101,787.6 |
| **Liabilities & Equity** | | |
| Current liabilities | $ 6,413.8 | $ 4,859.6 |
| Lease liability | 570.5 | - |
| Current and long-term debt and capital leases | 22,649.0 | 23,797.7 |
| Deferred income taxes and other liabilities | 6,869.4 | 7,999.3 |
| Total equity | 58,196.4 | 65,131.0 |
| Total liabilities and equity | $ 94,699.1 | $ 101,787.6 |

The following table presents Allergan plc's Condensed Consolidated Statements of Cash Flows for the three and twelve months ended December 31, 2019 and 2018.

Table 4

**ALLERGAN PLC**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Unaudited; in millions)**

| | Three Months Ended December 31, | | Twelve Months Ended December 31, | |
|---|---|---|---|---|
| | 2019 | 2018 | 2019 | 2018 |
| **Cash Flows From Operating Activities:** | | | | |
| Net (loss) | $ (317.3) | $ (4,295.9) | $ (5,265.1) | $ (5,086.2) |
| Reconciliation to net cash provided by operating activities: | | | | |
| Depreciation | 53.9 | 46.6 | 204.5 | 196.3 |
| Amortization | 1,517.5 | 1,569.1 | 5,856.6 | 6,552.3 |
| Provision for inventory reserve | 32.4 | 21.5 | 160.2 | 96.4 |
| Share-based compensation | 52.6 | 54.6 | 214.3 | 239.8 |
| Deferred income tax benefit | (295.6) | 107.1 | (660.9) | (1,255.7) |
| In-process research and development impairments | - | 6.6 | 436.0 | 804.6 |
| Loss on asset sales and impairments, net | 314.0 | 5,426.4 | 3,993.0 | 5,698.7 |
| Gain on forward sale of Teva shares | - | - | - | (60.9) |
| Gain on sale of businesses | - | - | - | (182.6) |
| Non-cash extinguishment of debt | - | 12.6 | 0.2 | 30.0 |
| Cash charge related to extinguishment of debt | - | (27.4) | - | (45.6) |
| Amortization of deferred financing costs | 4.2 | 5.2 | 17.5 | 22.6 |
| Non-cash lease expense | 37.4 | | 130.9 | - |
| Contingent consideration adjustments, including accretion | 4.6 | 6.6 | 54.1 | (106.5) |
| Other, net | (3.2) | 28.5 | (5.5) | 29.0 |
| Changes in assets and liabilities (net of effects of acquisitions): | | | | |
| Decrease / (increase) in accounts receivable, net | (174.2) | (54.0) | (358.8) | (37.0) |
| Decrease / (increase) in inventories | (64.5) | (9.5) | (393.4) | (145.7) |
| Decrease / (increase) in prepaid expenses and other current assets | (41.9) | 9.7 | (78.1) | 4.3 |
| Increase / (decrease) in accounts payable and accrued expenses | 559.5 | 197.7 | 1,434.4 | 151.6 |
| Increase / (decrease) in income and other taxes payable | 59.2 | (1,607.1) | 1,697.9 | (1,191.6) |
| Increase / (decrease) in other assets and liabilities | (68.3) | 0.3 | (199.1) | (73.7) |
| Net cash provided by operating activities | 1,670.3 | 1,498.6 | 7,238.7 | 5,640.1 |
| **Cash Flows From Investing Activities:** | | | | |
| Additions to property, plant and equipment | (121.9) | (88.4) | (375.2) | (253.5) |
| Additions to product rights and other intangibles | (12.3) | - | (58.3) | - |
| Additions to investments | (200.0) | (1,015.3) | (3,938.0) | (2,471.7) |
| Proceeds from sale of investments and other assets | 102.9 | 58.0 | 1,569.6 | 6,259.3 |
| Payments to settle Teva related matters | - | - | - | (466.0) |
| Proceeds from sales of property, plant and equipment | 5.2 | 5.8 | 23.7 | 30.4 |
| Acquisitions of businesses, net of cash acquired | - | - | (80.6) | - |
| Net cash (used in) / provided by investing activities | (226.1) | (1,039.9) | (2,858.8) | 3,098.5 |
| **Cash Flows From Financing Activities:** | | | | |
| Proceeds from borrowings on long-term indebtedness, including credit facility | 8.6 | 1,939.8 | 11.9 | 2,657.0 |
| Proceeds from Forward Sale of Teva securities | - | - | - | 465.5 |
| Debt issuance and other financing costs | - | (10.4) | - | (10.4) |
| Payments on debt, including capital lease obligations | - | (1,688.6) | (1,044.9) | (8,804.5) |
| Proceeds from stock plans | 46.2 | 4.2 | 91.2 | 102.4 |
| Other financing, including contingent consideration | (3.0) | (9.2) | (9.3) | (30.9) |
| Payments to settle Teva related matters | - | - | - | (234.0) |
| Repurchase of ordinary shares | (6.3) | (751.9) | (840.6) | (2,775.4) |
| Dividends | (243.0) | (241.7) | (974.4) | (1,049.8) |
| Net cash (used in) financing activities | (197.5) | (757.8) | (2,766.1) | (9,680.1) |
| Effect of currency exchange rate changes on cash and cash equivalents | 19.1 | (8.4) | 9.1 | 4.7 |
| Net increase / (decrease) in cash and cash equivalents | 1,265.8 | (307.5) | 1,622.9 | (936.8) |
| Cash and cash equivalents at beginning of period | 1,237.5 | 1,187.9 | 880.4 | 1,817.2 |
| Cash and cash equivalents at end of period | $ 2,503.3 | $ 880.4 | $ 2,503.3 | $ 880.4 |

Non-GAAP performance net income per share is used by management as one of the primary metrics in evaluating the Company's performance. We believe that Non-GAAP performance net income per share enhances the comparability of our results between periods and provides additional information and transparency to investors on adjustments and other items that are not indicative of the Company's current and future operating performance. These are the financial measures used by our management team to evaluate operating performance and make day to day operating decisions. We define non-GAAP adjustments to the reported GAAP measures as GAAP measures adjusted for the following net of tax: (i) amortization expenses, (ii) global supply chain and operational excellence initiatives or other restructurings of a similar nature, (iii) acquisition, divestiture, integration and licensing charges, (iv) accretion and fair market value adjustments on contingent liabilities, (v) impairment/asset sales and related costs, including the exclusion of discontinued operations, (vi) legal settlements and (vii) other unusual charges or expenses. Non-GAAP performance net income per share is not, and should not be viewed as, a substitute for reported GAAP continuing operations loss per share. The Company has consistently excluded amortization of all intangible assets, including the product rights that generate a significant portion of our ongoing revenue. The Company's total accumulated amortization, including impairments of currently marketed products, related to our intangible assets as of December 31, 2019 and December 31, 2018 was $39.6 billion and $32.3 billion, respectively, and is expected to continue to be a material non-GAAP adjustment. The following table presents Allergan plc's GAAP to Non-GAAP adjustments for the three and twelve months ended December 31, 2019 and 2018:

Table 5

**ALLERGAN PLC**
**GAAP TO NON-GAAP ADJUSTMENTS**
**(Unaudited; in millions)**

**Three Months Ended December 31, 2019**

| GAAP | Net Revenue | COGS | Research & Development | Selling & Marketing | General & Administrative | Amortization | Asset sales & Impairments, net | Interest expense, net | Other income (expense) | Income taxes |
|---|---|---|---|---|---|---|---|---|---|---|
| | $ 4,351.0 | $ 704.0 | $ 452.5 | $ 883.0 | $ 756.6 | $ 1,517.5 | $ 314.0 | $ (166.6) | $ 21.2 | $ (104.7) |
| Purchase accounting impact on stock-based compensation for acquired awards | - | (0.2) | (0.2) | (0.6) | (0.2) | - | - | - | - | - |
| Severance due to integration of acquired entities | - | - | - | - | - | - | - | - | - | - |
| Non-acquisition related severance and restructuring | - | (2.3) | 0.1 | (1.4) | 4.2 | - | - | - | - | - |
| Costs associated with disposed businesses | - | - | - | - | - | - | - | - | - | - |
| Integration charges of acquired businesses | - | (0.3) | (4.9) | (0.7) | (13.2) | - | - | - | - | - |
| Costs associated with the AbbVie transaction | - | (4.1) | (3.1) | (31.2) | (34.5) | - | - | - | - | - |
| Milestones and upfront expenses for asset acquisitions Other | - | - | (27.1) | - | - | - | - | - | - | - |
| Accretion and fair-value adjustments to contingent consideration | - | (2.2) | (2.4) | - | - | - | - | - | - | - |
| Impairment of Carafate intangible asset | - | - | - | - | - | - | (314.0) | - | - | - |
| Non-cash amortization of debt premium recognized in purchase accounting | - | - | - | - | - | - | - | (5.8) | - | - |
| Asset sales and impairments, other | - | - | - | - | - | - | - | - | - | - |
| Litigation settlement related charges | - | - | - | - | (401.6) | - | - | - | - | - |
| Other adjustments | - | (0.1) | (0.1) | - | 1.8 | (1,517.5) | - | - | - | - |
| Income taxes on pre-tax adjustments | - | - | - | - | - | - | - | - | - | 239.9 |
| Discrete income tax events | - | - | - | - | - | - | - | - | - | 63.2 |
| **Non-GAAP Adjusted** | **$ 4,351.0** | **$ 694.8** | **$ 414.8** | **$ 849.1** | **$ 313.1** | **$ -** | **$ -** | **$ (172.4)** | **$ 21.2** | **$ 198.4** |

Three Months Ended December 31, 2018

| GAAP | Net Revenue | COGS | Research & Development | Selling & Marketing | General & Administrative | Amortization | Asset sales & Impairments, net | Interest expense, net | Other income (expense) | Income taxes |
|---|---|---|---|---|---|---|---|---|---|---|
| | $ 4,079.7 | $ 590.0 | $ 678.1 | $ 841.6 | $ 352.0 | $ 1,569.1 | $ 5,433.0 | $ (198.6) | $ (9.9) | $ (1,296.7) |
| Purchase accounting impact on stock-based compensation for acquired awards | - | (0.3) | (0.6) | (1.4) | (0.4) | - | - | - | - | - |
| Severance due to integration of acquired entities | - | - | (0.6) | - | (2.5) | - | - | - | - | - |
| Non-acquisition related severance and restructuring | - | (5.2) | (0.1) | (20.3) | 0.2 | - | - | - | - | - |
| Costs associated with disposed businesses | - | 0.5 | - | 0.2 | (1.3) | - | - | - | - | - |
| Integration charges of acquired businesses | - | (0.1) | (2.8) | - | (10.4) | - | - | - | - | - |
| Milestones and upfront expenses for asset acquisitions Bonti, Inc. | - | - | (196.6) | - | - | - | - | - | - | - |
| Editas Medicine, Inc. | - | - | (25.0) | - | - | - | - | - | - | - |
| Other | - | - | (16.5) | - | - | - | - | - | - | - |
| Accretion and fair-value adjustments to contingent consideration | - | (3.7) | (2.9) | - | - | - | - | - | - | - |
| Non-cash amortization of debt premium recognized in purchase accounting | - | - | - | - | - | - | - | (5.5) | - | - |
| Impairment of Kybella® intangible asset | - | - | - | - | - | - | (1,643.8) | - | - | - |
| Impairment of TrueTear® intangible asset | - | - | - | - | - | - | (187.6) | - | - | - |
| Impairment of goodwill | - | - | - | - | - | - | (2,841.1) | - | - | - |
| Impairment of Anti-Infectives held for sale | - | - | - | - | - | - | (771.7) | - | - | - |
| Asset sales and impairments, other | - | - | - | - | - | - | 25.5 | - | - | - |
| Impairment of assets held for sale | - | - | - | - | - | - | (14.2) | - | - | - |
| Loss on bond repurchases | - | - | - | - | - | - | - | (13.9) | - | (13.9) |
| Litigation settlement related charges | - | - | - | - | (16.4) | - | - | - | - | - |
| Other adjustments | - | 0.1 | 0.1 | - | (0.9) | (1,569.1) | (0.1) | (0.1) | (2.0) | - |
| Income taxes on pre-tax adjustments | - | - | - | - | - | - | - | - | - | 658.8 |
| Discrete income tax events | - | - | - | - | - | - | - | - | - | 879.8 |
| **Non-GAAP Adjusted** | **$ 4,079.7** | **$ 581.3** | **$ 436.1** | **$ 820.1** | **$ 320.3** | **$ -** | **$ -** | **$ (204.2)** | **$ (25.8)** | **$ 241.9** |

The non-GAAP income tax expense is determined based on our pre-tax income, adjusted for non-GAAP items on a jurisdiction by jurisdiction basis. The non-GAAP effective tax rate in the three months ended December 31, 2019 was impacted by income earned in jurisdictions with tax rates lower than the Irish statutory rate, partially offset by U.S. income taxed at rates higher than the Irish statutory rate.

