IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ALLERGAN USA, INC. and ALLERGAN INDUSTRIE SAS, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) C.A. No. 19-126-CFC ) |
| | ) **JURY TRIAL DEMANDED** |
| PROLLENIUM US INC. and PROLLENIUM MEDICAL TECHNOLOGIES INC., | ) ) ) |
| Defendants. | ) ) |

## DEFENDANTS' SECOND AMENDED ANSWER AND COUNTERCLAIM TO PLAINTIFFS' COMPLAINT

Defendants Prollenium US Inc. and Prollenium Medical Technologies Inc. ("Defendants" or, collectively, "Prollenium"), by and through its undersigned counsel, hereby respond to the Amended Complaint (D.I. 5) of Plaintiffs Allergan USA, Inc. and Allergan Industrie SAS ("Allergan" or "Plaintiffs") in the following Second Amended Answer and Counterclaim:

## NATURE OF ACTION

1. Prollenium admits that the Amended Complaint is styled as an action for infringement of U.S. Patent No. 8,450,475 ("the '475 patent"), U.S. Patent No. 8,357,795 ("the '795 patent"), U.S. Patent No. 8,822,676 ("the '676 patent"), U.S. Patent No. 9,089,519 ("the '519 patent"), U.S. Patent No. 9,238,013 ("the '013 patent"), and U.S. Patent No. 9,358,322 ("the '322 patent") (collectively, the "Asserted Patents") pursuant to the Patent Act. Prollenium denies that any purported infringement has occurred.

## PARTIES

2. Prollenium is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies these allegations.

{01530157;v1 }

3.      Prollenium is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies these allegations.

4.      Admitted.

5.      Admitted.

6.      Admitted.

## JURISDICTION AND VENUE

7.      Admitted.

8.      Admitted.

9.      Prollenium admits that it has placed products into the stream of commerce by shipping, importing, offering for sale and/or selling products in this district.  Prollenium denies that it infringes, or has infringed, any valid claim of any Asserted Patent.

10.     Denied.

11.     Admitted.

## BACKGROUND

### The Patents-In-Suit

12.     Prollenium admits that the '475 patent is titled "Hyaluronic Acid-Based Gels Including Lidocaine" and, on its face, indicates that it issued to Pierre F. Lebreton on May 28, 2013.  Prollenium admits that a true and accurate copy of the '475 patent is attached to the Amended Complaint as Exhibit A.  Prollenium otherwise denies the allegations in this paragraph.

13.     Prollenium is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies these allegations.

14.     Prollenium is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies these allegations.

15.     Prollenium is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies these allegations.

16.     Prollenium admits that the '795 patent is titled "Hyaluronic Acid-Based Gels Including Lidocaine" and, on its face, indicates that it issued to Pierre F. Lebreton on January 22, 2013.  Prollenium admits that a copy of the '795 patent is attached to the Amended Complaint as Exhibit B.  Prollenium otherwise denies the allegations in this paragraph.

17.     Prollenium is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies these allegations.

18.     Prollenium is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies these allegations.

19.     Prollenium is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies these allegations.

20.     Prollenium admits that the '676 patent is titled "Hyaluronic Acid-Based Gels Including Lidocaine" and, on its face, indicates that it issued to Pierre F. Lebreton on September 2, 2014.  Prollenium admits that a copy of the '676 patent is attached to the Amended Complaint as Exhibit C.  Prollenium denies the remaining allegations in this paragraph.

21.     Prollenium is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies these allegations.

22.     Prollenium is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies these allegations.

23.     Prollenium is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies these allegations.

24.     Prollenium admits that the '519 patent is titled "Hyaluronic Acid-Based Gels Including Lidocaine" and, on its face, indicates that it issued to Pierre F. Lebreton on July 28, 2015.  Prollenium admits that a copy of the '519 patent is attached to the Amended Complaint as Exhibit D.  Prollenium denies the remaining allegations in this paragraph.

25.     Prollenium is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies these allegations.

26.     Prollenium is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies these allegations.

27.     Prollenium is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies these allegations.

28.     Prollenium admits that the '013 patent is titled "Hyaluronic Acid-Based Gels Including Lidocaine" and, on its face, indicates that it issued to Pierre F. Lebreton on January 19, 2016.  Prollenium admits that a copy of the '013 patent is attached to the Amended Complaint as Exhibit E.  Prollenium otherwise denies the allegations in this paragraph.

29.     Prollenium is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies these allegations.

30.     Prollenium is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies these allegations.

31.     Prollenium is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies these allegations.

32.     Prollenium admits that the '322 patent is titled "Hyaluronic Acid-Based Gels Including Lidocaine" and, on its face, indicates that it issued to Pierre F. Lebreton on June 7, 2016.  Prollenium admits that a copy of the '322 patent is attached to the Amended Complaint as Exhibit F.  Prollenium otherwise denies the allegations in this paragraph.

33.     Prollenium is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies these allegations.

34.     Prollenium is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies these allegations.

35.     Prollenium is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies these allegations.

36.     Prollenium admits that the abstract of each of the aforementioned patents indicates that they are directed to dermal and subdermal fillers, based on hyaluronic acids and pharmaceutically acceptable salts thereof.  Prollenium admits that dermal fillers are compositions that can be injected into the skin to smooth wrinkles and creases.

37.     Prollenium admits that hyaluronic acid-based dermal and subdermal fillers can be injected into patients and can cause discomfort.  Prollenium further admits that anesthetic agents can alleviate the discomfort from injection.  Prollenium denies that any of the Asserted Patents were actual inventions of formulations for and/or methods of manufacturing hyaluronic acid-based compositions or fillers that include lidocaine.

38.     Prollenium admits that Teoxane S.A. filed petitions for *inter partes* review with the Patent Trial and Appeal Board seeking review of certain claims of the '475 patent and the '795 patent.  Prollenium further admits that the Patent Trial and Appeal Board denied institution of *inter partes* review due to Teoxane S.A.'s failure to demonstrate that certain primary prior art

references were "printed publications" within the meaning of 35 U.S.C. § 311(b).  Prollenium

denies the remaining allegations of this paragraph.

### Allergan's Hyaluronic Acid + Lidocaine Products

39.     Prollenium admits that Allergan is a developer, manufacturer, and distributor of

dermal filler products in the United States, including the products listed in this paragraph.

Prollenium is without information or knowledge sufficient to form a belief as to the truth or

falsity of the remaining allegations in this paragraph and therefore denies these allegations.

40.     Prollenium admits that Allergan's JUVEDÉRM® products are injectable

hyaluronic acid fillers that contain local anesthetic.  Prollenium further admits that the goal of

such fillers is to replace lost volume and temporarily correct the appearance of wrinkles and

creases.  Prollenium is without information or knowledge sufficient to form a belief as to the

truth or falsity of the remaining allegations in this paragraph and therefore denies these

allegations.

41.     Prollenium admits that Allergan has a webpage that list various Allergan products

along with a list of U.S. Patent numbers that Allergan alleges are covered by the respective

Allergan products.

### PROLLENIUM'S ACCUSED PRODUCTS

42.     Prollenium admits that Prollenium Medical Technologies Inc. exports to the

United States a dermal filler product named Revanesse® Versa+™.  Prollenium further admits

that Prollenium US Inc. offers to sell and sells in the United States a dermal filler product named

Revanesse® Versa+™.  Prollenium further admits that Revanesse® Versa+™ is an injectable

hyaluronic acid dermal filler that includes lidocaine and can be used in order to correct the

appearance of facial wrinkles and creases.  Prollenium denies the remaining allegations in this paragraph.

43.     The statement in Paragraph 43 is not an allegation to which a response is necessary.

44.     Denied.

45.     Denied.

46.     Denied.

47.     Denied.

48.     Denied.

49.     Denied.

50.     Denied.

51.     Denied.

52.     Denied.

53.     Denied.

54.     Denied.

55.     Denied.

56.     Denied.

57.     Prollenium admits that Prollenium US Inc. offers for sale and sells in the United States a dermal filler product named Revanesse® Versa+$^{TM}$.  Prollenium denies the remaining allegations in this paragraph.

58.     Prollenium admits that Prollenium Medical Technologies, Inc. manufactures its Revanesse® Versa+$^{TM}$ product in Canada.  Prollenium further admits that Prollenium US Inc.

offers for sale and sells the Revanesse® Versa+™ product in the United States.  Prollenium denies the remaining allegations of this paragraph.

59.     Denied.

## COUNT I
### (Alleged Infringement of the '475 Patent Under 35 U.S.C. § 271)

60.     Prollenium incorporates by reference its responses to the preceding paragraphs 1 to 59 as though fully set forth herein.

61.     Denied.

62.     Denied.

63.     Prollenium admits that it does not have a license to or authority from Plaintiff to practice the '475 patent.  Prollenium denies the remaining allegations of this paragraph.

64.     Prollenium admits that it has been aware of the '475 Patent since December 17, 2018.  Prollenium is without information or knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations in this paragraph, at least because it does not specify what is meant by the phrase "at all relevant times," and therefore denies these allegations.

65.     Denied.

66.     Denied.

67.     Denied.

## COUNT II
### (Alleged Infringement of the '795 Patent Under 35 U.S.C. § 271)

68.     Prollenium incorporates by reference its responses to the preceding paragraphs 1 to 67 as though fully set forth herein.

69.     Denied.

70.     Denied.

71.     Prollenium admits that it does not have a license to or authorization from Plaintiff to practice the '795 patent.  Prollenium denies the remaining allegations of this paragraph.

72.     Prollenium admits that it has been aware of the '795 Patent since December 17, 2018.  Prollenium is without information or knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations in this paragraph, and therefore denies these allegations.

73.     Denied.

74.     Denied.

75.     Denied.

## COUNT III
### (Alleged Infringement of the '676 Patent Under 35 U.S.C. § 271)

76.     Prollenium incorporates by reference its responses to the preceding paragraphs 1 to 75 as though fully set forth herein.

77.     Denied.

78.     Denied.

79.     Prollenium admits that it does not have a license to or authorization from Plaintiff to practice the '676 patent.  Prollenium denies the remaining allegations of this paragraph.

80.     Prollenium admits that it has been aware of the '676 Patent since December 17, 2018.  Prollenium is without information or knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations in this paragraph, and therefore denies these allegations.

81.     Denied.

82.     Denied.

83.     Denied.

## COUNT IV
### (Alleged Infringement of the '519 Patent Under 35 U.S.C. § 271)

84.     Prollenium incorporates by reference its responses to the preceding paragraphs 1 to 83 as though fully set forth herein.

85.     Denied.

86.     Denied.

87.     Prollenium admits that it does not have a license to or authorization from Plaintiff to practice the '519 patent.  Prollenium denies the remaining allegations of this paragraph.

88.     Prollenium admits that it has been aware of the '519 Patent since December 17, 2018.  Prollenium is without information or knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations in this paragraph, and therefore denies these allegations.

89.     Denied.

90.     Denied.

91.     Denied.

## COUNT V
### (Alleged Infringement of the '013 Patent Under 35 U.S.C. § 271)

92.      Prollenium incorporates by reference its responses to the preceding paragraphs 1 to 91 as though fully set forth herein.

93.     Denied.

94.     Denied.

95.     Prollenium admits that it does not have a license to or authorization from Plaintiff to practice the '013 patent.  Prollenium denies the remaining allegations of this paragraph.

96.     Prollenium admits that it has been aware of the '013 Patent since December 17, 2018.  Prollenium is without information or knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations in this paragraph, and therefore denies these allegations.

97.     Denied.

98.     Denied.

99.     Denied.

## COUNT VI
### (Alleged Infringement of the '322 Patent Under 35 U.S.C. § 271)

100.    Prollenium incorporates by reference its responses to the preceding paragraphs 1 to 99 as though fully set forth herein.

101.    Denied.

102.    Denied.

103.    Prollenium admits that it does not have a license to or authorization from Plaintiff to practice the '322 patent.  Prollenium denies the remaining allegations of this paragraph.

104.    Prollenium admits that it has been aware of the '322 Patent since December 17, 2018.  Prollenium is without information or knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations in this paragraph, and therefore denies these allegations.

105.    Denied.

106.    Denied.

107.    Denied.

## GENERAL DENIAL

Unless expressly admitted herein, Prollenium denies each and every allegation contained in Paragraphs 1-107 of Allergan's Amended Complaint and denies that Allergan is entitled to any of the relief requested in its Prayer for Relief.

## AFFIRMATIVE DEFENSES

Pursuant to Rule 8(c) of the Federal Rules of Civil Procedure, Prollenium asserts the following affirmative defenses to Allergan's allegations in the Amended Complaint.  By alleging the affirmative defenses below, Prollenium does not admit that it has the burden of proof on such matters or that any of the following defenses are not already at issue by virtue of the forgoing responses.

### First Defense (Invalidity)

All claims of the Asserted Patents are invalid and/or unenforceable for failing to satisfy one or more of the requirements for patentability under Title 35 of the United States Code, including, without limitation, 35 U.S.C. §§ 101, 102, 103, and/or 112.

### Second Defense (Non-Infringement)

Prollenium has not infringed, and does not infringe, literally, or by the doctrine of equivalents, any valid and enforceable claim of the Asserted Patents, either directly or indirectly.

### Third Defense (Failure to state a claim)

The Amended Complaint fails to state a claim upon which relief can be granted.  By way of example only, Allergan has at least failed to state any plausible claim for direct infringement or inducement of patent infringement.

### Fourth Defense (Inequitable conduct)

For at least the reasons set forth in more detail in Paragraph's 1–142 and 179–196 of Prollenium's Counterclaim below, the Asserted Patents are unenforceable as a result of Allergan's inequitable conduct before the United States Patent and Trademark Office.

### Fifth Defense (Unclean Hands)

Allergan's claims, or some of them, are barred by the doctrine of unclean hands.

## Sixth Defense (No injunctive relief)

Allergan is not entitled to injunctive relief because any purported injury is not immediate or irreparable, it has an adequate remedy available at law for any claims that can be proven, and the balance of hardship and the public interest do not favor injunctive relief.

## Seventh Defense (Limitation on Damages and Costs)

Allergan's claims for relief are limited by Title 35 of the United States Code, including without limitation 35 U.S.C. §§ 286, 287, and/or 288.

## Eighth Defense (No Willful Infringement)

Allergan is not entitled to enhanced damages for willful infringement because Prollenium has not engaged in any conduct that meets the applicable standard for willful infringement.

## Ninth Defense (No Exceptional Case)

Allergan cannot prove that this is an exceptional case justifying an award of attorneys' fees and/or costs pursuant to 35 U.S.C. § 285.

## RESERVATION OF RIGHTS

Prollenium reserves the right to add any additional defense or counterclaim that may be revealed during the course of discovery.

## DEFENDANTS' FIRST AMENDED COUNTERCLAIM

Defendants and Counterclaim-Plaintiffs Prollenium US Inc. and Prollenium Medical Technologies Inc. ("Prollenium" or "Defendants") bring the following First Amended Counterclaim for declaratory judgment against Plaintiffs and Counterclaim-Defendants Allergan USA, Inc. and Allergan Industrie SAS ("Allergan" or "Plaintiffs") and allege as follows:

## NATURE OF THE ACTION

1.      This counterclaim for declaratory judgment arises under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq*., and under the federal Declaratory Judgment Act, 28 U.S.C.

§§ 2201–02.  Prollenium requests a declaration that the claims of each of U.S. Patent No. 8,450,475 ("the '475 patent"); U.S. Patent No. 8,357,795 ("the '795 patent"); U.S. Patent No. 8,822,676 ("the '676 patent"); U.S. Patent No. 9,089,519 ("the '519 patent"); U.S. Patent No. 9,238,013 ("the '013 patent"); and U.S. Patent No. 9,358,322 ("the '322 patent") (collectively, the "Asserted Patents") are invalid and that the Asserted Patents are unenforceable.

## PARTIES

2.      Prollenium US Inc. is a corporation organized and existing under the laws of the State of Delaware and has a principal place of business at 9121 Anson Way, Suite 200, Raleigh, NC 27615.

3.      Prollenium Medical Technologies is foreign corporation have a principal place of business at 138 Industrial Parkway North, Aurora Ontario, L4G 4C3.

4.      Based on its assertions, Defendant Allergan USA, Inc. is a corporation organized and existing under the laws of the State of Delaware, with a place of business at 5 Giralda Farms, Madison, New Jersey 07940.

5.      Based on its assertions, Defendant Allergan Industrie SAS is a company incorporated in France, with a principal place of business at Route De Promery, 254 ZA Pre Mairy, 74370 Pringy, France.

## JURISDICTION AND VENUE

6.      This counterclaim arises under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq.*, and under the federal Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a), and 2201.

7.      Allergan has consented to the personal jurisdiction of this Court as well as venue in this judicial district by commencing its action for patent infringement in this judicial district.

## BACKGROUND

8.      Allergan generates hundreds of millions of dollars of revenue from sales of its

Juvéderm Collection of filler products utilizing hyaluronic acid ("HA") compositions crosslinked

with BDDE and containing lidocaine.  Allergan sold more than $1.5 billion of products in the

Juvéderm Collection from 2016 to 2018.  Allergan aggressively uses the courts to enforce its

purported rights in the Asserted Patents and thus maintain this revenue stream even though the

Asserted Patents are invalid and unenforceable.

9.      The claims of the Asserted Patents should not have issued because they are either

invalid as anticipated by prior art and/or obvious modifications of prior art.

10.      In the United States dermal fillers are considered medical devices and are

therefore regulated by the Food and Drug Administration ("FDA").  A company wanting to sell a

medical device must first obtain FDA approval by demonstrating the safety and effectiveness of

the device.

11.      For products such as dermal fillers, companies obtain FDA approval by

submitting a Pre-Market Approval ("PMA") application.  According to FDA, "PMA is the most

stringent type of device marketing application required by FDA. The applicant must receive

FDA approval of its PMA application prior to marketing the device. PMA approval is based on a

determination by FDA that the PMA contains sufficient valid scientific evidence to assure that

the device is safe and effective for its intended use(s)."[1]  Consequently, this PMA application

must submit safety and effectiveness data for a specific use of the medical device, as well as

demonstrate a favorable risk/benefit rational.

---

[1] *See* Premarket Approval (PMA) – Overview, https://www.fda.gov/medical-devices/premarket-submissions/premarket-approval-pma.

12.     Prior to submitting a PMA application, the relevant medical device must necessarily already have been invented, reduced practice, and thoroughly tested, as a PMA application requires the disclosure to FDA of, *inter alia*:

a.     A device description, including "how the device functions, the basic scientific concepts that form the basis for the device, and the significant physical and performance characteristics of the device." (21 C.F.R. § 814.20(b)(3)(ii));

b.     "A brief description of the manufacturing process should be included if it will significantly enhance the reader's understanding of the device." (21 C.F.R. § 814.20(b)(3)(ii));

c.     "A summary of the nonclinical laboratory studies submitted in the application" (21 C.F.R. § 814.20(b)(3)(v)(A); *see also* 21 C.F.R. § 814.20(b)(6)(i) (requiring disclosure of all results from nonclinical laboratory studies));

d.     "A summary of the clinical investigations involving human subjects submitted in the application including a discussion of subject selection and exclusion criteria, study population, study period, safety and effectiveness data, … results of statistical analyses of the clinical investigations, [and other information]" (21 C.F.R. § 814.20(b)(3)(v)(B); *see also* 21 C.F.R. § 814.20(b)(6)(ii) (requiring disclosure of all results from clinical investigations));

e.     "A discussion demonstrating that the data and information in the application constitute valid scientific evidence … and provide reasonable

assurance that the device is safe and effective for its intended use." (21
C.F.R. § 814.20(b)(3)(vi));

    f.    A discussion presenting the "benefit and risk considerations related to the
device including a discussion of any adverse effects of the device on health
and any proposed additional studies or surveillance the applicant intends to
conduct following approval of the PMA." (21 C.F.R. § 814.20(b)(3)(vi));

    g.    "The methods used in, and the facilities and controls used for, the
manufacture, processing, packing, storage, and, where appropriate,
installation of the device, in sufficient detail so that a person generally
familiar with current good manufacturing practice can make a
knowledgeable judgment about the quality control used in the manufacture
of the device." (21 C.F.R. § 814.20(b)(4)(v));

13.    After FDA approves a PMA application, the decision and a summary of the safety
and effectiveness data are made publicly available on FDA's website.[2]

14.    A person of ordinary skill in the art would have monitored and/or periodically
reviewed FDA's website in order to stay aware of the medical devices that competitors were
bringing to market and also to remain abreast of new developments in the field of dermal fillers.

15.    A person of ordinary skill in the art would have understood that medical devices
for which a PMA application had been approved by FDA, would have existed for some amount
of time prior to the submission of the PMA application, would have already been thoroughly

---

[2] *See, e.g.*, PMA Approvals, https://www.fda.gov/medical-devices/device-approvals-denials-and-
clearances/pma-approvals (instructing users how to search the PMA database by various fields).

tested, and that FDA's approval of the PMA application was an affirmation that the medical device sufficiently met all criteria for safety and effectiveness.

<p align="center">**The Purported Inventions Were Well-known in the Prior Art**</p>

**A.      Hyaluronic Acid Dermal Fillers**

16.      A variety of materials have been used in facial dermal fillers.  By 2008, however, HA dermal fillers were among the most popular in the United States and abroad at least in part because of its biocompatibility.

17.      Despite HA's excellent biocompatibility, it is not well suited for use as an implantable dermal filler as HA is rapidly degraded by enzymes in the body after injection.  But HA can be chemically crosslinked into a water insoluble gel network that reduces accessibility of the HA polymer by enzymes, thus substantially reducing the degradation of HA.

18.      Crosslinked-HA dermal fillers were well known in the art long before August 4, 2008.  For instance, a 1,4-butanediol diglycidyl ether ("BDDE") crosslinked-HA dermal filler product originally developed by Q-Med, Inc., called Restylane, was launched in Europe in 1996 and was approved by FDA in December 2003.  By 2005, clinical use of Restylane in the United States was common.

19.      Another BDDE-crosslinked-HA dermal filler product line was developed by Inamed Corp. (later acquired by Allergan) called Juvéderm.  Juvéderm is a BDDE-crosslinked-HA dermal filler and was approved by FDA in June 2006.

20.      Another crosslinked-HA dermal filler product line called Puragen was developed by Mentor Corporation, which received approval to be marketed and distributed in Europe and Canada in 2005.

21.     By 2008, there were four primary crosslinkers used in crosslinked-HA dermal fillers.  These crosslinkers included (1) 1,4-divinylsulfone ("DVS"); (2) p-phenylene-bis(ethylcarbodiimide ("BDCI"); (3) diepoxyoctone ("DEO"); and (4) BDDE.



22.     Each of these crosslinkers includes two electrophilic functional groups that can react with the primary alcohol and/or carboxylic acid groups in HA (and thus create a "crosslink").  In other words, even though each of these crosslinkers has different chemical structures, they serve the same purpose of increasing the stability and durability of the HA dermal filler.

23.     Likewise, although the individual crosslinkers have different chemical structures, they are largely considered to function in the same way.  All four crosslinkers covalently join HA polymers together through a linker that is roughly the same length and none of the crosslinking segments contain any functional groups that further react with HA or living tissue. In fact, the prior art, including Lebreton's own prior applications in this space, recognize the interchangeability of crosslinkers by listing them as alternatives for one another.  (*See, e.g.*, US Patent Application Publication No. 2005/0250939 to Zhao, ¶ [0019] (identifying DVS, BDDE, and DEO as crosslinking agents suitable for the preparation of HA dermal fillers); US Patent

Application Publication No. 2006/0194758 to Lebreton, ¶ [0045] (identifying both BDDE and DVS as suitable crosslinkers for the preparation of HA dermal fillers)).

24.     By August 2008, several crosslinked-HA dermal fillers had been approved for sale in the United States and/or abroad, including, but not limited to, Hylaform and Captique (HA crosslinked with DVS), Puragen (HA crosslinked with DEO), Restylane and Perlane (HA crosslinked with BDDE), Eleveess (HA crosslinked with BDCI) and Juvéderm (another HA crosslinked with BDDE, commercially available from Allergan).

**B.     Crosslinked Hyaluronic Acid Dermal Fillers With Lidocaine**

25.     Because these HA dermal fillers were administered via subcutaneous injection, pain associated with such injections was a well-known side effect associated with these products.

26.     In response to this well-known side effect associated with HA dermal fillers, persons of ordinary skill in the art were motivated to include a local anesthetic, such as lidocaine, with these dermal fillers to solve the problem of pain and discomfort during subcutaneous injection.

27.     Early on, dermal fillers were either co-formulated with an anesthetic like lidocaine, or lidocaine was injected concurrently to mitigate pain.  In some cases, physicians would premix a crosslinked-HA dermal filler with lidocaine immediately prior to injection.

28.     Prior to August of 2008, however, several lidocaine-containing HA dermal fillers had been successfully developed, thoroughly tested, and were commercially available in the United States, abroad, or both.

            a.      As early as 1993, lidocaine was incorporated into a commercially available DVS-crosslinked-HA product called Hylagel.

            b.      Mentor Corporation developed a product called Puragen Plus that is DEO-crosslinked-HA dermal filler containing 0.3% lidocaine.  Puragen Plus was approved to

be marketed and distributed in Canada in December 2005, approval in Europe was

pending around that same time, and clinical trials began in the United States around

January 2005.

      c.     Anika Therapeutics Inc. developed a product called Cosmetic Tissue

Augmentation Product, later renamed Elevess (and in some markets referred to as

Hydrelle or REDEFYNE), that is a BDCI-crosslinked-HA dermal filler containing 0.3%

lidocaine.  This product was approved by FDA for sale in the United States in December

2006.  Anika received approval to market a version of Elevess in Canada in early 2007

and in Europe in April 2007.

      d.     Allergan began selling its Juvéderm (BDDE-crosslinked-HA dermal filer)

with lidocaine product line (e.g., Juvéderm Ultra 2, 3 and 4, containing lidocaine) in

Europe in January 2008, and in Canada in October 2008 (Juvéderm Ultra and Ultra Plus

with lidocaine).

      e.     In February 2008, FDA approved a DVS-crosslinked-HA dermal filler

containing 0.3% lidocaine called Prevelle Silk.  Prevelle Silk was approved based on a

supplemental PMA application submitted by Genzyme BioSurgery on July 25, 2007.

29.     A person of ordinary skill in the art would understand that in order to obtain FDA

approval for the products described above, it would have been necessary for these lidocaine-

containing crosslinked-HA dermal fillers to be sterile and stable.

30.     If a particular dermal filler product had issues regarding stability, degradation, or

viscosity reductions following high temperature sterilization, making the composition unsuitable

for soft tissue filing applications, this would have prevented approval of the product by FDA.

31.     A person of ordinary skill in the art would have known that FDA would not have approved Prevelle Silk and Elevess if they were not sterile, stable, and did not have a suitable shelf life, nor would clinical trials have been initiated with Puragen Plus if it was not sufficiently sterile and/or stable.  Similarly, regulatory authorities in other countries would not have approved the foreign counterparts of these products for these same reasons.

32.     More than one year before the earliest claimed priority date of the Asserted Patents (i.e., August 4, 2008), lidocaine had been successfully incorporated into compositions containing HA crosslinked with three of the four conventional crosslinking agents.  DVS-crosslinked-HA with lidocaine was developed in 1993, and both BDCI and DEO crosslinked-HA with lidocaine was developed by 2006.

33.     For years prior to August 4, 2008, persons of skill in the art were aware that lidocaine had been successfully incorporated into compositions containing crosslinked-HA.

34.     The existence of at least three crosslinked-HA dermal fillers with lidocaine in the market, including at least two that had been approved by FDA would have demonstrated a reasonable expectation of success in the addition of lidocaine to a crosslinked-HA dermal filler to a person of ordinary skill in the art.

35.     Given the biocompatibility of all four of the different HA crosslinkers, the successful incorporation of lidocaine into HA dermal fillers crosslinked with DVS, BDCI, and DEO, a person of ordinary skill in the art would have expected that incorporating lidocaine into a BDDE-crosslinked-HA dermal filler would produce the same result.

C.     **Dr. Pierre Lebreton Is a Person of Ordinary Skill in the Art**

36.     Allergan employee and inventor Dr. Pierre Lebreton ("Lebreton") has worked for Allergan since at least as early as 1998.  Lebreton served as the R&D Director and Project

Manager in charge of dermal fillers at Allergan (formerly Group Corneal Laboratories, referred to herein as Allergan) and is the sole inventor listed on each of the Asserted Patents.

37.     In Lebreton's declaration submitted to the United States Patent and Trademark Office ("USPTO"), on or around June 14, 2012, as part of the prosecution of U.S. Application No. 12/393,884, Lebreton stated he is "an expert in the area of polymer chemistry for medical aesthetics."  (Ex. A at ¶ 2).  Lebreton further stated that he holds a Ph.D. in Chemistry and Physico-Chemistry of Polymers as well as a Master of Science degree in Polymer Material. (*Id*.).

38.     Lebreton also stated in his declaration that he was "familiar with the state of the art related to soft tissue fillers comprising crosslinked hyaluronic acid ('HA') shortly prior to August 4, 2008."  (Ex. A at ¶ 4). Lebreton further states that the information contained in his declaration "are directed to the knowledge and belief of those having ordinary skill in the art *at this time*," i.e., shortly prior to August 4, 2008."  (Ex. A at ¶ 4) (emphasis added).

39.     Based on Lebreton's own statements made in his signed declaration, he is a person of at least ordinary skill in the art with knowledge of the state of the art related to soft tissue fillers comprising crosslinked-HA before August 4, 2008.

40.     As a person of ordinary skill in the art, Lebreton would have monitored and/or reviewed relevant scientific literature to stay aware of the medical devices that competitors were bringing to market and also to remain abreast of new developments in the field of dermal fillers

41.     Lebreton would have monitored and/or periodically reviewed FDA's website in order to stay aware of the medical devices that competitors were bringing to market and also to remain abreast of new developments in the field of dermal fillers.

42.     As a person of ordinary skill in the art, Lebreton would have been aware that prior to August 4, 2008, lidocaine had been successfully incorporated into compositions containing crosslinked-HA.

43.     As a person or ordinary skill in the art, Lebreton would have been aware of the existence of at least three crosslinked-HA dermal fillers with lidocaine in the market demonstrating a reasonable expectation of success in the addition of lidocaine to a crosslinked-HA dermal filler.

**D.     Lebreton Had Knowledge That Crosslinked-HA Fillers With Lidocaine Had Been Successfully Developed and Commercialized Well Before August 2008**

44.     In fact, Lebreton knew that crosslinked-HA fillers with lidocaine had been successfully developed and commercialized well before August 2008.  In or around the early 2000s, Allergan manufactured HA products that included Rhexeal, an ophthalmic product composed of uncrosslinked HA, as well the Juvéderm and Surgiderm lines of dermal filler products composed of BDDE-crosslinked HA.  (Ex. B at 7 (Allergan Interrogatory response from *Allergan, et al. v. Medicis Aesthetics, Inc., et al.*, No. 8:13-cv-01436 (C.D. Cal.))).

45.     In or around 2005, Lebreton (assisted primarily by Samuel Gavard) performed, supervised, and/or managed a series of studies and/or experiments about adding lidocaine to its existing BDDE-crosslinked HA fillers (i.e., Juvéderm and Surgiderm) would have any effect on the stability of the composition, including what effects sterilization would have on the compositions' properties. (Ex. B at 8).

46.     In a ▮▮▮▮▮▮ 2005 report, Allergan described the results of a study into the stability of its Surgiderm products containing lidocaine.  (Ex. D at 1 (AGN-RVP-0417652)).  Surgiderm with lidocaine used the same raw materials as in Juvéderm, including the same

concentration of lidocaine, except that Surgiderm used a mix of high and low molecular weight HA to form the gel.[3]



    a.   This study identified its purpose as ███████████ ███████████████████ of Surgiderm with lidocaine.  (*Id.*).

    b.   The results of this study ████████████████ ███████████████████ ████████████████████ ████████████ (Ex. E. at 4 (AGN-RVP-0324122 at AGN-RVP-0324125)).

    c.   The study also concluded ████████████████ █████████████████ ████████.  (*Id.*).

47.    In another Project Report (███████) dated ████████ 2005, Allergan discussed a study "to demonstrate the feasibility" of incorporating lidocaine into products containing crosslinked-HA, including that such a product could be sterilized in an autoclave without deterioration or degradation.  (Ex. F at 2 (AGN-RVP-0417712 at AGN-RVP-0417713)). Lebreton managed the study and both received a copy and signed the resulting report. (*See* Ex. G at 7 (AGN-RVP-0212923 at AGN-RVP-0212929)).

    a.   The Project Report includes █████████████ ████████████.  (Ex. F at 1 (AGN-RVP-0417712)).  The Report identified ████████████████████

---

[3] The feature of mix of high and low molecular weight HA components is claimed in certain claims of the '795 and '475 patents.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████ (*Id.* at 4).

b.    The Report further identified ████████████████████████

████████████████████████████████████████████

████████████████████████████████.” *Id.* (emphasis

added).

c.    The Report further states: “████████████████████████

████████████████████████████████████████████

██████████████████████████████████.” *Id.* (emphasis

added).

d.    The Report states that ████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████” *Id.* (emphasis added).

e.    The Report also noted a previous study (identified as “████████”) that

concluded that ████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████. (*Id.* at 5).



f.    Another conclusion in the Report was that ████████████

██████████████████████████████████████

██████████████████████████████████████

███████████████. (*Id*. at 5-6).

g.    Based on the analyses reviewed in the Report, it concluded: "████████

██████████████████████████████████████

███████████████" (*Id*. at 7).

48.    Accordingly, no later than December 2005 and based at least on the December

2005 Project Report (████████) bearing his signature, Lebreton ████████████████

███████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████. (Ex. B at 9; *see also*

Ex. F (AGN-RVP-0417712)).

49.    Lebreton also had actual knowledge that, prior to August 4, 2008, several other

lidocaine-containing HA dermal fillers had been successfully developed, tested, and approved by

FDA and/or were commercially available abroad and that numerous reports of using lidocaine in

crosslinked-HA fillers had appeared in scientific literature.

**1.    Since at least 2005, Lebreton knew that Mentor Corp., one of Allergan's competitors in the dermal filler market, had developed a crosslinked-HA dermal filler that included lidocaine**

50.    Lebreton knew of the existence of Puragen Plus (a crosslinked-HA dermal filler

containing 0.3% lidocaine), at least through the product's approval to be marketed and

distributed in Canada in December 2005, as well as through the clinical trials that had begun in the United States around January 2005.

51.     Additionally, Lebreton also had personal knowledge of the existence of, and successfully development of, Puragen Plus, a crosslinked-HA dermal filler containing lidocaine, by at least as early as September 2005.

52.     In a September 12, 2005, email to Lebreton ██████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████. (Ex. H (AGN-RVP-0222440); Ex. C (AGN-RVP-0417698)).

53.     This document indicates that the purpose of the project was to "incorporate lidocaine into the products of the SURGIDERM line," which as noted above was Allergan's predecessor to Corneal's crosslinked-HA dermal filler. Lebreton did not conceive of the idea to incorporate lidocaine to the existing HA filler. ████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████ and *to counter the upcoming launch* of the first hyaluronic acid-based product (PURAGEN Plus) to incorporate an anaesthetic, [sic] the aim is to incorporate lidocaine into the products of the SURGIDERM line." (Ex. C at 1 (AGN-RVP-0417698) (all emphasis added)).

54.     The █████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████



(*Id.* at 3).

55.     Thus, by September 2005 Lebreton and his team knew that the origin of the lidocaine product was the marketing team, rather than Lebreton himself, in response to a competitor's nearly complete efforts to launch the (true) first HA-based product to incorporate lidocaine, so that Corneal/Allergan could remain competitive in the market for dermal fillers. Further Lebreton and his team knew that the manufacturing and sterilization process for its new crosslinked-HA gel with lidocaine would not differ from the prior version without lidocaine.

56.     At least as early as December 2005, Lebreton had actual knowledge that ███ ████████████████████████████████████████████████ ████████████████████ (Ex. F at 4 (AGN-RVP-0417712 at AGN-RVP-0417715)).  A CE marking is a required certification that indicates that a product has been assessed and deemed to meet the European Union's safety, health, and environmental protection standards and is required for products manufactured anywhere in the world that are then marketed within the European Economic Area.

57.     Further, Lebreton sent an email on ████████, 2005, to several people ████████████████████████ (Ex. I at 1 (AGN-RVP-0458230)). Lebreton's email provided the text of a press release from Mentor announcing that it had "received approval to begin marketing and distributing its … Puragen Plus(TM) hyaluronic acid-based dermal filler products in Canada. Both products are indicated for the correction of facial

folds and wrinkles and for lip augmentation and will be distributed through Mentor's Canadian subsidiary." (*Id.*). Lebreton's email also contains text describing both products as using crosslinked-HA and specifically describes Puragen Plus as "the only hyaluronic acid-based product on the market in Canada that is formulated with an anesthetic for improved patient comfort." (*Id.*). The email also describes that the CE Mark "for Puragen Plus is pending" and that Mentor expected "to complete the filing of its pre-market approval application for Puragen Plus in the fourth quarter of fiscal year 2006." (*Id.*).

58.     Accordingly, no later than December 2005 (almost three years before the earliest priority date claimed in the Asserted Patents), Lebreton and his R&D team knew that Mentor had developed a crosslinked-HA product that included lidocaine, that Mentor was that it was sufficiently stable and sterile to receive approval to market to patients in Canada, and that Mentor was pursuing commercial launch of its product in various jurisdictions around the world.

59.     Mentor's Puragen Plus product in 2005 was a soft tissue dermal filler comprising hyaluronic acid including lidocaine. Heat sterilization in an autoclave was, in 2005, and remains today, the standard sterilization method for dermal fillers. So, on information and belief, Puragen Plus was heat sterilized. Yet Puragen Plus was sufficiently stable after such sterilization to be useful as a soft tissue filler, as indicated (at least) by its approval for sale to consumers by the Canadian and European regulatory authorities.

   **2.     Since at least 2006, Lebreton knew that Anika Therapeutics, Inc., one of Allergan's competitors in the dermal filler market, had developed a crosslinked-HA dermal filler that included lidocaine**

60.     Lebreton knew of the existence of Elevess (a crosslinked-HA dermal filler containing 0.3% lidocaine) at least through the approval of Anika Therapeutics, Inc.'s PMA application by FDA on December 20, 2006.

61.     Lebreton also had personal knowledge of the existence of, and successful development of, Elevess, a crosslinked-HA dermal filler containing lidocaine, by at least as early as February 2006.

62.     For example, in a ███████, 2006, email, Lebreton forwarded to ████████ ████████████████████████████████████ a "Yahoo! Alerts" email noting that "Anika Therapeutics, Inc. today announced that it has received CE Mark approval to market its cosmetic tissue augmentation product, REDEFYNE, in the European Union. REDEFYNE is an injectable soft tissue filler for facial wrinkles, scar remediation and lip augmentation." (Ex. J (AGN-RVP-0458232)).  Elevess was formerly known in certain markets as REDEFYNE.

63.     Although the forwarded press release did not contain any reference to "lidocaine," Lebreton knew that the new product included lidocaine because he wrote to his team (translated), "for info, new HA filler with lidocaine." (*Id.*). Thus, by February 2006, Lebreton and his team were aware that Anika Therapeutics had successfully developed a crosslinked-HA filler with lidocaine. On information and belief, because Anika Therapeutics had received CE Mark approval "to market" the product, Lebreton would have known that at the time the product was sterile and sufficiently stable to be used as a dermal filler.

64.     In an email dated █████ 2008, ████████████████████████ asked Lebreton ████████████████████████████████████████████████ ████████████████████████████████" (Ex. K (AGN-RVP-0367989)). ████████████ ████████████████████████████████████████████████ ████████████████████████ (Ex. K (AGN-RVP-0367989))

a.     Attached to this email is a █████ 2008 press release entitled "███ ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████." (Ex. L at 1

(AGN-RVP-0367990)).

b.      This press release further states that "ELEVESS is an injectable filler that

reduces the appearance of facial wrinkles and folds such as nasolabial

folds, and is the first HA-based dermal filler approved by the Food and

Drug Administration ('FDA') to incorporate the anesthetic lidocaine to

improve patient comfort."  (*Id.*).

c.      The press release further discloses that Elevess has been approved for sale

in the United States, the European Union, and Canada.  (*Id.*).

d.      In response to this email ████████████████████████████

████████████████████████."  (Ex. M at 1 (AGN-RVP-

0367992)).

65.      This email demonstrates that well before August 8, 2008, Lebreton had actual

knowledge that lidocaine had been successfully incorporated into a crosslinked-HA dermal filler

and that the Elevess product was commercially available.

> **3.      *Since at least early 2008, Lebreton knew that Genzyme BioSurgery, one of Allergan's competitors in the dermal filler market, had developed a crosslinked-HA dermal filler that included lidocaine***

66.      Lebreton knew of the existence of Prevelle Silk (a crosslinked-HA dermal filler

containing 0.3% lidocaine) at least through the approval of Genzyme BioSurgery's PMA

application by FDA on February 26, 2008.

67.      Lebreton also had personal knowledge of the existence of, and successful

development of, Prevelle Silk, a crosslinked-HA dermal filler containing lidocaine, by at least as

early as March 2008.

68.     In a ███████ 2008 email from ██████████████████ to Lebreton and others, it was disclosed that Mentor Corporation had announced that its crosslinked-HA dermal filler containing lidocaine, Prevelle Silk, had obtained FDA approval and would be marketed and distributed globally.  (Ex. N at 1 (AGN-RVP-0357368)).

69.     This email also stated ████████████████████████████████████ ████████████████████████████████.  (*Id.*).

70.     This email demonstrates that before August 8, 2008, Lebreton had actual knowledge that lidocaine had been successfully incorporated into a crosslinked-HA dermal filler and that the Prevelle Silk product was approved by the FDA for commercialization.

**4.      *Since prior to August 2008, Lebreton knew that Q-Med AB, one of Allergan's competitors in the dermal filler market, had developed a crosslinked-HA dermal filler that included lidocaine***

71.     Lebreton knew that Q-Med AB (and its strategic partner, Medicis Pharmaceutical Company) had been successful in its efforts to incorporate lidocaine into its Restylane dermal filler products.

72.     Prior to August 2008, Q-Med had begun efforts to incorporate lidocaine into its Restylane dermal filler product (a BDDE-crosslinked-HA dermal filler).  Such efforts were well known to persons of ordinary skill in the art in the field of dermal fillers.

73.     In fact, on April 16, 2009, Q-Med filed its PMA application for its Restylane product containing lidocaine, which was filed before Allergan's first patent application became published. That is, Q-Med's development of its so-called "Restylane-L" product was conducted independent of Allergan's development of its lidocaine dermal filler.

74.     To support the safety and effectiveness of the PMA application for Restylane with lidocaine, Q-Med and/or Medicis conducted a clinical trial titled, "A Randomized, Double-Blind Study Comparing Safety and Tolerability of Restylane® With and Without Addition of 0.3%

Lidocaine HCL During Correction of Nasolabial Folds," between November 2008 and March 2009. Information about the trial and its study results are posted online at by the National Library of Medicine and the National Institutes of Health at:

https://clinicaltrials.gov/ct2/show/NCT00797459.

75.     Within days of Q-Med/Medicis submitting the study information to clinicaltrials.gov, Lebreton was aware of the clinical trial and, in a ███████████, 2008 email, notified a colleague that "████████████████████████████████████████." (Ex. O (AGN-RVP-0464609)).

76.     Thus, Lebreton would have known at that time that Q-Med had successfully incorporated lidocaine into a sterile, stable, BDDE-crosslinked-HA filler no later than a few months preceding its November 2008 submission of its clinical trial study.

    **5.    *Lebreton acknowledges that crosslinked-HA products with lidocaine were "widely utilized* ████████████████████████**

77.     At least in July and August 2009, the development team at Allergan ███████████ ██████████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████. (Ex. P at 1 (AGN-RVP-0460463)). Lebreton identifies himself as the "R&D Director (Filler)" in his email signature. (*Id.*).

78.     ██████████████████████████████████████████████ ████████████████████████████████," (*id.*) produced by Allergan in this litigation as Bates number AGN-RVP-0460466-90 and is attached as Ex. Q hereto.  The ████ ███████████ identifies Lebreton as the "Director, R&D" responsible for █████████ ███████████████. (Ex. Q at 25 (AGN-RVP-0460466 at AGN-RVP-0460490)).

79. 

(*Id*. at 15 (emphasis added)).

80.

(Ex. Q at 15 (AGN-RVP-0460466 at AGN-RVP-0460480) (emphasis added)).

81.

███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████. (*See id.* at 22-23).

**6.    *Additional Exemplary Prior Art References***

82.    As a person of ordinary skill in the art, Lebreton would have been aware that other prior art disclosed the successful development of crosslinked-HA dermal fillers with lidocaine.

(a)    *Cosmetic Tissue Augmentation product Summary of Safety and Effectiveness*

83.    Anika Therapeutics, Inc.'s Cosmetic Tissue Augmentation ("CTA") product, later renamed Elevess, was approved by FDA on December 20, 2006, making it the first commercially available crosslinked-HA dermal filler with lidocaine in the United States and indicating that lidocaine could be successfully incorporated in crosslinked-HA dermal filler products.

84.    On or around December 31, 2006, FDA made available to the public the Summary of Safety and Effectiveness of the CTA product.  (Ex. R).  The Summary of Safety and Effectiveness concluded, *inter alia*, that all stability studies supported an expiration date of 15 months.  (Ex. R at 6).

85.    As of its December 2006 publication, the CTA product, including its Summary of Safety and Effectiveness, would have been understood by a person of ordinary skill in the art to

disclose a sterilized, crosslinked-HA dermal filler that includes lidocaine and that was sufficiently stable to be useful as a soft tissue filler.

       *(b)*     *Aesthetic Surgery Journal*

86.     In an article in the November/December 2006 issue of the Aesthetic Surgery Journal entitled "Injecting Puragen Plus into the Nasolabial Folds: Preliminary Observations of FDA Trial" by Brian M. Kinney, MD ("Kinney"), the author describes Puragen Plus, a crosslinked-HA dermal filler containing lidocaine, which was undergoing FDA clinical trials (Ex. S at 742).

87.     The article describes results from the clinical study comparing the non-lidocaine product Restylane and the lidocaine containing product Puragen Plus.  The article states that for the patients injected with Puragen Plus, "[m]ore than half of the patients had excellent persistence at 9 months, and about one quarter had moderate persistence even at 12 months." (*Id*. at 748).

88.     The article concludes that for the lidocaine containing Puragen Plus product, "[n]ine to twelve months of duration of effect can generally be expected based on my clinical experience."  (*Id*.).

89.     As of December 2006, Puragen Plus, as described in Kinney's article, would have been understood by a person of ordinary skill in the art to disclose a sterilized, crosslinked-HA dermal filler that includes lidocaine and that was sufficiently stable to be useful as a soft tissue filler.

       *(c)*     *February 2007 Journal of the American Academy of Dermatology*

90.     In the February 2007 supplement to the Journal of the American Academy of Dermatology, two poster abstracts supported by Anika Therapeutics and Galderma Laboratories, LP were published; each describes a HA dermal filler containing lidocaine.  (Ex. T at 4). These

poster abstracts summarized presentations given to persons of ordinary skill in the art at the 65th Annual Meeting of the American Academy of Dermatology on or around February 2–6, 2007, in Washington, D.C.

91.     One such poster and presentation by C. William Hanke, MD ("Hanke"), among others, is entitled "Effectiveness and durability of a hyaluronic acid 28 mg/ml, lidocaine 0.3% **stable combination** product as demonstrated in a multicenter, randomized trial."  This poster states that a stable combination of HA with 0.3% lidocaine has now been developed.  *Id.*

92.     This poster abstract from Hanke discloses that a pivotal trial was carried out in ten United States clinical sites to evaluate the effectiveness and safety of this new HA dermal filler with lidocaine.  The poster abstract concludes: "Results from this trial support the use of this new HA 28 mg/ml – lidocaine 0.3% **stable combination** for the aesthetic correction of lines and wrinkles."  *Id.*

93.     In another poster entitled "Preclinical evaluation of a novel hyaluronic acid 28 mg/ml, lidocaine 0.3% stable combination product," Carol A Toth, PhD ("Toth"), among others, describes a crosslinked-HA filler with lidocaine.  *Id.*

94.     This poster abstract from Toth discloses when the crosslinked-HA/lidocaine combination was tested and compared to other marketed HA products, the lidocaine containing product demonstrated superior performance over a 48-week period.  *Id.*

95.     This poster abstract from Toth also disclosed that following an extrusion force study, the crosslinked-HA/lidocaine formulation had "good flow characteristics, passing easily through a 30-gauge needle and maintains form well after hydration" and that it behaved similarly to a leading marketed HA product.  *Id.*

96.     Finally, the poster abstract from Toth concludes that the introduction of this new crosslinked-HA/lidocaine filler product "is expected to offer an advantage to the aesthetic patient over current choices."  *Id*.

97.     The Toth and Hanke posters and presentations were known to persons of ordinary skill in the art of soft tissues fillers by February 2007. And these posters and presentations would have been understood by persons of ordinary skill in the art in February 2007 to disclose a sterilized, crosslinked-HA dermal filler that includes lidocaine and that was sufficiently stable to be useful as a soft tissue filler.

        *(d)     Sadozai (U.S. Application No. 2005/0136122)*

98.     U.S. Patent Application Publication No. 2005/0136122 ("Sadozai") was filed on December 22, 2003 and published on June 23, 2005.  Sadozai discloses a BDCI-crosslinked-HA dermal filler that includes lidocaine.  (Ex. U ¶¶ [0007, 0085]).

99.     Sadozai teaches an example of the successful incorporation of lidocaine with a crosslinked-HA dermal filler that is autoclaved sterilized.  *Id*. ¶¶ [0007, 0085, 0090, 0100, 0102]. Sadozai also teaches that the incorporation of an anesthetic, such as lidocaine, into a dermal filler ***increases*** the stability of the composition relative to an equivalent dermal filler without the anesthetic.  (*Id*. ¶ [0024, 0068, 0107]).  Sadozai thus teaches a stable composition with lidocaine that does not exhibit degradation after autoclave sterilization.

100.    Sadozai discloses "the storage modulus G' is increased, e.g., the composition is stabilized, by the inclusion of a local anesthetic, e.g., lidocaine, compared to a non-stabilized composition, e.g. an identical composition except that the local anesthetic is not included."  (*Id*.). In the field of rheology, storage modulus (G') is a measure of the elastic response of a material and is related to the viscosity of the material.

101.    Sadozai also discloses that "[l]idocaine can have a synergistic effect and increase the initial storage modulus G' of the gel compared to otherwise identical compositions prepared in a buffer without lidocaine."  (*Id.* ¶ [0107]).

102.    Sadozai discloses an example of a three separate samples of crosslinked-HA, one containing no lidocaine, another containing 0.2% lidocaine, and the third containing 0.3% lidocaine.  (*Id.* ¶¶ [0024], FIG. 7; [0107]).  The storage modulus G' and degradation profiles of each sample were monitored over time and the compositions with lidocaine had a significantly higher storage modulus G' over time, as illustrate in the figure below:



FIG. 7

(Ex. U ¶ [0024], FIG. 7)

103.    As a result of this testing, Sadozai concludes that crosslinked-HA compositions containing lidocaine "can have good biostability, and can in some cases have a synergistic effect, increasing G'."  (*Id.* ¶ [0107]).

104.    Provisional application (No. 61/085,956), for which Lebreton is a named inventor and to which the Asserted Patents claim priority, admitted that U.S. Publication No. 2005/0136122 disclosed "a process for making an HA-based composition including lidocaine." As the sole named inventor on the provisional application, on information and belief, Lebreton would have been aware of and approved of its contents before the provisional application was filed on August 4, 2008.  By the time the non-provisional applications claiming priority to this provisional application were filed in February 2009, however, this reference to the Sadozai prior art had been removed from the non-provisional application (*see, e.g.*, U.S. Application No. 12/393,884).

105.    As of its June 2005 publication, Sadozai would have been understood by a person of ordinary skill in the art to disclose a sterilized, crosslinked-HA dermal filler that includes lidocaine that was sufficiently stable to be useful as a soft tissue filler.

(e)     *Reinmuller (U.S. Patent No. 5,731,298)*

106.    U.S. Patent No. 5,731,298 to Reinmuller issued on March 24, 1998 and discloses the successful production of a crosslinked-HA product called Hylagel that contains lidocaine, as shown in the image below:

**7**
**EXAMPLE 1**
Production of an injectable gel from the following components:

| Component | Amount | |
|---|---|---|
| | | 5 |
| cross-linked hyaluronic acid ("Hylagel" Biomatrix Co., NJ, USA) | 0.004 g | |
| lidocaine hydrochloride | 0.02 g | |
| water, purified (DAB 9) | to 1.0 g | 10 |

The components are dissolved under a nitrogen atmosphere while stirring and briefly heating; a colourless clear gel is obtained after cooling; pH value: 7.00±0.1.                          15

Reinmuller further discloses: "The gel is dispensed into pressure-resistant piercable ampoules and sealed. Afterwards a *heat sterilization* is carried out and the gel is *stored* protected from light." (Ex. V at 7:1-17 (emphasis added)).

107.    As of its 1998 publication, the Reinmuller patent would have been understood by a person of ordinary skill in the art to disclose a heat sterilized, crosslinked-HA gel that includes lidocaine and that was sufficiently stable to be useful as a soft tissue filler.

### Prosecution History of U.S. Application No. 12/393,884

108.    Allergan filed United States provisional application No. 61/085,956 ("'956 provisional application") on August 4, 2008, of which Lebreton is listed as an inventor.

109.    Shortly after filing its provisional application, on August 18, 2008, Allergan filed a supplemental PMA application for its Juvéderm with lidocaine products (P050047/S005).

110.    With knowledge of at least the above-mentioned state of the prior art (*see infra* Part D (¶¶ 44-107)), on February 26, 2009, Lebreton filed U.S. Application No. 12/393,884 (which issued as the '795 patent) and U.S. Application No. 12/373,768 (which issued as the '475 patent) with claims directed towards crosslinked-HA compositions that contained lidocaine. U.S. Application No. 12/393,884 and U.S. Application No. 12/373,768 are the parent applications of the Asserted Patents.

111.    In U.S. Application No. 12/393,884, the discussions of the Sadozai and Wohlrab references are removed from the specification.

112.    The Examiner ultimately rejected all claims of the '884 application as obvious in view of prior art that taught crosslinked-HA dermal fillers in view of other references that disclosed the possibility of adding lidocaine to other dermal fillers.

113.   In the Examiner's May 31, 2001 Non-Final Rejection, all pending claims of the '884 application were rejected are obvious over U.S. Patent Application Publication No. 2006/0194758 to Lebreton in view of U.S. Patent Application Publication No. 2005/0271729 to Wang.

114.   In the May 31, 2001 Non-Final Rejection, the Examiner stated that "[i]t would have been prima facie obvious to one of ordinary skill in the art at the time of the instant invention to add lidocaine to the hydrogel composition of [the prior art publication to] Lebreton in order to provide a therapeutic delivery of an anesthetic to the injectable formulation.  One would have expected success since both Lebreton and Wang are directed to crosslinked hyaluronic acid formulations … With regard to the concentration of lidocaine present in the hydrogel it would have been obvious to one of ordinary skill in the art at the time of the instant invention to arrive at the instant concentration through routine optimization.  One would have been motivated to do so in order to provide lidocaine, an anesthetic, to the tissue at the site of surgery.  It would have been obvious to one [of] ordinary skill in the art at the time of the instant invention to add the lidocaine to the hydrogel during the homogenization in order to provide a hydrogel which as [sic] a lidocaine homogenously mixed throughout the gel."  (Ex. W (May 31, 2011, Non-Final Rejection at 7)).

115.   In response to the Examiner's rejection, Allergan amended the first independent claim as follows:

> Claim 23.  A soft tissue filler composition comprising:
> a hyaluronic acid (HA) component crosslinked with a crosslinking agent selected from the group consisting of 1,4-butanediol diglycidyl ether (BDDE), 1,4-bis(2,3-epoxypropoxy)butane, 1,4-bisglycidyloxybutane, 1,2-bis(2,3-epoxypropoxy)ethylene and 1-(2,3-epoxypropyl)-2,3-epoxycyclohexane, and 1,4-butanediol diglycidyl ether;
> wherein the HA is not crosslinked to a non-HA biopolymer; and
> at least one anesthetic agent lidocaine combined with said

crosslinked HA component;
    wherein the lidocaine is freely released *in vivo;* and
    wherein the composition is sterile.

(Ex. X (Sept. 29, 2011 Response)).

116.    The Examiner issued his Final Rejection on December 27, 2011, again rejecting all pending claims of the '884 application.  The Final Rejection rejected all claims as obvious in view of some combination of (1) U.S. Patent Application Publication No. 2006/0194758 to Lebreton; (2) U.S. Patent No. 6,521,223 to Calias; and (3) U.S. Patent Application Publication No. 2004/0101959 to Marko.  (Ex. Y (Dec. 27, 2011, Final Rejection at 1, 5, 8)).

117.    In the December 27, 2011 Final Rejection, with respect to claims 23-32, 35, 36, 38, and 40-50 the examiner stated, *inter alia*, that "[i]t would have been prima facie obvious to one of ordinary skill in the art at the time of the instant invention to add lidocaine to the hydrogel composition of Lebreton.  One would have been motivated to do so in order to provide lidocaine, an anesthetic, to the tissue at the site of surgery.  It would have been obvious to one ordinary skill in the art at the time of the instant invention to add the lidocaine to the hydrogel during the homogenization in order to provide a hydrogel which as a lidocaine homogeneously mixed throughout the gel … With regard to the limitation that the HA is not crosslinked to a non-HA biopolymer, this is limitation is taught since no other biopolymer is present in the gel composition prior to final crosslinking.  With regard to the limitation that the lidocaine is freely released in vivo, this limitation is taught because the prior art hydrogel and instant hydrogel are structurally indistinguishable and therefore it would necessarily result from the addition of lidocaine to the hydrogel.  With regard to the limitation that the hydrogel is stable at ambient temperature for at least 6 hours following sterilization, this limitation is taught because the prior art hydrogel and instant hydrogel are structurally indistinguishable and therefore it would

necessarily because this is a property of the hydrogel."  (Ex. Y (Dec. 27, 2011, Final Rejection at 7-8)).

118.    Further, in the December 27, 2011 Final Rejection, with respect to claims 34 and 51-67 the examiner stated, *inter alia*, that "[i]t would have been prima facie obvious to one of ordinary skill in the art at the time of the instant invention to add 0.3% lidocaine.  One would have been motivated to do so in order to provide an HA hydrogel composition with lidocaine. With regard to the limitations in claims 53-62, 66, and 67 about stability of the composition, these limitations are necessarily present in the prior art gel since the instant composition and the prior art composition are structurally indistinguishable."  (Ex. Y (Dec. 27, 2011, Final Rejection at 9)).

119.    On January 12, 2012, Allergan also initiated an interview with the Examiner in which Allergan discussed that it could submit an affidavit stating that properties of the gel which were not previously appreciated resulted from the incorporation of lidocaine, where previous attempts failed.  The Examiner indicated that, if true, such an affidavit would likely overcome the prior art rejection.

120.    On April 3, 2012, Allergan again sought an interview with the Examiner stating that it could submit a declaration discussing the unexpected results of incorporating lidocaine into a crosslinked-HA gel.  Allergan further discussed that the declaration could state that it found that incorporating lidocaine into a crosslinked-HA gel was stable and did not degrade over time.  The Examiner again indicated that, if true, such an affidavit would likely overcome the prior art rejection.

**Material Information Was Misrepresented to the Patent Office**

121.    After the examiner interviews, on or around June 14, 2012, Allergan submitted a signed declaration by Lebreton (the "Inventor Declaration") to the United States Patent and Trademark Office that was dated May 2, 2012.  (Ex. A).  Lebreton stated in the Inventor Declaration that "shortly prior to August 4, 2008" it was believed that adding lidocaine to HA compositions would cause degradation of the HA prior to injection.  Lebreton also stated in the Inventor Declaration that it was not known at the time whether HA compositions with lidocaine were stable after high temperature sterilization when stored.

122.    By way of example, the Inventor Declaration states that: "[i]t was believed that adding lidocaine to hyaluronic acid gel compositions during manufacturing caused degradation of the hyaluronic acid prior to injection of the HA as a dermal filler."  Ex. A at ¶ 5.

> a.    This statement by Lebreton was a misrepresentation to the Patent Office because it is demonstrably false.  As illustrated by the numerous products and publications discussed above, known in the art before the application's filing, it was not believed by persons of ordinary skill in the art at the time that adding lidocaine to HA gel compositions during manufacturing caused degradation of the HA prior to injection of the HA as a dermal filler.

> b.    Moreover, Lebreton *personally* knew that long before August 4, 2008, lidocaine could be successfully added to HA gel compositions during manufacture without causing degradation to the HA.  This is demonstrated by Lebreton's personal knowledge of multiple crosslinked-HA dermal fillers containing lidocaine having already been successfully developed,

thoroughly tested, and were commercially available, including: Puragen Plus in at least as early as 2005, Elevess in at least as early 2006, and Prevelle Silk before its February 2008 PMA approval.

c.      The false nature of this statement is also demonstrated by Lebreton's own 2005 studies, which, according to an Allergan ████████ 2005 report, showed that, ██████████████████████████████ ██████████████████████████████ ████████████████████████████████████ ███████████████████. (*See* Ex. E at 4 (AGN-RVP-0324122 at AGN-RVP-0324125)).

d.      The false nature of this statement is further demonstrated by another Lebreton 2005 study, which, according to a ████████ 2005 report, illustrated that, ██████████████████████████ ████████████████████████████████████ ██████████████████████████████ ███████████████████████. (*See* Ex. F at 4-7 (AGN-RVP-0417712 at AGN-RVP-0417715-18)).

e.      The totality of the prior art before August 4, 2008, demonstrated to a person of ordinary skill the expectation that lidocaine could be, and in fact already had been, successfully combined with crosslinked-HA dermal fillers.  Lebreton, as a person of ordinary skill in the art, could not have believed his statement in Paragraph 5 of his declaration to be true "shortly prior to August 4, 2008."

123.    The Inventor Declaration also states that "[i]t was believed that lidocaine caused degradation of HA gel compositions during high temperature sterilization." Ex. A at ¶ 6.

a.      This statement by Lebreton was a misrepresentation to the Patent Office because it is demonstrably false.  As illustrated by the numerous products and publications discussed above, known in the art before the application's filing, it was not believed by persons of ordinary skill in the art at the time that adding lidocaine to HA gel compositions caused degradation of HA gel compositions during high temperature sterilization.

b.      Moreover, Lebreton *personally* knew that before August 4, 2008, lidocaine could be successfully added to HA gel compositions without causing significant degradation of the HA gel composition during high temperature sterilization.  This is demonstrated by Lebreton's personal knowledge of multiple crosslinked-HA dermal fillers containing lidocaine having already been successfully developed, thoroughly tested, and were commercially available, including: Puragen Plus in at least as early as 2005, Eleveess in at least as early 2006, and Prevelle Silk before its February 2008 PMA approval.

c.      The false nature of this statement is also demonstrated by Lebreton's own 2005 studies, which, according to an Allergan ███████ 2005 report, showed that, ████████████████████████████
████████████████████████████████████
██████████████████████████████████████

██████████████████████████. (*See* Ex. E at 4 (AGN-RVP-0324122 at AGN-RVP-0324125).

    d.    The false nature of this statement is further demonstrated by another Lebreton 2005 study, which, according to a ██████████ 2005 report, illustrated that, █████████████████████████████

████████████████████████████████████

███████████████████████████████

██████████████████████████████ (*See* Ex. F at 4-7 (AGN-RVP-0417712 at AGN-RVP-0417715-18)).

    e.    The totality of the prior art before August 4, 2008, demonstrated to a person of ordinary skill the expectation that lidocaine could be, and in fact already had been, successfully combined with crosslinked-HA dermal fillers.  Lebreton, as a person of ordinary skill in the art, could not have believed his statement in Paragraph 6 of his declaration to be true "shortly prior to August 4, 2008."

124.    The Inventor Declaration also states that "[i]t was not known whether HA compositions comprising lidocaine were stable or not after high temperature sterilization when placed in storage for any significant length of time."  Ex. A at ¶ 7.

    a.    This statement by Lebreton was a misrepresentation to the Patent Office because it is demonstrably false.  As illustrated by the numerous products and publications discussed above, known in the art before the application's filing, a person of ordinary skill in the art at the time knew that HA compositions comprising lidocaine were stable after high

temperature sterilization when placed in storage for a significant length of time, and thus would not have believed this statement to be accurate.

b.    Moreover, Lebreton *personally* knew that before August 4, 2008, HA compositions comprising lidocaine were stable after high temperature sterilization when placed in storage for a significant length of time.  This is demonstrated by Lebreton's personal knowledge of multiple crosslinked-HA dermal fillers containing lidocaine having already been successfully developed, thoroughly tested, and were commercially available, including: Puragen Plus in at least as early as 2005, Elevess in at least as early 2006, and Prevelle Silk before its February 2008 PMA approval.

c.    The false nature of this statement is also demonstrated by Lebreton's own 2005 studies, which, according to an Allergan ███████ 2005 report, showed that, ████████████████████████ ████████████████████████ ██████████████████████████ ███████████████████. (*See* Ex. E at 4 (AGN-RVP-0324122 at AGN-RVP-0324125).

d.    The false nature of this statement is further demonstrated by another Lebreton 2005 study, which, according to a ████████ 2005 report, illustrated that, ████████████████████ ██████████████████████████ █████████████████████████

███████████████████████████████████ (*See*

Ex. F at 4-7 (AGN-RVP-0417712 at AGN-RVP-0417715-18)).

    e.    The totality of the prior art before August 4, 2008 demonstrated to a person of ordinary skill the expectation that lidocaine could be, and in fact already had been, successfully combined with crosslinked-HA dermal fillers.  Lebreton, as a person of ordinary skill in the art, could not have believed his statement in Paragraph 7 of his declaration to be true "shortly prior to August 4, 2008."

125.    The Inventor Declaration also states that "[i]t was also believed that the instability of HA described above would have caused a viscosity reduction of the HA that would make it unsuitable for soft tissue filling applications."  Ex. A at ¶ 8.

    a.    This statement by Lebreton was a misrepresentation to the Patent Office because it is demonstrably false.  As illustrated by the numerous products and publications discussed above, known in the art before the application's filing, a person of ordinary skill in the art at the time knew that HA compositions comprising lidocaine were stable and did not cause a viscosity reduction of the HA that would make it unsuitable for soft tissue filling applications.

    b.    Moreover, Lebreton *personally* knew that before August 4, 2008, HA compositions comprising lidocaine were stable and did not cause a viscosity reduction of the HA that would make it unsuitable for soft tissue filling applications.  This is demonstrated by Lebreton's personal knowledge of multiple crosslinked-HA dermal fillers containing lidocaine

having already been successfully developed, thoroughly tested, and were commercially available, including: Puragen Plus in at least as early as 2005, Elevess in at least as early 2006, and Prevelle Silk before its February 2008 PMA approval.

c.    The false nature of this statement is also demonstrated by Lebreton's own 2005 studies, which, according to an Allergan ███████ 2005 report, showed that, ████████████████████████



. (*See* Ex. E at 4 (AGN-RVP-0324122 at AGN-RVP-0324125)).

d.    The false nature of this statement is further demonstrated by another Lebreton 2005 study, which, according to a ████████, 2005 report, illustrated that, ████████████████████

. (*See* Ex. F at 4-7 (AGN-RVP-0417712 at AGN-RVP-0417715-18)).

e.    The totality of the prior art before August 4, 2008, demonstrated to a person of ordinary skill the expectation that lidocaine could be, and in fact already had been, successfully combined with crosslinked-HA dermal fillers.  Lebreton, as a person of ordinary skill in the art, could not have

believed his statement in Paragraph 8 of his declaration to be true "shortly

prior to August 4, 2008."

126.     The Inventor Declaration also states that "[b]ased upon the facts set forth above, a

person of ordinary skill in the art would have expected that a dermal filler comprising hyaluronic

acid and lidocaine would not have remained sufficiently stable to be useful as a soft tissue filler."

Ex. A at ¶ 9.

a.     This statement by Lebreton was a misrepresentation to the Patent Office

because it is demonstrably false.  As illustrated by the numerous products

and publications discussed above, known in the art before the

application's filing, it was not believed by persons of ordinary skill in the

art at the time that dermal fillers comprising hyaluronic acid and lidocaine

would not have remained sufficiently stable to be useful as soft tissue

fillers.

b.     Moreover, Lebreton *personally* knew that before August 4, 2008,

crosslinked dermal fillers comprising hyaluronic acid and lidocaine

remained sufficiently stable and could be useful as soft tissue fillers.  This

is demonstrated by Lebreton's personal knowledge of multiple

crosslinked-HA dermal fillers containing lidocaine having already been

successfully developed, thoroughly tested, and were commercially

available, including: Puragen Plus in at least as early as 2005, Elevess in at

least as early 2006, and Prevelle Silk before its February 2008 PMA

approval.

c.      The false nature of this statement is also demonstrated by Lebreton's own 2005 studies, which, according to an Allergan ████████, 2005 report, showed that



. (*See* Ex. E at 4 (AGN-RVP-0324122 at AGN-RVP-0324125)).

d.      The false nature of this statement is further demonstrated by another Lebreton 2005 study, which, according to a ████████, 2005 report, illustrated that,



. (*See* Ex. F at 4-7 (AGN-RVP-0417712 at AGN-RVP-0417715-18)).

e.      The totality of the prior art before August 4, 2008, demonstrated to a person of ordinary skill the expectation that lidocaine could be, and in fact already had been, successfully combined with crosslinked-HA dermal fillers.  Lebreton, as a person of ordinary skill in the art, could not have believed his statement in Paragraph 9 of his declaration to be true "shortly prior to August 4, 2008."

127.    The Inventor Declaration also states that "[i]t was not appreciated that a dermal filler comprising a cohesive gel of hyaluronic acid makes it possible for lidocaine to be

combined with hyaluronic acid in a gel that is sufficiently stable to be useful as a soft tissue filler."  Ex. A at ¶ 10.

      a.    This statement by Lebreton was a misrepresentation to the Patent Office because it is demonstrably false.  As illustrated by the numerous products and publications discussed above, known in the art before the application's filing, it was not believed by persons of ordinary skill in the art at the time that it was "not appreciated" or not possible for lidocaine to be combined with a crosslinked-HA in a gel that is sufficiently stable to be useful as a soft tissue filler.

      b.    Moreover, Lebreton *personally* knew that before August 4, 2008, it was possible for lidocaine to be combined with a crosslinked-HA in a gel that is sufficiently stable to be useful as a soft tissue filler.  This is demonstrated by Lebreton's personal knowledge of multiple crosslinked-HA dermal fillers containing lidocaine having already been successfully developed, thoroughly tested, and were commercially available, including: Puragen Plus in at least as early as 2005, Elevess in at least as early 2006, and Prevelle Silk before its February 2008 PMA approval.

      c.    The false nature of this statement is also demonstrated by Lebreton's own 2005 studies, which, according to an Allergan ████████ 2005 report, showed that █████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████. (*See* Ex. E at 4 (AGN-RVP-0324122 at AGN-RVP-0324125)).

d.     The false nature of this statement is further demonstrated by another Lebreton 2005 study, which, according to a ██████, 2005 report, illustrated that, ████████████████████████

████████████████████████████████

████████████████████████████

████████████████████████. (*See* Ex. F at 4-7 (AGN-RVP-0417712 at AGN-RVP-0417715-18)).

e.     The totality of the prior art before August 4, 2008, demonstrated to a person of ordinary skill the expectation that lidocaine could be, and in fact already had been, successfully combined with crosslinked-HA dermal fillers.  Lebreton, as a person of ordinary skill in the art, could not have believed his statement in Paragraph 10 of his declaration to be true "shortly prior to August 4, 2008."

128.   The Inventor Declaration also states that "[t]o my knowledge, it was a surprising and unexpected discovery, not appreciated prior to the present invention, that certain cohesive HA gels, as defined in the application, when mixed with lidocaine, could be made to be heat and shelf stable."  Ex. A at ¶ 15.

a.     This statement by Lebreton was a misrepresentation to the Patent Office because it is demonstrably false.  As illustrated by the numerous products and publications discussed above, known in the art before the application's filing, a person of ordinary skill in the art at the time would

have expected that crosslinked-HA gels, when mixed with lidocaine, could

be made to be heat and shelf stable and that such a result was not

surprising or unexpected.

b.      Moreover, Lebreton *personally* knew that before August 4, 2008, it was

possible for crosslinked-HA gels, when mixed with lidocaine, to be made

to be heat and shelf stable.  This is demonstrated by Lebreton's personal

knowledge of multiple crosslinked-HA dermal fillers containing lidocaine

having already been successfully developed, thoroughly tested, and were

commercially available, including: Puragen Plus in at least as early as

2005, Elevess in at least as early 2006, and Prevelle Silk before its

February 2008 PMA approval.

c.      The false nature of this statement is also demonstrated by Lebreton's own

2005 studies, which, according to an Allergan ███████████ 2005 report,

showed that ██████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████

███████████████████████████. (*See* Ex. E at 4 (AGN-RVP-0324122 at

AGN-RVP-0324125)).

d.      The false nature of this statement is further demonstrated by another

Lebreton 2005 study, which, according to a ███████████, 2005 report,

illustrated that, █████████████████████████████

█████████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████. (*See*

Ex. F at 4-7 (AGN-RVP-0417712 at AGN-RVP-0417715-18)).

e.      The totality of the prior art before August 4, 2008, demonstrated to a

person of ordinary skill the expectation that lidocaine could be, and in fact

already had been, successfully combined with crosslinked-HA dermal

fillers.  Lebreton, as a person of ordinary skill in the art, could not have

believed his statement in Paragraph 15 of his declaration to be true

"shortly prior to August 4, 2008."

129.    Citing to the Inventor Declaration, the Allergan argued to the Examiner that the

claimed invention was "a surprising and unexpected discovery, not appreciated prior to the

present invention" and thus would not have been obvious at the time the invention was made to a

person of ordinary skill in the art.  (Ex. Z at 12-15 (June 14, 2012, Response to Final Office

Action)).

130.    This argument made to the Examiner is also demonstrably false, as the feasibility

of incorporating lidocaine into a crosslinked-HA dermal filler was known to persons of ordinary

skill in the art, as well as known to Lebreton personally, and in fact had already been

successfully accomplished in several commercially available products prior to August 2008.

131.    Lebreton's declaration references experiments performed at his direction, and that

were generally described in at least U.S. Patent Application No. 12/393,884 (*see* Example 4),

concerning the stability properties of HA gels when mixed with lidocaine.  (Ex. A at ¶¶ 11-15).

These experiments do not support the statements made in Lebreton's declaration.

132.     Lebreton's declaration states that these experiments "showed that certain HA gels, when mixed with lidocaine, degraded and became substantially less viscous after high temperature sterilization, specifically autoclave sterilization." (Ex. A at ¶ 13).

133.     Lebreton's declaration further states that Samples 1-3 showed more of a decrease in viscosity after autoclave sterilization than Samples 4-5 (the alleged inventive compositions). (Ex. A at ¶¶ 13-14).  Lebreton concludes that this was a "surprising and unexpected discovery … that certain cohesive HA gels … when mixed with lidocaine, could be made to be heat and shelf stable." (Ex. A at ¶ 15).

134.     The reported viscosities of Samples 1-3, however, were all within what would be considered an acceptable range for dermal fillers to a person of ordinary skill in the art.

   a.     Sample 1 is an uncrosslinked HA mixture and thus the results of testing of this sample are irrelevant to the stability of a crosslinked-HA fillers.

   b.     There is also no evidence to suggest that the uncrosslinked HA mixture described as Sample 1 had ever been used as a dermal filler.

   c.     Sample 2 is identified in the provisional application (No. 61/085,956) as the commercial product Hylaform, an FDA-approved, DVS-crosslinked-HA filler.

   d.     The experimental results from Sample 2 (Hylaform) demonstrated that when pH control is employed (as a person of ordinary skill in the art would have known was critical) with the addition of lidocaine, the viscosity after autoclave sterilization remained within acceptable ranges for use as a dermal filler.

e.     Thus, contrary to the statements in Lebreton's declaration, the results of the testing do not suggest any reason Sample 2 (Hylaform) could not be combined with lidocaine.

f.     Sample 3 is described as having a formulation similar to the commercially available Restylane product.  Notably, a product incorporating lidocaine into the Restylane product was approved by FDA and is commercially available.

g.     Although Lebreton's declaration states that Sample 3 lost viscosity to autoclave sterilization, the data actually supports the opposite conclusion. When lidocaine is added to Sample 3 with pH control, the resulting compositions viscosity actually increases relative to the non-lidocaine sample after autoclave sterilization by about 10%.

h.     In fact, the specification of the '795 patent admits that Sample 3 (a BDDE-crosslinked HA composition, similar to Restylane) and Sample 4 (a BDDE-crosslinked HA composition) were both found to be stable to autoclaving.

i.     Even though certain of the Samples exhibited lower viscosities when not receiving a pH adjustment, such a finding is irrelevant as a person of ordinary skill in the art would have understood that a dermal filler had to be maintained at a physiologically acceptable pH.

135.   Accordingly, not only do the results of the experiments referenced in Lebreton's declaration not support his assertions that certain HA gels, when mixed with lidocaine, degraded and became substantially less viscous after high temperature sterilization, but a person of

ordinary skill in the art (like Lebreton) would have known that these assertions were false.  Thus, Lebreton's purported conclusions about these tests show that he acted with the specific intent to deceive the PTO.

136.    Allergan also argued to the Examiner that an article published in 2012 entitled "The comparison of physicochemical properties of four Cross-linked sodium hyaluronate gels with different cross-linking agents" by Yu jia Cui, et al. ("Cui"), was evidence that supported its position of unexpected results.  (Ex. Z at 14, 18 (June 14, 2012 Response to Final Office Action)).

> a.    Allergan stated that Cui showed that BDDE-crosslinked HA fillers "are known to be especially sensitive to heat sterilization relative to HA gels crosslinked with other, i.e. non BDDE, crosslinkers."  (*Id*. at 18).
>
> b.    Cui compares the stability of BDDE-crosslinked HA with HA crosslinked with three other crosslinking agents.  Cui does not, however, test or compare BDDE to any of the three crosslinking agents (i.e., DVS, BDCI, DEO) that were known by persons of ordinary skill in the art to have been approved by FDA.
>
> c.    None of the crosslinkers tested in Cui appear to have ever been used as a dermal filler prior to August 2008.
>
> d.    Cui also does not evaluate the effect of lidocaine on any of the compositions that were tested.

137.    Accordingly, Cui provides no support for Allergan's assertion of unexpected results as it is not relevant to the purported invention disclosed in the Asserted Patents.

138.     Further, because Cui was not published until well after the time the '884 application was filed, it would not have informed a person of ordinary skill in the art's understanding of the viability of incorporating lidocaine into existing crosslinked-HA dermal fillers.

139.     Consequently, Cui was presented and argued misleadingly and with deceptive intent to support the patentability of the claims as Cui does not relate to lidocaine-containing products, nor does it not relate to any of the crosslinked-HA products that had already successfully incorporated lidocaine as of the time of the applications' filing.

140.     As a result of the Inventor Declaration, as well as Allergan's related arguments, however, on August 6, 2012, the Examiner allowed original claims 23-32, 34-36, 38, 40-50, and 55-67, specifically finding that Lebreton's assertions of unexpected results were sufficient to overcome the rejection.  (Ex. AA at 3-4 (August 6, 2012, Notice of Allowance and Fees Due) ("Applicant unexpectedly found that a hyaluronic acid gel cross-linked, but not with a non-hyaluronic acid biopolymer, mixed with lidocaine and sterilized does not degrade.")).  The allowed claims included claims that were not limited to BDDE-crosslinked HA, but instead would have covered products in existence and known to Lebreton at the time of the application's filing. In other words, but for the statements made in the Declaration by Lebreton, the Examiner would not have allowed, and in fact had already rejected, the above-mentioned claims.

141.     The Examiner withdrew his rejections and allowed the claims "in view of the claim amendments and unexpected results presented by Applicant."  *Id*. at 3. Thus, Lebreton's factual representations were material.

142.     The Inventor Declaration, however, did not cite to any prior art reference or otherwise corroborate the assertions contained therein.

## COUNT ONE
### (Declaration of Invalidity of all claims of the '475 patent)

143.    Prollenium realleges and incorporates by reference the foregoing paragraphs of this Amended Counterclaim.

144.    Allergan brought this action alleging infringement of the '475 patent by Prollenium.  Prollenium denies that it infringes any valid and enforceable claim of the '475 patent and contends that the claims of the '475 patent are invalid.  For at least these reasons, there exists an actual controversy between the parties regarding the validity of the claims of the '475 patent.

145.    Each and every claim of the '475 patent is invalid for failing to satisfy one or more of the conditions for patentability, or otherwise failing to comply with the requirements set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

146.    A judicial declaration is necessary and appropriate so that Prollenium can ascertain its rights regarding whether the claims of the '475 patent are invalid.

147.    The existence of this dispute creates a justiciable controversy between the parties, which this Court may hear pursuant to 28 U.S.C. § 2201(a).  The Court may further grant additional relief, including injunctive relief and damages, pursuant to 28 U.S.C. § 2202.

148.    This is an exceptional case under 35 U.S.C. § 285 because Allergan filed its Complaint with knowledge of the facts stated in this Counterclaim.

## COUNT TWO
### (Declaration of Invalidity of all claims of the '795 patent)

149.    Prollenium realleges and incorporates by reference the foregoing paragraphs of this Amended Counterclaim.

150.    Allergan brought this action alleging infringement of the '795 patent by Prollenium.  Prollenium denies that it infringes any valid and enforceable claim of the '795 patent and contends that the claims of the '795 patent are invalid.  For at least these reasons, there exists an actual controversy between the parties regarding the validity of the claims of the '795 patent.

151.    Each and every claim of the '795 patent is invalid for failing to satisfy one or more of the conditions for patentability, or otherwise failing to comply with the requirements set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

152.    A judicial declaration is necessary and appropriate so that Prollenium can ascertain its rights regarding whether the claims of the '795 patent are invalid.

153.    The existence of this dispute creates a justiciable controversy between the parties, which this Court may hear pursuant to 28 U.S.C. § 2201(a).  The Court may further grant additional relief, including injunctive relief and damages, pursuant to 28 U.S.C. § 2202.

154.    This is an exceptional case under 35 U.S.C. § 285 because Allergan filed its Complaint with knowledge of the facts stated in this Counterclaim.

## COUNT THREE
### (Declaration of Invalidity of all claims of the '676 patent)

155.    Prollenium realleges and incorporates by reference the foregoing paragraphs of this Amended Counterclaim.

156.    Allergan brought this action alleging infringement of the '676 patent by Prollenium.  Prollenium denies that it infringes any valid and enforceable claim of the '676 patent and contends that the claims of the '676 patent are invalid.  For at least these reasons, there exists an actual controversy between the parties regarding the validity of the claims of the '676 patent.

157.    Each and every claim of the '676 patent is invalid for failing to satisfy one or more of the conditions for patentability, or otherwise failing to comply with the requirements set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

158.    A judicial declaration is necessary and appropriate so that Prollenium can ascertain its rights regarding whether the claims of the '676 patent are invalid.

159.    The existence of this dispute creates a justiciable controversy between the parties, which this Court may hear pursuant to 28 U.S.C. § 2201(a).  The Court may further grant additional relief, including injunctive relief and damages, pursuant to 28 U.S.C. § 2202.

160.    This is an exceptional case under 35 U.S.C. § 285 because Allergan filed its Complaint with knowledge of the facts stated in this Counterclaim.

## COUNT FOUR
### (Declaration of Invalidity of all claims of the '519 patent)

161.    Prollenium realleges and incorporates by reference the foregoing paragraphs of this Amended Counterclaim.

162.    Allergan brought this action alleging infringement of the '519 patent by Prollenium.  Prollenium denies that it infringes any valid and enforceable claim of the '519 patent and contends that the claims of the '519 patent are invalid.  For at least these reasons, there exists an actual controversy between the parties regarding the validity of the claims of the '519 patent.

163.    Each and every claim of the '519 patent is invalid for failing to satisfy one or more of the conditions for patentability, or otherwise failing to comply with the requirements set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

164.    A judicial declaration is necessary and appropriate so that Prollenium can ascertain its rights regarding whether the claims of the '519 patent are invalid.

165.     The existence of this dispute creates a justiciable controversy between the parties, which this Court may hear pursuant to 28 U.S.C. § 2201(a).  The Court may further grant additional relief, including injunctive relief and damages, pursuant to 28 U.S.C. § 2202.

166.     This is an exceptional case under 35 U.S.C. § 285 because Allergan filed its Complaint with knowledge of the facts stated in this Counterclaim.

## COUNT FIVE
### (Declaration of Invalidity of all claims of the '013 patent)

167.     Prollenium realleges and incorporates by reference the foregoing paragraphs of this Amended Counterclaim.

168.     Allergan brought this action alleging infringement of the '013 patent by Prollenium.  Prollenium denies that it infringes any valid and enforceable claim of the '013 patent and contends that the claims of the '013 patent are invalid.  For at least these reasons, there exists an actual controversy between the parties regarding the validity of the claims of the '013 patent.

169.     Each and every claim of the '013 patent is invalid for failing to satisfy one or more of the conditions for patentability, or otherwise failing to comply with the requirements set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

170.     A judicial declaration is necessary and appropriate so that Prollenium can ascertain its rights regarding whether the claims of the '013 patent are invalid.

171.     The existence of this dispute creates a justiciable controversy between the parties, which this Court may hear pursuant to 28 U.S.C. § 2201(a).  The Court may further grant additional relief, including injunctive relief and damages, pursuant to 28 U.S.C. § 2202.

172.     This is an exceptional case under 35 U.S.C. § 285 because Allergan filed its Complaint with knowledge of the facts stated in this Counterclaim.

**COUNT SIX**
**(Declaration of Invalidity of all claims of the '322 patent)**

173.     Prollenium realleges and incorporates by reference the foregoing paragraphs of this Amended Counterclaim.

174.     Allergan brought this action alleging infringement of the '322 patent by Prollenium.  Prollenium denies that it infringes any valid and enforceable claim of the '322 patent and contends that the claims of the '322 patent are invalid.  For at least these reasons, there exists an actual controversy between the parties regarding the validity of the claims of the '322 patent.

175.     Each and every claim of the '322 patent is invalid for failing to satisfy one or more of the conditions for patentability, or otherwise failing to comply with the requirements set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112.

176.     A judicial declaration is necessary and appropriate so that Prollenium can ascertain its rights regarding whether the claims of the '322 patent are invalid.

177.     The existence of this dispute creates a justiciable controversy between the parties, which this Court may hear pursuant to 28 U.S.C. § 2201(a).  The Court may further grant additional relief, including injunctive relief and damages, pursuant to 28 U.S.C. § 2202.

178.     This is an exceptional case under 35 U.S.C. § 285 because Allergan filed its Complaint with knowledge of the facts stated in this Counterclaim.

**COUNT SEVEN**
**(Declaration of Unenforceability of all the Asserted Patents for Inequitable Conduct)**

179.     Prollenium realleges and incorporates by reference the foregoing paragraphs of this Amended Counterclaim.

180.     Each individual associated with the filing and prosecution of a patent application has an absolute duty of candor and good faith in dealing with the United States Patent and Trademark Office ("PTO").  37 C.F.R. § 1.56.  A breach of this duty may constitute inequitable conduct or "fraud on the PTO," rendering the patent unenforceable.

181.     In submitting the Inventor Declaration containing materially false information, Lebreton misrepresented and/or omitted material information regarding the prior art with the specific intent to deceive the PTO.

182.     As shown above, Lebreton actual knowledge of the successful incorporation of lidocaine into multiple dermal fillers by multiple competitors before August 4, 2008. Lebreton knew that the statements in his declaration, presented from the supposedly objective perspective of a person of ordinary skill in the art, were false.

183.     The totality of what was known in the art before August 4, 2008, as well the removal of discussions of relevant prior art from U.S. Application No. 12/393,884, further shows that Lebreton made misstatements in the Inventor Declaration knowing of their falsity and with the specific intention to deceive the Examiner.  And, in fact, Lebreton did deceive the Examiner into allowing the claims despite the teachings of the prior art.

184.     Prior to submitting the Inventor Declaration, the claims of U.S. Application No. 12/393,884 had been rejected by the Examiner, finding that it would have been obvious to one of ordinary skill in the art at the time of the invention to add lidocaine to existing crosslinked-HA dermal fillers.

185.     But for the misrepresentations in the Inventor Declaration, the Examiner would have, and in fact already had, rejected the claims of U.S. Application No. 12/393,884.

186.    Every claim of each of the Asserted Patents has been allowed because of the same knowingly false statements of unexpected results by Inventor Lebreton, as reflected in the Examiner's "Reasons for Allowance" for all six underlying patent applications. The Examiner believed that the claims were prima facie obvious. Allergan never overcame the prima facie case of obviousness presented by the Examiner in any of the applications, and the Examiner allowed each and every claim only because of the false declaration of unexpected results.

187.    In the August 6, 2012 Notice of Allowance for Application 12/393,884 that eventually issued as the '795 patent, the Examiner stated: "Applicant argues that one of ordinary skill in the art would have expected degradation of the hyaluronic acid gel with addition of lidocaine during sterilization, as this was what was known in the prior art. Applicant unexpectedly found that a hyaluronic acid gel crosslinked, but not with a non-hyaluronic acid biopolymer, mixed with lidocaine and sterilized does not degrade. … Claims 23-32, 34-36, 38, 40-53 and 55-67 are allowed." The Examiner also stated that he was withdrawing rejections of claims "in view of the unexpected results presented by Applicant." Claims 23-32, 34-36, 38, 40-53 and 55-67 were the only pending claims at the time. Thus, every claim of the '795 patent was allowed as a direct result of the Examiner accepting the false statements in the Inventor Declaration.

188.    In the March 25, 2013, Notice of Allowance for Application 12/393,768 that eventually issued as the '475 patent, the Examiner stated: "Applicant argues that they have unexpectedly found that the addition of lidocaine to the instant hyaluronic acid soft tissue filler did not result in instability of the composition as was expected by those of ordinary skill in the art at the time of the instant invention. Therefore, claims 1, 3-12, 14, 15, 17-22, 24, 26, 28-32, 35-38, and 40-48 are allowed." Claims 1, 3-12, 14, 15, 17-22, 24, 26, 28-32, 35-38, and 40-48

were the only pending claims at the time. Thus, every claim of the '475 patent was allowed as a direct result of the Examiner accepting the false statements in the Inventor Declaration.

189.    In the July 18, 2014, Notice of Allowance for Application 13/419,079 that eventually issued as the '676 patent, the Examiner stated: "Applicant argues that one of ordinary skill in the art would have expected degradation of the hyaluronic acid gel with addition of lidocaine during sterilization, as this was what was known in the prior art. Applicant unexpectedly found that a hyaluronic acid gel crosslinked, but not with a non-hyaluronic acid biopolymer, mixed with lidocaine and sterilized does not degrade. Therefore, claims 1 and 23-52 are allowed." Claims 1 and 23–-52 were the only pending claims at the time. Thus, every claim of the '676 patent was allowed as a direct result of the Examiner accepting the false statements in the Inventor Declaration.

190.    In the April 14, 2015, Notice of Allowance for Application 14/242,747 that eventually issued as the '519 patent, the Examiner stated: "Applicant provided unexpected results when combining HA crosslinked with BODE with lidocaine in a submission in the parent application 12/393,884 (now patent 8357795). Applicant argued that it was known by one of ordinary skill in the art at the time of the instant invention that HA gels formed by crosslinking HA with BDDE is less stable when subjected to sterilization procedures such as autoclaving compared to HA gels formed from crosslinking HA with other classes of crosslinkers. Therefore, Applicant argued in the parent application that they unexpectedly found that when lidocaine was added and the HA crosslinked gel was sterilized it was stable (response filed on 06/14/2012, pp. 14-18). Therefore, claims 1-8 are allowed." As explained above, the claims pending at the time in the '884 application ('795 patent) and the Inventor Declaration cover "other classes of crosslinkers" besides BDDE; they are not limited to HA gels formed by crosslinking HA with

BDDE. Claims 1–8 were the only pending claims at the time. Thus, every claim of the '519 patent was allowed as a direct result of the Examiner accepting the false statements in the Inventor Declaration.

191.    In the September 9, 2015, Notice of Allowance for Application No. 13/746,170 that eventually issued as the '013 patent, the Examiner stated: "Applicant provided unexpected results when combining HA crosslinked with BDDE with **lidocaine in a submission in the parent application 12/393,884 (now patent 8357795)**. … **Applicant argued in the parent application** that they unexpectedly found that when lidocaine was added and the HA crosslinked gel was sterilized it was stable (response filed on 06/14/2012, pp. 14-18). **Therefore, claims 14-17 are allowed.**" (emphasis added). Claims 14–17 were the only pending claims at the time. Thus, every claim of the '013 patent was allowed as a direct result of the Examiner accepting the false statements in the Inventor Declaration.

192.    In the February 5, 2016, Notice of Allowance for Application No. 13/891,052 that eventually issued as the '322 patent, the Examiner stated his reason for allowing the claims as: "Applicant has shown that the combination of crosslinked hyaluronic acid and lidocaine are stable when exposed to high temperatures necessary in sterilizing the composition (**See unexpected results arguments in copending application 12/393768** [the application that eventually issued as the '475 patent]. **For the foregoing reasons claims 1, 2, 6, and 11 are allowed.**" (emphasis added). Claims 1, 2, 6, and 11 were the only pending claims at the time. Thus, every claim of the '322 patent was allowed as a direct result of the Examiner accepting the false statements in the Inventor Declaration.

193.    Thus, each of the Asserted Patents were obtained based on the same conduct by the Applicant and Inventor Lebreton.

194.     The Asserted Patents were obtained as a result of inequitable conduct before the PTO.  As a result, all of the Asserted Patents are unenforceable.

195.     A judicial declaration is necessary and appropriate so that Prollenium can ascertain its rights regarding whether the Asserted Patents are unenforceable.

196.     The existence of this dispute creates a justiciable controversy between the parties, which this Court may hear pursuant to 28 U.S.C. § 2201(a).  The Court may further grant additional relief, including injunctive relief and damages, pursuant to 28 U.S.C. § 2202.

## JURY DEMAND

Prollenium respectfully requests a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Prollenium prays for the following relief:

A.     Dismissal of the Amended Complaint with prejudice, denying each and every prayer for relief contained therein;

B.     A declaratory judgment that each and every claim of the '475 patent is invalid;

C.     A declaratory judgment that each and every claim of the '795 patent is invalid;

D.     A declaratory judgment that each and every claim of the '676 patent is invalid;

E.     A declaratory judgment that each and every claim of the '519 patent is invalid;

F.     A declaratory judgment that each and every claim of the '013 patent is invalid;

G.     A declaratory judgment that each and every claim of the '322 patent is invalid;

H.     A declaratory judgment that each of the Asserted Patents are unenforceable due to inequitable conduct before the United States Patent & Trademark Office;

I.     An order awarding Prollenium its costs and expenses;

J.      An order declaring this to be an exceptional case and, pursuant to 35 U.S.C.

§ 285, awarding Prollenium its reasonable attorneys' fees;

K.      Such other further relief as the Court deems just and proper.

ASHBY & GEDDES

*/s/ Andrew C. Mayo*

_____

John G. Day (#2403)
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
jday@ashbygeddes.com
amayo@ashbygeddes.com

*Of Counsel:*                                                     *Attorneys for Defendants*

John W. Harbin
Gregory J. Carlin
Warren Thomas
Robert J. Leonard
MEUNIER CARLIN & CURFMAN LLC
999 Peachtree Street NE, Suite 1300
Atlanta, GA  30309
(404) 645-7700

Dated:  January 24, 2020

# EXHIBIT A

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| Appln. Serial No. : 12/393,884 | ) Examiner:  Ali Soroush |
| Applicant : Pierre F. Lebreton | ) Art unit:    1617 |
| Filing Date: February 26, 2009 | ) |
| For: HYALURONIC ACID-BASED | ) |
| GELS INCLUDING LIDOCAINE | ) Confirmation No.  1553 |

**DECLARATION UNDER 37 C.F.R § 1.132**

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

1.      I am employee of Allergan, Inc., the assignee of this application.

2.      I am an expert in the area of polymer chemistry for medical aesthetics.  I hold Ph.D in Chemistry and Physico-Chemistry of Polymers, from the University of Montpellier-France, and a Masters of Science degree in Polymer Material from the National Chemistry School of Montpellier, France.

3.      I am also the inventor of the invention claimed in the above referenced subject patent application.

4.      I am familiar with the state of the art related to soft tissue fillers comprising crosslinked hyaluronic acid ("HA") shortly prior to August 4, 2008.  My statements below are directed to the knowledge and belief of those having ordinary skill in the art at this time.

5.      It was believed that adding lidocaine to hyaluronic acid gel compositions during manufacturing caused degradation of the hyaluronic acid prior to injection of the HA as a dermal filler.

6.     It was believed that lidocaine caused degradation of HA gel compositions during high temperature sterilization.

7.     It was not known whether  HA compositions comprising lidocaine were stable or not after high temperature sterilization when placed in storage for any significant length of time.

8.     It was also believed that the instability of HA described above would have caused a viscosity reduction of the HA that would make it unsuitable for soft tissue filling applications.

9.     Based upon the facts set forth above, a person of ordinary skill in the art would have expected that a dermal filler comprising hyaluronic acid and lidocaine would not have remained sufficiently stable to be useful as a soft tissue filler.

10.     It was not appreciated that a dermal filler comprising a cohesive gel of hyaluronic acid makes it possible for lidocaine to be combined with hyaluronic acid in a gel that is sufficiently stable to be useful as a soft tissue filler.

11.     The enhanced stability properties of the inventive dermal fillers was evidenced by certain experiments performed under my direction by my research team prior to the application filing date.

12.     The experiments are generally set forth in the patent application in the Examples and Drawings.

13.     The experiments showed that certain HA gels, when mixed with lidocaine, degraded and became substantially less viscous after high temperature sterilization, specifically autoclave sterilization, as would have been expected by one of ordinary skill in the art.  This is shown in Figures 1-3 of the application.  Samples 1, 2 and 3 exhibited a decrease in viscosity of approximately 60%, 73% and 35%, respectively.

14.     I discovered that other HA gels, when mixed with lidocaine, maintained their viscosity and elasticity, even after such high temperature sterilization.  This is shown in Figures 4, 5 and 7 of the application. Samples 4, 5 and 6 exhibited a decrease in

- 2 -

Application Serial No. 12/393,884                                    Docket No. 18438-59 (COR)

viscosity of approximately 30%, 0% and 13%, respectively and a non-significant viscosity change (measured at ~4%, +9%, -2%, respectively, below 10%) with additional pH adjustment.

15.    To my knowledge, it was a surprising and unexpected discovery, not appreciated prior to the present invention, that  certain cohesive HA gels, as defined in the application, when mixed with lidocaine, could be made to be heat and shelf stable.

17.    I hereby declare that all statements made herein of my own knowledge and belief are true; and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code, and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

**SIGNATURE**

Date: _May, 2nd 2012_

Pierre F. Lebreton

Signed at: _Péângy ( France)_

- 3 -

# EXHIBIT B

# Exhibit 11



CONFIDENTIAL – SUBJECT TO PROTECIVE ORDER

Juanita R. Brooks (CA Bar No. 75934) (brooks@fr.com)
Craig E. Countryman (CA Bar No. 244601) (countryman@fr.com)
Lara S. Garner (CA Bar No. 234701) (lgarner@fr.com)
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, CA 92130
Telephone: (858) 678-5070 / Fax: (858) 678-5099

Jonathan E. Singer (CA Bar No. 187908) (singer@fr.com)
Michael J. Kane (kane@fr.com)
FISH & RICHARDSON P.C.
60 South Sixth Street, Suite 3200
Minneapolis, MN 55402
Telephone:  (612) 335-5070 / Fax:  (612) 288-9696

Susan M. Coletti (coletti@fr.com)
Elizabeth M. Flanagan (eflanagan@fr.com)
FISH & RICHARDSON P.C.
222 Delaware Avenue, 17th Floor
Wilmington, DE 19899
Telephone:  (302) 652-5070 / Fax:  (302) 652-0607

Attorneys for Plaintiffs
ALLERGAN USA, INC. and
ALLERGAN INDUSTRIE, SAS

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALLERGAN USA, INC., and ALLERGAN INDUSTRIE, SAS,<br><br>Plaintiffs,<br><br>v.<br><br>MEDICIS AESTHETICS, INC., MEDICIS PHARMACEUTICAL CORP., VALEANT PHARMACEUTICALS NORTH AMERICA LLC, VALEANT PHARMACEUTICALS INTERNATIONAL, and VALEANT PHARMACEUTICALS INTERNATIONAL, INC. AND GALDERMA LABORATORIES, L.P. | Case No. 8:13-cv-01436 AG (JPRx)<br><br>**PLAINTIFFS' FISRT SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANTS' INTERROGATORY NO. 3** |

1

PLAINTIFFS' FIRST SUPPLEMENTAL RESPONSE TO
INTERROGATORY NO. 3
CASE NO. 8:13-CV-01436 AG (JPRx)

CONFIDENTIAL – SUBJECT TO PROTECIVE ORDER

| Defendants. |

1  
2       Pursuant to Rule 33 of the Federal Rules of Civil Procedure and the Local

3  Rules of the United States District Court for the Central District of California,

4  Plaintiffs Allergan USA, Inc. and Allergan Industries, SAS (collectively,

5  "Allergan") hereby respond to Defendants' Interrogatory No. 3 as follows.

6       Investigation and discovery is ongoing in this case.  Allergan's objections and

7  responses are based upon information currently available to Allergan, and are made

8  without prejudice to Allergan's rights to use or rely on any subsequently discovered

9  information.

10                       **GENERAL OBJECTIONS**

11       The following General Objections are incorporated into and made a part of

12  the response:

13       1.      Plaintiffs object to Defendants' definition of "You," "Your,"

14  "Allergan," and "Plaintiffs" as vague, ambiguous and overly broad and inconsistent

15  with the Federal Rules of Civil Procedure to the extent it purports to include

16  information outside Allergan's possession, custody or control and conflates legally

17  distinct entities Allergan USA, Inc. and Allergan Industrie, SAS.

18       2.      Allergan objects to the Interrogatories, and the "Definitions" and

19  "Instructions" contained in the Interrogatories, to the extent that they are

20  inconsistent with or seek to impose obligations on Allergan beyond those imposed

21  by the Federal Rules of Civil Procedure, the Local Rules of the United States

22  District Court for the Central District of California, Judge Guilford's Standing

23  Patent Rules, and any applicable Court Order.  Such Definitions and Instructions

24  render Interrogatories subject to them vague, ambiguous, overly broad, unduly

25  burdensome, improperly divided into multiple sub-parts, and otherwise inconsistent

26  with the Federal Rules of Civil Procedure.  Allergan will abide by the Federal Rules

27  of Civil Procedure, the Local Rules of the United States District Court for the

28

2       PLAINTIFFS' FIRST SUPPLEMENTAL RESPONSE TO
                                INTERROGATORY NO. 3
                            CASE NO. 8:13-CV-01436 AG (JPRx)

CONFIDENTIAL – SUBJECT TO PROTECIVE ORDER

1 Central District of California, Judge Guilford's Standing Patent Rules, and any
2 applicable Court Order in responding to the Interrogatories.

3       3.     By identifying a document in response to an Interrogatory, Allergan
4 does not admit that the document is free of information that is privileged or immune
5 from discovery, nor does Allergan waive its right to withhold any portion of the
6 document that is privileged or immune from discovery.

7       4.     By identifying a document in response to an Interrogatory, Allergan
8 does not admit that the document is relevant or admissible at a hearing or trial of this
9 action (e.g., as coming within an exception to the hearsay rule, Fed. R. Evid. 802).

10       5.     In those instances where the response to the Interrogatories can be
11 derived from Allergan's business records—or from an examination, audit or
12 inspection of such business records—and the burden of deriving or ascertaining the
13 answer is substantially the same for Defendants as for Allergan, Allergan will
14 specify the record(s) from which a complete answer may be ascertained and afford
15 Defendants a reasonable opportunity to audit, inspect, and copy such records, or will
16 provide copies of such records in accordance with Federal Rule of Civil Procedure
17 33(d).

18       6.     Allergan objects to the Interrogatories to the extent that they seek
19 information protected by the attorney-client privilege, work-product doctrine, and/or
20 any other applicable privilege or immunity.

21       7.     Allergan objects to the Interrogatories to the extent that they seek
22 information that is not relevant and admissible or not reasonably calculated to lead
23 to the discovery of admissible evidence.

24       8.     To the extent that the Interrogatories seek duplicative or cumulative
25 information provided in response to other discovery requests, Allergan objects to
26 them on the grounds that they are overly broad, unduly burdensome, and/or seek

27

28
            3     PLAINTIFFS' FIRST SUPPLEMENTAL RESPONSE TO
INTERROGATORY NO. 3
CASE NO. 8:13-CV-01436 AG (JPRx)

CONFIDENTIAL – SUBJECT TO PROTECIVE ORDER

1  information that is neither relevant nor reasonably calculated to lead to the discovery
2  of admissible evidence.

3        9.     Allergan objects to each Interrogatory to the extent that it seeks
4  information containing confidential or proprietary information of a non-party or
5  information that is covered by a confidentiality agreement between Allergan and the
6  non-party, unless the non-party agrees to a suitable protective order or consents in
7  writing to disclosure to Defendants.

8        10.    Allergan objects to the Interrogatories to the extent that they seek
9  information that is a matter of public record or that is otherwise equally available to
10  or already in the possession of Defendants.

11        11.    Allergan objects to the Interrogatories to the extent that they seek
12  information not in Allergan's possession, custody, or control.

13        12.    Allergan objects to the Interrogatories to the extent that they are vague,
14  ambiguous, indefinite, overbroad, unduly burdensome, duplicative, cumulative,
15  unlimited in time or scope, or otherwise unclear as to the information sought.

16        13.    Allergan objects to Defendants' definition of "Patent" as vague,
17  ambiguous and overly broad, and inconsistent the Federal Rules of Civil Procedure.

18        14.    Allergan objects to Defendants' definition of "Prior Art" as vague,
19  ambiguous and overly broad, and inconsistent the Federal Rules of Civil Procedure.

20        15.    Allergan objects to Defendants' definition of "Patent Application(s)" as
21  vague, ambiguous and overly broad, and inconsistent the Federal Rules of Civil
22  Procedure.

23        16.    Allergan reserves the right to supplement, amend, modify, or correct its
24  responses to Defendants' Interrogatories as additional evidence pertinent to this
25  action becomes available.

26        17.    The General Objections and Specific Objections are made as to matters
27  that are clearly objectionable on the face of the Interrogatories.  Allergan makes the

28

4     PLAINTIFFS' FIRST SUPPLEMENTAL RESPONSE TO
INTERROGATORY NO. 3
CASE NO. 8:13-CV-01436 AG (JPRx)

CONFIDENTIAL – SUBJECT TO PROTECIVE ORDER

1  objections without prejudice to and without waiver of its right to object on any

2  grounds to any of the Interrogatories.

3       18.    Any failure to repeat all or any part of the General Objections in any

4  specific response shall not constitute a waiver or relinquishment of such objection.

5       The foregoing General Objections are incorporated into each of Allergan's

6  responses irrespective of whether such Objection is expressly referred to by

7  Allergan's answer to a specific Interrogatory.  The repetition or omission of a

8  particular General Objection in a specific answer is not a waiver of any of

9  Allergan's General Objections.

10       Since discovery is still ongoing and Allergan's investigation continues,

11  Allergan reserves its right to supplement its Objections and Responses.  The

12  following Responses reflect Allergan's present knowledge, information, and belief,

13  and as permitted by the Federal Rules of Civil Procedure, may be changed,

14  modified, or supplemented based on discovery or as additional facts and

15  circumstances come to Allergan's attention.  Allergan reserves the right to produce

16  evidence of any subsequently discovered fact, to alter or amend the Objections and

17  Responses set forth herein, and otherwise to assert factual and legal contentions as

18  additional facts are ascertained, analyses are made, and legal research is completed.

19       **RESPONSES TO INTERROGATORIES**

20  **INTERROGATORY NO. 3:**

21       Separately for each asserted claim of the Patents-in-Suit, state the
circumstances of the conception and reduction to practice of the claimed subject

22  matter, including the earliest dates of conception and reduction to practice that You
will rely upon in this litigation, each and every fact on which You rely as a basis for

23  those dates (including any evidence of diligence between those dates), persons
involved as participants or witnesses, and the identity of all documents and persons

24  that can support or refute the described circumstances.

25  **RESPONSE TO INTERROGATORY NO. 3:**

26       Allergan objects to this Interrogatory as purporting to be a single

27  interrogatory when, on its face, it includes multiple, discrete subparts.  Allergan also

28  

5    PLAINTIFFS' FIRST SUPPLEMENTAL RESPONSE TO
INTERROGATORY NO. 3
CASE NO. 8:13-CV-01436 AG (JPRx)

CONFIDENTIAL – SUBJECT TO PROTECIVE ORDER

1 objects to this Interrogatory as premature because it seeks Allergan's contentions
2 regarding conception, diligence and reduction to practice before discovery is
3 substantially complete.  It is not appropriate to require answers to contention
4 interrogatories until discovery is substantially complete (unless otherwise ordered
5 by the Court, which has not occurred here).  *See AMEC Env't & Infrastructure, Inc.*
6 *v. Geosyntec Consultants Inc.*, 2013 WL 3923459, at *4 (N.D. Cal. July 26, 2013);
7 *B. Braun Med. Inc. v. Abbott Labs.*, 155 F.R.D. 525, 527 (E.D. Pa. 1994); *Nestle*
8 *Foods Corp. v. Aetna Cas. & Surety Co.*, 135 F.R.D. 101, 110-111 (D.N.J.1990); *In*
9 *re Convergent Techs. Sec. Litig.*, 108 F.R.D. 328, 332 (N.D. Cal. 1985); *see also*
10 *Nat'l Acad. of Recording Arts & Scis., Inc. v. On Point Events, LP*, 256 F.R.D. 678,
11 682 n.5 (C.D. Cal. Feb. 25, 2009).
12     Allergan further objects to this Interrogatory to the extent that it seeks
13 discovery of information that is subject to the attorney-client privilege, work product
14 immunity, and/or any other applicable privilege or immunity.
15     Allergan also objects to this Interrogatory as overly broad, unduly
16 burdensome, and cumulative in that it seeks "each and every fact" and "all
17 documents and persons."
18     Allergan further objects to this Interrogatory to the extent that it seeks
19 information that is neither relevant nor reasonably calculated to lead to the discovery
20 of admissible evidence.  Defendants have not yet identified any relevant prior art
21 that would render the information sought by this Interrogatory relevant.
22     Allergan also objects that this Interrogatory calls for a legal conclusion.
23     Subject to the forgoing general and specific objections, and without waiving
24 any such objections, Allergan will provide a response to this contention
25 Interrogatory once fact discovery is substantially complete if Defendants identify
26 prior art that makes a conception date or reduction to practice date a relevant issue
27 in this case.
28

6          PLAINTIFFS' FIRST SUPPLEMENTAL RESPONSE TO
INTERROGATORY NO. 3
CASE NO. 8:13-CV-01436 AG (JPRx)

CONFIDENTIAL – SUBJECT TO PROTECIVE ORDER

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3:**

1
2        Allergan hereby incorporates by reference its Response to Interrogatory No. 3
dated March 11, 2014.
3
4        Subject to the foregoing general and specific objections, and without waiving
such objections, Allergan supplements its response as follows:
5
6        In the early 2000s, Allergan (then known as Group Corneal Laboratories,
7    based in France), was a leading manufacturer and developer of hyaluronic acid (HA)
products.  Those products included Rhexeal, an ophthalmic product composed of
8    uncrosslinked HA, and the Juvederm and Surgiderm line of dermal filler products,
9    composed of BDDE-crosslinked HA.
10
11       Building on its expertise in HA-based products, in late 2004 Allergan sought
to improve its dermal filler line of products and satisfy an existing market need by
12   incorporating lidocaine directly into a BDDE-crosslinked HA dermal filler
13   compositions.
14
15       Inventor Dr. Pierre Lebreton sought to develop a stable, sterile BDDE-
crosslinked HA dermal filler containing the anesthetic agent lidocaine.  He first
16   sought to incorporate the lidocaine into the existing Juvederm and Surgiderm
17   products during the course of manufacture to achieve a stable, sterile BDDE-
18   crosslinked HA filler containing lidocaine that had a duration of clinical effect and
19   physical characteristics at least equivalent to that of the Juvederm and Surgiderm
20   line of products.  However, the properties of lidocaine and the manufacturing
21   process—namely, high-temperature heat sterilization—posed significant obstacles
22   to this goal.  Because lidocaine HCl is acidic, its addition would decrease the pH of
23   the gel composition, leading to acid-catalyzed hydrolytic degradation of the
24   crosslinked HA.  Subjecting the more acidic lidocaine-containing gel to standard
25   high-temperature autoclave sterilization conditions was thought to increase the rate
26   of acid hydrolysis of HA, exacerbating the degradation of crosslinked HA.  If the
27   degradative effect on HA was great enough, the composition's physical properties
28

7        PLAINTIFFS' FIRST SUPPLEMENTAL RESPONSE TO
                 INTERROGATORY NO. 3
                 CASE NO. 8:13-CV-01436 AG (JPRx)

CONFIDENTIAL – SUBJECT TO PROTECIVE ORDER

1   could be substantially impacted, rendering the composition unacceptable as a dermal
2   filler.  In addition, it was not known whether even if a viable filler survived the
3   manufacturing process its physical and other properties could be maintained over an
4   acceptable shelf life.  Further, it was believed that adding salts to the compositions,
5   including from lidocaine HCl or from any pH adjustment associated with the
6   introduction of lidocaine, could alter and degrade the composition's physical
7   properties.

8         Dr. Lebreton, assisted primarily by Samuel Gavard, undertook a series of
9   studies and experiments in 2005.  Those studies included evaluation of lidocaine's
10  reaction to the manufacturing and sterilization processes used with the Juvederm
11  and Surgiderm BDDE-crosslinked gel bases, and determination of lidocaine's
12  impact on the properties of those gels.  Work on the compositions included, for
13  example, analyzing the effect of lidocaine on the pH of the gel, pH optimization,
14  assessing the impact of sterilization on the compositions' properties, and stability
15  testing.  The laboratory work supporting the studies and experiments is reported in
16  AGNHA00188334-597; *see also* AGNHA00176334-371; AGNHA00176372-515;
17  AGNHA_T00188334-597.

18        During the course of the development work, Dr. Lebreton discovered that
19  after incorporating lidocaine into a BDDE-crosslinked HA dermal filler, referred to
20  as gel 30, and autoclaving it, the composition did not substantially degrade over
21  time, either with or without pH adjustment, as evidenced by rheological testing
22  conducted at 0.1 Hz over the course of accelerated stability testing.  *See, e.g.*,
23  AGNHA188451; AGNHA 176613-24; AGNHA 176625-32.  This was in contrast to
24  what Dr. Lebreton observed upon adding lidocaine to uncrosslinked HA
25  compositions, which exhibited a substantial, prohibitive viscosity loss after heat
26  sterilization.  *See, e.g.*, AGNHA 188334-597; AGNHA_T00188334-597; AGNHA
27  317844, AGNHA 298493, AGNHA 189883.

28

8   PLAINTIFFS' FIRST SUPPLEMENTAL RESPONSE TO
    INTERROGATORY NO. 3
    CASE NO. 8:13-CV-01436 AG (JPRx)

CONFIDENTIAL – SUBJECT TO PROTECIVE ORDER

1    Pursuant to Fed. R. Civ. P. 33(d), additional information responsive to this

2  Interrogatory can be found in the following exemplary documents:  AGNHA

3  185800-02; AGNHA 185749-50; AGNHA 185744-45; AGNHA 187380-89;

4  AGNHA0185731-62; AGNHA 187356-64; AGNHA 185966-67; AGNHA 192350-

5  52; AGNHA 183214-70; AGNHA 176625-32; AGNHA 185746; AGNHA 176613-

6  24; AGNHA 187365-71; AGNHA 192290-91; AGNHA 176174-84; AGNHA

7  176000-02; AGNHA 176207-12; AGNHA 189883-89; AGNHA 317844; AGNHA

8  298493-95; AGNHA176003-09; AGNHA 187259-63.

9    Based on the above, by 2005, Dr. Lebreton had identified and made certain

10  heat-sterilized crosslinked-HA dermal fillers containing lidocaine that would be

11  commercially acceptable, shelf stable, and provide adequate pain relief at the time of

12  injection.  Dr. Lebreton continued to refine these compositions while developing

13  additional lidocaine-containing BDDE-crosslinked dermal filler compositions,

14  including Juvederm Ultra 2, 3 and 4, and Juvederm Voluma XC, first sold in

15  Europe, and Juvederm Ultra XC and Juvederm Ultra Plus XC.  To the extent the

16  inventions of the '795 and '475 patents were not actually reduced to practice, they

17  were constructively reduced to practice when provisional application nos.

18  61/085,956, 61/087,934, and 61/096,278 were filed on August 4, August 11, and

19  September 11, 2008, respectively.  Pursuant to Fed. R. Civ. P. 33(d), additional data

20  incorporated into the provisional applications can be found in the following

21  exemplary documents:  *see, e.g.*, AGNHA 187631-73; AGNHA 176575-612.

22    Investigation and discovery is ongoing in this case.  The objections and

23  contentions are based upon information currently available to Allergan, and are

24  made without prejudice to Allergan's rights to use or rely on any subsequently

25  discovered information.  Allergan specifically reserves the right to supplement,

26  amend, modify, and/or correct this response after discovery is substantially

27  complete.

28

9    PLAINTIFFS' FIRST SUPPLEMENTAL RESPONSE TO
INTERROGATORY NO. 3
CASE NO. 8:13-CV-01436 AG (JPRx)

CONFIDENTIAL – SUBJECT TO PROTECIVE ORDER

Dated:  January 6, 2014                    FISH & RICHARDSON P.C.


                                           By:  _/s/ Elizabeth M. Flanagan_____
                                                Elizabeth M. Flanagan

                                           Attorney for Plaintiffs
                                           ALLERGAN USA, INC. and
                                           ALLERGAN INDUSTRIE, SAS

10          PLAINTIFFS' FIRST SUPPLEMENTAL RESPONSE TO
            INTERROGATORY NO. 3
            CASE NO. 8:13-CV-01436 AG (JPRx)

CONFIDENTIAL – SUBJECT TO PROTECIVE ORDER

## <u>PROOF OF SERVICE</u>

1

2      I am employed in the County of New Castle, my business address is Fish &

3   Richardson P.C., 222 Delaware Avenue, 17th Floor, Wilmington, Delaware.  I am

4   over the age of 18 and not a party to the foregoing action.

5      On January 6, 2015, I caused a copy of the following document(s):

6

7   **PLAINTIFFS' FISRT SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANTS' INTERROGATORY NO. 3**

8   to be served on the interested parties in this action by ELECTRONIC MAIL, via

9   the email addresses set forth below:

10
11      Donald G. Norris                        William F. Cavanaugh, Jr.
        dnorris@norgallaw.com            wfcavanaugh@pbwt.com
12      Douglas F. Galanter                    William F. Schmedlin
        dgalanter@norgallaw.com          wschmedlin@pbwt.com
13      Norris & Galanter LLP                Scott B. Howard
        523 West Sixth Street                sbhoward@pbwt.com
14      Suite 716                                  Adam E. Pinto
15      Los Angeles, CA 90014             apinto@pbwt.com
                                                      Patterson Belknap Webb & Tyler LLP
16                                                   1133 Avenue of the Americas
17                                                   New York, NY  10036

18      I declare that I am employed in the office of a member of the bar of this Court

19   at whose direction the service was made.

20      I declare under penalty of perjury that the above is true and correct.  Executed

21   on January 6, 2015, at Wilmington, DE.

22                                          _/s/ Elizabeth M. Flanagan_
                                                Elizabeth M. Flanagan
23

24

25

26

27                         11      PLAINTIFFS' FIRST SUPPLEMENTAL RESPONSE TO
                                             INTERROGATORY NO. 3
28                                           CASE NO. 8:13-CV-01436 AG (JPRx)

# EXHIBIT C

# REDACTED IN ITS ENTIRETY

# EXHIBIT D

# REDACTED IN ITS ENTIRETY

# EXHIBIT E

# REDACTED IN ITS ENTIRETY

# EXHIBIT F

# REDACTED IN ITS ENTIRETY

# EXHIBIT G

# REDACTED IN ITS ENTIRETY

# EXHIBIT H

# REDACTED IN ITS ENTIRETY

# EXHIBIT I

| From: | Pierre Lebreton ███████████████████ |
|---|---|
| | ███████████████████ |
| Sent: | ███████████████, 2005 ███████ |
| To: | ████████████████████████████████████ |
| | ████████ |
| Subject: | info puragen |

Mentor's Puragen and Puragen Plus Dermal Filler Products Approved in Canada Monday December 19, 8:30 am ET Non-Animal-Based, Stabilized, Hyaluronic Acid Dermal Filler Products Manufactured with Mentor's Patented DXL(TM) Technology

SANTA BARBARA, Calif.--(BUSINESS WIRE)--Dec. 19, 2005--Mentor Corporation (NYSE:MNT - News), a leading supplier of medical products in the United States and internationally, today announced that it has received approval to begin marketing and distributing its Puragen(TM) and Puragen Plus(TM) hyaluronic acid-based dermal filler products in Canada. Both products are indicated for the correction of facial folds and wrinkles and for lip augmentation and will be distributed through Mentor's Canadian subsidiary.
ADVERTISEMENT

"Mentor's dermal filler products are important new options that help me optimize facial rejuvenation outcomes for my patients," commented Claudio De Lorenzi, M.D., Board Certified Plastic Surgeon and past-President of the Canadian Society for Aesthetic Plastic Surgery and current President of the Canadian Laser Aesthetic Surgery Society. "I am pleased to now have access to both of these products for my patients in Canada. It is important to have alternatives, and I predict that a product that contains anesthetic will be extremely popular among doctors and patients."

The medical device license applications granted by Health Canada for Puragen and Puragen Plus were based on data from the Company's U.S. pivotal clinical trial for Puragen Plus. Both Puragen and Puragen Plus are uniquely stabilized through Mentor's patent-protected DXL(TM) technology, which introduces two discrete cross-linking reactions to provide improved product stability relative to all other commercially available hyaluronic acid based dermal fillers on the market in Europe, Canada and the United States. Puragen Plus is the only hyaluronic acid-based product on the market in Canada that is formulated with an anesthetic for improved patient comfort.

"Puragen and Puragen Plus are Mentor's first products for the fast growing facial rejuvenation market, and we are pleased that they are now available in Canada," commented Joshua H. Levine, President and Chief Executive Officer of Mentor Corporation. "We are committed to developing and marketing leading products based on advancements in science and technology and expect to expand our portfolio with botulinum toxin and other products used in non-surgical cosmetic procedures in the future."

Puragen was launched in Europe in May 2005. The CE Mark for Puragen Plus is pending. In the United States, Mentor expects to complete the filing of its pre-market approval application for Puragen Plus in the fourth quarter of fiscal year 2006, which ends March 31, 2006.

About Mentor Corporation

AGNHA00435103

AGN-RVP-0458230

Founded in 1969, Mentor Corporation is a leading supplier of medical products for the global healthcare market. The Company develops, manufactures and markets innovative, science-based products for the aesthetics, urologic specialties and clinical and consumer healthcare markets around the world. The Company's website is www.mentorcorp.com.

Safe Harbor Statement

All statements included or incorporated by reference in this release, other than statements or characterizations of historical fact, are forward-looking statements. These forward-looking statements are based on our current expectations, estimates and projections about our industry, management's beliefs and certain assumptions made by us. Forward-looking statements in this press release include but are not limited to those statements related to the "fast growing facial rejuvenation market", "our commitment to developing and marketing leading products based on advancements in science and technology", and "expect to expand our portfolio with botulinum toxin and other products used in non-surgical cosmetic procedures in the future." Forward-looking statements can also be identified by words such as "anticipates," "expects," "intends," "plans," "predicts," "believes," "seeks," "estimates," "may," "will," "should," "would," "could," "provide," "potential," "continue," similar expressions, and variations or negatives of these words. In addition, any statements that refer to expectations, projections or other characterizations of future events or circumstances, including any underlying assumptions, are forward-looking statements. These forward-looking statements speak only as of the date hereof and are based upon the information available to us at this time. Such information is subject to change, and we will not necessarily inform you of such changes. These statements are not guarantees of future results and are subject to risks, uncertainties and assumptions that are difficult to predict. Therefore, our actual results could differ materially and adversely from those expressed in any forward-looking statement as a result of various factors.

The Securities and Exchange Commission filings of Mentor, including, without limitation, its Annual Reports on Form 10-K, subsequent quarterly reports on Form 10-Q, and recent Current Reports on Form 8-K, discuss important risk factors that could contribute to such differences or otherwise affect its business, results of operations and financial condition. Mentor undertakes no obligation to revise or update publicly any forward-looking statement for any reason.

Contact:
Mentor Corporation
Peter R. Nicholson, 805-879-6082

2

AGNHA00435104

AGN-RVP-0458231

# EXHIBIT J

| From: | Pierre Lebreton ████████████ ████████████ |
|---|---|
| Sent: | ████████████, 2006 ███████ |
| To: | ████████████████████████ |
| Subject: | TR: Keyword News: [hyaluronic] |

pour infos, nouveau HA filler avec lidocaine (REDEFYNE) -----Message d'origine----- ████████████
████████████████████████████████████████████
██████████████████

Yahoo! Alerts    Yahoo! News - My Alerts - Edit Alert
Friday, February 17, 2006 11:05 AM PST

Anika gets EU OK to sell wrinkle filler
Mass High Tech Fri, 17 Feb 2006 7:43 AM PST
The European Union has given Woburn-based Anika Therapeutics Inc. CE Mark approval to market its cosmetic tissue augmentation product, Redefyne, in the EU.

Anika Therapeutics Receives CE Mark for its REDEFYNE(TM) Cosmetic Tissue Augmentation Product
PR Newswire via Yahoo! Finance Thu, 16 Feb 2006 1:45 PM PST
Anika Therapeutics, Inc. today announced that it has received CE Mark approval to market its cosmetic tissue augmentation product, REDEFYNE, in the European Union. REDEFYNE is an injectable soft tissue filler for facial wrinkles, scar remediation and lip augmentation.

See more news stories that match my keyword

‗‗‗‗‗‗

You received this email because you subscribed to Yahoo! Alerts. Use this link to unsubscribe from this alert. To change your communications preferences for other Yahoo! business lines, please visit your Marketing Preferences. To learn more about Yahoo!'s use of personal information, including the use of web beacons in HTML-based email, please read our Privacy Policy. Yahoo! is located at 701 First Avenue, Sunnyvale, CA 94089.

AGNHA00435105

AGN-RVP-0458232

# EXHIBIT K

**To:** Lebreton ██████████████████████████████
**Cc:** ██████████████████████████
**From:** ████████████
**Sent:** ████████ 2008 ██████████
**Importance:** Normal
**MAIL_RECEIVED:** ████████ 2008 ████████
<u>BUSINESS WIRE_07.08.08_Anika Therapeutics Announces.doc</u>

Pierre/████████

████████████████████████████████████████

**About Elevess** Anika's Elevess is the first FDA approved injectable soft-tissue
filler to combine hyaluronic acid (HA) and lidocaine, a local anesthetic that
improves patient comfort, and provides physicians with a new alternative for their
aesthetic practice.

████

████████████

████████████

████████████████

Allergan Inc.

2525 Dupont Drive

Irvine, CA 92612

██████████████

████████@allergan.com

This communication may contain information that is confidential and/or privileged  If you are not
the intended recipient or believe that you have received this communication in error,
please promptly delete this communication, including any attachments, and notify the sender.

AGNHA00493310

AGN-RVP-0367989
AGN-RVP-0367989

# EXHIBIT L

BUSINESS WIRE

**Anika Therapeutics Announces Exclusive U.S. Distribution Agreement For Elevess Injectable Dermal Filler ; Anika's HA-Based Dermal Filler Incorporating Lidocaine To Be Distributed By Artes Medical**
July 8, 2008

**Anika Therapeutics**, Inc., a leader in products for tissue protection, healing and repair based on hyaluronic acid (HA) technology, announced today that it has signed an exclusive agreement with **Artes Medical**, Inc., a medical **aesthetics** company, to distribute and market **ELEVESS**™, Anika's cross-linked hyaluronic acid-based (HA) injectable dermal filler. **ELEVESS** is an injectable filler that reduces the appearance of facial wrinkles and folds such as nasolabial folds, and is the first HA-based dermal filler approved by the Food and Drug Administration ("FDA") to incorporate the anesthetic lidocaine to improve patient comfort. **Artes Medical** manufactures, markets and sells **ArteFill**(®), the first and only FDA-approved, nonresorbable dermal filler for the correction of smile lines.

"We are very pleased to reach this agreement with **Artes Medical** to distribute **ELEVESS**, our breakthrough dermal filler product," said Anika President and Chief Executive Officer Charles H. Sherwood, Ph.D. "After undertaking an extensive search with a number of potential commercialization partners, we believe that **Artes Medical** possesses the capabilities that can help **ELEVESS** achieve its full potential in the marketplace. Artes' highly experienced sales force has well established relationships with the leading aesthetic physicians in markets throughout the United States. In addition, their complementary product, deep understanding of the injectable dermal filler marketplace and compatible culture make this a highly synergistic agreement for both companies." Under the terms of the agreement, **Artes Medical** will receive exclusive distribution and marketing rights for **ELEVESS** in the United States.

"Going forward, we are actively seeking partners with characteristics and capabilities similar to **Artes Medical** to help us distribute **ELEVESS** in Europe, Canada, and the rest of the world," said Sherwood. "Our hopes are high for this product and we are eager for an increasing number of doctors and patients to experience its benefits."

About **ELEVESS**:

Anika's **ELEVESS** is the first FDA approved injectable dermal filler to combine hyaluronic acid (HA) and lidocaine, a local anesthetic that improves patient comfort, and provides physicians with a new alternative for their aesthetic practice. Hyaluronic acid is a naturally occurring polymer found throughout the body and is present in the **skin**, where it supports **skin** structure and elasticity. Designed for longer durability based on its proprietary cross-linking technology and its high concentration of Anika's chemically modified hyaluronic acid, **ELEVESS** has been approved for sale in the United States, the European Union and Canada.

About **Anika Therapeutics**, Inc.

Headquartered in Bedford, Mass., **Anika Therapeutics**, Inc. develops, manufactures and commercializes therapeutic products for tissue protection, healing and repair. These products are based on hyaluronic acid (HA), a naturally occurring, biocompatible polymer found throughout the body. Anika's products include ORTHOVISC(®), a treatment for osteoarthritis of the knee available internationally and marketed in the U.S. by DePuy Mitek; HYVISC®, a treatment for equine osteoarthritis marketed in the U.S. by Boehringer Ingelheim Vetmedica, Inc.; the **ELEVESS**™ family of aesthetic **dermatology** products for facial wrinkles, scar remediation and lip augmentation; AMVISC®, AMVISC® Plus, STAARVISC™-II and Shellgel™ injectable viscoelastic HA products for ophthalmic surgery; INCERT(®), an HA-based anti-adhesive for surgical applications; ORTHOVISC(®) Mini a treatment for osteoarthritis targeting small joints and available in Europe; MONOVISC™ a single-injection osteoarthritis product based on its proprietary cross-linking technology and available in Europe; and next generation products for joint health and aesthetic **dermatology** based on the Company's proprietary, chemically modified HA.

AGNHA00493311

Forward-Looking StatementsThe statements made in this press release which are not statements of historical fact are forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934, including, without limitation, statements that may be identified by words such as "expectations," "remains," "focus," "expected," "prospective," "expanding," "building," "continue," "progress," "plan(s)," "efforts," "hope," "believe," "objectives," "opportunities," "will," "seek," "expect" and other expressions which are predictions of or indicate future events and trends and which do not constitute historical matters identify forward-looking statements. Specifically, these statements include a risk that (i) a material amount of sales of **ELEVESS** will not occur, (ii) the Company's efforts to enter into long-term marketing and distribution arrangements with new international distributors for **ELEVESS**, will not be successful, (iii)) competitive products will adversely impact the Company's product sales, or (iv) the markets for which the Company has targeted its products will fail to be achieved, any of which may have a material adverse effect on the Company's business and operations. Certain other factors that might cause the Company's actual results to differ materially from those in the forward-looking statements include those set forth under the headings "Business," "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" in each of the Company's Annual Report on Form 10-K for the year ended December 31, 2007 and on Form 10-Q for the period ended March 31, 2008, as well as those described in the Company's other press releases and SEC filings.

AGNHA00493312

AGN-RVP-0367991
AGN-RVP-0367990

# EXHIBIT M

# REDACTED IN ITS ENTIRETY

# EXHIBIT N

**From:** Lebreton_Pierre

**Sent:** ████████████, 2008 ████

**To:** ████████████████████

**Subject:** RE: ████████████████

**Attachments:** image010.gif; image011.gif; image012.gif; image013.gif; image014.gif; image015.gif; image016.gif; image017.gif; image018.gif

Merci ████ de l'infos.

Est-ce le Hylaform (version HA d'origine non animal) avec lidocaine ?

Il lancerait le produit avant d'avoir la gamme complète avec lido disponible ?

Pierre

_____

De : ████████████

Envoyé : ████████████

À : Lebreton_Pierre; ████████████████████████, 2008

_____

____

____

____

_____

De : ████████████████████ Envoyé : ████████ 2008████ À : ████████

Objet : ████ Report ████ 2008

_____

1

AGNHA00482689



DERMAL FILLERS

.

Mentor Corporation Announces FDA Approval of Prevelle Silk: First Dermal Filler ...

Business Wire

2

AGNHA00482690

Mentor Corporation announced that the FDA has approved Prevelle Silk. This is the first of a new line of lidocaine containing hyaluronic acid (HA) dermal fillers that Mentor anticipates marketing and distributing globally.

.

████████████████████████████████████████████████████
████████████████████████████████

████████████

████████████████████████████████████████████████
███████████████████████████████████████

████████████████████

████████████████
██████████████████████████████████████████████████████
███

████████████████

.
██████████████████████████████████████████████████████
████████████████████
.
██████████████████████████████████████████████████████
████████████████████████
.
██████████████████████████████████████████████████████
██████████████
.
██████████████████████████████████████████████████████
██████████████
.
██████████████████████████████████████████████████████
████████████████████
.
██████████████████████████████████████████████████████
████████████████████
.
██████████████████████████████████████████████████████
████████████████████

AGNHA00482691

███████████

AGN-RVP-0357370

AGNHA00482692

AGN-RVP-0357371

# EXHIBIT O

**From:**      Lebreton_Pierre ████████████████████████████████
**Sent:**      ████████████████, 2008 ████████
**To:**        ████████████
**Subject:**   restylane with lidocaine

████

In case you didn't get the information

QMED finally succeeded in formulating restylane with lidocaine. See below

Pierre

"ClinicalTrials.gov processed this record on November 28, 2008

Safety Study That Compares Restylane to Restylane With Lidocaine While Correcting Wrinkles in the Nasolabial Folds

This study is currently recruiting participants.
Verified by Medicis Global Services Corporation, November 2008

| | |
|---|---|
| Sponsors and Collaborators: | **Medicis Global Services Corporation**<br>Q-Med Scandinavia, Inc. |
| Information provided by: | Medicis Global Services Corporation |
| ClinicalTrials.gov Identifier: | NCT00797459 |

| | |
|---|---|
| Estimated Enrollment: | 60 |
| Study Start Date: | November 2008 |
| Estimated Study Completion Date: | January 2009 |
| Estimated Primary Completion Date: | January 2009 (Final data collection date for primary outcome measure) |

"

1

AGNHA00441482

# EXHIBIT P

# REDACTED IN ITS ENTIRETY

# EXHIBIT Q

# REDACTED IN ITS ENTIRETY

# EXHIBIT R

## SUMMARY OF SAFETY AND EFFECTIVENESS

I.     **GENERAL INFORMATION**

    **Device Generic Names:**    Injectable Dermal Filler

    **Device Trade Name:**    Cosmetic Tissue Augmentation product (CTA)

    **Applicant:**    Anika Therapeutics, Inc.
    236 West Cummings Park
    Woburn, MA 01801

    **Premarket Approval (PMA) Application Number:** P050033

    **Date of Panel Recommendation:** None

    **Date of Notice of Approval to the Applicant:** December 20, 2006

II.    **INDICATIONS FOR USE**

    CTA is indicated for injection into the mid to deep dermis for the correction of moderate to severe facial wrinkles and folds (such as nasolabial folds).

III.   **CONTRAINDICATIONS**

- CTA is contraindicated for patients with severe allergies manifested by a history of anaphylaxis or history or presence of multiple severe allergies.

- CTA is composed of hyaluronic acid, lidocaine and may contain trace amounts of gram positive bacterial proteins. CTA is contraindicated for patients with a history of allergies to such material.

IV.    **WARNINGS AND PRECAUTIONS**

Warnings and precautions can be found in the CTA physician's labeling.

V.     **DEVICE DESCRIPTION**

CTA is a sterile, nonpyrogenic gel implant, composed of hyaluronan produced by *Streptococcus equi* (bacterial fermentation) that is crosslinked and suspended in a buffer solution at a concentration of 28 mg/mL. CTA contains 0.3% lidocaine HCl. The finished product is provided in a pre-filled glass syringe at a volume of 1 mL, co-packaged with two 30 G. x ½ inch hypodermic needles.

## VI.   ALTERNATIVE PRACTICES & PROCEDURES

Alternative therapies for cosmetic tissue augmentation include bovine collagen dermal fillers, human collagen dermal fillers, other hyaluronic acid-based dermal fillers, and autologous fat transfer.  Other treatment options for the treatment of photo-damaged skin with its associated wrinkling and changes in texture and pigmentation include topical creams (containing e.g. retinoids), chemical peeling procedures or laser resurfacing.  Deep wrinkles, folds, scars, and other depressed lesions are often treated with surgery (e.g. rhytidectomy).

## VII.   MARKETING HISTORY

CTA is a new product that has not yet been commercialized.

## VIII.   POTENTIAL ADVERSE EFFECTS ON HEALTH

In a study of 208 patients at 10 centers, symptoms reported in patient diaries during 14 days after initial treatment are listed in Table 1 by intensity of symptoms and Table 2 by duration of symptoms.  Patients in the study were either injected with CTA in both nasolabial folds (NLF) (n=17) or CTA in one NLF and a human collagen dermal filler (Control) in the contralateral NLF (n=191).  Eighty-eight percent (88%) of patients reported symptoms on both sides of the face following treatment.  In most cases, symptoms (bruising, redness, swelling, pain, tenderness, itching, nodule formation) were of mild to moderate intensity and resolved in 7 days or less.  Adverse events were reported on the physician case report form.  Events occurring in > 2% of the 191 randomized patients are listed in Table 3.  Many of these adverse events represent physician reporting of the same data reported by patients in Table 1.  Local adverse events are reported in Table 3 by side of face; because of the "split-face" study design, causality of systemic adverse events cannot be assigned.

**Table 1.  Maximum Intensity of Symptoms after Initial Treatment, Patient Diary**

| | CTA Side N=208 | Control Side N=191 | CTA Side Intensity | | | | Control Side Intensity | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Total reporting symptoms N (%) | Total reporting symptoms N (%) | Unknown N (%) | Mild N (%) | Mode-rate N (%) | Severe N (%) | Unknown N (%) | Mild N (%) | Mode-rate N (%) | Severe N (%) |
| Bruising | 131 (63.0%) | 94 (49.2%) | 7 (3.3%) | 45 (21.6%) | 49 (23.6%) | 30 (14.4%) | 4 (2.1%) | 58 (30.4%) | 26 (13.6%) | 6 (3.1%) |
| Redness | 151 (72.6%) | 124 (64.9%) | 6 (2.9%) | 45 (21.6%) | 76 (35.5%) | 24 (11.5%) | 6 (3.1%) | 71 (37.2%) | 42 (22.0%) | 5 (2.6%) |
| Swelling | 181 (87.0%) | 129 (67.5%) | 11 (5.3%) | 31 (14.9%) | 78 (37.5%) | 61 (29.3%) | 7 (3.7%) | 86 (45.0%) | 34 (17.8%) | 2 (1.0% |
| Pain | 108 (51.9%) | 63 (33.0%) | 6 (2.9%) | 52 (25.0%) | 40 (19.2%) | 14 (6.7%) | 2 (1.0%) | 51 (26.7%) | 9 (4.7%) | 1 (0.5%) |
| Tenderness | 145 (69.7%) | 101 (52.9%) | 11 (5.3%) | 57 (27.4%) | 57 (27.4%) | 20 (9.6%) | 6 (3.1%) | 71 (37.2%) | 20 (10.5%) | 4 (2.1%) |
| Itching | 83 (39.9%) | 49 (25.7%) | 7 (3.4%) | 63 (30.3%) | 10 (4.8%) | 3 (1.4%) | 2 (1.0%) | 43 (22.5%) | 4 (2.1%) | 0 (0.0%) |
| Nodule formation | 129 (62.0%) | 112 (58.6%) | 11 (5.3%) | 39 (18.8%) | 61 (29.3%) | 18 (8.7%) | 9 (4.7%) | 69 (36.1%) | 32 (16.8%) | 2 (1.0%) |

9

**Table 2.  Duration of Symptoms after Initial Treatment, Patient Diary**

| | CTA Side (N=208) Number of Days | | | | Control Side (N=191) Number of Days | | | |
|---|---|---|---|---|---|---|---|---|
| | <=3 N (%) | 4-7 N (%) | 8-13 N (%) | 14+ N (%) | <=3 | 4-7 | 8-13 N (%) | 14+ N (%) |
| Bruising | 56 (26.9%) | 51 (24.5%) | 17 (8.2%) | 7 (3.7%) | 47 (24.6%) | 25 (13.1%) | 16 (8.4%) | 6 (3.1%) |
| Redness | 79 (38.0%) | 49 (23.6%) | 14 (6.7%) | 9 (4.7%) | 78 (40.8%) | 28 (14.7%) | 13 (6.8%) | 5 (2.6%) |
| Swelling | 81 (38.9%) | 77 (37.0%) | 19 (19.9%) | 4 (2.1%) | 87 (45.5%) | 28 (14.7%) | 11 (5.8%) | 3 (1.6%) |
| Pain | 87 (41.8%) | 15 (7.2%) | 3 (1.6%) | 3 (1.6%) | 52 (27.2%) | 5 (2.6%) | 3 (1.6%) | 3 (1.6%) |
| Tenderness | 83 (39.9%) | 52 (25.0%) | 5 (2.4%) | 5 (2.6%) | 61 (31.9%) | 31 (16.2%) | 7 (3.7%) | 2 (1.0%) |
| Itching | 61 (29.3%) | 13 (6.3%) | 5 (2.6%) | 4 (2.1%) | 35 (18.3%) | 7 (3.7%) | 4 (2.1%) | 3 (1.6%) |
| Nodule formation | 27 (13.0%) | 28 (13.5%) | 48 (23.1%) | 26 (12.5%) | 24 (12.6%) | 24 (12.6%) | 46 (24.1%) | 18 (9.4%) |

**Table 3. Adverse Events Occurring in >2% of Patients, Physician Case Report Form**

| Description of Adverse Event (WHO Preferred Term) | CTA Side (N=208) N (%) | Control Side (N=191) N (%) |
|---|---|---|
| Any Adverse Event | 59 (27.7%) | 37 (19.4%) |
| Injection Site Bruising | 5 (2.1%) | 1 (0.5%) |
| Injection Site Discoloration | 3 (1.6%) | 4 (2.1%) |
| Injection Site Erythema | 4(1.0%) | 6 (3.1%) |
| Injection Site Edema | 5 (2.6%) | 0 (0.0%) |
| Nodule | 17 (8.4%) | 15 (7.9%) |
| Swelling | 14 (6.8%) | 5 (2.6%) |
| Contusion | 15 (7.3%) | 4 (2.1%) |
| Erythema | 2 (1.0%) | 4 (2.1%) |
| Swelling Face | 7 (3.7%) | 1 (0.5%) |

No adverse events related to treatment were observed at the 9 and 12 month follow-up visits in the 101 subjects who participated in the extension phase of the study

*Local adverse events*
Local adverse events were observed by the physician in 59/208 subjects treated with CTA in the randomized study.  Injection site reactions included bruising and edema.  Additional non-injection site reactions of nodule formation, swelling, contusion and facial swelling account for the majority of adverse events observed.  In most cases, symptoms (bruising, redness, swelling, pain, tenderness, itching, nodule formation) were of mild to moderate intensity and resolved in 7 days or less.

*Non-local adverse events*
Non-local adverse events occurred in 34/191 (17.8%) of the study subjects.  Since each patient received both CTA treatment and control, the causality of these events could not be identified. Non local adverse events occurring in >2% of the subjects included Infections and Infestations occurring in 12 subjects (5.8%) (bronchitis, cystitis, diverticulitis, folliculitis, herpes zoster, influenza, onychomycosis, sinusitis, suture line infection and upper respiratory infection); Musculoskeletal disorders (2.4%) (arthralgia, back pain, osteoporosis, extremity pain); and Nervous System disorders (2.4%) (dizziness, headache and sinus headache).

10

**Serious Adverse Events**

Six subjects experienced serious adverse events. One event (i.e., injection site cellulitis) was judged definitely related to study treatment. The remaining serious adverse events (i.e., difficulty breathing, dizziness and chest pain) were not considered related to study treatment.

**Retreatment Phase**

90 patients enrolled in an open label retreatment extension study 6 months after their final treatment to achieve optimal correction. The safety profile observed during the 1 and 3 month follow-up was similar to that described above in the pivotal study.

## IX. NONCLINICAL STUDIES

The clinical trial of CTA was conducted using CTA formulated with HA from an avian source. Commercial CTA will be formulated with HA from a bacterial fermentation source. Nonclinical studies demonstrated that the CTA formulated with avian sourced HA was safe to be evaluated in clinical studies, and that CTA formulated with fermented sourced HA is equivalent to CTA used in the clinical trial.

### Biocompatibility Testing

Both the avian- and fermentation-derived CTA devices were tested in accordance with ISO 10993 "Biological Evaluation of Medical Devices Part 1: Evaluation and Testing" for devices in contact with tissue and bone for durations of greater than 30 days and in compliance with FDA GLP regulations. Test results are summarized in Table 5.

**Table 5. Summary of Anika CTA Biocompatibility Test Results**

| Test | ISO Reference | Test Results |
|---|---|---|
| Genotoxicity-Bacterial Reverse Mutation | ISO 10993-3 | Test article was nonmutagenic |
| Genotoxicity-*In Vitro* Chromosomal Aberration | ISO 10993-3 | No evidence of genotoxicity |
| Genotoxicity-Mouse Bone Marrow Micronucleus | ISO 10993-3 | No evidence of genotoxicity No evidence of cellular toxicity |
| Cytotoxicity-Agarose Overlay Method | ISO 10993-5 | No evidence of cell lysis or toxicity |
| ISO Maximization Sensitization | ISO 10993-10 | No evidence of delayed contact sensitization |
| Systemic Toxicity | ISO 10993-11 | No evidence of systemic toxicity |
| Rat Chronic Toxicity-13 week, subcutaneous implant | ISO 10993-11 | Slight irritant following subcutaneous implantation; no evidence of systemic toxicity, no changes in histopathology, hematology values, or clinical chemistry of biological significance or related to treatment. |
| Implantation Test-Intradermal Injection in Guinea Pig | ISO 10993-6 | Slight irritant following intradermal injection; present at the injection sites up to 24 weeks post-injection |

### Design Verification Testing

Design verification testing was conducted to compare the avian and fermented HA raw materials and finished products and to demonstrate that the two raw materials are equivalent, that the change in raw material source did not affect the finished product, and that design outputs meet design inputs. The results of the raw material comparison testing (Table 6) demonstrated that the HA from the avian source is comparable to the HA produced by bacterial fermentation. The design verification testing of finished CTA product (Table 7) demonstrated that CTA made from the two HA raw materials (avian and fermented) is comparable and that all design outputs for the fermented CTA product met design inputs.

**Table 6. Comparability Studies for Avian and Bacterial HA**

| Test | Result / Conclusion |
|---|---|
| Molecular Weight (MW) | The average MW for three lots of avian (797.8 kD) and fermented (930.3 kD) HA were comparable |
| Infrared (IR) spectroscopy | The IR Spectra for avian and bacterial HA are comparable |
| Nuclear magnetic resonance (NMR) spectroscopy | The NMR Spectra for avian and bacteria HA are identical |
| Endotoxin | All values observed with avian (n=3) and fermented (n=3) lots were below the specification of 0.03 EU/mg |
| Bioburden | All avian (n=3) and fermented (n=3) lots had < 10 cfu/g with regard to bacteria and yeast and no detectable pathogens |
| Sodium dodecyl sulfate polyacrylamide gel electrophoresis (SDS-PAGE) | The protein concentrations observed in the SDS-PAGE of avian and bacterial HA are equivalent |
| Ultraviolet (UV) absorbance | The average $A_{260nm}$ for avian lots (n=3) 0.069 were similar to, but less then the average absorbance observed with bacterial HA (i.e., 0.125) |
| Iron Content | All values observed with avian (n=3) and fermented (n=3) lots were less than 80 ppm |
| Heavy Metals | All values observed with avian (n=3) and fermented (n=3) lots were less than 20 ppm |

**Table: 7. Comparison of CTA Final Products Prepared from Avian HA (n=3 lots) and Bacterial HA (n=3 lots)**

| Test | Result / Conclusion |
|---|---|
| Appearance | Avian and bacterial-derived CTA were both clear and colorless |
| Sterility | All avian and bacterial CTA lots were sterile |
| Endotoxin | All avian and bacterial CTA lots had endotoxin values < 0.08 Endotoxin Units/ml |
| Residual solvents | All lots of avian and bacterial CTA met the specifications for residual levels of dimethyl sulfoxide, ethanol, acetone and methanol |
| Residual Mercury | All lots of avian and bacterial CTA had values < 0.005 ppm |
| pH | All lots of avian and bacterial CTA met the specification of 6.2 – 7.6 |
| Osmolality | The average value observed with 3 lots of bacterial CTA (i.e., 300 mOsm) met the specification of 280 – 340 mOsm |
| Crosslinked HA Concentration | All lots of avian and bacterial CTA were within the 21 – 29 mg/ml specification |
| Low Molecular Weight Hyaluronic Acid Fragments | The average fragments concentrations were 0.04% for bacterial CTA and 0.06% for avian CTA |
| Crosslinker Concentration | The $Abs_{250nm}$ for avian and bacterial CTA were similar |
| Durability | The average values for resistance to hyaluronidase were similar for bacterial (i.e., 86.2%) and avian CTA (71.2%) |
| Extrusion Force | Forces between 3-5 lbs were measured for all lots of bacterial and avian CTA |

The following additional tests were performed to further characterize the final CTA device.

**Table 8. Other Preclinical Studies with the Final CTA Product**

| Test | Results / Conclusions |
|---|---|
| Lidocaine Bio-Availability | *In vitro* testing demonstrated that over 90% of the lidocaine elutes from CTA within 2 minutes. |
| Shelf-life via tests for: Sterility, Visual appearance, Endotoxin, Viscoelastic Properties of Crosslinked Gel (i.e., Storage Modulus G' and Decrease in G' as a Function of Time Due to Enzyme Digestion), UV Absorbance of the Crosslinked HA, pH, Osmolality, HA Concentration (Gravimetric), Extrusion Force, HA fragments and Lidocaine concentration | Stability studies support an expiration date of 15 months |

13

## X.    CLINICAL STUDIES

The following is a summary of the pivotal study (i.e., "A Randomized, Controlled, Paired Double-Blind, Multicenter, and Pivotal Study of Cross-Linked Hyaluronic Acid in the Treatment of Dermal Contour Deformities", Study CTA0302). Following this discussion is a summary of the re-treatment study "Study CTA0302-1 "An Extension to the Randomized, Controlled, Paired, Double-Blind Multicenter, Pivotal Study of Cross-Linked Hyaluronic Acid (Anika CTA) in the Treatment of Dermal Contour Deformities."

**Study Design:**

The safety and effectiveness of CTA for the treatment of facial wrinkles and folds was evaluated in a prospective, randomized, controlled, paired, double-blinded, multi-center, pivotal clinical study. Randomized subjects underwent treatment with CTA in one NLF and control implant (a human collagen dermal filler) in the contralateral (NLF).

Up to three bilateral treatments (i.e., initial treatment and up to 2 touch-up treatments), approximately 2 weeks apart, were allowed. At 2 and 4 weeks after each treatment, a Blinded Evaluator assessed the level of correction. If correction was less than optimal after the first or second treatment, the Investigator re-treated the under-corrected NLFs using the same respective treatment materials as in the initial treatment. The blinded evaluator and subject remained blinded to the randomized treatment assignment.

Routine follow-up visits for safety and effectiveness occurred at 2 weeks after each treatment and at 1, 4, 6, 9 and 12 months after the last treatment. The blinded reviewer and subject independently evaluated the severity of the subjects NLF using the Lemperle Rating Scale (LRS), (i.e., a validated 6-point wrinkle severity scale ranging from 0 = no wrinkles to 5= very deep wrinkle, redundant fold).

**Study Endpoints**

- *Effectiveness*

The primary effectiveness endpoint was the blinded evaluator's LRS score at 6-months following the last touch-up (at which optimal correction was achieved). Secondary effectiveness endpoints included: blinded evaluator LRS at 1- and 4-months; subject LRS at 1-, 4- and 6-months; proportion of nasolabial folds returning to baseline at 6-months; number of treatment sessions and volume of material to obtain optimal correction. The primary endpoint, the LRS score, is a 6-point scale. A change in LRS of 1 was considered to be clinically significant. Optimal correction was defined to be the best possible cosmetically pleasing result and 100% correction; unlimited touch-ups were permitted to achieve optimal correction.

14

- *Safety*

Adverse outcomes were evaluated by comparing the incidence and severity of clinical events reported in patient diaries during the 14 days after treatment and the adverse events assessed during study visits by investigator.

## Patient Enrollment

The study enrolled subjects with bilateral NLF with a 3 or 4 LRS score. Patients were excluded if they had: an allergy to avian products, sensitivity to lidocaine, previous exposure to soft tissue augmentation in any area of the face, aesthetic or dermatologic procedures in the target area of the face in the past 6 months, (i.e., medium depth or deep chemical peel, facial wrinkle therapies (e.g., Accutane and Renova), facial silicone injections, facial surgery (facelift), or facial dermabrasion). Laser resurfacing of the face in the last 56 months was also an exclusion criterion. In addition, subjects were excluded if they had: HIV/AIDS, Hepatitis C, active facial acne lesions or severe acne scarring that might affect NLF assessment, active skin diseases or inflammation on or near the NLF (e.g., psoriasis, herpes zoster, infection and discoid lupus), or if they received immunosuppressive therapy, anticoagulant therapy, chemotherapy or systemic corticosteroids within the last 3 months or a history of bleeding disorders or connective tissue disease. Patients were also excluded if they were involved in any research with an investigational product or new application of an approved product within 30 days of screening. Finally, patient enrollment also required cessation of anti-platelet therapy for 7-10 days prior to each treatment and a commitment to forgo dermabrasion, laser resurfacing, facial wrinkle therapies, all aesthetic facial surgeries and all other soft tissue augmentation for the study duration.

- *Patient Accounting*

A total of 208 patients were treated at 10 centers, including 17 "roll-in" patients implanted with CTA in both NLF and 191 subjects treated with CTA in one NLF and Control in the contralateral NLF (n=191). Accounting of these patients is presented below in Table 9.

### Table 9. Patient Accounting

| | All subjects N=208 | Randomized N=191 | Roll-in N=17 |
|---|---|---|---|
| Eligible/randomized | 208 | 191 | 17 |
| Withdrew prior to month 6 | 9 (4.3%) | 6 (3.1%) | 3 (17.6%) |
| Completed 6 months | 199 (95.7%) | 185 (96.9%) | 14 (82.4%) |
| Eligible for re-treatment | 151 (72.6%) | 140 (73.3%) | 11 (64.7%) |
| Participated in re-treatment* | 90 (43.3%) | 84 (44.0%) | 6 (35.3%) |
| Eligible for extended follow-up study (not retreated) | 101 (48.6%) | | |
| Subjects at 9 month visit (not retreated) | 90 (43.3%) | | |
| Subjects at 12 month visit (not retreated) | 84 (40.4%) | | |

*For accounting of retreatment patients, see below

15

- *Baseline Demographics*

The randomized study population (n=191) was composed of 16 men and 175 women between the ages of 30 and 77 years of age.  The baseline demographics are displayed in Table 10.

**Table 10. Study Population Demographics**

| Demographic | N (%) |
|---|---|
| Total study enrollment (randomized) | 191 (100%) |
| Age (mean ± standard deviation) | 52.6 ± 8.5 |
| Gender | |
| Male | 16 (8.4%) |
| Female | 175 (91.6%) |
| Race | |
| Caucasian | 172 (90.1%) |
| Black or African-American | 7 (3.7%) |
| Asian | 4 (2.1%) |
| Other | 8 (4.2%) |
| Ethnicity | |
| Hispanic or Latino | 18 (9.4%) |
| Not Hispanic or Latino | 173 (90.6%) |
| Cigarette Use (Pre-treatment) | |
| Non-Smoker | 90 (47.1%) |
| Current Smoker | 37 (19.4%) |
| Former Smoker | 64 (33.5%) |
| Sun Exposure (Pre treatment) | |
| To Natural Sunlight | |
| Minimal | 59 (30.9%) |
| Moderate | 99 (51.8%) |
| High | 33 (13.3%) |
| To Artificial Sunlight | |
| None | 127 (66.5%) |
| Minimal | 54 (28.3%) |
| Moderate | 10 (5.2%) |
| High | 0 (0.0%) |

- *Ethnic Representation*

The majority of patients enrolled in the study were Caucasian (90.1 %).  Minority populations comprised 9.9 percent of the study population.  While the study did not directly record Fitzpatrick skin type as part of the case report forms, on retrospective analysis they believe that between 16-18 subjects had skin types between 4-6 on the Fitzpatrick scale, (i.e., 7 African Americans, 4 Asian, 1 Native American, 4 Hispanic and 2 Non-Hispanic subjects).

16

- *Treatment Material Delivered*

The mean total volume injected per nasolabial fold for all treatment sessions (initial and touch-ups) was 1.2 mL for the CTA side and 1.9 mL for the control. Forty-seven (47) CTA sides (24.6%) required one or more touch-ups, whereas 61 (31.9%) of control sides required one or more touch-ups. No randomized CTA NLF and two control-treated NLFs required three touch ups.

**Effectiveness Results**

The primary effectiveness results for CTA based on the Blinded Evaluator assessment of NLF severity at 6 months are presented in Table 11. The blinded evaluator LRS scores demonstrated non-inferiority of CTA to Control.

**Table 11. Mean Blinded Evaluator LRS Scores**

| Timepoint | N | CTA | Control | P-Value |
|-----------|-----|-----|---------|---------|
| Pretreatment | 191 | 3.5 | 3.5 | 0.8733 |
| Optimal Correction | 188 | 1.1 | 1.1 | 0.2586 |
| 4-Months | 175 | 2.2 | 2.7 | <0.0001* |
| 6-Months | 182 | 2.7 | 3.0 | 0.0001* |

\* p-values are from a paired comparison using McNemar's test.

**Safety Results**

- *Adverse Events*

The reported adverse events are presented in section VIII.

- *Antibody Testing*

A pre-existing antibody response against CTA was observed in 5/208 (2.4%) subjects and 18/208 (8.7%) subjects developed a response after CTA injection. 6/18 subjects with elevated anti-CTA titers post-treatment experienced adverse events at the injection site that were judged related to device administration. This proportion of adverse events is similar to that observed in the entire CTA population 59/208 (27.7%). While most reactions were mild in severity, one severe case of swelling and one severe case of inflammation were reported.

**Other Clinical Studies with CTA**

- *Extension Study and Retreatment*

185/191 subjects who completed the 6 month evaluation were eligible to continue in an extension phase of the study. All subjects who had a blinded LRS evaluation which

worsened by 2 or more points were eligible for CTA retreatment (which was a total of 140 subjects). 84 of these subjects, plus an additional 6 patients from the "roll-in" phase of the study underwent retreatment. These subjects were followed for safety for 3 months following treatment. Please refer to Section VIII (Adverse Events) for a discussion of study outcomes.

101 Subjects who opted not to undergo retreatment as well as those who were ineligible for retreatment participated in the extended follow-up evaluation through 9 and 12 months. 90 subjects were followed through 9 months and 84 subjects through 12 months. Please refer to Section VIII (Adverse Events) for a discussion of study outcomes.

## XI.   CONCLUSIONS DRAWN FROM STUDIES

Based on both blinded evaluator and subject assessments during the CTA0302 clinical study, CTA was shown to be effective and non-inferior to an approved human collagen dermal filler. Reasonable assurance of safety has also been demonstrated by the short duration and generally mild/moderate severity of adverse events observed.

The *in vitro* and *in vivo* studies performed to test CTA demonstrate that: 1) CTA is biocompatible; 2) fermented HA is comparable to avian-derived HA in all tested specifications and characteristics; 3) CTA produced using fermented HA is comparable to CTA made with avian-derived HA; and 4) the finished CTA product, when manufactured in accordance with the approved design outputs, meets all user requirements and design inputs.

Therefore it is reasonable to conclude that the benefits of the use of the device for the target population outweigh the risks of illness or injury when used as indicated in accordance with the direction for use.

## XII.   PANEL RECOMMENDATION

In accordance with the provisions of section 515c(2) of the act as amended by the Safe Medical Devices Act of 1990, this PMA was not referred to the General and Plastic Surgery Devices Panel, an FDA advisory committee, for review and recommendation because the information in the PMA substantially duplicates information previously reviewed by this panel.

## XIII.   FDA DECISION

FDA issued an approval order on December 20, 2006.

The applicant's manufacturing facility was inspected and was found to be in compliance with the Quality System Regulation (21 CFR 820).

To better understand the safety of the device is patient populations that were underrepresented in the clinical study, the sponsor was requested to perform an open-

label, longitudinal, uncontrolled, Post Approval study in a minimum of 100 patients with Fitzpatrick Skin Types 4, 5 or 6 at 10 or more U.S. centers. These patients will have elected to undergo nasolabial fold treatment with intradermal injection of CTA and will be followed for a minimum of 24 weeks to assess pain, tenderness, redness, ecchymosis, swelling, itching, mass (nodule / cyst / abscess) formation, dermal pigmentation and keloid changes at the site of injection.

## XIV.   APPROVAL SPECIFICATIONS

Direction for use: See the labeling.

Hazards to Health from Use of the Device: See Indications, Contraindications, Warnings, Precautions and Adverse Events in the labeling.

Postapproval Requirements and Restrictions: See approval order

19

# EXHIBIT S



25/01/07

9189111
BOSTON SPA
LS23 7BQ

AESTHETIC SURGERY JOURNAL.

0730.384000

Volume 26:Number 6(2
006)
1

NOVEMBER/DECEMBER 200

# AESTHETIC SURGERY

JOURNAL

ARTIST J. CHARLES FINN, MD

OFFICIAL PUBLICATION OF THE AMERICAN SOCIETY FOR AESTHETIC PLASTIC SURGERY

OFFICIAL ENGLISH-LANGUAGE JOURNAL:

BRAZILIAN SOCIETY OF PLASTIC SURGERY
COLOMBIAN SOCIETY OF PLASTIC, AESTHETIC, MAXILLOFACIAL AND HAND SURGERY
COSTA RICAN ASSOCIATION OF PLASTIC, RECONSTRUCTIVE AND AESTHETIC SURGERY
DUTCH SOCIETY FOR AESTHETIC PLASTIC SURGERY
ISRAEL SOCIETY FOR PLASTIC SURGEONS
JAPAN SOCIETY OF AESTHETIC PLASTIC SURGERY
KOREAN SOCIETY FOR AESTHETIC PLASTIC SURGERY
MEXICAN ASSOCIATION OF PLASTIC, AESTHETIC AND RECONSTRUCTIVE SURGERY
SOCIETY OF PLASTIC AND RECONSTRUCTIVE SURGEONS OF THAILAND

www.aestheticsurgeryjournal.com
ISSN 1090-820X

Exhibit 1012
Prollenium v. Allergan

This material may be protected by Copyright law (Title 17 U.S. Code)

# Injecting Puragen Plus into the Nasolabial Folds: Preliminary Observations of FDA Trial

Based on participation in ongoing FDA trials, the author presents his initial impressions of Puragen Plus for treatment of the nasolabial folds. Puragen and Puragen Plus (Mentor Corp., Santa Barbara, CA) are double–cross-linked NASHA products. Depending on double cross-linking for duration of effect, instead of a varying particle size, may allow for use of one filler at all levels in the soft tissue. Other features observed by the author in the clinical setting included reduced injection pain, minimal erythema and tenderness, typically 9 to 12 months' duration of effect, and high patient satisfaction. (*Aesthetic Surg J* 2006;26:741–748.)



**Brian M. Kinney, MD, MSME, Los Angeles, CA,** *is a board-certified plastic surgeon and an ASAPS member.*

I n the United States, bovine collagen was essentially the only soft tissue filler on the market from the 1980s until just a few years ago. In many other countries, however, a wide variety of injectable materials have been long utilized for soft tissue filling.[1,2] Perhaps the most widely used substance today is polymerized chains of hyaluronan, hyaluronic acid (HA). Starting with the early 1996 Sweden experience, and spreading from Europe to the rest of the world, physicians have used cross-linked, non–animal source hyaluronic acid (NASHA).

A large body of NASHA clinical experience has grown with generally excellent results. In the November/ December 1999 issue of *Aesthetic Surgery Journal*, Troilius[3] reported his initial favorable experience in more than 200 patients, using Restylane (QMed, Inc., Eatontown, NJ), a NASHA preparation (mean particle size 525 µ) single cross-linked with ether bonds by 1,4-butanediol diglycidyl ether (BDDE).

In December 2003, the Food and Drug Administration (FDA) approved Restylane, the first Restylane filler to be approved in the United States, and by January 2005, clinical use had become common. Advantages of Restylane include longer lasting effects than bovine collagen, improved contouring and volume augmentation, increased patient satisfaction, and freedom from allergy testing. A major disadvantage of many HA preparations is the pain associated with injection and the need for several different preparations based on particle size (300 to 650 µ) to allow for injection at various tissue depths. Additionally, while duration of effect is longer than with bovine collagen, it still falls short of ideal. Restylane Fine Lines is recommended for superficial use, Restylane for deeper use, and Restylane SubQ and/or Perlane are recommended for use deeper than the dermis. However, of these preparations, only Restylane is cleared for marketing in the United States. All of these products contain a concentration of 20 mg/mL.

Hylaform (Allergan Inc., Irvine, CA) uses single cross-linking by divinyl sulphone (DVS), has a mean particle size of 692 µ, and has not gained significant market share in the United States. Juvaderm (Allergan Inc., Irvine, CA), a higher-concentration NASHA preparation with a mean particle size of about 594 µ, was approved by the FDA in June 2006 and is just coming to market. A major stated claim is that Juvaderm is not a gel-particle suspension but, instead, a malleable smooth gel that flows more easily and with a higher level of control. There are several areas in which improved capabilities are desirable. Use of a single type of injectable at multiple tissue depths with only 1 syringe and 1 hypodermic skin puncture, little or no pain associated with the injection, and longer duration of effect are important advantages.

## Materials and Methods

The half-life of non–cross-linked, naturally occurring hyaluronan in the body is 2 to 4 days, and about one third is turned over per day. Alteration of the physical and chemical properties is required for duration of effect in the soft tissues. In creating a synthetic analog, one can categorize at least 5 different types for HA products:

1. Liquid HA
2. Syrup-like HA with higher viscosity
3. A mix of syrup-like HA and weakly stabilized HA particles

4. A high concentration of HA particles with HA concentration of heavily cross-linked HA molecules. Puragen (Mentor Corp., Santa Barbara, CA) falls into this category.[5,6]
5. A high concentration of HA particles with high concentration of minimally modified HA molecules. The Restylane family of fillers falls into this category.

One method of increasing duration of effect is to vary particle size, as is demonstrated in the Restylane family. Another is to alter the chemistry of cross-linking by creating double-cross-linked chains with ether bonds and ester bonds. Puragen and Puragen Plus (Mentor Corp., Santa Barbara, CA) are double-cross-linked NASHA products. The ester bonds confer increased stability in vitro by resisting the enzymatic degradation by hyaluronidase and by protecting the ether bonds during sterilization. The ether bonds are hydrophobic and resist enzymatic degradation. The first chemical reaction is performed at high pH with 1, 2, 7, 8–diepoxyoctane (DEO), a hydrophobic epoxide that builds an HA network through ether bonds between hydroxyl groups. The second chemical low-pH reaction, using the same agent (DEO), further cross-links carboxyl groups to form ester bonds. The increased chemical stability allows for the addition of lidocaine 0.3% for a relatively pain-free injection. Enhanced stability in vivo and slower degradation in vitro are achieved by double cross-linking. Solid C13 nuclear magnetic resonance scanning in double-cross-linked HA shows a methylene bridge compared with standard HA.[5] The ester bond is confirmed by Fourier transform infrared spectrometry (FT-IR).[6]

Using a gel with a smaller average particle size (220 μ) may create a *smoother* injection (more continuous application of pressure). A gel with higher viscosity may require more pressure to inject. Depending on double cross-linking for duration of effect, instead of a varying particle size, may allow for use of 1 filler at all levels in the soft tissue.

Puragen Plus biocompatibility studies were performed, including skin sensitization in the guinea pig (no positive responses) and intradermal implantation in the guinea pig (minor initial reactions of erythema seen clinically and anti-inflammatory and giant cells seen on histopathology, minimal or undetectable at 27 weeks, similar to 2 comparator products). Also, there was no cytotoxicity in the Ames test at concentrations up to 5000 μg, no cytotoxicity in vitro in an agar overlay assay, no mutagenesis in vitro in a chromosomal aberration test, no unscheduled DNA synthesis in vitro, no pyrogenicity (ISO 10993-11), and no hemolysis. No necrosis, fibrosis, or granuloma were observed.

Puragen was introduced into the market in the European Union and many countries around the world in the spring of 2005. Its formulation is similar to Puragen Plus, except that it does not contain lidocaine. Puragen Plus has been undergoing FDA clinical trials since January 2005 in the United States. Each milliliter of Puragen Plus contains 20 mg of ether and ester cross-linked sodium hyaluronate 20 mg, sodium chloride 8.5 mg, disodium hydrogen orthophosphate dehydrate 0.22 mg, sodium dihydrogen phosphate dihydrate 0.045 mg, lidocaine HCl 0.3%, and water for injection.

## FDA Clinical Trials

Five centers led by 3 dermatologists and 2 plastic surgeons participated in the original FDA clinical trials. In the original (first) study group, patients were randomized, Restylane was injected into one nasolabial fold (NLF), and Puragen Plus, into the other. None of the 5 centers had enough patients to reach statistical significance and results have been blinded from center to center.

In the continuing access (second) study, Puragen Plus was injected into both NLFs. Final data analysis has not been completed. Here, I report initial clinical impressions based on the experience of 1 center in the continuing access study. In future publications, I will present the compiled data. Study parameters included blood draw, photographs, 2 independent observers in the initial study, 1 observer (only) in the continuing access study, a pain assessment scale, and NLF scoring on a 6-part Lemperle scale. Follow-up took place at 14 days (when a second injection was allowed), and at 1, 4, 6, 9, and 12 months in the first study group and at 14 days, and 1, 6, 9, and 12 months in the second study group.

In the initial study group each patient wore an eye mask, and in both studies each patient was injected after a skin prep of alcohol only. For both studies, only patients with a Lemperle scale of 2 to 4 were allowed to participate. Exclusion criteria included severe skin disease (eg, eczema, psoriasis, severe acne, or rosacea), systemic diseases, history of NLF injection within 18 months, use of tretinoin within 4 weeks, use of botulinum toxin within 6 months, or laser resurfacing within 12 months. Blood was drawn at baseline, 30 days after the last injection, and at the 6-month visit.

Patients were injected in the NLF, deep and superficially, from the alar base inferior to the oral commissure as dictated by fold anatomy. In the first study group, 2 mL were allowed on each side during the first session,

**Figure 1. A,** *Pretreatment view of a 41-year-old woman.* **B,** *Posttreatment view 1 month following Puragen Plus injection into the nasolabial folds.* **C,** *Posttreatment view after 3 months.* **D,** *Posttreatment view after 6 months.* **E,** *Posttreatment view after 9 months.* **F,** *Posttreatment view after 1 year. (Patient had transient postinjection erythema that lasted from 1 to 2 days.)*



**Figure 2. A,** Pretreatment view of a 39-year-old woman. **B,** Posttreatment view 1 month following Puragen Plus injection into the nasolabial folds. **C,** Posttreatment view after 3 months. **D,** Posttreatment view after 6 months. **E,** Posttreatment view after 9 months. The patient had deep folds; due to volume limitations she did not undergo complete correction in either fold; however, there is broad persistence of HA at 6 months.



**Figure 4. A,** *Pretreatment view of a 44-year-old man.* **B,** *Posttreatment view 1 month after Puragen Plus injection into the nasolabial folds.* **C,** *Posttreatment view after 3 months.* **D,** *Posttreatment view after 6 months. Challenging treatment of a heavy-set male with an excellent result.*

skin through the puncture site. Not surprisingly, there was minimal to no pain in essentially every patient injected with Puragen Plus, and less pain in every patient injected with Puragen Plus compared with patients injected with Restylane. In both groups, mild injection erythema of a similar magnitude and similar to that seen with other HA preparations occurred in about one third of patients and lasted 1 to 2 days. No patient expressed regret at undergoing the initial injection in any location. On second injection in the initial group, all patients expressed a preference for a lidocaine-containing HA. Due to volume limitations, complete correction of the NLF was not possible in every patient. However, photographic documentation allowed comparison of initial injection results and late visits at 6, 9, and 12 months.

In my hands, judging subjectively, Puragen feels slightly more viscous on injection and requires more pressure than injecting Restylane, but I was able to adapt to this difference quickly. From the first patient, on initial inspection, injection results on either side were similar. Of the 36 patients at 6 months, all expressed interest in undergoing additional injection with the lidocaine-containing HA, if it were available at the completion of the study or cleared by the FDA.

One patient undergoing lip injection had a 2-day episode of lip swelling documented by photography 2 months after injection. Sulfa allergic, she attributed it to drinking red wine containing sulphites. No treatment was given, and she recovered from the episode without sequellae. Afterwards, she expressed a desire for additional injection in the lips and NLF should injections become available. In the second study group, 2 patients reported transient episodes (1 to 2 days) of minor swelling between the 1- and 6-month visits, but chose



**Figure 5. A,** *Pretreatment view of a 57-year-old woman.* **B,** *Posttreatment view 1 month after Puragen Plus injection into the nasolabial folds.* **C,** *Posttreatment view after 6 months.* **D,** *Posttreatment view after 9 months.* **E,** *Posttreatment view after 12 months.*

not to report it until the 6-month visit because they considered it to be inconsequential. One of these patients suggested the swelling was due to gardening outdoors in hot weather and had 2 more episodes between the 6- and 9-month visit. In addition, 1 day after the 9-month visit, she experienced an additional episode in the absence of exertion in hot weather (documented by photographs) that lasted 2 days. Transient nodularity, erythema, and tenderness surfaced overnight and dissipated without intervention in 2 days. This patient changed her mind, now stating that she would not undergo additional injections after a 9-month experience.

More than half of the patients had excellent persistence at 9 months, and about one quarter had moderate persistence even at 12 months. Only 1 or 2 patients resorbed the Puragen as early as seen in the 6-month pictures. Reasonable informed consent would be to predict 9 to 12 months of persistence (Figures 1 to 5).

## Conclusions

I can make a few preliminary observations before the formal data analysis; however, much is yet to be determined. Injection is minimally painful due to the presence of lidocaine. Nine to twelve months of duration of effect can generally be expected based on my clinical experience. Erythema, tenderness, and pain are minimal. Patient acceptance is excellent and satisfaction is extremely high. Likelihood of nodularity and other potential complications await large-scale follow-up studies.

The particle size is smaller than in other HA preparations and this subjectively allows use of a single syringe to inject superficially, in intermediate depths, and deeply without expectation of lumpiness, protrusion, or prominence. Because it is the cross-linking, and not the particle size, that dictates the duration of effect, only 1 type of syringe is required for injection at various depths for correction. The small particle size may allow for better massaging and manipulation of the material immediately after injection, but no blinded control studies have been performed to confirm this. If and when there is FDA approval, further clinical experience will reveal the complete picture. ∎

*The author was paid by Mentor as a consultant to perform this clinical trial.*

## References

1. Kinney BM, Hughes CE. Soft tissue fillers—an overview. *Aesthetic Surg J* 2001;21:469-471.
2. Bergeret-Galley C. Comparison of resorbable soft tissue fillers. *Aesthetic Surg J* 2004;24:33-46.
3. Troilius C. Soft tissue fillers—what options are available today? *Aesthetic Surg J* 1999;19:505-507.
4. Verpaele A, Strand A. Restylane SubQ, a non-animal stabilized hyaluronic acid gel for soft tissue augmentation of the mid- and lower face. *Aesthetic Surg J* 2006;26(suppl):S10-S17.
5. Zhao XB, Fraser JE, Alexander C. Synthesis and characterization of a novel double crosslinked hyaluronan hydrogel. *J Mater Sci Mater Med.* 2002;13:11-16.
6. Zhao XB. J Biomater Sci, Polymer ed. In press.

Reprint requests: Brian M. Kinney, MD, MSME, 2080 Century Park E., Suite 1110, Los Angeles, CA 90067-2009.

Copyright © 2006 by The American Society for Aesthetic Plastic Surgery, Inc.

1090-820X/$32.00

doi:10.1016/j.asj.2006.10.008

# EXHIBIT T



SUPPLEMENT TO

# JOURNAL OF THE AMERICAN ACADEMY OF
# DERMATOLOGY

FEBRUARY 2007 · VOLUME 56 · NUMBER 2

## Poster Abstracts

American Academy of Dermatology
65th Annual Meeting
February 2–6, 2007
Washington, DC

February 7, 2007
HEALTH SCIENCES
LIBRARIES

Supported by
Abbott Immunology

M Mosby

Exhibit 1021
Prollenium v. Allergan

Exhibit Page 1 of 4

# SUPPLEMENT TO
# JOURNAL OF THE AMERICAN ACADEMY OF
# DERMATOLOGY

FEBRUARY 2007  VOLUME 56  NUMBER 2

*Copyright © 2007 by the American Academy of Dermatology, Inc.*

**Editor**
Jeffrey D. Bernhard, MD

**Deputy Editors**
Thomas G. Cropley, MD
Karen Wiss, MD

**Editorial Office**
University of Massachusetts
Medical School
55 Lake Avenue
North Worcester, MA 01655
508-856-2583
E-mail: melissa.derby@
umassmed.edu

**Associate Editors**
Andrew Blauvelt, MD
*Portland, Oregon*

Ponciano D. Cruz, Jr, MD
*Dallas, Texas*

Jane Grant-Kels, MD
*Farmington, Connecticut*

Nathaniel Jellinek, MD
*Providence, Rhode Island*

Timothy M. Johnson, MD
*Ann Arbor, Michigan*

Alexandra Boer Kimball, MD
*Boston, Massachusetts*

Maria J. Petersen, MD
*Salt Lake City, Utah*

Martin A. Weinstock, MD, PhD
*Providence, Rhode Island*

**Assistant Editors**
Leah Belazarian, MD
*Worcester, Massachusetts*

Michael E. Bigby, MD
*Boston, Massachusetts*

Jean L. Bolognia, MD
*New Haven, Connecticut*

Luis A. Diaz, MD
*Chapel Hill, North Carolina*

Mark Lebwohl, MD
*New York, New York*

Donald J. Miech, MD
*Marshfield, Wisconsin*

Ginat W. Mirowski, DMD, MD
*Indianapolis, Indiana*

Scott A. Norton, MD
*Bethesda, Maryland*

Elise Olsen, MD
*Durham, North Carolina*

Jeffrey Orringer, MD
*Ann Arbor, Michigan*

Amy S. Paller, MD
*Chicago, Illinois*

**Founding Editor**
J. Graham Smith, Jr, MD
*Mobile, Alabama*

**Editor Emeritus**
Richard L. Dobson, MD
*Charleston, South Carolina*

## POSTER DISCUSSION SESSIONS

*Supported by Abbott Immunology*

| | |
|---|---|
| PDS 491—Cutaneous Surgery | AB1 |
| PDS 492—Pediatric Dermatology | AB3 |
| PDS 493—Psoriasis I | AB5 |
| PDS 494—Medical Dermatology | AB7 |
| PDS 495—Psoriasis II | AB9 |
| PDS 496—Infectious Diseases | AB11 |
| Acne | AB13 |
| Aging/Geriatrics | AB24 |
| Art, History, and Humanities of Dermatology | AB33 |
| Basic Science | AB35 |
| Clinical Dermatology and Other Cutaneous Disorders | AB40 |
| Connective Tissue Disease | AB64 |
| Dermatitis, Atopic | AB67 |
| Dermatitis, Contact and Allergic Irritants | AB75 |

*Continued on page 8A*

The opinions or views expressed in this professional educational supplement are those of the author(s) and not necessarily those of the Editor(s), publisher, sponsor, or Academy, and the Editor(s) publisher, sponsor, and Academy disclaim any responsibility or liability for such material. Neither the Editor(s), publisher, nor the Academy guarantees, warrants, or endorses any product or service advertised in this publication, nor do they guarantee any claim made by the manufacturer of such product or service.

Dosages, indications, and methods of use for products that are referred to in the supplement by the authors may reflect their clinical experience or may be derived from the professional literature or other clinical sources. Because of the differences between in vitro and in vivo systems and between laboratory animal models and clinical data in humans, in vitro and animal data may not necessarily correlate with clinical results.

**Future citation agreement/How to cite abstracts from this supplement:** Author(s) agree(s) that citations to poster abstracts published in the *Journal of the American Academy of Dermatology* will adhere to the format of the examples given below, which clearly indicate that the cited item has been published in abstract form.

Authors. Title of abstract (abstract). J Am Acad Dermatol 2007;56:AB page number. Abstract number.

Tremblay, JF. Plasma skin regeneration (PSR) in the treatment of acne scars (abstract). J Am Acad Dermatol 2007;56:AB1. Abstract P1.

Exhibit Page 2 of 4

**Contents** *continued*

| | |
|---|---|
| Dermatopathology | AB81 |
| Dermatopharmacology/Cosmeceuticals | AB84 |
| Digital/Electronic Technology | AB97 |
| Education and Community Service | AB99 |
| Epidemiology and Health Services Administration | AB102 |
| Genodermatoses | AB107 |
| Hair and Nail Disorders | AB112 |
| Immunodermatology and Blistering Disorders | AB115 |
| Infection (Bacterial) | AB120 |
| Infection (Fungal) | AB124 |
| Infection (Viral, Including AIDS) | AB130 |
| Internal Medicine Dermatology | AB133 |
| Lymphoma, Cutaneous/Mycosis Fungoides | AB138 |
| Melanoma and Pigmented Lesions | AB143 |
| Non-Melanoma Skin Cancer | AB146 |
| Pediatric Dermatology | AB153 |
| Photobiology, Phototherapy, and Photosensitivity Diseases | AB162 |
| Pigmentary Disorders and Vitiligo | AB169 |
| Psoriasis and Other Papulosquamous Disorders | AB174 |
| Skin Anatomy, Embryology, and Physiology | AB195 |
| Surgery (Cosmetic) | AB196 |
| Surgery (Dermatologic) | AB201 |
| Surgery (Laser) | AB202 |
| Wound Healing and Ulcers | AB207 |
| Author Disclosures | AB210 |
| Author Index | AB238 |
| Subject Index | AB249 |

Exhibit Page 3 of 4

## P1038

### Comparison of the pigment lightening effects of thiodipropionate acid and its ester with hydroquinone

David Brown, PhD, Avon Products, Inc, Suffern, NY, United States; Christos Kyrou, Avon Products, Inc, Suffern, NY, United States; Dmitri Ptchelintsev, PhD, Avon Products, Inc, Suffern, NY, United States; James Leyden, MD, University of Pennsylvania, Philadelphia, PA, United States

Whitening agents are commonly used in skin care products either to reduce the appearance of age spots or to produce brighter, lighter skin. We have discovered that thiodipropionic acid (TDPA) and its ester, dilauryl thiodipropionate (TDPA ester) have skin lightening properties similar to hydroquinone (HQ), a commonly used skin lightening agent. While TDPA is water soluble and therefore suitable for use in aqueous based formulations (eg, hydrogels), the TDPA ester is insoluble in water and more suitable for use in lipophilic cream based formulations. In vitro testing using purified enzyme showed that TDPA ester is a 6-fold more potent inhibitor of tyrosinase than TDPA. In a reconstructed skin model, 1% TDPA ester applied topically was almost twice as effective as 1% TDPA dissolved in the media. In a 12-week, dermatologist-supervised clinical study (n = 33), twice daily topical application of cosmetic formulations containing either 2% HQ or 1% TDPA resulted in similar effects on skin lightening as measured by an improvement in skin tone (45% and 43%, respectively), a reduction in discrete pigmentation (54% and 52%, respectively) and a decrease in mottled pigmentation (55% and 45%, respectively). Similarly, in an 8-week dermatologist-supervised clinical study (n = 35), twice daily topical application of a cosmetic formulation containing either 2% HQ or 2% TDPA ester resulted in an improvement in even skin tone (37% and 31%, respectively), discrete pigmentation (31% and 26%, respectively) and mottled pigmentation (29% and 26%, respectively). Topical application of cosmetic formulations containing either 1% TDPA or 2% TDPA ester did not cause irritation or allergic contact dermatitis and were shown to be suitable for sensitive skin in 4 week dermatologist-supervised clinical use studies (n = 52 and 55, respectively). These results indicate that TDPA and TDPA ester are safe and effective alternatives to HQ for cosmetic skin whitening applications.

*100% is sponsored by Avon Products, Inc.*

## P1039

### Preclinical evaluation of a novel hyaluronic acid 28 mg/ml, lidocaine 0.3% stable combination product

Carol A. Toth, PhD, Anika Therapeutics, Woburn, MA, United States; Hyun Kim, PhD, Anika Therapeutics, Woburn, MA, United States; Tamera Gooding, Anika Therapeutics, Wobu, MA, United States; Ronald W. Gottschalk, MD, Galderma Laboratories, Fort Worth, TX, United States

Hyaluronic acid (HA) is a natural constituent of connective tissue throughout the body. Over the last 15 years, it has been used extensively as a dermal filler to reduce the appearance of facial lines and wrinkles. Despite highly desirable results aesthetically, one drawback to the injection of HA fillers is the pain associated with injection. Due to the nature of the compound, burning and stinging can be significant. Prior to the use of HA fillers, manufacturers of collagen injections overcame some of these tolerability issues using a stable combination with the local anesthetic, lidocaine. Unfortunately, collagen injections have a relatively short duration of effect in comparison to HA. As a result of the enhanced acceptability of this combination as well as a desire to achieve a longer duration of effect, a stable formulation of cross linked HA (28 mg/ml) and lidocaine (0.3%) was developed. The use of a novel cross-linked HA gives the formulation a longer in vivo durability. The HA is not derived from an animal source rendering the product safe from worries of animal contagion. The HA/lidocaine combination was tested in a 48-week guinea pig intradermal implantation model and compared with several other marketed HA tissue augmentation products. When compared to other marketed hyaluronic acid products, this formulation had the highest residual score throughout a 42-week period. A week 18 assessment indicated that this formulation was the only one that was rated with good filling capacity, with other comparators being rated as intermediate or poor in this regard. The HA/lidocaine formulation was considered a non irritant in this model. Microscopically, the HA/lidocaine combination did not induce a tissue response at the site of implantation and remained present at the site throughout the study as a space occupying material. An extrusion force study demonstrated that the HA/lidocaine formulation has good flow characteristics, passing easily through a 30-gauge needle and maintains form well after hydration. Data showed that this HA formulation with lidocaine behaved similarly to a leading marketed HA product with respect to extrusion force. Introduction of this new filler product, consisting of a non-animal derived HA in combination with lidocaine, is expected to offer an advantage to the aesthetic patient over current choices.

*Study and poster support were provided by Anika Therapeutics and Galderma Laboratories, LP.*

## P1040

### Effectiveness and durability of a hyaluronic acid 28 mg/ml, lidocaine 0.3% stable combination product as demonstrated in a multicenter, randomized trial

C. William Hanke, MD, Laser and Skin Surgery Center of Indiana, P.C., Carmel, IN, United States; Frederic Brandt, MD, Frederic Brandt Dermatology, Coral Gables, FL, United States; William P. Coleman III, MD, Tulane University Health Sciences Center, New Orleans, LA, United States; Dee Anna Glaser, MD, Saint Louis University, St Louis, MO, United States

Dermal fillers, such as collagen and hyaluronic acid (HA), have been used for more than 25 years for aesthetic correction of lines and wrinkles. The effects of these injectable treatments have a wide range of durability ranging from 1 to 4 months for collagen injections to 3 to 8 months with current HA injections. Collagen and HA injections have been associated with pain, however collagen in combination with lidocaine has increased its tolerability. The major drawback to collagen is the shorter duration of benefit compared with HA. A stable combination of HA 28 mg/ml with lidocaine 0.3% has now been developed. A pivotal trial was carried out in 10 US clinical sites to evaluate effectiveness and safety of this new dermal HA filler formulation. This trial was an active-controlled, randomized, split-face design with bilateral symmetrical nasolabial folds. HA/lidocaine was injected into the fold on one side of the face and a commercial preparation of collagen to the other side of the face. Touch-up sessions were conducted every 10 to 14 days until optimal correction was attained. Follow-up visits were done at 1, 4, and 6 months after optimal correction. A total of 208 subjects were enrolled and 191 comprised the intent-to-treat population with 164 comprising the per protocol population. Touch-up sessions were required more with collagen than with HA (mean 0.35 and 0.26 respectively). Lemperle Rating Scale (LRS) scores indicated that more patients had superior results with the HA filler compared to the collagen filler at 4 months ($P < .0001$) and at 6 months ($P = .0003$) according to evaluator assessments. Subject assessments also rated HA filler superior in more patients at both 4 and 6 months ($P < .0001$). All patients experienced injection site reactions with both agents. Swelling and nodules occurred in 8.4% and 8.9% of patients respectively for HA and in 3.1% and 7.9% of patients respectively for collagen. Other injection site reactions occurring in less than 5% of patients included bruising, discoloration, erythema, edema inflammation, pain, abscess and infection. Contusions occurred in more than 5% of subjects (7.3% for HA and 2.1% for collagen). This resolved in approximately 2/3 of affected subjects within one week. Pruritus, erythema and facial swelling were also reported as adverse events in fewer than 5% of patients. Results from this trial support the use of this new HA 28 mg/ml – lidocaine 0.3% stable combination for the aesthetic correction of lines and wrinkles.

*Study and poster support were provided by Anika Therapeutics and Galderma Laboratories, LP.*

## P1041

### Medical grade lanolin USP accelerates repair of hands, heels, and lips

Laurie B. Joseph, PhD, Croda Inc, Edison, NJ, United States; Nigel Langley, PhD, Croda Inc, Edison, NJ, United States; Michael Christiansen, PhD, S.K.I.N. Inc, Conshocken, PA, United States; Albert M. Kligman, MD, PhD, Skin Inc, Conshocken, PA, United States

Background: Moisture loss of the skin results in cracked, reddened, irritated lips and hands. Feet are also subjected to the perils of weather and are the most neglected part of our body. In these studies medical grade lanolin USP was compared to white petrolatum USP for promoting the repair of damaged hands, heels, and lips.

Methods: The lip and hand studies were performed during the winter, while the heel study was conducted during the summer. For the hand and heel studies side-by-side comparisons were made between petrolatum and medical grade lanolin. Men and women (aged 14-52 yrs) with cracked and xerotic hands, heels, or lips were enrolled in all studies. There were no adverse events and all subjects completed the studies. A dermatologist determined the degree of damage using a 0 to 3 scale. Photographs were taken prior to the first application. During the hand study, individuals were treated twice daily for 2 weeks followed by a 9-day regression. At days 8, 15, and 24, hands were assessed and photographed. For the heel study, heels were treated at night and covered with socks for 2 weeks followed by a 1-week regression. At 1 and 2 weeks of treatment, plus 1 week after treatment heels were assessed and photographed. For the lip study, materials were applied twice daily for 2 weeks with 1 application immediately before bed.

Results: All 10 individuals in the hand study had reduced dryness, cracking, reddening, and itching after use of the lanolin as compared to the petrolatum-treated hands. At the end of the regression the hands treated with petrolatum had regressed to a state similar to day 0, while the all lanolin treated hands were improved compared to the baseline. Before treatment, all individuals had stained and fissured heels. After 1 week, lanolin-treated heels had less staining and fissuring. By 2 weeks, no staining was seen on the lanolin-treated heels and the subjects stated that their feet were softer and less fissured than the petrolatum-treated feet. After regression, both feet regressed, but feet treated with lanolin were softer and less fissured, though some staining did reappear. After 1 week of lanolin treatment, there was less cracking, peeling, bleeding, and swelling. At 2 weeks, the lips treated with petrolatum were still cracked as compared to the healed lanolin-treated lips.

Conclusion: This data clearly shows that medical grade lanolin is superior to petrolatum in restoring the barrier function of skin.

*100% sponsored by Croda Inc.*

This material may be protected by Copyright law (Title 17 U.S. Code)

Exhibit Page 4 of 4

# EXHIBIT U

US 20050136122A1

(19) **United States**

(12) **Patent Application Publication**   (10) Pub. No.: **US 2005/0136122 A1**

Sadozai et al.   (43) **Pub. Date:**   **Jun. 23, 2005**

(54) **CROSSLINKED HYALURONIC ACID COMPOSITIONS FOR TISSUE AUGMENTATION**

(75) Inventors: **Khalid K. Sadozai**, Shrewsbury, MA (US); **Tamera B. Gooding**, Jamaica Plain, MA (US); **Kyle Bui**, North Andover, MA (US); **Charles H. Sherwood**, Sudbury, MA (US)

Correspondence Address:
**HAMILTON, BROOK, SMITH & REYNOLDS, P.C.**
**530 VIRGINIA ROAD**
**P.O. BOX 9133**
**CONCORD, MA 01742-9133 (US)**

(73) Assignee: **Anika Therapeutics, Inc.**, Woburn, MA (US)

(21) Appl. No.: **10/743,557**

(22) Filed: **Dec. 22, 2003**

**Publication Classification**

(51) Int. Cl.$^7$ ...................... **A61K 48/00**; A61K 39/395; A61K 31/24

(52) U.S. Cl. .......................... **424/493**; 514/304; 514/536; 514/2; 514/44; 424/130.1; 536/53

(57)   **ABSTRACT**

A hyaluronic acid (HA) composition includes crosslinked, water-insoluble, hydrated HA gel particles. The HA includes crosslinks represented by the following structural formula:

$$HA—U—R_2—U—HA$$

The variables are defined herein.

A method of augmenting tissue in a subject includes inserting a needle into a subject at a location in the subject that is in need of tissue augmentation, wherein the needle is coupled to a syringe loaded with the HA composition, and applying force to the syringe, to deliver the HA composition into the subject.

A method of preparing the HA composition, includes forming water-insoluble, dehydrated crosslinked HA particles, separating the water-insoluble, dehydrated particles by average diameter, selecting a subset of particles by average diameter, and hydrating the subset of dehydrated particles with a physiologically compatible aqueous solution.

Another method of preparing the crosslinked HA composition includes crosslinking a precursor of the crosslinked HA with a biscarbodiimide in the presence of a pH buffer and dehydrating the crosslinked HA.

Also included is a method of augmenting tissue in a subject that is in need of tissue augmentation.

A method of stabilizing crosslinked HA includes hydrating water-insoluble, dehydrated crosslinked HA with a physiologically compatible aqueous solution that includes a local anesthetic, wherein the value of storage modulus G' for the stabilized composition is at least about 110% of the value of G' for a non-stabilized composition,.

Also included is the stabilized HA composition.

Exhibit 1030
Prollenium v. Allergan

Patent Application Publication    Jun. 23, 2005   Sheet 1 of 7        US 2005/0136122 A1



FIG. 1

Case 1:19-cv-00126-CFC-SRF   Document 104   Filed 06/19/20   Page 157 of 249 PageID #: 4355



FIG. 2



FIG. 3



FIG. 4



FIG. 5

Exhibit Page 6 of 21



FIG. 6



FIG. 7

US 2005/0136122 A1

Jun. 23, 2005

1

## CROSSLINKED HYALURONIC ACID COMPOSITIONS FOR TISSUE AUGMENTATION

### BACKGROUND OF THE INVENTION

[0001] Currently, all tissue augmentation fillers approved by the United States Food and Drug Administration are derived from collagen. Approximately 3-5% of human subjects show serious allergic reactions to bovine collagen, thus requiring careful testing before using these fillers in any particular subject.

[0002] Hyaluronic acid, also referred to as "HA," is a naturally occurring, water soluble polysaccharide that is a major component of the extra-cellular matrix and is widely distributed in animal tissues. Naturally occurring HA generally has a molecular weight range of about between $6 \times 10^4$ to about $8 \times 10^6$ Daltons. It has excellent biocompatibility and does not give a foreign body or allergic reaction when implanted into a subject.

[0003] Methods of preparing commercially available hyaluronan are well known. Also known are various methods of coupling HA and cross-linking HA to reduce the water solubility and diffusibility of HA, and to increase the viscosity of HA. See, for example, U.S. Pat. Nos. 5,356,883 and 6,013,679, the entire teachings of which are incorporated herein by reference. Further, many forms of HA have been employed, e.g., as surgical aids to prevent post operative adhesions of tissues, as adjuncts to synovial fluid in joints, as fluid replacement and/or surgical aids in ophthalmic surgery, as a scaffold for tissue engineering in vitro or guided tissue regeneration or augmentation in vivo, and the like.

[0004] The use of such HA products suffers several defects, however, in particular, a tradeoff between in vivo properties and surgical usability. For example, HA that is sufficiently chemically modified or crosslinked to have desirable in vivo mechanical and biostability properties can be so highly viscous that injection through fine needles is difficult or impossible. Conversely, HA that is injectable can have inferior in vivo biostability and mechanical properties.

[0005] Further, there is high current interest in employing chemically modified HA for vehicle-assisted time release delivery of bioactive agents including, for example, therapeutic agents or drugs and biological probes. A major challenge is the development of a delivery vehicle that will provide the appropriate level of bioavailability of a therapeutic agent at the affected area to achieve a desired clinical result, yet also have a desirable balance of in vivo mechanical and biostability properties balanced with surgical/administrative usability. The bioavailability of a drug depends upon the nature of the drug, the drug delivery vehicle used, and the route of delivery, for example, oral, topical, transdermal, mucosal, administration by injection, administration by inhalation, or administration by a combination of two or more of these routes. The bioavailability may be low as a result of, for example, the degradation of the drug by metabolic processes, rapid or uneven degradation of the delivery vehicle, rapid or uneven release of the drug from the delivery vehicle, and the like. These can be accompanied by similar problems of frequency of administration, difficulty of administration, e.g., difficulty of injection, biodegradation, and the like. In addition to the difficulties noted above, frequent administration of insufficiently stable drug

delivery vehicles can lead to variations in drug delivery, leading to an increase in the occurrence of damaging side effects, a decrease in therapeutic benefit, and the like.

[0006] Therefore, there is a need for a HA composition that overcomes or minimizes the above referenced problems.

### SUMMARY OF THE INVENTION

[0007] The invention is directed to a hyaluronic acid (HA) composition and a method of making and using a HA composition that is effective for tissue augmentation and/or drug delivery.

[0008] A hyaluronic acid (HA) composition includes crosslinked, water-insoluble, hydrated HA gel particles. The HA includes crosslinks represented by the following structural formula:

$$HA'—U—R_2—U—HA'$$

[0009] Each HA' is the same or different crosslinked HA' molecule, e.g., the crosslinks can be intramolecular or intermolecular.

[0010] Each U is independently an optionally substituted O-acyl isourea or N-acyl urea.

[0011] R2 is optionally substituted alkyl, alkenyl, alkynyl, alkoxy, cycloalkyl, cycloalkenyl, cycloalkynyl aryl, heteroaryl, heterocyclyl, cycloaliphaticalkyl, aralkyl, heteroaralkyl, or heterocyclylalkyl.

[0012] A method of augmenting tissue in a subject that is in need of tissue augmentation includes the step of inserting a needle into a subject at a location in the subject that is in need of tissue augmentation, wherein the needle is coupled to a syringe loaded with the HA composition. Also included is applying force to the syringe, whereby at least a portion of the HA composition is delivered into the subject.

[0013] A method of preparing the HA composition, includes forming water-insoluble, dehydrated crosslinked HA particles, separating the water-insoluble, dehydrated particles by average diameter, selecting a subset of particles by average diameter, and hydrating the subset of dehydrated particles with a physiologically compatible aqueous solution, thereby forming the HA composition.

[0014] Another method of preparing the crosslinked HA composition includes crosslinking a precursor of the crosslinked HA with a biscarbodiimide in the presence of a pH buffer that is at a pH between about 4 and about 8, and dehydrating the crosslinked HA to produce the dehydrated, crosslinked HA.

[0015] A method of stabilizing crosslinked HA includes hydrating water-insoluble, dehydrated crosslinked HA with a physiologically compatible aqueous solution, thereby forming the stabilized HA composition, wherein the physiologically compatible aqueous solution includes at least about 0.1% by weight of a local anesthetic, wherein the value of storage modulus G' for the stabilized composition is at least about 110% of the value of G' measured for a non-stabilized composition, when measured at 37° C. and 1 Hz frequency using a 4 cm flat geometry.

[0016] Also included is the stabilized HA composition.

US 2005/0136122 A1

Jun. 23, 2005

2

[0017]   The embodiments disclosed herein are effective for preparing and using crosslinked, water-insoluble, hydrated HA gel particles, wherein the crosslinks in the HA include linking group R2, that have improved combinations of in-vivo biostability and mechanical properties, while at the same time having improved usability, e.g., improved ease of injection through fine needles. For example, as shown in the Exemplification, the HA compositions have improved values for storage modulus G' and kinematic viscosity, while exhibiting improved in vitro and in vivo biostability to hyaluronidase enzyme. The disclosed embodiments are effective for employing crosslinked HA in tissue augmentation while reducing the frequency of implantation needed. The embodiments are also effective for employing crosslinked HA as a drug delivery vehicle that exhibits the surprising and unexpected effect of increasing biostability along with effective drug release properties and effective administrative properties.

BRIEF DESCRIPTION OF THE DRAWINGS

[0018]   FIG. 1: UV absorbance of the crosslinked products obtained by reacting HA and p-phenylene-bis(ethylcarbodiimide) in a molar equivalent ratio of 75%, 100%, and 125%.

[0019]   FIG. 2: UV absorbance of the crosslinked products obtained by reacting HA and p-phenylene-bis(ethylcarbodiimide) in MES buffer of pH 5.5, 6.0, and 6.5.

[0020]   FIG. 3: Effect of the particle average diameter distribution on the storage modulus (G') of the gel.

[0021]   FIG. 4: Effect of the particle average diameter distribution in the gel on the force required to extrude the gel from a 30-gauge needle.

[0022]   FIG. 5: Degradation of crosslinked HA product in the presence of enzyme hyaluronidase, compared to the other tissue augmentation products RESTYLANE®, PERLANE® and HYLAFORM®

[0023]   FIG. 6: Degradation profile of the gel of different initial G', prepared from the crosslinked HA of the invention.

[0024]   FIG. 7: Storage Modulus G' and degradation profile of the gels prepared in phosphate buffer containing no lidocaine, 0.2% lidocaine, and 0.3% lidocaine.

DETAILED DESCRIPTION OF THE INVENTION

[0025]   The invention is directed to crosslinked HA compositions, their preparation, and their methods of use.

[0026]   Uncrosslinked HA, e.g, the precursor to the crosslinked HA of the invention, typically comprises disaccharide units of D-glucuronic acid (GlcUA) and N-acetyl-D-glucosamine (GlcNAc), which are alternately linked, forming a linear polymer. HA often occurs naturally as the sodium salt, sodium hyaluronate. HA, sodium hyaluronate, and preparations of either HA or sodium hyaluronate are often referred to as "hyaluronan." As used herein, the terms "HA" and "hyaluronan" also refer to any of the other hyaluronate salts, including, for example, potassium hyaluronate, magnesium hyaluronate, calcium hyaluronate, and the like. The uncrosslinked HA used as precursors for the crosslinking typically has an average molecular weight range of from between about $6 \times 10^4$ to about $8 \times 10^6$ Daltons, or 150 to 20,000 disaccharide repeat units. HA from any of

a variety of sources, including HA extracted from animal tissues or harvested as a product of bacterial fermentation, can be used as a starting material. Alternatively, the uncrosslinked HA used to make the composites of this invention can be produced in commercial quantities by bioprocess technology, as described, for example, in Nimrod et al., PCT Publication No. WO 86/04355, the entire teachings of which are incorporated herein by reference.

[0027]   Crosslinked HA can be formed by reacting uncrosslinked HA with a crosslinking agent under suitable reaction conditions. The crosslinked HA is prepared by reacting uncrosslinked HA with a biscarbodiimide in the presence of a pH buffer, wherein the buffer is at a pH between about 4 and about 8. The pH of the buffer can be between about 4 and about 7, typically between 5 and about 6.5, or more typically between about 5 and about 6. In a preferred embodiment, the pH is about 5.5.

[0028]   The pH buffer can include any buffer agent known to one skilled in the art, e.g., 2-(N-morpholino)ethanesulfonic acid (MES); 2,2-bis(hydroxymethyl)-2,2',2''-nitrotriethanol; succinate/succinic acid; $KH_2PO_4$; N-tris(hydroxymethyl-2-aminoethanesulfonic acid; triethanolamine; diethylbarbituate;  tris(hydroxymethyl)aminoethane;  N-tris(hydroxy)methylglycine;  and  N,N-bis(2-hydroxyethyl)glycine. The buffer agent can be employed with an additional acid or base, e.g., 2-(N-morpholino)ethanesulfonic acid with NaOH; 2,2-bis(hydroxymethyl)-2,2',2''-nitrotriethanol with HCl; succinate with succinic acid; $KH_2PO_4$ with borax; N-tris(hydroxymethyl-2-aminoethanesulfonic acid with NaOH; triethanolamine with HCl; diethylbarbituate with HCl; tris(hydroxymethyl)aminoethane with HCl; N-tris(hydroxy)methylglycine with HCl; and N,N-bis(2-hydroxyethyl)glycine with HCl. Preferably, the buffer includes 2-(N-morpholino)ethanesulfonic acid and NaOH.

[0029]   Typically, the buffer agent is mixed in aqueous media, in a concentration between about 5 mM (millimolar) and about 250 mM, typically between about 10 mM and about 150 mM, more typically between about 25 and about 100 mM, and preferably about 75 mM.

[0030]   Typically, the uncrosslinked HA is mixed in aqueous media, e.g., the pH buffer solution, in a concentration between about 1 mM (millimolar) and about 100 mM, typically between about 10 mM and about 50 mM, more typically between about 25 and about 50 mM, and preferably about 37 mM. The particular concentration employed can vary depending on the molecular weight of the uncrosslinked HA precursor. At lower concentrations, the reactions can be slower. At higher concentrations, the product can be difficult to handle due to the increase in viscosity. Examples of acceptable concentrations of uncrosslinked HA for other crosslinking reactions are described in U.S. Pat. No. 5,356,883, to Kuo et al., the teachings of which are incorporated herein by reference in their entirety.

[0031]   The reaction can be carried out at a temperature range of between about 0° C. and about 60° C., typically between about 10° C. and about 40° C., more typically between about 15° C. and about 30° C., and preferably about 25° C. Exemplary reaction conditions can be found in Examples 1-9.

[0032]   The biscarbodiimide can be combined with the uncrosslinked HA solution alone, or more typically as a

US 2005/0136122 A1
Jun. 23, 2005

3

solution in a water-miscible organic solvent, e.g., acetone, methyl ethyl ketone, dimethyformamide, dimethyl sulfoxide, methanol, ethanol, 2-propanol, acetonitrile, tetrahydrofuran, N-methyl pyrrolidone, and the like. More typically, the solvent is acetone, and the biscarbodiimide is at a concentration of between about 0.1 mg/mL and about 100 mg/mL, typically between about 1 mg/mL and about 50 mg/mL, more typically between about 5 mg/mL and about 25 mg/mL, and preferably about 15 mg/mL.

[0033]   The uncrosslinked HA and the biscarbodiimide can be combined in any molar equivalent ratio, e.g., between about 1% and about 200%, typically between about 10% and about 150%, more typically between about 18% and about 125%. In various embodiments, the molar equivalent ratio is about 18%; or about 38%; or about 50%, or about 75%, or about 100%; or about 125%.

[0034]   A HA composition crosslinked with the biscarbodiimide can include crosslinks characterized by a linking group R2 of the biscarbodiimide agent included in the crosslink, e.g., the linking group connecting through a group U at each end to a HA' molecule, as shown in the following structural formula:

$$HA'—U—R_2—U—HA'$$

[0035]   Each HA' in the preceding formula can be different or the same HA' molecule, e.g., the crosslink can be an intermolecular or intramolecular crosslink. Each U can be the same or different and is an optionally substituted N-acyl urea or O-acyl isourea, as shown in the bracketed fragments in the following structural formulas:



[O-acyl isourea]          [N-acyl urea]

[0036]   These crosslinks can be generated in the reaction of HA' with a biscarbodiimide crosslinking reagent, represented in the following structural formula:

$$R_1—N=C=N—R_2—N=C=N—R_1$$

[0037]   wherein two carbodiimides, substituted with R1, are connected through the linking group R2.

[0038]   In the preceding structural formulas, each R1 can be the same or different and is an optionally substituted group selected from hydrogen, aliphatic (e.g., alkyl, alkenyl, alkynyl), alkoxy, cycloaliphatic (e.g., cycloalkyl, cycloalkenyl, and cycloalkynyl), aryl, heteroaryl, heterocyclyl, cycloaliphaticalkyl, aralkyl, heteroaralkyl, heterocyclylalkyl, and the like. Suitable optional substituents are those that do not substantially interfere with the properties of the resulting crosslinked HA composition and are described herein in the section describing each of the respective groups. In other embodiments, R1 is an optionally substituted aliphatic group. More preferably, R1 is alkyl, e.g., C1-C6 linear or branched alkyl, e.g., methyl, ethyl, propyl, butyl, 2-propyl, tert-butyl, and the like. Preferably, each R1 is ethyl.

[0039]   Each R2 is an optionally substituted linking group including one or more of aliphatic, cycloaliphatic, aryl, heteroaryl, heterocyclyl, cycloaliphaticalkyl, aralkyl, heteroaralkyl, heterocyclylalkyl, groups, and the like. Suitable optional substituents are those that do not substantially interfere with the properties of the resulting crosslinked HA composition and are described herein in the section describing each of the respective groups. R2 can optionally include or be interrupted by other groups, e.g., carbonyl, amide, oxy, sulfide, disulfide, and the like. In other embodiments, R2 is a cycloaliphatic, aryl, heteroaryl, or heterocyclyl group. In still other embodiments, R2 is 1,6-hexamethylene octamethylene, decamethylene, dodecamethylene, PEG, —CH2CH2—S—S—CH2CH2—, para-phenylene-S-S-paraphenylene, meta-phenylene-S-S-meta-phenylene, meta-phenylene or para-phenylene. More preferably, R2 is p-phenylene. Preferably, R2 is para-phenylene.

[0040]   In one embodiment, the biscarbodiimide is selected from 1,6-hexamethylene bis(ethylcarbodiimide), 1,8-octamethylene bis(ethylcarbodiimide), 1,10 decamethylene bis(ethylcarbodiimide), 1,12 dodecamethylene bis(ethylcarbodiimide), PEG-bis(propyl(ethylcarbodiimide)), 2,2'-dithioethyl bis(ethylcarbodiimide), 1,1'-dithio-p-phenylene bis(ethylcarbodiimide), para-phenylene-bis(ethylcarbodiimide), and 1,1'-dithio-m-phenylene bis(ethylcarbodiimide). In a preferred embodiment, the biscarbodiimide is para-phenylene-bis(ethylcarbodiimide). Methods of preparing biscarbodiimides are described in U.S. Pat. Nos. 6,013,679; 2,946,819; 3,231,610; 3,502,722; 3,644,456; 3,972,933; 4,014,935; 4,066,629; 4,085,140; 4,096,334; 4,137,386, 6,548,081, and 6,620,927 the teachings of which are incorporated herein by reference in their entireties.

[0041]   The reaction of HA with a biscarbodiimide crosslinking reagent, in the presence of an available proton, is believed to comprise protonation in the first step. The acid anion can then attach to the carbon atom of the cation formed, resulting in the formation of an O-acyl isourea intermediate. The acyl group in the intermediate can migrate from the oxygen atom to a nitrogen atom to produce a N-acyl isourea derivative of the HA. It is believed that the O-to-N migration can be incomplete, resulting in a product reaction mixture that can include both the N-acyl urea and the O-acyl isourea. Thus, a crosslink resulting from reaction of a biscarbodiimide with the crosslinked HA precursor typically can contain two O-acyl isoureas connected through R2, as represented in the following structural formula:



[0042]   or an O-acyl isourea and an N-acyl urea connected through R2, as represented in the following structural formula:

US 2005/0136122 A1

Jun. 23, 2005

4

[0043] or two N-acyl ureas connected through R2, as represented in the following structural formula:



[0044] The mixed products can be used separately or together to prepare the compositions according to embodiments of the invention.

[0045] The crosslinked HA can be precipitated by pouring into a water-miscible organic solvent, e.g., acetone, methyl ethyl ketone, dimethylformamide, dimethyl sulfoxide, methanol, ethanol, 2-propanol, acetonitrile, tetrahydrofuran, N-methyl pyrrolidone, and the like, preferably an alcohol, e.g., ethanol. The precipitate can be collected and dried, e.g., under reduced pressure.

[0046] The dried crosslinked HA can be formed into particles by any means well known to one in the art, e.g., abrading, grinding, fracturing, and the like, preferably by grinding in a cryogenic mill. Alternatively, the undried crosslinked HA can be cryoprecipitated to form small particles, which can then be dried, or the undried crosslinked HA can be ground in a cryogenic mill and then the resulting particles can be dried.

[0047] As used herein, "water-insoluble" and like terms refers to compositions, e.g., the water-insoluble dehydrated particles, or the water insoluble hydrated particles that are heterogeneous when suspended in a sufficient amount of water at room temperature. In one embodiment, "water-insoluble" means that upon placing the particles of the HA composition in water at neutral pH and 25° C. for at least about 2 weeks, the HA in the particles is essentially undissolved, e.g., essentially no HA from the particles becomes freely dissolved in the water. In other embodiments, "water-insoluble" means that the HA in the particles is essentially undissolved after generally at least about 4 weeks under the preceding conditions, typically at least about 6 weeks, more typically at least about 8 weeks, or preferably at least about 12 weeks. In one embodiment, "water-insoluble" means that the HA in the particles is essentially undissolved after at least about 26 weeks under the preceding conditions. As used herein, "freely dissolved" means solvation of HA molecules in the water separately from the hydrated, water-swelled particles.

[0048] Moreover, a cross-linked HA derivative can be a hydrogel. As the term is used herein, a "hydrogel" is a cross-linked macromolecular network that can swell in water or biological fluids, and can retain a significant portion of water within its structure without dissolving. As used herein, the term "swelling" refers to the taking up of a liquid, for example water, by a gel with an increase in volume, typically with the addition of heat and pressure. Hydrogels have a large molecular weight that generally cannot be measured by conventional methods and are composed of a polymer backbone and cross-links.

[0049] The crosslinked HA particles can be characterized by particle average diameter distribution. The average diam-

eter can be measured as the average diameter of the hydrated particles and/or the average diameter of the dehydrated particles. Typically, the particle average diameter is selected from the group consisting of a hydrated particle average diameter between about 20 $\mu$m (micrometers) and about 1000 $\mu$m and a dehydrated particle average diameter between about 10 $\mu$m and about 500 $\mu$m. In other embodiments, the hydrated particle average diameter is between about 40 $\mu$m and about 600 $\mu$m and a dehydrated particle average diameter between about 20 $\mu$m and about 300 $\mu$m, or more preferably the hydrated particle average diameter is between about 50 $\mu$m and about 500 $\mu$m and the dehydrated particle average diameter is between about 25 $\mu$m and about 250 $\mu$m.

[0050] In a particular embodiment, the HA in the composition consists essentially of the crosslinked, water-insoluble, hydrated HA gel particles. For example, the HA composition in this embodiment can be considered to be a single hydrated particle phase, e.g., any liquid in the composition is essentially contained in the hydrated particles, e.g., there is essentially no free liquid phase. In other embodiments wherein the HA in the composition consists essentially of the crosslinked, water-insoluble, hydrated HA gel particles, certain forms of HA is excluded from the composition, e.g., typically excluded are HA particles or molecules that have an average diameter smaller than about 1 $\mu$m, more typically excluded are HA particles or molecules that have an average diameter smaller than about 10 $\mu$m, and preferably excluded are HA particles or molecules that have an average diameter smaller than about 20 $\mu$m.

[0051] As used herein, a "subset" of particles by average diameter means that a collection of particles are characterized by average diameter, and at least some fraction of particles is rejected, e.g., not included in the subset.

[0052] In still other embodiments, the particle average diameters are selected, e.g., by sieving or other methods well known to the art, so that particular average diameter distributions can be chosen to result in particular properties in the final composition, for example, as shown in the Examples. Thus, the dehydrated particles can be sieved to separate by average diameter fractions, e.g., as in Example 16, where five average diameter fractions of particles were collected: 0-25 $\mu$m, 25-75 $\mu$m, 75-125 $\mu$m, 125-180 $\mu$m, and 180-250 $\mu$m.

[0053] The various average diameter fractions of a particular composition can be employed to determine a combination of average diameter fractions in various proportions that will result in particular combined properties. Thus, in one embodiment, the water-insoluble, dehydrated particles can be separated into at least two average diameter fractions and the fractions can be combined in a ratio to adjust the properties of the combination, e.g., in Example 17, two fractions containing 125-250 $\mu$m, and 0-125 $\mu$m are combined in a 1:1 ratio. The resulting composition has a average diameter distribution that is different from the ground particles before sizing, for example, the average diameter distribution can be a multimodal average diameter distribution, e.g., a bimodal average diameter distribution when two average diameter fractions are selected for the composition. The properties of the multimodal composition are built from the properties of the individual average diameter fractions and their amounts in the composition. In another embodi-

US 2005/0136122 A1

Jun. 23, 2005

5

ment, the water-insoluble, dehydrated particles can be separated into at least three average diameter fractions, where at least two average diameter fractions are selected and at least one average diameter fraction is rejected.

[0054] The dehydrated particles are typically hydrated in the presence of the physiologically acceptable solution (e.g., a saline solution, or a phosphate buffer as provided in the Examples) under conditions including a temperature of at least about 100° C., a pressure of at least about 120 kPa (kilopascals); and a duration of at least about 15 min. Such conditions can be achieved in an autoclave, for example, and can also serve to sterilize the particles. Other conditions include: temperatures of from about 100° C. to about 150° C., typically from about 110° C. to about 140° C., or preferably from about 120° C. to about 140° C.; pressures from about 120 kPa to about 200 kPa, typically from about 120 kPa to about 160 kPa, or preferably from about 130 kPa to about 140 kPa; and durations from about 15-75 min, more typically from about 20 to about 60 min.

[0055] Additional contemplated sterilization/hydration techniques include the following. In one embodiment, product can be contacted with a clean steam supply at a temperature of 118-133° C. (typically about 121° C.) and the corresponding steam pressure at saturation (about 103 kPa to about 186 kPa). Evaporative cooling can occur during vacuum or "natural" cooling, e.g., slow venting of steam pressure. In another embodiment, a product can be sterilized at a temperature of 118-133° C. (typically 121° C.) using a mixture of air and steam, preferably circulated, e.g., by fans. Typical pressures are 69 kPa to about 103 kPa over the saturation pressure of the steam (typically less than 310 kPa). Cooling can be achieved, e.g., by the addition of cool air and circulation with the fans. In another embodiment, products can be sprayed with liquid water at the sterilization temperature under sufficient counter pressure to keep the water in the liquid phase (typically less than 310 kPa). Cooling to approximately 80° C. can be achieved by direct contact water spray in heat exchange with a cooling system. Cooling from about 80° C. down to about 20° C. is generally evaporative and can also serve to remove excess liquid from the product. Many variations on the preceding hydration/ sterilization techniques are possible.

[0056] The crosslinked HA composition preferably includes a physiologically effective amount of at least one bioactive agent selected from the group consisting of cells, genes, proteins, antibodies, peptides, and pharmaceuticals.

[0057] A pharmaceutical, as that term is used herein, includes, for example: compounds and compositions recognized in the official United States Pharmacopoeia, the official Homeopathic Pharmacopoeia of the United States, or the official National Formulary, or any supplement thereof; compounds and compositions intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and compounds and compositions (other than food) intended to affect the structure or any function of the body of man or other animals. Pharmaceuticals include pharmaceutical compounds and solvates, salts, crystal polymorphs, and stereoisomers thereof. Examples of classes of pharmaceuticals include growth factors (e.g., interleukins, prostaglandins, thromboxanes, leukotrienes and cytokines), steroidal and non-steroidal contraceptive agents, antibiotics (e.g., penicillin, streptomycin and linoco-

mycin), analgesics, anesthetics, sedatives, barbiturates, aminoalkybenzenes, catecholamines, narcotics, narcotic antagonists, anti-neoplastic agents and anticoagulants (e.g., heparin and heparin sulfate)steroidal and non-steroidal anti-inflammatory drugs, anesthetics, antibiotics, antifungals, hormones and any synthetic analogues and pharmaceutically-active fragments thereof, and the like. Pharmaceuticals which are suitable for use in delivery systems in embodiments of the invention may be fat soluble, water-soluble, anionic or cationic, as long as they can interact with a group on the hyaluronic aid derivative of an embodiment to form either covalent or ionic bonds or hydrophobic or hydrophilic interactions, for example, a hydrophobic interaction between a pharmaceutical having a hydrophobic moiety and the HA derivative according to an embodiment can occur. .

[0058] The bioactive agent can be introduced at any stage, but is typically added during preparation of the composition by inclusion in the physiologically compatible solution used to hydrate the dehydrated particles, e.g., the phosphate buffer in the Examples. In one embodiment, the crosslinked HA composition, e.g., the hydrated HA particles, includes an anesthetic, e.g., a local anesthetic, as the bioactive agent. A local anesthetic can include at least one member of the group selected from ambucaine, amolanone, amylocaine, benoxinate, benzocaine, betoxycaine, biphenamine, bupivacaine, butacaine, butamben, butanilicaine, butethamine, butoxycaine, carticaine, chloroprocaine, cocaethylene, cocaine, cyclomethycaine, dibucaine, dimethysoquin, dimethocaine, diperodon, dycyclonine, ecgonidine, ecgonine, ethyl chloride, etidocaine, beta-eucaine, euprocin, fenalcomine, formocaine, hexylcaine, hydroxytetracaine, isobutyl p-aminobenzoate, leucinocaine mesylate, levoxadrol, lidocaine, mepivacaine, meprylcaine, metabutoxycaine, methyl chloride, myrtecaine, naepaine, octacaine, orthocaine, oxethazaine, parethoxycaine, phenacaine, phenol, piperocaine, piridocaine, polidocanol, pramoxine, prilocaine, procaine, propanocaine, proparacaine, propipocaine, propoxycaine, psuedococaine, pyrrocaine, ropivacaine, salicyl alcohol, tetracaine, tolycaine, trimecaine, zolamine, and salts thereof. Typically, the bioactive agent is a local anesthetic selected from lidocaine, mepivacaine, prilocaine, bupivacaine, cocaine, procaine, chlorocaine, and tetracaine, or a salt or solvate thereof thereof. Preferably, the bioactive agent is the local anesthetic lidocaine, or a solvate or salt thereof, e.g., the salt lidocaine-HCl.

[0059] The crosslinked HA can function as a vehicle which provides the controlled or sustained release of the bioactive agent. In one embodiment, the controlled-release HA is placed in contact with a pre-selected tissue, and allowed to remain in place until a desired clinical result is achieved. The controlled-release HA according to an embodiment may be injected or implanted at the locus where delivery is desired, or may be administered orally or by a route that is a combination of two or more of these administration routes.

[0060] Diffusion provides the delivery of a bioactive agent via delivery systems in which the drug non-covalently interacts with the crosslinked HA. Such non-covalent interactions include ionic, hydrophobic, and hydrophilic interactions in which the bioactive agent is dispersed within the carrier. As used herein, the term "dispersed" means ionic, hydrophobic, and hydrophilic interactions between the drug and the HA.

US 2005/0136122 A1

6

Jun. 23, 2005

[0061] The rate of delivery of a bioactive agent is related not only to the rate of its diffusion, but also to the rate of degradation of the HA in which the drug or other bioactive agent is dispersed. The rate of degradation of the HA is related to the degree of cross-linking and is also dependent on numerous metabolic processes taking place in vivo. The degradation process is usually slower than diffusion. By choosing the concentration of the drug dispersed within the HA, and the degree of cross-linking, the rate of degradation and diffusion and, thus, the rate of drug delivery, can be controlled.

[0062] As used herein, a "physiologically effective amount" is the amount of bioactive agent that is sufficient to have the intended effect, e.g., an amount of local anesthetic sufficient to have an anesthetic effect in a subject injected with a composition including the agent. One skilled in the art will be able to determine a physiologically effective amount based on the amount of composition employed, the subject's medical history, and the like. The drug concentration can be varied over very broad limits and preferably should be chosen depending on the degree of cross-linking of the HA, the solubility of the drug, its pharmaceutical activity, and the effect desired.

[0063] As used herein, a "physiologically acceptable solution" is any solution known in the art that is useful as a carrier in a physiological system, e.g., aqueous solutions that are typically sterile, non-allergenic, non-toxic, and the like, e.g., a saline solution, a buffer solution, a sugar solution, and the like.

[0064] The viscoelastic properties of the composition can be determined as shown in the Examples. In one embodiment, the composition has at least one parameter measured at 37° C. selected from a storage modulus G' of at least about 50 Pa (Pascals) when measured at 1 Hz (Hertz) frequency using a 4 cm (centimeter) flat geometry; and a kinematic viscosity of at least about 20,000 cPs (centiPoise) when measured at a shear rate of 1 s$^{-1}$.

[0065] In other embodiments, kinematic viscosity is at least about 40,000 cPs, more typically at least about 60,000 cPs, and preferably at least about 70,000 cPs. In another embodiment, the kinematic viscosity is from about 20,000 cPs to about 250,000 cPs. In other embodiments, the kinematic viscosity is from about 40,000 cPs to about 220,000 cPs, more typically from about 60,000 cPs to about 200,000 cPs, and preferably from about 70,000 cPs to about 170,000 cPs.

[0066] In other embodiments, the storage modulus G' is at least about 100 Pa, typically at least about 100 Pa, more typically at least about 200 Pa, and preferably at least about 400 Pa. In other embodiments, the storage modulus G' is from about 50 Pa to about 1,600 Pa, typically from about 100 Pa to about 1,200 Pa, more typically from about 200 Pa to about 1000 Pa, and preferably from about 400 Pa to about 700 Pa.

[0067] The crosslinked HA composition can be characterized by its biostability, e.g., its resistance to degradation in vitro by hyaluronidase enzyme as shown in the Examples. For example, upon combining the composition at 37° C. with hyaluronidase enzyme in an amount of about 0.3% by weight, under conditions suitable for reaction with hyaluronidase, the value of G' for the composition measured after

about 16 hours of reaction is at least about 5% of the value of G' measured at about 15 min of reaction. In other embodiments, the value of G' for the composition measured after about 16 hours of reaction is a fraction of the value of G' measured at about 15 min of reaction of generally at least about 10%, or at least about 25%, or at least about 45%, or at least about 50%, typically at least about 60%; more typically at least about 75%; or preferably, at least about 80%. In one embodiment, the value of G' for the composition measured after about 16 hours of reaction is about the same as the value of G' measured at about 15 min of reaction.

[0068] In other embodiments, the storage modulus G' is increased, e.g., the composition is stabilized, by the inclusion of a local anesthetic, e.g., lidocaine, compared to a non-stabilized composition, e.g. an identical composition except that the local anesthetic is not included. For these embodiments, the stabilized and non-stabilized compositions can be compared by measuring the value of G' under the same conditions. A stabilized composition prepared by hydrating dehydrated particles under the hydration conditions disclosed herein with a solution having 0.1% of a local anesthetic (e.g., lidocaine) by weight has a G' greater than G' for a non-stabilized composition of generally at least about 110%, typically at least about 120%, more typically at least about 150%, and preferably at least about 175%.

[0069] In a particular embodiment, the HA composition, includes crosslinked, water-insoluble, hydrated HA gel particles. The particles include lidocaine.HCl. Also, the particles have an average diameter selected from the group consisting of a hydrated particle average diameter between about 20 and about 1000 μm, and a dehydrated particle average diameter between about 10 and about 500 μm. Further, the particles include crosslinks represented by the following structural formula:

$$HA'-U-R_2-U-HA'$$

[0070] wherein the variables have the values described above. The composition has at least one parameter measured at 37° C. selected from a storage modulus G' of at least about 50 Pa when measured at 1 Hz frequency using a 4 cm flat geometry, and a kinematic viscosity of at least about 20,000 cPs when measured at a shear rate of 1 s$^{-1}$. Also, the composition is sufficiently stable to enzymatic degradation that upon combining the composition at 37° C. with hyaluronidase enzyme in an amount of about 0.3% by weight, under conditions suitable for reaction with hyaluronidase, the value of G' for the composition measured after 16 hours of reaction is at least about 5% of the value of G' measured at less than about 15 min of reaction. In another embodiment, the value of G' for the composition measured after 16 hours of reaction is at least about 50% of the value of G' measured at less than about 15 min of reaction.

[0071] As used herein, "in need of tissue augmentation" means that a subject has a medical condition that can benefit from application of the HA composition of the invention, e.g., the subject is in need of treatment and/or correction of conditions, e.g., wrinkles, furrows and folds and other wrinkles in the skin, typically in the forehead and around the eyes, nose and lips, correction and reforming of soft tissue defects and depressed scars. These conditions can be hereditary or acquired through age, illness, injury, surgical complications, and the like.

US 2005/0136122 A1

Jun. 23, 2005

7

[0072]   A "subject" includes mammals, e.g., humans, companion animals (e.g., dogs, cats, birds, and the like), farm animals (e.g., cows, sheep, pigs, horses, fowl, and the like) and laboratory animals (e.g., rats, mice, guinea pigs, birds, and the like). Most preferably, the subject is human.

[0073]   As used herein, alkyl groups include, for example, methyl, ethyl, propyl, butyl, pentyl, hexyl, heptyl, octyl, nonyl, decyl, undecyl, dodecyl, tridecyl, tetradecyl, pentadecyl, hexadecyl, heptadecyl, octadecyl, nonodecyl, eicosyl, heneicosyl, docosyl, tricosyl, tetracosyl, pentacosyl and the isomeric forms thereof. An alkoxy group is an alkyl group connected through an oxygen atom, e.g., methoxy, ethoxy, propoxy, and the like.

[0074]   As used herein, alkenyl groups are alkyl groups of 2 to 25 carbon atoms that contain a double bond, such as vinyl, allyl, butenyl, pentenyl, hexenyl, octenyl, nonenyl, decenyl, undecenyl, dodecenyl, tridecenyl, tetradecenyl, pentadecenyl, hexadecenyl, heptadecenyl, octadecenyl, nonadecenyl, eicosenyl, heneicosenyl, docosenyl, tricosenyl, tetracosenyl, pentacosenyl, and isomeric forms thereof.

[0075]   As used herein, alkynyl groups are alkyl groups of 2 to 25 carbon atoms that contain a triple bond, such as vinyl, allyl, butynyl, pentynyl, hexynyl, octynyl, nonynyl, decynyl, undecynyl, dodecynyl, tridecynyl, tetradecynyl, pentadecynyl, hexadecynyl, heptadecynyl, octadecynyl, nonadecynyl, eicosynyl, heneicosynyl, docosynyl, tricosynyl, tetracosynyl, pentacosynyl, and isomeric forms thereof.

[0076]   The term "aryl" as used herein refers to phenyl, tolyl, xylyl, naphthyl, biphenylyl, triphenylyl, and the like. The term "heteroaryl" refers to heteroaromatic groups, e.g. pyrrolyl, thienyl, furanyl, pyridinyl, oxazolyl, isooxazolyl, thiazolyl, isothiazolyl, quinolinyl, and the like. An aralkyl group is an aryl group connected through an alkyl group, e.g., benzyl, ethylnapthyl, and the like.

[0077]   As used herein, cycloalkyl includes saturated rings of 3 to 8 carbon atoms, inclusive, such as cyclopropyl, cyclobutyl, cyclopentyl, cyclohexyl, cycloheptyl, cyclooctyl and the like. A cycloalkylalkyl group is a cycloalkyl group connected through an alkyl group, e.g., methylcyclopropyl, and the like.

[0078]   The term heterocyclyl refers to a cycloalkyl group wherein one or more ring carbon atoms are replaced with a heteroatom, e.g., aziridyl, azetidyl, pyrrolidyl, piperidyl, thiiranyl, thietanyl, tetrahydrothiophenyl, tetrahydrothiopyranyl, oxiranyl, oxetanyl, tetrahydrofuranyl, tetrahydropyranyl, morpholinyl, and the like.

[0079]   The term "cycloalkenyl" refers to cycloalkyl groups having a double bond, e.g., cyclopropenyl, cyclobutenyl, cyclopentenyl, cyclohexenyl, cycloheptenyl, cyclooctenyl and the like.

[0080]   The term "cycloalkynyl" refers to cycloalkyl groups having a triple bond, e.g., cyclopropynyl, cyclobutynyl, cyclopentynyl, cyclohexynyl, cycloheptynyl, cyclooctynyl and the like.

[0081]   The term "substituted" as used herein means a group wherein one or more hydrogen atoms have been replaced with a chemical group which does not adversely affect the desired preparation of the product derivative. Representative of such groups are halogen (e.g., —F, —Cl, —Br, —I), amino, nitro, cyano, —OH, alkoxy, alkyl, aryl,

amido, sulfamido, sulfate, sulfonate, phosphate, phosphonate, carboxylate, carboxamido, and the like.

EXAMPLES

[0082]   Crosslinked HA is prepared in the following examples by reacting a biscarbodiimide with uncrosslinked hyaluronic acid in the described ratios. The molecular weight of the uncrosslinked HA used in these examples was approximately from about $5 \times 10^5$ Daltons to about $2 \times 10^6$ Daltons, though higher or lower molecular weight HA can also be used. The hyaluronic acid used was obtained from rooster combs or bacterial sources. All compounds were obtained from Sigma, St. Louis, Mo., unless otherwise specified.

Preparation of MES-Buffers (pH range 5.2-7.1)

[0083]   For each MES buffer, 2-[N-Morpholino]ethanesulfonic acid (MES hydrate) (14.6 g) was dissolved in 980 mL of sterile water. For each of three solutions, the pH was adjusted to the desired value (5.5, 6.0, or 6.5) by the addition of 0.1N NaOH. Sterile water was added to bring the volume to 1 L.

Phosphate Buffers 1-5

[0084]   For each individual phosphate buffer, 1 L of sterile water was used to dissolve the amounts indicated in Table 1 of sodium phosphate dodecahydrate ($Na_3PO_4.12H_2O$), lidocaine hydrochloride (Lidocaine·HCl), sodium hydrogen phosphate ($Na_2HPO_4$), and sodium dihydrogen phosphate monohydrate ($NaH_2PO_4·H_2O$).

TABLE 1

| Details phosphate buffers 1–5 | | | | |
|---|---|---|---|---|
| Phosphate buffer # | $Na_3PO_4.12H_2O$ | Lidocaine.HCl | $Na_2HPO_4$ | $NaH_2PO_4.H_2O$ |
| 1 | 3.4 g, 9.0 mM | — | — | — |
| 2 | 3.4 g, 9.0 mM | 2.0 g -> 0.20% | — | — |
| 3 | 3.4 g, 9.0 mM | 3.0 g -> 0.30% | — | — |
| 4 | 2.48 g, 6.50 mM | 3.0 g -> 0.30% | 0.36 g, 2.5 mM | — |
| 5 | — | 3.0 g -> 0.30% | 1.42 g, 10.0 mM | 0.27 g, 2.0 mM |

Procedure for Examples 1-9

[0085]   In each of the following examples, reagents were used in the amounts indicated in Table 2. Uncrosslinked HA was dissolved in 133.4 mL of MES buffer at the specified pH and combined with a 15 mg/mL acetone solution of p-phenylene-bis(ethylcarbodiimide) (PBCDI), resulting in the specified molar equivalent ratio (MER%) and mol % between PBCDI:HA. The reaction mixture was thoroughly mixed (mixing with either a glass rod or an overhead mechanical stirrer, e.g., for~1 minute, results in a white paste from the clear reaction mixture), and the mixture was allowed to stand at room temperature for about 72 hours. Sodium chloride (6.5 g, to make the mixture 5% by weight of sodium chloride) was mixed into the resulting gel, which was allowed to stand for 1 hour. The crosslinked HA gel was precipitated by addition into about 1.2 L of vigorously

US 2005/0136122 A1

Jun. 23, 2005

8

stirred ethanol. The precipitate was collected and dried under reduced pressure yielding the crosslinked hyaluronic acid.

TABLE 2

Details for synthesizing crosslinked HA in Examples 1–9.

| Exam- | PBCDI | | | Ace-tone | HA | | | | |
|-------|-------|------|--------|------|------|------|------|-------|-----|
| ple | mg | mmol | mequiv | mL | g | mmol | MER | mol % | pH |
| 1 | 100 | 0.47 | 0.94 | 6.7 | 2 | 4.98 | 18.7 | 9.4 | 5.5 |
| 2 | 200 | 0.94 | 1.87 | 13.3 | 2 | 4.98 | 37.5 | 18.8 | 5.5 |
| 3 | 267 | 1.25 | 2.5 | 12.6 | 2 | 4.98 | 50 | 25.0 | 5.5 |
| 4 | 400 | 1.87 | 3.74 | 26.7 | 2 | 4.98 | 75 | 37.5 | 5 |
| 5 | 400 | 1.87 | 3.74 | 26.7 | 2 | 4.98 | 75 | 37.5 | 5.5 |
| 6 | 400 | 1.87 | 3.74 | 26.7 | 2 | 4.98 | 75 | 37.5 | 6 |
| 7 | 400 | 1.87 | 3.74 | 26.7 | 2 | 4.98 | 75 | 37.5 | 6.5 |
| 8 | 534 | 2.5 | 5 | 35.6 | 2 | 4.98 | 100 | 50.0 | 5.5 |
| 9 | 667 | 3.12 | 6.2 | 44.5 | 2 | 4.98 | 125 | 62.5 | 5.5 |

## Example 10

### Degree of Crosslinking Increases with Increasing Molar Ratio of the Crosslinker

[0086] Crosslinking of hyaluronic acid with p-phenylene-bis(ethylcarbodiimide) incorporates the phenylene UV chromophore into the crosslinked product. By measuring the UV absorbance of the crosslinked product, the amount of the UV chromophore and degree of crosslinks incorporating the biscarbodiimide-derived linker can be quantified.

[0087] To make a 0.1-mg/mL solution, a weighed amount (1-10 mg) of each of the crosslinked products of Examples 5, 8 and 9 was separately dissolved in a sufficient amount of 5% sulfuric acid solution by heating at 70-75° C. for 4 h in a sealed container. Each solution was diluted with 5% sulfuric acid to make a 0.1-mg/mL solution of each product. The UV absorbance (UV Max) of these solutions measured at 249 nm is shown in FIG. 1 as a function of the biscar-bodiimide:HA molar equivalent ratio in %. Thus, a correlation can be seen between the degree of crosslinking incorporating the biscarbodiimide-derived linker (evidenced by UV Max) and the biscarbodiimide:HA molar equivalent ratio in %.

## Example 11

### Degree of Crosslinking can be Controlled by pH

[0088] To make a 0.1-mg/mL solution, a weighed amount (1-10 mg) of each of the crosslinked products of Examples 5, 6 and 7 was separately dissolved in a sufficient amount of 5% sulfuric acid solution by heating at 70-75° C. for 4 hour in a sealed container and then allowing to stand for 16 hours at room temperature. These solutions were each diluted with 5% sulfuric acid to make a 0.1 -mg/mL solution of each product. The UV absorbance of these solutions measured at 249 nm is shown in FIG. 2.

[0089] It can be seen that the degree of crosslinking incorporating the biscarbodiimide-derived linker is greatest at pH 5.5 (the composition of Example 5), which is greater than that at pH 6.0 (the composition of Example 6), which are both greater than that at pH 6.5 (the composition of Example 7).

## Example 12

### Preparation of a Gel From Dehydrated Crosslinked HA

[0090] A portion of the dry crosslinked HA precipitate of Example 5 was milled in a cryogenic mill. The powder was suspended in dimethyl sulfoxide (DMSO) and the suspension was stirred for 4-10 hours. The suspension was centrifuged and the DMSO was removed. The water-insoluble crosslinked HA was re-suspended in ethanol, stirred for a few hours, and the ethanol was removed (the ethanol washing can be repeated if desired). After removing the ethanol, the solid was collected and dried under vacuum. The dried powder of the crosslinked HA was suspended in Phosphate Buffer 4 to make a 30-mg/mL suspension in the form of a slurry or paste. The osmolarity of the suspension was adjusted to 280-340 mOsm (milliosmol) by adding NaCl and loaded into a syringe. The syringe was autoclaved at 120° C. at a pressure of about 138 kPa (kilopascal) (20-lb/in²) for 25 minutes and cooled after sterilization with chilled water.

## Example 13

### Characterization of Storage Modulus G' of Hydrated HA Gels

[0091] The rheological behavior (including storage modulus G') of the gel in Example 12 was evaluated with a Rheometer AR-1000 (TA Instruments, New Castle, Del.). The measuring conditions included a temperature=37° C., a measuring geometry=flat plate, a gap of 200 $\mu$m (micrometers), and a frequency of 1 Hz. Under these conditions, the storage modulus G' of the gel prepared in Example 12 was measured to be 1076 Pa (Pascals).

## Example 14

### Characterization of Extrusion Force of Hydrated HA Gels

[0092] The force required to extrude a gel can be characterized by loading the gel in a 1 mL glass syringe [having an internal diameter of 0.635 cm, equipped with a 30-gauge (~150 $\mu$m internal diameter, cross-sectional area of 0.0177 mm²) needle. The force required to extrude the gel through the needle at a rate of 4 mL/h was measured by placing the syringe on a syringe pump mounted with a force sensor system (Load Cell SLB-50, Transducer Techniques, Temecula, Calif.). At about 25° C., and an extrusion rate of 4 mL/h, the extrusion force measured was 10.7 N (Newtons) (2.4 pounds).

## Example 15

### Characterization of Stability of Hydrated HA Gels to Enzymatic Hydrolysis

[0093] Durability of the crosslinked hyaluronic acid against enzymatic hydrolysis can be measured by an in vitro test by combining the gel with a measured amount of hyaluronidase enzyme, and recording the storage modulus as a function of time.

[0094] To the gel of Example 12 (0.75 g) taken in a vial, was added a solution of hyaluronidase enzyme from bovine testes (15 $\mu$L of 0.15 mg/mL solution of hyaluronidase in 1.9

9

mM phosphate buffer in saline, ~2.5 units) and both were mixed thoroughly for 1 minute. The mixture was filled into a syringe and centrifuged for 1 minute at 1500 rpm to remove air bubbles. 0.35 g of this mixture was loaded on the rheometer plate. Data accumulation was begun at 15 min after addition of the enzyme. The storage modulus G' of the gel was recorded at 10 min intervals for 16 hours at a temperature=37° C., a flat plate measuring geometry, a gap of 200 μm, and a frequency of 1 Hz.

[0095] The rate of decrease in storage modulus ΔG'/Δt, e.g., the slope of G' versus time, can be calculated by dividing the value of ΔG' by the time interval,. This rate can represent the susceptibility of the product to enzymatic hydrolysis. In comparing the stability of two compositions, the composition with greater stability maintains G' better than a composition with lesser stability. In this example, the average rate of loss of G' for the gel was about −5 Pa/hour. Thus, the composition in this example can be considered to be stable under the conditions of the test. One skilled in the art can appreciate that a composition that is stable under these conditions can be expected to have good in vivo stability as well.

### Example 16

#### Effect of Particle Size on the Rheological Properties of the Gel

[0096] The dry, precipitated crosslinked HA from Example-5 was milled in a cryogenic mill and washed with DMSO and ethanol as described in Example 12. After removing the ethanol, the solid was collected and dried under vacuum. The dried powder of the crosslinked HA was fractionated by average diameter according to five sieves: 25 μm, 75 μm, 125 μm, 180 μm, and 250 μm placed on the top of each other. Five average diameter fractions of particles were collected: 0-25 μm, 25-75 μm, 75-125 μm, 125-180 μm, and 180-250 μm. Each fraction was suspended in Phosphate Buffer 5 to make 32 mg/mL suspension. The osmolarity of the suspension was adjusted to 280-340 mOsm (miliosmol) and each suspension was loaded into a syringe. The syringes were autoclaved at 120° C. at a pressure of about 138 kPa (kilopascal) (20-lb/in²) for about 45 minutes and subsequently cooled with chilled water.

[0097] FIG. 3 shows the storage modulus (G') for each gel, measured under the conditions described in Example-12. As can be seen from the FIG. 3, the rheological properties of these viscoelastic gels were dependent on the particle average diameter distribution and composition of the gels.

[0098] FIG. 4 shows the force required to extrude these gels through a 30 gauge needle according to the procedure described in Example 12. As can be seen in FIG. 4, the extrusion force of these viscoelastic gels was dependent on the particle average diameter distribution and composition of the gels.

### Example 17

#### Combining Particle Size Fractions to Achieve Particular Rheological Properties

[0099] The dry, precipitated, crosslinked HA from Example 5 was milled and washed as described in Example-

12. A portion of the dried powder of the crosslinked HA was then sieved through a 250 μm sieve. All particles of less than 250 μm average diameter were collected and suspended in Phosphate Buffer 4 to make 32-mg/mL suspension.

[0100] Two portions having particle average diameters 250-125 μm and less then 125 μm were collected. These fractions were combined in 1:1 ratio by weight and suspended in Phosphate Buffer 4 to make 32-mg/mL suspension. The osmolarity of each suspension was adjusted to 280-340 mOsm (miliosmol) and loaded into a syringe. The syringes were autoclaved at 120° C. at a pressure of about 138 kPa (kilopascal) (20-lb/in²) for about 45 minutes and subsequently cooled with chilled water.

[0101] The storage modulus (G') for these gels was measured using the measuring conditions described in Example-12. The gel sample prepared from particles average diameters less than 250 μm had an initial G' of 600 Pa; the gel sample prepared from a 1:1 ratio of 250-125 μm and 125-0 μm particle average diameters had an initial G' of 450 Pa.

### Example 18

#### Storage Modulus Versus Degree of Crosslinking

[0102] A portion of the dry, precipitated, crosslinked HA from each of Examples 5 and 6 was milled and washed as described in Example 12. Each portion was sieved through a 250 μm sieve. Particles of less than about 250 μm average diameter were collected and suspended in Phosphate Buffer 4 to make a 32-mg/mL suspension.

[0103] The osmolarity of each suspension was adjusted to 280-340 mOsm (miliosmol) and loaded into a syringe. The syringes were autoclaved at 120° C. at a pressure of about 138 kPa (kilopascal) (20-lb/in²) for about 20 minutes and subsequently cooled with chilled water.

[0104] The storage modulus (G') for these gels was measured using the measuring conditions described in Example 12. The gel sample prepared from the composition of Example 5 had an initial G' of 700 Pa; the gel sample prepared from the crosslinked composition of Example 6 had an initial G' of 450 Pa. It can be seen that the composition having a higher degree of crosslinking according to the UV crosslinking measurements, the composition of Example 5, also shows a higher storage modulus.

### Example 19

#### ΔG'/Δt for Invention is Superior to Competitive Products

[0105] Crosslinked HA obtained according Example 5 and processed according to Example 12 was made into a gel having a initial G' of 450 Pa. The resistance of this product and three competitive tissue augmentation products RESTYLANE®, PERLANE® (both Q-Med, Uppsala, Sweden), and HYLAFORM® (Genzyme, Cambridge, Mass.) to digestion with the hyaluronidase was evaluated. Hyaluronidase solution (15 μL of 0.15 mg/mL solution of hyaluronidase in 1.9 mM phosphate buffer in saline, ~2.5 units) was added and thoroughly mixed with 0.75 g of each product. Each mixture was loaded into a syringe and centrifuged for 1 minute at 1500 rpm to remove air bubbles. 0.35 g of each mixture was then loaded on a rheometer plate. Data accumulation began 15 minutes from the time of

addition of the enzyme. The storage modulus G' of the gel was recorded at 10 min intervals for 16 hours at a temperature=37° C., a flat plate measuring geometry, a gap of 200 μm, and a frequency of 1 Hz. FIG. 5 shows G' for each product versus time. As can be see, the rate of loss representing the susceptibility of the product to enzymatic hydrolysis for the invention is much less than that of the three competing compositions.

### Example 20

#### ΔG'/Δt of Compositions Versus Hyaluronidase is Independent of G'

[0106]   FIG. 6 shows ΔG'/Δt over a 16 h period for a range of crosslinked HA compositions having initial storage modulus values between about 200 to about 1200 Pa. The compositions are prepared and the measurements conducted according to the preceding Examples. As can be seen, the degradation of the crosslinked HA compositions is essentially independent of initial storage modulus G' over this 16 hour period.

### Example 21

#### Synergistic Effect of Lidocaine on Rheological Properties of the Gel

[0107]   Lidocaine can have a synergistic effect and increase the initial storage modulus G' of the gel compared to otherwise identical compositions prepared in a buffer without lidocaine. Crosslinked HA of Example-5 was processed as in Example-12 using three separate phosphate buffers 1 (no lidocaine), 2 (0.2% lidocaine), and 3(0.3% lidocaine). Gels were made to 32-mg/mL concentrations and the storage modulus G' and degradation profile ΔG'/Δt of each was measured according to the method described in Example-12. FIG. 7 shows that the compositions with lidocaine have a significantly higher modulus G' over the time of the test. Thus, crosslinked HA with lidocaine can have good biostability, and can in some cases have a synergistic effect, increasing G'.

### Example 22

#### Invention is Effective for Tissue Augmentation

[0108]   The crosslinked HA product used in the study was prepared according to the procedure described in Example 14. In an Interdermal Injection Study in the Guinea Pig Model, the crosslinked HA product and a control article, (ZYDERM™ II, Collagen, Palo Alto, Calif.), were injected intradermally. Each injection site (6 per time interval per sample) was measured for height and diameter at 2, 4-, 8 and 12-weeks. Specimens were explanted for histological evaluation at each time interval.

[0109]   Twelve guinea pigs were used in this study and assigned to a termination interval of two animals each at 2, 4, 8, 12, 18, and 24 weeks.

[0110]   The right and left flank of each animal was clipped free of fur at least 1 hour before dosing. Each animal received six intradermal injections, three per side. The test article and control article were randomized over each animal. Both articles were dosed at 0.2 cc per site. Each site was marked with a non-toxic marker and injection sites were

approximately 2 cm apart. In addition, each site was measured for height and diameter at each interval. The measurements immediately after injection were assigned a score of "0". An increase in height and diameter indicated edema.

[0111]   At each termination interval, three animals were euthanized, the fur clipped, injection site measured, and the site removed and fixed in 10% neutral buffered formalin. The excised tissues were embedded, cut and stained with hematoxylin and eosin (H & E), and examined by a qualified pathologist. Specimens were examined for the presence of the injected article and for any tissue response.

[0112]   During the first week of the study, erythema scores were minimal (slight) and equally distributed between the test article and Zyderm II injection sites. Edema scores were inconsistent and equally distributed between the two materials. During week two, erythema scores were similar to week one. Edema scores were reduced with most dropping to zero. Injection site measurements at 4-weeks were equivalent to measurements taken immediately after injection.

[0113]   The volume of CTA was unchanged from 2 weeks to 4 weeks. At 8-weeks observation time, nearly all test article sites continued to maintain height and diameter measurements. Conversely, nearly all control sites were unmeasurable. At 12-weeks observation time, test article was flattened and extended laterally in all sites. However, in the more tissue dense areas of the dermis, the test article did not spread out to the degree as in the less dense areas. Fibroblasts and adipose tissue were located through out the test article at approximately the same density as the tissues adjacent to the injection site. The control article was not identified in any of the injection sites.

[0114]   Microscopic examination showed no cellular response to test article and only a minor macrophage infiltrate in the control article at 2-weeks and 4-weeks. At 8-weeks and 12-weeks, there was no observable cellular response to either material.

[0115]   The test articles at 2, 4, 8 and 12-weeks were devoid of any microscopic tissue response, confirming the biocompatibility of this preparation. Upon injection, the test article appeared to integrate into the stromal elements of the dermis. Measurements of height and diameter were unchanged between 2 and 4 weeks. At 8-weeks CTA seemed to extend laterally in the dermal layers, but still maintained its volume. Conversely, the control article appeared as a homogeneous bolus of material compressing the underlying dermis. A minor macrophage infiltrate was observed in the control article at 4-weeks, and at 8-weeks most of the injection had resorbed from the injection site.

[0116]   The in vivo stability of the test article at 8, and 12-weeks, compared to the control article indicates that this product can exhibit long-term persistence in clinical applications. These results support in vitro data above showing in vivo resistance to degradation by hyaluronidase.

[0117]   While this invention has been particularly shown and described with references to preferred embodiments thereof, it will be understood by those skilled in the art that various changes in form and details may be made therein without departing from the scope of the invention encompassed by the appended claims.

US 2005/0136122 A1

11

Jun. 23, 2005

What is claimed is:

1. A hyaluronic acid (HA) composition comprising crosslinked, water-insoluble, hydrated HA gel particles, wherein the HA includes crosslinks represented by the following structural formula:

HA'—U—R₂—U—HA'

wherein:

each HA' is the same or different crosslinked HA' molecule;

each U is independently an optionally substituted O-acyl isourea or N-acyl urea; and

R2 is optionally substituted alkyl, alkenyl, alkynyl, alkoxy, cycloalkyl, cycloalkenyl, cycloalkynyl aryl, heteroaryl, heterocyclyl, cycloaliphaticalkyl, aralkyl, heteroaralkyl, or heterocyclylalkyl.

2. The HA composition of claim 1, wherein the particles include at least one bioactive agent selected from the group consisting of cells, genes, proteins, antibodies, peptides, and pharmaceuticals.

3. The HA composition of claim 2, wherein the bioactive agent includes an anesthetic.

4. The HA composition of claim 3, wherein the bioactive agent is lidocaine, mepivacaine, prilocaine, bupivacaine, cocaine, procaine, chlorocaine, or tetracaine, or a salt or solvate thereof.

5. The HA composition of claim 4, wherein the bioactive agent is lidocaine.HCl.

6. The HA composition of claim 1, wherein the particles have a particle average diameter distribution selected from the group consisting of:

a hydrated particle average diameter between about 20 μm and about 1000 μm; and

a dehydrated particle average diameter between about 10 μm and about 500 μm.

7. The HA composition of claim 6, wherein the distribution is a multimodal distribution.

8. The HA composition of claim 6, wherein the HA in the composition consists essentially of the crosslinked, water-insoluble, hydrated HA gel particles.

9. The HA composition of claim 1, wherein the composition has at least one parameter measured at 37° C. selected from a storage modulus G' of at least about 50 Pa when measured at 1 Hz frequency using a 4 cm flat geometry, and a kinematic viscosity of at least about 20,000 cPs when measured at a shear rate of 1 s⁻¹.

10. The HA composition of claim 9, whereupon immersing the composition at 37° C. with hyaluronidase enzyme in an amount of about 0.3% by weight, under conditions suitable for reaction with hyaluronidase, the value of storage modulus G' for the composition measured after 16 hours of reaction is at least about 5% of the value of G' measured at less than about 15 min of reaction.

11. A method of augmenting tissue in a subject that is in need of tissue augmentation, comprising the steps of:

a) inserting a needle into a subject at a location in the subject that is in need of tissue augmentation, wherein the needle is coupled to a syringe loaded with a crosslinked HA composition that includes crosslinked, water-insoluble, hydrated HA gel particles, wherein the HA includes crosslinks represented by the following structural formula:

HA'—U—R₂—U—HA'

wherein:

each HA' is the same or different crosslinked HA' molecule;

each U is independently an optionally substituted O-acyl isourea or N-acyl urea; and

R2 is optionally substituted alkyl, alkenyl, alkynyl, alkoxy, cycloalkyl, cycloalkenyl, cycloalkynyl aryl, heteroaryl, heterocyclyl, cycloaliphaticalkyl, aralkyl, heteroaralkyl, or heterocyclylalkyl, and

b) applying force to the syringe, whereby at least a portion of the HA composition is delivered into the subject.

12. The method of claim 11, wherein the subject is human.

13. The method of claim 12, wherein the particles include at least one bioactive agent selected from the group consisting of cells, genes, proteins, antibodies, peptides, and pharmaceuticals.

14. The method of claim 13, wherein the bioactive agent includes a local anesthetic.

15. The method of claim 14, wherein the bioactive agent is lidocaine, mepivacaine, prilocaine, bupivacaine, cocaine, procaine, chlorocaine, or tetracaine, or a salt or solvate thereof.

16. The method of claim 15, wherein the bioactive agent is lidocaine.HCl.

17. The method of claim 12, wherein the particles have an average particle diameter distribution selected from the group consisting of a hydrated particle average diameter between about 20 μm and about 1000 μm, and a dehydrated particle average diameter between about 10 μm and about 500 μm.

18. The method of claim 17, wherein the distribution is a multimodal distribution.

19. The method of claim 18, wherein the HA in the composition consists essentially of the crosslinked, water-insoluble, hydrated HA gel particles.

20. The method of claim 12, wherein the composition has at least one parameter measured at 37° C. selected from a storage modulus G' of at least about 50 Pa when measured at 1 Hz frequency using a 4 cm flat geometry, and a kinematic viscosity of at least about 20,000 cPs when measured at a shear rate of 1 s⁻¹.

21. The method of claim 20, wherein the composition has a storage modulus G' of at least about 100 Pa.

22. The method of claim 21, wherein the composition has a storage modulus G' of at least about 400 Pa.

23. A method of preparing a hyaluronic acid (HA) composition, comprising the steps of:

a) forming water-insoluble, dehydrated crosslinked HA particles;

b) separating the water-insoluble, dehydrated particles by average diameter and selecting a subset of particles by average diameter;

c) hydrating the subset of dehydrated particles with a physiologically compatible aqueous solution, thereby forming the HA composition.

US 2005/0136122 A1

Jun. 23, 2005

12

**24**. The method of claim 23, further including hydrating a portion of the dehydrated particles having an average diameter between about 10 $\mu$m and about 1000 $\mu$m.

**25**. The method of claim 24, further including the steps of:

d) separating the water-insoluble, dehydrated particles into at least three fractions by average diameter; and

e) selecting at least two average diameter fractions and rejecting at least one average diameter fraction.

**26**. The method of claim 23, wherein the dehydrated particles are hydrated in the presence of the physiologically acceptable solution under conditions including a temperature of at least about 100° C., a pressure of at least about 120 kPa, and a duration of at least about 15 min.

**27**. The method of claim 23, wherein the physiologically compatible aqueous solution includes a bioactive agent.

**28**. The method of claim 27, wherein the bioactive agent is lidocaine, mepivacaine, prilocaine, bupivacaine, cocaine, procaine, chlorocaine, or tetracaine, or salt or solvate thereof.

**29**. The method of claim 28, wherein the bioactive agent is lidocaine.HCl.

**30**. The method of claim 23, further including preparing the dehydrated, crosslinked HA by:

a) crosslinking a precursor of the crosslinked HA with a biscarbodiimide in the presence of a pH buffer that is at a pH between about 4 and about 8, wherein the resulting crosslinked HA includes crosslinks represented by the following structural formula:

HA'—U—R$_2$—U—HA'

wherein:

each HA' is the same or different crosslinked HA' molecule;

each U is independently an optionally substituted O-acyl isourea or N-acyl urea; and

R2 is optionally substituted alkyl, alkenyl, alkynyl, alkoxy, cycloalkyl, cycloalkenyl, cycloalkynyl aryl, heteroaryl, heterocyclyl, cycloaliphaticalkyl, aralkyl, heteroaralkyl, or heterocyclylalkyl, and

b) dehydrating the crosslinked HA to produce the dehydrated, crosslinked HA.

**31**. The method of claim 30, wherein the pH is about 5.5.

**32**. A method of preparing a crosslinked hyaluronic acid (HA) composition, comprising the steps of:

a) crosslinking a precursor of the crosslinked HA with a biscarbodiimide in the presence of a pH buffer that is at a pH between about 4 and about 8, wherein the resulting crosslinked HA includes crosslinks represented by the following structural formula:

HA'—U—R$_2$—U—HA'

wherein:

each HA' is the same or different crosslinked HA' molecule;

each U is independently an optionally substituted O-acyl isourea or N-acyl urea; and

R2 is optionally substituted alkyl, alkenyl, alkynyl, alkoxy, cycloalkyl, cycloalkenyl, cycloalkynyl aryl,

heteroaryl, heterocyclyl, cycloaliphaticalkyl, aralkyl, heteroaralkyl, or heterocyclylalkyl, and

b) dehydrating the crosslinked HA to produce the dehydrated, crosslinked HA.

**33**. The method of claim 32, wherein the buffer includes at least one buffer agent selected from the group consisting of 2-(N-morpholino)ethanesulfonic acid; 2,2-bis(hydroxymethyl)-2,2′,2″-nitrotriethanol; succinate/succinic; KH$_2$PO$_4$; N-tris(hydroxymethyl-2-aminoethanesulfonic acid; triethanolamine; diethylbarbituate; tris(hydroxymethyl)aminoethane; N-tris(hydroxy)methylglycine; and N,N-bis(2-hydroxyethyl)glycine.

**34**. The method of claim 32, wherein the biscarbodiimide is at least one member selected from the group consisting of 1,6-hexamethylene bis(ethylcarbodiimide), 1,8-octamethylene bis(ethylcarbodiimide), 1,10 decamethylene bis(ethylcarbodiimide), 1,12 dodecamethylene bis(ethylcarbodiimide), PEG-bis(propyl(ethylcarbodiimide)), 2,2′-dithioethyl bis(ethylcarbodiimide), 1,1′-dithio-p-phenylene bis(ethylcarbodiimide); para-phenylene-bis(ethylcarbodiimide), and 1,1′-dithio-m-phenylene bis(ethylcarbodiimide).

**35**. The method of claim 32, further including the steps of:

c) dehydrating the crosslinked HA to form dehydrated HA;

d) grinding the dehydrated HA to form water-insoluble, dehydrated HA particles;

e) separating the water-insoluble, dehydrated particles by average diameter and selecting a subset of particles by average diameter; and

f) hydrating the subset of dehydrated particles with a physiologically compatible aqueous solution, thereby forming the HA composition.

**36**. The method of claim 35, wherein the dehydrated particles are hydrated in the presence of the physiologically acceptable solution under conditions including a temperature of at least about 100° C., a pressure of at least about 120 kPa, and a duration of at least about 15 min.

**37**. The method of claim 36, wherein the pH is about 5.5.

**38**. A stabilized hyaluronic acid (HA) composition comprising crosslinked HA and at least about 0. 1% by weight of a local anesthetic, wherein the value of storage modulus G′ for the stabilized composition is at least about 110% of the value of G′ measured for a non-stabilized composition, when measured at 37° C. and 1 Hz frequency using a 4 cm flat geometry.

**39**. The composition of claim 38, wherein the value of G′ for the stabilized composition is at least about 150% of the value of G′ for the non-stabilized composition.

**40**. The composition of claim 39, wherein the local anesthetic is lidocaine.HCl.

**41**. The composition of claim 40, wherein the HA composition includes crosslinked, water-insoluble, hydrated HA gel particles, wherein the particles include crosslinks represented by the following structural formula:

HA'—U—R$_2$—U—HA'

wherein:

each HA' is the same or different crosslinked HA' molecule;

each U is independently an optionally substituted O-acyl isourea or N-acyl urea; and

US 2005/0136122 A1

13

Jun. 23, 2005

R2 is optionally substituted alkyl, alkenyl, alkynyl, alkoxy, cycloalkyl, cycloalkenyl, cycloalkynyl aryl, heteroaryl, heterocyclyl, cycloaliphaticalkyl, aralkyl, heteroaralkyl, or heterocyclylalkyl.

**42.** A method of stabilizing crosslinked hyaluronic acid (HA), comprising hydrating water-insoluble, dehydrated crosslinked HA with a physiologically compatible aqueous solution, thereby forming the stabilized HA composition, wherein the physiologically compatible aqueous solution includes at least about 0.1% by weight of a local anesthetic, wherein the value of storage modulus G' for the stabilized composition is at least about 110% of the value of G' measured for a non-stabilized composition, when measured at 37° C. and 1 Hz frequency using a 4 cm flat geometry.

**43.** The method of claim 42, wherein the dehydrated crosslinked HA is hydrated in the presence of the physiologically acceptable solution under conditions including a temperature of at least about 100° C., a pressure of at least about 120 kPa, and a duration of at least about 15 min.

**44.** The composition of claim 43 wherein the value of G' for the stabilized composition is at least about 150% of the value of G' for the non-stabilized composition.

**45.** The composition of claim 44, wherein the local anesthetic is lidocaine.HCl.

**46.** The composition of claim 45, wherein the HA composition includes crosslinked, water-insoluble, hydrated HA gel particles, wherein the particles include crosslinks represented by the following structural formula:

HA'—U—R$_2$—U—HA'

wherein:

each HA' is the same or different crosslinked HA' molecule;

each U is independently an optionally substituted O-acyl isourea or N-acyl urea; and

R2 is optionally substituted alkyl, alkenyl, alkynyl, alkoxy, cycloalkyl, cycloalkenyl, cycloalkynyl aryl, heteroaryl, heterocyclyl, cycloaliphaticalkyl, aralkyl, heteroaralkyl, or heterocyclylalkyl.

**47.** A hyaluronic acid (HA) composition comprising crosslinked, water-insoluble, hydrated HA gel particles, wherein:

a) the particles include lidocaine.HCl;

b) the particles have an average diameter selected from the group consisting of a hydrated particle average diameter between about 20 and about 1000 μm, and a dehydrated particle average diameter between about 10 and about 500 μm;

c) the particles include crosslinks represented by the following structural formula:

HA'—U—R$_2$—U—HA'

wherein:

each HA' is the same or different crosslinked HA' molecule;

each U is independently an optionally substituted O-acyl isourea or N-acyl urea; and

R2 is optionally substituted alkyl, alkenyl, alkynyl, alkoxy, cycloalkyl, cycloalkenyl, cycloalkynyl aryl, heteroaryl, heterocyclyl, cycloaliphaticalkyl, aralkyl, heteroaralkyl, or heterocyclylalkyl, and

d) the composition has at least one parameter measured at 37° C. selected from a storage modulus G' of at least about 50 Pa when measured at 1 Hz frequency using a 4 cm flat geometry, and a kinematic viscosity of at least about 20,000 cPs when measured at a shear rate of 1 s$^{-1}$; and

e) the composition is sufficiently stable to enzymatic degradation that upon combining the composition at 37° C. with hyaluronidase enzyme in an amount of about 0.3% by weight, under conditions suitable for reaction with hyaluronidase, the value of G' for the composition measured after 16 hours of reaction is at least about 5% of the value of G' measured at less than about 15 min of reaction.

**48.** The HA composition of claim 47, wherein the value of G' for the composition measured after 16 hours of reaction is at least about 50% of the value of G' measured at less than about 15 min of reaction.

* * * * *

# EXHIBIT V

US005731298A

# United States Patent [19]

Reinmuller

[11] Patent Number: 5,731,298

[45] Date of Patent: Mar. 24, 1998

[54] **METHOD FOR THE TREATMENT OF SCARS AND KELOIDS**

[76] Inventor: **Johannes Reinmuller,** Gustav-Freytag-Strasse 27, 65189 Wiesbaden, Germany

[21] Appl. No.: **256,040**

[22] PCT Filed: **Dec. 24, 1992**

[86] PCT No.: **PCT/EP92/02990**

§ 371 Date: **Aug. 15, 1994**

§ 102(e) Date: **Aug. 15, 1994**

[87] PCT Pub. No.: **WO93/12801**

PCT Pub. Date: **Jul. 8, 1993**

[30] **Foreign Application Priority Data**

Jan. 3, 1992 [DE] Germany .......................... 42 00 080.7

[51] Int. Cl.[6] .......................... A61K 31/715; C08B 37/00

[52] U.S. Cl. .................................. 514/54; 514/55; 514/56; 514/62; 536/53; 536/20; 536/21; 536/55.2; 536/123.1

[58] Field of Search ................................ 514/54, 55, 56, 514/62; 536/20, 21, 55.2, 53, 123.1

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,350,629 | 9/1982 | Yannas et al. | 530/356 |
| 4,582,865 | 4/1986 | Balazs et al. | 524/29 |
| 4,613,502 | 9/1986 | Turková et al. | 424/94.3 |
| 4,863,907 | 9/1989 | Sakurai et al. | 514/56 |
| 4,947,840 | 8/1990 | Yannas et al. | 602/50 |
| 5,093,319 | 3/1992 | Higham et al. | 514/55 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 2129300 | 5/1984 | United Kingdom . |
| 89/04172 | 5/1989 | WIPO . |

OTHER PUBLICATIONS

Yannas et al. *J. Biomed. Mater. Res.* 1980, 14, 65–81. month not available.

Friderich Z. *Allgemeinemedizin* 1985, 61, 1101–1103. month not available.

Dockery et al. *Clinics Podiatric Med. Surg.* 1986 3(3), 473–485. month not available.

Nicolai et al. *Aesth. Plast. Surg.* 1987, 11, 29–32. month not available.

Davidson et al. *Clin. Mater.* 1991, 8, 171–177. month not available.

Biagini et al. *Biomaterials* 1991, 12, 281–286. month not available.

Sorrone et al. *Riv. Ital. Chir. Plastica* 1986, 18, 205–207. month not available.

*Primary Examiner*—Kathleen K. Fonda
*Attorney, Agent, or Firm*—Felfe & Lynch

[57] **ABSTRACT**

A method and a pharmaceutical composition for non-topical wound, scar and keloid treatment is described which contains cross-linked glycosaminoglycans and conventional pharmaceutical auxiliary and/or carrier substances. The pharmaceutical composition is preferably administered intralesionally e.g. by injection in the form of a gel containing water. The cross-linked glycosaminoglycans are also suitable for use as cosmetics and skin care products.

3 Claims, No Drawings

Exhibit 1059
Prollenium v. Allergan

5,731,298

**1**

## METHOD FOR THE TREATMENT OF SCARS AND KELOIDS

This is in an application under 35 U.S.C. §371 of PCT/EP92/02990 having an international filing date of Dec. 24, 1992.

### BACKGROUND OF THE INVENTION

The invention concerns a pharmaceutical composition for the treatment of wounds, scars and keloids.

Excess new growth of scar tissue occurs in many people during healing of skin wounds. In medical terminology this new formation of tissue is referred to as cicatricial hypertrophy or as keloid in severe cases. These are unpredictable reactions during wound healing caused by a predisposition. Up to now the reasons for excess cicatrisation are not known. Thus at present there is also no scientifically based causal method of treatment.

Numerous methods have been described for keloid treatment (cf. e.g. McCarthy/Convers "Plastic Surgery", volume 1, pages 732–747, W. B. Saunders, 1990). However, they are all more or less empirically based and do not have a secure foundation in a strict scientific sense. This is due on the one hand to a lack of basic knowledge and is also due to the fact that a spontaneous tendency of untreated keloids to regress is often observed.

As a consequence there is an extremely large number of competing methods of treatment whose effectiveness is, however, doubtful and of which the most important are briefly described in the following.

It is necessary to differentiate between mechanical (physical) and medicinal (chemical) methods of treatment.

The mechanical methods of treatment encompass the application of pressure on the keloid by external compression bandages and the application of foils made of silicon elastomers. A major disadvantage in this case is that the application has to be carried out over months and years. It can also not be used to the same extent in all body regions; thus for example an adequate degree of compression cannot be achieved on the neck. In addition extensive compression bandages always mean a considerable restriction in the freedom of movement and quality of life for the carrier. Moreover they also create considerable problems of hygiene, in particular in the warm period of the year and in hot countries. Compression bandages can also again lead to renewed tissue lesions by the mechanical strain on the sensitive scar skin and thus again promote keloid formation.

The physical methods also include cold treatment (cryotherapy) and laser therapy. Both methods produce tissue necroses by cold or heat by which means the active connective tissue cells and the fibrous substance within the keloid are destroyed. The keloids temporarily collapse and tissue defects are formed. During the subsequent healing of these defects, connective tissue cells again immigrate by which means the formation of keloid starts again. Consequently this method of treatment can thus always only achieve short-term improvements but no final healing.

In the case of the medicinal methods it is necessary to differentiate between preparations for external application and for injection.

In the case of the agents for external application, these are usually ointments with a great variety of active substances such as e.g. hormones, amino acids, mucopolysaccharides. Plant extracts such as from the thorn-apple are also used. A preferred component of preparations for the external treat-

**2**

ment of scars and cicatricial keloids is heparin (cf. e.g. "Pharmazie in unserer Zeit" 10 (1981), page 168 to 181).

All preparations of active substances for external applications have the same inherent disadvantage, namely that the external application, i.e. spreading on the skin over the keloid, does not ensure an adequate tissue concentration in the keloid itself which can reach a thickness of up to several centimetres. Due to the excessively increased blood circulation within the keloids, the active substances—provided that they can penetrate the skin barriers at all—are rapidly transported away via the blood and lymph stream. The diffusion of the active substances in the tissue therefore only plays a subordinate role in the distribution.

It is also known that the active substance heparin cannot penetrate the epidermal layers. Thus the effect of externally applied preparations, such as e.g. ointments based on heparin, on connective tissue cells is doubtful. It cannot therefore be excluded that the successes achieved with scar ointments containing heparin could be ascribed to spontaneous healing.

Derivatives of the hormone cortisol (hydrocortisone) are used in the invasive methods of treatment for keloids; due to the known increased blood circulation within keloids and the concomitant rapid transport of pharmaceutical agents, the crystalline poorly soluble forms are preferably used with which a depot effect can be achieved. Since cortisol and its derivatives strongly inhibit the cells of connective tissue, the quantitatively and qualitatively strongest changes in keloids can be achieved at present with the invasive administration (injection) of pharmaceutical preparations based on crystalline corticoids (corticosteroids).

However, a decisive disadvantage of this therapy with corticoids is the lack of control of the reaction. Therefore in the practical application this can either result in an undesired scar atrophy i.e. a divergence and sinking of the scar with corresponding disfigurement or in an inadequate reaction of the tissue with an unsatisfactory therapeutic result.

A further disadvantage of corticoid therapy is the systemic action of the dissolved active substance which prevents its use in the case of keloids of large area or in children.

### SUMMARY OF THE INVENTION

The object of the invention is to provide a pharmaceutical composition for the treatment of wounds, scars and keloids with which the aforementioned disadvantages that occur in previous methods of treatment can be avoided, in particular the undesired side-effects of corticoid therapy such as e.g. local over-reactions, that can be administered easily and successfully and is degraded by the organism.

This object is achieved by the pharmaceutical composition of the invention which contains cross-linked glycosaminoglycans and conventional pharmaceutical auxiliary and/or carrier substances.

Practical embodiments thereof are the subject matter of this invention.

A further subject matter is also a process for the production of the pharmaceutical compositions according to the invention.

It is possible using the compositions according to the invention to avoid the undesired properties of corticoid therapy. Namely it was found that the cross-linked glycosaminoglycans (GAG, mucopolysaccharides) used according to the invention have an inhibitory effect on keloid formation when they are administered non-topically (intralesionally). In this case no local over-reactions occur as

Exhibit Page 2 of 5

5,731,298

**3**

is the case with the corticoids and also no systemic effects. A further advantage is the biological degradability in the organism.

Moreover the compositions according to the invention also allow the successful treatment of deep scar formations in connective tissue such as e.g. Dupuytren's disease of the palmar surfaces or the so-called Induratio penis plastica (IPP) which form without prior injury (cross-section).

### DETAILED DESCRIPTION OF THE INVENTION

Cross-linked glycosaminoglycans according to the invention are understood to be those in which two or several of the same and/or different glycosaminoglycans are linked together to form a molecular unit. The cross-linking is preferably carried out by chelate formation, complex formation and/or salt formation and in particular by a chemical cross-linking.

Natural or synthetic glycosaminoglycans and also substances that are chemically related thereto can be used as glycosaminoglycans. They can be of an anionic or cationic character.

Natural glycosaminoglycans that are preferably used are those that occur in human connective tissue in particular e.g. hyaluronic acid, heparin, heparin sulfate, chondroitin sulfate. Sulfated polysaccharides are preferably used as synthetic glycosaminoglycans. Substances that are chemically related to glycosaminoclycans that are used according to the invention are preferably those of biological origin and in particular chitosamine and chitosan or their derivatives such as e.g. N-carboxybutlychitosan (cf. R. Muzzarelli et al., Carbohydrate Polymers 11 (1989) 307–320). The formation of chelates, poorly soluble salts or complexes of glycosaminoglycans which also represent a cross-linking within the sense of the invention is achieved by a holding-together through ionic forces as is common for such chelates, salts or complexes.

The cross-linked glycosaminoglycans used according to the invention can be produced in a well-known manner. The chemical cross-linking in this process is usually carried out by cross-linking with bifunctional reactive agents such as e.g. glutaraldehyde or carbodiimide; it is, however, also for example possible to produce cross-linking via amide bonds by means of bifunctional amino acids such as lysine, protamines or albumins. If glycosaminoglycans or analogues thereof that have been produced synthetically are used according to the invention then these can already be primarily cross-linked during production so that a further treatment for cross-linking is not necessary. Such glycosaminoglycans are partly commercially available already in a cross-linked state and can be used directly according to the invention (e.g. "Hylon" and "Hylagel", a cross-linked hyaluronic acid from the Biomatrix Company NJ, USA; for the production c.f. also U.S. Pat. Nos. 4,713,448, 4,605,691).

It is preferable to cross-link identical glycosaminoglycans are preferably and then use them according to the invention but it is also possible according to the invention to use a combination of two or more different or partially different glycosaminoglycans. In a particularly preferred embodiment, glycosaminoglycans with an extremely long chain (molecular weight preferably between 100.000 and 1.000.000) are used; in this case the degree of cross-linking can then remain low. The products are practically free of protein.

In a particularly preferred embodiment of the invention intermolecularly cross-linked heparin is used as the cross-linked glycosaminoglycan.

**4**

The intermolecular cross-linking of heparin can for example be carried out in the following manner: commercially available heparin is treated with dilute nitric acid by which means reactive aldehyde groups are formed on the heparin; subsequently a reductive animation is carried out by means of $NaBH_3CN$. Covalent bonds are formed between the individual heparin chains (end and side chains) via the free amino functional groups of heparin.

A cross-linking of heparin by complex formation is preferably carried out with protamines, gentamycin or vancomycin, metal ions such as e.g. $Fe^{2+}$, $Zn^{2+}$.

The pharmaceutical compositions according to the invention contain the cross-linked glycosaminoglycans preferably in amounts of 0.1 to 20% by weight in relation to the total pharmaceutical composition and in particular in an amount of 0.5 to 10% by weight and especially preferably in an amount of 1 to 5% by weight.

The pharmaceutical compositions according to the invention can be present in the form of preparations that can be administered intralesionally and in particular in the form of injectable gels preferably with a water content of 80 to 99% by weight and also as an anhydrous precursor e.g. lyophilized powder in the form of a powder. The pharmaceutical auxiliary and carrier substances that can be used are those that are conventionally used for this purpose and are suitable for the application according to the invention and are compatible with the cross-linked glycosaminoglycans. The preferred carrier substance is water.

The pharmaceutical compositions according to the invention can for example contain agents to set the pH value, stabilizers, antioxidants, solubilizers, agents that promote penetration, preservatives and/or gel formers as pharmaceutical auxiliary substances as they are usually used in such compositions. They are used in the usual amounts for such preparations.

The pharmaceutical compositions according to the invention can in addition to the actual active substances (cross-linked glycosaminoglycans) also contain further pharmaceutically active substances that are compatible with the cross-linked glycosaminoglycans within the scope of the application e.g. active substances for the therapy of skin diseases (dermatoses), antibiotics (in particular antibiotics with a charge of opposite polarity such as e.g. gentamycin and vancomycin with a positive charge for e.g. cross-linked heparin, or e.g. penicillins or cephalosporins with a negative charge for e.g. cross-linked chitosamine), sulfonamides, disinfectants, hormones (e.g. corticoids) and hormone derivatives (e.g. cortisol), local anaesthetics e.g. of the lidocaine or novocaine type, vasoactive substances for vascular constriction (avoidance of bleeding), adrenalin, enzymes such as e.g. hyaluronidase, interleukins, growth factors e.g. EGF, PDGF and/or IGF, skin care agents and/or agents that stimulate blood flow (hyperaemising agents). These substances can be present bound firmly to the glycosaminoglycans such as e.g. antibiotics with a heteropolar charge of opposite polarity i.e. as a component of the cross-linked glycosaminoglycans and are then released during the degradation of the cross-linked glycosaminoglycans or they can be released by a controlled release type of system.

In the preferred application according to the invention in the form of an injection, the preparations can for example contain local anesthetics to avoid pain when the injection cannula is inserted. The preparations preferably contain an anionically or cationically charged molecule such as gentamycin as an antibiotic which is bound as a counter-ion to the

5,731,298

**5**

cross-linked glycosaminoglycans and thus remains immobilized in loco which prolongs the action accordingly.

The compositions according to the invention can be produced in a conventional, generally known manner for the production of such compositions. In this process the order of mixing of the individual components is usually not critical.

The invention also concerns a process for the production of the compositions which is characterized in that the cross-linked glycosaminoglycan and the other components are dissolved in the pharmaceutical carrier. Water is preferably used as the pharmaceutical carrier and it is expedient to carry out the process while heating and subsequently cooling. For protection against oxidation it may be expedient to work under an inert gas atmosphere in particular under nitrogen.

The type, dose and frequency with which the composition according to the invention is administered depends in particular on the severity of the disease and the general state of the patient and also quite generally on the state and the sensitivity of the skin scar. If the compositions according to the invention are administered in the form of preparations that can be applied topically then the administration is as a rule in accordance with the usual conditions for such compositions.

The type of treatment and frequency of administration also depends in particular on the individual response of the person to be treated. An application of gels is preferably carried out at intervals of 1 to 2 months.

If the compositions according to the invention in the form of injectable gels are applied intralesionally which is primarily the case then this is preferably carried out by injection with the aid of fine cannulae and with pressure-resistant syringes. The gels according to the invention can also be shot percutaneously with the aid of compressed air instruments; compressed air instruments such as those that are known in medicine for such an application can be used for this.

In a particularly preferred embodiment of the invention the pharmaceutical preparation in the form of an injectable gel contains cross-linked heparin as the cross-linked glycosaminoglycan. Whereas for example the injection of non-cross-linked heparin does not come into consideration because heparin inhibits blood coagulation and is additionally rapidly transported out of the lesion via the vascular system and then has a systemic effect similar to the corticoids. heparin loses its inhibitory properties on blood coagulation in the cross-linked form according to the invention and cannot be transported away via the blood and lymph stream. It therefore remains active at the site of application in the keloid tissue for weeks and months after injection. Degradation is primarily via phagocytosis by special cell populations.

When the compositions according to the invention are used which contain cross-linked glycosaminoglycans there is also no occurrence of local over-reactions and no systemic effects such as is the case for corticoids. A further advantage is the biological degradability in the organism. Thus for example the intralesional application by injection can be repeated at intervals of 4 to 8 weeks.

An advantage of the preferred preparations according to the invention in the form of injectable gels and their intralesional application is also that no additional hygienic measures whatsoever are necessary after the injection sites have healed. All regions of the body can be treated in the same manner and the mobility of the patients is not restricted by bandages. Treatment with the preparations according to the

**6**

invention can also prevent an occurrence or reoccurrence of keloids which demonstrates its preventive effect.

The invention therefore also concerns the use of cross-linked glycosaminoglycans for the treatment of wounds, scars and primarily keloids and for the production of a pharmaceutical composition for wound. scar and keloid treatment. In this case the aforementioned glycosaminoclycans that were stated as being preferred are preferably used as the cross-linked glycosaminoglycan.

A particular method of application for the prevention of keloids or contract scars is the administration of anhydrous precursors of cross-linked glycosaminoglycans (e.g. as a lyophilisate) in the form of a wound powder into fresh wounds. In this case the powder is sprinkled into the open wound or wound cavity before wound closure. The wound is then closed by a suture, clamps etc.. In the wound the powder takes up water from the tissue and then corresponds to the preparation according to the invention in the form of a gel or itself represents a preparation according to the invention.

The powder or gel form can also be introduced into large body cavities to prevent undesired adhesions e.g. into the abdominal cavity or thoracic cavity during a surgical operation on the intestine or the lung, into the pericardium. or after operative procedures via indwelling drainages. In the case of inflammatory effusions into large body cavities, the preparation according to the invention can also be introduced via the indwelling cannula after puncturing and emptying the effusion.

The preparation according to the invention which may be on a suitable carrier (e.g. tampon) can also be introduced into cavities and ducts of the body that are accessible from the outside e.g. into the main nasal cavities and paranasal sinuses or into the meati of the nose or into the tear ducts to prevent scarred adhesions.

It is known from U.S. Pat. No. 4,605,691 that cross-linked gels of hyaluronic acid can be use alone or together with other hydrophilic polymers in cosmetic formulations. R. Muzzarelli et al. (1.c) also describe the use of N-carboxybutylchitosan for cosmetic preparations.

It was now surprisingly found that the cross-linked glycosaminoglycans according to the invention that are described above are excellently suitable as a carrier or component of cosmetics and skin care products.

The present invention therefore also concerns the use of the cross-linked glycosaminoglycans described above with the exception of cross-linked hyaluronic acid or cross-linked N-carboxybutylchitosan for cosmetics or as skin care products. In particular the cross-linked glycosaminoglycans that were previously stated as being preferred and distinctively described are used for this.

The cosmetic preparations and skin care products can be present in the usual forms for such preparations e.g. as creams, ointments, lotions and in particular as gels that can be applied topically. They can also contain other auxiliary and/or carrier substances that are conventionally used for this that are compatible with the cross-linked glycosaminoglycans according to the invention. In addition they can also contain the auxiliary substances and/or further active substances described previously in connection with the pharmaceutical preparations, provided that they are compatible with the cross-linked glycosaminoglycans within the scope of the application and are practical.

It is intended to elucidate the invention in more detail by the following examples without limiting it thereto.

5,731,298

| 7 | 8 |

## EXAMPLE 1

Production of an injectable gel from the following components:

| Component | Amount |
|---|---|
| cross-linked hyaluronic acid ("Hylagel" Biomatrix Co., NJ, USA) | 0.004 g |
| lidocaine hydrochloride | 0.02 g |
| water, purified (DAB 9) | to 1.0 g |

The components are dissolved under a nitrogen atmosphere while stirring and briefly heating; a colourless clear gel is obtained after cooling; pH value: 7.00±0.1.

The gel is dispensed into pressure-resistant piercable ampoules and sealed. Afterwards a heat sterilization is carried out and the gel is stored protected from light.

Application example 1

The treatment of a ca. 3 cm×5 cm dark-red raised keloid is described which was present on the back of a 30 year old woman after a tangential cut by a broken pane of glass.

The patient complained about itching in the area of the keloid. The keloid was infiltrated with cross-linked hyaluronic acid (Hylon) by injection for a total of four times at intervals of 4 to 8 weeks. The itching had already disappeared a few hours after the first injection. The keloid became considerably paler within two weeks and a flattening was already recognizable after four weeks. After ca. 6 months there was a pale, only slightly raised scar.

Application example 2

The treatment of a keloid in the lower fold of the breast (right and left) is described which occurred in a female patient after surgical breast correction.

The keloids were treated several times using conservative methods (topical preparations) and repeatedly excised. After the last excision, cross-linked hyaluronic acid was injected during the operation into the wound edges on the right side. Then both sides were sutured identically. The sutures were removed on the right and left side after two weeks. After four weeks the untreated scar on the left side was raised considerably more and was more reddened than the scar on the right side treated with hyaluronic acid. In addition it was possible to successfully prevent the reoccurrence of a keloid on the right-hand side. This also demonstrates the preventive effect of the pharmaceutical preparation according to the invention.

I claim:

1. A method for treating a pre-existing scar or pre-existing keloid comprising injecting a composition comprising a pharmaceutically effective amount of a cross-linked hyaluronic acid in combination with a pharmaceutically acceptable carrier into the pre-existing scar or pre-existing keloid, wherein the pharmaceutically effective amount of a cross-linked hyaluronic acid is 0.1% to 20% by weight of the composition.

2. A method for treating a scar or keloid according to claim 1, wherein said cross-linked hyaluronic is cross-linked by chemical cross-linking, chelate formation, complex formation or salt formation.

3. A method for treating a scar or keloid according to claim 1, wherein said cross-linked hyaluronic acid is cross-linked by chemical cross-linking.

* * * * *

# EXHIBIT W

 United States Patent and Trademark Office

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/393,884 | 02/26/2009 | Pierre F. Lebreton | 18438-59 (COR) | 1553 |

51957     7590     05/31/2011
ALLERGAN, INC.
2525 DUPONT DRIVE, T2-7H
IRVINE, CA 92612-1599

| EXAMINER |
|---|
| SOROUSH, ALI |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1617 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 05/31/2011 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

patents_ip@allergan.com

PTOL-90A (Rev. 04/07)

| ***Office Action Summary*** | Application No. | Applicant(s) |
|---|---|---|
| | 12/393,884 | LEBRETON, PIERRE F. |
| | **Examiner** | **Art Unit** | |
| | ALI SOROUSH | 1617 | |

-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE *three* MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on *26 February 2009*.

2a)☐ This action is **FINAL**.      2b)☒ This action is non-final.

3)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4)☒ Claim(s) *1-22* is/are pending in the application.

    4a) Of the above claim(s) _____ is/are withdrawn from consideration.

5)☐ Claim(s) _____ is/are allowed.

6)☒ Claim(s) *1-22* is/are rejected.

7)☒ Claim(s) *10-22* is/are objected to.

8)☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9)☐ The specification is objected to by the Examiner.

10)☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

11)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a)☐ All   b)☐ Some * c)☐ None of:

      1.☐ Certified copies of the priority documents have been received.

      2.☐ Certified copies of the priority documents have been received in Application No. _____.

      3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1)☒ Notice of References Cited (PTO-892)

2)☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)

3)☒ Information Disclosure Statement(s) (PTO/SB/08)
    Paper No(s)/Mail Date *See Continuation Sheet*.

4)☐ Interview Summary (PTO-413)
    Paper No(s)/Mail Date. _____.

5)☐ Notice of Informal Patent Application

6)☐ Other: _____.

U.S. Patent and Trademark Office

PTOL-326 (Rev. 08-06)                     Office Action Summary                     Part of Paper No./Mail Date 20110517

**Continuation Sheet (PTOL-326)**                                        **Application No.  12/393,884**

Continuation of Attachment(s) 3). Information Disclosure Statement(s) (PTO/SB/08), Paper No(s)/Mail Date :02/26/2009, 03/09/2009, 08/04/2009, 11/10/2009, 07/21/2010, 08/19/2010, and 12/02/2010.

2

Application/Control Number: 12/393,884                                    Page 2
Art Unit: 1617

## DETAILED ACTION

### Claim Status

Claims 1-22 are pending.

Claims 1-22 have been examined.

Claims 1-22 are rejected.

Claims 10-22 are objected to.

### Priority

Priority to applications 60/085956 filed on 08/04/2008, 61/087934 filed on 08/11/2008, and 61/096278 filed on 09/11/2008 is acknowledged.

### Information Disclosure Statement

The information disclosure statements (IDSs) submitted on 02/26/2009, 03/09/2009, 08/04/2009, 11/10/2009, 07/21/2010, 08/19/2010, and 12/02/2010 are in compliance with the provisions of 37 CFR 1.97.  Accordingly, the information disclosure statements are being considered by the examiner.

### Drawings

The drawings filed on 02/26/2009 are accepted.

### Claim Objections

The numbering of claims is not in accordance with 37 CFR 1.126 which requires the original numbering of the claims to be preserved throughout the prosecution.  When

Application/Control Number: 12/393,884                                    Page 3
Art Unit: 1617

claims are canceled, the remaining claims must not be renumbered.  When new claims

are presented, they must be numbered consecutively beginning with the number next

following the highest numbered claims previously presented (whether entered or not).

Misnumbered claims 10-22 have been renumbered 12-26.


### Double Patenting

Claims 1, 8, 11, 10, 12, 13, 15, 17, 20, 21, and 27 are provisionally rejected

under 35 U.S.C. 101 as claiming the same invention as that of claims 1, 9, 10, 11, and

14-19 of copending Application No. 12/393768.  This is a <u>provisional</u> double patenting

rejection since the conflicting claims have not in fact been patented.


### Claim Rejections - 35 USC § 112

The following is a quotation of the second paragraph of 35 U.S.C. 112:

The specification shall conclude with one or more claims particularly pointing out and distinctly
claiming the subject matter which the applicant regards as his invention.

Claim 14 recites the limitation "The method of claim 9" in line 1.  There is

insufficient antecedent basis for this limitation in the claim.

Claim 15 recites the limitation "The method of claim 9" in line 1.  There is

insufficient antecedent basis for this limitation in the claim.

Claim 16 recites the limitation "The method of claim 9" in line 1.  There is

insufficient antecedent basis for this limitation in the claim.

Application/Control Number: 12/393,884                                    Page 4
Art Unit: 1617

Claim 17 recites the limitation "The method of claim 9" in line 1 and "said

adjusted pH" in line 1.  There is insufficient antecedent basis for this limitation in the

claim.

Claim 18 recites the limitation "The method of claim 9" in line 1.  There is

insufficient antecedent basis for this limitation in the claim.

Claim 19 recites the limitation "The method of claim 9" in line 1 and "said step of

homogenizing" line 1.  There is insufficient antecedent basis for this limitation in the

claim.

Claim 20 recites the limitation "The method of claim 9" in line 1.  There is

insufficient antecedent basis for this limitation in the claim.

Claim 23 recites the limitation "The method of claim 9" in line.  There is

insufficient antecedent basis for this limitation in the claim.

Claims 21, 22, and 24 are rejected as being dependent on indefinite claims.


***Claim Rejections - 35 USC § 103***

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set
> forth in section 102 of this title, if the differences between the subject matter sought to be patented and
> the prior art are such that the subject matter as a whole would have been obvious at the time the
> invention was made to a person having ordinary skill in the art to which said subject matter pertains.
> Patentability shall not be negatived by the manner in which the invention was made.

Application/Control Number: 12/393,884                                      Page 5
Art Unit: 1617

The factual inquiries set forth in *Graham* v. *John Deere Co.*, 383 U.S. 1, 148

USPQ 459 (1966), that are applied for establishing a background for determining

obviousness under 35 U.S.C. 103(a) are summarized as follows:

1.    Determining the scope and contents of the prior art.
2.    Ascertaining the differences between the prior art and the claims at issue.
3.    Resolving the level of ordinary skill in the pertinent art.
4.    Considering objective evidence present in the application indicating
      obviousness or nonobviousness.

Claims 1-26 are rejected under 35 U.S.C. 103(a) as being unpatentable over

Lebreton (US Patent Application 2006/0194758 A1, Published 08/31/2006) in view of

Wang (US Patent Application 2005/0271729 A1, Published 12/08/2005).

The claims are directed to a composition comprising hyaluronic acid (HA)

component crosslinked with a crosslinking agent such as 1,4-butanediol diglycidyl ether

(BDDE) and at least one anesthetic agent such as lidocaine. The claims are further

directed to the composition is a cohesive (monophasic) composition. The claims are

further directed to the composition being a hydrogel. The claims are further directed to

the amount of uncrosslinked (HA) is no greater than 10%. The claims are further

directed to the composition having an extrusion injection force of about 13N at an

extrusion rate of 12.5 mm/minute. The claims are further directed to the composition

having a viscosity between about 5 Pa*s to about 450 Pa*s when measured at about 5

Hz. The claims are further directed to the composition has a degree of crosslinking of at

least about 6%. The claims are further directed to composition comprises 0.1% to 5.0%

of an anesthetic.  The claims are further directed to a method of preparing a the

composition comprising providing hyaluronic acid (HA) component crosslinked with a

Application/Control Number: 12/393,884                                         Page 6
Art Unit: 1617

crosslinking agent such as 1,4-butanediol diglycidyl ether (BDDE), adjusting the pH to

above about 7.2/7.5, and adding a solution containing at least one anesthetic agent

such as lidocaine. The claims are further directed to a method wherein the composition

is sterilized by autoclaving. The claims are further directed to the composition being

homogenized after adding a solution of lidocaine. The claims are further directed to a

method wherein the hydrating the HA component with an alkaline solution. The claims

are further directed to a method wherein the HA component is a mixture of low

molecular weight HA and high molecular weight HA with at least a weight of about 1

million daltons.


        Lebreton teaches a method of forming monohase hydrogel by adding a mixture

of sodium hyaluronate (NaHA) fibers to NaOH to hydrate; to this hydrate gel BDDE is

added and homogenized; the crosslinked product is neutralized to pH 7.2 with

phosphate buffer; the resulting hydrogel is homogenized before being packed into

syringes and sterilized in an autoclave (paragraphs 0074, 0076, 0086, 0087, 0090, and

0091). The extrusion force is 14N (about 13N) at a rate of 12.5 mm/min (paragraphs

0062 and 0089). The degree of crosslinking is 6.5% and viscosity is 41 at 1 Hz

(approximately 5Hz) (table). The mixture of NaHA fibers are at least one low molecular

weight  HA component and high molecular weight HA component having a molecular

weight of greater than or equal to 1 million daltons (prior art claims 1 and 5). The

formulation can be buffered to a pH 6.5 to 7.5 (paragraph 0048).

        Lebreton lacks a teaching wherein the hydrogel further comprises lidocaine.

Application/Control Number: 12/393,884                                          Page 7
Art Unit: 1617

Wang teaches the formation of crosslinked hyluronic acid which further comprises preferably an anesthetic such as lidocaine (paragraph 011).

It would have been obvious to one of ordinary skill in the art at the time of the instant invention to add lidocaine to the hydrogel of Lebreton in order to provide a therapeutic delivery of an anesthetic to the injectable formulation. One would have expected success since both Lebreton and Wang are directed to crosslinked hyaluronic acid formulations. With regard to the amount of uncrosslinked HA being present is no greater 10%, since Lebreton is silent as to the amount of uncrosslinked HA there is 0% uncrosslinked HA. With regard to the concentration of lidocaine present in the hydrogel it would have been obvious to one of ordinary skill in the art at the time of the instant invention to arrive at the instant concentration through routine optimization.

### Conclusion

Any inquiry concerning this communication or earlier communications from the examiner should be directed to ALI SOROUSH whose telephone number is (571)272-9925.  The examiner can normally be reached on M-F (9am-6pm).

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Fereydoun G. Sajjadi can be reached on (571)272-3311.  The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Application/Control Number: 12/393,884                                    Page 8
Art Unit: 1617

      Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/A. S./                                          /KARLHEINZ R SKOWRONEK/
Examiner, Art Unit 1617                          Primary Examiner, Art Unit 1631

May 17, 2011

| *Notice of References Cited* | Application/Control No.<br>12/393,884 | Applicant(s)/Patent Under Reexamination<br>LEBRETON, PIERRE F. | |
|---|---|---|---|
| | Examiner<br>ALI SOROUSH | Art Unit<br>1617 | Page 1 of 1 |

**U.S. PATENT DOCUMENTS**

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| * | A | US-2006/0194758 A1 | 08-2006 | Lebreton, Pierre | 514/054 |
| * | B | US-2005/0271729 A1 | 12-2005 | Wang, Wei | 424/488 |
| | C | US- | | | |
| | D | US- | | | |
| | E | US- | | | |
| | F | US- | | | |
| | G | US- | | | |
| | H | US- | | | |
| | I | US- | | | |
| | J | US- | | | |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

**FOREIGN PATENT DOCUMENTS**

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

U.S. Patent and Trademark Office
PTO-892 (Rev. 01-2001)          **Notice of References Cited**          Part of Paper No. 20110517

# EXHIBIT X

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

Applicant:    Pierre F. Lebreton          )   Group Art Unit:  1617
                                          )
Serial No.:   12/393,884                  )   Examiner:  Ali Soroush
                                          )
Filed:        February 26, 2009           )   Conf. No.:  1553
                                          )
For:          HYALURONIC ACID-BASED       )
              GELS INCLUDING LIDOCAINE    )
                                          )
_____  )

**RESPONSE TO OFFICE ACTION**

Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Dear Sir,

    This is filed in response to an Office Action mailed on May 31, 2011.  Please amend the above referenced patent application as follows.  Authorization is hereby given to charge any fee required for the filing of this paper, to Deposit Account No. 01-0885.

    **Amendments to the Claims** are reflected in the **listing of claims** which begin on page 2 of this paper.

    **Remarks** begin on page 10 of this paper.

18438-59 (COR)

**Amendments to the Claims**:

    This listing of claims will replace all prior versions, and listings, of claims in the application:

**Listing of Claims**:

1-22.  (Cancelled)

23.  (Currently Amended) A soft tissue filler composition comprising:

    a hyaluronic acid (HA) component crosslinked with a crosslinking agent selected from the group consisting of 1,4-butanediol diglycidyl ether (BDDE), 1,4-bis(2,3-epoxypropoxy)butane, 1,4-bisglycidyloxybutane, 1,2-bis(2,3-epoxypropoxy)ethylene and 1-(2,3-epoxypropyl)-2,3-epoxycyclohexane, and 1,4-butanediol diglycidyl ether;

        wherein the HA is not crosslinked to a non-HA biopolymer; and at least one anesthetic agent lidocaine combined with said crosslinked HA component;

        wherein the lidocaine is freely released *in vivo*; and

        wherein the composition is sterile.

24.  (Original) The soft tissue filler composition of claim 23 wherein the HA component comprises a cohesive composition.

25.  (Original) The soft tissue filler composition of claim 23 wherein the HA component is a hydrated gel.

26.  (Original) The soft tissue filler composition of claim 25 wherein the HA component includes no greater than between about 1% and about 10% uncrosslinked HA by volume.

18438-59 (COR)

27.   (Original) The soft tissue filler composition of claim 26 wherein the HA component includes no greater than about 10% uncrosslinked HA by volume.

28.   (Currently Amended) The soft tissue filler composition of claim 23 wherein ~~said composition has an~~ the extrusion force of the composition is between about 10 N and about 13 N at an extrusion rate of about 12.5 mm/minute.

29.   (Original) The soft tissue filler composition of claim 23 wherein said composition has a viscosity of between about 5 Pa*s and about 450 Pa*s when measured at about 5 Hz.

30.   (Original) The soft tissue filler composition of claim 23 wherein the crosslinking agent is BDDE.

31.   (Original) The soft tissue filler composition of claim 27 wherein HA component has degree of crosslinking of at least about 5%.

32.   (Original) The soft tissue filler composition of claim 27 wherein the HA component has a degree of crosslinking of at least about 6%.

33.   (Cancelled)

34.   (Currently Amended) The soft tissue filler composition of claim 23 wherein the ~~at least one anesthetic agent~~ lidocaine is present at a concentration between about 0.1% and about 5.0% by weight of said composition.

3

18438-59 (COR)

35.  (Currently Amended) A method of preparing a soft tissue filler composition, the method comprising the steps of:

providing a HA component crosslinked with at least one crosslinking agent selected from the group consisting of 1,4-butanediol diglycidyl ether (BDDE), 1,4-bis(2,3-epoxypropoxy)butane, 1,4-bisglycidyloxybutane, 1,2-bis(2,3-epoxypropoxy)ethylene and 1-(2,3-epoxypropyl)-2,3-epoxycyclohexane, and 1,4-butanediol diglycidyl ether or combinations thereof;

dialyzing the HA component against a phosphate buffer so that the pH is about 7.2;

adjusting the pH of said HA component from about 7.2 to an adjusted pH above about 7.2of about 7.5 to about 8; and

adding a solution containing lidocaine HCl at least one anesthetic agent to said HA component at having said adjusted pH of about 7.5 to about 8 to obtain said soft tissue filler composition.

36.  (Original) The method of claim 35 wherein said soft tissue filler composition is cohesive.

37.  (Cancelled)

38.  (Original) The method of claim 35 wherein said soft tissue filler composition is sterilized by autoclaving to form a sterilized HA-based filler composition and wherein said sterilized composition is stable at ambient temperature for at least 6 months.

39.  (Cancelled)

4

18438-59 (COR)

40.   (Currently Amended) The method of claim 35 further comprising the step of homogenizing the HA component during or after the step of adding said solution containing said ~~anesthetic agent~~ lidocaine HCl.

41.   (Original) The method of claim 35 wherein said step of homogenizing comprises subjecting said composition to mixing with a controlled shear.

42.   (Original) The method of claim 35 wherein said step of providing a HA component comprises providing dry uncrosslinked NaHA material and hydrating said dry uncrosslinked NaHA material in an alkaline solution to obtain an alkaline, uncrosslinked NaHA gel.

43.   (Original) The method of claim 42 wherein said alkaline, uncrosslinked NaHA gel has a pH greater than about 8.0.

44.   (Original) The method of claim 43 wherein said alkaline, uncrosslinked NaHA gel has a pH greater than about 10.

45.   (Original) The method of claim 31 wherein said HA component comprises a high molecular weight HA component and a low molecular weight component.

46.   (Original) The method of claim 45 wherein said high molecular weight HA component has a molecular weight of at least about 1 million Da.

47.   (Currently Amended) A cohesive soft tissue filler composition, the composition comprising:

5

18438-59 (COR)

a hyaluronic acid (HA) component crosslinked with [[BDDE]] 1,4-butanediol diglycidyl ether (BDDE); and

unbound lidocaine HCl combined with the crosslinked HA component,

wherein said cohesive soft tissue filler composition has an extrusion force of between about 10 N and about 13 N and has a viscosity of between about 5 Pa*s and about 450 Pa*s after sterilization.

48.   (Currently Amended) A method of preparing a cohesive HA-based filler composition, the method comprising the steps of:

providing dry uncrosslinked NaHA material and hydrating said dry uncrosslinked NaHA material in an alkaline solution to obtain an alkaline, uncrosslinked NaHA gel;

crosslinking said uncrosslinked NaHA gel with BDDE to form a crosslinked alkaline HA composition with a pH above about [[7.2]] 7.5;

adding a solution containing about lidocaine HCl to said HA component having said adjusted pH above about 7.5 to obtain said HA-based filler composition;

homogenizing said HA-based filler composition thereby forming a homogenized HA-based filler composition;

and sterilizing said homogenized HA-based filler composition thereby forming said cohesive HA-based filler composition,

wherein said cohesive HA-based filler composition has an extrusion force of between about 10 N and about 13 N at an extrusion rate of about 12.5 mm/minute and has a viscosity of between about 5 Pa*s and about 450 Pa*s when measured at about 5 Hz.

18438-59 (COR)

49.  (New) A method of adding lidocaine to a crosslinked hyaluronic acid (HA) composition comprising:

    providing a BDDE crosslinked HA composition having a pH of about 7.2 or lower;

        increasing the pH of the composition to at least about 7.5;

        adding lidocaine to the composition; and

        sterilizing the composition by autoclaving the composition.

50.  (New) The method of claim 49, wherein the pH is increased to about 7.5 to about 8 before adding lidocaine to the composition.

51.  (New) A composition comprising a crosslinked hyaluronic acid (HA) at a concentration of about 20 mg/mL to about 30 mg/mL and lidocaine at a concentration of about 0.1% to about 5% by weight, wherein the composition has a pH above about 7.5.

52.  (New) The composition of claim 51, wherein the pH is about 7.5 to about 8.

53.  (New) The composition of claim 51, wherein the composition is stable to autoclaving.

54.  (New) The composition of claim 51, wherein the composition is stable at 120 °C for at least 1 minute.

55.  (New)  A composition comprising a crosslinked hyaluronic acid (HA)  at a concentration of about 22 mg/mL and lidocaine at a concentration of about 0.2% to about 1% by weight, wherein the composition is stable during storage under ambient conditions for at least 3 months.

7

18438-59 (COR)

56.   (New) The composition of claim 55, which is stable during storage under ambient conditions for at least 6 months.

57.   (New) The composition of claim 55, which is stable during storage under ambient conditions for at least 9 months.

58.   (New) The composition of claim 55, wherein the lidocaine concentration is substantially constant during storage under ambient conditions for at least 3 months.

59.   (New) The composition of claim 55, wherein the HA concentration is substantially constant during storage under ambient conditions for at least 3 months.

60.   (New) The composition of claim 55, having an extrusion force that is substantially constant during storage under ambient conditions for at least 3 months.

61.   (New) The composition of claim 55, wherein the composition remains a substantially homogeneous transparent gel during storage under ambient conditions for at least 3 months.

62.   (New) The composition of claim 55, wherein no substantial increase in 2,6-dimethylaniline concentration occurs during storage under ambient conditions for at least 3 months.

63.   (New) The composition of claim 55, wherein the lidocaine is freely released *in vivo*.

64.   (New) The composition of claim 55, wherein the lidocaine is substantially unbound to the HA.

8

18438-59 (COR)

65.  (New) The composition of claim 55, wherein the lidocaine is substantially unbound to the HA to the extent that, during dialysis of the composition against water, the composition has substantially the same concentration of lidocaine as the dialysis water within about 1 hour of beginning dialysis.

66.  (New) The composition of claim 23, wherein the composition has a viscosity that is substantially the same as an otherwise identical composition that is not sterile.

67.  (New) The composition of claim 23, wherein the composition has an extrusion force that is substantially constant for at least 9 months.

18438-59 (COR)

## REMARKS

Claims 1-22, 37 and 39 are cancelled.  Claims 23, 28, 34, 35, 40, and 47-48 are amended herein.  Claims 49-67 are new.  The amendments to the claims and the new claims are supported in at least p. 4, lines 5-11; p. 10, lines 4-11; p. 13, lines 7-14, lines 26-30; p.21 line 5 to p. 22, line 16; p. 28, lines 3-6; p. 27, lines 21-26; Table 2, and Table 3, of the specification as filed; FIG. 9; and the original claims.  Applicant does not disclaim any subject matter as a result of this amendment, and reserves the right to seek patent protection for all original claims and any other claims supported by the specification as filed.

## Preliminary Amendment

A preliminary amendment was submitted on December 15, 2009 that was not considered in the Office Action.  The Office has instructed the Applicant to apply the rejections to the claims in the preliminary amendment instead of the claims listed in the rejection.  Applicant will do so to the extent possible.  However, an error in assigning a rejection to the correct claims should not be taken as an admission on the part of Applicant.

## Claim Objections

The objected to claims were cancelled in the preliminary amendment, and it is believed that this error was not perpetuated in the new claims.  Thus, this objection is believed to be moot.

## Double Patenting

10

18438-59 (COR)

The Office Action rejected claims 1, 8, 11, 10, 12, 13, 15, 17, 20, 21, and 27, which are believed to correspond to claims 23, 30, 32-35, 37, 39, 42, 44, and 49, for allegedly claiming the same invention as claims 1, 9, 10, 11, and 14-19 of copending Application No. 12/393,768.  Applicant respectfully disagrees. However, Applicant respectfully and properly defers addressing the present rejection until there is otherwise allowable subject matter in each application.  Only then is it proper to assess the propriety of the Office's rejection in view of the potentially allowable claims.  Accordingly, Applicant respectfully requests reconsideration and withdrawal of the present rejection or that the rejection be held in abeyance until claims are allowable in the present application, and claims are allowable in co-pending Application No. 12/393,768.

## Claim Rejection-35 USC § 112

The rejected claims were cancelled in the preliminary amendment, and it is believed that the errors in antecedents was not perpetuated in the new claims.   Thus, this rejection is believed to be moot.

## Claim Rejections-35 USC § 103

Claims 23-46 are rejected as obvious over Lebreton (US 2006/0194758) and Wang (US 2005/0271729).   While Applicant respectfully disagrees, the claims are Amended to expedite prosecution.  The claims are not *prima facie* obvious at least because the combination of references teaches away from the claimed inventions and because the combination of references do not teach or suggest every limitation.

11

18438-59 (COR)

In order to make a proper *prima facie* case of obviousness, the Patent Office must demonstrate: 1) that all elements of a rejected claim are taught or suggested in the prior art;[1] 2) that there is an apparent reason to combine the prior art elements in the manner claimed;[2] and, that 3) the result is predictable.[3]  In making this determination, the Patent Office must examine the prior art, design demands, marketplace demands, and the background knowledge of a person of ordinary skill in the art.[4]  These factors must be considered as a whole, including those portions which teach away from the claimed invention.[5] The Patent Office must also consider objective indicia of nonobviousness such as copying, commercial success, failure of others, long-felt need, general skepticism of those in the art, and unexpected results.[6]

### **Claim 23 is not obvious**

### **Wang teaches away from adding lidocaine to an HA that is not crosslinked to a non-HA biopolymer**

Wang "features a product containing <u>hyaluron cross linked to chitosan</u>"[7] that "can be for the delivery of an anesthetic such as lidocaine."[8]  According to Wang, "[b]ecause HA is a water-soluble polymer and is degraded and eliminated rapidly *in vivo*, the potential applications for HA in biomedical purposes have been somewhat limited."[9]  Based upon this, a person of ordinary skill in the art would understand that Wang teaches a crosslinked

---

[1] *KSR v. Teleflex*, 127 S. Ct. 1727, 1740-1741 (2007); *In re Vaeck*, 20 U.S.P.Q.2d 1438, 1442 (Fed. Cir. 1991).
[2] *KSR*, 127 S. Ct. at 1740-1741.
[3] *Id.*
[4] *Id.*
[5] *W.L. Gore & Associates, Inc. v. Garlock, Inc.*, 721 F.2d 1540 (Fed. Cir. 1983) MPEP 2140.02(VI).
[6] *Id.* at 1734; *Graham v. John Deer Co. of Kansas City*, 86 S.Ct. 684 (1966)
[7] Wang, para 0011
[8] Wang, para 0011
[9] Wang, para 0005

12

18438-59 (COR)

combination of HA and chitosan, and more specifically, teaches that HA alone is ineffective for delivery of anesthetics such as lidocaine.  Thus, based on Wang's teachings, a person of ordinary skill in the art and would have been deterred from preparing a combination of HA, not crosslinked to different biopolymer, and lidocaine.  Thus, Wang teaches away from amended Claim 23, which recites that the HA is not crosslinked to a non-HA biopolymer.

**Wang teaches away from a composition wherein the lidocaine is freely released *in vivo***

As explained above, Wang suggests that HA degrades too rapidly *in vivo* to be useful "in biomedical purposes."  A person of ordinary skill would have understood this to refer to a product that provides sustained delivery of the lidocaine because stability over a period of weeks or months is generally required for sustained drug delivery systems.  If lidocaine is freely released *in vivo*, a composition cannot provide sustained delivery because it would be released within a few hours rather than over a period of weeks or months.  Thus, Wang teaches away from the limitation of claim 23 that "the lidocaine is freely released *in vivo*."

**Claim 35 is not obvious**

**Wang teaches away from adding lidocaine to HA**

As explained above, Wang teaches away from adding lidocaine to HA that is not crosslinked to a non-HA biopolymer such as chitosan.

**The combination of references does not teach or suggest adjusting the pH of the HA component from about 7.2 to an adjusted pH of about 7.5 to about 8.**

13

18438-59 (COR)

Lebreton gives several examples of an HA composition with a pH of 7.2.[10] These compositions are obtained by crosslinking HA at a high pH, then neutralizing the crosslinked HA composition to a pH of 7.2.[11]   Thus, there would have been no apparent reason for a person of ordinary skill in the art to increase the pH from about 7.2 to about 7.5 to about 8 because it would have undone the pH reduction step that had just been carried out.

Furthermore, these Examples mention that the pH is reduced to 7.2 in a phosphate buffer.[12]   A person of ordinary skill would know that the second pKa of phosphate is about 7.2.[13]   A person of ordinary skill also would know that the optimal pH of any buffer is the same as the pKa of the buffer.[14]   Thus, a person of ordinary skill would have concluded that the pH was reduced to about 7.2 because that was the optimal pH of the phosphate buffer.

A person of ordinary skill would also know that a difference between the pH of a buffered composition and the pKa of the buffer reduces buffer capacity.[15]   For example, at a pH of about 7.5, the buffer capacity of phosphate against base is reduced by about 50% as compared to a pH of 7.2.   Thus, a person of ordinary skill would be deterred from adjusting the pH from about 7.2 to about 7.5 to about 8 based upon the Examples in Lebreton.

Wang does not provide any useful information regarding the pH of an HA composition.   Any pH ranges recited in Wang are specific to conditions used to crosslink HA with chitosan, and are not relevant to combining lidocaine with HA.[16]       Therefore, the combination of Lebreton and Wang does not teach or suggest this limitation of claim 35.

---

[10] Lebreton, Examples 1-4
[11] *Id.*
[12] *Id.*
[13] Brown, Chemistry: The Central Science, Upper Saddle NJ: Pearson Prentice Hall, 2006.
[14] *Id.* at 728-729.
[15] *Id.*
[16] see Wang, paras 0017, 0021

14

18438-59 (COR)

**The combination of references does not teach or suggest adding lidocaine to HA at a pH of about 7.5 to about 8.**

Neither Lebreton nor Wang teach or suggest adding lidocaine HCl to an HA component at a pH of about 7.5 to about 8. Lebreton is silent with respect to a pH at which lidocaine might be added to a crosslinked HA. As mentioned above, any pH ranges recited in Wang are specific to conditions used to crosslink HA with chitosan, and are not relevant to combining lidocaine with HA.[17] Thus, the combination of Lebreton and Wang do not teach or suggest this limitation of claim 35.

For at least the reasons given above, claim 35 and its dependent claims are not *prima facie* obvious over the combination of Lebreton and Wang.

Claim 47 is not obvious because Wang teaches away from combining HA with lidocaine, as explained above.

Claim 48 is not obvious because the combination of Lebreton and Wang do not teach or suggest adding lidocaine HCl to the HA component at a pH above about 7.5, as explained above.

## CONCLUSION

For at least the above reasons Applicant respectfully submits that the claims as amended herein are patentable, and that all claims in the application are in condition for allowance. Therefore, Applicant respectfully urge the Examiner to issue a Notice to that effect. The Examiner is invited to call the undersigned attorney if there are any unresolved issues.

---

[17] see Wang, paras 0017, 0021

15

18438-59 (COR)

The Commissioner is authorized to charge any fee which may be required in connection with this Amendment to deposit account No. 01-0885.

Dated:  September 29, 2011          Respectfully submitted,


                                    /Linda Allyson Fox/

                                    Linda Allyson Fox
                                    Reg. No. 38,883
                                    Attorney for Applicant


Please direct all inquiries and correspondence to:

Linda A. Fox, Esq.
Allergan, Inc.
2525 Dupont Drive, T2-7H
Irvine, California 92623-9534
Tel:  714.246.4758/Fax: 714.246.4249

16

# EXHIBIT Y

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/393,884 | 02/26/2009 | Pierre F. Lebreton | 18438-59 (COR) | 1553 |

51957          7590          12/27/2011
ALLERGAN, INC.
2525 DUPONT DRIVE, T2-7H
IRVINE, CA 92612-1599

| EXAMINER |
|---|
| SOROUSH, ALI |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1617 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 12/27/2011 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

patents_ip@allergan.com

PTOL-90A (Rev. 04/07)

| ***Office Action Summary*** | Application No. | Applicant(s) |
| --- | --- | --- |
| | 12/393,884 | LEBRETON, PIERRE  F. |
| | **Examiner** | **Art Unit** | |
| | ALI SOROUSH | 1617 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a).  In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED  (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment.  See 37 CFR 1.704(b).

**Status**

1)  ☒ Responsive to communication(s) filed on <u>29 September 2011</u>.
2a) ☒ This action is **FINAL**.    2b) ☐ This action is non-final.
3)  ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.
4)  ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

5)  ☒ Claim(s) <u>23-32,34-36,38 and 40-67</u> is/are pending in the application.
    5a) Of the above claim(s) _____ is/are withdrawn from consideration.
6)  ☐ Claim(s) _____ is/are allowed.
7)  ☒ Claim(s) <u>23-32,34-36,38 and 40-67</u> is/are rejected.
8)  ☐ Claim(s) _____ is/are objected to.
9)  ☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

10) ☐ The specification is objected to by the Examiner.
11) ☐ The drawing(s) filed on _____ is/are: a) ☐ accepted or b) ☐ objected to by the Examiner.
    Applicant may not request that any objection to the drawing(s) be held in abeyance.  See 37 CFR 1.85(a).
    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).
12) ☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

13) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
    a) ☐ All   b) ☐ Some * c) ☐ None of:
       1. ☐ Certified copies of the priority documents have been received.
       2. ☐ Certified copies of the priority documents have been received in Application No. _____.
       3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☒ Notice of References Cited (PTO-892)
2) ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3) ☒ Information Disclosure Statement(s) (PTO/SB/08)
   Paper No(s)/Mail Date <u>07182011</u>.
4) ☐ Interview Summary (PTO-413)
   Paper No(s)/Mail. Date. _____ .
5) ☐ Notice of Informal Patent Application
6) ☐ Other: _____.

Application/Control Number: 12/393,884                                    Page 2
Art Unit: 1617

### DETAILED ACTION

#### *Acknowledgement of Receipt*

Applicant's response filed on 09/29/2011 to the Office Action mailed on

05/31/2011 is acknowledged.

#### *Claim Status*

Claims 23-32, 34-36, 38, and 40-67 are pending.

Claims 1-22, 33, 37, and 39 are cancelled.

Claims 23, 28, 34, 35, 40, 47, and 48 are currently amended.

Claims 49-67 are newly added.

Claims 23-32, 34-36, 38, and 40-67 have been examined.

Claims 23-32, 34-36, 38, and 40-67 are rejected.

The original claim set was inadvertently examined. Claims 1-22 as originally filed

were presented as claims 23-52 in a preliminary amendment filed on 12/15/2009.

Claims 23, 35, 40, 48, and 49-51 introduced new limitations in the preliminary

amendment not presented in the original claim set, however are taught in the art that is

commonly applied in this action and the first action.

#### *Priority*

Priority to applications 60/085956 filed on 08/04/2008, 61/087934 filed on

08/11/2008, and 61/096278 filed on 09/11/2008 is acknowledged.

Application/Control Number: 12/393,884                                                    Page 3
Art Unit: 1617

### *Information Disclosure Statement*

The information disclosure statement (IDS) submitted on 07/18/2011 is in compliance with the provisions of 37 CFR 1.97.  Accordingly, the information disclosure statement has been considered by the examiner.

### *Claim Objections*

### *Response to Applicant's Arguments*

In view of Applicant's amendments the objection to claims 10-22 is moot since these claims have been cancelled.

### *Double Patenting*

### *Response to Applicant's Arguments*

In view of Applicant's amendments the provisional rejection of claims 1, 8, 11, 10, 12, 13, 15, 17, 20, and 21 under 35 U.S.C. 101 as claiming the same invention as that of claims 1, 9, 10, 11, and 14-19 of copending Application No. 12/393768 is moot since the claims have been cancelled.

### *Claim Rejections - 35 USC § 112*

The following is a quotation of the second paragraph of 35 U.S.C. 112:

The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

### *Response to Applicant's Arguments*

Application/Control Number: 12/393,884                                      Page 4
Art Unit: 1617

In view of Applicant's amendments the rejection of claims 14-22 under 35 U.S.C.

112, second paragraph is moot since the claims have been amended.

In view of Applicants amendments the rejection of claims 23 and 24 under 35

U.S.C. 112, second paragraph is withdrawn.

This is a new ground of rejection.

Claim 40 is rejected under 35 U.S.C. 112, second paragraph, as being indefinite

for failing to particularly point out and distinctly claim the subject matter which applicant

regards as the invention.

Claim 40 recites the limitation "said solution containing" in line 3.  There is

insufficient antecedent basis for this limitation in the claim.

### Claim Rejections - 35 USC § 103

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

The factual inquiries set forth in *Graham* v. *John Deere Co.*, 383 U.S. 1, 148

USPQ 459 (1966), that are applied for establishing a background for determining

obviousness under 35 U.S.C. 103(a) are summarized as follows:

1.      Determining the scope and contents of the prior art.

Application/Control Number: 12/393,884                                         Page 5
Art Unit: 1617

2.    Ascertaining the differences between the prior art and the claims at issue.
3.    Resolving the level of ordinary skill in the pertinent art.
4.    Considering objective evidence present in the application indicating obviousness or nonobviousness.

### *Response to Applicant's Arguments*

In view of Applicants the rejection of claims 1-22 under 35 U.S.C. 103(a) as being unpatentable over Lebreton (US Patent Application 2006/0194758 A1, Published 08/31/2006) in view of Wang (US Patent Application 2005/0271729 A1, Published 12/08/2005) is moot since the claims have been cancelled.

In view of Applicants the rejection of claims 23-26 under 35 U.S.C. 103(a) as being unpatentable over Lebreton (US Patent Application 2006/0194758 A1, Published 08/31/2006) in view of Wang (US Patent Application 2005/0271729 A1, Published 12/08/2005) is withdrawn in view of the amendments to the claims.


This is a new ground of rejection.

Claims 23-32, 35, 36, 38, and 40-50 are rejected under 35 U.S.C. 103(a) as being unpatentable over Lebreton (US Patent Application 2006/0194758 A1, Published 08/31/2006) in view of Calias et al. (US Patent 6521223 B1, Published 02/18/2003).

The claims are directed to a sterile composition comprising hyaluronic acid (HA) component crosslinked with a crosslinking agent such as 1,4-butanediol diglycidyl ether (BDDE) and lidocaine, wherein the HA is not crosslinked to a non-HA biopolymer. The claims are further directed to the composition is a cohesive (monophasic) composition. The claims are further directed to the composition being a hydrated gel (hydrogel). The

Application/Control Number: 12/393,884                                    Page 6
Art Unit: 1617

claims are further directed to the amount of uncrosslinked (HA) is no greater than 10%.

The claims are further directed to the composition having an extrusion injection force of

about 13N at an extrusion rate of 12.5 mm/minute. The claims are further directed to the

composition having a viscosity between about 5 Pa*s to about 450 Pa*s when

measured at about 5 Hz. The claims are further directed to the composition has a

degree of crosslinking of at least about 6%. The claims are further directed to a method

of preparing a the composition comprising providing hyaluronic acid (HA) component

crosslinked with a crosslinking agent such as 1,4-butanediol diglycidyl ether (BDDE),

dialyzing the HA component against a phosphate buffer so that the pH is about 7.2,

adjusting the pH to above about 7.5, and adding lidocaine. The claims are further

directed to a method wherein the composition is sterilized by autoclaving. The claims

are further directed to the composition being homogenized after adding a solution of

lidocaine. The claims are further directed to a method wherein the hydrating the HA

component with an alkaline solution. The claims are further directed to a method

wherein the HA component is a mixture of low molecular weight HA and high molecular

weight HA with at least a weight of about 1 million daltons.

Lebreton teaches a method of forming monohase (cohesive) hydrogel (hydrated

gel) by adding a 25.6g mixture of dry sodium hyaluronate (sodium hyaluronic acid salt -

NaHA) fibers to 0.25N NaOH to hydrate; to this hydrate gel BDDE is added and

homogenized; the crosslinked product is neutralized to pH 7.2 with phosphate buffer

(dialyzing); the resulting hydrogel is homogenized before being packed into syringes

and sterilized in an autoclave (paragraphs 0074, 0076, 0086, 0087, 0090, and 0091).

Application/Control Number: 12/393,884                                          Page 7
Art Unit: 1617

The extrusion force is 14N (about 13N) at a rate of 12.5 mm/min (paragraphs 0062 and

0089). The concentration of HA in the hydrogel is 26 mg/ml (paragraph 0082). The

degree of crosslinking is 6.5% and viscosity is 41 at 1 Hz (approximately 5Hz) (table).

The mixture of NaHA fibers are at least one low molecular weight  HA component and

high molecular weight HA component having a molecular weight of greater than or

equal to 1 million daltons (prior art claims 1 and 5). The formulation can be buffered to a

pH 6.5 to 7.5 following neutralization of the gel but before homogenization to make the

gel compatible with the human body (paragraphs 0048 and 0049 –which reads on

adjusting the pH from 7.2(neutralized) to 7.5). The composition can be used to prevent

tissue adhesions (paragraph 0005).

Lebreton lacks a teaching wherein the hydrogel further comprises lidocaine.

Calias et al. teach a single phase gel for the prevention of adhesion (title). The

single phase gel formed from reacting hyaluronic acid with divinyl sulfone (crosslinking

agent), and then neutralizing the pH (column 8, lines 55-60 and column 9, lines 8-9).

The gel can further comprises a drug (column 10, lines 4-5). A drug such as lidocaine is

incorporated in the gel for delivery to the tissue at the site of surgery (column 4, lines

23-27).

It would have been prima facie obvious to one of ordinary skill in the art at the

time of the instant invention to add lidocaine to the hydrogel composition of Lebreton.

One would have been motivated to do so in order to provide lidocaine, an anesthetic, to

the tissue at the site of surgery. It would have been obvious to one ordinary skill in the

art at the time of the instant invention to add the lidocaine to the hydrogel during the

Application/Control Number: 12/393,884                                    Page 8
Art Unit: 1617

homogenization in order to provide a hydrogel which as a lidocaine homogeneously mixed throughout the gel. With regard to the pH of the uncrosslinked NaHa gel is greater than 10, this limitation is taught by Lebreton that 25.6g NaHa is added 0.25N NaOH. With regard to the limitation that the HA is not crosslinked to a non-HA biopolymer, this is limitation is taught since no other biopolymer is present in the gel composition prior to final crosslinking. With regard to the limitation that the lidocaine is freely released in vivo, this limitation is taught because the prior art hydrogel and instant hydrogel are structurally indistinguishable and therefore it would necessarily result from the addition of lidocaine to the hydrogel. With regard to the limitation that the hydrogel is stable at ambient temperature for at least 6 hours following sterilization, this limitation is taught because the prior art hydrogel and instant hydrogel are structurally indistinguishable and therefore it would necessarily because this is a property of the hydrogel.


This is a new ground of rejection.

Claims 34 and 51-67 are rejected under 35 U.S.C. 103(a) as being unpatentable over Lebreton (US Patent Application 2006/0194758 A1, Published 08/31/2006) in view of Calias et al. (US Patent 6521223 B1, Published 02/18/2003) as applied to claims 23-32, 35, 36, 38, and 40-50 above, and further in view of Marko et al. (US Patent Application 2004/0101959 A1, Published 05/27/2004).

The claims are further directed to the composition has a concentration 20 mg/mL to 30 mg/mL crosslinked HA and 0.2 to 1% by weight of lidocaine.

Application/Control Number: 12/393,884                                      Page 9
Art Unit: 1617

The teachings of Lebreton and Calias et al. are discussed above.

Calias et al. lacks a teaching wherein the concentration of lidocaine is between
0.2 to 1%.

Marko et al. teach a crosslinked collagen hydrogel composition that comprises
0.3% lidocaine.

It would have been prima facie obvious to one of ordinary skill in the art at the
time of the instant invention to add 0.3% lidocaine. One would have been motivated to
do so in order to provide an HA hydrogel composition with lidocaine. With regard to the
limitations in claims 53-62, 66, and 67 about stability of the composition, these
limitations are necessarily present in the prior art gel since the instant composition and
the prior art composition are structurally indistinguishable.

### *Conclusion*

Applicant's amendment necessitated the new ground(s) of rejection presented in
this Office action.  Accordingly, **THIS ACTION IS MADE FINAL**.  See MPEP
§ 706.07(a).  Applicant is reminded of the extension of time policy as set forth in 37
CFR 1.136(a).

A shortened statutory period for reply to this final action is set to expire THREE
MONTHS from the mailing date of this action.  In the event a first reply is filed within
TWO MONTHS of the mailing date of this final action and the advisory action is not
mailed until after the end of the THREE-MONTH shortened statutory period, then the
shortened statutory period will expire on the date the advisory action is mailed, and any

Application/Control Number: 12/393,884                                    Page 10
Art Unit: 1617

extension fee pursuant to 37 CFR 1.136(a) will be calculated from the mailing date of

the advisory action.  In no event, however, will the statutory period for reply expire later

than SIX MONTHS from the date of this final action.

    Any inquiry concerning this communication or earlier communications from the

examiner should be directed to ALI SOROUSH whose telephone number is (571)272-

9925.  The examiner can normally be reached on M-F (9am-6pm).

    If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Fereydoun G. Sajjadi can be reached on (571)272-3311.  The fax phone

number for the organization where this application or proceeding is assigned is 571-

273-8300.

    Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/A. S./
Examiner, Art Unit 1617

                                            /KARLHEINZ R SKOWRONEK/
                                            Primary Examiner, Art Unit 1631

December 17, 2011

# EXHIBIT Z

### IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| Applicant: | Pierre F. Lebreton | ) Group Art Unit: 1617 |
| | | ) |
| Serial No.: | 12/393,884 | ) Examiner: Ali Soroush |
| | | ) |
| Filed: | February 26, 2009 | ) Conf. No.: 1553 |
| | | ) |
| For: | HYALURONIC ACID-BASED | ) |
| | GELS INCLUDING LIDOCAINE | ) |
| | | ) |

### RESPONSE TO FINAL OFFICE ACTION

Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Dear Sir,

Applicant thanks the Examiner for the in-person interview conducted on April 3, 2012 in the Remsen Building of the U.S.P.T.O., and submits this Response to the Office Action dated December 27, 2011, including a summary of the **substance of the interview**. Applicant requests a three-month extension of time for filing this Response, and authorizes that all fees therefor be charged to Deposit Account No. 01-0885.

**Amendments to the Specification** are shown on page 2 of this paper.

**Amendments to the Claims** are reflected in the **listing of claims** which begin on page 3 of this paper.

**Remarks** begin on page 11 of this paper.

18438-59 (COR)

**Amendments to the Specification**

Please replace the paragraph beginning on page 26, line 18 of the application as filed, with the following two paragraphs:

--With regard to viscosity, Sample 3 and Sample 4 were found to be stable to autoclaving in Test 2 but were not stable in Test 1. Samples 4 and 5 were found to be stable to autoclaving in both Test 1 and Test 2. Figures 3 and 4 illustrate that Samples 3 and 4 were stable when prepared with lidocaine and with pH adjustment, but were not stable when lidocaine was added and the pH not adjusted. Figure 6 illustrates that Sample 5 prepared with lidocaine and pH control had similar viscous and elastic properties (G″/G′) to Sample 5 prepared without lidocaine. When Sample 5 was prepared with lidocaine and no pH adjustment, the viscous and elastic properties changed an insubstantial amount (Fig. 6). Figs. 7 and 8 illustrate that Sample 6 was stable and had similar viscous and elastic properties (G″/G′) when prepared with lidocaine, both with and without pH control.

Figures 1-5 and 7 show changes in viscosity between the autoclaved Samples without lidocaine ("No Lido") and the autoclaved Samples with lidocaine ("Lido no pH control"). More specifically, as shown in Figures 1-3, the viscosity at 0.1 Hz of Samples 1, 2 and 3 decreased at least about 35% when lidocaine was added. As shown in Figures 4, 5 and 7, the viscosity at 0.1 Hz of cohesive Samples 4, 5 and 6, in accordance with the invention, did not decrease to any appreciable extent (not greater than about 30%) when lidocaine was added and the combination was autoclaved. --

2

18438-59 (COR)

**Amendments to the Claims**:

This **listing of claims** will replace all prior versions, and listings, of claims in the application:

**Listing of Claims:**

1-22.   (Cancelled)

23.   (Previously presented)   A   soft   tissue   filler   composition comprising:

a hyaluronic acid (HA) component crosslinked with a crosslinking agent selected from the group consisting of 1,4-butanediol diglycidyl ether (BDDE), 1,4-bis(2,3-epoxypropoxy)butane, 1,4-bisglycidyloxybutane, 1,2-bis(2,3-epoxypropoxy)ethylene and 1-(2,3-epoxypropyl)-2,3-epoxycyclohexane, and 1,4-butanediol diglycidyl ether;

wherein the HA is not crosslinked to a non-HA biopolymer; and

lidocaine combined with said crosslinked HA component;

wherein the lidocaine is freely released *in vivo*; and

wherein the composition is sterile.

24.   (Original)   The   soft   tissue   filler   composition   of   claim   23 wherein the HA component comprises a cohesive composition.

25.   (Original)   The   soft   tissue   filler   composition   of   claim   23 wherein the HA component is a hydrated gel.

26.   (Original)   The   soft   tissue   filler   composition   of   claim   25 wherein the HA component includes no greater than between about 1% and about 10% uncrosslinked HA by volume.

3

18438-59 (COR)

27.  (Original) The soft tissue filler composition of claim 26 wherein the HA component includes no greater than about 10% uncrosslinked HA by volume.

28.  (Previously presented) The soft tissue filler composition of claim 23 wherein the extrusion force of the composition is between about 10 N and about 13 N at an extrusion rate of about 12.5 mm/minute.

29.  (Original) The soft tissue filler composition of claim 23 wherein said composition has a viscosity of between about 5 Pa*s and about 450 Pa*s when measured at about 5 Hz.

30.  (Original) The soft tissue filler composition of claim 23 wherein the crosslinking agent is BDDE.

31.  (Original) The soft tissue filler composition of claim 27 wherein HA component has degree of crosslinking of at least about 5%.

32.  (Original) The soft tissue filler composition of claim 27 wherein the HA component has a degree of crosslinking of at least about 6%.

33.  (Cancelled)

34.  (Previously presented) The soft tissue filler composition of claim 23 wherein the lidocaine is present at a concentration between about 0.1% and about 5.0% by weight of said composition.

35.  (Previously presented) A method of preparing a soft tissue filler composition, the method comprising the steps of:

providing a HA component crosslinked with at least one crosslinking agent selected from the group consisting of 1,4-butanediol diglycidyl ether (BDDE), 1,4-bis(2,3-epoxypropoxy)butane, 1,4-bisglycidyloxybutane, 1,2-bis(2,3-epoxypropoxy)ethylene and 1-(2,3-epoxypropyl)-2,3-epoxycyclohexane, and 1,4-butanediol diglycidyl ether or combinations thereof;

dialyzing the HA component against a phosphate buffer so that the pH is about 7.2;

adjusting the pH of said HA component from about 7.2 to an adjusted pH of about 7.5 to about 8; and

adding lidocaine HCl to said HA component at said adjusted pH of about 7.5 to about 8 to obtain said soft tissue filler composition.

36.  (Original) The method of claim 35 wherein said soft tissue filler composition is cohesive.

37.  (Cancelled)

38.  (Original) The method of claim 35 wherein said soft tissue filler composition is sterilized by autoclaving to form a sterilized HA-based filler composition and wherein said sterilized composition is stable at ambient temperature for at least 6 months.

39.  (Cancelled)

18438-59 (COR)

40. (Currently Amended) The method of claim 35 further comprising the step of homogenizing the HA component during or after the step of adding ~~said solution containing~~ said lidocaine HCl.

41. (Original) The method of claim 35 wherein said step of homogenizing comprises subjecting said composition to mixing with a controlled shear.

42. (Original) The method of claim 35 wherein said step of providing a HA component comprises providing dry uncrosslinked NaHA material and hydrating said dry uncrosslinked NaHA material in an alkaline solution to obtain an alkaline, uncrosslinked NaHA gel.

43. (Original) The method of claim 42 wherein said alkaline, uncrosslinked NaHA gel has a pH greater than about 8.0.

44. (Original) The method of claim 43 wherein said alkaline, uncrosslinked NaHA gel has a pH greater than about 10.

45. (Original) The method of claim 31 wherein said HA component comprises a high molecular weight HA component and a low molecular weight component.

46. (Original) The method of claim 45 wherein said high molecular weight HA component has a molecular weight of at least about 1 million Da.

47. (Previously presented) A cohesive soft tissue filler composition, the composition comprising:

6

18438-59 (COR)

a hyaluronic acid (HA) component crosslinked with 1,4-butanediol diglycidyl ether (BDDE); and

unbound lidocaine HCl combined with the crosslinked HA component,

wherein said cohesive soft tissue filler composition has an extrusion force of between about 10 N and about 13 N and has a viscosity of between about 5 Pa*s and about 450 Pa*s after sterilization.

48. (Previously presented) A method of preparing a cohesive HA-based filler composition, the method comprising the steps of:

providing dry uncrosslinked NaHA material and hydrating said dry uncrosslinked NaHA material in an alkaline solution to obtain an alkaline, uncrosslinked NaHA gel;

crosslinking said uncrosslinked NaHA gel with 1,4-butanediol diglycidyl ether (BDDE)to form a crosslinked alkaline HA composition with a pH above about 7.5;

adding a solution containing about lidocaine HCl to said HA component having said adjusted pH above about 7.5 to obtain said HA-based filler composition;

homogenizing said HA-based filler composition thereby forming a homogenized HA-based filler composition;

and sterilizing said homogenized HA-based filler composition thereby forming said cohesive HA-based filler composition,

wherein said cohesive HA-based filler composition has an extrusion force of between about 10 N and about 13 N at an extrusion rate of about 12.5 mm/minute and has a viscosity of between about 5 Pa*s and about 450 Pa*s when measured at about 5 Hz.

18438-59 (COR)

49.   (Previously presented) A method of adding lidocaine to a crosslinked hyaluronic acid (HA) composition comprising:

providing a 1,4-butanediol diglycidyl ether (BDDE) crosslinked HA composition having a pH of about 7.2 or lower;

increasing the pH of the composition to at least about 7.5;

adding lidocaine to the composition; and

sterilizing the composition by autoclaving the composition.


50.   (Previously presented) The method of claim 49, wherein the pH is increased to about 7.5 to about 8 before adding lidocaine to the composition.


51.   (Previously presented) A composition comprising a crosslinked hyaluronic acid (HA) at a concentration of about 20 mg/mL to about 30 mg/mL and lidocaine at a concentration of about 0.1% to about 5% by weight, wherein the composition has a pH above about 7.5.


52.   (Previously presented) The composition of claim 51, wherein the pH is about 7.5 to about 8.


53.   (Previously presented) The composition of claim 51, wherein the composition is stable to autoclaving.


54.   (Cancelled)


55.   (Currently amended) A _sterile_ composition comprising a crosslinked hyaluronic acid (HA) at a concentration of about 22 mg/mL and lidocaine at a concentration of about 0.2% to about 1% by weight, wherein the composition is stable during storage under ambient conditions for at least 3 months.


8

18438-59 (COR)

56.   (Previously presented) The composition of claim 53, which is stable during storage under ambient conditions for at least 6 months.

57.   (Previously presented) The composition of claim 53, which is stable during storage under ambient conditions for at least 9 months.

58.   (Previously presented) The composition of claim 53, wherein the lidocaine concentration is substantially constant during storage under ambient conditions for at least 3 months.

59.   (Previously presented) The composition of claim 53, wherein the HA concentration is substantially constant during storage under ambient conditions for at least 3 months.

60.   (Previously presented) The composition of claim 53, having an extrusion force that is substantially constant during storage under ambient conditions for at least 3 months.

61.   (Previously presented) The composition of claim 53, wherein the composition remains a substantially homogeneous transparent gel during storage under ambient conditions for at least 3 months.

62.   (Previously presented) The composition of claim 53, wherein no substantial increase in 2,6-dimethylaniline concentration occurs during storage under ambient conditions for at least 3 months.

63.   (Previously presented) The composition of claim 53, wherein the lidocaine is freely released *in vivo*.

9

64.  (Previously presented)  The composition of claim 53, wherein the lidocaine is substantially unbound to the HA.

65.  (Previously presented)  The composition of claim 53, wherein the lidocaine is substantially unbound to the HA to the extent that, during dialysis of the composition against water, the composition has substantially the same concentration of lidocaine as the dialysis water within about 1 hour of beginning dialysis.

66.  (Previously presented)  The composition of claim 23, wherein the composition has a viscosity that is substantially the same as an otherwise identical composition that is not sterile.

67.  (Previously presented)  The composition of claim 23, wherein the composition has an extrusion force that is substantially constant for at least 9 months.

18438-59 (COR)

**<u>Remarks:</u>**

The subject, above-identified patent application has been carefully reviewed and amended in response to the Final Office Action mailed on December 27, 2011.  A three-month extension of time for filing this response is requested.  All fees dues in connection with the filing can be charged to Deposit Account No. 01-0885.

Applicant notes that a <u>Request for Continued Examination (RCE)</u> was filed on March 7, 2012, along with an Information Disclosure Statement (IDS) but without a Response to the final Office Action.

Applicant then received a <u>Notice of Improper Request for Continued Examination</u> ("Notice"), mailed on March 13, 2012, for the reason that the RCE "was not accompanied by a submission as required under 37 C.F.R. 1.114".  A copy of the Notice is filed along with **this present submission.**  Applicant submits that the conditions for filing the RCE have now been satisfied, and this Response, the IDS, and the additional IDS enclosed herewith should therefor be considered.

**<u>Substance of the Interview Summary</u>**

Applicant kindly thanks the Examiner for the <u>in-person interview</u> conducted at the USPTO Remsen Building, on April 3, 2012. Applicant agrees with the Examiner's Applicant-Initiated Interview Summary dated April 3, 2012, in that at the interview, the undersigned and the Examiner agreed that submitting a Declaration to show unexpected results of incorporating lidocaine into a hyaluronic acid gel that has been crosslinked, and has not been

11

18438-59 (COR)

crosslinked to any other polymer, would be sufficient to overcome the prior art of record.  Applicant has found that incorporation of lidocaine into such a gel provided a crosslinked hyaluronic acid-lidocaine gel that was stable and did not degrade over time, contrary to what had been expected by those of ordinary skill in the art at the time of the invention.  The Examiner asked that the Response to the Office Action point out where in the specification the description of the experiments performed by the inventor show the unexpected results.

**Remarks/Arguments**

Applicant submits herewith a Declaration under 37 CFR 1.132, of the inventor, Pierre Lebreton, as discussed.

The Declaration filed herewith is evidence that the presently claimed invention has unexpected properties, and would not have been obvious, at the time the invention was made, to a person having of ordinary skill in the art, under 35 U.S.C. 103(a).

Applicant bears the burden of rebutting a *prima facie* case by the presentation of evidence of unexpected results.  Section 716.01 of the MPEP states that such evidence of secondary considerations, traversing rejections, when timely presented, <u>must</u> be considered by the Examiner whenever present.   When such evidence is submitted, <u>all of the evidence must be considered anew</u>. *In re Piasecki,* 745 F2d 1468, 1472-1473, 223 USPQ 785, 787-788 (Fed. Cir. 1984).

The enclosed Declaration is timely submitted, as it is being filed as a part of this submission for the RCE filed on March 7, 2012.

12

18438-59 (COR)

The present submission, including the Declaration and data in support thereof, are believed to be proof of nonobviousness of the claimed invention.

It is known that a showing of unexpected results can be made using examples in the specification. *In re Soni*, F.3d at 750, USPQ2d at 1687, ("Consistent with the rule that all evidence of nonobviousness must be considered when assessing patentability, the PTO must consider comparative data in the specification in determining whether the claimed invention provides unexpected results.").

In the present case, applicant offers evidence, in the form of the Declaration of the inventor, supported by examples and data in the specification, to show unexpected results, namely, that it was a surprising and unexpected discovery, not appreciated prior to the present invention, that certain hyaluronic acid gels, as defined in the application, when mixed with lidocaine, could be made to be heat stable and thus useful as dermal fillers.  The Declaration shows that it was believed that adding lidocaine to hyaluronic acid gel compositions during manufacturing caused degradation of the hyaluronic acid prior to injection of the hyaluronic acid as a dermal filler.  The Declaration further shows that at the time of the invention, it was not known whether a heat sterilized hyaluronic acid/lidocaine gel could be made to be stable.  As will be explained hereinafter, the examples and data in the specification support these assertions in the Declaration by showing that, when tested, certain hyaluronic acid based gels degraded and lost viscosity when mixed with lidocaine and heat sterilized, as was expected.  Further still, a publication entitled "The comparison of physiochemical properties of four

13

18438-59 (COR)

Cross-linked sodium hyaluronate gels with different cross-linking agents" Cui, et al., November 22, 2011, ("Cui, et al."), attached as Exhibit A, is offered as further evidence of unexpected results.  As will be further discussed below, Cui, et al. is offered as evidence showing that hyaluronic acid crosslinked with BDDE (as in some of the claimed embodiments) is <u>one of the least</u> heat stable of four different crosslinked hyaluronic acid gels tested by Cui, et al..  Applicant submits that this evidence, though published after the present invention, at least suggests that one would not expect a BDDE-crosslinked hyaluronic acid gel with lidocaine to be heat stable.

Accordingly, as will be shown, the presently claimed soft tissue filler compositions comprising a hyaluronic acid (HA) component crosslinked with a crosslinking agent selected from the group consisting of 1,4-butanediol diglycidyl ether (BDDE), 1,4-bis(2,3-epoxypropoxy)butane, 1,4-bisglycidyloxybutane, 1,2-bis(2,3-epoxypropoxy)ethylene and 1-(2,3-epoxypropyl)-2,3-epoxycyclohexane, and 1,4-butanediol diglycidyl ether, wherein the HA is not crosslinked to a non-HA biopolymer, and lidocaine combined with said crosslinked HA component, wherein the lidocaine is freely released *in vivo*, and wherein the composition is sterile, were at the time of the invention, a surprising and unexpected discovery, and non-obvious under 35 U.S.C. 103(a).

Section 716.02(a)III of the MPEP states that PRESENCE OF AN UNEXPECTED PROPERTY IS EVIDENCE OF NONOBVIOUSNESS and cites *In re Papesch*, 315 F.2d 381, 137 USPQ 43 (CCPA 1963).  It is well established that *a property of a claimed compound that is unexpected by the prior art is evidence of nonobviousness*.  In the present case, the heat stable property of the claimed dermal

14

18438-59 (COR)

filler compositions, as shown in the Declaration and as supported by the data of record, is evidence that the claimed compositions comprising hyaluronic acid and lidocaine, are nonobvious.

At the time of invention, it was believed that adding lidocaine to hyaluronic acid gel compositions during manufacturing caused degradation of the hyaluronic acid, especially when the combination was subjected to autoclaving. For example, it was believed that crosslinked hyaluronic acid compositions when combined with lidocaine were not capable of withstanding high temperature sterilization without a significant reduction in viscosity (See Declaration, paragraphs 4-6). Such a reduction of viscosity would make these compositions unsuitable for soft tissue filling applications. It was not appreciated, prior to the presently claimed invention, that a dermal filler comprising a cohesive gel of crosslinked hyaluronic acid makes it possible for lidocaine to be combined with hyaluronic acid to form a gel that is sufficiently stable to be useful as a soft tissue filler. Applicant submits that this Declaration, in view of the remarks herein and further in view of the publication submitted herewith (to be discussed below), show that the presently claimed invention is not obvious in view of the prior art, and is patentable.

Applicant has carefully reviewed the specification and has made certain corrections and clarifications thereto. These amendments do not add new matter to the application and are only done to make the specification read more clearly and consistently with the Figures showing actual test results.

Specifically, the specification has been amended on pages 25 and 26 to clarify the results of experiments represented in the

15

18438-59 (COR)

Figures.   These new replacement paragraphs do not add any new matter to the application as filed, and only more clearly describe experiments performed, under the direction of the above-named inventor, and already shown in the Figures of the application as filed.   The experiments demonstrated that the claimed heat sterilized, crosslinked hyaluronic acid-based compositions with lidocaine, had a viscosity similar to the viscosity of their precursor crosslinked HA compositions before lidocaine was added, whereas other heat sterilized, crosslinked hyaluronic acid-based compositions with lidocaine, had a substantial reduction in viscosity relative to their precursor crosslinked HA compositions before lidocaine was added.

The experiments are described in the specification as filed, for example, in Example 4, entitled "Stability of Soft Tissue Fillers", beginning on page 24, and as shown in the corresponding Figures.   Samples 1, 2 and 3 are non-cohesive HA gels.   Samples 4, 5 and 6 are cohesive gels.   Cohesiveness of the gel is defined, for example, in the second paragraph on page 9 of the specification, and in Example 1 of the specification.

Through these experiments described in Example 4, it is demonstrated that cohesive precursor compositions (crosslinked HA-compositions prior to the addition of lidocaine) did not lose viscosity after the addition of lidocaine and heat sterilization.

Generally, with regard to stability in terms of viscosity (pas/sec), Samples 1, 2 and 3 all showed a substantial reduction in viscosity after lidocaine and sterilization, about 60%, 73% and 35% respectively.   More specifically, Figure 1 (Sample 1) shows a drop in viscosity from just below about 600 to about 250 after

16

18438-59 (COR)

lidocaine and heat sterilization.  Controlling pH of the precursor composition, as described in paragraph [0063], [0084] and [0104], does not result in any significant improvement.  Similar results are shown with respect to Samples 2 and 3 in Figures 2 and 3. Applicant submits that this lack of stability is what would have been expected by someone of ordinary skill in the art (see Declaration, paragraphs 4 and 5).  On the other hand, Samples 4, 5 and 6, shown in Figures 4, 5 and 7 exhibited a much lower, or even insignificant change in viscosity (about 30%, 0% and 13% respectively when lidocaine was added and the compositions heat sterilized.  Moreover, Samples 3, 4 and 5 showed a minimal viscosity change, all below 10%, when pH was adjusted.  Further, Figures 6 and 8 show more precise measurements for change in viscosity as well as elasticity of Samples 5 and 6, respectively. Figure 6 illustrates that Sample 5 prepared with lidocaine and pH control had nearly identical viscous as well as elastic properties (G″/G′) to Sample 5 prepared without lidocaine.  Figure 8 illustrates that Sample 6 was stable and had similar viscous and elastic properties (G″/G′) when prepared with lidocaine, both with and without pH control.

The enhanced stability properties of the presently claimed compositions make it possible for these compositions to be useful as commercial soft tissue fillers, as they can be heat sterilized and stored for long periods of time without any substantial change in their characteristics, such as, for example, extrusion force, viscosity, elasticity and transparency.  This is shown, for example in Table 2 which demonstrates that the claimed compositions are stable for at least 9 months from manufacture date.

17

18438-59 (COR)

Further submitted herewith, for the Examiner's consideration, in support of the non-obviousness of the presently claimed invention, is a publication entitled "The comparison of physiochemical properties of four Cross-linked sodium hyaluronate gels with different cross-linking agents" Cui, et al., November 22, 2011, ("Cui, et al."), attached as Exhibit A. Cui, et al. shows that HA gels are known to be sensitive to heat sterilization, and that even more particularly, that HA gels crosslinked with BDDE are known to be especially sensitive to heat sterilization relative to HA gels crosslinked with other, i.e. non-BDDE, crosslinkers. More specifically, the third paragraph and Figure 5 on page 1510 of Cui, et al. illustrates a drastic drop in intrinsic viscosity of a BDDE-crosslinked HA gel (identified as "BDDE-CHA") after heat sterilization, compared to HA-based gels crosslinked with other crosslinking agents (identified as "PEG20000-CHA" and "PDE-CHA"). Applicant submits that this publication provides further evidence that the discovery of a sterile HA-based composition, comprising BDDE as a crosslinker and with the addition of lidocaine, as claimed herein, is surprising, given the generally unstable nature of HA-based gels crosslinked with BDDE even without the addition of lidocaine.

Applicant files herewith a terminal disclaimer over co-pending U.S. Patent Application No. 12/393,768.

In view of the above, applicant respectfully submits that the presently claimed invention is novel and unobvious over the prior art of record, the application as a whole is in condition for allowance. Applicant respectfully requests a Notice of Allowance.

18438-59 (COR)

The Commissioner is hereby authorized to charge any fee which may be required in connection with this Amendment to Deposit Account No. 01-0885.


Dated:  June 14, 2012          Respectfully submitted,


                               /Linda Allyson Fox/
                               Linda Allyson Fox
                               Reg. No. 38,883
                               Attorney for Applicant


Please direct all inquiries and correspondence to:

Linda A. Fox, Esq.
Allergan, Inc.
2525 Dupont Drive, T2-7H
Irvine, California 92623-9534
Tel:  714.246-4758/Fax: 714.246-4249

# EXHIBIT AA

| ***Notice of Allowability*** | Application No. | Applicant(s) |
| | 12/393,884 | LEBRETON, PIERRE F. |
| | Examiner | Art Unit |
| | ALI SOROUSH | 1617 |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☒ This communication is responsive to <u>06/14/2012</u>.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☒ The allowed claim(s) is/are <u>23-32,34-36,38,40-53 and 55-67</u>.

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
      a) ☐ All   b) ☐ Some*   c) ☐ None   of the:
         1. ☐ Certified copies of the priority documents have been received.
         2. ☐ Certified copies of the priority documents have been received in Application No. _____ .
         3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the
            International Bureau (PCT Rule 17.2(a)).
      * Certified copies not received: _____.

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application. **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ A SUBSTITUTE OATH OR DECLARATION must be submitted. Note the attached EXAMINER'S AMENDMENT or NOTICE OF INFORMAL PATENT APPLICATION (PTO-152) which gives reason(s) why the oath or declaration is deficient.

6. ☐ CORRECTED DRAWINGS ( as "replacement sheets") must be submitted.
    (a) ☐ including changes required by the Notice of Draftsperson's Patent Drawing Review ( PTO-948) attached
        1) ☐ hereto or 2) ☐ to Paper No./Mail Date _____.
    (b) ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of
        Paper No./Mail Date _____.

    **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

7. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**

1. ☐ Notice of References Cited (PTO-892)
2. ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3. ☒ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date <u>See Continuation Sheet</u>
4. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material

5. ☐ Notice of Informal Patent Application
6. ☐ Interview Summary (PTO-413), Paper No./Mail Date _____ .
7. ☐ Examiner's Amendment/Comment
8. ☒ Examiner's Statement of Reasons for Allowance
9. ☐ Other _____.

/ALI SOROUSH/
Examiner, Art Unit 1617

**Continuation Sheet (PTOL-37)** **Application No.  12/393,884**

Continuation of Attachment(s) 3. Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date: 03072012, 03302012, 06142012.

Application/Control Number: 12/393,884                                    Page 2
Art Unit: 1617

## DETAILED ACTION

### *Acknowledgement of Receipt*

Applicant's response filed on 09/29/2011 to the Office Action mailed on

05/31/2011 is acknowledged.

### *Claim Status*

Claims 23-32, 34-36, 38, 40-53 and 55-67 are pending.

Claims 1-22, 33, 37, and 39 were previously cancelled and claim 54 is cancelled.

Claims 40 and 55 are currently amended.

Claims 23-32, 34-36, 38, 40-53 and 55-67 have been examined.

Claims 23-32, 34-36, 38, 40-53 and 55-67 are allowed.

### *Priority*

Priority to applications 60/085956 filed on 08/04/2008, 61/087934 filed on

08/11/2008, and 61/096278 filed on 09/11/2008 is acknowledged.

### *Information Disclosure Statement*

The information disclosure statements (IDSs) submitted on 03/07/2012,

03/30/2012, and 06/14/2012 are in compliance with the provisions of 37 CFR 1.97.

Accordingly, the information disclosure statements have been considered by the

examiner.

Application/Control Number: 12/393,884                                      Page 3
Art Unit: 1617

### *Withdrawn Claim Rejections - 35 USC § 112*

### *Response to Applicant's Arguments*

The rejection of claim 40 under 35 U.S.C. 112, second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention is withdrawn.

### *Claim Rejections - 35 USC § 103*

### *Response to Applicant's Arguments*

The rejection of claims 23-32, 35, 36, 38, and 40-50 under 35 U.S.C. 103(a) as being unpatentable over Lebreton (US Patent Application 2006/0194758 A1, Published 08/31/2006) in view of Calias et al. (US Patent 6521223 B1, Published 02/18/2003) is withdrawn in view of the unexpected results presented by Applicant.

The rejection of claims 34, 51-53 and 55-67 under 35 U.S.C. 103(a) as being unpatentable over Lebreton (US Patent Application 2006/0194758 A1, Published 08/31/2006) in view of Calias et al. (US Patent 6521223 B1, Published 02/18/2003) as applied to claims 23-32, 35, 36, 38, and 40-50 above, and further in view of Marko et al. (US Patent Application 2004/0101959 A1, Published 05/27/2004) is withdrawn in view of the claim amendments and unexpected results presented by Applicant.

Application/Control Number: 12/393,884                                    Page 4
Art Unit: 1617

### REASONS FOR ALLOWANCE

The following is an examiner's statement of reasons for allowance: Applicant argues that one of ordinary skill in the art would have expected degradation of the hyaluronic acid gel with addition of lidocaine during sterilization, as this was what was known in the prior art. Applicant unexpectedly found that a hyaluronic acid gel cross-linked, but not with a non-hyaluronic acid biopolymer, mixed with lidocaine and sterilized does not degrade.

### *Conclusion*

Claims 23-32, 34-36, 38, 40-53 and 55-67 are allowed.

Any comments considered necessary by applicant must be submitted no later than the payment of the issue fee and, to avoid processing delays, should preferably accompany the issue fee.  Such submissions should be clearly labeled "Comments on Statement of Reasons for Allowance."

Any inquiry concerning this communication or earlier communications from the examiner should be directed to ALI SOROUSH whose telephone number is (571)272-9925.  The examiner can normally be reached on M-F (9am-6pm).

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Fereydoun G. Sajjadi can be reached on (571)272-3311.  The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Application/Control Number: 12/393,884                                        Page 5
Art Unit: 1617

   Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/ALI  SOROUSH/
Examiner, Art Unit 1617

July 15, 2012