IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ALLERGAN USA, INC. and<br>ALLERGAN INDUSTRIE SAS, | ) | ██████████████ |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 19-126-CFC |
| | ) | |
| PROLLENIUM US INC. and<br>PROLLENIUM MEDICAL<br>TECHNOLOGIES INC., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' OPENING BRIEF IN SUPPORT OF
## MOTION FOR LEAVE TO AMEND ANSWER AND COUNTERCLAIM

*Of Counsel:*

John W. Harbin
Gregory J. Carlin
Warren Thomas
Robert J. Leonard
MEUNIER CARLIN & CURFMAN LLC
999 Peachtree Street NE, Suite 1300
Atlanta, GA 30309
(404) 645-7700

Dated: January 24, 2020

ASHBY & GEDDES
John G. Day (#2403)
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
jday@ashbygeddes.com
amayo@ashbygeddes.com

*Attorneys for Defendants*

# **TABLE OF CONTENTS**

I.     INTRODUCTION .........................................................................................1

II.    NATURE AND STAGE OF THE PROCEEDINGS .....................................3

III.   SUMMARY OF THE ARGUMENT ...........................................................5

IV.    SUMMARY OF ALLEGATIONS ...............................................................6

V.     LEGAL STANDARDS ...............................................................................8

       A.     Standard for Amending Pleadings ......................................................8

       B.     Inequitable Conduct ...........................................................................9

VI.    ARGUMENT.............................................................................................10

       A.     Prollenium's proposed amendment is timely and does not unfairly
              prejudice Allergan ...........................................................................10

       B.     Prollenium's proposed amendment addresses Magistrate Judge
              Fallon's R&R ...................................................................................11

              1.     POSITAs were aware of prior successful efforts developing HA
                     fillers with lidocaine ...............................................................13

              2.     Prior art documents taught that it was known that lidocaine
                     could be successfully incorporated into existing HA fillers.....14

              3.     Lebreton had actual knowledge that statements in his
                     declaration were false when they were made ...........................17

              4.     The proposed amendment sufficiently alleges intent to deceive
                     the PTO ...................................................................................20

VII.   CONCLUSION..........................................................................................23

# TABLE OF AUTHORITIES

<u>CASES</u>                                                                    Page(s)

*Bechtel v. Robinson*,
    886 F.2d 644 (3d Cir. 1989) ................................................................. 6, 10

*Cordance Corp. v. Amazon.com, Inc.*,
    255 F.R.D. 366 (D. Del. 2009) ..................................................................... 9

*Courtesy Prods., L.L.C. v. Hamilton Beach Brands, Inc.*,
    No. 13-2012-SLR-SRF, 2015 U.S. Dist. LEXIS 142257
    (D. Del. Oct. 20, 2015) ............................................................................... 21

*Dole v. Arco Chem. Co.*,
    921 F.2d 484 (3d Cir. 1990) ........................................................................ 8

*Exergen Corp. v. Wal-Mart Stores*,
    575 F.3d 1312 (Fed. Cir. 2009) ........................................................... 5, 9, 21

*Helios Software, LLC v. Awareness Techs., Inc.*,
    No. CV 11-1259-LPS, 2013 WL 6773658 (D. Del. Dec. 19, 2013) ..... 10-11

*Intellectual Ventures I LLC v. Toshiba Corp.*,
    No. CV 13-453-SLR, 2016 WL 4690384 (D. Del. Sept. 7, 2016) ............... 6

*Shane v. Fauver*,
    213 F.3d 113 (3d Cir. 2000) ............................................................... 5, 8, 9

*Standard Chlorine of Delaware, Inc. v. Sinibaldi*,
    821 F. Supp. 232 (D. Del. 1992) ............................................................... 11

*SunPower Corp. v. PanelClaw, Inc.*,
    No. 12-1633-MPT, 2016 WL 5107029 (D. Del. Sep. 19, 2016) ................ 10

*Therasense, Inc. v. Benton, Dickinson & Co.*,
    649 F.3d 1276 (Fed. Cir. 2011) (en banc) ............................................. 9, 22

*WebXchange Inc. v. Dell Inc.*,
    No. CA 08-132-JJF, 2010 WL 256547 (D. Del. Jan. 20, 2010) ................ 10

*Wyeth Holdings Corp. v. Sandoz, Inc.*,
    No. CIV.A. 09-955-LPS, 2012 WL 600715 (D. Del. Feb. 3, 2012) .. 5, 9, 21