The non-GAAP effective tax rate for the three months ended December 31, 2019 excludes a net discrete tax benefit of $63.2 million related to a change in valuation allowance and the tax effects of integration activities.

Twelve Months Ended December 31, 2019

| GAAP | Net Revenue | COGS | Research & Development | Selling & Marketing | General & Administrative | Amortization | Asset sales & Impairments, net | Interest expense, net | Other income (expense) | Income taxes |
|---|---|---|---|---|---|---|---|---|---|---|
| | $ 16,088.9 | $ 2,493.1 | $ 1,812.0 | $ 3,461.7 | $ 2,481.8 | $ 5,856.6 | $ 4,429.0 | $ (706.2) | $ 32.8 | $ 146.4 |
| Purchase accounting impact on stock-based compensation for acquired awards | - | (0.9) | (1.1) | (2.8) | (0.9) | - | - | - | - | - |
| Severance due to integration of acquired entities | - | - | - | - | (0.8) | - | - | - | - | - |
| Non-acquisition related severance and restructuring | - | (8.3) | 0.9 | (4.0) | (4.3) | - | - | - | - | - |
| Costs associated with disposed businesses | - | - | - | - | (0.3) | - | - | - | - | - |
| Integration charges of acquired businesses | - | (0.2) | (5.4) | (1.5) | (23.2) | - | - | - | - | - |
| Costs associated with the AbbVie transaction | - | (4.6) | (5.0) | (49.9) | (86.7) | - | - | - | - | - |
| Milestones and upfront expenses for asset acquisitions Akarna Therapeutics, Ltd | - | - | (10.0) | - | - | - | - | - | - | - |
| RetroSense Therapeutics, LLC | - | - | (20.0) | - | - | - | - | - | - | - |
| Other | - | - | (53.2) | - | - | - | - | - | - | - |
| Accretion and fair-value adjustments to contingent consideration | - | (44.6) | (9.5) | - | - | - | - | - | - | - |
| Non-cash amortization of debt premium recognized in purchase accounting | - | - | - | - | - | - | - | (22.2) | - | - |
| Impairment of goodwill | - | - | - | - | - | - | (3,552.8) | - | - | - |
| Impairment of Anti-Infectives | - | - | - | - | - | - | (129.4) | - | - | - |
| Impairment of IPR&D products acquired in the Allergan Acquisition | - | - | - | - | - | (182.0) | - | - | - | - |

| | Net Revenue | COGS | Research & Development | Selling & Marketing | General & Administrative | Amortization | Asset sales & Impairments, net | Interest expense, net | Other income (expense) | Income taxes |
|---|---|---|---|---|---|---|---|---|---|---|
| Impairment of IPR&D products acquired in the Vitae Acquisition | - | - | - | - | - | - | (78.0) | - | - | - |
| Impairment of IPR&D products acquired in the Tobira Acquisition | - | - | - | - | - | - | (176.0) | - | - | - |
| Impairment of Carafate intangible asset | - | - | - | - | - | - | (314.0) | - | - | - |
| Asset sales and impairments, other | - | - | - | - | - | - | 3.2 | - | - | - |
| Litigation settlement related charges | - | - | - | - | (1,167.3) | - | - | - | - | - |
| Milestone component of ongoing intellectual property agreement | (25.0) | - | - | - | - | - | - | - | - | - |
| Other adjustments | - | (0.2) | (0.1) | - | (1.2) | (5,856.6) | - | - | (0.3) | - |
| Income taxes on pre-tax adjustments | - | - | - | - | - | - | - | - | - | 1,022.5 |
| Discrete income tax events | - | - | - | - | - | - | - | - | - | (384.0) |
| **Non-GAAP Adjusted** | **$  16,063.9** | **$  2,434.3** | **$  1,708.6** | **$  3,403.5** | **$  1,197.1** | **$  -** | **$  -** | **$  (728.4)** | **$  32.5** | **$  774.9** |

| | | | | | Twelve Months Ended December 31, 2018 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Net Revenue | COGS | Research & Development | Selling & Marketing | General & Administrative | Amortization | Asset sales & Impairments, net | Interest expense, net | Other income (expense) | Income taxes |
| GAAP | $  15,787.4 | $  2,191.4 | $  2,266.2 | $  3,250.6 | $  1,271.2 | $  6,552.3 | $  6,503.3 | $  (866.0) | $  256.7 | $  (1,770.7) |
| Purchase accounting impact on stock-based compensation for acquired awards | - | (2.1) | (4.8) | (8.6) | (2.9) | - | - | - | - | - |
| Severance due to integration of acquired entities | - | - | (0.6) | (0.7) | (3.3) | - | - | - | - | - |
| Non-acquisition related severance and restructuring | - | (33.7) | (1.9) | (38.8) | (5.4) | - | (13.6) | - | - | - |
| Costs associated with disposed businesses | - | (1.0) | - | 0.2 | (4.1) | - | - | - | - | - |
| Integration charges of acquired businesses | - | (0.3) | (0.6) | (1.0) | (43.5) | - | - | - | - | - |
| Milestones and upfront expenses for asset acquisitions | | | | | | | | | | |
| Elastagen Pty Ltd | - | - | (96.1) | - | - | - | - | - | - | - |
| AstraZeneca plc | - | - | (90.0) | - | - | - | - | - | - | - |
| Merck & Co. | - | - | (115.0) | - | - | - | - | - | - | - |
| Chase Pharmaceuticals Corporation | - | - | (75.0) | - | - | - | - | - | - | - |
| Repros Therapeutics, Inc. | - | - | (33.2) | - | - | - | - | - | - | - |
| Bonti, Inc. | - | - | (196.6) | - | - | - | - | - | - | - |
| Editas Medicine, Inc. | - | - | (40.0) | - | - | - | - | - | - | - |
| Other | - | - | (33.0) | - | - | - | - | - | - | - |
| Accretion and fair-value adjustments to contingent consideration | - | - | 111.7 | (5.1) | - | - | - | - | - | - |
| Non-cash amortization of debt premium recognized in purchase accounting | - | - | - | - | - | - | - | (21.2) | - | - |
| Impairment of Kybella® intangible asset | - | - | - | - | - | - | (1,643.8) | - | - | - |
| Impairment of TrueTear® intangible asset | - | - | - | - | - | - | (187.6) | - | - | - |
| Impairment of goodwill | - | - | - | - | - | - | (2,841.1) | - | - | - |
| Impairment of Anti-Infectives held for sale | - | - | - | - | - | - | (771.7) | - | - | - |
| Impairment of IPR&D products acquired in the Allergan Acquisition | - | - | - | - | - | - | (236.0) | - | - | - |
| Impairment of IPR&D products acquired in the Vitae Acquisition | - | - | - | - | - | - | (40.0) | - | - | - |
| Impairment of assets held for sale | - | - | - | - | - | - | (266.2) | - | - | - |
| Impairment of ROR$\gamma$t IPR&D product | - | - | - | - | - | - | (522.0) | - | - | - |
| Asset sales and impairments, other | - | - | - | - | - | - | 18.4 | - | - | - |
| Gain on Teva securities | - | - | - | - | - | - | - | - | (60.6) | - |
| Milestone component of ongoing intellectual property agreement | (25.0) | - | - | - | - | - | - | - | - | - |
| Gain on the sale of divestiture | - | - | - | - | - | - | - | - | (182.6) | - |
| Gain on bond repurchases | - | - | - | - | - | - | - | - | (15.6) | - |
| Litigation settlement related charges | - | - | - | - | (56.8) | - | - | - | - | - |
| Other adjustments | - | 0.1 | 0.2 | - | (2.0) | (6,552.3) | 0.3 | (0.1) | (5.7) | - |
| Income taxes on pre-tax adjustments | - | - | - | - | - | - | - | - | - | 1,506.1 |
| Discrete income tax events | - | - | - | - | - | - | - | - | - | 1,213.8 |
| **Non-GAAP Adjusted** | **$  15,762.4** | **$  2,266.1** | **$  1,574.5** | **$  3,201.7** | **$  1,153.2** | **$  -** | **$  -** | **$  (887.3)** | **$  (7.8)** | **$  949.2** |

The non-GAAP income tax expense is determined based on our pre-tax income, adjusted for non-GAAP items on a jurisdiction by jurisdiction basis. The non-GAAP effective tax rate in the twelve months ended December 31, 2019 was impacted by income earned in jurisdictions with tax rates lower than the Irish statutory rate, partially offset by U.S. income taxed at rates higher than the Irish statutory rate.

The non-GAAP effective tax rate for the twelve months ended December 31, 2019 excludes a net discrete tax detriment of $394.0 million related to a change in valuation allowance partially offset by the tax impacts of U.S. capital losses and changes in the applicable tax rates on certain temporary differences.

The following table presents a reconciliation of Allergan plc's reported net income / (loss) attributable to shareholders and diluted earnings per share to non-GAAP performance net income and non-GAAP performance net income per share for the three and twelve months ended December 31, 2019 and 2018:

Table 6

**ALLERGAN PLC
RECONCILIATION TABLE**
**(Unaudited; in millions except per share amounts)**

| | Three Months Ended December 31, | | Twelve Months Ended December 31, | |
|---|---|---|---|---|
| | 2019 | 2018 | 2019 | 2018 |
| **GAAP to Non-GAAP Performance net income calculation** | | | | |
| GAAP (loss) attributable to ordinary shareholders | $  (317.2) | $  (4,299.9) | $  (5,271.0) | $  (5,096.4) |
| Adjusted for: | | | | |
| Amortization | 1,517.5 | 1,569.1 | 5,856.6 | 6,552.3 |
| Acquisition, divestiture and licensing (income) / charges | 112.9 | 249.9 | 220.5 | 485.7 |
| Accretion and fair-value adjustments to contingent consideration | 4.6 | 6.6 | 54.1 | (106.6) |
| Goodwill and other impairments and asset sales, net and related costs | 314.0 | 5,433.0 | 4,429.0 | 6,503.3 |
| Other | - | (15.9) | - | (42.6) |
| Non-acquisition restructurings, including Global Supply Chain initiatives | (0.6) | 25.4 | 15.7 | 79.8 |
| Legal settlements | 401.6 | 16.4 | 1,167.3 | 56.8 |
| Income taxes on items above and other discrete income tax adjustments | (303.1) | (1,538.6) | (628.5) | (2,719.9) |
| Non-GAAP performance net income attributable to shareholders | $  1,729.7 | $  1,446.0 | $  5,843.7 | $  5,712.4 |
| **Diluted earnings per share** | | | | |
| Diluted (loss) per share from continuing operations attributable to shareholders- GAAP | $  (0.97) | $  (12.83) | $  (16.02) | $  (15.12) |
| Non-GAAP performance net income per share attributable to shareholders | $  5.22 | $  4.29 | $  17.64 | $  16.69 |
| Basic weighted average ordinary shares outstanding | 328.4 | 335.1 | 329.0 | 337.0 |
| Effect of dilutive securities: | | | | |
| Dilutive shares | 2.9 | 2.3 | 2.2 | 5.2 |

| Diluted weighted average ordinary shares outstanding | 331.3 | 337.4 | 331.2 | 342.2 |
|---|---|---|---|---|

We define adjusted EBITDA as an amount equal to consolidated net income / (loss) attributable to shareholders for such period adjusted for the following: (i) interest expense, (ii) interest income, (iii) (benefit) for income taxes, (iv) depreciation and amortization expenses, (v) stock-based compensation expense, (vi) asset impairment charges and losses / (gains) and expenses associated with the sale of assets, including the exclusion of discontinued operations, (vii) business restructuring charges associated with Allergan's global supply chain and operational excellence initiatives or other restructurings of a similar nature, (viii) costs and charges associated with the acquisition and divestitures of businesses and assets including, but not limited to, milestone payments, integration charges, other charges associated with the revaluation of assets or liabilities and charges associated with the revaluation of acquisition related contingent liabilities that are based in whole or in part on future estimated cash flows, (ix) litigation charges and settlements and (x) other unusual charges or expenses. We define non-GAAP adjusted operating income as adjusted EBITDA including depreciation and certain stock-based compensation charges and excluding identified income and fair value accounting results included within other income (expense), net.