RULE(S)                                         Page(s)

Fed. R. Civ. P. 15 ................................................................................. 5

Fed. R. Civ. P. 15(a)(2) .................................................................. 1, 8

Fed. R. Civ. P. 16(b)(4) ................................................................... 10

D. Del. LR 15.1 .................................................................................. 1

## I.   <u>INTRODUCTION</u>

Defendants Prollenium US Inc. and Prollenium Medical Technologies Inc. (collectively, "Prollenium") move for leave to amend their answer and counterclaim (D.I. 29) against Plaintiffs Allergan USA, Inc. and Allergan Industrie SAS (collectively, "Allergan") under Fed. R. Civ. P. 15(a)(2) and D. Del. LR 15.1. Prollenium's proposed Second Amended Answer and Counterclaim ("SACC") is attached as Exhibit 1 to the Motion; a redline version of the proposed amended pleading compared to the First Amended Answer and Counterclaim is attached as Exhibit 2 to the Motion.

Prollenium initially brought its inequitable conduct counterclaim and affirmative defense (referred to herein collectively as the "counterclaim") based on publicly available information that was available to it at the time. Magistrate Judge Fallon ultimately recommended that Allergan's motion to dismiss this counterclaim be granted, and in doing so identified certain areas that required additional factual support.

The proposed SACC (""proposed amendments") incorporates new facts not available to Prollenium until after it filed its First Amended Answer and Counterclaims and provides more detail about its inequitable conduct allegations to address the concerns raised by Judge Fallon. The proposed amendments provide additional factual support demonstrating that the representations made by inventor

Pierre Lebreton ("Lebreton") in his declaration to the U.S. Patent and Trademark Office ("PTO") were false, that he knew the statements were false, and that the declaration was submitted with the intent to deceive the PTO. The proposed amendments, assumed true, show it was well-known in the field—and the declarant Lebreton had personal knowledge—that crosslinked-HA dermal fillers with lidocaine had been successfully developed before August 2008, and that the prior art would have motivated a person of ordinary skill in the art to do the same, thus contradicting the statements in his declaration. The proposed amended counterclaim addresses the "who, what, when, where, and how" required to plead inequitable conduct (and as addressed in the Judge Fallon's previous R&R), as discussed below.

Finally, this is an important issue for Prollenium and for the public interest—to ensure that patent applicants abide by the duty of candor and good faith in dealing with the PTO and to ensure that we are not unnecessarily stifling competition by only incentivizing and rewarding those who have truly innovated.

For these reasons, and as described in more detail herein, the Court should grant Prollenium's motion to amend.

## II.   NATURE AND STAGE OF THE PROCEEDINGS

Prollenium filed its initial Answer and Counterclaims (D.I. 11) on May 6, 2019. Among its counterclaims, Prollenium alleged that the Asserted Patents[1] are unenforceable because they were obtained as a result of inequitable conduct. D.I. 11 ¶¶ 9-21, 58-64. Allergan moved to dismiss Prollenium's inequitable conduct counterclaim (D.I. 20). In response, Prollenium filed its First Amended Answer and Counterclaims (D.I. 29). Allergan then filed a second motion to dismiss. D.I. 35. Judge Fallon issued her Report and Recommendations ("R&R") on December 30, 2019. D.I. 55. On January 24, 2020, the Court adopted the R&R.  D.I. 61.

The R&R found that Prollenium had adequately pled the majority of the elements of its inequitable conduct counterclaim. Judge Fallon found that Prollenium had adequately plead the "who" by identifying Lebreton as the individual who made the misrepresentations and the "when" by identifying the June 14, 2012, submission of Lebreton's declaration to the PTO. *Id.* at 10. The R&R also found that Prollenium identified the relevant claims affected by the misrepresentations. *Id.* The materiality element was also found to be adequately

---

[1] "Asserted Patents" refers collectively to U.S. Patent Nos. 8,450,475 ("'475 patent"); 8,357,795 ("'795 patent"); 8,822,676 ("'676 patent"); 9,089,519 ("'519 patent"); 9,238,013 ("'013 patent"); and 9,358,322 ("'322 patent").

pled because it alleged that but for Lebreton's declaration, the PTO would not have allowed the '884 application[2] to issue. *Id*. at 13-14.