The following table presents a reconciliation of Allergan plc's reported net income / (loss) attributable to shareholders for the three and twelve months ended December 31, 2019 and 2018 to adjusted EBITDA and non-GAAP operating income:

Table 7

**ALLERGAN PLC**
**ADJUSTED EBITDA and NON-GAAP OPERATING INCOME, RECONCILIATION TABLE**
**(Unaudited; in millions)**

| | Three Months Ended December 31, | | Twelve Months Ended December 31, | |
|---|---|---|---|---|
| | 2019 | 2018 | 2019 | 2018 |
| GAAP (loss) attributable to ordinary shareholders | $ (317.2) | $ (4,299.9) | $ (5,271.0) | $ (5,096.4) |
| Plus: | | | | |
| Interest expense | 191.9 | 210.2 | 783.0 | 911.2 |
| Interest income | (25.3) | (11.6) | (76.8) | (45.2) |
| Provision / (benefit) for income taxes | (104.7) | (1,296.7) | 146.4 | (1,770.7) |
| Depreciation | 53.9 | 46.6 | 204.5 | 196.3 |
| Amortization | 1,517.5 | 1,569.1 | 5,856.6 | 6,552.3 |
| EBITDA | $ 1,316.1 | $ (3,782.3) | $ 1,642.7 | $ 747.5 |
| Adjusted for: | | | | |
| Acquisition, divestiture and licensing charges | 117.5 | 252.7 | 237.0 | 480.3 |
| Goodwill and other impairments and asset sales, net and related costs | 314.0 | 5,433.0 | 4,429.0 | 6,503.3 |
| Other | - | (15.9) | - | (42.6) |
| Non-acquisition restructurings, including Global Supply Chain initiatives, excluding depreciation | (0.6) | 25.4 | 15.7 | 75.6 |
| Legal settlements | 401.6 | 16.4 | 1,167.3 | 56.8 |
| Accretion and fair-value adjustments to contingent consideration | 4.6 | 6.6 | 54.1 | (106.6) |
| Share-based compensation including cash settlements | 52.6 | 54.6 | 214.3 | 239.8 |
| Adjusted EBITDA | $ 2,205.8 | $ 1,990.5 | $ 7,760.1 | $ 7,954.1 |
| Adjusted for: | | | | |
| Depreciation | (53.9) | (46.6) | (204.5) | (192.1) |
| Other income (expense) related to fair value accounting | (21.2) | 25.8 | (32.5) | 7.0 |
| Share-based compensation not related to restructuring charges and purchase accounting impact on stock-based compensation for acquired awards | (51.4) | (51.9) | (208.6) | (213.2) |
| Non-GAAP Operating Income | $ 2,079.3 | $ 1,917.8 | $ 7,314.5 | $ 7,555.8 |

The following table details Allergan plc's segment contribution reconciled to the non-GAAP contribution for the same financial statement line items for the three and twelve months ended December 31, 2019 and 2018.

Table 8

**ALLERGAN PLC**
**Segment Contribution to Non-GAAP Allergan plc Contribution**
**(Unaudited; $ in millions)**

| | Three Months Ended December 31, 2019 | | | | | Three Months Ended December 31, 2018 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | US Specialized Therapeutics Segment | US General Medicine Segment | International Segment | Corporate | Total | US Specialized Therapeutics Segment | US General Medicine Segment | International Segment | Corporate | Total |
| Net revenues | $ 1,821.2 | $ 1,610.7 | $ 917.7 | $ 1.4 | $ 4,351.0 | $ 1,808.8 | $ 1,397.9 | $ 870.2 | $ 2.8 | $ 4,079.7 |
| Operating expenses: | | | | | | | | | | |
| Cost of sales[1] | 156.0 | 287.8 | 148.4 | 102.6 | 694.8 | 139.3 | 195.1 | 146.1 | 100.8 | 581.3 |
| Selling and marketing | 376.1 | 256.4 | 216.6 | - | 849.1 | 378.1 | 211.1 | 230.8 | 0.1 | 820.1 |
| General and administrative | 47.8 | 41.5 | 36.9 | 186.9 | 313.1 | 59.7 | 45.1 | 41.3 | 174.2 | 320.3 |
| Segment contribution | $ 1,241.3 | $ 1,025.0 | $ 515.8 | $ (288.1) | $ 2,494.0 | $ 1,231.7 | $ 946.6 | $ 452.0 | $ (272.3) | $ 2,358.0 |
| Segment margin | 68.2 % | 63.6 % | 56.2 % | n.m. | 57.3 % | 68.1 % | 67.7 % | 51.9 % | n.m. | 57.8 % |
| Segment gross margin[2] | 91.4 % | 82.1 % | 83.8 % | n.m. | 84.0 % | 92.3 % | 86.0 % | 83.2 % | n.m. | 85.8 % |

(1) Excludes amortization and impairment of acquired intangibles including product rights.
(2) Defined as net revenues less segment related cost of sales as a percentage of net revenues.

| | Twelve Months Ended December 31, 2019 | | | | | Twelve Months Ended December 31, 2018 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | US Specialized Therapeutics Segment | US General Medicine Segment | International Segment | Corporate | Total | US Specialized Therapeutics Segment | US General Medicine Segment | International Segment | Corporate | Total |
| Net revenues | $ 6,820.0 | $ 5,834.9 | $ 3,402.0 | $ 7.0 | $ 16,063.9 | $ 6,920.3 | $ 5,322.9 | $ 3,504.7 | $ 14.5 | $ 15,762.4 |
| Operating expenses: | | | | | | | | | | |
| Cost of sales[1] | 578.2 | 954.8 | 548.3 | 353.0 | 2,434.3 | 565.2 | 799.1 | 537.1 | 364.7 | 2,266.1 |
| Selling and marketing | 1,490.4 | 978.2 | 934.7 | 0.2 | 3,403.5 | 1,348.3 | 924.6 | 928.7 | 0.1 | 3,201.7 |
| General and administrative | 190.1 | 160.7 | 117.2 | 729.3 | 1,197.1 | 205.3 | 156.4 | 141.7 | 649.8 | 1,153.2 |
| Segment contribution | $ 4,561.3 | $ 3,741.2 | $ 1,802.0 | $ (1,075.5) | $ 9,029.0 | $ 4,801.5 | $ 3,442.8 | $ 1,897.2 | $ (1,000.1) | $ 9,141.4 |
| Segment margin | 66.9 % | 64.1 % | 53.0 % | n.m. | 56.2 % | 69.4 % | 64.7 % | 54.1 % | n.m. | 58.0 % |
| Segment gross margin[2] | 91.5 % | 83.6 % | 83.9 % | n.m. | 84.8 % | 91.8 % | 85.0 % | 84.7 % | n.m. | 85.6 % |

(1) Excludes amortization of acquired intangibles including product rights.
(2) Defined as net revenues less segment related cost of sales as a percentage of net revenues.

The following table details Allergan plc's product revenue for significant promoted products within the US Specialized Therapeutics segment for the three and twelve months ended December 31, 2019 and 2018.

Table 9

**ALLERGAN PLC**
**US Specialized Therapeutics Product Revenue**
**(Unaudited; in millions)**

| | Three Months Ended December 31, | | Change | |
|---|---|---|---|---|
| | 2019 | 2018 | Dollars | % |
| **Total Eye Care** | $ 587.0 | $ 587.3 | $ (0.3) | (0.1) % |
| Restasis® | 309.0 | 325.0 | (16.0) | (4.9) % |
| Alphagan®/Combigan® | 94.5 | 97.7 | (3.2) | (3.3) % |
| Lumigan®/Ganfort® | 81.9 | 74.0 | 7.9 | 10.7 % |
| Ozurdex® | 31.6 | 29.3 | 2.3 | 7.8 % |
| Eye Drops | 61.2 | 47.9 | 13.3 | 27.8 % |
| Other Eye Care | 8.8 | 13.4 | (4.6) | (34.3) % |
| **Total Medical Aesthetics** | 742.2 | 738.3 | 3.9 | 0.5 % |
| **Facial Aesthetics** | 444.5 | 423.7 | 20.8 | 4.9 % |
| Botox® Cosmetics | 271.8 | 258.1 | 13.7 | 5.3 % |
| Juvederm® Collection | 166.4 | 158.4 | 8.0 | 5.1 % |
| Kybella® | 6.3 | 7.2 | (0.9) | (12.5) % |
| **Plastic Surgery** | 67.1 | 68.2 | (1.1) | (1.6) % |
| Breast Implants | 67.1 | 68.2 | (1.1) | (1.6) % |
| **Regenerative Medicine** | 132.7 | 124.7 | 8.0 | 6.4 % |
| Alloderm® | 104.7 | 94.9 | 9.8 | 10.3 % |
| Other Regenerative Medicine | 28.0 | 29.8 | (1.8) | (6.0) % |
| **Body Contouring** | 53.3 | 81.3 | (28.0) | (34.4) % |
| Coolsculpting® Systems & Add On Applicators | 16.9 | 26.8 | (9.9) | (36.9) % |
| Coolsculpting® Consumables | 36.4 | 54.5 | (18.1) | (33.2) % |
| **Skin Care**[3] | 44.6 | 40.4 | 4.2 | 10.4 % |

| | 2019 | 2018 | Dollars | % |
|---|---|---|---|---|
| **Total Medical Dermatology** | **13.0** | **4.5** | **8.5** | **188.9** % |
| Aczone® | 2.5 | 0.6 | 1.9 | n.m. |
| Other Medical Dermatology(4) | 10.5 | 3.9 | 6.6 | 169.2 % |
| **Total Neuroscience & Urology** | **465.0** | **452.2** | **12.8** | **2.8** % |
| Botox® Therapeutics | 463.0 | 433.3 | 29.7 | 6.9 % |
| Rapaflo® | 2.0 | 18.9 | (16.9) | (89.4) % |
| **Other Revenues** | **14.0** | **26.5** | **(12.5)** | **(47.2)** % |
| **Net Revenues** | $ **1,821.2** | $ **1,808.8** | $ **12.4** | **0.7** % |
| | | | | |
| Operating expenses: | | | | |
| Cost of sales(1) | 156.0 | 139.3 | 16.7 | 12.0 % |
| Selling and marketing | 376.1 | 378.1 | (2.0) | (0.5) % |
| General and administrative | 47.8 | 59.7 | (11.9) | (19.9) % |
| Segment contribution | $ 1,241.3 | $ 1,231.7 | $ 9.6 | 0.8 % |
| Segment margin | 68.2 % | 68.1 % | | 0.1 % |
| Segment gross margin(2) | 91.4 % | 92.3 % | | (0.9) % |

(1) Excludes amortization and impairment of acquired intangibles including product rights, as well as indirect cost of sales not attributable to segment results.
(2) Defined as net revenues less segment related cost of sales as a percentage of net revenues.
(3) Includes SkinMedica® and Latisse®.
(4) Includes Tazorac® sales of $0.3 million which were previously disclosed separately in the three months ended December 31, 2018.

| | Twelve Months Ended December 31, | | Change | |
|---|---|---|---|---|
| | 2019 | 2018 | Dollars | % |
| **Total Eye Care** | $ **2,182.4** | $ **2,235.7** | $ **(53.3)** | **(2.4)** % |
| Restasis® | 1,138.4 | 1,197.0 | (58.6) | (4.9) % |
| Alphagan®/Combigan® | 360.0 | 375.4 | (15.4) | (4.1) % |
| Lumigan®/Ganfort® | 269.2 | 291.8 | (22.6) | (7.7) % |
| Ozurdex® | 125.5 | 111.0 | 14.5 | 13.1 % |
| Eye Drops | 230.4 | 202.7 | 27.7 | 13.7 % |
| Other Eye Care | 58.9 | 57.8 | 1.1 | 1.9 % |
| **Total Medical Aesthetics** | **2,772.0** | **2,774.6** | **(2.6)** | **(0.1)** % |
| **Facial Aesthetics** | **1,606.2** | **1,487.3** | **118.9** | **8.0** % |
| Botox® Cosmetics | 991.3 | 907.3 | 84.0 | 9.3 % |
| Juvederm® Collection | 587.5 | 548.2 | 39.3 | 7.2 % |
| Kybella® | 27.4 | 31.8 | (4.4) | (13.8) % |
| **Plastic Surgery** | **254.4** | **263.0** | **(8.6)** | **(3.3)** % |
| Breast Implants | 254.4 | 263.0 | (8.6) | (3.3) % |
| **Regenerative Medicine** | **505.3** | **523.9** | **(18.6)** | **(3.6)** % |
| Alloderm® | 395.9 | 407.3 | (11.4) | (2.8) % |
| Other Regenerative Medicine | 109.4 | 116.6 | (7.2) | (6.2) % |
| **Body Contouring** | **248.1** | **361.6** | **(113.5)** | **(31.4)** % |
| Coolsculpting® Systems & Add On Applicators | 62.8 | 126.3 | (63.5) | (50.3) % |
| Coolsculpting® Consumables | 185.3 | 235.3 | (50.0) | (21.2) % |
| **Skin Care(3)** | **158.0** | **138.8** | **19.2** | **13.8** % |
| **Total Medical Dermatology** | **44.0** | **115.5** | **(71.5)** | **(61.9)** % |
| Aczone® | 9.3 | 55.1 | (45.8) | (83.1) % |
| Other Medical Dermatology(4) | 34.7 | 60.4 | (25.7) | (42.5) % |
| **Total Neuroscience & Urology** | **1,762.7** | **1,720.4** | **42.3** | **2.5** % |
| Botox® Therapeutics | 1,739.2 | 1,638.5 | 100.7 | 6.1 % |
| Rapaflo® | 23.5 | 81.9 | (58.4) | (71.3) % |
| **Other Revenues** | **58.9** | **74.1** | **(15.2)** | **(20.5)** % |
| **Net Revenues** | $ **6,820.0** | $ **6,920.3** | $ **(100.3)** | **(1.4)** % |
| | | | | |
| Operating expenses: | | | | |
| Cost of sales(1) | 578.2 | 565.2 | 13.0 | 2.3 % |
| Selling and marketing | 1,490.4 | 1,348.3 | 142.1 | 10.5 % |
| General and administrative | 190.1 | 205.3 | (15.2) | (7.4) % |
| Segment contribution | $ 4,561.3 | $ 4,801.5 | $ (240.2) | (5.0) % |
| Segment margin | 66.9 % | 69.4 % | | (2.5) % |
| Segment gross margin(2) | 91.5 % | 91.8 % | | (0.3) % |