The court concluded, however, that Prollenium failed to plead with particularity how Lebreton's declaration mischaracterized the state of the art at the time and failed to identify with specificity where the prior art demonstrated that Lebreton's representations were false and/or misleading. *Id*. at 10-12. The R&R also found that Prollenium failed to adequately allege specific intent, stating that alleging that the applicant's removal of the Sadozai reference from the specification of the '884 application was not sufficient to allege specific intent, particularly where the reference was disclosed in an IDS to the PTO. *Id*. at 16-18. Finally, the court found that the counterclaim did not establish with particularity Lebreton's understanding of the art shortly prior to August 4, 2008 (*Id*. at 17-18), more specifically, that Lebreton understood that the prior art overcame the problems with viscosity and stability. *Id*. at 18. Accordingly, the R&R recommended granting Allergan's motion to dismiss Prollenium's inequitable conduct counterclaim without prejudice.

This litigation is still in its early stages. Under the Scheduling Order (D.I. 19), fact discovery closes on June 19, 2020, expert discovery closes on December 10, 2020, and trial is not scheduled until June 14, 2021. On January 6, 2020, the

---

[2] "'884 application" refers to U.S. Application No. 12/393,884.

Court granted the parties' stipulation extending the deadline to file motions to amend or supplement the pleadings until January 24, 2020. D.I. 56.

## III.   <u>SUMMARY OF THE ARGUMENT</u>

1.      Under Fed. R. Civ. P. 15 and the Third Circuit's liberal standard for amending pleadings, Prollenium's request to amend its inequitable conduct counterclaim to address the concerns raised by the Court's R&R should be granted, as the revised pleading more than sufficiently alleges an inequitable conduct counterclaim. *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000); *Exergen Corp. v. Wal-Mart Stores*, 575 F.3d 1312, 1328 (Fed. Cir. 2009); *Wyeth Holdings Corp. v. Sandoz, Inc.*, No. 1:09-cv-00955, 2012 WL 600715 (D. Del. Feb. 3, 2012).

2.      The proposed amendment sufficiently pleads that, before August 4, 2008, lidocaine had been successfully incorporated into existing HA dermal fillers and that the prior art likewise taught that such compositions had been successfully made by Allergan's competitors, directly contradicting the representations made in Lebreton's declaration.

3.      The proposed amendment also pleads facts demonstrating that Lebreton had actual knowledge that the representations in his declaration concerning the state of the art were false and were made with the intent to deceive the PTO. Similarly, it pleads facts demonstrating that Lebreton's purported

conclusions about testing in his declaration were not only unfounded, they present

further evidence of intent to deceive the PTO.

4.      The proposed amendment is timely brought, not futile, and will not

prejudice Allergan. *Bechtel v. Robinson*, 886 F.2d 644, 652 (3d Cir. 1989);

*Intellectual Ventures I LLC v. Toshiba Corp.*, No. CV 13-453-SLR, 2016 WL

4690384, at *1 (D. Del. Sept. 7, 2016).

## IV.    SUMMARY OF ALLEGATIONS

On February 26, 2009, Allergan, owner of each of the Asserted Patents (D.I.

5 ¶¶ 12-37) filed the '884 application directed towards crosslinked hyaluronic acid

("HA") compositions that included a local anesthetic such as lidocaine.[3] SACC

¶ 110. The Examiner ultimately rejected all claims of the '884 application finding

that it would have been obvious to a person of ordinary skill in the art ("POSITA")

at the time of the invention to add lidocaine to existing crosslinked-HA dermal

fillers. *Id.* ¶¶ 112-118. In response, Allergan initiated two separate interviews with

the Examiner in which Allergan suggested that it could submit a declaration stating

the unexpected results of incorporating lidocaine into a crosslinked-HA gel. *Id.*

---

[3] While many of the asserted claims are directed to BDDE-crosslinked compositions, the '795 Patent includes claims that *are not* limited to BDDE-crosslinked-HA compositions. *See, e.g.*, SACC ¶¶ 140, 190. Further, Lebreton's declaration about the POSITA's expectations were not limited to BDDE-crosslinked gel, and using BDDE rather than another known crosslinker was not a patentable difference. *Id.* ¶¶ 140, 23-35.

¶¶ 119-120. The Examiner indicated that such a declaration would likely overcome the prior art rejection. *Id.*

Multiple of Allergan's competitors had already developed crosslinked-HA compositions with lidocaine that were stable and sterile—*years before* the filing date. *E.g., id.* ¶¶ 28, 59-65, 81. Between 2005 and early 2008, Lebreton learned of multiple filler manufacturers making crosslinked-HA fillers with lidocaine and winning regulatory approval to sell them—before Allergan did—such that he knew those products were sufficiently stable to be useful as a filler. *Id.* ¶¶ 47-87. As late as August 2009, ███████████████████████████████████████████ ███████████████████████████████████. *Id.* ¶ 81. The proliferation of products thus shows that it was known and expected, long before August 2008, that lidocaine could be successfully added to HA fillers without jeopardizing their stability.