(1) Excludes amortization and impairment of acquired intangibles including product rights, as well as indirect cost of sales not attributable to segment results.
(2) Defined as net revenues less segment related cost of sales as a percentage of net revenues.
(3) Includes SkinMedica® and Latisse®.
(4) Includes Tazorac® sales of $25.4 million which were previously disclosed separately in the twelve months ended December 31, 2018.

The following table details Allergan plc's product revenue for significant promoted products within the US General Medicine segment for the three and twelve months ended December 31, 2019 and 2018.

Table 10

**ALLERGAN PLC**
**US General Medicine Product Revenue**
**(Unaudited; in millions)**

| | Three Months Ended December 31, | | Change | |
|---|---|---|---|---|
| | 2019 | 2018 | Dollars | % |
| **Total Central Nervous System (CNS)** | $ **457.0** | $ **316.1** | $ **140.9** | **44.6** % |
| Vraylar® | 283.1 | 150.5 | 132.6 | 88.1 % |
| Viibryd®/Fetzima® | 114.2 | 95.5 | 18.7 | 19.6 % |
| Saphris® | 36.3 | 36.8 | (0.5) | (1.4) % |
| Namzaric® | 20.2 | 22.6 | (2.4) | (10.6) % |
| Namenda®(3) | 3.2 | 10.7 | (7.5) | (70.1) % |
| **Total Gastrointestinal (GI)** | **434.1** | **449.8** | **(15.7)** | **(3.5)** % |
| Linzess® | 231.2 | 205.2 | 26.0 | 12.7 % |
| Zenpep® | 80.8 | 66.8 | 14.0 | 21.0 % |
| Carafate®/Sulcrate® | 46.9 | 54.1 | (7.2) | (13.3) % |
| Viberzi® | 49.8 | 48.9 | 0.9 | 1.8 % |
| Asacol®/Delzicol® | 8.5 | 27.9 | (19.4) | (69.5) % |
| Canasa®/Salofalk® | 7.5 | 38.8 | (31.3) | (80.7) % |
| Other GI | 9.4 | 8.1 | 1.3 | 16.0 % |
| **Total Women's Health** | **232.8** | **213.9** | **18.9** | **8.8** % |
| Lo Loestrin® | 156.2 | 143.8 | 12.4 | 8.6 % |
| Liletta® | 22.5 | 14.6 | 7.9 | 54.1 % |
| Other Women's Health(4)(5) | 54.1 | 55.5 | (1.4) | (2.5) % |
| **Total Anti-Infectives** | **104.3** | **78.8** | **25.5** | **32.4** % |
| Teflaro® | 38.1 | 30.0 | 8.1 | 27.0 % |
| Avycaz® | 30.7 | 24.6 | 6.1 | 24.8 % |
| Dalvance® | 26.4 | 17.3 | 9.1 | 52.6 % |
| Other Anti-Infectives | 9.1 | 6.9 | 2.2 | 31.9 % |
| **Diversified Brands** | **320.3** | **300.1** | **20.2** | **6.7** % |
| Bystolic®/Byvalson® | 169.6 | 151.7 | 17.9 | 11.8 % |
| Armour Thyroid | 57.4 | 53.4 | 4.0 | 7.5 % |
| Savella® | 21.5 | 23.6 | (2.1) | (8.9) % |
| Other Diversified Brands | 71.8 | 71.4 | 0.4 | 0.6 % |
| **Other Revenues** | **62.2** | **39.2** | **23.0** | **58.7** % |
| **Net revenues** | $ **1,610.7** | $ **1,397.9** | $ **212.8** | **15.2** % |
| | | | | |
| Operating expenses: | | | | |
| Cost of sales(1) | 287.8 | 195.1 | 92.7 | 47.5 % |
| Selling and marketing | 256.4 | 211.1 | 45.3 | 21.5 % |
| General and administrative | 41.5 | 45.1 | (3.6) | (8.0) % |
| Segment contribution | $ 1,025.0 | $ 946.6 | $ 78.4 | 8.3 % |
| Segment margin | 63.6 % | 67.7 % | | (4.1) % |
| Segment gross margin(2) | 82.1 % | 86.0 % | | (3.9) % |

(1) Excludes amortization and impairment of acquired intangibles including product rights, as well as indirect cost of sales not attributable to segment results.

(2) Defined as net revenues less segment related cost of sales as a percentage of net revenues.

(3) Includes Namenda XR® and Namenda® IR.

(4) Includes Estrace® Cream sales of $14.7 million which were previously disclosed separately in the three months ended December 31, 2018

(5) Includes Minastrin® 24 sales of $2.9 million which were previously disclosed separately in the three months ended December 31, 2018

| | Twelve Months Ended December 31, | | Change | |
| | 2019 | 2018 | Dollars | % |
|---|---|---|---|---|
| **Total Central Nervous System (CNS)** | $ 1,516.3 | $ 1,156.0 | $ 360.3 | 31.2 % |
| Vraylar® | 857.5 | 487.1 | 370.4 | 76.0 % |
| Viibryd®/Fetzima® | 412.1 | 342.4 | 69.7 | 20.4 % |
| Saphris® | 135.3 | 139.7 | (4.4) | (3.1) % |
| Namzaric® | 88.6 | 115.8 | (27.2) | (23.5) % |
| Namenda®[3] | 22.8 | 71.0 | (48.2) | (67.9) % |
| **Total Gastrointestinal (GI)** | **1,634.2** | **1,723.7** | **(89.5)** | **(5.2) %** |
| Linzess® | 803.2 | 761.1 | 42.1 | 5.5 % |
| Zenpep® | 288.0 | 237.3 | 50.7 | 21.4 % |
| Carafate®/Sulcrate® | 212.5 | 217.8 | (5.3) | (2.4) % |
| Viberzi® | 187.9 | 176.5 | 11.4 | 6.5 % |
| Asacol®/Delzicol® | 76.7 | 130.8 | (54.1) | (41.4) % |
| Canasa®/Salofalk® | 31.5 | 169.2 | (137.7) | (81.4) % |
| Other GI | 34.4 | 31.0 | 3.4 | 11.0 % |
| **Total Women's Health** | **895.7** | **786.8** | **108.9** | **13.8 %** |
| Lo Loestrin® | 588.9 | 527.7 | 61.2 | 11.6 % |
| Liletta® | 79.1 | 50.9 | 28.2 | 55.4 % |
| Other Women's Health[4][5] | 227.7 | 208.2 | 19.5 | 9.4 % |
| **Total Anti-Infectives** | **377.1** | **304.4** | **72.7** | **23.9 %** |
| Teflaro® | 147.0 | 128.0 | 19.0 | 14.8 % |
| Avycaz® | 116.7 | 94.6 | 22.1 | 23.4 % |
| Dalvance® | 81.9 | 56.1 | 25.8 | 46.0 % |
| Other Anti-Infectives | 31.5 | 25.7 | 5.8 | 22.6 % |
| **Diversified Brands** | **1,202.8** | **1,156.0** | **46.8** | **4.0 %** |
| Bystolic®/Byvalson® | 600.6 | 583.8 | 16.8 | 2.9 % |
| Armour Thyroid | 218.5 | 198.8 | 19.7 | 9.9 % |
| Savella® | 88.5 | 85.0 | 3.5 | 4.1 % |
| Other Diversified Brands | 295.2 | 288.4 | 6.8 | 2.4 % |
| **Other Revenues** | **208.8** | **196.0** | **12.8** | **6.5 %** |
| **Net revenues** | **$ 5,834.9** | **$ 5,322.9** | **$ 512.0** | **9.6 %** |
| | | | | |
| **Operating expenses:** | | | | |
| Cost of sales[1] | 954.8 | 799.1 | 155.7 | 19.5 % |
| Selling and marketing | 978.2 | 924.6 | 53.6 | 5.8 % |
| General and administrative | 160.7 | 156.4 | 4.3 | 2.7 % |
| Segment contribution | $ 3,741.2 | $ 3,442.8 | $ 298.4 | 8.7 % |
| Segment margin | 64.1 % | 64.7 % | | (0.6) % |
| Segment gross margin[2] | 83.6 % | 85.0 % | | (1.4) % |

(1) Excludes amortization and impairment of acquired intangibles including product rights, as well as indirect cost of sales not attributable to segment results.

(2) Defined as net revenues less segment related cost of sales as a percentage of net revenues.

(3) Includes Namenda XR® and Namenda® IR.

(4) Includes Estrace® Cream sales of $49.0 million which were previously disclosed separately in the twelve months ended December 31, 2018

(5) Includes Minastrin® 24 sales of $9.5 million which were previously disclosed separately in the twelve months ended December 31, 2018

The following table details Allergan plc's product revenue for significant promoted products within the International segment for the three and twelve months ended December 31, 2019 and 2018.

Table 11

**ALLERGAN PLC**
**International Product Revenue**
**(Unaudited; in millions)**

| | Three Months Ended December 31, | | Change | |
| | 2019 | 2018 | Dollars | % |
|---|---|---|---|---|
| **Total Eye Care** | $ 319.4 | $ 308.2 | $ 11.2 | 3.6 % |
| Lumigan®/Ganfort® | 95.6 | 96.9 | (1.3) | (1.3) % |
| Alphagan®/Combigan® | 43.1 | 46.7 | (3.6) | (7.7) % |
| Ozurdex® | 66.7 | 29.6 | 37.1 | 125.3 % |
| Eye Drops | 59.3 | 71.7 | (12.4) | (17.3) % |
| Restasis® | 18.7 | 16.6 | 2.1 | 12.7 % |
| Other Eye Care | 36.0 | 46.7 | (10.7) | (22.9) % |
| **Total Medical Aesthetics** | **412.9** | **396.0** | **16.9** | **4.3 %** |
| **Facial Aesthetics** | **364.6** | **332.8** | **31.8** | **9.6 %** |
| Botox® Cosmetics | 182.9 | 157.8 | 25.1 | 15.9 % |
| Juvederm® Collection | 180.9 | 174.0 | 6.9 | 4.0 % |
| Belkyra® (Kybella®) | 0.8 | 1.0 | (0.2) | (20.0) % |
| **Plastic Surgery** | **15.3** | **10.8** | **4.5** | **41.7 %** |
| Breast Implants | 15.1 | 10.5 | 4.6 | 43.8 % |
| Other Plastic Surgery | 0.2 | 0.3 | (0.1) | (33.3) % |
| **Regenerative Medicine** | **3.4** | **3.9** | **(0.5)** | **(12.8) %** |
| Alloderm® | 2.0 | 2.5 | (0.5) | (20.0) % |
| Other Regenerative Medicine | 1.4 | 1.4 | 0.0 | 0.0 % |
| **Body Contouring** | **25.4** | **44.9** | **(19.5)** | **(43.4) %** |
| Coolsculpting® Systems & Add On Applicators | 8.8 | 21.5 | (12.7) | (59.1) % |
| Coolsculpting® Consumables | 16.6 | 23.4 | (6.8) | (29.1) % |
| **Skin Care** | **4.2** | **3.6** | **0.6** | **16.7 %** |
| **Botox® Therapeutics and Other** | **168.8** | **150.1** | **18.7** | **12.5 %** |
| Botox® Therapeutics | 102.5 | 96.7 | 5.8 | 6.0 % |
| Asacol®/Delzicol® | 8.9 | 10.7 | (1.8) | (16.8) % |
| Constella® | 6.8 | 6.4 | 0.4 | 6.3 % |
| Other Products | 50.6 | 36.3 | 14.3 | 39.4 % |
| **Other Revenues** | **16.6** | **15.9** | **0.7** | **4.4 %** |
| **Net revenues** | **$ 917.7** | **$ 870.2** | **$ 47.5** | **5.5 %** |
| | | | | |
| **Operating expenses:** | | | | |
| Cost of sales[1] | 148.4 | 146.1 | 2.3 | 1.6 % |
| Selling and marketing | 216.6 | 230.8 | (14.2) | (6.2) % |
| General and administrative | 36.9 | 41.3 | (4.4) | (10.7) % |
| Segment contribution | $ 515.8 | $ 452.0 | $ 63.8 | 14.1 % |
| Segment margin | 56.2 % | 51.9 % | | 4.3 % |
| Segment gross margin[2] | 83.8 % | 83.2 % | | 0.6 % |

(1) Excludes amortization and impairment of acquired intangibles including product rights, as well as indirect cost of sales not attributable to segment results.