But in his June 2012 declaration, filed to overcome the Examiner's rejection of all pending claims in the application, Lebreton stated the opposite. He represented to the PTO that "shortly prior to August 4, 2008," a POSITA at the time would have believed that adding lidocaine to existing HA compositions produced undesirable results such as degradation of the HA, viscosity reduction, and instability. *Id.* ¶¶ 121-128; SACC Ex. A. Lebreton's statements cannot be a truthful assessment of the state of the art because of the "widely utilized" and

████████████████████████████████████████████████, *see id.* ¶¶ 77-81,

was not only objectively known by a POSITA, but also personally, actually known

by the declarant Lebreton. *See id.* ¶¶ 77-81, 130, 182-183.

The Examiner withdrew his rejection, specifically finding that Lebreton's

representations in his declaration were the reason for allowing the claims. *Id.*

¶¶ 140-141-. The '884 application issued as the '795 patent. The Examiner also

allowed the other Asserted Patents expressly based on the "unexpected results"

representations made by Lebreton in his declaration; every notice of allowance

cited Lebreton's proffered unexpected results evidence. *Id.* ¶¶ 186-193.

## V.   <u>LEGAL STANDARDS</u>

### A.   **Standard for Amending Pleadings**

A party may amend its pleading "only with the opposing party's written

consent or the court's leave," and "leave shall be freely given when justice so

requires." Fed. R. Civ. P. 15(a)(2); *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir.

2000). The Third Circuit's liberal policy favoring amendments ensures claims are

decided on their merits rather than on technicalities. *Dole v. Arco Chem. Co.*, 921

F.2d 484, 487 (3d Cir. 1990). Thus, amendment should ordinarily be permitted

unless the other party shows equitable considerations such as undue delay, bad

faith, undue prejudice, or futility of the amendment by the moving party. *Id.*;

*Shane*, 213 F.3d at 115. "Futility" means that the amended pleading would fail to state a claim upon which relief could be granted. *Shane*, 213 F.3d at 115.

### B.    Inequitable Conduct

Inequitable conduct occurs when a patent applicant misrepresents material information during the prosecution of a patent with the specific intent to deceive the PTO. *Therasense, Inc. v. Benton, Dickinson & Co.*, 649 F.3d 1276, 1287 (Fed. Cir. 2011) (en banc). To plead inequitable conduct with "particularity" under Rule 9(b), "the pleading must identify the specific who, what, when, where, and how of the material misrepresentation … committed before the PTO." *Exergen*, 575 F.3d at 1328. Specific intent may be alleged generally, but the pleading must "allege sufficient underlying facts from which a court may reasonably infer that a party acted with the requisite state of mind." *Id*. at 1327. Thus, to properly plead the specific intent prong of an inequitable conduct counterclaim, "the claimant need only allege facts from which the Court could *reasonably infer* that the patent applicant made a deliberate decision to deceive the PTO." *Wyeth*, 2012 WL 600715, at *7. A party is not required to plead issues which may have been concealed by an adverse party. *Cordance Corp. v. Amazon.com, Inc.*, 255 F.R.D. 366, 372 (D. Del. 2009).

## VI.   **ARGUMENT**

### A.   **Prollenium's proposed amendment is timely and does not unfairly prejudice Allergan**

As an initial matter, this motion to amend is timely because it is being filed within the time permitted by the Scheduling Order (as amended) (D.I. 19; D.I. 56).[4]

There is no undue delay or undue prejudice to Allergan. The inequitable conduct claim at issue has been asserted since the initial Answer, and Prollenium moves to amend, adding additional details, within four weeks of receiving the R&R identifying the elements it recommended were insufficiently pled. D.I. 55. Allergan has ample opportunity to present facts or evidence to oppose the claim because discovery is ongoing and not scheduled to close until June 2020, with trial not set till next year. *See Bechtel v. Robinson*, 886 F.2d 644, 652 (3d Cir. 1989); *cf. WebXchange*, 2010 WL 256547, at *4 (granting motion to amend where case was in early stages and amendments pertained to previously raised theories); *Helios Software, LLC v. Awareness Techs., Inc.*, No. CV 11-1259-LPS, 2013 WL

---

[4] "Good cause" under Fed. R. Civ. P. 16(b)(4) is not required because this motion is being filed in accordance with the Scheduling Order. *SunPower Corp. v. PanelClaw, Inc.*, No. 12-1633-MPT, 2016 WL 5107029, at *5-6 (D. Del. Sep. 19, 2016).