(2) Defined as net revenues less segment related cost of sales as a percentage of net revenues.

| | Twelve Months Ended December 31, | | Change | |
| | 2019 | 2018 | Dollars | % |
|---|---|---|---|---|
| **Total Eye Care** | $ 1,251.1 | $ 1,294.6 | $ (43.5) | (3.4) % |
| Lumigan®/Ganfort® | 360.8 | 392.6 | (31.8) | (8.1) % |
| Alphagan®/Combigan® | 162.0 | 176.0 | (14.0) | (8.0) % |
| Ozurdex® | 274.6 | 187.7 | 86.9 | 46.3 % |
| Eye Drops | 235.8 | 279.7 | (43.9) | (15.7) % |

| | | | | |
|---|---|---|---|---|
| Restasis® | 50.2 | 64.5 | (14.3) | (22.2) % |
| Other Eye Care | 167.7 | 194.1 | (26.4) | (13.6) % |
| Total Medical Aesthetics | 1,480.8 | 1,533.3 | (52.5) | (3.4) % |
| Facial Aesthetics | 1,331.1 | 1,262.3 | 68.8 | 5.5 % |
| Botox® Cosmetics | 671.7 | 641.2 | 30.5 | 4.8 % |
| Juvederm® Collection | 656.1 | 614.8 | 41.3 | 6.7 % |
| Belkyra® (Kybella®) | 3.3 | 6.3 | (3.0) | (47.6) % |
| Plastic Surgery | 1.8 | 131.5 | (129.7) | (98.6) % |
| Breast Implants | 0.6 | 130.1 | (129.5) | (99.5) % |
| Other Plastic Surgery | 1.2 | 1.4 | (0.2) | (14.3) % |
| Regenerative Medicine | 14.6 | 16.8 | (2.2) | (13.1) % |
| Alloderm® | 7.9 | 8.0 | (0.1) | (1.3) % |
| Other Regenerative Medicine | 6.7 | 8.8 | (2.1) | (23.9) % |
| Body Contouring | 118.7 | 107.5 | 11.2 | 10.4 % |
| Coolsculpting® Systems & Add On Applicators | 42.4 | 43.3 | (0.9) | (2.1) % |
| Coolsculpting® Consumables | 76.3 | 64.2 | 12.1 | 18.8 % |
| Skin Care | 14.6 | 15.2 | (0.6) | (3.9) % |
| Botox® Therapeutics and Other | 603.0 | 611.5 | (8.5) | (1.4) % |
| Botox® Therapeutics | 389.1 | 390.4 | (1.3) | (0.3) % |
| Asacol®/Delzicol® | 36.1 | 45.7 | (9.6) | (21.0) % |
| Constella® | 23.8 | 24.1 | (0.3) | (1.2) % |
| Other Products | 154.0 | 151.3 | 2.7 | 1.8 % |
| Other Revenues | 67.1 | 65.3 | 1.8 | 2.8 % |
| Net revenues | $ 3,402.0 | $ 3,504.7 | $ (102.7) | (2.9) % |
| | | | | |
| Operating expenses: | | | | |
| Cost of sales[1] | 548.3 | 537.1 | 11.2 | 2.1 % |
| Selling and marketing | 934.7 | 928.7 | 6.0 | 0.6 % |
| General and administrative | 117.0 | 141.7 | (24.7) | (17.4) % |
| Segment contribution | $ 1,802.0 | $ 1,897.2 | $ (95.2) | (5.0) % |
| Segment margin | 53.0 % | 54.1 % | | (1.1) % |
| Segment gross margin[2] | 83.9 % | 84.7 % | | (0.8) % |

(1) Excludes amortization and impairment of acquired intangibles including product rights, as well as indirect cost of sales not attributable to segment results.

(2) Defined as net revenues less segment related cost of sales as a percentage of net revenues.

The following table details Allergan plc's non-GAAP product revenues for the three and twelve months ended December 31, 2019 and 2018.

**ALLERGAN PLC**
**NON GAAP NET REVENUES TOP GLOBAL PRODUCTS**
(Unaudited; in millions)

Table 12

| | Three Months Ended December 31, 2019 | | | | | Three Months Ended December 31, 2018 | | | | | Movement | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | US Specialized Therapeutics | US General Medicine | International | Corporate | Total | US Specialized Therapeutics | US General Medicine | International | Corporate | Total | Global Change | Global Change Percentage |
| Botox® | $ 734.8 | $ — | $ 285.4 | $ — | $ 1,020.2 | $ 691.4 | $ — | $ 254.5 | $ — | $ 945.9 | $ 74.3 | 7.9 % |
| Juvederm® Collection | 166.4 | — | 180.9 | — | 347.3 | 158.4 | — | 174.0 | — | 332.4 | 14.9 | 4.5 % |
| Linzess®/Constella® | — | 231.2 | 6.8 | — | 238.0 | — | 205.2 | 6.4 | — | 211.6 | 26.4 | 12.5 % |
| Lumigan®/Ganfort® | 81.9 | — | 95.6 | — | 177.5 | 74.0 | — | 96.9 | — | 170.9 | 6.6 | 3.9 % |
| Bystolic®/Byvalson® | — | 169.6 | 0.6 | — | 170.2 | — | 151.7 | 0.4 | — | 152.1 | 18.1 | 11.9 % |
| Alphagan®/Combigan® | 94.5 | — | 43.1 | — | 137.6 | 97.7 | — | 46.7 | — | 144.4 | (6.8) | (4.7) % |
| Eye Drops | — | — | 59.3 | — | 120.5 | 47.9 | — | 71.7 | — | 119.6 | 0.9 | 0.8 % |
| Lo Loestrin® | — | 156.2 | — | — | 156.2 | — | 143.8 | — | — | 143.8 | 12.4 | 8.6 % |
| Breast Implants | 67.1 | — | 15.1 | — | 82.2 | 68.2 | — | 10.5 | — | 78.7 | 3.5 | 4.4 % |
| Vibryd®/Fetzima® | — | 114.2 | 3.6 | — | 117.8 | — | 95.5 | 2.3 | — | 97.8 | 20.0 | 20.4 % |
| Alloderm® | 104.7 | — | 2.0 | — | 106.7 | 94.9 | — | 2.5 | — | 97.4 | 9.3 | 9.5 % |
| Vraylar® | — | 283.1 | — | — | 283.1 | — | 150.5 | — | — | 150.5 | 132.6 | 88.1 % |
| Coolsculpting® Consumables | 36.4 | — | 16.6 | — | 53.0 | 54.5 | — | 23.4 | — | 77.9 | (24.9) | (32.0) % |
| Ozurdex® | 31.6 | — | 66.7 | — | 98.3 | 29.3 | — | 29.6 | — | 58.9 | 39.4 | 66.9 % |
| Carafate®/Sulcrate® | — | 46.9 | 0.9 | — | 47.8 | — | 54.1 | 0.7 | — | 54.8 | (7.0) | (12.8) % |
| Zenpep® | — | 80.8 | 0.5 | — | 81.3 | — | 66.8 | 0.4 | — | 67.2 | 14.1 | 21.0 % |
| Coolsculpting® Systems & Add On Applicators | 16.9 | — | 8.8 | — | 25.7 | 26.8 | — | 21.5 | — | 48.3 | (22.6) | (46.8) % |
| Viberzi® | — | 49.8 | 0.4 | — | 50.2 | — | 48.9 | 0.6 | — | 49.5 | 0.7 | 1.4 % |
| Namzaric® | — | 20.2 | — | — | 20.2 | — | 22.6 | — | — | 22.6 | (2.4) | (10.6) % |
| Teflaro® | — | 38.1 | 3.7 | — | 41.8 | — | 30.0 | — | — | 30.0 | 11.8 | 39.3 % |
| Dalvance® | — | 26.4 | 2.4 | — | 28.8 | — | 17.3 | 1.0 | — | 18.3 | 10.5 | 57.4 % |
| Avycaz® | — | 30.7 | — | — | 30.7 | — | 24.6 | — | — | 24.6 | 6.1 | 24.8 % |
| Kybella®/Belkyra® | 6.3 | — | 0.8 | — | 7.1 | 7.2 | — | 1.0 | — | 8.2 | (1.1) | (13.4) % |
| Other Regenerative Medicine | 28.0 | — | 1.4 | — | 29.4 | 29.8 | — | 1.4 | — | 31.2 | (1.8) | (5.8) % |
| Other Promoted Products | 1.7 | — | (4.9) | — | (3.2) | 5.6 | — | 5.1 | — | 10.7 | (13.9) | (129.9) % |
| Total Promoted Brands & Brands with Ongoing Exclusivity | 1,431.5 | 1,247.2 | 789.7 | — | 3,468.4 | 1,385.7 | 1,011.0 | 750.6 | — | 3,147.3 | 321.1 | 10.2 % |
| Restasis® | 309.0 | — | 18.7 | — | 327.7 | 325.0 | — | 16.6 | — | 341.6 | (13.9) | (4.1) % |
| Asacol®/Delzicol® | — | 8.5 | 8.9 | — | 17.4 | — | 27.9 | 10.7 | — | 38.6 | (21.2) | (54.9) % |
| Rapaflo® | 2.0 | — | 2.5 | — | 4.5 | 18.9 | — | 1.8 | — | 20.7 | (16.2) | (78.3) % |
| Canasa®/Salofalk® | — | 7.5 | 4.7 | — | 12.2 | — | 38.8 | 4.5 | — | 43.3 | (31.1) | (71.8) % |
| Saphris | — | 36.3 | — | — | 36.3 | — | 36.8 | — | — | 36.8 | (0.5) | (1.4) % |
| Other LOE/ Risk | — | 10.7 | — | — | 10.7 | — | 28.3 | — | — | 28.3 | (17.6) | (62.2) % |
| Total LOE/Risk | 311.0 | 63.0 | 34.8 | — | 408.8 | 343.9 | 131.8 | 33.6 | — | 509.3 | (100.5) | (19.7) % |
| Aczone® | 2.5 | — | — | — | 2.5 | 0.6 | — | 0.1 | — | 0.7 | 1.8 | 257.1 % |
| Other Divested | 10.5 | — | 0.1 | — | 10.6 | 4.0 | — | 5.2 | — | 9.3 | 1.3 | 14.0 % |
| Total Divested | 13.0 | — | 0.1 | — | 13.1 | 4.6 | — | 5.2 | — | 10.0 | 3.1 | 31.0 % |
| Total Brands facing LOE Risk/Divested | 324.0 | 63.0 | 34.9 | — | 421.9 | 348.5 | 137.0 | 33.8 | — | 519.3 | (97.4) | (18.8) % |
| Skincare | 44.6 | — | 4.2 | — | 48.8 | 40.4 | — | 3.6 | — | 44.0 | 4.8 | 10.9 % |
| Liletta® | — | 22.5 | — | — | 22.5 | — | 14.6 | — | — | 14.6 | 7.9 | 54.1 % |
| Armour Thyroid | — | 57.4 | — | — | 57.4 | — | 53.4 | — | — | 53.4 | 4.0 | 7.5 % |
| Savella® | — | 21.5 | — | — | 21.5 | — | 23.6 | — | — | 23.6 | (2.1) | (8.9) % |
| Other Products Revenues | 21.1 | 199.1 | 88.9 | 1.4 | 310.5 | 34.2 | 158.3 | 82.2 | 2.8 | 277.5 | 33.0 | 11.9 % |
| Total Other | 65.7 | 300.5 | 93.1 | 1.4 | 460.7 | 74.6 | 249.9 | 85.8 | 2.8 | 413.1 | 47.6 | 11.5 % |
| Total Net Revenues | $ 1,821.2 | $ 1,610.7 | $ 917.7 | $ 1.4 | $ 4,351.0 | $ 1,808.8 | $ 1,397.9 | $ 870.2 | $ 2.8 | $ 4,079.7 | $ 271.3 | 6.6 % |