6773658, at *2 (D. Del. Dec. 19, 2013) (finding no prejudice where trial was several months away).[5]

The critical question then is whether the proposed amendment addresses the Court's concerns raised in the R&R, and whether it adequately states a claim for inequitable conduct. It does both. Indeed, the proposed amendment provides additional details and incorporates newly obtained information from Allergan that confirms Prollenium's previous (less detailed) allegations.

## B. Prollenium's proposed amendment addresses Magistrate Judge Fallon's R&R

Prollenium's inequitable conduct counterclaim is premised on the submission of a declaration to the PTO by Allergan that contains multiple, material misrepresentation by Lebreton about the state of the prior art. This declaration was ultimately the reason the Examiner allowed the '884 application and the five other applications that would follow. *E.g.*, SACC ¶¶ 185-193.

Lebreton's declaration contains a series of statements regarding the state of the prior art "shortly prior to August 4, 2008." SACC ¶¶ 38, SACC Ex. A. According to Lebreton, a POSITA at that time believed that it was surprising to successfully incorporate lidocaine into existing crosslinked-HA dermal filler

---

[5] In any case, it is Allergan's burden to show leave should *not* be granted. See *Standard Chlorine of Delaware, Inc. v. Sinibaldi*, 821 F. Supp. 232, 259 (D. Del. 1992).

products because (1) doing so would degrade the HA prior to injection, (2) it would degrade the HA composition during high temperature sterilization, (3) it was not known whether such compositions were stable after high temperature sterilization when stored for any significant length of time, (4) such instability would have caused unsuitable viscosity reductions, and (5) a POSITA would have expected that a HA filler with lidocaine would not have remained sufficiently stable. *Id.* ¶¶ 121-128; Ex. A. Lebreton's declaration concludes that a POSITA would have expected that HA dermal fillers with lidocaine were not sufficiently stable to be used as a dermal filler and that the applications' described compositions were, in fact, heat and shelf stable was a "surprising and unexpected discovery, not appreciated prior to the present invention." *Id.*

These statements are demonstrably false because crosslinked-HA dermal filler products with lidocaine were developed by Allergan's competitors long before August 2008, as shown in prior art documents, internal Allergan documents showing that Lebreton knew about these prior products, and internal Allergan documents dating back to at least 2005 concluding ███████████ ████ rather than *surprising*. SACC ¶¶ 47-48; *see generally id.* ¶¶ 42-107. Thus, a POSITA, including Lebreton, would have been motivated to incorporate lidocaine into existing HA dermal fillers and would not be surprised by the results. *Id.*; *see also id.* ¶¶ 25-35.

### 1. POSITAs were aware of prior successful efforts developing HA fillers with lidocaine

The proposed amendment alleges that by August 2008, at least three competitors of Allergan had already successfully incorporated lidocaine in their crosslinked-HA fillers.[6] For example, by December 2006, Anika Therapeutics, Inc. had developed and received approval to sell its Elevess product from the U.S. Food and Drug Administration ("FDA"). *Id.* ¶¶ 28-31. Similarly, by February 2008, Genzyme BioSurgery had developed and received FDA approval for its Prevelle Silk product. *Id.* Both products are crosslinked-HA fillers containing lidocaine. *Id.*; *see also id.* ¶¶ 77-80, Ex. Q (at AGN-RVP-0460480). Regulatory approval is significant here because an applicant must thoroughly test the product to show FDA that it is safe and effective and thus suitable for use as a dermal filler. *Id.* ¶¶ 10-12, 29. Any issues regarding stability, degradation, or viscosity reductions following high temperature sterilization, making the composition "unsuitable for soft tissue filing applications," would have prevented approval by FDA. *Id.* ¶¶ 30-31. Even earlier, Mentor developed a crosslinked-HA dermal filler containing lidocaine called Puragen Plus, which underwent clinical trials in the U.S. in 2006 and was made available in Europe and Canada even earlier. *Id.* ¶¶ 28, 57-59, 86-89.

---

[6] At least one other was far along in its development by that time.