| | Twelve Months Ended December 31, 2019 | | | | | Twelve Months Ended December 31, 2018 | | | | | Movement | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | US Specialized Therapeutics | US General Medicine | International | Corporate | Global | US Specialized Therapeutics | US General Medicine | International | Corporate | Global | Global Change | Global Change Percentage |
| Botox® | $ 2,730.5 | $ — | $ 1,060.8 | $ — | $ 3,791.3 | $ 2,545.8 | $ — | $ 1,031.6 | $ — | $ 3,577.4 | $ 213.9 | 6.0 % |
| Juvederm® Collection | 587.5 | — | 656.1 | — | 1,243.6 | 548.2 | — | 614.8 | — | 1,163.0 | 80.6 | 6.9 % |
| Linzess®/Constella® | — | 803.2 | 23.8 | — | 827.0 | — | 761.1 | 24.1 | — | 785.2 | 41.8 | 5.3 % |
| Lumigan®/Ganfort® | 269.2 | — | 360.8 | — | 630.0 | 291.8 | — | 392.6 | — | 684.4 | (54.4) | (7.9) % |
| Bystolic®/Byvalson® | — | 600.6 | 2.1 | — | 602.7 | — | 583.8 | 2.0 | — | 585.8 | 16.9 | 2.9 % |
| Alphagan®/Combigan® | 360.0 | — | 162.0 | — | 522.0 | 375.4 | — | 176.0 | — | 551.4 | (29.4) | (5.3) % |
| Eye Drops | 230.4 | — | 235.8 | — | 466.2 | 202.7 | — | 279.7 | — | 482.4 | (16.2) | (3.4) % |
| Lo Loestrin® | — | 588.9 | — | — | 588.9 | — | 527.7 | — | — | 527.7 | 61.2 | 11.6 % |
| Breast Implants | 254.4 | — | 0.6 | — | 255.0 | 263.0 | — | 130.1 | — | 393.1 | (138.1) | (35.1) % |
| Vibryd®/Fetzima® | — | 412.1 | 11.4 | — | 423.5 | — | 342.4 | 7.2 | — | 349.6 | 73.9 | 21.1 % |
| Alloderm® | 395.9 | — | 7.9 | — | 403.8 | 407.3 | — | 8.0 | — | 415.3 | (11.5) | (2.8) % |
| Vraylar ™ | — | 857.5 | — | — | 857.5 | — | 487.1 | — | — | 487.1 | 370.4 | 76.0 % |
| Coolsculpting® Consumables | 185.3 | — | 76.3 | — | 261.6 | 235.3 | — | 64.2 | — | 299.5 | (37.9) | (12.7) % |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ozurdex ® | 125.5 | - | 274.6 | - | 400.1 | 111.0 | - | 187.7 | - | 298.7 | 101.4 | 33.9 % |
| Carafate ® /Sulcrate ® | - | 212.5 | 3.0 | - | 215.5 | - | 217.8 | 2.8 | - | 220.6 | (5.1) | (2.3) % |
| Zenpep® | - | 288.0 | 1.2 | - | 289.2 | - | 237.3 | 0.4 | - | 237.7 | 51.5 | 21.7 % |
| Coolsculpting® Systems & Add On Applicators | 62.8 | - | 42.4 | - | 105.2 | 126.3 | - | 43.3 | - | 169.6 | (64.4) | (38.0) % |
| Viberzi® | - | 187.9 | 1.6 | - | 189.5 | - | 176.5 | 1.3 | - | 177.8 | 11.7 | 6.6 % |
| Namzaric® | - | 88.6 | - | - | 88.6 | - | 115.8 | - | - | 115.8 | (27.2) | (23.5) % |
| Teflaro® | - | 147.0 | 6.0 | - | 153.0 | - | 128.0 | 0.3 | - | 128.3 | 24.7 | 19.3 % |
| Dalvance® | - | 81.9 | 6.0 | - | 87.9 | - | 56.1 | 2.3 | - | 58.4 | 29.5 | 50.5 % |
| Avycaz® | - | 116.7 | - | - | 116.7 | - | 94.6 | - | - | 94.6 | 22.1 | 23.4 % |
| Kybella® /Belkyra® | 27.4 | - | 3.3 | - | 30.7 | 31.8 | - | 6.3 | - | 38.1 | (7.4) | (19.4) % |
| Other Regenerative Medicines | 109.4 | - | 6.7 | - | 116.1 | 116.6 | - | 8.8 | - | 125.4 | (9.3) | (7.4) % |
| Other Promoted and New Launch Products | 25.7 | - | 10.9 | - | 36.6 | 21.5 | - | 20.5 | - | 42.0 | (5.4) | (12.9) % |
| **Total Promoted Brands & Brands with Ongoing Exclusivity** | **5,364.0** | **4,384.9** | **2,953.3** | **-** | **12,702.2** | **5,276.7** | **3,728.2** | **3,004.0** | **-** | **12,008.9** | **693.3** | **5.8 %** |
| Restasis® | 1,138.4 | - | 50.2 | - | 1,188.6 | 1,197.0 | - | 64.5 | - | 1,261.5 | (72.9) | (5.8) % |
| Asacol®/Delzicol® | - | 76.7 | 36.1 | - | 112.8 | - | 130.8 | 45.7 | - | 176.5 | (63.7) | (36.1) % |
| Rapaflo® | 23.5 | - | 6.0 | - | 29.5 | 81.9 | - | 6.4 | - | 88.3 | (58.8) | (66.6) % |
| Canasa®/Salofalk® | - | 31.5 | 16.8 | - | 48.3 | - | 169.2 | 17.6 | - | 186.8 | (138.5) | (74.1) % |
| Saphris | - | 135.3 | - | - | 135.3 | - | 139.7 | - | - | 139.7 | (4.4) | (3.1) % |
| Other LOE/ Risk | - | 72.1 | - | - | 72.1 | - | 129.5 | - | - | 129.5 | (57.4) | (44.3) % |
| *Total LOE Risk* | *1,161.9* | *315.6* | *109.1* | *-* | *1,586.6* | *1,278.9* | *569.2* | *134.2* | *-* | *1,982.3* | *(395.7)* | *(20.0) %* |
| Aczone® | 9.3 | - | - | - | 9.3 | 55.1 | - | 0.4 | - | 55.5 | (46.2) | (83.2) % |
| Other Divested | 34.0 | 2.3 | 0.6 | - | 36.9 | 60.5 | 19.9 | 0.7 | - | 81.1 | (44.2) | (54.5) % |
| *Total Divested* | *43.3* | *2.3* | *0.6* | *-* | *46.2* | *115.6* | *19.9* | *1.1* | *-* | *136.6* | *(90.4)* | *(66.2) %* |
| **Total Brands facing LOE Risk** | **1,205.2** | **317.9** | **109.7** | **-** | **1,632.8** | **1,394.5** | **589.1** | **135.3** | **-** | **2,118.9** | **(486.1)** | **(22.9) %** |
| Skincare | 158.0 | - | 14.6 | - | 172.6 | 138.8 | - | 15.2 | - | 154.0 | 18.6 | 12.1 % |
| Liletta® | - | 79.1 | - | - | 79.1 | - | 50.9 | - | - | 50.9 | 28.2 | 55.4 % |
| Armour Thyroid | - | 218.5 | - | - | 218.5 | - | 198.8 | - | - | 198.8 | 19.7 | 9.9 % |
| Savella® | - | 88.5 | - | - | 88.5 | - | 85.0 | - | - | 85.0 | 3.5 | 4.1 % |
| Other Products Revenues | 92.8 | 746.0 | 324.4 | 7.0 | 1,170.2 | 110.3 | 670.9 | 350.2 | 14.5 | 1,145.9 | 24.3 | 2.1 % |
| **Total Other** | **250.8** | **1,132.1** | **339.0** | **7.0** | **1,728.9** | **249.1** | **1,005.6** | **365.4** | **14.5** | **1,634.6** | **94.3** | **5.8 %** |
| **Total Net Revenues** | **$ 6,820.0** | **$ 5,834.9** | **$ 3,402.0** | **$ 7.0** | **16,063.9** | **$ 6,920.3** | **$ 5,322.9** | **$ 3,504.7** | **$ 14.5** | **15,762.4** | **$ 301.5** | **1.9 %** |

C View original content to download multimedia:http://www.prnewswire.com/news-releases/allergan-reports-fourth-quarter-and-full-year-2019-financial-results-301001646.html

SOURCE Allergan plc

# EXHIBIT C

REDACTED PUBLIC VERSION

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ALLERGAN USA, INC. and ALLERGAN INDUSTRIE SAS, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | C.A. No. 19-126-CFC |
| PROLLENIUM US INC. and PROLLENIUM MEDICAL TECHNOLOGIES INC., | ) ) ) ) | |
| Defendants. | ) | |
| ALLERGAN USA, INC. and ALLERGAN INDUSTRIE SAS, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 20-104-CFC |
| PROLLENIUM US INC. and PROLLENIUM MEDICAL TECHNOLOGIES INC., | ) ) ) ) | |
| Defendants. | ) | |

**DECLARATION OF KHASHA IGHANIAN IN SUPPORT OF
PROLLENIUM'S MOTION TO STAY PENDING IPR**

REDACTED PUBLIC VERSION

I, Khasha Ighanian, declare under penalty of perjury that the following is true and correct to the best of my personal knowledge:

1.      I am the President of defendant Prollenium Medical Technologies Inc., which is the parent company of defendant Prollenium US Inc. (collectively "Prollenium").

2.      I am over the age of 18 and have personal knowledge of the following matters.

3.      Prollenium's total sales of the product accused of infringing Allergan's asserted patents in this case (Revanesse Versa +, the "Accused Product") in calendar year 2019 were approximately ▮▮▮▮▮▮. From launch of the Accused Product in the United States in December 2018 through February 29, 2020, sales of the Accused Product have totaled approximately ▮▮▮▮▮.

4.      Other companies besides Prollenium US Inc. sell hyaluronic acid (HA) dermal fillers containing lidocaine in the United States. Based on review of Allergan's public annual reports (e.g., its 2019 Financial Results),[1] my knowledge and experience in the field, and Prollenium's recorded sales in the U.S., I estimate that the plaintiff, Allergan, has approximately ▮▮▮▮ of the market share for HA dermal fillers. Allergan's next largest competitor in the HA dermal filler market is

---

[1] "Allergan Reports Fourth Quarter and Full-Year 2019 Financial Results," https://www.prnewswire.com/news-releases/allergan-reports-fourth-quarter-and-full-year-2019-financial-results-301001646.html (Feb. 10, 2020).

REDACTED PUBLIC VERSION

Galderma, which I estimate has approximately ▮ of the market. I estimate that

Prollenium's share of the market is ▮▮▮. An additional manufacturer,

Teoxane, has partnered with a distributer in the U.S. (Revance Therapeutics) and

announced its intention to enter the market and launch a HA dermal filler with

lidocaine in the second quarter of 2020.[2]

5.     I declare under penalty of perjury under the laws of the United States

of America that the foregoing is true and correct.


Executed the 10th day April 2020.

_____

Khasha Ighanian

---

[2] "Revance Announces Transformative Aesthetics Portfolio Transaction with Exclusive U.S. Distribution Agreement of FDA-Approved Dermal Fillers from TEOXANE SA," https://investors.revance.com/news-releases/news-release-details/revance-announces-transformative-aesthetics-portfolio (Jan. 10, 2020).