The successful development, testing, and in certain instances approval by FDA of these products directly contradicts Lebreton's statements that it was "not appreciated" that such a combination was feasible based on the expectation (or lack thereof) that adding lidocaine would cause degradation, instability, or viscosity reductions after high temperature sterilization. Not only was it appreciated, it had already been accomplished—multiple times.

A POSITA working in the field of dermal fillers would have been aware of these products and thus aware of the successful incorporation of lidocaine into crosslinked-HA dermal fillers products. *E.g.*, *Id.* ¶¶ 14, 28-33. In other words, though Lebreton's declaration purports to identify the state of the art related to dermal fillers "shortly prior to August 4, 2008," a POSITA would have believed differently based on its knowledge of the market for HA fillers with lidocaine. *See, e.g.*, *id.* ¶¶ 122-128.

> ### 2. Prior art documents taught that it was known that lidocaine could be successfully incorporated into existing HA fillers

Prollenium's proposed amendment provides further details about prior art documents that provide examples incorporating lidocaine into crosslinked-HA dermal fillers. *See, e.g.*, *id.* ¶¶ 65-85. These documents (where are also presumed to be known to a POSITA) directly contradict Lebreton's statements that a POSITA would believe such compositions were not stable, would degrade, and would exhibit unsuitable viscosity reductions.

For example, the December 2006 Summary of Safety and Effectiveness for the Eleviss describes a lidocaine-containing, crosslinked-HA filler was shelf stable for at least 15 months, as measured by, *inter alia*, extrusion force, viscosity, and HA concentration. *Id.* ¶¶ 83-85, Ex. R. A December 2006 article by Kinney discusses observations from a clinical study comparing two crosslinked-HA dermal fillers, Restylane (no lidocaine) and Puragen Plus (with lidocaine). *Id.* ¶¶ 86-89, Ex. S. The author observed that Puragen Plus was stable enough to last for 9-12 months for most individuals, and that the lidocaine in Puragen Plus minimized pain for patients. *Id.*, Ex. S at 747. A POSITA would have thus understood Kinney to disclose a sterilized, stable crosslinked-HA filler with lidocaine. *Id.* Another relevant prior art document includes a publication of two poster abstracts of a presentation that taught that the use of lidocaine in HA dermal fillers produced a "stable combination" of crosslinked-HA and lidocaine in a filler. *Id.* ¶¶ 90-97. Finally, U.S. Patent No. 5,731,298 to Reinmuller, issued on March 24, 1998, teaches a crosslinked-HA product with lidocaine that is heat sterilized and stored. *Id.* ¶¶ 106-107.

The proposed amendment also provides additional information about the 2005 patent publication to Sadozai. Sadozai teaches an example of the successful incorporation of lidocaine with a crosslinked-HA dermal filler that is autoclaved sterilized. *Id.* ¶ 98-103. Sadozai teaches that the incorporation of an anesthetic,

such as lidocaine, into a dermal filler ***increases*** the stability of the composition relative to an equivalent dermal filler without the anesthetic. *Id*. Sadozai thus teaches a stable composition with lidocaine that does not exhibit degradation after autoclave sterilization.[7]

Each of these documents—and even more when considered collectively—teaches that (long) before August 2008 it was known to POSITAs that it was practical to incorporate lidocaine into existing HA dermal fillers, and that POSITAs would have expected a crosslinked-HA filler with lidocaine would be sufficiently stable and suitable for use as dermal fillers. These documents would have been understood to teach stable compositions that are advantageous over non-lidocaine fillers, *e.g.*, SACC ¶¶ 85, 96-97, and thus contradict Lebreton's statements regarding instability, degradation, and viscosity reduction. A composition that is determined to be stable for a period of time, and remain suitable for use as a dermal filler, would not demonstrate significant degradation or viscosity reduction. Reinmuller and Sadozai, for instance, expressly teach stable crosslinked-HA products with lidocaine that are heat sterilized and stored. *Id.*

---

[7] The Court previously concluded Prollenium had not sufficiently alleged the falsity based on what was pled about Sadozai and that Sadozai's removal from the application was insufficient to infer an intent to deceive. D.I. 55 at 11-13, 18. In the proposed amendment here, the gravamen of Prollenium's allegations of falsity and intent to deceive is not Sadozai. Instead, they are but is, instead, based on a *plethora* of known information that contradict Lebreton's declaration.

¶¶ 99-103, 106-107. These documents demonstrate that Lebreton's statements that such success was "surprising," "unexpected," and "not appreciated" were not accurate.