"

"

"

# GZJ KDKV'F

1  Susan M. Coletti (coletti@fr.com) (admitted *pro hac vice*)
   Elizabeth M. Flanagan (eflanagan@fr.com) (admitted *pro hac vice*)
2  FISH & RICHARDSON P.C.
   222 Delaware Avenue, 17th Floor
3  Wilmington, DE 19899
   Telephone:  (302) 652-5070 / Fax:  (302) 652-0607
4
5  Attorneys for Plaintiffs
   ALLERGAN USA, INC. and ALLERGAN INDUSTRIE, SAS
6
7  William F. Cavanaugh (SBN 133461) (wcavanaugh@pbwt.com)
   Scott B. Howard (sbhoward@pbwt.com) (admitted *pro hac vice*)
8  William F. Schmedlin (wschmedlin@pbwt.com) (admitted *pro hac vice*)
   PATTERSON BELKNAP WEBB & TYLER LLP
9  1133 Avenue of the Americas
   New York, NY 10036
10 Telephone:  (212) 336-2000/ Fax:  (212) 336-2222
11
12 Attorneys for Defendants
   MEDICIS AESTHETICS, INC., MEDICIS PHARMACEUTICAL CORP.,
13 VALEANT PHARMACEUTICALS NORTH AMERICA LLC,
   VALEANT PHARMACEUTICALS INTERNATIONAL,
14 VALEANT PHARMACEUTICALS INTERNATIONAL, INC., and
   GALDERMA LABORATORIES, L.P.
15
16 SEE ADDITIONAL COUNSEL ON PAGE 2
17          **UNITED STATES DISTRICT COURT**
              **CENTRAL DISTRICT OF CALIFORNIA**
18

| | |
|---|---|
| 19  ALLERGAN USA, INC., and<br>ALLERGAN INDUSTRIE, SAS, | Case No. 8:13-cv-01436 AG (JPRx) |
| 20              Plaintiffs, | |
| 21  v. | **STIPULATION FOR AMENDED<br>CONSENT JUDGMENT** |
| 22  MEDICIS AESTHETICS, INC.,<br>MEDICIS PHARMACEUTICAL CORP.,<br>23  VALEANT PHARMACEUTICALS<br>NORTH AMERICA LLC,<br>24  VALEANT PHARMACEUTICALS<br>INTERNATIONAL,<br>25  VALEANT PHARMACEUTICALS<br>INTERNATIONAL, INC., and<br>26  GALDERMA LABORATORIES, L.P. | |
| 27              Defendants. | |

28

1  Jonathan E. Singer (CA Bar No. 187908) (singer@fr.com)
2  Michael J. Kane (kane@fr.com) (admitted *pro hac vice*)
   Phillip W. Goter (goter@fr.com) (admitted *pro hac vice*)
3  FISH & RICHARDSON P.C.
   60 South Sixth Street, Suite 3200
   Minneapolis, MN 55402
4  Telephone:  (612) 335-5070 / Fax:  (612) 288-9696

5  Juanita R. Brooks (CA Bar No. 75934) (brooks@fr.com)
   Lara S. Garner (CA Bar No. 234701) (lgarner@fr.com)
6  FISH & RICHARDSON P.C.
   12390 El Camino Real
7  San Diego, CA 92130
   Telephone: (858) 678-5070 / Fax: (858) 678-5099
8
   Craig E. Countryman (CA Bar No. 244601) (countryman@fr.com)
9  FISH & RICHARDSON P.C.
   555 W. 5th Street, 31st Floor
10 Los Angeles, California 90013
   Telephone: (213) 533-4240 / Fax:  (213) 996-8304
11
   Attorneys for Plaintiffs
12 ALLERGAN USA, INC. and ALLERGAN INDUSTRIE, SAS

13

14 Donald G. Norris (SBN 90000) (dnooris@norgallaw.com)
   Douglas F. Galanter (SBN 93740) (dgalanter@norgallaw.com)
15 NORRIS & GALANTER LLP
   523 W. Sixth St., Suite 716
16 Los Angeles, CA 90014
   Tel:   213-232-0855/ Fax:  213-286-9499
17 dnorris@norgallaw.com
   dgalanter@norgallaw.com
18
   Attorneys for Defendants
19 MEDICIS AESTHETICS, INC., MEDICIS PHARMACEUTICAL CORP.,
   VALEANT PHARMACEUTICALS NORTH AMERICA LLC,
20 VALEANT PHARMACEUTICALS INTERNATIONAL,
   VALEANT PHARMACEUTICALS INTERNATIONAL, INC., and
21 GALDERMA LABORATORIES, L.P.

22

23

24

25

26

27

28

Case 8:19-cv-00126-CFC-SRF Document 164-1 Filed 04/14/20 Page 344 of 357 PageID #:
Case 8:13-cv-01436-AG-JPR Document 150-1 Filed 06/17/15 Page 3 of 5 Page ID #:
2738

Pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, Plaintiffs Allergan USA, Inc., and Allergan Industrie, SAS ("Allergan") and Defendants Galderma Laboratories, L.P. ("Galderma") and Medicis Aesthetics, Inc., Medicis Pharmaceutical Corp., Valeant Pharmaceuticals North America LLC, Valeant Pharmaceuticals International, and Valeant Pharmaceuticals International, Inc. (collectively "Valeant") hereby stipulate that Consent Judgment (D.I. 149) in the above entitled and numbered action be amended and replaced in its entirety to be consistent with the following stipulation.

Allergan and Galderma, hereby stipulate as follows, pursuant to their Settlement and License Agreement entered as of June 8, 2015 (the "Agreement"):

1. United States Patent Nos. 8,357,795 and 8,450,475 are valid and enforceable as between Allergan and Galderma.

2. United States Patents Nos. 8,357,795 and 8,450,475 are infringed by Galderma's Restylane-L® and Perlane-L® products and will be infringed by Galderma's future Emervel® family of products containing lidocaine.

3. Consistent with the Agreement, Galderma Laboratories, L.P. and its Affiliates will not make, import, use, offer to sell, or sell its Emervel® family products containing lidocaine in the United States and its territories before January 1, 2016, except that this injunction shall not prohibit Galderma or its Affiliates, Agents, Successors, and Assigns at any time from (1) importing into the Territory or having imported into the Territory Emervel Lidocaine Products so long as the Emervel Lidocaine Products are not offered for sale or sold in the Territory prior to January 1, 2016, (2) training its sales force, including any independent contractors, on the marketing of Emervel Lidocaine Products, (3) preparing and having prepared marketing materials for Emervel Lidocaine Products, and (4) conducting or having conducted

clinical trials of Emervel Lidocaine Products in the Territory. Emervel Lidocaine Products imported into the Territory pursuant to subsection (1) may be stored at a warehouse owned or operated by a third party distributor so long as the Emervel Lidocaine Products are not sold, offered for sale or used by any Third Party in the United States prior to January 1, 2016.

4. Each party shall bear its own costs and attorneys' fees.

5. Consistent with the Agreement, the parties agree that this Court should be the exclusive forum for resolving any disputes relating to the Agreement.

A proposed order is filed herewith.

Dated: June 17, 2015

By: /s/ *Michael J. Kane*

Michael J. Kane

Attorney for Plaintiffs

Dated: June 17, 2015

By: /s/*William F. Cavanaugh, Jr.*

William F. Cavanaugh, Jr.

Attorney for Defendants

## SIGNATURE ATTESTATION

Pursuant to Civil Local Rule 5-4.3.4(a)(2), I attest that counsel for Defendants have authorized the filing of this document.


 /s/ *Michael J. Kane*
Michael J. Kane


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on June 17, 2015 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Civil Local Rule 5.4. Any other counsel of record will be served by electronic mail, facsimile and/or overnight delivery.


 /s/ *Michael J. Kane*
Michael J. Kane

STIPULATION FOR AMENDED CONSENT JUDGMENT
Case No. 8:13-cv-01436 AG (JPRx)

# EXHIBIT E

# REDACTED IN ITS ENTIRETY

"

"

"

# GZJ KDKV'H



## Revance Announces Transformative Aesthetics Portfolio Transaction with Exclusive U.S. Distribution Agreement of FDA-Approved Dermal Fillers from TEOXANE SA

January 10, 2020

*- TEOXANE SA RHA® portfolio: first and only range of FDA-approved dermal fillers for correction of dynamic wrinkles -*

*- Revance gains access to the growing $1.1B U.S. filler market with three differentiated products, and plans to launch in second quarter 2020 -*

*- Fast-tracks Revance's commercial organization, and strengthens the anticipated launch of DaxibotulinumtoxinA for Injection (DAXI), the company's next-generation neuromodulator -*

*- Conference call and webcast today at 8:30 a.m. ET -*

NEWARK, Calif.--(BUSINESS WIRE)--Jan. 10, 2020-- Revance Therapeutics, Inc. (Nasdaq: RVNC), a biotechnology company pioneering new innovations in neuromodulators for aesthetic and therapeutic indications, today announced the signing of a U.S. distribution agreement with TEOXANE SA , making Revance the exclusive commercialization partner of the Swiss company's modern and innovative Resilient Hyaluronic Acid® (RHA®) technology. Revance will be holding a conference call and webcast at 8.30 a.m. ET today to discuss the agreement, strategic rationale, and commercialization plans.

### TEOXANE's RHA® and the Distribution Agreement

Under the distribution agreement announced today, Revance will gain immediate and exclusive rights to commercialize TEOXANE's RHA® line of fillers in the U.S., starting with the U.S. Food and Drug Administration (FDA)-approved RHA® 2, RHA® 3, and RHA® 4 products, which include lidocaine. The RHA® line provides physicians with a broad range of uniquely designed gels for individualized treatment in the face. The RHA® line was designed using a patented crosslinking method that preserves the hyaluronic acid network for correction of moderate-to-severe dynamic facial wrinkles and folds. The formulation optimizes strength, stretch and tissue integration. Filler injections with RHA® gels have been shown to be safe and well tolerated.[2]

Revance believes the RHA® dermal filler line, in combination with the company's next-generation neuromodulator, DaxibotulinumtoxinA for Injection (DAXI), will position the company to be the innovation leader in the $2 billion U.S. facial injectable market.

The agreement also includes a fourth product, RHA® 1, currently in clinical trials in the U.S. with FDA approval anticipated in 2021, and includes an ongoing collaboration with TEOXANE SA for a robust pipeline of additional indications and next-generation dermal filler technologies. Additionally, the agreement contains a right of first negotiation to access TEOXANE's novel cosmeceutical line that incorporates its propriety RHA® technology.

In consideration for the U.S. distribution rights for all of the above mentioned, Revance has agreed to issue 2.5 million shares of Revance common stock to TEOXANE SA.

"This is a transformational deal for Revance, giving us access to the fast-growing, billion-dollar U.S. dermal filler market, with a line of highly differentiated fillers that are complementary to our first and only, long-lasting neuromodulator," said Mark Foley, President and Chief Executive Officer of Revance. "Valérie Taupin is a pioneer in the dermal filler market and her company, TEOXANE SA, is dedicated to creating new innovations and providing high-quality HA products to the aesthetic market. Importantly, both these RHA® fillers and DAXI have the potential to deliver unique customer experiences. This deal provides commercial synergies, organizational leverage and fast-tracks the build-out of our sales organization. It also creates a broad foundation from which to launch DAXI upon anticipated approval later this year."

"We are eager to introduce U.S. physicians and consumers to our exciting, highly differentiated RHA® range of dermal fillers," said Valérie Taupin, Founder and Chief Executive Officer of TEOXANE SA. "The combination of our RHA filler range with Revance's cutting-edge neuromodulator, DAXI, will create a premium facial injectable portfolio that we believe will be unrivaled in the industry. TEOXANE SA and Revance have a shared passion for innovation, quality and excellence in aesthetic results."

Revance has begun the build-out of a U.S. commercial organization and is targeting the introduction of the TEOXANE RHA® fillers in the second quarter of 2020, followed by the launch of DAXI, upon regulatory approval, in the second half of 2020. According to Dustin Sjuts, Chief Commercial Officer, Aesthetics and Therapeutics, "We're excited to partner with TEOXANE SA to launch this innovative Swiss technology in the U.S. Their next-generation, novel filler portfolio, sold in combination with DAXI, will position Revance as the premium brand in the U.S. aesthetics facial injectable market."

### Conference Call

Individuals interested in listening to the conference call may do so by dialing (855) 453-3827 for domestic callers, or (484) 756-4301 for international callers and reference conference ID: 7659336; or from the webcast link in the investor relations section of the company's website at: www.revance.com. A replay of the call will be available beginning January 10, 2020 at 8:30 a.m. PT/11:30 a.m. ET to January 11, 2020 at 8:30 a.m. PT/11:30 a.m. ET. To access the replay, dial (855) 859-2056 or (404) 537-3406 and reference conference ID: 7659336. The webcast will be available in the investor relations section on the company's website for 30 days following the completion of the call.