### 3. Lebreton had actual knowledge that statements in his declaration were false when they were made

Lebreton identified himself as an expert in polymer chemistry for medical aesthetics who was familiar with the state of the art related to crosslinked-HA dermal fillers at that time. SACC ¶¶ 37-38. Thus, as a POSITA, Lebreton would have been aware of these existing prior art products and documents and so would have been aware that the statements in his declaration that his discovery of a stable product was "surprising," "unexpected," and "not appreciated" were false. *Id.* ¶¶ 39-43, 122-128.

But the proposed amendment goes farther and alleges (based on internal Allergan documents) that Lebreton had *actual, personal* knowledge that Allergan's competitors' products had successfully incorporated lidocaine into sterile, stable crosslinked-HA fillers before August 2008. *Id.* ¶¶ 44-81. The Allergan documents show Lebreton was well aware of the successful development of Puragen Plus, Elevess, and Prevelle Silk years before submitting his declaration. *Id.*

For example, in a September 2005 email, Lebreton was sent a document that described Puragen Plus as the "first HA-based product … to incorporate an anaesthetic [sic]." *Id.* ¶¶ 52-53; Ex. C. According to Allergan's document, the

███████████████████████████████████████████████████████,

so Allergan could "counter the upcoming launch" of Puragen Plus and remain

competitive. *Id.* ¶¶ 53-55.

Lebreton also knew about Anika's lidocaine product(s) by early 2006.

Lebreton █████████████████████████████████████████

███████ Anika had received approval to market its product in Europe, and

Lebreton ████████████████████ on ███████, 2006 ███████████

██████████████████████████. *Id.* ¶¶ 62-63; SACC Ex. J.

Later, in ███ 2008, █████████████████ emailed Lebreton ███

████████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████. *Id.* ¶¶ 64,

SACC Ex. K.[8]

Lebreton also knew in ████ 2008 that Prevelle Silk had been approved by

FDA so that Allergan's Juvéderm would certainly not be the first HA filler with

lidocaine for sale in the U.S. *Id.* ¶¶ 68-78, Ex. N.

Later in ██████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

---

[8] ███████████████████████████████████ SACC ¶ 64.

████████████████████████████████████ *Id.* ¶¶ 77-79 (emphasis added). ████████████████████████████████████████ ████████████████████. *Id.* ¶¶ 80-81; SACC Ex. Q, at at 15.

Despite all this knowledge of prior art products, Lebreton's 2012 declaration, submitted to overcome the Examiner's rejections, claims that POSITAs in August 2008 believed there were problems with degradation when lidocaine was added to HA gels, and he professed the POSITA's ignorance as to whether the (previously acknowledged) HA compositions with lidocaine were stable or not after sterilization. SACC ¶¶ 122-128, Ex. A. Lebreton then claimed to the Examiner that it was "surprising," "unexpected," and "not appreciated" that his application's compositions would exhibit the stability that *products predating his application had already achieved. See Id.*; *id.* ¶¶ 47-107.

Aside from this knowledge, Lebreton's laboratory testing showed in early 2005 (not "shortly" before August 2008) that incorporating lidocaine into existing HA dermal fillers was feasible. *Id.* ¶¶ 44-48. In 2005, Lebreton's team concluded, based on its testing, that incorporating ████ lidocaine into Allergan's existing crosslinked-HA dermal fillers was feasible (████████) because ████████ ████████████████████████████████████



██████ . *Id.* ¶ 46.

Another ██████ 2005 study by Lebreton's team similarly concluded that the lidocaine-containing composition showed no degradation, was stable, ██████ ██████, after high-temperature sterilization. *Id.* ¶ 47-48, 122.

These studies contradict the representations made in Lebreton's declaration because they show Lebreton (and his team) had verified *years before* the application filing what the prior art products indicated: that there were no stability issues resulting from the addition of lidocaine that would cause a viscosity reductions that would prevent use of the gel as a filler. Contrary to Lebreton's representations, these tests demonstrated that such compositions were *suitable* for use as dermal fillers. Thus, Lebreton's representations was about what was believed "shortly prior to August 4, 2008," are demonstrably false, and he knew they were false.

### 4. The proposed amendment sufficiently alleges intent to deceive the PTO

As alleged (and shown above), Lebreton knew that the *collective* prior art clearly taught that lidocaine could be successfully incorporated into existing HA dermal fillers. Despite this knowledge, Lebreton intentionally misrepresented the state of the art to the examiner to get the applications allowed. Intent may be

alleged generally, and Prollenium only needs to allege facts sufficient underlying facts to allow the Court to reasonably infer deceptive intent. *Exergen*, 575 F.3d at 1327; *Wyeth*, 2012 WL 600715, at *7.