### About Dermal Fillers in the United States

Dermal fillers are injected into the superficial and deep layers of the skin to restore volume, smooth lines, provide facial lift and contour, plump the lips or improve the appearance of facial scars commonly caused by acne. Hyaluronic acid (HA) dermal fillers represent 88% of the total U.S. dermal filler market and are the second most frequently preformed non-surgical aesthetic treatment after neuromodulator injections. The American Society of

Aesthetic Plastic Surgery (ASAPS) reported HA dermal filler procedures have increased by more than 58% since 2014, with an estimated 810,240 HA dermal filler procedures performed in 2018.**

Hyaluronic acid is naturally found in the body, primarily in the skin, joints and connective tissue. With age, human skin loses its ability to produce HA, resulting in loss of volume, firmness and elasticity. HA dermal fillers are manufactured from synthesized hyaluronic acid crosslinked to significantly enhance durability in the skin. These products can restore lost volume for six to 12 months or longer before the body gradually and naturally absorbs the HA. *** Most HA dermal fillers also contain lidocaine to help minimize discomfort during and after treatment.

The US dermal filler market is estimated to be $1.1 billion in 2019 and is expected to double to $2.2 billion by 2026.****

**About TEOXANE SA**

TEOXANE Laboratories, a private company, was established in Geneva in 2003, by Madame Valérie Taupin and specializes in the design and manufacturing of hyaluronic acid-based dermal fillers and cosmeceuticals. As a result of our uncompromising commitment to innovation, quality and patient satisfaction, TEOXANE Laboratories is now among the top hyaluronic acid-based dermal filler manufacturers in the world, with products across more than 90 countries.

Moreover, with its scientific expertise, TEOXANE is one of the first Swiss laboratories offering a range of innovative cosmeceutical care formulated with cross-linked hyaluronic acid from its patented process, RHA resilient hyaluronic acid®. The cosmeceutical range, TEOXANE, is designed for patients who have undergone aesthetic medical procedures and continue their skin care with a targeted cosmetic routine designed specifically for them. For more information go to www.TEOXANE.com.

**About Revance Therapeutics, Inc.**

Revance Therapeutics is a Silicon Valley-based biotechnology company, pioneering new innovations in neuromodulators for aesthetic and therapeutic indications. Revance's lead product candidate, DaxibotulinumtoxinA for Injection (DAXI), combines a proprietary stabilizing peptide excipient with a highly purified botulinum toxin that does not contain human or animal-based components. Revance has successfully completed a Phase 3 program for DAXI in glabellar (frown) lines and is pursuing U.S. regulatory approval in 2020. Revance is also evaluating DAXI in the full upper face, including glabellar lines, forehead lines and crow's feet, as well as in three therapeutic indications - cervical dystonia, adult upper limb spasticity and plantar fasciitis, with plans to study migraine. Beyond DAXI, Revance has begun development of a biosimilar to BOTOX®, which would compete in the existing short-acting neuromodulator marketplace. Revance is dedicated to making a difference by transforming patient experiences. For more information or to join our team visit us at www.revance.com.

"Revance Therapeutics" and the Revance logo are registered trademarks of  Revance Therapeutics, Inc.

[1] RHA® is a trademark of TEOXANE SA. RHA® 2, RHA® 3, RHA® 4 are products of TEOXANE SA. They are class III medical devices and have received FDA approval but are not yet commercialized in the United States. The United States Federal law restricts these devices to sale by or on the order of a physician or license practitioner. RHA® 2, RHA® 3 and RHA® 4 are indicated for the correction of moderate to severe dynamic facial wrinkles and folds, such as nasolabial folds (NLF), in adults aged 22 years or older. RHA® 2, RHA® 3, and RHA® 4 are sterile gels containing crosslinked hyaluronic acid in physiological buffer and 0.3% lidocaine hydrochloride to reduce pain on injection. RHA® 2, RHA® 3 and RHA® 4 are contraindicated in patients with previous hypersensitivity to local anesthetics of the amide type, such as lidocaine. Please refer to the Instructions for Use (https://www.accessdata.fda.gov/cdrh_docs/pdf17/P170002C.pdf). It is the practitioner's full responsibility to read and inform the patient about contraindications, warnings, precautions, risks and benefits.

[2] RHA® 2 and RHA® 3 clinical study G140028: Study 1302: A Controlled, Randomized, Double- Blinded, Within-Subject, Multicenter, Prospective Clinical Study of TEOSYAL® RHA 2 and TEOSYAL® RHA 3 versus Juvéderm® Ultra XC in the Treatment of Moderate to Severe Nasolabial Folds. RHA® 4 clinical study G140106: Study 1402: A Controlled, Randomized, Double- Blinded, Within Subject, Multicenter, Prospective Clinical Study of TEOSYAL® RHA 4 versus Perlane-L® in the Treatment of Moderate to Severe Nasolabial Folds.
*Sources: Medical Insight, Inc. | Global Facial Injectables Market Study | December 2018;
DRG Report Aesthetic Injectables | Market Insights | Europe | 2020 France, Germany, Italy, Spain, UK, Author: Diksha Garg Published: November 2019 – Table 21
**Source: https://www.surgery.org/sites/default/files/ASAPS-Stats2018_0.pdf
ASAPS-Stats2018-Proof5e - surgery.org
***Source: https://www.fda.gov/medical-devices/cosmetic-devices/dermal-fillers-approved-center-devices-and-radiological-health
****Source: DRG – Medtech 360 "Aesthetic Injectables | Market Analysis | US | 2019", Medical Insights – "The Global Aesthetics Market Study – XVII", ASPS – "Plastic Surgery Statistics" (2019 report)
"Revance Therapeutics" and the Revance logo are registered trademarks of  Revance Therapeutics, Inc.
BOTOX® is a registered trademark of Allergan, Inc.
TEOXANE® is a registered trademark of TEOXANE SA.

**Forward-Looking Statements**

This press release contains forward-looking statements, including statements related to the anticipated strategic and financial benefits of our exclusive distribution agreement with TEOXANE SA; commercial acceptance and therapeutic potential of TEOXANE's dermal fillers, including market size and anticipated adoption rates; statements about our business strategy, timeline and other goals and market for our anticipated products, plans and prospects, including our pre-commercialization plans; statements about the timing and our ability to obtain regulatory approval and launch products, including with respect to DaxibotulinumtoxinA for Injection to treat glabellar (frown) lines; and potential benefits of our drug product candidates and our technologies. Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from our expectations. These risks and uncertainties include, but are not limited to: anticipated financial and other benefits of the distribution agreement with TEOXANE SA, including our ability to realize anticipated synergies and successfully commercialize TEOXANE's dermal fillers; the outcome, cost, and timing of our product development activities and clinical trials; our ability to obtain and maintain regulatory approval of our drug product candidates, including with respect to DAXI for Injection to treat glabellar (frown) lines; our ability to obtain funding for our operations and achieve our goals; our plans to research, develop, and commercialize our drug product candidates; our ability to successfully compete with treatments and therapies; our ability to achieve, and the rate and degree of market acceptance and adoption of our drug product candidates; unanticipated costs or delays in research, development, and commercialization efforts; the size and growth potential of the markets for our drug product candidates; our ability to successfully manufacture and commercialize our drug product candidates and the timing of commercialization activities; our ability to develop sales

and marketing capabilities; the accuracy of our estimates regarding expenses, future revenues and capital requirements; our ability to continue obtaining and maintaining intellectual property protection for our drug product candidates; and other risks. Detailed information regarding factors that may cause actual results to differ materially from the results expressed or implied by statements in this press release may be found in Revance's periodic filings with the Securities and Exchange Commission (the "SEC"), including factors described in the section entitled "Risk Factors" of our quarterly report on Form 10-Q filed November 4, 2019. These forward-looking statements speak only as of the date hereof. Revance disclaims any obligation to update these forward-looking statements.

View source version on businesswire.com: https://www.businesswire.com/news/home/20200110005110/en/

Source: Revance Therapeutics, Inc.

**INVESTORS**
Revance Therapeutics, Inc.:
Jeanie Herbert, 714-325-3584
jherbert@revance.com
or
Gilmartin Group, LLC.:
Laurence Watts, 619-916-7620
laurence@gilmartinir.com

**MEDIA**
Revance Therapeutics, Inc.:
Sara Fahy, 949-887-4476
sfahy@revance.com
or
General Media:
Y&R:
Jenifer Slaw, 347-971-0906
jenifer.slaw@YR.com
or
Trade Media:
Nadine Tosk, 504-453-8344
nadinepr@gmail.com

# EXHIBIT G



11 rue Saint Georges
75009 Paris

Phone : 01 43 12 84 60
Fax: 33 (0)1 43 12 84 70
E-mail : nony@nony.fr

OFFICE EUROPEEN DES BREVETS
Direction Générale 2
D-80298 MUNICH
ALLEMAGNE

<u>ONLINE FILING</u>

Paris, 11 July 2019

Our reference:    X21355/KLP/SLC/sb
Re:    Opposition by TEOXANE S.A. against European patent EP2 323 617 B1 granted on January 18, 2017 to
ALLERGAN INDUSTRIE SAS on the basis of PCT/IB2009/005048

Dear Sirs,

I write in connection with European patent EP2 323 617 B1 granted on January 18, 2017 to
ALLERGAN INDUSTRIE SAS, to inform you that my Client TEOXANE SA (the Opponent
04) expressly withdraws his opposition.

Kindly therefore, please take the necessary steps in due time and confirm to me that his
opposition has been recorded as withdrawn.

Very truly yours,

Pascale LE COUPANEC



Europäisches
Patentamt

European
Patent Office

Office européen
des brevets

# Submission in opposition proceedings

Representative:

**Cabinet NONY**
**452**
**11 rue Saint-Georges**
**75009 PARIS**
**France**

**Phone: 33 1 43 12 84 60**
**Fax: 33 1 43 12 84 70**
**E-mail: nony@nony.fr**

80298 Munich
Germany
Tel. +49(0)89 2399-0 | Fax -4465

P.O. Box 5818
NL-2280 HV Rijswijk
Netherlands
Tel. +31(0)70 340-2040 | Fax -3016

10958 Berlin
Germany
Tel. +49(0)30 25901-0 | Fax -840

- representing the opponent(s):

| TEOXANE S.A. |
|---|

Opponent/representative's reference

| X21355KLPSLCsb |
|---|

The information given below is pertaining to the following patent in opposition proceedings:

Patent No.

| EP2323617 |
|---|

Application No.

| EP09785852.6 |
|---|

Date of mention of the grant in the European Patent Bulletin (Art. 97(3), Art. 99(1) EPC)

| 18 January 2017 |
|---|

Title of the invention

| Hyaluronic acid-based gels including anesthetic agents |
|---|

Proprietor of the patent

| Allergan Industrie SAS |
|---|

**Requests:**

| • Opposition is herewith withdrawn. |
|---|

Documents attached:

| | Description of document | Original file name | Assigned file name |
|---|---|---|---|
| 1 | Any annexes (other than citation) to an opposition letter - Withdrawal of an opposition | 20190711_X21355_EP_TEOXANE_E_demande de retrait.pdf | OTHER-1.pdf |

**Signatures**

| Place: | **PARIS** |
|---|---|
| Date: | **11 July 2019** |
| Signed by: | **Pascale Le Coupanec 14682** |

X21355KLPSLCsb

| | |
|---|---|
| Association: | **Cabinet NONY** |
| Representative name: | **Pascale LE COUPANEC** |
| Capacity: | **(Representative)** |

X21355KLPSLCsb



**Europäisches Patentamt**
**European Patent Office**
**Office européen des brevets**

# Acknowledgement of receipt

We hereby acknowledge receipt of the following submission by the opponent:

| | |
|---|---|
| Submission number | 7659037 |
| Application number | EP09785852.6 |
| Patent number | EP2323617 |
| Date of receipt | 11 July 2019 |
| Your reference | X21355KLPSLCsb |
| Opponent | TEOXANE S.A. |
| Title | Hyaluronic acid-based gels including anesthetic agents |
| Documents submitted | package-data.xml<br><br>ep-oppo.pdf (2 p.) | ep-opposition-data.xml<br><br>OTHER-1.pdf\20190711_X21355_EP_TEOXANE_E_demande de retrait.pdf (1 p.) |
| Submitted by | CN=Pascale Le Coupanec 14682 |
| Method of submission | Online |
| Date and time receipt generated | 11 July 2019, 15:23 (CEST) |
| Message Digest | D6:7F:91:80:1D:2C:E6:2E:3F:9E:3B:6F:F8:E5:AD:07:C2:7A:1F:B6 |

**Correction by the EPO of errors in debit instructions filed by eOLF**
Errors in debit instructions filed by eOLF that are caused by the editing of Form 1038E entries or the continued use of outdated software (all forms) may be corrected automatically by the EPO, leaving the payment date unchanged (see decision T 152/82, OJ EPO 1984, 301 and point 6.3 ff ADA, Supplement to OJ EPO 10/2007).

/European Patent Office/