Here, the proposed amendment goes above and beyond alleging intent generally by providing detailed factual support not only of what a POSITA would have known, but also that Lebreton actually knew at the time that his statements were false. *E.g.*, SACC ¶¶ 28-43, 48-81. Lebreton had actual knowledge that three different crosslinked-HA dermal fillers with lidocaine had been successfully developed, two of which had received FDA approval. *Id*. Lebreton's team's testing likewise showed lidocaine could be incorporated into Allergan's existing dermal filler products to produce stable compositions that showed no degradation and could be heat sterilized. *Id*. ¶¶ 44-48, 52-55. One of these studies concluded—three years before the earliest patent filing date—that it was not only feasible ▌ ▌ to incorporate lidocaine into the products based on crosslinked-HA. *Id*. ¶¶ 47-48. Based on the information showing Lebreton's actual knowledge of the prior art, it is clear not only that the statements in his declaration were false, but that he knew they were false when they were made. *Courtesy Prods., L.L.C. v. Hamilton Beach Brands, Inc.*, No. 13-2012-SLR-SRF, 2015 U.S. Dist. LEXIS 142257, at * 21 (D. Del. Oct. 20, 2015) (finding knowledge of falsity of statements sufficient to satisfy the specific intent requirement at the pleading stage), *adopted*

*by* 2016 U.S. Dist. LEXIS 10788 (D. Del. Jan. 28, 2016). At minimum, it is reasonable to infer Lebreton did not believe the statements in his declaration were accurate, nor would a POSITA have reached these conclusions at that time. Moreover, it is reasonable to infer that in submitting his declaration containing these material misrepresentations, Lebreton specifically intended to deceive the PTO. While not required at the pleading stage, this is likely the "single most reasonable inference that can be drawn from the evidence." *Therasense*, 649 F.3d at 1290.

In prior briefing, Allergan argued that Lebreton believed, based on experiments he conducted, that his statements were true, and that Prollenium failed to consider the facts and inferences that could be drawn from them. D.I. 42, at 7-8. The proposed amendment rebuts that argument and alleges that Lebreton's statements about the experiments are the misleading at best and actually provide additional evidence of his intent to deceive. SACC ¶¶ 133-135. According to Lebreton, these experiments showed that "certain HA gels" degraded and became substantially less viscous after high temperature sterilization when mixed with lidocaine. *Id*. ¶¶ 132, SACC Ex. A ¶¶ 11-13. The reported viscosities for these samples, however, were within what is considered an acceptable range for dermal fillers. SACC ¶ 134. For example, two samples demonstrated that when pH control is employed with the addition of lidocaine—something a POSITA would have

known is critical—the viscosity of sample 2 remained within acceptable ranges, while the viscosity of sample 3 actually *increased* relative to the non-lidocaine sample. *Id*.

As the amendment alleges, these results actually *contradict* Lebreton's representations that lidocaine-containing HA compositions were not sufficiently stable and demonstrated viscosity reductions after high temperature sterilization. Further, the amendment alleges that the results of sample 1 are completely irrelevant, as this sample was an *uncrosslinked-HA* mixture, which is known to be less stable than crosslinked-HA—with or without lidocaine—and there is no evidence that sample 1 has ever been used as a dermal filler. *Id.* Thus, these experiments provide no support for Lebreton's misrepresentations, and actually provide additional support for an inference of Lebreton's intent to deceive.

## VII.   <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant Prollenium leave to amend its answer and counterclaims.

ASHBY & GEDDES

*/s/ Andrew C. Mayo*

_____

John G. Day (#2403)
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
jday@ashbygeddes.com
amayo@ashbygeddes.com

*Attorneys for Defendants*

*Of Counsel:*

John W. Harbin
Gregory J. Carlin
Warren Thomas
Robert J. Leonard
MEUNIER CARLIN & CURFMAN LLC
999 Peachtree Street NE, Suite 1300
Atlanta, GA 30309
(404) 645-7700

Dated: January 24, 2020

## <u>CERTIFICATION OF COMPLIANCE</u>

The undersigned hereby certifies that the foregoing brief contains 4,968 words, excluding the cover page, tables, and signature blocks, and that it complies with the Court's type, font, and word limitations.

*/s/ Andrew C. Mayo*

Andrew C. Mayo